**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| AMANDA BENSON, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **NOTICE OF REMOVAL** |
| | ) | **OF CIVIL ACTION AND** |
| THE CITY OF LINCOLN, a political | ) | **REQUEST FOR PLACE OF TRIAL** |
| subdivision, CHRIS BEUTLER, TOM | ) | |
| CASADY, DOUG MCDANIEL, TIM | ) | |
| LINKE, LEO BENES, ERIC JONES, | ) | |
| DARREN MERRYMAN, and SHAWN | ) | |
| MAHLER, | ) | |
| | ) | |
| Defendants. | ) | |

Defendants City of Lincoln, Chris Beutler, Tom Casady, Doug McDaniel, Tim Linke, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, hereby file this Notice of Removal of Case No. CI 18-2288 pending in the District Court of Lancaster County, Nebraska, to this Court.  In support of removal, Defendants state as follows:

<u>REMOVAL</u>

1.      This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b).  The Complaint was filed in the District Court of Lancaster County, Nebraska on July 6, 2018, which consisted only of state law claims.  An Amended Complaint was filed on August 28, 2018, which added federal law claims.  To date, Defendants have not been served with the Complaint or Amended Complaint but have received a copy of the Amended Complaint via email and communicated with opposing counsel that they intend to file Waivers of Service with this Court after filing of this removal.

2.      Copies of the Complaint and Amended Complaint are attached as Exhibits A and B.

3.      This Court has original jurisdiction over this action under 28 U.S.C. § 1331 as Plaintiff alleges Defendants violated rights guaranteed to Plaintiff under the United States Constitution and 42 U.S.C. § 1983.  Plaintiff's state law claims fall within this Court's supplemental jurisdiction.

1

4.      By removing this action to this Court, Defendants do not waive any defenses and expressly reserve the right to assert all such defenses in their responsive pleadings.

5.      A true and correct copy of this Notice will be filed with the Clerk of the District Court of Lancaster County, Nebraska.

6.      For the foregoing reasons, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and this action is properly removed pursuant to 28 U.S.C. § 1446.

<u>REQUEST FOR PLACE OF TRIAL</u>

7.      Defendants request trial in Lincoln, Nebraska.

WHEREFORE, Defendants prays that this Notice of Removal be filed; that this action, Case No. CI 18-2288 pending in the District Court of Lancaster County, Nebraska, be removed to and proceed in this Court; and that no further proceedings be had in this case in the District Court of Lancaster County, Nebraska, and for such other and further relief as the Court deems just.

Dated this 7th day of September, 2018.

CITY OF LINCOLN, CHRIS BEUTLER,
TOM CASADY, DOUG MCDANIEL,
TIM LINKE, LEO BENES, ERIC JONES,
DARREN MERRYMAN, and SHAWN MAHLER,
Defendants

JEFFERY R. KIRKPATRICK, City Attorney
JOCELYN W. GOLDEN, Assistant City Attorney
ABIGAIL F. LITTRELL, Assistant City Attorney

By: */s/ Jocelyn W. Golden*
Jocelyn W. Golden, #23039
Abigail F. Littrell, #24423
555 South 10th Street, Suite 300
Lincoln, NE 68508
(402) 441-7281
jgolden@lincoln.ne.gov
alittrell@lincoln.ne.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 7, 2018, I electronically filed the foregoing Notice of Removal with the Clerk of the Court using the CM/ECF system.  I further certify that I mailed a true and accurate copy of the foregoing Notice of Removal via email and regular United States mail, postage prepaid, to:

Kelly K. Brandon
Stephanie J. Costello
Fiedler & Timmer, P.L.L.C.
20615 Highway 370
Gretna, NE 68028
kelly@employmentlawnebraska.com
stephanie@employmentlawnebraska.com

By: */s/ Jocelyn W. Golden*
Jocelyn W. Golden, #23039

Filed in Lancaster District Court
*** EFILED ***
Case Number: D02CI180002288
Transaction ID: 0007113514
Filing Date: 07/06/2018 04:19:02 PM CDT

## IN THE DISTRICT COURT OF LANCASTER COUNTY, NEBRASKA

| | |
|---|---|
| AMANDA BENSON, ) | Case No. |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **COMPLAINT AND JURY TRIAL** |
| ) | **DEMAND** |
| THE CITY OF LINCOLN, a political ) | |
| subdivision, CHRIS BEUTLER, TOM ) | |
| CASADY, DOUG MCDANIEL, TIM ) | |
| LINKE, LEO BENES, ERIC JONES, ) | |
| DARREN MERRYMAN, and SHAWN ) | |
| MAHLER, ) | |

Defendants.

COMES NOW the Plaintiff, AMANDA BENSON, by and through undersigned counsel, and hereby files this Complaint against THE CITY OF LINCOLN, a political subdivision, CHRIS BEUTLER, TOM CASADY, DOUG MCDANIEL, TIM LINKE, LEO BENES, ERIC JONES, DARREN MERRYMAN, and SHAWN MAHLER, and states and alleges as follows:

## I.   NATURE OF THE ACTION

This is an action under the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §48-1101, *et seq.* and Article I, Section 3 of the Constitution of the State of Nebraska, alleging violations of Plaintiff Amanda Benson's civil rights.

Amanda Benson was subjected to a hostile work environment based upon her sex where representatives of the City of Lincoln (hereinafter "The City") discriminated against

**EXHIBIT**

**A**

Amanda regarding the terms and conditions of her employment based on her sex, as she is female, and retaliated against Amanda for her complaints.

## II.     JURISDICTION AND VENUE

1.     This Court has original jurisdiction over these claims pursuant to Neb. Rev. Stat. § 24-302.

2.     Venue is appropriate in this court pursuant to Neb. Rev. Stat. §25-403.1 as a substantial part of the events or omissions giving rise to this claim occurred in Lincoln, Lancaster County, Nebraska.

## III.     PARTIES

3.     Plaintiff Amanda Benson (hereinafter "Amanda") is a female and at all relevant times alleged herein was a resident of Lincoln, Lancaster County, Nebraska, and is an employee of Defendant the City of Lincoln as a Firefighter/EMT in the City's Lincoln Fire and Rescue Department (hereinafter "LFR").

4.     At all relevant times, Defendant has employed at least fifteen (15) employees.

5.     Defendant the City is a political subdivision located in Lancaster County, Nebraska.

6.     Defendant Chris Beutler is a resident of Lancaster County, Nebraska.

7.     Defendant Tom Casady is a resident of Lancaster County, Nebraska.

8.     Defendant Tim Linke is a resident of Lancaster County, Nebraska.

9.     Defendant Doug McDaniel is a resident of Lancaster County, Nebraska.

2

10.     Defendant Leo Benes is a resident of Lancaster County, Nebraska.

11.     Defendant Eric Jones is a resident of Lancaster County, Nebraska.

12.     Defendant Darren Merryman is a resident of Lancaster County, Nebraska.

13.     Defendant Shawn Mahler is a resident of Lancaster County, Nebraska.

## IV.     ADMINISTRATIVE PROCESS

14.     On August 15, 2016, Amanda filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission ("NEOC"), charge number NEB 1-16/17-B-48196-RS/EEOC 32E-2016-00768, alleging unlawful employment practices occurring within three hundred days or less from the date of filing the charge, and alleging that the unlawful employment practices were continuing.

15.     On or about April 11, 2018, within 90 days of the filing of this action, Amanda received a determination from the Nebraska Equal Opportunity Commission.

## V.     FACTUAL BACKGROUND

16.     On or about July 1, 2013, Amanda, a female, began her employment with the City in LFR as a Firefighter/EMT.

17.     On or about October 10, 2014, Shawn Mahler (hereinafter "Mahler"), a Captain for LFR, learned Amanda would be replacing Nic Cunningham (hereinafter "Cunningham"), a male Firefighter, at Station 8.  Mahler and Brian Giles (hereinafter "Giles") were the Station Captains at Station 8.

18.     It is customary within LFR for the Station Captain to greet a newly-assigned person to their station.  Traditionally within LFR, the Station Captain would go through the house rules, expectations, and procedures with the newly assigned person.  This customary process also allowed the station captain and the new member of his or her station to build rapport.

3

19.     Upon learning that Amanda would be assigned to Station 8 on or about October 12, 2014, Mahler became visibly upset and had a verbal confrontation with Cunningham, and Giles. Cheyenne Jeffers (hereinafter "Jeffers") was a civilian that was at Station 8 for a ride-along and witnessed the confrontation.

20.     Jeffers informed Amanda about the interaction between Giles, Cunningham, and Mahler. She told Amanda she felt it was necessary to tell her about it because she felt Mahler was aggressive and inappropriate.

21.     On or about October 15, 2014, Amanda began her assignment at Station 8. When Amanda arrived at Station 8, Mahler refused to speak to Amanda and did not go through the house rules, expectations, or procedures.    Mahler did not attempt to build any sort of rapport with Amanda.

22.     During Amanda's time at Station 8, she was primarily an Engine Firefighter. It was part of the standard rotation at Station 8 for Engine Firefighters to rotate to the truck.  Mahler did not allow Amanda to rotate onto the truck.  By not allowing Amanda to rotate to the truck, Mahler denied Amanda important training that she could have obtained through that rotation.

23.     At Station 8 the engine generally went on more calls than the truck. Therefore, Firefighters assigned to the truck had more training and more downtime. Amanda had less downtime than the other Firefighters at Station 8 because she was consistently assigned to the engine and missed out on crucial training that would allow her to perform her job duties more effectively and assist her in her career trajectory.

24.     Sometime between October 15 and November 4, 2014, Jeanne Pashalek (hereinafter "Pashalek"), a Battalion Chief for the City and the human resources director

4

for LFR, contacted Amanda to see how things were going. Amanda mentioned that Mahler had indicated to Jeffers that he was not happy she was assigned there, but that Amanda enjoyed everyone else.

25.     In November 2014, Pashalek filed a formal complaint against Mahler because of the incident on or about October 12, 2014.

26.     On November 5, 2014, Eric Jones (hereinafter "Jones"), a Battalion Chief for LFR and the Battalion Chief in charge of Station 8, went to Station 8 to get a statement regarding the incident between Cunningham, Mahler, and Giles.

27.     Amanda was reminded by several coworkers that an investigation could go very badly for her if LFR did not handle it correctly. Jeffers was also moving through the hiring process at LFR, and Amanda thought she could be impacted if the complaint was not handled correctly.

28.     Amanda contacted John Huff (hereinafter "Huff"), the Fire Chief of LFR, and asked him to stop the investigation into Pashalek's complaint.  Amanda feared that based on Mahler's conduct to-date, the situation might get worse if she pursued the complaint. Amanda also wanted the opportunity to allow herself and Mahler to work out any issues Mahler had with her between the two of them.

29.     On or about December 19, 2014, because Mahler still was not speaking to Amanda, Amanda asked Mahler about training and for advice about joining the Urban Search and Rescue Team (hereinafter "USAR").  Amanda also inquired why she was not included in the truck rotation like the male firefighters.  Mahler told Amanda she should stick with medical specialties because typically women are less mechanically-minded than men.

5

30.     Mahler told Amanda he would observe her for 18 months to three years, and then he would decide after that time if she was qualified and competent enough to be on his truck.  It is not LFR's policy for a Station Captain to observe a Firefighter for 18 months to three years to decide if he or she is qualified or competent for a particular rotation.

31.     Similarly-situated male Firefighters/EMTs for LFR did not have to be observed by Mahler for 18 months to three years before Mahler allowed them to rotate onto the truck for overtime or to fill a vacancy.

32.     Amanda told Mahler she had a desire to become proficient on all apparatuses in the fire station.  She asked Mahler if he would work with her on rope rescue and rigging to meet his standard.  Mahler told Amanda it was not his job to train her.

33.     Giles witnessed Mahler's schedule manipulation and discrimination of Amanda throughout her time at Station 8.  Amanda also complained to Giles throughout her time at Station 8 about Mahler's disparate treatment of her in comparison to all the other male Firefighters.  Giles complained to Jones that Mahler was treating Amanda unfairly and discriminating against her because she was female by manipulating the schedule, so he would not have to ride with Amanda. Giles felt the environment at Station 8 had turned hostile and he believed Jones needed to do something to address it.

34.     Jones repeatedly told Giles he was going to rectify the situation. Jones told Giles he addressed Mahler regarding the discriminatory treatments, but then he eventually took Mahler out for a beer and apologized to Mahler because Mahler had refused to speak to him for a month following Jones' oral counseling.

6

35.    On August 8, 2015, Amanda purchased a "fall protection" belt from Jason Relford (hereinafter "Relford"), a Firefighter for LFR. Amanda told Mahler that she had purchased the belt because he would not let Amanda do roof ventilation operations without a fall protection belt. Mahler told Amanda that she had still not proven to him that she was trained to his standards and that Amanda would not be doing any ventilation operations if there was a working incident.

36.    Jesse Johnson (hereinafter "Johnson"), a male Firefighter at Station 8, was scheduled on August 17, 2015 to drive the Medic 8 Unit. Upon information and belief, sometime before August 17, 2015, Mahler manipulated the schedule to switch Amanda from the engine unit to the medic unit at 7:00 p.m. during her twenty-four hour shift. During the first part of her shift, Amanda was assigned to the engine unit. While she was on the Engine Unit at approximately 6:15 p.m., the Engine Unit including Amanda was dispatched to an emergency situation.

37.    While she was still at the emergency situation, Amanda told Giles that she had to switch to the medic unit at 7:00 p.m. Giles contacted Mahler to again confront him about manipulating the schedule to Amanda's detriment.

38.    The scene Amanda was working was cleared at approximately 8:00 p.m. The unit was taken out of service and called downtown. The Station 8 personnel waited downstairs  in Station 8 while Mahler, Giles, and Jones had a meeting to discuss the situation with Mahler manipulating the schedule and treating Amanda differently.

39.    Upon information and belief, Giles again reported to Jones during the meeting that Mahler was discriminating against Amanda and denying her training by manipulating the schedule.  Giles also reported to Jones how affected Amanda was by

7

the continued discrimination and that Amanda had begun going to the Employee Assistance Program ("EAP") for counseling.

40.     On or about December 21, 2015, Amanda was on kitchen duty.  Station 8's house rules dictate that it is the responsibility of the person on kitchen duty to sweep the area, clean the prep utensils, and run the dishwasher with the dishes used during the station meal.  Amanda had already completed these tasks and started the dishwasher. Amanda and Giles were in the kitchen, and neither of them had participated in the house meal. According to the house policy, because they did not participate in the house meal, they did not have to clean up.

41.     Even though Amanda and Giles were in no way required to clean up the meal they did not participate in, Giles and Amanda elected to collect all the dishes and put them in the sink to start the clean-up from the meal, so the Firefighters who had prepared the meal could take a break.

42.     After Amanda and Giles had cleaned up from the meal, Mahler came into the kitchen while the dishwasher was still running, and additional dishes were sitting in the sink, stacked, waiting for the next load. Mahler loudly stated, "Whoever the kitchen man is, needs to do his job."  Mahler knew that Amanda was assigned to kitchen duty at that time.

