IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMANDA BENSON,<br><br>        Plaintiff,<br><br>vs.<br><br>CITY OF LINCOLN, a political subdivision; CHRIS BEUTLER, TOM CASADY, DOUG MCDANIEL, TIM LINKE, LEO BENES, ERIC JONES, DARREN MERRYMAN, and SHAWN MAHLER,<br><br>        Defendants. | 4:18CV3127<br><br>MEMORANDUM<br>AND ORDER |

    Amanda Benson, a female Firefighter/EMT for Lincoln Fire & Rescue ("LFR"), filed this action asserting claims of sex discrimination, harassment, and retaliation under Title VII, the Nebraska Fair Employment Practices Act, and Section 1983. (Filing 94, Third Amended Complaint.) Pending before the court is Plaintiff's Motion for Preliminary Injunction and Hearing (Filing 112), in which she alleges that Defendant Mahler recently "refused to speak with Plaintiff and abandoned her and her crew in a burning warehouse with nearly zero visibility" at a fire scene where they were both working. (Filing 112 at CM/ECF p. 2.)

    Benson alleges that she faces "obvious irreparable harm if Mahler is allowed to continue retaliating against her while this litigation proceeds." (Filing 112 at CM/ECF p. 2.) For relief, Benson requests "that the Court 1) order the City of Lincoln to immediately initiate disciplinary proceedings against Mahler; 2) enjoin Mahler from assignment/dispatch to any fire scene during the pendency of disciplinary proceedings; and 3) appoint an independent, third-party investigator to investigate Plaintiff's complaint about Mahler's actions at the recent warehouse fire." (Filing 112 at CM/ECF p. 2.)

## I. *Standard of Review*

The standards set forth by *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981), apply to a motion for injunctive relief. In *Dataphase*, the court, sitting *en banc*, clarified the factors district courts should consider when determining whether to grant a motion for preliminary injunctive relief: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest. *Id.* at 114.

"No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. . . ." *Dataphase*, 640 F.2d at 113. The burden of proving that a preliminary injunction should be issued rests entirely with the movant. *Modern Computer Systems v. Modern Banking Systems*, 871 F.2d 734, 737 (8th Cir. 1989) (en banc) (superseded by state statute on other grounds).

The Supreme Court has held that a preliminary injunction is appropriate to grant relief of the "same character as that which may be granted finally." *De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945).

## II. *Factual Findings*

### <u>The Scene</u>

1.  Plaintiff is a Firefighter/EMT for Lincoln Fire & Rescue ("LFR"). She has served in that role since July 2013. (Filing 114-1, Plaintiff's Aff. ¶ 2 (hereinafter "Plaintiff's Aff.").)

2. Shawn Mahler is named as an individual defendant, and Plaintiff's Third Amended Complaint contains numerous allegations of discriminatory and retaliatory conduct by Mahler over the past several years. (Filing 94, Third Amended Complaint.)

3. Mahler works as a Captain at Fire Station No. 8. (Plaintiff's Aff. ¶ 3.) Plaintiff is assigned to Fire Station No. 1. (Plaintiff's Aff. ¶ 2.) Regardless of their assignment to different stations, when both of their stations report to the same fire or accident scene, Plaintiff can end up being under Mahler's supervision. This can occur multiple times a day or week. (Plaintiff's Aff. ¶ 3.)

4. On April 26, 2021—four days after Plaintiff had reported Mahler for retaliatory behavior when he allegedly disparaged her to another firefighter—Plaintiff and Mahler were both dispatched to a cardboard storage warehouse fire in Lincoln, Nebraska. (Plaintiff's Aff. ¶¶ 5, 7[1], 23.) At the incident, Battalion Chief Michael Smith was serving as the Safety Officer (Filing 132-2, Smith Dec. ¶¶ 1-2), and Acting Battalion Chief Curt Faust was the Incident Commander ("IC"). (Filing 132-3, Roberts Dec. ¶ 3; Filing 132-4, Hurley Dec. ¶ 3; Filing 132-5, Borchers Dec. ¶ 3; Filing 132-6, Dyer Dec. ¶ 3; Filing 132-7, Love Dec. ¶ 3; Filing 132-10, Statement of Battalion Chief Faust, authenticated at Filing 132-1, Engler Dec. ¶ 24.)