43.     Even after Giles and Amanda explained what happened, Mahler insisted Amanda handwash the remaining dishes.  The other male Firefighters in the kitchen at the time, sat at the table and watched as Amanda handwashed the dishes.

8

44.     Amanda and Giles both contacted the LFR administration to complain about the continued harassment and the kitchen incident. LFR initiated an investigation into the incident.

45.     On December 30, 2015, Mahler was transferred to Station 5 due to the pending investigation.

46.     On January 7, 2016, Tim Linke (hereinafter "Linke"), the Interim Fire Chief contacted Amanda at Station 8 and requested Amanda go downtown to meet with him. Amanda complained to Linke about the disparate treatment she was receiving in comparison to the male Firefighters at the station concerning the rotation schedule, that she was being excluded from training, and about the incident between herself and Mahler in the kitchen. Amanda asked Linke what the investigative process entailed. Linke told Amanda that the pre-disciplinary hearing for Mahler had been postponed so Mahler could prepare a defense.

47.     Following her meeting with Linke, Amanda emailed Linke and asked if he wanted the information from her EAP counselor.

48.     On January 19, 2016, the City found no reason for any action and advised Amanda to return to Station 8.

49.     Amanda explained to Benes that she feared she would be retaliated against because of her complaint if she returned to Station 8. She told Benes that she did not feel safe reporting to Mahler especially given the high-risk situations Amanda's job responsibilities placed her in, and that Amanda was fearful for her career.

9

50.     On or about January 19, 2016, Giles had a meeting with command staff regarding their internal investigation of Giles' and Amanda's complaints regarding discrimination and harassment by Mahler.

51.     During the meeting, Linke stated that LFR's investigation had not supported a finding of wrongdoing by Mahler but that he found that there was a personality conflict between Mahler and Giles.

52.     Giles vehemently questioned those findings and expressed how he had repeatedly made complaints to Jones regarding Mahler's conduct toward Amanda and that he could not believe they were going to put Mahler and Amanda back in the same environment; that Jones had not addressed his multiple complaints about Mahler and Amanda; and that the one time Jones had said something to Mahler, he ended up apologizing to Mahler because Mahler would not speak to him.

53.     During the conversation, Giles asked Jones, "Am I lying?"  Jones' reply was, "You brought up multiple problems about Shawn."

54.     On or about January 19, 2016, Amanda was informed by Jim Bopp (hereinafter "Bopp"), a Battalion Chief at LFR, that Giles would be replaced by Darren Merryman (hereinafter "Merryman"), a Captain for LFR, who had been briefed on Amanda's situation.  Amanda was told that Merryman would take part in the re-education of Station 8 on what Bopp referred to as "these matters." Amanda was also told Mahler would return to Station 8.

55.     On January 19, 2016, Amanda was asked to return to meet with the LFR Administration.  Amanda met with Linke, Bopp, Ron Trouba, Jr. (hereinafter "Trouba"), a Captain for LFR and the Union President, and Leo Benes (hereinafter "Benes"), a

10

Battalion Chief for LFR. Amanda told Trouba she was fearful about her career and about further retaliation. Trouba told Amanda that she needed to trust him.  On January 20, 2016, Amanda was put on paid administrative leave.

56.     On or about January 20, 2016, Linke, Bopp, and Benes told Amanda she would have to return to Station 8 or give up her assignment and become a floater.  Linke, Bopp, and Benes, also tried to set up a meeting with Mahler and Amanda.  Amanda reiterated her concerns about Mahler and requested to become a temporary floater. Amanda also told Linke she did not feel comfortable returning to Station 8 to get her gear. Amanda excused herself from the meeting when it became apparent that her concerns were not being considered.  After Amanda told them she did not feel safe at Station 8, Linke removed Amanda from administrative leave and required her to take sick leave for the remainder of the day.

57.     On January 20, 2016, Amanda sent an email to Linke, Benes, and Bopp. In her email she said she was not comfortable meeting with Mahler that afternoon because she did not believe the meeting would alleviate her worries of the continued harassment, hostile, and unsafe work environment at Station 8. Amanda requested that they find a long-term solution and that she not be forced to go back to Station 8 where she did not feel safe because of the retaliation and continued harassment.

58.     On January 21, 2016, Amanda contacted Trouba to discuss her concerns about her transfer rights. Amanda and Trouba arranged to meet on February 3, 2016.

59.     On or about January 29, 2016, Amanda filed an internal EEO complaint based on sexual harassment and discrimination through Kimberley Taylor-Riley (hereinafter "Taylor-Riley"), the Director of Equity and Diversity for the City.

11

60.     Upon information and belief, as part of Taylor-Riley's investigation into Amanda's complaint, multiple members of command staff and Station 8 personnel were interviewed, including, but not limited to, Pat Borer (hereinafter "Borer"), the Assistant Chief for LFR, Jones, Mahler, Amanda, Giles, Jeremy Phillips (hereinafter "Phillips"), a male Firefighter at Station 8, Mark Rist (hereinafter "Rist"), a male Firefighter at Station 8, Cunningham, and Mahler.

61.     On February 3, 2016, Amanda met with Trouba.  Amanda asked Trouba about her transfer rights.  During the conversation, Trouba mentioned Amanda's private medical information and the private medical information of a civilian.  He told Amanda "it" was embarrassing and she should be spending her energy trying to fix her career and reputation instead of pursuing a harassment claim against the City.  Amanda expressed her discomfort to Trouba about his knowledge of her private medical information and his attempt to dissuade her from pursuing her harassment complaint.

62.     Trouba also told Amanda that she would eventually run out of the ability to float to a different station.

63.     On or about February 4, 2016, Amanda contacted Merryman to inquire about the re-education program for Station 8.  Merryman denied knowing anything about Amanda's situation and denied her request to meet with him.

64.     On February 5, 2016, Amanda sent an email to Linke, Bopp, Benes, and Merryman. She said in her email that she would return to Station 8 in the next scheduling set with the understanding that everyone involved, including herself, displayed the diligence it would take to continue fighting to make the station a safe and

12

healthy environment for everyone. She also asked that they feel free to contact her if there were any issues.

65.     On February 5, 2016, Amanda also sent a text message to Merryman. Amanda told Merryman in her text message that she would be back on Wednesday, but if Merryman had any availability prior to that, she would like to take him out for a cup of coffee to talk. Merryman responded that he would be unavailable for a cup of coffee.

66.     On or about February 20, 2016, Amanda was forced to return to Station 8. She was told by Linke that the City could no longer allow her to float from her assignment.  Upon her return to Station 8, Mahler did not speak or look at Amanda. Merryman told Amanda and Mahler that Mahler could only communicate to her through him, and ordered Amanda to only communicate with Mahler through Merryman. Amanda voiced concerns with Merryman about this arrangement.  Merryman told Amanda that Mahler was angry about the complaint Amanda made and Mahler requested Rist be the only Firefighter to rotate onto his truck.  Merryman said that any training for Amanda would be conducted by himself or other Firefighters because Mahler would not train her.

67.     In response to her conversation with Merryman, Amanda immediately told Benes about the situation.  She received no response from Benes.

68.     On March 3, 2016, Amanda sent an email to Benes again, and blind copied Linke to provide an update on how things were going at Station 8 since she returned. She questioned the mandate of no communication and informed them Mahler was not communicating with her and she was still not being allowed to rotate to the truck.

13

69.     On March 24, 2016, Sherry Meints (hereinafter "Meints"), the Privacy Office for the City, informed Amanda there was a HIPAA violation involving her medical records.

70.     On March 25, 2016, Amanda emailed Meints to get more information about how her private medical information had been disclosed.

71.     On March 25, 2016, Amanda had a meeting with Merryman to discuss training for Amanda to be a Fire Apparatus Operator (hereinafter "FAO"). The training document that was signed by both Merryman and Amanda said her midpoint evaluation would be June 27, 2016, and she would be re-evaluated on September 19, 2016. By the September 19, 2016 evaluation, Amanda was to be ready for the FAO certification process and prepared to fulfill the duties of an FAO. The document Amanda signed was not standard policy and only pertained to Amanda.

72.     Amanda and Meints met on March 30, 2016, along with Roger Bonin (hereinafter "Bonin"), the Division Chief of Training and Emergency Medical Services Chief for the City.  Amanda told Bonin and Meints about her earlier conversation with Trouba.  She said Trouba had been made aware of her private medical information and he had approached her to discourage her from any further action against the City

73.     On March 31, 2016, Amanda asked Bonin if it would be okay if Giles attended the meeting she was scheduled to have with Bonin and Meints for support. Bonin said that would be okay.

74.     On or about April 4, 2016, Amanda, Meints, Bonin, Giles, and Liz Elliot (hereinafter "Elliot"), an Assistant City Attorney for the City, met to discuss Trouba's

actions.  Amanda also learned that Kyle Reinhart (hereinafter "Reinhart"), a Firefighter, had requested her personal medical information.

75.     On or about April 4, 2016, Amanda had a meeting with Elliot regarding the breach of her HIPAA Rights. Giles attended the meeting with Amanda. Amanda raised complaints in the meeting about her private medical information being disclosed following her EEO complaint in violation of HIPAA.

76.     On or about April 19, 2016, Elliot informed Amanda she was not obligated to investigate Trouba for doing his job as Union President and the investigation was inconclusive regarding the HIPAA violation. Amanda informed Elliot that the civilian whose HIPAA privacy rights were also breached, needed to be informed. The City never informed the civilian that her HIPAA privacy rights had been breached.

77.     On or about April 26, 2016, Taylor-Riley told Amanda that during Taylor-Riley's investigation into Amanda's complaint of harassment, Taylor-Riley was told Amanda was reported numerous times for insubordination, wearing socks in the fire station, refusing to accept a pastry offered to her, refusing coffee refills, and for having a strange, possibly romantic relationship with Giles. Taylor-Riley told Amanda several attempts were made by Mahler and others under Mahler's direction to submit photos of her, without her knowledge, sitting in a recliner next to Giles as evidence of their inappropriate relationship.  Amanda was never advised by anyone about these alleged claims of insubordination.

78.     Upon information and belief, Merryman also reported to Taylor-Riley that Amanda was refusing to speak to Mahler as if she was being insubordinate, even though he had ordered her not to communicate with Mahler.

15

79.     After Amanda learned of the alleged complaints about her performance, she asked Merryman if there had been any complaints about her.  Merryman told Amanda that no issue had been relayed to him, and he thought her performance was exemplary.

80.     On or about May 6, 2016, Amanda reported to Merryman that she did not feel safe at Station 8 because of retaliation from Mahler and his peers.  Phillips told Amanda he felt the discrimination against her was so blatant and severe that he could no longer watch it and he had asked for a transfer.

81.     In May 2016, Benes told Amanda if she had accepted a mediation with Mahler at the onset of the issues, then the problem would not have gotten so bad and her issues with Mahler would be over.  Amanda explained to Benes she had never been given an option to mediate any issue with Mahler.  Benes insinuated to Amanda that she was lying.  He told Amanda her options were to float for the work-set; ending in union grievance; transfer to a floating position and lose her current position; or float for 90 days if the Union, City Administration, and the City Hall agreed to write a Memorandum of Understanding (hereinafter "MOU") regarding Amanda's position.

82.     Giles filed his own Charge of Discrimination with the Nebraska Equal Opportunity Commission on or about June 8, 2016, based on retaliation for participating as a witness for Troy Hurd (hereinafter "Hurd"), a Captain for LFR, and reporting discrimination and harassment of another female firefighter recruit, (hereinafter Firefighter "A", and Amanda, resulting in the City's failure to promote him to a Battalion Chief position.

83.     In either late April or early May 2016, Taylor-Riley's report following her investigation of Amanda's complaint was sent to Mayor Chris Beutler (hereinafter "Mayor Beutler") for review.  Upon information and belief, Taylor-Riley's report stated that Taylor-

16

Riley found that Amanda had been discriminated and retaliated against by LFR representatives. Upon information and belief, Taylor-Riley's report details that Amanda had less hours of training on the Truck yet more calls with less sleep and downtime for personal training than her male peers. Taylor-Riley's report also indicated that Mahler had informed another Firefighter at LFR that in his opinion there was no room for women in fire service.

84.    On May 24, 2016, Amanda was put on injury leave to have surgery because of a work injury.

85.    On July 18, 2016, Merryman emailed Amanda because the MOU was coming to an end and she would have to give up her assignment or go back to Station 8. At the time, the City had not responded to Taylor-Riley's report or Amanda's complaints concerning the continued harassment, discrimination, and retaliation Amanda had experienced.

86.    On July 22, 2016, because Amanda felt there had not been any effort to protect her from further harassment, discrimination and retaliation, Amanda was forced to give up her assignment at Station 8 to become a floating firefighter. Amanda told Merryman she was giving up her assignment because the environment was so toxic and retaliatory towards her she felt she had no other option.

87.    On July 28, 2016, Amanda received a letter from Mayor Beutler. The letter stated the law department for the City did not see grounds for discrimination or retaliation. It also stated Amanda would be able to schedule a meeting with Doug McDaniel (hereinafter "McDaniel"), the Human Resources Director for the City, and Tom Casady (hereinafter "Casady"), the Public Safety Director for the City, to discuss how to improve

17

fire house interactions.  The letter did not inform Amanda of any actions put in place to remedy harassment or retaliation.

88.     Following Mayor Beutler's letter, Amanda was contacted by Casady on or about August 1, 2016, to schedule a meeting with her and McDaniel.  Amanda requested that she be allowed to bring Giles as a witness to their conversation rather than a union representative.  Casady denied the request to have Giles present.

89.     On August 2, 2016, Amanda met with Casady and McDaniel.  Casady admitted that there had been a "management failure" when Command Staff failed to communicate with her supervisors at Station 8, Darren Merryman and Shawn Mahler, and management's expectations regarding how Mahler should treat her at Station 8 after her complaints of discrimination and harassment.  McDaniel told her in response to her complaints of discrimination/harassment by Mahler that LFR had "a systemic issue that need[ed] to be addressed."  McDaniel also said, "If we had the advantage of the HR Wand, this never would have happened. It would have been solved in 2012 with the culture, but the HR Wand is pretty damn weak."

90.     McDaniel and Casady attempted to pressure Amanda into returning to Station 8. They both told her to trust them and said they finally "had Mahler's attention." Amanda told them that she would not return to Station 8 because they had not remedied the situation.

91.     In August 2016, Michael Despain (hereinafter "Despain"), the newly-appointed Fire Chief for LFR, contacted Amanda to discuss her options with her. Amanda was then transferred to Fire Station 3.

18

92.     Amanda filed a Charge of Discrimination with the NEOC on or about August 15, 2016 alleging sex harassment, discrimination, and retaliation.

93.     On December 12, 2016, Merryman called Station 3 and spoke to Dan Ripley (hereinafter "Ripley"), the Fire Captain for Station 3. Merryman asked Ripley to send Amanda to Station 8 to receive her evaluation. Ripley told Merryman that Amanda would not being going to Station 8 for her evaluation and something else needed to be arranged.