5. Plaintiff's crew ("Truck 1" or "T1") was comprised of Plaintiff as the Acting Captain, Fire Apparatus Operator ("FAO") Matt Roberts (a 23-year LFR veteran), and Firefighter Trainee Morgan Hurley. (Plaintiff's Aff. ¶ 8; Filing 132-2, Smith Dec. ¶ 3; Filing 132-3, Roberts Dec. ¶¶ 1-2, 4; Filing 132-4, Hurley Dec. ¶ 4.) Mahler was the Captain of a separate team ("Truck 8" or "T8"). All Captains and Acting Captains have a duty to closely supervise their crew members to ensure their safety. (Filing 132-2, Smith Dec. ¶ 4.)

---

[1] Plaintiff's Affidavit erroneously states she was dispatched to the fire on April 26, 20<u>20</u>. (Plaintiff's Aff. ¶ 7.)

6. In addition to Trucks 1 and 8, Truck 5, Engine 10, and Battalion 2 also arrived at the scene. (Filing 132-3, Roberts Dec. ¶ 6; Filing 132-4, Hurley Dec. ¶ 5; Filing 132-5, Borchers Dec. ¶ 5; Filing 132-6, Dyer Dec. ¶ 5; Filing 132-7, Love Dec. ¶ 5.)

## *Mahler's Role at the Scene*

7. Multiple truck or engine companies were assigned to common tasks during the incident. It is common to assign more than one company, or crew, to various tasks. When multiple companies are assigned to the same task(s), the Captain is still the supervisor over his or her own crew unless ordered otherwise by the IC. (Filing 132-2, Smith Dec. ¶ 6.)

8. Group-Supervisor designations are only made explicitly by the IC and require explicit recognition by the designated Group Supervisor and the company that is ordered to report to the Group Supervisor. (Filing 132-2, Smith Dec. ¶ 10.)

9. At the scene, Truck 8 (Mahler's crew), was assigned to ventilation tasks after working on cutting the power to the warehouse. (Filing 132-5, Borchers Dec. ¶ 9; Filing 132-6, Dyer Dec. ¶ 9; Filing 132-7, Love Dec. ¶ 9.)

10. At this point, Plaintiff's crew (Truck 1) had already safely entered and exited the warehouse on their own. Plaintiff then asked the IC if he would like Truck 1 to assist with ventilation. The IC replied, "Yeah, if you can—if you can hook up with Truck 8, you can assist with ventilation getting one of those doors open." (Filing 132-10, Statement of Battalion Chief Curt Faust; Filing 132-12, Transcript at 10:2-8, authenticated at Filing 132-9, Witte Dec. ¶ 4.)

11. Plaintiff believed that Mahler served as the Group Ventilation Supervisor overseeing T1. (Plaintiff's Aff. ¶ 8.) However, Plaintiff's own crew members, Mahler, and Mahler's crew members did not hear the IC designate Mahler as Ventilation Group Supervisor on the radio, nor did they consider Mahler to be a

Group Supervisor. (Filing 132-12, Transcript; Filing 132-9, Witte Dec. ¶¶ 4-6; Filing 132-1, Engler Dec. ¶¶ 10, 12; Filing 132-2, Smith Dec. ¶¶ 7, 8; Filing 132-3, Roberts Dec. ¶¶ 7, 8; Filing 132-4, Hurley Dec. ¶¶ 6, 7; Filing 132-5, Borchers Dec. ¶¶ 6-8; Filing 132-6, Dyer Dec. ¶¶ 6-8; Filing 132-7, Love Dec. ¶¶ 6-8; Filing 132-8, Mahler Dec. ¶ 8; Filing 132-10, Faust Statement.) The IC himself stated, "T1 or T8 was not designated a ventilation group supervisor and neither T1 or T8 requested or acknowledged that they were 'working for' or 'working with' the other crew. . . . it was not my intent to have T1 work for T8." (Filing 132-10, Statement of IC Faust, authenticated at Filing 132-1, Engler Dec. ¶ 24.) Without a Group Supervisor, both crews were required to report to their respective Captains (Filing 132-2, Smith Dec. ¶ 8), and both of Plaintiff's own direct reports believed at all times that their direct supervisor was Plaintiff. (Filing 132-3, Roberts Dec. ¶ 10; Filing 132-4, Hurley Dec. ¶ 9.) In turn, Plaintiff was to report directly to the IC. (Filing 132-1, Engler Dec. ¶ 15.)