94.     Later that day, while Amanda was enroute to the hospital with a patient on the Medic 3 unit, Merryman contacted Amanda on the radio.  Over the radio, Merryman demanded Amanda meet him as soon as possible regarding her evaluation.  Merryman instructed Amanda to wait at the hospital once her Medic Unit had transferred the patient care to the hospital. Despite the unusual circumstances, Amanda arranged to meet Merryman at the hospital.  Merryman gave Amanda her evaluation in the hospital break room in the presence of another Firefighter.

95.     Merryman rated Amanda 74%, which is far lower than any other performance evaluation she has ever received.  Amanda's Captain's rating in her next evaluation was 91%.  Merryman could not give Amanda any explanation for her poor review.

96.     Amanda was forced to transfer stations to remove herself from the hostile work environment created by Mahler that was never effectively addressed by management.

### WIDESPREAD CUSTOM OF DISCRIMINATION AND RETALIATION AT LFR

97.     Under the City's Equity and Diversity Plan (hereinafter "EAD Plan") adopted in 2012, City representatives had a duty and to monitor City departments,

19

including LFR, regarding whether they were complying with the City's EAD.  The EEO

officer had very specific and detailed duties regarding investigation discrimination

complaints and monitoring compliance for the EAD, including working with the

supervisors who are charged with the responsibility and accountability for EEO and

implementation of the establishment EAD Plan.

98.     Casady, Huff, and Linke were required to report instances of

discrimination and retaliation of which they were aware and had the legal duty to comply

with the EAD.  The plan had very specific duties with respect to Department Directors

and Managers.

99.     City Directors and Managers have the ultimate responsibility for decisions

affecting progress toward achieving equal opportunity, which would include Director

Casady, McDaniel, Huff, and Linke during his time as Interim Chief.  Casady, while he

was aware there was an Equity and Diversity Plan document, he doesn't know whether

he ever read it. Linke wasn't even aware there was an Equity and Diversity Plan.

Neither was Borer.

100.   In 2012, Fire Captain Hurd complained to several superiors that Female

Firefighter A was being harassed and treated differently on the basis of her sex and

national origin.

101.   Hurd was disciplined following his complaint on several occasions.  Hurd

believed his discipline was in retaliation for reporting the discriminatory treatment of

Female Firefighter A.

102.   Hurd completed a workplace harassment survey in August 2012. The

survey was initiated by Taylor-Riley and McDaniel who also reviewed the results.

103.   In response to the same EEO survey, two Battalion Chiefs employed by LFR at the time expressed that the current LFR administration acted in a retaliatory or discriminatory manner.   One of those Battalion Chiefs (hereinafter "Battalion Chief A") wrote in response to a question about discrimination that he had witnessed:

"Retaliation can be a factor.  I just know I only have a few months before retirement and can't wait to leave (note: that this last statement could ID me if anyone in LFR reads this!!)  There is a fine line between just being a crappy condescending boss and discriminating acts or behaviors."

104.   In response to Question No. 3 of the EEO survey, a male LFR Firefighter (hereinafter "Firefighter B") who worked in the same station as Firefighter "A", reported her mistreatment during her preceptorship to his Captain three times.

105.   Jeanne Pashalek, HR Battalion Chief at the time, wrote in response to a question about general comments about discriminatory or harassing activities you believe are occurring within LFR:

I believe there are subtle occurrences on a daily basis ranging from ignoring others, comments or jokes, to actual isolation in some cases. Our middle managers really need training on EEO since they are the front-line managers in the stations.  The training must also be for all personnel, but stating with the captains in the front line "defense."

106.   Pashalek went on to state in response to a question "How can LFR make improvements in matters of discrimination or sexual harassment?"

The first step is awareness, followed by education and training, and lastly is the accountability with zero tolerance. Last year we had training due to a grant, but it had been years before that.  Our department is a white male dominated culture that believes they treat people fairly, but women are subjected to a lot of subtle harassment/discrimination.  The women are too concerned about getting along and not being considered a troublemaker by their peers so they will not report issues.  I hear about them and I know several of our women have or currently are experiencing issues.  Having a confidential process for reporting will be a huge improvement.  We should

21

contract with Cultural Bridges to Justice for training starting next year.  If we get multiple agencies to split the cost, it will be affordable.

107.    As part of Taylor-Riley's investigation into Hurd's complaint, Giles was interviewed multiple times.  Generally, during these interviews Giles supported Hurd's allegations of illegal retaliation and provided Taylor-Riley assistance in background for her investigation regarding where certain documents or information could be located. From 2012 to when the Taylor-Riley report was finalized in October of 2014, Giles had at least sixty-five (65) telephone calls and sent or received two-hundred twenty-one (221) text messages from Taylor-Riley.

108.    On September 5, 2012, Hurd filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission.

109.    LFR generally notifies command staff when an NEOC Charge has been filed, and command staff was notified when Hurd filed his Charge.

110.    Hurd reported numerous instances of retaliation to City officials during her investigation, but nothing was done by City representatives to address or remedy the retaliation.

111.    In July 2013, at a Command Staff meeting, Borer called Hurd a "f'in idiot" and told Chief officers that he wanted to tell Hurd that he would never be promoted or able to serve as an EMS Supervisor because of his NEOC Complaint.

112.    Casady and Pashalek spoke to Borer in the Chief's meeting about his retaliatory comments about Hurd. Pashalek and Casady told Borer he should not tell Hurd he did not get promoted to EMS Supervisor because he filed an NEOC Complaint.

113.    On July 24, 2013, Borer went to Station 11 to speak with Hurd.  Hurd and Sten Ulrich (hereinafter "Ulrich"), another Firefighter for LFR, were at Station 11 when

Borer arrived.  Hurd complained to Borer about how the selection of EMS Supervisors was unfair because there was no qualification procedure or policy in place. Borer told Hurd that Bonin and several other Chiefs in the department had trust issues with Hurd and that those trust issues were a major consideration when it was decided that Hurd was not going to considered for an EMS Supervisor position or EMS Supervisor back-up position. Borer stated to Hurd that the trust issues were because Hurd filed an EEOC State of Nebraska complaint. Hurd than complained to Borer that if he was denied the EMS Supervisor position because of his NEOC Charge that he was being illegally retaliated against.

114.   On August 1, 2013, Borer again came to Station 11. Hurd asked Borer why he received elevated discipline in comparison to the other LFR employees who committed similar alleged infractions. Borer told Hurd that he had a lot of history on the job and that is why he received elevated discipline. Borer told Hurd that he had a poor history in the department and Hurd's state complaint issues of why Hurd had problems.

115.   Pashalek heard a rumor from Bonin that Borer had made the retaliatory statement about Hurd not being considered for the EMS supervisor position because of his NEOC Complaint and investigated the statement. Pashalek confirmed through Hurd and Ulrich that Borer had made the retaliatory comments and reported her findings to Huff.  Pashalek spoke with McDaniel, and he told her to let Taylor-Riley handle the investigation. Huff told Pashalek he didn't believe Hurd's allegation and that he was lying.  Pashalek felt that Huff's comments about Hurd were inappropriate and indicated that he had closed the chapter on the investigation without even investigating it. Pashalek documented her conversation with Huff because she wanted to make sure it

23

was documented if it ever came out and to ensure that she was protected if Huff ever denied having the conversation with her.

116.   Upon information and belief, McDaniel did not independently investigate whether Borer was retaliating against Hurd.

117.   Sometime following the meeting in July 2013, wherein Borer made comments about Hurd not being promoted because of his NEOC Complaint at the Chief's meeting, another Battalion Chief, (hereinafter "Battalion Chief B") came forward to speak to Taylor-Riley about Borer's comments.  Battalion Chief B told Taylor-Riley that Borer said Troy Hurd would not get promoted to the EMS Supervisor position or anything else in LFR.

118.   In January 2014, another firefighter at LFR (hereinafter "Firefighter C", informed Taylor-Riley that Benes had spoken with him about Borer making inappropriate comments in a Chief's meeting about Hurd.  Benes told Firefighter "C" he was scared that Huff was positioning him as the fall guy for the training academy and that the Taylor-Riley investigation will cost somebody their job.  Firefighter "C" reported to Taylor-Riley that there was a plan to move Hurd to Station 1 to keep an eye on him and that they were trying to set Hurd up.  Firefighter "C" thought either Battalion Chief B or Benes may both be willing to disclose the plan to Taylor-Riley.

119.   In January and February 2014, the Chief Officers were interviewed in connection with the Taylor-Riley investigation.

120.   Following Borer's interview, he was upset that someone had told Taylor-Riley about what he said in an executive session about Hurd being a "f'in idiot."  Borer

wanted to know who the witness was.  Taylor-Riley refused to disclose the witness' identity.

121.   In September 2014, Giles applied to be placed on a promotions list to a Battalion Chief position if one became available.  To determine the ranking of the potential candidate(s) on the promotions list, the candidates were ranked and scored based on their background, education, performance of certain tasks and an interview process.  Giles received the highest score,74, of the candidates tested/evaluated. The next highest scored candidate after Giles was 58.

122.   Hurd also applied for the promotions list.  During the promotional process, Hurd raised complaints to McDaniel about how the process could not be fair given his retaliation allegations against Command Staff who would be evaluating him in the promotional process.  No modifications were made to the promotional process based on Hurd's complaints.

123.   Taylor-Riley's investigation into Hurd's complaint resulted in a report by Taylor-Riley condemning the retaliation that Hurd suffered for complaining about illegal discrimination. Taylor-Riley's report was issued on October 10, 2014.  In Taylor-Riley's report regarding Hurd's complaint, Giles was listed as a witness she personally interviewed.

124.   Taylor-Riley reached the following conclusions:

Reasons advanced by LF&R are a pretext to cover retaliatory motive (reason is not believable, similarly situated individuals who did not oppose discrimination or participate in the EEO process were treated differently.)

In the instant matter:

1.     The Complainant received a reprimand for leaving a meeting that he was not ordered to either attend or remain at;

2.      He was given a verbal warning followed by an EIR for damage or potential damage to E11, but the evidence reveals that the pump was not damaged or at real risk for such by his crew's actions;

3.      He received the most severe sanction that was given for the logbook error even though he had not had prior discipline for this conduct in the past and the person that had been disciplined for the conduct previously got the same level of penalty, not a more severe one; in the second instance, Complainant was disciplined when he discovered the error of another Firefighter and made an error himself trying to correct it; and

4.      The Complainant has been precluded from acting out of grade as a Battalion Chief when others have been allowed to do so without complying with the restrictions placed upon Complainant.

Based upon the foregoing analysis, it seems that the reasons proffered by LFR are pretext for retaliation.

The EEO is of the opinion that the conduct detailed herein is the direct result of a retaliatory environment that is further impaired by a lack of consistent discipline, lack of communication on the administrative level (chief to chief), lack of communication from the administrative level to the rank and file, and a lack of trust at all levels. These are not issues that can be easily addressed through training or discussion. These are issues that reflect on overall environment that does not easily lend itself to change. The EEO would suggest that whatever intervention is sought a supervisor/gatekeeper/facilitator be put in place and given the power to enact new procedures that are needed to bring the necessary changes to fruition through global implementation within LFR.

125.    Taylor-Riley's report also described the incidents of Giles's initial complaint about the discrimination of Female Firefighter A.

126.    Battalion Chief C who was employed with LFR during Hurd's employment who was interviewed during the Kimberley Taylor-Riley investigation reported, "As far as whether or not the current processes result in retaliation toward employees/rank-and-file Firefighters, (this Battalion Chief) feels that it is a retaliatory state. If a Chief has a

26

problem with a Firefighter, they can go after them. It just really depends on who they are."

127.   In a subsequent interview with Taylor-Riley, Battalion Chief C reported that in February 2014 both Borer and Bonin were upset that one of the Command Staff members was talking to the EEO about conversations that were had in command staff meetings where Borer had disparaged Hurd. Taylor-Riley's conclusion from this report from Battalion Chief C was, "These instances certainly seem to be direct evidence in support of (Battalion Chief C's) assessment that it's a retaliatory environment."

128.   Upon information and belief neither Mayor Beutler nor Casady initiated any investigation regarding Hurd's allegations of retaliation in connection with the promotions process or to ensure that the Battalion Chief promotional process was completed fairly since the Command Staff who was evaluating the candidates had been accused of retaliation by not only Hurd, but multiple members of LFR rank and file, as well as, Command Staff members as disclosed in the Taylor-Riley report.

129.   On December 17, 2014, Mayor Beutler sent a letter to Hurd indicating that he had reviewed he Kimberley Taylor-Riley investigative findings; that he had met with Casady and McDaniel and had recommended that all of the disciplinary actions be removed from Hurd's personnel file. Mayor Beutler also indicated that Casady was going to examine and restructure the fire training academy with the assistance of a task force; implement mandatory training seminar regarding equal employment practices general, and retaliation specifically, for all management-level employees; and review the process of imposing discipline to ensure consistency.

27

130. On or about January 8, 2015, Hurd had a meeting with Casady to discuss Taylor-Riley's report on Hurd's retaliation. Hurd asked Giles to attend the meeting with Casady in order to witness the meeting as his friend and supporter.

131. During the meeting, Casady informed Hurd that he Battalion Chiefs who Taylor-Riley's report confirmed had retaliated against Hurd would not receive any discipline. During the meeting, Giles complained verbally to Casady about the retaliation he experienced after his complaint of illegal discrimination and that Casady had to fix the problem. Giles told Casady that Casady and the City were not doing anything to remedy the problem of discrimination and retaliation within LFR. Trouba also told Casady that Chief Huff, Pashalek and Borer who were accused of retaliation in the Kimberley Taylor-Riley investigation were incompetent. Casady became extremely upset and ended the meeting. He then had a meeting with Trouba in his office for over an hour.

132. Trouba also hand-delivered a letter to Mayor Beutler's office on January 12, 2015 that stated, in pertinent part:

> LFR is having a harder time retaining quality employees due to the culture that is being created. Employees are being told they can't talk about particular safety issues and they shouldn't call their union representatives. They have been threatened with layoffs if they don't move from the position of EMT to Paramedic. Employees are outright quitting this job to work somewhere else that makes less money. That is a clear indicator of just how unhappy they are. They are constantly in fear of being retaliated against. They are frustrated and bitter from being held to a higher standard than any of the Chief Officers.

Regarding the Battalion Chief's promotional process, Trouba went on to state:

> Lastly, they included the applicant's performance evaluations in their consideration for promotion. Fire Captain Troy Hurd, whom you recently responded to regarding his retaliation complaint, had received his

28

performance evaluations from Assistant Chief Pat Borer.  As one might expect, Captain Hurd's evaluations were not very high and ultimately was ranked dead last.

133.    Upon information and belief, Mayor Beutler or Casady did not initiate any investigation regarding Trouba's allegations of retaliation or to ensure that the Battalion Chief promotional process was completed fairly since the command staff who was evaluating the candidates had been accused retaliation by not only Hurd, but multiple members of LFR rank and file, as well as, command staff members.

134.    In April 2015, Hurd responded to a request for an interview when he was contacted by the Lincoln Journal Star and gave an interview regarding his experience at LFR in reporting discrimination and retaliation. Casady and the Mayor's office responded to the Journal Star's requests for comment as well.