12.  After reviewing the audio recording of the incident, LFR Chief Engler concluded:

> [I]t is indisputable that Captain Mahler and Acting Captain Benson were operating in a peer capacity at the Incident. The ventilation task consisted of opening the overhead door. Once the overhead door was open, there was no ongoing assignment to ventilate.
>
> . . . .
>
> Acting Captain Benson, acting as a supervisor at the Incident, had the same expectations and rank as all other Captains at the Incident, was expected to follow safety guidelines and policies, and had a responsibility to keep her crew safe.
>
> At no time during the Incident did the Incident Commander ("IC") designate Captain Mahler as a "Group Supervisor" for ventilation within the meaning of LFR Reference Source 851.01 (Doc. #114-5). In addition to Truck 1 and Truck 8, Truck 5 was initially assigned to

5

ventilation. None were assigned Group Supervisor of ventilation. Each was expected to report directly to IC.

Anytime a Group Supervisor is established, all radio communications thereafter refer to the group rather than the unit. Had T8 and Mahler been designated as Group Supervisor for Ventilation, all radio communication from IC to the group would be addressed to "Vent Group" instead of T8. The radio transmission includes no reference to "Vent Group" whatsoever.

At no time during the Incident did IC ever order Acting Captain Benson to act in a subordinate role to Captain Mahler. Nor did IC order Captain Mahler to supervise Benson and the Truck 1 crew.

(Filing 132-1, Engler Dec. ¶¶ 6-12 (paragraph numbering removed).)

13.    Both Truck 1 and Truck 8 crews were assisting with ventilation without an assigned Group Supervisor. All of the firefighters involved understood that they were still reporting *only* to their own Captain. (Filing 132-3, Roberts Dec. ¶ 13; Filing 132-4, Hurley Dec. ¶ 12; Filing 132-5, Borchers Dec. ¶ 13; Filing 132-6, Dyer Dec. ¶ 13; Filing 132-7, Love Dec. ¶ 13.)

14.    No members of Plaintiff's or Mahler's crew considered any action by Mahler to be abandoning them in an environment immediately dangerous to life or health. (Filing 132-3, Roberts Dec. ¶ 12; Filing 132-4, Hurley Dec. ¶ 11; Filing 132-5, Borchers Dec. ¶ 12; Filing 132-6, Dyer Dec. ¶ 12; Filing 132-7, Love Dec. ¶ 12.) Plaintiff's crew was able to navigate and enter and exit the warehouse multiple times through the same door without danger, and her crew members had no immediate concerns regarding their own safety or the safety of their crew. Plaintiff's crew believed that visibility and safety conditions in the warehouse continued to improve as time went on in response to the fire-suppression tasks performed by the various LFR crews. (Filing 132-3, Roberts Dec. ¶ 14; Filing 132-4, Hurley Dec. ¶ 13.) Battalion Chief Smith also observed the crews at the incident enter and exit without danger. As Safety Officer, he had no immediate concerns regarding the safety of the

crews at the incident and observed conditions improve as well. (Filing 132-2, Smith Dec. ¶ 12.)

15. As the Safety Officer, Smith always makes contact with all crews once they exit a structure. He made contact with Plaintiff's Truck 1 crew outside of the warehouse and checked to see if there were any injuries and that they were all right. Plaintiff reported everything was fine and reported no issues. (Filing 132-2, Smith Dec. ¶ 13.)

16. If any Captain felt that the environment at the incident was putting any of their crew in jeopardy, then that Captain had the responsibility to safely exit the structure with the crew and immediately contact the IC under LFR management policies or reference sources. (Filing 132-2, Smith Dec. ¶ 14; Filing 132-3, Roberts Dec. ¶ 15; Filing 132-4, Hurley Dec. ¶ 14; Filing 132-5, Borchers Dec. ¶ 16; Filing 132-6, Dyer Dec. ¶ 16; Filing 132-7, Love Dec. ¶ 15.) Following the incident, LFR Command fielded no complaints or safety concerns about Mahler from any personnel at the incident other than Plaintiff. (Filing 132-1, Engler Dec. ¶ 22.)