135.    Shortly thereafter, Hurd gave a radio interview on the Coby Mach show on KFOR and again discussed the City's failure to address the continued corruption at LFR and the Command Staff's multiple instances of continual discriminatory and retaliatory treatment of Firefighter "A" and himself.

136.    In response to the Taylor-Riley report, Lincoln Journal Star article and the Coby Mach interview, Casady wrote a detailed memo to Mayor Beutler criticizing Taylor-Riley's investigation.  Other than discuss the investigation with Chief Huff, McDaniel, Borer, and Pashalek at Chief Officer meetings with other Command Staff members present, Casady did nothing to independently investigate Hurd's allegations, nor did he review Taylor-Riley's extensive file.

29

137.   On or about May 21, 2015, Casady with the blessing of Mayor Beutler,

issued letters of "exoneration" to Borer, Pashalek, and Chief Huff in conjunction with the

Hurd investigation.  The letter stated as follows:

> Late last year, the City's director of equity and diversity issued a report
> culminating a lengthy investigation pertaining to a firefighter who alleged
> that he had been retaliated against for filing an earlier EEO complaint.
> The investigator asserted that your action in initiating disciplinary action
> against this employee at a point in time following his complaints
> constituted retaliation.  The employee also made these same claims in the
> local newspaper and talk radio shows.

> I reviewed the investigator's report in detail and did not agree with her
> findings.  I do not believe that there is conclusive evidence of any
> retaliatory motive at all in the disciplinary action you initiated, and I have
> determined that there is no basis for any kind of disciplinary action against
> you for this alleged retaliation.  I have thoroughly discussed this matter
> with the Mayor in three meetings, most recently earlier this week.

> As I have told you previously, I found what I believe to be errors of fact in
> the investigator's report, and conclusions not supported by the evidence.
> You may rest assured that I do not accept the findings of this investigation
> as it pertains to your conduct.  I realize this has been a difficult situation,
> and I appreciate your professionalism.

138.   Giles had an excellent performance evaluation in February 2015 authored

by Jones that indicated he was looking forward to watching Giles' career go to the next

level; and that Giles would make a great addition to the leadership team.   Despite his

excellence performance and that he had gone through extensive objective testing where

he significantly outscored the other candidates, Giles was not promoted to Battalion

Chief after Giles continued complaints regarding the treatment of Amanda and the

continued upheaval within LFR regarding the Hurd investigation.

139.   In August 2015, Giles complained to Jones that he believed that his

involvement with the EEO issues involving Hurd were hurting his chances for the

30

promotion. Upon information and belief, no investigation was initiated at that point in time regarding Giles' retaliation complaint to Jones.

140.    Linke, along with recommendations and input from Casady and Command Staff, made both his promotional decisions in 2015 partly to keep the peace in LFR. He does not believe he chose the most objectively qualified candidate for the positions.

141.    Giles filed his Charge of Discrimination with the Nebraska Equal Opportunity Commission on or about June 8, 2016 based on retaliation for participating as a witness for Hurd and reporting discrimination and harassment of Firefighter "A" and Amanda for the City's failure to promote him to the Battalion Chief positions.

142.    In February 2016, Hurd filed a federal lawsuit alleging violations of Section 1983, Title VII, and the Nebraska Fair Employment Practice Act for discrimination and retaliation against the City of Lincoln.

143.    In April 2017, Giles filed a federal lawsuit alleging violation of Section 1983, Title VII and the Nebraska Fair Employment Practice Act for discrimination and retaliation against the City of Lincoln.

144.    Mayor Beutler was a policymaker for the City of Lincoln, did not have the discretion to illegally discriminate or retaliate against employees of LFR; was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Mayor Beutler has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

31

145. Tom Casady was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR; was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful. Casady has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

146. Doug McDaniel was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR, and was aware through City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful. McDaniel has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

147. Tim Linke was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR, and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful. Casady has been aware or should have been aware since August 012 of LFR's continuing pattern of

32

discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

148.  Leo Benes was a policymaker for the City of Lincoln or was designated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Linke has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

149.  Eric Jones was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR, and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Linke has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

150.  Darren Merryman was a policymaker for the City of Lincoln or was delegated policymaking authority by LFR; did not have the discretion to illegally discriminate or retaliate against employees of LFR, and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is

33

unlawful.  Merryman has been aware or should have been aware since December 2016 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

151.    Shawn Mahler was a policymaker for the City of Lincoln or was delegated policymaking authority by LFR; did not have the discretion to illegally discriminate or retaliate against employees of LFR, and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Mahler has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### HOSTILE WORK ENVIRONMENT HARASSMENT/RETALIATORY HARASSMENT
### (SUPERVISOR/CO-WORKER/NEGLIGENCE STANDARD)

152.    Plaintiff realleges paragraphs 1 to 151 of this Complaint as if fully set forth herein.

153.    Plaintiff was subjected to unwelcome and offensive conduct from her co-workers and supervisors employed by the Defendant who created a hostile work environment at Station 8 before and after her complaints of discrimination

154.    Such conduct was based on Plaintiff's sex.

34

155.    Mayor Beutler, Casady, Linke, McDaniel, Benes, Jones, Merryman, Mahler, and other City officials were all aware or should have been aware of the harassment, discrimination, and retaliation and failed to take appropriate remedial measures.

156.    The hostile environment affected a term, condition, or privilege or her employment.

157.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### SEXUAL DISCRIMINATION

158.    Plaintiff realleges paragraphs 1 through 157 as if fully set forth herein.

159.    Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of her sex in violation of the Nebraska Fair Employment Practice Act.

160.    Plaintiff suffered an adverse action.

161.    Plaintiff's sex was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

35

162.   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### RETALIATION

163.   Plaintiff realleges paragraphs 1 through 162 as if fully set forth herein.

164.   Plaintiff complained to Defendant about the sexual harassment she experienced, and otherwise opposed practices made unlawful by the Nebraska Fair Employment Practice Act.

165.   Defendant retaliated against Plaintiff because of her complaints and opposition to harassment.

166.   Plaintiff's sex and her protected activity were motivating factors in Defendant's retaliation against her.

167.   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

## FOURTH CAUSE OF ACTION
## STATE CONSTITUTIONAL DISCRIMINATION, RETALIATORY HARASSMENT, AND RETALIATION
## (CITY OF LINCOLN AND INDIVIDUAL DEFENDANTS)
## (EQUAL PROTECTION CLAUSE)

168.    Plaintiff hereby repleads paragraph 1 to 167 as if fully set forth herein.

169.    Defendant City of Lincoln through its agents, servants, and employees, including, but not limited to, Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their official capacities, established an official policy, practice, or custom of reckless or deliberate indifference to females and/or person who complain about illegal discrimination, illegal retaliation, or unlawful activities, people who refuse to countenance a discriminatory or retaliatory hostile work environment, and/or participate as a witness or complainant in connection with an EEO investigation.

170.    Defendant City of Lincoln discriminated, harassed, and/or retaliated against Plaintiff and others by establishing, maintaining, and enforcing polices which create or foster a discrimination, retaliatory, and hostile work environment, by discriminating against, harassing, and retaliating against women and/or employees who complain about illegal discrimination, illegal retaliation, or other unlawful activities' people who refuse to

37

countenance a discriminatory or retaliatory hostile work environment; and/or participate as a witness or complainant in connection with an EEO investigation.

171.    In the alternative, if the discriminatory practice of establishing, maintaining, and enforcing policies which create or foster a hostile work environment, by treating women; people who complain about illegal discrimination, illegal retaliation, or other unlawful activities people who refuse to countenance a discriminatory or retaliatory hostile work environment; and/or participate as a witness or complainant in connection with an EEO investigation, including Plaintiff, it was a practice, procedure or custom which the Defendant City of Lincoln and its policy makers had actual or constructive knowledge of the discriminatory, hostile, and retaliatory atmosphere; failed to remedy the harassment, discrimination and/or retaliation; failed to adequately train employees regarding discrimination and retaliation; and/or ratified the illegal actions of employees of the City of Lincoln.

172.    Plaintiff was subject to this official policy or custom while she was employed at LFR.

173.    Defendant City of Lincoln's policy, custom, or practice in general, and as applied to Amanda in particular, was purposeful and intentional; and/or the Defendant's policymakers were aware or should have been aware of the unconstitutional conduct; Defendant failed to train its employees to follow the law; Defendant's policymakers ratified the conduct of their subordinates; and/or Defendant's policymakers condoned or turned a blind eye to the unlawful conduct.

174.    Defendant City of Lincoln deprived Plaintiff of her rights to be free from sex discrimination, harassment, and retaliation, which she is entitled under the Equal

38

Protection Clause of the Article I, Section 2 of the Constitution of the State of Nebraska, which was clearly established at all times material hereto.

175. Plaintiff has been damaged as a direct and proximate result of the Defendants' acts and omissions aforesaid.

WHEREFORE, Plaintiff prays for judgment against Defendant City of Lincoln, Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler in their official capacities, in an amount which will fully and fairly compensate her for her injuries and damages, for attorney's fees and costs, for interests as allowed by law and for such other and further relief as is just in this case.

## FIFTH CAUSE OF ACTION
## STATE CONSTITUTIONAL EQUAL PROTECTION VIOLATION
## (INDIVIDUAL DEFENDANTS)

176. Plaintiff hereby repleads paragraph 1 to 175 as if fully set forth herein.

177. Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their individual capacities, deprived Plaintiff of rights protected by the Article I, Section 2 of the Constitution of the State of Nebraska by establishing, maintaining, or enforcing policies which create or foster an illegal retaliatory hostile work environment; by treating women differently than other similarly situated employees and by retaliating against those, including Plaintiff, who complain about and/or refuse to countenance a hostile work environment harassment based on sex and retaliation; and/or by turning a blind eye or condoning the illegal conduct of their subordinates.

178. In the alternative, if the acts complained of were not committed by the individual Defendants pursuant to an official policy, practice or custom of the Defendant

39

the City of Lincoln , they were committed by the Individual Defendants with the purpose and intent of creating or fostering a retaliatory hostile work environment, by treating women and/or people who complain about illegal discrimination differently than other similarly situated employees and by retaliating against and harassing those, including Plaintiff, who complain about and/or refuse to countenance a hostile work environment based on sex, disability, or retaliation; and/or by turning a blind eye or condoning the illegal conduct of their subordinates.

179.   Each individual Defendant acted under color of state law and did not have the discretion to act in an unlawful manner.

180.   Each individual Defendant deprived Plaintiff of her rights to be free from sex discrimination, harassment, and retaliation, which she is entitled under the Equal Protection Clause of the Article I, section 2 of the Constitution of the State of Nebraska, which was clearly established at all times material hereto.

181.   Each individual Defendant acted with reckless or deliberate indifference to the rights of Plaintiff, which were clearly established under the law, and with malice.

182.   Plaintiff has been damaged as a direct and proximate result of the individual Defendants' acts and omissions.

WHEREFORE Plaintiff prays for judgment against Defendants, in their individual capacities, in an amount which will fully and fairly compensate her for her injuries and damages, for punitive damages in an amount sufficient to punish Defendants and deter others, for attorney's fees/expert witness fees, and costs, for interest as allowed by law and for such other and further relief as is just in the premises.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff, Amanda Benson, respectfully requests that this Court:

A.      Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of sex and retaliation.

B.      Order the Defendant to pay Amanda back pay, front pay, compensatory damages, consequential damages and liquidated damages in amounts to be proven at trial, and all other affirmative and equitable relief necessary to eradicate the effects of Defendant's unlawful employment practices.

C.      Direct the Defendant to expunge all negative reports or evaluations in Plaintiff's personnel file.

D.      Order Defendant to pay Amanda punitive damages for its malicious and reckless conduct in an amount to be determined at trial.

E.      Award the Plaintiff her reasonable attorneys' fees and expert witness fees.

F.      Award Plaintiff her costs in this action.

G.      Grant such further relief as the Court deems necessary and proper.

## **JURY TRIAL DEMAND**

The Plaintiff requests a jury trial on all matters raised in this Complaint.

Dated this 6th day of July, 2018.

AMANDA BENSON, Plaintiff

BY: _____

Kelly K. Brandon, #20734
Stephanie J. Costello, #26309
Fiedler & Timmer, P.L.L.C.
20615 Highway 370
Gretna, NE  68028
(402) 316-3060
(402) 513-6501 (facsimile)
kelly@employmentlawnebraska.com
stephanie@employmentlawnebraska.com
Attorneys for Plaintiff

Filed in Lancaster District Court
*** EFILED ***
Case Number: D02CI180002288
Transaction ID: 0007365982
Filing Date: 08/28/2018 11:14:33 AM CDT

IN THE DISTRICT COURT OF LANCASTER COUNTY, NEBRASKA

| | | |
|---|---|---|
| AMANDA BENSON, | ) | Case No. CI 18 - 2288 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **AMENDED COMPLAINT AND JURY** |
| | ) | **TRIAL DEMAND** |
| THE CITY OF LINCOLN, a political | ) | |
| subdivision, CHRIS BEUTLER, TOM | ) | |
| CASADY, DOUG MCDANIEL, TIM | ) | |
| LINKE, LEO BENES, ERIC JONES, | ) | |
| DARREN MERRYMAN, and SHAWN | ) | |
| MAHLER, | ) | |
| | ) | |
| Defendants. | | |

COMES NOW the Plaintiff, AMANDA BENSON, by and through undersigned counsel, and hereby files this Amended Complaint against THE CITY OF LINCOLN, a political subdivision, CHRIS BEUTLER, TOM CASADY, DOUG MCDANIEL, TIM LINKE, LEO BENES, ERIC JONES, DARREN MERRYMAN, and SHAWN MAHLER, and states and alleges as follows:

## I.    NATURE OF THE ACTION

This is an action under the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §48-1101, *et seq.* and Article I, Section 3 of the Constitution of the State of Nebraska, Title VII of the Civil Rights Act and the 14th Amendment of the Constitution, Equal Protection Clause, alleging violations of Plaintiff Amanda Benson's civil rights.

EXHIBIT

B

Amanda Benson was subjected to a hostile work environment based upon her sex where representatives of the City of Lincoln (hereinafter "The City") discriminated against Amanda regarding the terms and conditions of her employment based on her sex, as she is female, and retaliated against Amanda for her complaints of sex discrimination.

## II.   <u>JURISDICTION AND VENUE</u>

1.      This Court has original jurisdiction over these claims pursuant to Neb. Rev. Stat. § 24-302 and concurrent jurisdiction over the federal claims.

2.      Venue is appropriate in this court pursuant to Neb. Rev. Stat. §25-403.1 as a substantial part of the events or omissions giving rise to this claim occurred in Lincoln, Lancaster County, Nebraska.

## III.   <u>PARTIES</u>

3.      Plaintiff Amanda Benson (hereinafter "Amanda") is a female and at all relevant times alleged herein was a resident of Lincoln, Lancaster County, Nebraska, and is an employee of Defendant the City of Lincoln as a Firefighter/EMT in the City's Lincoln Fire and Rescue Department (hereinafter "LFR").