### *Mahler's & Plaintiff's Interaction at the Scene From Plaintiff's Perspective*

17. At the scene, Plaintiff claims she approached Mahler, intending to ask him about how her team should assist with ventilation, but Mahler walked past Plaintiff when she tried to approach him. Plaintiff caught up to Mahler and informed him that her team had been assigned to assist him; she then asked what his plan was for ventilation. Mahler refused to make eye contact with Plaintiff and just said that T8 was going to open some overhead doors. He did not indicate how T1 should assist with his ventilation plan. (Plaintiff's Aff. ¶¶ 9, 10.)

18. Plaintiff asked Mahler directly how he wanted her team to assist with ventilation. He ignored Plaintiff's question and walked off towards the building entrance. T1 then also proceeded to the building entrance and Plaintiff once again approached Mahler to ask what he wanted her team to do about ventilation. Once

7

again, Mahler ignored her and walked inside the building. Lacking any direction or plan from Mahler, Plaintiff and the rest of T1 followed Mahler into the building. Plaintiff made another attempt to get Mahler to provide her with direction on ventilation, but he continued to ignore her questions. Mahler then suddenly walked away from Plaintiff and abandoned T1 without communication or direction on how or where to proceed. (Plaintiff's Aff. ¶¶ 11-14.)

19. At this point, there was extremely low visibility inside the building due to heavy smoke. Plaintiff had to be within one foot of her colleagues to read the names on their helmets, and the outline of bodies could not be seen if more than a few feet away. Plaintiff worked to get T1 to safety. She had to use her thermal-imaging camera to identify the direction of the fire, because if T1 could get close to the fire, they would be able to find a hose line to follow out of the building. (Plaintiff's Aff. ¶¶ 16-18.)

20. As T1 approached the fire, Roberts's low-oxygen alarm went off and Plaintiff had to immediately exit the building with Roberts and Hurley to switch out their oxygen cannisters. (Plaintiff's Aff. ¶ 20.)

21. Once they obtained new oxygen, T1 was assigned to replace T8. As T8 exited the building, Plaintiff approached Mahler, but he tried to side-step her and walk around her. Plaintiff moved directly in front of Mahler to get him to stop and acknowledge her; she then told him that her team was taking over for T8 and she needed to know what he had been working on inside the building. Mahler refused to look at Plaintiff. He quickly replied, "chasing hot spots on the Charlie side," and then moved around Plaintiff and walked away without giving any further information. (Plaintiff's Aff. ¶¶ 21, 22.)

22. If Mahler had been the Group Ventilation Supervisor for T1 and T8, he would have been required to maintain voice, visual, or physical contact with the personnel under his command and provide them direction about their assignment

while inside the building, according to LFR Safety Management Policy, incident command policies, and department best practices. (Filings 114-4, 114-5, 114-6.)

23. Plaintiff admits that before this incident, she "communicated directly with Captain Mahler for work-related purposes a number of times . . . without incident." (Filing 143-1 ¶ 17.)

### *Mahler's & Plaintiff's Interaction at the Scene From Mahler's Perspective*

24. Mahler does not believe he ignored or avoided interacting with Plaintiff or any of her crew members during the incident. (Filing 132-8, Mahler Dec. ¶¶ 6, 8.) None of Plaintiff's or Mahler's crew members heard Plaintiff's alleged conversations and interactions with Mahler at the scene. (Filing 132-8, Mahler Dec. ¶¶ 6, 8; Filing 132-3, Roberts Dec. ¶ 11; Filing 132-4, Hurley Dec. ¶ 10; Filing 132-5, Borchers Dec. ¶ 11; Filing 132-6, Dyer Dec. ¶ 11; Filing 132-7, Love Dec. ¶ 11.)