4.      At all relevant times, Defendant has employed at least fifteen (15) employees.

5.      Defendant the City is a political subdivision located in Lancaster County, Nebraska.

6.      Defendant Chris Beutler is a resident of Lancaster County, Nebraska.

7.      Defendant Tom Casady is a resident of Lancaster County, Nebraska.

8.     Defendant Tim Linke is a resident of Lancaster County, Nebraska.

9.     Defendant Doug McDaniel is a resident of Lancaster County, Nebraska.

10.    Defendant Leo Benes is a resident of Lancaster County, Nebraska.

11.    Defendant Eric Jones is a resident of Lancaster County, Nebraska.

12.    Defendant Darren Merryman is a resident of Lancaster County, Nebraska.

13.    Defendant Shawn Mahler is a resident of Lancaster County, Nebraska.

## IV.    ADMINISTRATIVE PROCESS

14.    On August 15, 2016, Amanda filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission ("NEOC"), charge number NEB 1-16/17-B-48196-RS/EEOC 32E-2016-00768, alleging unlawful employment practices occurring within three hundred (300) days or less from the date of filing the charge, and alleging that the unlawful employment practices were continuing.

15.    On or about April 11, 2018, within 90 days of the filing of this action, Amanda's counsel received a determination from the Nebraska Equal Opportunity Commission.

16.    On or about June 4, 2018 within 90 days of the filing of this action, Amanda's counsel received a Notice of Right to Sue from the Equal Employment Opportunity Commission.

## V.    FACTUAL BACKGROUND

17.    On or about July 1, 2013, Amanda, a female, began her employment with the City in LFR as a Firefighter/EMT.

18.    On or about October 10, 2014, Shawn Mahler (hereinafter "Mahler"), a Captain for LFR, learned Amanda would be replacing Nic Cunningham (hereinafter

"Cunningham"), a male Firefighter, at Station 8.  Mahler and Brian Giles (hereinafter "Giles") were the Station Captains at Station 8.

19.     It is customary within LFR for the Station Captain to greet a newly-assigned person to their station.  Traditionally within LFR, the Station Captain would go through the house rules, expectations, and procedures with the newly assigned person.  This customary process also allowed the Station Captain and the new member of his or her station to build rapport.

20.     Upon learning that Amanda would be assigned to Station 8 on or about October 12, 2014, Mahler became visibly upset and had a verbal confrontation with Cunningham, and Giles. Cheyenne Jeffers (hereinafter "Jeffers") was a civilian that was at Station 8 for a ride-along and witnessed the confrontation.

21.     Jeffers informed Amanda about the interaction between Giles, Cunningham, and Mahler. She told Amanda she felt it was necessary to tell her about it because she felt Mahler was aggressive and inappropriate.

22.     On or about October 15, 2014, Amanda began her assignment at Station 8. When Amanda arrived at Station 8, Mahler refused to speak to Amanda and did not go through the house rules, expectations, or procedures.    Mahler did not attempt to build any sort of rapport with Amanda.

23.     During Amanda's time at Station 8, she was primarily an Engine Firefighter. It was part of the standard rotation at Station 8 for Engine Firefighters to rotate to the truck.  Mahler did not allow Amanda to rotate onto the truck.  By not allowing Amanda to rotate to the truck, Mahler denied Amanda important training that she could have obtained through that rotation.

24.     At Station 8 the engine generally went on more calls than the truck. Therefore, Firefighters assigned to the truck had more training and more downtime. Amanda had less downtime than the other Firefighters at Station 8 because she was consistently assigned to the engine and missed out on crucial training that would allow her to perform her job duties more effectively and assist her in her career trajectory.

25.     Sometime between October 15 and November 4, 2014, Jeanne Pashalek (hereinafter "Pashalek"), a Battalion Chief for the City and the human resources director for LFR, contacted Amanda to see how things were going. Amanda mentioned that Mahler had indicated to Jeffers that he was not happy she was assigned there, but that Amanda enjoyed everyone else.

26.     In November 2014, Pashalek filed a formal complaint against Mahler because of the incident on or about October 12, 2014.

27.     On November 5, 2014, Eric Jones (hereinafter "Jones"), a Battalion Chief for LFR and the Battalion Chief in charge of Station 8, went to Station 8 to get a statement regarding the incident between Cunningham, Mahler, and Giles.

28.     Amanda was reminded by several coworkers that an investigation could go very badly for her if LFR did not handle it correctly. Jeffers was also moving through the hiring process at LFR, and Amanda thought she could be impacted if the complaint was not handled correctly.

29.     Amanda contacted John Huff (hereinafter "Huff"), the Fire Chief of LFR, and asked him to stop the investigation into Pashalek's complaint.  Amanda feared that based on Mahler's conduct to-date, the situation might get worse if she pursued the complaint.

Amanda also wanted the opportunity to allow herself and Mahler to work out any issues Mahler had with her between the two of them.

30.     On or about December 19, 2014, because Mahler still was not speaking to Amanda, Amanda asked Mahler about training and for advice about joining the Urban Search and Rescue Team (hereinafter "USAR").  Amanda also inquired why she was not included in the truck rotation like the male firefighters.  Mahler told Amanda she should stick with medical specialties because typically women are less mechanically-minded than men.

31.     Mahler told Amanda he would observe her for 18 months to three years, and then he would decide after that time if she was qualified and competent enough to be on his truck.  It is not LFR's policy for a Station Captain to observe a Firefighter for 18 months to three years to decide if he or she is qualified or competent for a particular rotation.

32.     Similarly-situated male Firefighters/EMTs for LFR did not have to be observed by Mahler for 18 months to three years before Mahler allowed them to rotate onto the truck for overtime or to fill a vacancy.

33.     Amanda told Mahler she had a desire to become proficient on all apparatuses in the fire station.  She asked Mahler if he would work with her on rope rescue and rigging to meet his standard.  Mahler told Amanda it was not his job to train her.

34.     Giles witnessed Mahler's schedule manipulation and discrimination of Amanda throughout her time at Station 8.  Amanda also complained to Giles throughout her time at Station 8 about Mahler's disparate treatment of her in comparison to all the

other male Firefighters.  Giles complained to Jones that Mahler was treating Amanda unfairly and discriminating against her because she was female by manipulating the schedule, so he would not have to ride with Amanda. Giles felt the environment at Station 8 had turned hostile and he believed Jones needed to do something to address it.

35.     Jones repeatedly told Giles he was going to rectify the situation. Jones told Giles he addressed Mahler regarding the discriminatory treatments, but then he eventually took Mahler out for a beer and apologized to Mahler because Mahler had refused to speak to him for a month following Jones' oral counseling.

36.     On August 8, 2015, Amanda purchased a "fall protection" belt from Jason Relford (hereinafter "Relford"), a Firefighter for LFR. Amanda told Mahler that she had purchased the belt because he would not let Amanda do roof ventilation operations without a fall protection belt. Mahler told Amanda that she had still not proven to him that she was trained to his standards and that Amanda would not be doing any ventilation operations if there was a working incident.

37.      Jesse Johnson (hereinafter "Johnson"), a male Firefighter at Station 8, was scheduled on August 17, 2015 to drive the Medic 8 Unit. Upon information and belief, sometime before August 17, 2015, Mahler manipulated the schedule to switch Amanda from the engine unit to the medic unit at 7:00 p.m. during her twenty-four-hour shift. During the first part of her shift, Amanda was assigned to the engine unit. While she was on the Engine Unit at approximately 6:15 p.m., the Engine Unit including Amanda was dispatched to an emergency situation.

38.     While she was still at the emergency situation, Amanda told Giles that she had to switch to the medic unit at 7:00 p.m. Giles contacted Mahler to again confront him about manipulating the schedule to Amanda's detriment.

39.     The scene Amanda was working was cleared at approximately 8:00 p.m. The unit was taken out of service and called downtown. The Station 8 personnel waited downstairs in Station 8 while Mahler, Giles, and Jones had a meeting to discuss the situation with Mahler manipulating the schedule and treating Amanda differently.

40.     Upon information and belief, Giles again reported to Jones during the meeting that Mahler was discriminating against Amanda and denying her training by manipulating the schedule.  Giles also reported to Jones how affected Amanda was by the continued discrimination and that Amanda had begun going to the Employee Assistance Program ("EAP") for counseling.

41.     On or about December 21, 2015, Amanda was on kitchen duty.  Station 8's house rules dictate that it is the responsibility of the person on kitchen duty to sweep the area, clean the prep utensils, and run the dishwasher with the dishes used during the station meal.  Amanda had already completed these tasks and started the dishwasher. Amanda and Giles were in the kitchen, and neither of them had participated in the house meal. According to the house policy, because they did not participate in the house meal, they did not have to clean up.

42.     Even though Amanda and Giles were in no way required to clean up the meal they did not participate in, Giles and Amanda elected to collect all the dishes and put them in the sink to start the clean-up from the meal, so the Firefighters who had prepared the meal could take a break.

43.     After Amanda and Giles had cleaned up from the meal, Mahler came into the kitchen while the dishwasher was still running, and additional dishes were sitting in the sink, stacked, waiting for the next load. Mahler loudly stated, "Whoever the kitchen man is, needs to do his job."  Mahler knew that Amanda was assigned to kitchen duty at that time.

44.     Even after Giles and Amanda explained what happened, Mahler insisted Amanda handwash the remaining dishes.  The other male Firefighters in the kitchen at the time, sat at the table and watched as Amanda handwashed the dishes.

45.     Amanda and Giles both contacted the LFR administration to complain about the continued harassment and the kitchen incident. LFR initiated an investigation into the incident.

46.     On December 30, 2015, Mahler was transferred to Station 5 due to the pending investigation.

47.     On January 7, 2016, Tim Linke (hereinafter "Linke"), the Interim Fire Chief contacted Amanda at Station 8 and requested Amanda go downtown to meet with him. Amanda complained to Linke about the disparate treatment she was receiving in comparison to the male Firefighters at the station concerning the rotation schedule, that she was being excluded from training, and about the incident between herself and Mahler in the kitchen. Amanda asked Linke what the investigative process entailed. Linke told Amanda that the pre-disciplinary hearing for Mahler had been postponed so Mahler could prepare a defense.

48.     Following her meeting with Linke, Amanda emailed Linke and asked if he wanted the information from her EAP counselor.

9

49.     On January 19, 2016, the City found no reason for any action and advised Amanda to return to Station 8.

50.     Amanda explained to Benes that she feared she would be retaliated against because of her complaint if she returned to Station 8. She told Benes that she did not feel safe reporting to Mahler especially given the high-risk situations Amanda's job responsibilities placed her in, and that Amanda was fearful for her career.

51.     On or about January 19, 2016, Giles had a meeting with command staff regarding their internal investigation of Giles' and Amanda's complaints regarding discrimination and harassment by Mahler.

52.     During the meeting, Linke stated that LFR's investigation had not supported a finding of wrongdoing by Mahler but that he found that there was a personality conflict between Mahler and Giles.

53.     Giles vehemently questioned those findings and expressed how he had repeatedly made complaints to Jones regarding Mahler's conduct toward Amanda and that he could not believe they were going to put Mahler and Amanda back in the same environment; that Jones had not addressed his multiple complaints about Mahler and Amanda; and that the one time Jones had said something to Mahler, he ended up apologizing to Mahler because Mahler would not speak to him.

54.     During the conversation, Giles asked Jones, "Am I lying?"  Jones' reply was, "You brought up multiple problems about Shawn."

55.     On or about January 19, 2016, Amanda was informed by Jim Bopp (hereinafter "Bopp"), a Battalion Chief at LFR, that Giles would be replaced by Darren Merryman (hereinafter "Merryman"), a Captain for LFR, who had been briefed on

10

Amanda's situation.  Amanda was told that Merryman would take part in the re-education of Station 8 on what Bopp referred to as "these matters." Amanda was also told Mahler would return to Station 8.

56.     On January 19, 2016, Amanda was asked to return to meet with the LFR Administration.  Amanda met with Linke, Bopp, Ron Trouba, Jr. (hereinafter "Trouba"), a Captain for LFR and the Union President, and Leo Benes (hereinafter "Benes"), a Battalion Chief for LFR. Amanda told Trouba she was fearful about her career and about further retaliation. Trouba told Amanda that she needed to trust him.  On January 20, 2016, Amanda was put on paid administrative leave.

57.     On or about January 20, 2016, Linke, Bopp, and Benes told Amanda she would have to return to Station 8 or give up her assignment and become a floater.  Linke, Bopp, and Benes, also tried to set up a meeting with Mahler and Amanda.  Amanda reiterated her concerns about Mahler and requested to become a temporary floater. Amanda also told Linke she did not feel comfortable returning to Station 8 to get her gear. Amanda excused herself from the meeting when it became apparent that her concerns were not being considered.  After Amanda told them she did not feel safe at Station 8, Linke removed Amanda from administrative leave and required her to take sick leave for the remainder of the day.

58.     On January 20, 2016, Amanda sent an email to Linke, Benes, and Bopp. In her email she said she was not comfortable meeting with Mahler that afternoon because she did not believe the meeting would alleviate her worries of the continued harassment, hostile, and unsafe work environment at Station 8. Amanda requested that

they find a long-term solution and that she not be forced to go back to Station 8 where she did not feel safe because of the retaliation and continued harassment.

59.     On January 21, 2016, Amanda contacted Trouba to discuss her concerns about her transfer rights. Amanda and Trouba arranged to meet on February 3, 2016.

60.     On or about January 29, 2016, Amanda filed an internal EEO complaint based on sexual harassment and discrimination through Kimberley Taylor-Riley (hereinafter "Taylor-Riley"), the Director of Equity and Diversity for the City.

61.     Upon information and belief, as part of Taylor-Riley's investigation into Amanda's complaint, multiple members of command staff and Station 8 personnel were interviewed, including, but not limited to, Pat Borer (hereinafter "Borer"), the Assistant Chief for LFR, Jones, Mahler, Amanda, Giles, Jeremy Phillips (hereinafter "Phillips"), a male Firefighter at Station 8, Mark Rist (hereinafter "Rist"), a male Firefighter at Station 8, Cunningham, and Mahler.

62.     On February 3, 2016, Amanda met with Trouba.  Amanda asked Trouba about her transfer rights.  During the conversation, Trouba mentioned Amanda's private medical information and the private medical information of a civilian.  He told Amanda "it" was embarrassing and she should be spending her energy trying to fix her career and reputation instead of pursuing a harassment claim against the City.  Amanda expressed her discomfort to Trouba about his knowledge of her private medical information and his attempt to dissuade her from pursuing her harassment complaint.

63.     Trouba also told Amanda that she would eventually run out of the ability to float to a different station.

12

64.     On or about February 4, 2016, Amanda contacted Merryman to inquire about the re-education program for Station 8.  Merryman denied knowing anything about Amanda's situation and denied her request to meet with him.

65.     On February 5, 2016, Amanda sent an email to Linke, Bopp, Benes, and Merryman. She said in her email that she would return to Station 8 in the next scheduling set with the understanding that everyone involved, including herself, displayed the diligence it would take to continue fighting to make the station a safe and healthy environment for everyone. She also asked that they feel free to contact her if there were any issues.