### *Investigation of the Incident*

25. After this incident, Plaintiff filed an internal complaint alleging that Mahler retaliated and discriminated against her. Chief Engler assigned Aishah Witte, J.D., LFR Administrative Officer, to investigate the complaint against Mahler. (Filing 114-7 at CM/ECF p. 1; Filing 132-1, Engler Dec. ¶ 4.) Witte conducted an investigation and found no merit to Plaintiff's allegations against Mahler. Witte specifically found that Mahler and Plaintiff were operating in a peer capacity at the incident and that Plaintiff had been in the warehouse and was familiar with how to make a safe exit prior to Mahler's arrival at the scene. (Filing 132-1, Engler Dec. ¶ 4.) Plaintiff is not aware that disciplinary action has been brought against Mahler for the April 26, 2021, incident. (Plaintiff's Aff. ¶ 32.)

26. On June 9, 2021, Firefighters Union Local 644, the Union representing LFR firefighters, including Plaintiff, submitted a grievance to Chief Engler. The grievance is also signed by Plaintiff and grieves the incident set forth in Plaintiff's

Motion for Preliminary Injunctive Relief. The grievance, similar to the Motion for Preliminary Injunction, requested a "thorough and honest investigation" and discipline of employees who have been found to breach rules of conduct. (Filing 132-16, authenticated at Filing 132-17, Golden Dec. ¶ 5.)

27. After Plaintiff complained that Witte's investigation was insufficient and filed the foregoing grievance, the City Attorney hired Torrey Gerdes of the Baylor Evnen Law Firm to conduct a third-party independent investigation of Plaintiff's allegations against Mahler. (Filing 132-1, Engler Dec. ¶ 5.)

28. Rather than awaiting the outcome of the grievance process, Plaintiff filed the present Motion for Preliminary Injunction on June 11, 2021, two days after her grievance, seeking court-appointment of an independent investigator into the incident, a court order requiring the City to begin disciplinary proceedings against Mahler, and a court order enjoining Mahler from dispatching to any fire scene. (Filing 112.)

29. Gerdes is working on her investigation. The City Attorney's Office has neither received a written report for the investigation into the incident nor been informed that the investigation is complete. (Filing 132-17, Golden Dec. ¶ 3.)

### III. Discussion

#### A. *Nature of Relief Requested*

After careful review of the parties' briefs and evidentiary submissions, the court determines that Benson's Motion for Preliminary Injunction should be denied because the relief requested in the Motion is not of the "same character as that which may be granted finally," *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945), and the effect of the relief requested in Benson's Motion will not be to "preserve the status quo until the merits are determined," *Dataphase*, 640 F.2d at 113, but to micromanage personnel procedures and decisions of LFR.

While Benson's Third Amended Complaint seeks a permanent injunction enjoining the Defendants from "engaging in any employment practice which discriminates on the basis of sex and retaliation" (Filing 94 at CM/ECF p. 61), the relief requested in Plaintiff's Motion for Preliminary Injunction is to "order the City of Lincoln to immediately initiate disciplinary proceedings against Mahler," to "enjoin Mahler from assignment/dispatch to any fire scene during the pendency of disciplinary proceedings," and to "appoint an independent, third-party investigator to investigate . . . Mahler's actions at the recent warehouse fire." (Filing 112 ¶ 8.) The relief requested in Plaintiff's Motion is not to remedy discriminatory employment practices, but to impose directives upon LFR regarding whom it should discipline, whom it should send to fire scenes, and whom to investigate—issues in which federal courts should not be involved.[2] *See Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 748-49 (8th Cir. 2021) (federal courts are not super-personnel departments who reexamine an employer's business decisions); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 637 (9th Cir. 2015) (denying motion for preliminary injunctive relief when it sought a remedy that would not be provided if movant succeeded in its underlying suit); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (under employment discrimination laws, federal courts were not given the authority to sit as super-personnel departments); *see, e.g.*, *Laramore v. Quality Residence, LLC*, No. 21-CV-0781, 2021 WL 1783491, at *1 (D. Minn. May 5, 2021) ("A moving party is not entitled to a preliminary injunction based on conduct that differs from the conduct alleged in the complaint, even if the new allegations might support additional claims against the same defendants."); *Zhou v. Int'l Bus. Machines Corp.*, 167 F. Supp. 3d 1008, 1011 (N.D. Iowa 2016) ("A preliminary injunction that bears no relationship to the claims