66.     On February 5, 2016, Amanda also sent a text message to Merryman. Amanda told Merryman in her text message that she would be back on Wednesday, but if Merryman had any availability prior to that, she would like to take him out for a cup of coffee to talk. Merryman responded that he would be unavailable for a cup of coffee.

67.     On or about February 20, 2016, Amanda was forced to return to Station 8. She was told by Linke that the City could no longer allow her to float from her assignment.  Upon her return to Station 8, Mahler did not speak or look at Amanda. Merryman told Amanda and Mahler that Mahler could only communicate to her through him and ordered Amanda to only communicate with Mahler through Merryman. Amanda voiced concerns with Merryman about this arrangement.  Merryman told Amanda that Mahler was angry about the complaint Amanda made and Mahler requested Rist be the only Firefighter to rotate onto his truck.  Merryman said that any training for Amanda would be conducted by himself or other Firefighters because Mahler would not train her.

13

68.     In response to her conversation with Merryman, Amanda immediately told Benes about the situation.  She received no response from Benes.

69.     On March 3, 2016, Amanda sent an email to Benes again, and blind copied Linke to provide an update on how things were going at Station 8 since she returned. She questioned the mandate of no communication and informed them Mahler was not communicating with her and she was still not being allowed to rotate to the truck.

70.     On March 24, 2016, Sherry Meints (hereinafter "Meints"), the Privacy Office for the City, informed Amanda there was a HIPAA violation involving her medical records.

71.     On March 25, 2016, Amanda emailed Meints to get more information about how her private medical information had been disclosed.

72.     On March 25, 2016, Amanda had a meeting with Merryman to discuss training for Amanda to be a Fire Apparatus Operator (hereinafter "FAO"). The training document that was signed by both Merryman and Amanda said her midpoint evaluation would be June 27, 2016, and she would be re-evaluated on September 19, 2016. By the September 19, 2016 evaluation, Amanda was to be ready for the FAO certification process and prepared to fulfill the duties of an FAO. The document Amanda signed was not standard policy and only pertained to Amanda.

73.     Amanda and Meints met on March 30, 2016, along with Roger Bonin (hereinafter "Bonin"), the Division Chief of Training and Emergency Medical Services Chief for the City.  Amanda told Bonin and Meints about her earlier conversation with

14

Trouba.  She said Trouba had been made aware of her private medical information and he had approached her to discourage her from any further action against the City

74.     On March 31, 2016, Amanda asked Bonin if it would be okay if Giles attended the meeting she was scheduled to have with Bonin and Meints for support. Bonin said that would be okay.

75.     On or about April 4, 2016, Amanda, Meints, Bonin, Giles, and Liz Elliot (hereinafter "Elliot"), an Assistant City Attorney for the City, met to discuss Trouba's actions.  Amanda also learned that Kyle Reinhart (hereinafter "Reinhart"), a Firefighter, had requested her personal medical information.

76.     On or about April 4, 2016, Amanda had a meeting with Elliot regarding the breach of her HIPAA Rights. Giles attended the meeting with Amanda. Amanda raised complaints in the meeting about her private medical information being disclosed following her EEO complaint in violation of HIPAA.

77.     On or about April 19, 2016, Elliot informed Amanda she was not obligated to investigate Trouba for doing his job as Union President and the investigation was inconclusive regarding the HIPAA violation. Amanda informed Elliot that the civilian whose HIPAA privacy rights were also breached, needed to be informed. The City never informed the civilian that her HIPAA privacy rights had been breached.

78.     On or about April 26, 2016, Taylor-Riley told Amanda that during Taylor-Riley's investigation into Amanda's complaint of harassment, Taylor-Riley was told Amanda was reported numerous times for insubordination, wearing socks in the fire station, refusing to accept a pastry offered to her, refusing coffee refills, and for having a strange, possibly romantic relationship with Giles. Taylor-Riley told Amanda several

attempts were made by Mahler and others under Mahler's direction to submit photos of her, without her knowledge, sitting in a recliner next to Giles as evidence of their inappropriate relationship. Amanda was never advised by anyone about these alleged claims of insubordination.

79.     Upon information and belief, Merryman also reported to Taylor-Riley that Amanda was refusing to speak to Mahler as if she was being insubordinate, even though he had ordered her not to communicate with Mahler.

80.     After Amanda learned of the alleged complaints about her performance, she asked Merryman if there had been any complaints about her. Merryman told Amanda that no issue had been relayed to him, and he thought her performance was exemplary.

81.     On or about May 6, 2016, Amanda reported to Merryman that she did not feel safe at Station 8 because of retaliation from Mahler and his peers. Phillips told Amanda he felt the discrimination against her was so blatant and severe that he could no longer watch it and he had asked for a transfer.

82.     In May 2016, Benes told Amanda if she had accepted a mediation with Mahler at the onset of the issues, then the problem would not have gotten so bad and her issues with Mahler would be over. Amanda explained to Benes she had never been given an option to mediate any issue with Mahler. Benes insinuated to Amanda that she was lying. He told Amanda her options were to float for the work-set; ending in union grievance; transfer to a floating position and lose her current position; or float for 90 days if the Union, City Administration, and the City Hall agreed to write a Memorandum of Understanding (hereinafter "MOU") regarding Amanda's position.

83.     Giles filed his own Charge of Discrimination with the Nebraska Equal Opportunity Commission on or about June 8, 2016, based on retaliation for participating as a witness for Troy Hurd (hereinafter "Hurd"), a Captain for LFR, and reporting discrimination and harassment of another female firefighter recruit, (hereinafter Firefighter "A", and Amanda, resulting in the City's failure to promote him to a Battalion Chief position.

84.     In either late April or early May 2016, Taylor-Riley's report following her investigation of Amanda's complaint was sent to Mayor Chris Beutler (hereinafter "Mayor Beutler") for review.  Upon information and belief, Taylor-Riley's report stated that Taylor-Riley found that Amanda had been discriminated and retaliated against by LFR representatives.  Upon information and belief, Taylor-Riley's report details that Amanda had less hours of training on the Truck yet more calls with less sleep and downtime for personal training than her male peers. Taylor-Riley's report also indicated that Mahler had informed another Firefighter at LFR that in his opinion there was no room for women in fire service.

85.     On May 24, 2016, Amanda was put on injury leave to have surgery because of a work injury.

86.     On July 18, 2016, Merryman emailed Amanda because the MOU was coming to an end and she would have to give up her assignment or go back to Station 8. At the time, the City had not responded to Taylor-Riley's report or Amanda's complaints concerning the continued harassment, discrimination, and retaliation Amanda had experienced.

87.     On July 22, 2016, because Amanda felt there had not been any effort to protect her from further harassment, discrimination and retaliation, Amanda was forced

17

to give up her assignment at Station 8 to become a floating firefighter.   Amanda told Merryman she was giving up her assignment because the environment was so toxic and retaliatory towards her she felt she had no other option.

88.   On July 28, 2016, Amanda received a letter from Mayor Beutler. The letter stated the law department for the City did not see grounds for discrimination or retaliation. It also stated Amanda would be able to schedule a meeting with Doug McDaniel (hereinafter "McDaniel"), the Human Resources Director for the City, and Tom Casady (hereinafter "Casady"), the Public Safety Director for the City, to discuss how to improve fire house interactions.   The letter did not inform Amanda of any actions put in place to remedy harassment or retaliation.

89.   Following Mayor Beutler's letter, Amanda was contacted by Casady on or about August 1, 2016, to schedule a meeting with her and McDaniel.   Amanda requested that she be allowed to bring Giles as a witness to their conversation rather than a union representative.   Casady denied the request to have Giles present.

90.   On August 2, 2016, Amanda met with Casady and McDaniel.   Casady admitted that there had been a "management failure" when Command Staff failed to communicate with her supervisors at Station 8, Darren Merryman and Shawn Mahler, and management's expectations regarding how Mahler should treat her at Station 8 after her complaints of discrimination and harassment.   McDaniel told her in response to her complaints of discrimination/harassment by Mahler that LFR had "a systemic issue that need[ed] to be addressed."   McDaniel also said, "If we had the advantage of the HR Wand, this never would have happened. It would have been solved in 2012 with the culture, but the HR Wand is pretty damn weak."

18

91.     McDaniel and Casady attempted to pressure Amanda into returning to Station 8. They both told her to trust them and said they finally "had Mahler's attention." Amanda told them that she would not return to Station 8 because they had not remedied the situation.

92.     In August 2016, Michael Despain (hereinafter "Despain"), the newly-appointed Fire Chief for LFR, contacted Amanda to discuss her options with her. Amanda was then transferred to Fire Station 3.

93.     Amanda filed a Charge of Discrimination with the NEOC on or about August 15, 2016 alleging sex harassment, discrimination, and retaliation.

94.     On December 12, 2016, Merryman called Station 3 and spoke to Dan Ripley (hereinafter "Ripley"), the Fire Captain for Station 3. Merryman asked Ripley to send Amanda to Station 8 to receive her evaluation. Ripley told Merryman that Amanda would not being going to Station 8 for her evaluation and something else needed to be arranged.

95.     Later that day, while Amanda was enroute to the hospital with a patient on the Medic 3 unit, Merryman contacted Amanda on the radio.  Over the radio, Merryman demanded Amanda meet him as soon as possible regarding her evaluation.  Merryman instructed Amanda to wait at the hospital once her Medic Unit had transferred the patient care to the hospital. Despite the unusual circumstances, Amanda arranged to meet Merryman at the hospital.  Merryman gave Amanda her evaluation in the hospital break room in the presence of another Firefighter.

96.     Merryman rated Amanda 74%, which is far lower than any other performance evaluation she has ever received.  Amanda's Captain's rating in her next

19

evaluation was 91%.  Merryman could not give Amanda any explanation for her poor review.

97.     Amanda was forced to transfer stations to remove herself from the hostile work environment created by Mahler that was never effectively addressed by management.

## WIDESPREAD CUSTOM OF DISCRIMINATION AND RETALIATION AT LFR

98.     Under the City's Equity and Diversity Plan (hereinafter "EAD Plan") adopted in 2012, City representatives had a duty and to monitor City departments, including LFR, regarding whether they were complying with the City's EAD.  The EEO officer had very specific and detailed duties regarding investigation discrimination complaints and monitoring compliance for the EAD, including working with the supervisors who are charged with the responsibility and accountability for EEO and implementation of the establishment EAD Plan.

99.     Casady, Huff, and Linke were required to report instances of discrimination and retaliation of which they were aware and had the legal duty to comply with the EAD.  The plan had very specific duties with respect to Department Directors and Managers.

100.    City Directors and Managers have the ultimate responsibility for decisions affecting progress toward achieving equal opportunity, which would include Director Casady, McDaniel, Huff, and Linke during his time as Interim Chief.  Casady, while he was aware there was an Equity and Diversity Plan document, he doesn't know whether he ever read it. Linke wasn't even aware there was an Equity and Diversity Plan. Neither was Borer.

20

101.    In 2012, Fire Captain Hurd complained to several superiors that Female Firefighter A was being harassed and treated differently on the basis of her sex and national origin.

102.    Hurd was disciplined following his complaint on several occasions.  Hurd believed his discipline was in retaliation for reporting the discriminatory treatment of Female Firefighter A.

103.    Hurd completed a workplace harassment survey in August 2012. The survey was initiated by Taylor-Riley and McDaniel who also reviewed the results.

104.    In response to the same EEO survey, two Battalion Chiefs employed by LFR at the time expressed that the current LFR administration acted in a retaliatory or discriminatory manner.  One of those Battalion Chiefs (hereinafter "Battalion Chief A") wrote in response to a question about discrimination that he had witnessed:

> "Retaliation can be a factor.  I just know I only have a few months before retirement and can't wait to leave (note: that this last statement could ID me if anyone in LFR reads this!!)  There is a fine line between just being a crappy condescending boss and discriminating acts or behaviors."

105.    In response to Question No. 3 of the EEO survey, a male LFR Firefighter (hereinafter "Firefighter B") who worked in the same station as Firefighter "A", reported her mistreatment during her preceptorship to his Captain three times.

106.    Jeanne Pashalek, HR Battalion Chief at the time, wrote in response to a question about general comments about discriminatory or harassing activities you believe are occurring within LFR:

> I believe there are subtle occurrences on a daily basis ranging from ignoring others, comments or jokes, to actual isolation in some cases. Our middle managers really need training on EEO since they are the front-

line managers in the stations.  The training must also be for all personnel, but stating with the captains in the front line "defense."

107.    Pashalek went on to state in response to a question "How can LFR make improvements in matters of discrimination or sexual harassment?"

> The first step is awareness, followed by education and training, and lastly is the accountability with zero tolerance.  Last year we had training due to a grant, but it had been years before that.  Our department is a white male dominated culture that believes they treat people fairly, but women are subjected to a lot of subtle harassment/discrimination.  The women are too concerned about getting along and not being considered a troublemaker by their peers so they will not report issues.  I hear about them and I know several of our women have or currently are experiencing issues.  Having a confidential process for reporting will be a huge improvement.  We should contract with Cultural Bridges to Justice for training starting next year.  If we get multiple agencies to split the cost, it will be affordable.

108.    As part of Taylor-Riley's investigation into Hurd's complaint, Giles was interviewed multiple times.  Generally, during these interviews Giles supported Hurd's allegations of illegal retaliation and provided Taylor-Riley assistance in background for her investigation regarding where certain documents or information could be located. From 2012 to when the Taylor-Riley report was finalized in October of 2014, Giles had at least sixty-five (65) telephone calls and sent or received two-hundred twenty-one (221) text messages from Taylor-Riley.

109.    On September 5, 2012, Hurd filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission.

110.    LFR generally notifies command staff when an NEOC Charge has been filed, and command staff was notified when Hurd filed his Charge.

111.    Hurd reported numerous instances of retaliation to City officials during her investigation, but nothing was done by City representatives to address or remedy the retaliation.

22

112.   In July 2013, at a Command Staff meeting, Borer called Hurd a "f'in idiot" and told Chief officers that he wanted to tell Hurd that he would never be promoted or able to serve as an EMS Supervisor because of his NEOC Complaint.

113.   Casady and Pashalek spoke to Borer in the Chief's meeting about his retaliatory comments about Hurd. Pashalek and Casady told Borer he should not tell Hurd he did not get promoted to EMS Supervisor because he filed an NEOC Complaint.

114.   On July 24, 2013, Borer went to Station 11 to speak with Hurd.  Hurd and Sten Ulrich (hereinafter "Ulrich"), another Firefighter for LFR, were at Station 11 when Borer arrived.  Hurd complained to Borer about how the selection of EMS Supervisors was unfair because there was no qualification procedure or policy in place. Borer told Hurd that Bonin and several other Chiefs in the department had trust issues with Hurd and that those trust issues were a major consideration when it was decided that Hurd was not going to considered for an EMS Supervisor position or EMS Supervisor back-up position. Borer stated to Hurd that the trust issues were because Hurd filed an EEOC State of Nebraska complaint. Hurd than complained to Borer that if he was denied the EMS Supervisor position because of his NEOC Charge that he was being illegally retaliated against.

115.   On August 1, 2013, Borer again came to Station 11. Hurd asked Borer why he received elevated discipline in comparison to the other LFR employees who committed similar alleged infractions. Borer told Hurd that he had a lot of history on the job and that is why he received elevated discipline. Borer told Hurd that he had a poor history in the department and Hurd's state complaint issues of why Hurd had problems.

23

116.    Pashalek heard a rumor from Bonin that Borer had made the retaliatory statement about Hurd not being considered for the EMS supervisor position because of his NEOC Complaint and investigated the statement. Pashalek confirmed through Hurd and Ulrich that Borer had made the retaliatory comments and reported her findings to Huff.  Pashalek spoke with McDaniel, and he told her to let Taylor-Riley handle the investigation. Huff told Pashalek he didn't believe Hurd's allegation and that he was lying.  Pashalek felt that Huff's comments about Hurd were inappropriate and indicated that he had closed the chapter on the investigation without even investigating it. Pashalek documented her conversation with Huff because she wanted to make sure it was documented if it ever came out and to ensure that she was protected if Huff ever denied having the conversation with her.

117.    Upon information and belief, McDaniel did not independently investigate whether Borer was retaliating against Hurd.

118.    Sometime following the meeting in July 2013, wherein Borer made comments about Hurd not being promoted because of his NEOC Complaint at the Chief's meeting, another Battalion Chief, (hereinafter "Battalion Chief B") came forward to speak to Taylor-Riley about Borer's comments.  Battalion Chief B told Taylor-Riley that Borer said Troy Hurd would not get promoted to the EMS Supervisor position or anything else in LFR.

119.    In January 2014, another firefighter at LFR (hereinafter "Firefighter C", informed Taylor-Riley that Benes had spoken with him about Borer making inappropriate comments in a Chief's meeting about Hurd.  Benes told Firefighter "C" he was scared that Huff was positioning him as the fall guy for the training academy and

that the Taylor-Riley investigation will cost somebody their job.  Firefighter "C" reported to Taylor-Riley that there was a plan to move Hurd to Station 1 to keep an eye on him and that they were trying to set Hurd up.  Firefighter "C" thought either Battalion Chief B or Benes may both be willing to disclose the plan to Taylor-Riley.

120.   In January and February 2014, the Chief Officers were interviewed in connection with the Taylor-Riley investigation.

121.   Following Borer's interview, he was upset that someone had told Taylor-Riley about what he said in an executive session about Hurd being a "f'in idiot."  Borer wanted to know who the witness was.  Taylor-Riley refused to disclose the witness' identity.

122.   In September 2014, Giles applied to be placed on a promotions list to a Battalion Chief position if one became available.  To determine the ranking of the potential candidate(s) on the promotions list, the candidates were ranked and scored based on their background, education, performance of certain tasks and an interview process.  Giles received the highest score,74, of the candidates tested/evaluated. The next highest scored candidate after Giles was 58.

123.   Hurd also applied for the promotions list.  During the promotional process, Hurd raised complaints to McDaniel about how the process could not be fair given his retaliation allegations against Command Staff who would be evaluating him in the promotional process.  No modifications were made to the promotional process based on Hurd's complaints.

124.   Taylor-Riley's investigation into Hurd's complaint resulted in a report by Taylor-Riley condemning the retaliation that Hurd suffered for complaining about illegal

25

discrimination. Taylor-Riley's report was issued on October 10, 2014.  In Taylor-Riley's

report regarding Hurd's complaint, Giles was listed as a witness she personally

interviewed.

125.    Taylor-Riley reached the following conclusions:

Reasons advanced by LF&R are a pretext to cover retaliatory motive
(reason is not believable, similarly situated individuals who did not oppose
discrimination or participate in the EEO process were treated differently.)

In the instant matter:

        1.      The Complainant received a reprimand for leaving a meeting
that he was not ordered to either attend or remain at;

        2.      He was given a verbal warning followed by an EIR for
damage or potential damage to E11, but the evidence reveals that the
pump was not damaged or at real risk for such by his crew's actions;

        3.      He received the most severe sanction that was given for the
logbook error even though he had not had prior discipline for this conduct
in the past and the person that had been disciplined for the conduct
previously got the same level of  penalty, not a more severe one; in the
second instance, Complainant was disciplined when he discovered the
error of another Firefighter and made an error himself trying to correct it;
and

        4.      The Complainant has been precluded from acting out of
grade as a Battalion Chief when others have been allowed to do so
without complying with the restrictions placed upon Complainant.

Based upon the foregoing analysis, it seems that the reasons proffered by
LFR are pretext for retaliation.

The EEO is of the opinion that the conduct detailed herein is the direct
result of a retaliatory environment that is further impaired by a lack of
consistent discipline, lack of communication on the administrative level
(chief to chief), lack of communication from the administrative level to the
rank and file, and a lack of trust at all levels.  These are not issues that
can be easily addressed through training or discussion.  These are issues
that reflect on overall environment that does not easily lend itself to
change.  The EEO would suggest that whatever intervention is sought a
supervisor/gatekeeper/facilitator be put in place and given the power to

enact new procedures that are needed to bring the necessary changes to
fruition through global implementation within LFR.

126.    Taylor-Riley's report also described the incidents of Giles's initial
complaint about the discrimination of Female Firefighter A.

127.    Battalion Chief C who was employed with LFR during Hurd's employment
who was interviewed during the Kimberley Taylor-Riley investigation reported, "As far as
whether or not the current processes result in retaliation toward employees/rank-and-file
Firefighters, (this Battalion Chief) feels that it is a retaliatory state.  If a Chief has a
problem with a Firefighter, they can go after them.  It just really depends on who they
are."

128.    In a subsequent interview with Taylor-Riley, Battalion Chief C reported
that in February 2014 both Borer and Bonin were upset that one of the command staff
members was talking to the EEO about conversations that were had in command staff
meetings where Borer had disparaged Hurd.  Taylor-Riley's conclusion from this report
from Battalion Chief C was, "These instances certainly seem to be direct evidence in
support of (Battalion Chief C's) assessment that it's a retaliatory environment."

129.    Upon information and belief neither Mayor Beutler nor Casady initiated
any investigation regarding Hurd's allegations of retaliation in connection with the
promotions process or to ensure that the Battalion Chief promotional process was
completed fairly since the command staff who was evaluating the candidates had been
accused of retaliation by not only Hurd, but multiple members of LFR rank and file, as
well as, command staff members as disclosed in the Taylor-Riley report.

130.    On December 17, 2014, Mayor Beutler sent a letter to Hurd indicating that he had reviewed the Kimberley Taylor-Riley investigative findings; that he had met with Casady and McDaniel and had recommended that all of the disciplinary actions be removed from Hurd's personnel file.  Mayor Beutler also indicated that Casady was going to examine and restructure the fire training academy with the assistance of a task force; implement mandatory training seminar regarding equal employment practices in general, and retaliation specifically, for all management-level employees; and review the process of imposing discipline to ensure consistency.

131.    On or about January 8, 2015, Hurd had a meeting with Casady to discuss Taylor-Riley's report on Hurd's retaliation. Hurd asked Giles to attend the meeting with Casady in order to witness the meeting as his friend and supporter.

132.    During the meeting, Casady informed Hurd that the Battalion Chiefs who Taylor-Riley's report confirmed had retaliated against Hurd would not receive any discipline.  During the meeting, Giles complained verbally to Casady about the retaliation he experienced after his complaint of illegal discrimination and that Casady had to fix the problem.  Giles told Casady that Casady and the City were not doing anything to remedy the problem of discrimination and retaliation within LFR. Trouba also told Casady that Chief Huff, Pashalek and Borer who were accused of retaliation in the Kimberley Taylor-Riley investigation were incompetent.   Casady became extremely upset and ended the meeting.  He then had a meeting with Trouba in his office for over an hour.

133.    Trouba also hand-delivered a letter to Mayor Beutler's office on January 12, 2015 that stated, in pertinent part:

> LFR is having a harder time retaining quality employees due to the culture that is being created.  Employees are being told they can't talk about particular safety issues and they shouldn't call their union representatives. They have been threatened with layoffs if they don't move from the position of EMT to Paramedic.  Employees are outright quitting this job to work somewhere else that makes less money.  That is a clear indicator of just how unhappy they are.  They are constantly in fear of being retaliated against.  They are frustrated and bitter from being held to a higher standard than any of the Chief Officers.

Regarding the Battalion Chief's promotional process, Trouba went on to state:

> Lastly, they included the applicant's performance evaluations in their consideration for promotion.  Fire Captain Troy Hurd, whom you recently responded to regarding his retaliation complaint, had received his performance evaluations from Assistant Chief Pat Borer.  As one might expect, Captain Hurd's evaluations were not very high and ultimately was ranked dead last.

134.    Upon information and belief, Mayor Beutler or Casady did not initiate any investigation regarding Trouba's allegations of retaliation or to ensure that the Battalion Chief promotional process was completed fairly since the command staff who was evaluating the candidates had been accused retaliation by not only Hurd, but multiple members of LFR rank and file, as well as, command staff members.

135.    In April 2015, Hurd responded to a request for an interview when he was contacted by the Lincoln Journal Star and gave an interview regarding his experience at LFR in reporting discrimination and retaliation. Casady and the Mayor's office responded to the Journal Star's requests for comment as well.

136.    Shortly thereafter, Hurd gave a radio interview on the Coby Mach show on KFOR and again discussed the City's failure to address the continued corruption at LFR and the Command Staff's multiple instances of continual discriminatory and retaliatory treatment of Firefighter "A" and himself.

137.   In response to the Taylor-Riley report, Lincoln Journal Star article and the Coby Mach interview, Casady wrote a detailed memo to Mayor Beutler criticizing Taylor-Riley's investigation.   Other than discuss the investigation with Chief Huff, McDaniel, Borer, and Pashalek at Chief Officer meetings with other command staff members present, Casady did nothing to independently investigate Hurd's allegations, nor did he review Taylor-Riley's extensive file.

138.   On or about May 21, 2015, Casady with the blessing of Mayor Beutler, issued letters of "exoneration" to Borer, Pashalek, and Chief Huff in conjunction with the Hurd investigation.   The letter stated as follows:

> Late last year, the City's director of equity and diversity issued a report culminating a lengthy investigation pertaining to a firefighter who alleged that he had been retaliated against for filing an earlier EEO complaint. The investigator asserted that your action in initiating disciplinary action against this employee at a point in time following his complaints constituted retaliation.  The employee also made these same claims in the local newspaper and talk radio shows.
>
> I reviewed the investigator's report in detail and did not agree with her findings.  I do not believe that there is conclusive evidence of any retaliatory motive at all in the disciplinary action you initiated, and I have determined that there is no basis for any kind of disciplinary action against you for this alleged retaliation.  I have thoroughly discussed this matter with the Mayor in three meetings, most recently earlier this week.
>
> As I have told you previously, I found what I believe to be errors of fact in the investigator's report, and conclusions not supported by the evidence. You may rest assured that I do not accept the findings of this investigation as it pertains to your conduct.  I realize this has been a difficult situation, and I appreciate your professionalism.

139.   Giles had an excellent performance evaluation in February 2015 authored by Jones that indicated he was looking forward to watching Giles' career go to the next level; and that Giles would make a great addition to the leadership team.   Despite his excellence performance and that he had gone through extensive objective testing where

30

he significantly outscored the other candidates, Giles was not promoted to Battalion Chief after Giles continued complaints regarding the treatment of Amanda and the continued upheaval within LFR regarding the Hurd investigation.

140.   In August 2015, Giles complained to Jones that he believed that his involvement with the EEO issues involving Hurd were hurting his chances for the promotion. Upon information and belief, no investigation was initiated at that point in time regarding Giles' retaliation complaint to Jones.

141.   Linke, along with recommendations and input from Casady and command staff, made both his promotional decisions in 2015 partly to keep the peace in LFR. He does not believe he chose the most objectively qualified candidate for the positions.

142.   Giles filed his Charge of Discrimination with the Nebraska Equal Opportunity Commission on or about June 8, 2016 based on retaliation for participating as a witness for Hurd and reporting discrimination and harassment of Firefighter "A" and Amanda for the City's failure to promote him to the Battalion Chief positions.

143.   In February 2016, Hurd filed a federal lawsuit alleging violations of Section 1983, Title VII, and the Nebraska Fair Employment Practice Act for discrimination and retaliation against the City of Lincoln.

144.   In April 2017, Giles filed a federal lawsuit alleging violation of Section 1983, Title VII and the Nebraska Fair Employment Practice Act for discrimination and retaliation against the City of Lincoln.

145.   Mayor Beutler was a policymaker for the City of Lincoln, did not have the discretion to illegally discriminate or retaliate against employees of LFR; was aware or should have been aware through the City's EAD Plan that harassment, discrimination on

the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Mayor Beutler has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

146.   Tom Casady was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR; was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Casady has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

147.   Doug McDaniel was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR, and was aware through City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  McDaniel has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

148.   Tim Linke was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate

against employees of LFR and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Linke has been aware or should have been aware since August 012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

149.   Leo Benes was a policymaker for the City of Lincoln or was designated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Benes has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

150.   Eric Jones was a policymaker for the City of Lincoln or was delegated policymaking authority; did not have the discretion to illegally discriminate or retaliate against employees of LFR and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Jones has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

151.   Darren Merryman was a policymaker for the City of Lincoln or was delegated policymaking authority by LFR; did not have the discretion to illegally discriminate or retaliate against employees of LFR and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Merryman has been aware or should have been aware since December 2016 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

152.   Shawn Mahler was a policymaker for the City of Lincoln or was delegated policymaking authority by LFR; did not have the discretion to illegally discriminate or retaliate against employees of LFR and was aware or should have been aware through the City's EAD Plan that harassment, discrimination on the basis of gender, and retaliation for complaining about gender harassment and discrimination is unlawful.  Mahler has been aware or should have been aware since August 2012 of LFR's continuing pattern of discriminatory and retaliatory treatment of women and/or individuals that complain about discrimination and harassment and has turned a blind eye to LFR's unlawful conduct.

## VI.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT**
**HOSTILE WORK ENVIRONMENT HARASSMENT/RETALIATORY HARASSMENT**
**(SUPERVISOR/CO-WORKER/NEGLIGENCE STANDARD)**

34

153.   Plaintiff realleges paragraphs 1 to 152 of this Complaint as if fully set forth herein.

154.   Plaintiff was subjected to unwelcome and offensive conduct from her co-workers and supervisors employed by the Defendant who created a hostile work environment at Station 8 before and after her complaints of discrimination.

155.   Such conduct was based on Plaintiff's sex.

156.   Mayor Beutler, Casady, Linke, McDaniel, Benes, Jones, Merryman, Mahler, and other City officials were all aware or should have been aware of the harassment, discrimination, and retaliation and failed to take appropriate remedial measures.

157.   The hostile environment affected a term, condition, or privilege or her employment.

158.   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
## SEXUAL DISCRIMINATION

159.   Plaintiff realleges paragraphs 1 through 158 as if fully set forth herein.

160.    Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of her sex in violation of the Nebraska Fair Employment Practice Act.

161.    Plaintiff suffered an adverse action.

162.    Plaintiff's sex was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

163.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
## RETALIATION

164.    Plaintiff realleges paragraphs 1 through 163 as if fully set forth herein.

165.    Plaintiff complained to Defendant about the sexual harassment she experienced, and otherwise opposed practices made unlawful by the Nebraska Fair Employment Practice Act.

166.    Defendant retaliated against Plaintiff because of her complaints and opposition to harassment.

167.   Plaintiff's sex and her protected activity were motivating factors in Defendant's retaliation against her.

168.   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

**FOURTH CAUSE OF ACTION**
**STATE CONSTITUTIONAL DISCRIMINATION,**
**RETALIATORY HARASSMENT, AND**
**RETALIATION**
**(CITY OF LINCOLN AND INDIVIDUAL DEFENDANTS)**
**(EQUAL PROTECTION CLAUSE)**

169.   Plaintiff hereby repleads paragraph 1 to 168 as if fully set forth herein.

170.   Defendant City of Lincoln through its agents, servants, and employees, including, but not limited to, Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their official capacities, established an official policy, practice, or custom of reckless or deliberate indifference to females and/or person who complain about illegal discrimination, illegal retaliation, or unlawful activities, people who refuse to countenance a discriminatory or retaliatory hostile work environment, and/or participate as a witness or complainant in connection with an EEO investigation.

171.   Defendant City of Lincoln discriminated, harassed, and/or retaliated against Plaintiff and others by establishing, maintaining, and enforcing polices which create or foster a discrimination, retaliatory, and hostile work environment, by discriminating against, harassing, and retaliating against women and/or employees who complain about illegal discrimination, illegal retaliation, or other unlawful activities' people who refuse to countenance a discriminatory or retaliatory hostile work environment; and/or participate as a witness or complainant in connection with an EEO investigation.

172.   In the alternative, if the discriminatory practice of establishing, maintaining, and enforcing policies which create or foster a hostile work environment, by treating women; people who complain about illegal discrimination, illegal retaliation, or other unlawful activities people who refuse to countenance a discriminatory or retaliatory hostile work environment; and/or participate as a witness or complainant in connection with an EEO investigation, including Plaintiff, it was a practice, procedure or custom which the Defendant City of Lincoln and its policy makers had actual or constructive knowledge of the discriminatory, hostile, and retaliatory atmosphere; failed to remedy the harassment, discrimination and/or retaliation; failed to adequately train employees regarding discrimination and retaliation; and/or ratified the illegal actions of employees of the City of Lincoln.

173.   Plaintiff was subject to this official policy or custom while she was employed at LFR.

174.   Defendant City of Lincoln's policy, custom, or practice in general, and as applied to Amanda in particular, was purposeful and intentional; and/or the Defendant's policymakers were aware or should have been aware of the unconstitutional conduct;

Defendant failed to train its employees to follow the law; Defendant's policymakers ratified the conduct of their subordinates; and/or Defendant's policymakers condoned or turned a blind eye to the unlawful conduct.

175.   Defendant City of Lincoln deprived Plaintiff of her rights to be free from sex discrimination, harassment, and retaliation, which she is entitled under the Equal Protection Clause of the Article I, Section 2 of the Constitution of the State of Nebraska, which was clearly established at all times material hereto.

176.   Plaintiff has been damaged as a direct and proximate result of the Defendants' acts and omissions aforesaid.

WHEREFORE, Plaintiff prays for judgment against Defendant City of Lincoln, Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler in their official capacities, in an amount which will fully and fairly compensate her for her injuries and damages, for attorney's fees and costs, for interests as allowed by law and for such other and further relief as is just in this case.

## FIFTH CAUSE OF ACTION
## STATE CONSTITUTIONAL EQUAL PROTECTION VIOLATION
## (INDIVIDUAL DEFENDANTS)

177.   Plaintiff hereby repleads paragraph 1 to 176 as if fully set forth herein.

178.   Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their individual capacities, deprived Plaintiff of rights protected by the Article I, Section 2 of the Constitution of the State of Nebraska by establishing, maintaining, or enforcing policies which create or foster an illegal retaliatory hostile work environment; by treating women differently than other similarly situated employees and by retaliating against those, including Plaintiff, who

complain about and/or refuse to countenance a hostile work environment harassment based on sex and retaliation; and/or by turning a blind eye or condoning the illegal conduct of their subordinates.

179.   In the alternative, if the acts complained of were not committed by the individual Defendants pursuant to an official policy, practice or custom of the Defendant the City of Lincoln , they were committed by the Individual Defendants with the purpose and intent of creating or fostering a retaliatory hostile work environment, by treating women and/or people who complain about illegal discrimination differently than other similarly situated employees and by retaliating against and harassing those, including Plaintiff, who complain about and/or refuse to countenance a hostile work environment based on sex, disability, or retaliation; and/or by turning a blind eye or condoning the illegal conduct of their subordinates.

180.   Each individual Defendant acted under color of state law and did not have the discretion to act in an unlawful manner.

181.   Each individual Defendant deprived Plaintiff of her rights to be free from sex discrimination, harassment, and retaliation, which she is entitled under the Equal Protection Clause of the Article I, section 2 of the Constitution of the State of Nebraska, which was clearly established at all times material hereto.

182.   Each individual Defendant acted with reckless or deliberate indifference to the rights of Plaintiff, which were clearly established under the law, and with malice.

183.   Plaintiff has been damaged as a direct and proximate result of the individual Defendants' acts and omissions.

WHEREFORE Plaintiff prays for judgment against Defendants, in their individual capacities, in an amount which will fully and fairly compensate her for her injuries and damages, for punitive damages in an amount sufficient to punish Defendants and deter others, for attorney's fees/expert witness fees, and costs, for interest as allowed by law and for such other and further relief as is just in the premises.

### SIXTH CAUSE OF ACTION
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### HOSTILE WORK ENVIRONMENT HARASSMENT/RETALIATORY HARASSMENT
### (SUPERVISOR/CO-WORKER/NEGLIGENCE STANDARD)

184.    Plaintiff realleges paragraphs 1 to 183 of this Complaint as if fully set forth herein.

185.    Plaintiff was subjected to unwelcome and offensive conduct from her co-workers and supervisors employed by the Defendant who created a hostile work environment at Station 8 before and after her complaints of discrimination.

186.    Such conduct was based on Plaintiff's sex.  Mayor Beutler, Casady, Linke, McDaniel, Benes, Jones, Merryman, Mahler, and other City officials were all aware or should have been aware of the harassment, discrimination, and retaliation and failed to take appropriate remedial measures.

187.    The hostile environment affected a term, condition, or privilege or her employment.

188.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional

41

distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## SEXUAL DISCRIMINATION

189.    Plaintiff realleges paragraphs 1 through 188 as if fully set forth herein.

190.    Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of her sex in violation of Title VII of the Civil Rights Act.

191.    Plaintiff suffered an adverse action.

192.    Plaintiff's sex was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

193.    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may

be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## RETALIATION

194.   Plaintiff realleges paragraphs 1 through 193 as if fully set forth herein.

195.   Plaintiff complained to Defendant about the sexual harassment she experienced, and otherwise opposed practices made unlawful by the Nebraska Fair Employment Practice Act.

196.   Defendant retaliated against Plaintiff because of her complaints and opposition to harassment.

197.   Plaintiff's sex and her protected activity were motivating factors in Defendant's retaliation against her.

198.   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for her attorneys' fees, for the costs of this action, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act.

### NINTH CAUSE OF ACTION
### UNITED STATES CONSTITUTION DISCRIMINATION,
### RETALIATORY HARASSMENT AND
### RETALIATION
### (CITY OF LINCOLN AND INDIVIDUAL DEFENDANTS)
### (EQUAL PROTECTION CLAUSE)

199.    Plaintiff hereby repleads paragraph 1 to 198 as if fully set forth herein.

200.    Defendant City of Lincoln through its agents, servants, and employees, including, but not limited to, Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their official capacities, established an official policy, practice, or custom of reckless or deliberate indifference to females and/or person who complain about illegal discrimination, illegal retaliation, or unlawful activities, people who refuse to countenance a discriminatory or retaliatory hostile work environment, and/or participate as a witness or complainant in connection with an EEO investigation.

201.  Defendant City of Lincoln discriminated, harassed, and/or retaliated against Plaintiff and others by establishing, maintaining, and enforcing polices which create or foster a discrimination, retaliatory, and hostile work environment, by discriminating against, harassing, and retaliating against women and/or employees who complain about illegal discrimination, illegal retaliation, or other unlawful activities' people who refuse to countenance a discriminatory or retaliatory hostile work environment; and/or participate as a witness or complainant in connection with an EEO investigation.

202.    In the alternative, if the discriminatory practice of establishing, maintaining, and enforcing policies which create or foster a hostile work environment, by treating women; people who complain about illegal discrimination, illegal retaliation, or other unlawful activities people who refuse to countenance a discriminatory or retaliatory hostile

44

work environment; and/or participate as a witness or complainant in connection with an EEO investigation, including Plaintiff, it was a practice, procedure or custom which the Defendant City of Lincoln and its policy makers had actual or constructive knowledge of the discriminatory, hostile, and retaliatory atmosphere; failed to remedy the harassment, discrimination and/or retaliation; failed to adequately train employees regarding discrimination and retaliation; and/or ratified the illegal actions of employees of the City of Lincoln.

203.    Plaintiff was subject to this official policy or custom while she was employed at LFR.

204.    Defendant City of Lincoln's policy, custom, or practice in general, and as applied to Amanda in particular, was purposeful and intentional; and/or the Defendant's policymakers were aware or should have been aware of the unconstitutional conduct; Defendant failed to train its employees to follow the law; Defendant's policymakers ratified the conduct of their subordinates; and/or Defendant's policymakers condoned or turned a blind eye to the unlawful conduct.

205.    Defendant City of Lincoln deprived Plaintiff of her rights to be free from sex discrimination, harassment, and retaliation, which she is entitled under the Equal Protection Clause of the United States Constitution, which was clearly established at all times material hereto.

206.    Plaintiff has been damaged as a direct and proximate result of the Defendants' acts and omissions aforesaid.

WHEREFORE, Plaintiff prays for judgment against Defendant City of Lincoln, Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren

Merryman, and Shawn Mahler in their official capacities, in an amount which will fully and fairly compensate her for her injuries and damages, for attorney's fees and costs, for interests as allowed by law and for such other and further relief as is just in this case.

## TENTH CAUSE OF ACTION
## UNITED STATES CONSTITUTIONAL EQUAL PROTECTION VIOLATION
## (INDIVIDUAL DEFENDANTS)

207.    Plaintiff hereby repleads paragraph 1 to 206 as if fully set forth herein.

208.    Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their individual capacities, deprived Plaintiff of rights protected by the Equal Protection Clause of the United States Constitution by establishing, maintaining, or enforcing policies which create or foster an illegal retaliatory hostile work environment; by treating women differently than other similarly situated employees and by retaliating against those, including Plaintiff, who complain about and/or refuse to countenance a hostile work environment harassment based on sex and retaliation; and/or by turning a blind eye or condoning the illegal conduct of their subordinates.

209.    In the alternative, if the acts complained of were not committed by the individual Defendants pursuant to an official policy, practice or custom of the Defendant the City of Lincoln , they were committed by the Individual Defendants with the purpose and intent of creating or fostering a retaliatory hostile work environment, by treating women and/or people who complain about illegal discrimination differently than other similarly situated employees and by retaliating against and harassing those, including Plaintiff, who complain about and/or refuse to countenance a hostile work environment

based on sex, disability, or retaliation; and/or by turning a blind eye or condoning the illegal conduct of their subordinates.

210.    Each individual Defendant acted under color of law and did not have the discretion to act in an unlawful manner.

211.    Each individual Defendant deprived Plaintiff of her rights to be free from sex discrimination, harassment, and retaliation, which she is entitled under the Equal Protection Clause of the United States Constitution, which was clearly established at all times material hereto.

212.    Each individual Defendant acted with reckless or deliberate indifference to the rights of Plaintiff, which were clearly established under the law, and with malice.

213.    Plaintiff has been damaged as a direct and proximate result of the individual Defendants' acts and omissions.

WHEREFORE Plaintiff prays for judgment against Defendants, in their individual capacities, in an amount which will fully and fairly compensate her for her injuries and damages, for punitive damages in an amount sufficient to punish Defendants and deter others, for attorney's fees/expert witness fees, and costs, for interest as allowed by law and for such other and further relief as is just in the premises.

## TWELFTH CAUSE OF ACTION
## CONSPIRACY UNDER SECTION 1985
## (INDIVIDUAL DEFENDANTS)

214.    Plaintiff repleads paragraph 1 to 213 as if fully set forth herein.

215.    Defendants Tom Casady, Pat Borer, Eric Jones, and Tim Linke, in their individual capacities conspired with others to deprive Plaintiff of his Constitutional rights under the First Amendment.

216.   That at least one of the defendants engaged in an overt act in furtherance of the conspiracy.

217.   As a result of Defendants' acts and omissions, Amanda has in the past and will in the future suffer damages including but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages; benefits; future earning; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against the individual Defendants in an amount which will fully and fairly compensate her for her injuries and damages, punitive damages in an amount sufficient to punish Defendants and deter others, for interest as allowed by law, for attorney's fees/expert witness fees, for the cost of this action, and for such other relief as may be just in the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Amanda Benson, respectfully requests that this Court:

A.   Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of sex and retaliation.

B.   Order the Defendant to pay Amanda back pay, front pay, compensatory damages, consequential damages and liquidated damages in amounts to be proven at trial, and all other affirmative and equitable relief necessary to eradicate the effects of Defendant's unlawful employment practices.

C.   Direct the Defendant to expunge all negative reports or evaluations in Plaintiff's personnel file.

48

D.     Order the Individual Defendants to pay Amanda punitive damages for their malicious and reckless conduct in an amount to be determined at trial.

E.     Award the Plaintiff her reasonable attorneys' fees and expert witness fees.

F.     Award Plaintiff her costs in this action.

G.     Grant such further relief as the Court deems necessary and proper.

## **JURY TRIAL DEMAND**

The Plaintiff requests a jury trial on all matters raised in this Complaint.

Dated this 28th day of August, 2018.


AMANDA BENSON, Plaintiff


BY:     /s/ Kelly K. Brandon_____
        Kelly K. Brandon, #20734
        Stephanie J. Costello, #26309
        Fiedler & Timmer, P.L.L.C.
        20615 Highway 370
        Gretna, NE  68028
        (402) 316-3060
        (402) 513-6501 (facsimile)
        kelly@employmentlawnebraska.com
        stephanie@employmentlawnebraska.com
        Attorneys for Plaintiff

# Certificate of Service

I hereby certify that on Tuesday, August 28, 2018 I provided a true and correct copy of the Amended Complaint to the following:

The City of Lincoln service method: No Service

McDaniel,Doug, service method: No Service

Benes,Leo, service method: No Service

Jones,Eric, service method: No Service

Casady,Tom, service method: No Service

Linke,Tim, service method: No Service

Mahler,Shawn, service method: No Service

Merryman,Darren, service method: No Service

Beutler,Chris, service method: No Service

Signature: /s/ Kelly K. Brandon (Bar Number: 20734)