---

[2] As Plaintiff's counsel points out, the court may "enjoin employers from discriminatory and retaliatory conduct" (Filing 141 at CM/ECF p. 19), but that is not what is sought here. Here, Plaintiff wants the court to direct how LFR investigates, manages, and disciplines a certain employee. (Filing 112 ¶ 8 (relief requested in Motion for Preliminary Injunction only encompasses initiating disciplinary proceedings, preventing Mahler from going to any fire scene while such disciplinary proceedings are pending, and appointing an investigator).)

11

and events alleged in the complaint would be unworkable, as the issues giving rise to that injunction will not be addressed, let alone resolved, at trial.")

### B. The Equities

To the extent Plaintiff requests that the court enjoin Mahler's retaliatory or discriminatory conduct, Plaintiff has failed to show that Mahler engaged in any such conduct in this instance. The evidence shows that, with the exception of Plaintiff, no person on Mahler's and Plaintiff's crew, nor the Incident Commander or the Safety Officer, believed that Mahler was a Ventilation Group Supervisor, that Mahler abandoned Plaintiff and her crew in a dangerous situation, or that Mahler was duty-bound to direct or supervise Plaintiff and her crew. In short, there is no evidence that Plaintiff and Mahler were anything more than peers in the incident at issue. The court declines to grant an injunction against Mahler for failing to direct, supervise, and protect when he was under no duty to do so. The equities of this situation simply do not warrant preliminary injunctive relief. *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 975 (8th Cir. 2011) (grant of injunctive relief will not be affirmed if district court erred in characterization of facts, made mistake of law, or abused its discretion in considering the equities); *Dataphase*, 640 F.2d at 113 ("The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case.").

### C. Dataphase

Finally, the *Dataphase* factors do not weigh in favor of granting preliminary injunctive relief.

#### 1. Threat of Irreparable Harm

"For an injunction to be appropriate, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1037 (8th Cir. 2016) (internal quotation marks and

12

citations omitted). A movant seeking injunctive relief must "demonstrate that irreparable [harm] is *likely* in the absence of an injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 992 (8th Cir. 2011) (emphasis in original) (internal quotation marks and citation omitted). "[I]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (internal quotation marks and citation omitted).

Here, harm to Plaintiff from future discrimination or retaliation by Mahler is not certain or imminent, especially when Plaintiff has not shown that such behavior occurred in this incident and when Plaintiff admits she has "communicated directly with Captain Mahler for work-related purposes a number of times . . . without incident." (Filing 143-1 ¶ 17.) Further, any potential injuries to Plaintiff could be compensated through a damages award. This lack of irreparable harm alone is a sufficient basis to deny Plaintiff's request for preliminary injunctive relief. *Sessler v. City of Davenport, Iowa*, 990 F.3d 1150, 1156 (8th Cir. 2021) ("The failure of a movant to show irreparable harm is an independently sufficient basis upon which to deny a preliminary injunction." (internal quotation marks and citation omitted)); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (same; "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. When there is an adequate remedy at law, a preliminary injunction is not appropriate." (internal quotation marks and citations omitted)).

### 2. *Balance of Injury to Parties*

Because Plaintiff cannot prove any irreparable harm, the injury that her requested preliminary injunction would have on Mahler—an investigation, discipline, and a prohibition from responding to fire emergencies—is a greater harm that weighs in favor of denying preliminary injunctive relief.

### *3. Public Interest*

Because it is not in the public's best interest for a court to dictate when and how LFR investigates, disciplines, and suspends its employees from service, the public interest does not weigh in favor of granting a preliminary injunction.

### *4. Likelihood of Success on the Merits*

Even if Plaintiff could demonstrate that she is likely to succeed on the merits of her claims, "[t]he likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public." *Dataphase*, 640 F.2d at 113. Here, the relative harms to the parties and the public weigh against granting Plaintiff's requested preliminary injunction.

Accordingly,

IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction and Hearing (Filing 112) is denied.

DATED this 16th day of August, 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge