**Page 1**

FEDERAL MEDIATION AND CONCILIATION SERVICE
BEFORE ARBITRATOR STEVEN RUTZICK

LINCOLN FIREFIGHTERS    )   FMCS CASE NO.
ASSOCIATION, IAFF LOCAL )   22103-00847
644, and AMANDA BENSON,  )
                         )
        Grievants,       )
                         )
vs.                      )   VOLUME I
                         )   PAGES 1-280
CITY OF LINCOLN,         )
                         )
        Respondent.      )
                         )
                         )

ARBITRATION HEARING held before Arbitrator Steven Rutzick (via Zoom), with Vickie L. Quinn, CCR and Notary Public for the State of Nebraska, counsel and all parties present at the City-County Building, 555 South 10th Street, Suite 300, Lincoln, Nebraska, beginning at 9:35 a.m., on the 20th day of June, 2022.

** ** **

**Page 2**

1           A P P E A R A N C E S
2
3   FOR THE GRIEVANTS:
4
    MR. JOHN E. CORRIGAN
5   DOWD & CORRIGAN, LLC
    6700 Mercy Road
6   Suite 501
    Omaha, NE  68106
7   402.913.9713
    jcorrigan@dowd-law.com
8
9
    FOR THE RESPONDENT:
10
11  MS. HEIDI GUTTAU
    BAIRD HOLM LLP
12  1700 Farnam Street
    Suite 1500
13  Omaha, NE  68102
    402.344.0500
14  hguttau@bairdholm.com
15
    MS. ABIGAIL LITTRELL
16  ASSISTANT CITY ATTORNEY
    555 South 10th Street
17  Suite 300
    Lincoln, NE  68508
18
19
20  ALSO PRESENT:  Mr. Ryan Moser, Vice President
    IAFF Local 644; Mr. Dave Engler, Fire Chief;
21  Tiffany Leasure, Paralegal for City of Omaha
22
23
24
25

**Page 3**

1           I N D E X
                                    PAGE
2   CASE CAPTION ........................  1
    APPEARANCES ........................  2
3   INDEX ..............................  3
    TESTIMONY ..........................  19
4   REPORTERS' CERTIFICATE .............  2084
5
6           WITNESSES
7
    FOR THE CITY:
8
9   CHIEF DAVID ENGLER
10  Direct by Ms. Guttau.................  19
    Cross by Mr. Corrigan...............  136
11  Cross Cont'd by Mr. Corrigan........  253
    Cross Cont'd by Mr. Corrigan........  1070
12  Redirect by Ms. Guttau.............  1135
    Recross by Mr. Corrigan.............  1193
13  Further Redirect by Ms. Guttau......  1202
    Further Recross by Mr. Corrigan.....  1209
14
15  FAO JASON LOVE
16  Direct by Ms. Littrell..............  210
    Cross by Mr. Corrigan...............  230
17  Redirect by Ms. Littrell...........  247
    Recross by Mr. Corrigan.............  249
18
19  FAO MATTHEW ROBERTS
20  Direct by Ms. Guttau................  295
    Cross by Mr. Corrigan...............  342
21  Redirect by Ms. Guttau..............  363
    Recross by Mr. Corrigan.............  367
22  Further Redirect by Ms. Guttau......  372
    Further Recross by Mr. Corrigan.....  372
23  Further Redirect Cont'd by Ms. Guttau  373
24
25

** ** **

**Page 4**

1           WITNESSES, CONT'D
2
    FOR THE CITY:
3
4   FF STEPHEN DYER
5   Direct by Ms. Littrell..........  375
    Cross by Mr. Corrigan...............  395
6   Redirect by Ms. Littrell........  409
    Recross by Mr. Corrigan.............  410
7
8   FF MORGAN HURLEY
9   Direct by Ms. Littrell..........  416
    Cross by Mr. Corrigan...............  447
10  Redirect by Ms. Littrell........  464
    Recross by Mr. Corrigan.............  466
11
12  DIVISION CHIEF MICHAEL SMITH
13  Direct by Ms. Littrell..........  470
    Cross by Mr. Corrigan...............  505
14  Redirect by Ms. Littrell........  569
    Recross by Mr. Corrigan.............  588
15  Further Redirect by Ms. Littrell....  610
    Further Recross by Mr. Corrigan.....  614
16
17  BC CURT FAUST
18  Direct by Ms. Guttau................  618
    Cross by Mr. Corrigan...............  729
19  Redirect by Ms. Guttau..........  806
    Recross by Mr. Corrigan.............  820
20  Further Redirect by Ms. Guttau......  828
21
22  DEPUTY CHIEF GEORGE HEALY
23  Direct by Ms. Guttau................  971
    Cross by Mr. Corrigan...............  1021
24  Redirect by Ms. Guttau..........  1054
    Recross by Mr. Corrigan.............  1055
25

**EXHIBIT 2**

## Page 5

WITNESSES, CONT'D

FOR THE CITY:

AISHAH WITTE
Direct by Ms. Littrell.............. 1214
Cross by Mr. Corrigan.............. 1263
Redirect by Ms. Littrell............ 1287
Recross by Mr. Corrigan............ 1297

CAPTAIN SHAWN MAHLER
Direct by Ms. Guttau.............. 1554
Cross by Mr. Corrigan.............. 1671
Redirect by Ms. Guttau............ 1754
Recross by Mr. Corrigan............ 1771
Further Redirect by Guttau........ 1784
Further Recross by Corrigan........ 1787
Further Redirect Cont'd by Guttau... 1794

CAPTAIN ADAM SCHRUNK
Direct by Ms. Guttau.............. 2059
Cross by Mr. Corrigan.............. 2073
Redirect by Ms. Guttau............ 2077

FOR THE UNION:

CHIEF EDWARD HADFIELD
Direct by Mr. Corrigan............ 844
Cross by Ms. Guttau.............. 888
Redirect by Mr. Corrigan........... 951
Recross by Ms. Guttau.............. 962

CAPTAIN MICHAEL WRIGHT
Direct by Mr. Corrigan............ 1316
Cross by Ms. Littrell.............. 1357
Redirect by Mr. Corrigan........... 1393
Recross by Ms. Littrell............ 1398

## Page 6

WITNESSES, CONT'D

FOR THE UNION:

CAPTAIN DAN RIPLEY
Direct by Mr. Corrigan............ 1399
Cross by Ms. Littrell.............. 1405
Redirect by Mr. Corrigan........... 1421
Recross by Ms. Littrell............ 1429

NICHOLAS CUNNINGHAM
Direct by Mr. Corrigan............ 1432
Cross by Ms. Littrell.............. 1446
Redirect by Mr. Corrigan........... 1457

AMANDA BENSON
Direct by Mr. Corrigan............ 1463
Cross by Ms. Guttau................ 1867
Redirect by Mr. Corrigan........... 2056

CAPTAIN BRIAN GILES
Direct by Mr. Corrigan............ 1810
Cross by Ms. Littrell.............. 1823
Redirect by Mr. Corrigan........... 1859
Recross by Ms. Littrell............ 1864

** ** **

## Page 7

CITY EXHIBITS

EXHIBIT    DESCRIPTION

1    8/16/21 Memorandum and Order Denying
     Plaintiff's Motion for Injunction by
     Senior District Judge Richard G.
     Kopf, United States District Court
     for the District of Nebraska,
     8/15/21
2    Declaration of Fire Chief David
     Engler
3    Declaration of BC Michael Smith
4    Declaration of Captain Mahler
5    Declaration of FAO Matt Roberts
6    Declaration of FF Morgan Hurley
7    Declaration of FF Jason Love
8    Declaration of FF Stephen Dyer
9    Declaration of FF Trent Borchers
10   Statement of Curt Faust
11   8/19/21 Investigation Report into
     4/26/21 Fire Incident by Attorney
     Torrey Gerdes, Baylor Evnen Law Firm
12   Audio of Fire Department Radio
     Recording of 4/26/21 Warehouse Fire
13   Transcript of Fire Department Radio
     Recording of 4/26/21 Warehouse Fire
14   Declaration of Aishah Witte,
     Authenticating Audio Transcript
15   Benson's 5/5/21 Complaint Regarding
     the 4/26/21 Warehouse Fire
16   Warehouse Photographs

## Page 8

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

17   LFR Prime Report of Warehouse Fire
18   Benson's 6/9/21 Grievance
19   Benson's 6/11/21 Affidavit
20   Benson's 8/9/21 Affidavit
21   Media Articles
22   Benson's Interview Audio 7/14/21
23   8 of '21 Grievance Hearing RE:
     June 9, 21 Grievance
24   9/24/21 Denial of 6/9/21 Grievance
     Letter to Benson
25   9/27/21 Pre-Disciplinary Meeting
     Notice Letter to Benson
26   Audio of 10/12/21 Pre-Disciplinary
     Meeting
27   Transcript of 10/12/21 Meeting
28   10/19/21 Termination Letter
29   CBA, 8/20/20 to 8/31/21
30   CBA, 8/19/21 to 8/30/23
31   LFR Professional Code of
     Ethics/Standard of Conduct Policy
32   LFR FF Safety Policy
33   LFR 2020 Annual Report
34   Captain Mahler's Awards
35   2017 Letter to Mahler
36   Terminal Building Fire Near-Miss
     Report, 2/19/18

## Page 9

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

37    Chief Engler's Video Message

38    Healy Expert Report

39    Lincoln Municipal Code - Cause for Disciplinary Action

40    Lincoln Municipal Code - Dismissal and Grievance Procedure

41    Grievant's 11/3/21 Appeal E-mail

42    Documents Regarding LFR Discipline

43    Captain Mahler Notes for Investigator Gerdes

44    Witte Investigation Correspondence

45    Witte Investigative File

46    Benson's Motion for Preliminary Injunction

47    Benson's Brief ISO Preliminary Injunction

48    Benson 2014 Complaint Retraction

49    Mahler Discipline Reversal

50    Management Policy

51    Victim Removal Presentation

** ** **

## Page 10

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

100    CBA

101    4/27/2011 Suspension Notice

102    11/4/2014 Memo of BC Pashalek

103    Dispositional Memorandum of Kimberly Taylor-Riley

104    4/4/21 Complaint

105    E-mail of BC Curt Faust, 4/4/21

106    E-mail of BC Michael Smith, 4/7/21

107    E-mail of BC Curt Faust, 4/13/11

108    E-mail of Benson to Witte, 4/18/21

109    Transcript of Radio Traffic

110    LFR Incident Report, 4/26/21

111    E-mail from Benson to Faust & Witte, 5/5/21

112    E-mail from Benson to Witte, 5/13/21

113    Witte Investigation Summary

114    E-mail to Benson from Witte, 5/25/21

115    Transcript of Audio File

116    E-mail from Smith to Witte, 5/26/21

117    Investigation Summary

118    Grievance, 6/9/21

119    Benson Affidavit, 6/11/21

120    E-mail from Schrunk to Engler, 6/14/21

## Page 11

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

121    E-mail from Kelly Brandon to Chris Connolly and Ms. Gerdes, 7/12/21

122    E-mail from Engler to Mahler, 7/1/21

123    Interview Audio Recording

124    Letter to Ms. Gerdes

125    Declaration of David Engler

126    Declaration of Michael Smith

127    Declaration of Matthew Roberts

128    Declaration of Morgan Hurley

129    Declaration of Trent Borchers

130    Declaration of Stephen Dyers

131    Declaration of Jason Love

132    Declaration of Shawn Mahler

133    Grievance Letter

134    Declaration of Edward Hadfield

135    Enhanced Fireground Safety, Effective Use of Division & Group Supervisors

136    Transcript of Grievance Hearing, 8/20/21

137    Letter of Chief Engler Denying Grievance, 9/24/21

138    Notice of Pre-disciplinary Action, 9/27/21

139    Transcript of Pre-disciplinary Hearing

## Page 12

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

140    Termination Letter, 10/19/21

141    Underlying Confidential Correspondence Regarding Comparative Discipline

142    Disciplinary Action, 10/14/11 to 10/14/21

143    Performance Evaluations

144    Deposition of Shawn Mahler, 5/9/22

145    Awards and Recognitions

146    LFR Best Practices No. 2-Division/ Group Supervision

147    Daisy Brayton Investigation

148    Text Message exchange between Faust and Benson

149    Arbitration Award, RE: Dan Duncan

150    Arbitration Award, RE: Jon Reed

151    E-mail from Corrigan to McDaniel, 11/3/21

152    E-mail, Benson to Witte, 4/22/21

153    E-mail, BC Smith, 4/22/21

154    Discipline Letter, 5/24/21

155    Discipline Letter, 6/6/22

156    Telephone Log Activity

156    E-mail from Mahler to Witte, 6/24/21

** ** **

Page 13

1
2  * All exhibits offered with objections to
   Union's 101, 102, 103, 147, 149, 150; and City
   Exhibits 20, 21, 38, 46, and 47
3
   * Union Exhibit 149 was offered and received on
4  page 142
5  * Union Exhibit 150 was offered on page 143 and
   received on page 144
6
   * Union Exhibit 156, Telephone Log Activity, was
7  marked on page 750
8  * City Exhibit 156, E-mail to Aishah from
   Mahler, was marked on page 1738
9
   * City Exhibit 50 was marked on June 22nd, 2022,
10 offered and received on page 571
11
12
13
14                    ** ** **
15
16
17
18
19
20
21
22
23
24
25

Page 14

1        (At 9:35 a.m., the following
2  proceedings were had:)
3        THE ARBITRATOR:  Good morning.
4  I'm Steve Rutzick.  I'm the arbitrator today
5  between Lincoln Firefighters Association, Local
6  644 and Amanda Benson, and the City of Lincoln.
7        Counsel, anything preliminary?
8        MS. GUTTAU:  Sorry.  I missed
9  that.
10       THE ARBITRATOR:  Counsel,
11 anything preliminary?
12       MS. GUTTAU:  Oh, I think just
13 introductions, and we'd like to reserve our
14 right for rebuttal for the City, and we can
15 offer exhibits, both sides, I believe.
16       THE ARBITRATOR:  All right.
17 Well, let's have the parties note their
18 appearance for the record to start with.  Go
19 ahead.
20       MS. GUTTAU:  Okay.  My name's
21 Heidi Guttau.  I'm with Baird Holm Law firm in
22 Omaha, Nebraska.  I represent the City of
23 Lincoln.  And I have with me at my table -- And
24 you probably can't see, but you'll see him
25 shortly.  I have Fire Chief Dave Engler, and

Page 15

1  then I have my co-counsel at the end of the
2  table -- she'll be in the screen after a while
3  -- Abigail Littell, and then we also have our
4  paralegal here, Tiffany Leasure, and she's kind
5  of sitting back here, helping out if we need
6  anything, so.  And if you need --
7        THE ARBITRATOR:  Okay.
8        MS. GUTTAU:  -- anything
9  e-mailed, she can do that for you.
10       THE ARBITRATOR:  That's fine.
11 John?
12       MR. CORRIGAN:  John Corrigan on
13 behalf of Local 644.  I'm with the law firm of
14 Dowd & Corrigan.  And with me at counsel table
15 is Amanda Benson, the grievant, and also Ryan
16 Moser, who is a union officer and has been
17 thrust into the technical difficulties today as
18 a result of another union officer becoming ill.
19       So we're here to present the
20 case.
21       THE ARBITRATOR:  All right.
22 Shall we begin?  Do you want to call your first
23 witness?
24       MS. GUTTAU:  Do you want us to
25 offer exhibits first and any objections?  Is

Page 16

1  that all right?
2        THE ARBITRATOR:  Sure.  Okay.
3        MS. GUTTAU:  I think there won't
4  be a whole lot of objections, just a few.
5        So first of all, on behalf of the
6  City, again, we would request the right to
7  present rebuttal at the end of the defendant's
8  case -- or, I'm sorry, at the end of the
9  grievant's case.
10       We'd like to offer exhibits.  We
11 have Exhibits 1 through 49 that have been sent
12 and provided to the grievants.
13       THE ARBITRATOR:  Hang on one
14 second.  Did you send me anything formal or
15 just, just by e-mail?
16       MS. GUTTAU:  There should be a
17 big binder that got sent to your office.
18       THE ARBITRATOR:  Okay.  I got it.
19       MS. GUTTAU:  Okay.
20       THE ARBITRATOR:  Mr. Corrigan,
21 any objection to these?  I assume you've had a
22 chance to look at them?
23       MR. CORRIGAN:  So, yes, Your
24 Honor, the objections we have are Exhibits 20,
25 21, 38, 46, 47, and that's it.

Page 17

1    THE ARBITRATOR:  You're objecting
2  to those?
3    MR. CORRIGAN:  Yes.
4    THE ARBITRATOR:  All right.
5  We'll deal with them when we come to those.  All
6  right.  Everything else is admitted.
7    MR. CORRIGAN:  The Union would
8  like to offer the exhibits that -- and we had
9  forwarded you a binder, as well, a couple of
10  binders.
11    THE ARBITRATOR:  Yeah, I've got
12  them.
13    MR. CORRIGAN:  All right.
14  Exhibits 1 through -- I'm sorry, 100 through
15  155.
16    THE ARBITRATOR:  Okay.  What
17  about them?  You are offering those?
18    MR. CORRIGAN:  Yes.
19    THE ARBITRATOR:  Any objection to
20  those?
21    MS. GUTTAU:  Yes.  We have
22  objections to Exhibits 101, 102, 103, 147, and
23  149 and 150.  Exhibit 141, there is just one
24  person missing off of that, but we can clear
25  that -- clear that up, I think, during

Page 18

1  testimony, so.
2    THE ARBITRATOR:  All right.
3  Again, we'll deal with those when we come to
4  them.
5    MS. GUTTAU:  Okay.
6    THE ARBITRATOR:  You want to call
7  your first witness?
8    MS. GUTTAU:  Yes.  We're going to
9  call Lincoln Fire Chief Dave Engler.
10    MR. CORRIGAN:  And if I can just
11  interrupt for a second, Mr. Rutzick.  Just to
12  clarify, both sides submitted issue statements,
13  and I don't know if you have any desire to
14  discuss those prior to implementing the start of
15  the hearing, but I just raise that because
16  that's normally something we would do at this
17  point in time.
18    THE ARBITRATOR:  I'm sorry.  I
19  didn't hear what you said.
20    MR. CORRIGAN:  Both sides issued
21  -- or, provided to you issue statements,
22  statements of the issue, and I don't -- I didn't
23  know if you wanted to address the differences or
24  if you saw any difference in those, prior to the
25  commencement of the hearing.

Page 19

1    THE ARBITRATOR:  Let's leave
2  those for the end.
3    MR. CORRIGAN:  Okay.
4    CHIEF DAVID THOMAS ENGLER,
5    Having been sworn to tell the truth,
6    the whole truth and nothing but the
7    truth, testified as follows:
8    THE ARBITRATOR:  All right.
9  State and spell your name for the record, sir.
10    THE WITNESS:  My name is David
11  Thomas Engler, D-A-V-I-D, T-H-O-M-A-S,
12  E-N-G-L-E-R.
13    THE ARBITRATOR:  Proceed.
14    MS. GUTTAU:  Thank you.
15    DIRECT EXAMINATION
16  BY MS. GUTTAU:
17    Q   Chief Engler, how long have you been
18  the Lincoln Fire & Rescue chief?
19    A   A little over a year.
20    Q   And we'll get into your background a
21  little bit more, but do you also have a
22  background on the labor side, on the Union side?
23    A   I do.
24    Q   And with that extensive background on
25  the Union side, is it fair to say that you tried
26  to give Ms. Benson the benefit of the doubt in

Page 20

1  your decision-making?
2    A   Yes, it is.
3    Q   And as you know, Ms. Benson has a
4  long-pending federal lawsuit naming several
5  individuals as defendants; correct?
6    A   That's correct.
7    Q   Including the City?
8    A   Yes.
9    Q   At the time you made the termination
10  decision, you've never been individually named
11  in the lawsuit, have you?
12    A   I have not.
13    Q   We'll go through the reasons for
14  Ms. Benson's termination in detail, but can you
15  tell the Arbitrator, generally, just to start
16  off with, why did you discharge Ms. Benson?
17    A   The, the reason for the discharge was
18  that we had an incident that was reported to us,
19  and through the -- through the overall
20  investigation, we found that the story that was
21  initially provided to us wasn't the same as what
22  the investigation found.
23    Q   Okay.  Did you conclude that she had
24  made false allegations against Captain Mahler
25  about a warehouse fire?

Page 21

1    A   Yes, I did.
2    Q   What was one of the most -- What were
3  some of the concerns you had when you discovered
4  that she had made these false accusations?
5    A   A number of things.  I felt it made
6  the, the department look bad in the media, and,
7  and it wasn't only the local media, but it was
8  in national media with, with fire publications.
9        It -- I had a number of, of people
10  that had believed that the, the accused fire
11  captain was guilty without, without
12  understanding the story, and, and so they were
13  demanding that he be fired.
14        We had personnel internally that did
15  not -- they had -- they raised concerns about
16  working with Ms. Benson because they, they were
17  concerned that they were either going to be
18  brought in on a lawsuit or they were going to be
19  falsely accused of something.
20        We were going through a recruitment
21  cycle at the time and we had three female
22  employees that we were looking at hiring and
23  within a couple days of the, the paper --
24  newspaper article, three of them had withdrawn
25  their application to the department.  They

Page 22

1  didn't cite a specific reason, so it could have
2  been for other reasons, but just based on the
3  timeliness, that was a little concerning,
4  especially when we're trying to recruit a
5  diverse workforce.
6        And then, certainly, the last factor
7  is the cost of the, the investigation, the
8  overtime, the, the changes in staffing was
9  significant.
10    Q   And she had requested the
11  investigation; correct?
12    A   Yes.
13    Q   Okay.  To your knowledge, do you know
14  what City Legal paid for the investigation?
15    A   I've been told it was over $80,000.
16    Q   Did you --
17        THE ARBITRATOR:  How much?
18        THE WITNESS:  80,000 -- It was
19  over $80,000.  I don't have an exact number.  It
20  was paid for by City Legal, so it wasn't paid
21  for by the fire department.
22    Q   (By Ms. Guttau)  Did you also lose the
23  services of the accused firefighter, Captain
24  Mahler?
25    A   Yes, we did.

Page 23

1    Q   And that's because he was placed on
2  leave?
3    A   Yeah, we placed him -- we placed him
4  on leave with pay, so we had to cover his shifts
5  in overtime for the majority of the time off.
6    Q   Okay.  So let's circle back a little
7  bit with your background.  Could you share with
8  the Arbitrator your educational and job history?
9    A   Sure.  I, I started with the Kansas
10  City, Kansas fire department in, I think it was,
11  1994.  In 1996, I came to the Lincoln, Lincoln
12  Fire & Rescue as a firefighter paramedic.  I
13  worked as a firefighter paramedic until 2006, I
14  was promoted to fire captain; and in 2018
15  promoted to battalion chief; in 2020 acting fire
16  chief; and then in 2021 was named the fire
17  chief.
18    Q   And can you describe your background
19  on the labor/union side of things before you
20  entered management?
21    A   Yeah.  I was -- I was an officer in
22  Local 644.  Starting in 1999, I was elected to
23  secretary, shortly thereafter vice president,
24  and then in -- I think it was around 2008,
25  became the president of the local until 2014.  I

Page 24

1  was also the vice president of the State
2  Firefighters Association, and then the president
3  of the State Firefighters Association, I believe
4  from about 2004 until 2014.
5        I was the second district field
6  services representative with the International
7  Association of Firefighters for several years --
8  I can't remember the years -- up until 2014.
9        In 2014 I took a leave of absence from
10  the fire department and worked with a law firm
11  as a labor consultant in California,
12  representing primarily public safety employees,
13  and then returned in 2015.
14    Q   As fire chief now, what are your --
15  can you describe your job responsibilities.
16    A   Well, I -- I'm appointed by the mayor
17  to oversee the fire department.  You know, that
18  includes budget, operations, anything within the
19  fire department.  Working with other departments
20  to ensure smooth services throughout the city.
21  Dealing with, with any issues concerning the
22  fire department.
23    Q   Okay.  And on December -- In December
24  2020 --
25        2020 or 2021?

Page 33

1   interactions with her before you became fire
2   chief?
3        A   Not, not before I became a battalion
4   chief.  I worked on a different shift across
5   town so I didn't know her very well.  We didn't
6   have a whole lot of interactions.
7        Q   Okay.
8        A   As battalion chief, she was assigned
9   initially to Station 3, Engine 3 on C shift,
10  which is an outstanding crew, and so I, I did
11  get to know her as I did station visits and
12  everything there.
13       Q   Okay.  Who's the captain of that crew
14  at that time?
15       A   Captain Dan Ripley.
16       Q   Okay.
17            MS. GUTTAU:  That's R-I-P-L-E-Y,
18  sir.
19            THE ARBITRATOR:  Okay.
20       Q   (By Ms. Guttau)  So once you became
21  battalion chief or into management, did you
22  become aware, at some time, that she had had a
23  lawsuit pending against Lincoln Fire & Rescue
24  since about 2018?
25       A   Yes.  And, and it was in the paper, so

Page 34

1   it was -- it was well known.
2        Q   Okay.  And you didn't have a lot of
3   involvement, though, with the issues that gave
4   rise to that lawsuit at that time?
5        A   No.  And when it first occurred, might
6   have been during my time in California.  I --
7   I'm not sure.  But I really wasn't aware of the
8   specifics.
9        Q   Okay.  And once you did become chief,
10  did you field some complaints from her at that
11  time?
12       A   Yes.
13       Q   And what -- Can you tell us what those
14  were?
15       A   I think a couple of days after I
16  started as battalion chief, her captain had
17  called me and she was having trouble with an
18  employee named Alex Martin, and the captain said
19  that, that he needed something done about it,
20  and so I evaluated the situation.  I moved
21  Captain Martin -- I removed him from that
22  station and placed him at, at a different
23  location.
24       Q   Okay.  Any other complaints that you
25  fielded?

Page 35

1        A   Not that I can remember.
2        Q   Okay.  Did she ever express a
3   complaint to you regarding USAR or Captain Mu --
4   Miller -- Mahler?
5        A   Yeah, I don't -- I don't think that
6   was directly to me, but I was aware that she had
7   a concern with, with USAR.
8        Q   Do you know what that concern was?
9        A   I really am not sure.
10       Q   That's fine.
11       A   Yeah.
12       Q   And were there any complaints that you
13  fielded in April of 2021?  Just if you could
14  tell us generally, and we'll go through in more
15  detail.
16       A   Yes.  There were -- There were a
17  couple of complaints.  She had expressed some
18  concerns about a discussion at, at a -- I can't
19  remember if it was the coffee table or the table
20  downstairs on the apparatus floor -- between
21  Matt Woitalewicz, Chad Roof, and I think Brady
22  Papik, and so I had that investigated.
23            There was a complaint --
24            THE ARBITRATOR:  Was she part of
25  that?

Page 36

1            THE WITNESS:  She, she, she made
2   the complaint, and I, I think it was that they
3   were -- they were talking about her or -- It, it
4   centered around training, I believe.
5        Q   (By Ms. Guttau)  Did you move them --
6   Did you move Captain Roof and Matt Woitalewicz
7   out of that station pending investigation?
8        A   I did.
9        Q   And took her complaint seriously?
10       A   Yes.
11       Q   Okay.  After investigation, was it
12  concluded they were unfounded?
13       A   Yes.
14       Q   And did you return them to the station
15  at that time?
16       A   I did.
17       Q   Okay.  Over the years now that you've
18  been involved with the lawsuit and, and since
19  becoming chief or battalion chief before that,
20  do you know of others that she has made
21  complaints against?
22       A   Yes.  There was another complaint
23  against Shawn Mahler about saying something at
24  training about her.
25       Q   Okay.  Has she made complaints about

Page 41

1    MS. GUTTAU: Okay.
2    Q   (By Ms. Guttau) When you removed
3  Captain Roof after Ms. Benson made a complaint
4  -- Well, first of all, who's Captain Roof?
5    A   He was the captain on Engine
6  Company 1, C shift. So he was -- He was the
7  captain on the engine. She was the captain --
8  the acting captain on the truck company.
9    Q   To your knowledge, have there been any
10  -- or how -- About how long had he been a
11  firefighter?
12    A   He was on the job before me, so I'm
13  gonna guess 27, 28 years.
14    Q   Okay. To your knowledge, in his 27-
15  or 28-year career, was he ever removed from
16  service or disciplined for similar issues at any
17  time?
18    A   I believe as a firefighter he was, but
19  not since he's become a captain.
20    Q   And how long has he been a captain?
21    A   Before me, so I'm gonna estimate maybe
22  2004 or '05 he was promoted.
23    Q   When you trans --
24    THE ARBITRATOR: What's his name
25  again?

Page 42

1    THE WITNESS: Captain Chad Roof,
2  R-O-O-F.
3    THE ARBITRATOR: R what?
4    THE WITNESS: R-O-O-F.
5    THE ARBITRATOR: Okay.
6    Q   (By Ms. Guttau) And who was the other
7  firefighter that you transferred out pending
8  investigation?
9    A   Matt Woitalewicz.
10    Q   And can you spell that?
11    A   I'm not gonna even try.
12    MS. GUTTAU: We'll get you the
13  spelling on that. It's a tough one.
14    THE ARBITRATOR: All right.
15    Q   (By Ms. Guttau) Can you tell me about
16  Matt Woitalewicz, what kind of firefighter he
17  is?
18    A   He's got a -- He's got a very good rep
19  -- He's a young firefighter. He does a lot of
20  training. He has a good reputation as a
21  firefighter.
22    Q   Do you know why he's really gung ho
23  about training?
24    A   His dad died in the line of duty on a
25  different -- on a volunteer fire department sev-

Page 43

1  -- many years ago, before he became a
2  firefighter.
3    Q   When you removed Captain Roof and
4  Firefighter Woitalewicz, is that disruptive to
5  operations?
6    A   Yes.
7    Q   In what way?
8    A   Well, we're removing them from their
9  station, and, you know, there is -- there is
10  always the desire to keep crews together because
11  they, they function better. It's kind of like a
12  team, and if you bring someone else in, the team
13  will function, but it won't function as good.
14    And then we have to find specific
15  spots for them, and, and that can be -- that can
16  be challenging.
17    Q   And just for a timeline --
18    THE ARBITRATOR: Hold on. Just
19  so I'm getting this, you're saying she made a
20  complaint, and then you had to move them from
21  the station to somewhere else? Is that what
22  you're saying?
23    THE WITNESS: Yes. I, I moved
24  them to other locations during that time. There
25  wasn't a requirement, but I felt that was

Page 44

1  the best way to conduct the investigation
2  without having an ongoing disruption in service.
3    THE ARBITRATOR: And you're
4  saying you did this because she made a complaint
5  about both of them?
6    THE WITNESS: Yes.
7    THE ARBITRATOR: Okay. All
8  right. Go ahead.
9    Q   (By Ms. Guttau) Did you then have
10  somebody conduct the investigation?
11    A   Yes, I did.
12    Q   And who was that?
13    A   The administrative officer, Aishah
14  Witte.
15    Q   And can you tell me, what -- why do
16  you have her -- why did you have her do the
17  investigation?
18    A   Aishah is the administrative officer,
19  and she was -- prior to my being fire chief, she
20  was designated to handle the HR issues. She
21  worked for the Nebraska Department of Health and
22  Human Services and conducted investigations
23  there, and then she took the managing
24  disciplinary issues in the fire service from
25  Curt Varone, which was, I believe, a four-day

Page 45

1    course that covered how to conduct
2    investigations.
3         She also had completed her SHRM CP,
4    which is a human resources designation that,
5    that covers investigations. So I felt, when I
6    looked at, at all the possible parties that
7    could do an investigation -- and she's also --
8    She also went to law school and completed law
9    school. So all those things, I felt that she
10   was a good choice to do the investigation. Plus
11   she's administrative, so if I -- if I would have
12   had chief officers do it, they're working shift
13   work and so they could be off on their days off.
14   So it just made sense at the time.
15        MS. GUTTAU: And, again, just for
16   your reference, Mr. Rutzick, Exhibit 45 is that
17   investigation, and we'll present her as a
18   witness later to discuss that in more detail.
19        THE ARBITRATOR: All right.
20   Q    (By Ms. Guttau) So this was -- This
21   complaint was around April -- beginning of April
22   of 2021, so within a few weeks of the warehouse
23   fire?
24   A    Yes.
25   Q    Okay. And what did Aishah's

Page 46

1    investigation conclude?
2    A    It concluded that it was unfounded.
3    Q    And returned the firefighters to
4    service?
5    A    Yes.
6    Q    So now I want to move ahead a couple
7    of weeks and just a few days before the
8    warehouse fire. Did you learn of further
9    complaints by Ms. Benson?
10   A    Yes, I did.
11   Q    Okay. Tell me what that was.
12   A    Aishah Witte, my administrative
13   officer, informed me that she was contacted by
14   Ms. Benson about Shawn Mahler's conduct at a
15   ladder training that was, was done in which he
16   apparently was saying things about her.
17   Q    Okay. And do you know who had
18   reported that to Ms. Benson?
19   A    It was reported by Jessie Lundvall.
20   Q    And who was she?
21   A    She was a firefighter assigned to the
22   training division to conduct training.
23   Q    Did you later discharge her for
24   unrelated charges of dishonesty?
25   A    Yes, I did.

Page 47

1    Q    Was Ms. Benson even present when
2    Captain Mahler allegedly made these statements
3    about her?
4    A    No.
5    Q    Nonetheless, did you take her
6    complaint seriously?
7    A    Yes, I did.
8    Q    What did you do next?
9    A    I asked Ms. Lundvall for the specific
10   information, had it forwarded to Aishah Witte,
11   and began an investigation.
12   Q    Okay. And what did Witte's
13   investigation conclude?
14   A    That the -- Well, it -- Unfounded.
15   Q    Okay. And did you notify Ms. Benson
16   of that outcome?
17   A    I did.
18   Q    Okay. Was it your understanding that
19   Ms. Benson reported this complaint, that she had
20   overheard from Ms. Lundvall, within about an
21   hour of hearing about it?
22   A    I, I believe so.
23   Q    She reported it pretty quickly after
24   she heard about it?
25   A    Yeah. I can't be sure of the timing,

Page 48

1    but it --
2    Q    Okay.
3    A    Yeah.
4    Q    Okay. Let's move now ahead four days,
5    and we'll move to the date you have, the April
6    26th, 21 -- 2021 warehouse fire, which is really
7    the subject that we're here on.
8         Can you tell me what station and
9    apparatus Ms. Benson was assigned to at the time
10   of that fire?
11   A    She was on Truck 1, C shift --
12   Q    Okay.
13   A    -- operating as the acting captain.
14   Q    And "acting captain" means what when
15   you go to a fire?
16   A    Acting captain is when the captain is
17   off, the -- we utilize someone on the captain's
18   list to fill the, the role, and although they're
19   not officially promoted, they have the same
20   responsibilities and the same expectations of an
21   actual fire captain.
22   Q    And do you know who was on
23   Ms. Benson's crew that day?
24   A    I believe it was Fire Apparatus
25   Operator Matt Roberts and Probationary

Page 49

1  Firefighter Morgan Hurley.
2      Q   So what's "probationary" mean in the
3  firefighter world?
4      A   Probation -- We -- When our
5  firefighter recruits get out of the academy,
6  they do a six-month probation in which they're
7  assigned to the fire apparatus.  That
8  probationary period allows us to ensure that,
9  that they're able to, to do the job without any
10  issues, and they -- They are able to gain
11  experience during that time to also make sure
12  that it's a career that they want to continue
13  in.
14      Q   Okay.  Morgan Hurley, as a
15  probationary firefighter, is she a good recruit?
16      A   Yeah, she had -- she had very good
17  reports, and the crews seemed to think highly of
18  her.
19      Q   And in your experience with her, did
20  you find her to be honest?
21      A   Yes, I did.
22      Q   Okay.  And the other member of the
23  crew, FAO Matt Roberts -- And what's FAO stand
24  for again?
25      A   Fire Apparatus Operator.  So that is

Page 50

1  someone who drives and operates the apparatus.
2      Q   And when you say "apparatus," what's
3  that mean in fire --
4      A   That's our fire engine or a ladder
5  truck or something that we use for fire
6  suppression.
7      Q   Okay.  Is Matt Roberts, in your
8  opinion, a good firefighter?
9      A   Yes, he is.
10      Q   Describe his skills.
11      A   Matt's been -- He, he came on the job
12  shortly after me.  He's kind of a quiet guy.
13  Really, really knows his stuff.  He's got a good
14  reputation on the department, and he's just --
15  He's just a solid employee.  You know, no issues
16  with him.
17      Q   In your experience with him, found him
18  to be honest?
19      A   Yes.  Yeah.
20      Q   As acting captain, was Ms. Benson
21  responsible for her own crew's safety?
22      A   Yes.
23      Q   Okay.  Ms. Benson makes her
24  accusations, again, against Captain Mahler in
25  regards to this fire.  Can you tell me where he

Page 51

1  was stationed?
2      A   He was stationed at Fire Station 8.
3  He's on Truck 8, C shift.  So he's on, also, one
4  of the four ladder trucks.  Station 8 is
5  probably -- I don't know how many miles from
6  Station 1, to the south.
7      Q   Okay.  And to the best of your
8  knowledge, does it sound accurate that
9  Ms. Benson and Captain Mahler had not worked
10  together permanently at the same station since
11  2016?
12      A   That's correct, yeah.
13      Q   Okay.  Do you know who was on Captain
14  Mahler's crew the day of the warehouse fire?
15      A   Let's see.  I believe it was Fire
16  Apparatus Operator Love, Firefighters Borchers
17  and Dyer.
18      Q   Okay.  And are these all good
19  firefighters, in your opinion?
20      A   Yeah, that's a good crew.
21      Q   Okay.  Were you present at the fire,
22  Chief?
23      A   I was not.
24      Q   And why weren't you?
25      A   I typically try to go to incidents

Page 52

1  when I can, but that was -- During that day, I
2  had meetings.  I was -- I was monitoring it.
3  Both of the battalion chiefs that were present
4  were giving me some updates, and what they had
5  reported is it was -- the fire was under
6  control.  It was kind of a nuisance fire, and it
7  -- they were going to be there for quite a
8  while, but it wasn't spreading.  It wasn't
9  anything to be overly concerned about.
10      Q   So you didn't feel the need to go in
11  person?
12      A   No.
13      Q   Okay.  But you've listened to the
14  audio of the fire radio traffic; correct?
15      A   I have, yeah.
16      Q   Okay.
17          MS. GUTTAU:  And just for your
18  reference, Mr. Arbitrator, that is -- We
19  submitted the audio as our R12, and that was via
20  a link, and then we also have a transcript of it
21  as R13.
22          THE ARBITRATOR:  Okay.  I'm not
23  sure what you're talking about, so.
24          MS. GUTTAU:  Yeah.  Yep.  Okay.
25  I'll give a little more description.

Page 53

1    Q   (By Ms. Guttau)  So can you tell --
2  When you're talking about the radio audio, what
3  do you -- what's that referring to?
4    A   Yeah, it's just a recording of all of
5  the radio traffic that occurred during that
6  incident.
7    Q   Okay.  Who all has radios on during an
8  incident -- during a fire?
9    A   Every firefighter has a radio assigned
10 to them and -- so they all have the capability
11 of transmitting on the radio.
12   Q   Okay.  And so then that traffic of the
13 talking back and forth between the battalion
14 chief or whoever is, you know, at the fire,
15 that's all preserved in an audio?
16   A   Yes, it is.
17   Q   Okay.
18   A   Yeah.
19       MS. GUTTAU:  So that would be the
20 audio we're referring to.
21       THE ARBITRATOR:  I have a
22 transcript of that somewhere?
23       MS. GUTTAU:  Yes.  That is --
24       THE ARBITRATOR:  Where?
25       MS. GUTTAU:  The transcript is

Page 54

1  R13.
2        THE ARBITRATOR:  Okay.  I don't
3  know where the Rs -- what the Rs are.
4        MS. GUTTAU:  Oh, it's just
5  Respondent.  I just meant -- We always mark them
6  as "Respondent."  So it's R -- City Exhibit 13.
7        THE ARBITRATOR:  Okay.  That
8  would be --
9        MS. GUTTAU:  Yep.
10       THE ARBITRATOR:  Yeah.
11       MS. GUTTAU:  Okay.  Sorry.
12       THE ARBITRATOR:  Now you can
13 (unintelligible).
14       MS. GUTTAU:  All right.
15       THE ARBITRATOR:  That confused
16 me.
17       MS. GUTTAU:  I know.  Sorry about
18 that.  So, yeah, that --
19       THE ARBITRATOR:  I found it.
20       MS. GUTTAU:  That's our 13.
21   Q   (By Ms. Guttau)  And you've listened
22 to the audio and read the transcript?
23   A   Yes.
24   Q   Okay.  Were you familiar with the
25 scene where this fire occurred on April 26th?

Page 55

1    A   I was not at the time, no.
2    Q   Okay.  Did you since -- Have you since
3  seen it?
4    A   Yes, I have.
5    Q   Could you describe it for Mr. Rutzick?
6    A   It's kind of one of those industrial
7  park-type buildings.  It's, it's, you know, a
8  fairly large building with a lot of garage
9  doors.  People utilize them for different
10 things.  You know, different businesses
11 typically use those because they have the
12 ability to park vehicles in and, and that sort
13 of thing.
14   Q   Okay.  Let's turn to City Exhibit R16.
15   A   Okay.
16       MS. GUTTAU:  So, sir, we're on
17 Exhibit 16.
18   Q   (By Ms. Guttau)  And can you tell us,
19 just generally, what those appear to be to you?
20   A   These are pictures of the building.
21   Q   Okay.  So 16 reflects the warehouse
22 that we're talking about in regards to the April
23 26th fire?
24   A   Yes.
25   Q   Okay.

Page 56

1        THE ARBITRATOR:  Okay.  I got it.
2        MS. GUTTAU:  Okay.  And for
3  brevity, instead of saying the date, can we
4  agree if we just refer to the warehouse fire we
5  all know what we're talking about?  Is that
6  okay, John?
7        MR. CORRIGAN:  It's fine with me.
8        MS. GUTTAU:  Okay.
9    Q   (By Ms. Guttau)  Is the warehouse --
10 was it still standing after the fire?
11   A   Yeah, it was.
12   Q   What, what kind of fire, I guess, was
13 it, to your knowledge?
14   A   There was cardboard recycling, and I
15 believe there was -- in the center of the
16 warehouse was a compactor, and there was a fire
17 in the compactor.
18   Q   And was it a lot of cardboard, to your
19 knowledge?
20   A   Yes.
21   Q   Okay.  Why would both Captain Mahler
22 and Acting Captain Benson be called to this
23 fire?
24   A   In every fire incident that is a
25 confirmed fire, we send two -- or, three

Page 57

1    engines, two truck companies, a medic unit, two
2    battalion chiefs, and our air unit to the fire.
3    They were both on truck companies that day.
4        Q    Okay.  Who was the incident commander
5    for the fire scene?
6        A    The overall incident commander was
7    Acting Battalion Chief Curt Faust who was on
8    Battalion 1, C shift that day.
9        Q    Can you spell his last name for the
10   arbitrator?
11       A    F-A-U-S-T.
12       Q    Okay.  What -- What's his --
13           THE ARBITRATOR:  What was his
14   name?
15           THE WITNESS:  Curt Faust,
16   F-A-U-S-T.
17           THE ARBITRATOR:  F?
18           MR. CORRIGAN:  F as in Frank.
19           THE WITNESS:  F as in Frank, A as
20   in Adam, U as in union, S as in Sam, T as in
21   Thomas.
22           THE ARBITRATOR:  Thank you.
23   Faust.  Okay.
24       Q    (By Ms. Guttau)  And just, can you
25   explain, what does an incident commander do at a

Page 58

1    fire?
2        A    The incident commander is kind of like
3    the coach of the team.  They, they make all the
4    -- They make all the orders to the crews and
5    ensure that there is organization at a fire
6    incident.
7        Q    And so how is the incident commander,
8    like, chosen or how is that person picked into
9    that position in a fire?
10       A    So the first officer on scene always
11   serves as the incident commander initially, and
12   then, typically, as higher ranking personnel get
13   there, they will end up taking command.
14           So in a typical incident, a fire
15   captain is most likely to be the initial
16   incident commander, and then when the battalion
17   chief arrives on scene, they will assume command
18   once they get on scene and get a face-to-face
19   briefing from the initial incident commander.
20       Q    Okay.  Talking about incident command,
21   we'll talk about a lot of references to ICS.
22   What does that refer to?
23       A    Incident Command System.
24       Q    What is that?
25       A    It's an organiza -- It's a way of

Page 59

1    organizing emergency incidents to ensure that
2    everyone is safe and that there is no confusion
3    in communications.
4        Q    Okay.  Do you provide training to the
5    Lincoln firefighters on ICS?
6        A    We do have training for ICS.
7        Q    We'll also hear a lot about tasks
8    today.  Can you describe what that means in the
9    context of ICS.
10       A    Tasks are things that you need done on
11   the scene.  So that might be applying water to a
12   fire.  It might be ventilating.  It might be
13   doing search and rescue.  There are -- There are
14   many different things that have to be done.  We
15   call those "tasks."
16       Q    Okay.  Talking about, then, some of
17   those tasks that we'll hear a lot about in the
18   next few days, what is "ventilation"?
19       A    "Ventilation" is basically opening up
20   a structure to allow the heat and gases to be
21   expelled from the structure.
22       Q    Okay.  And what is --
23           We'll also see reference to "extension."
24   What is that?
25       A    "Extension" is determining if the fire

Page 60

1    moved from the place of origin to a different
2    location.
3        Q    And sometimes we'll hear reference to
4    "fire attack."  What is that?
5        A    "Fire attack" is utilizing a hose line
6    and applying water to the fire.
7        Q    Okay.  You will also hear -- We'll
8    also talk a lot over the next couple of days
9    about the term "group supervisor."  What is a
10   "group supervisor"?
11       A    A "group supervisor" is a designation
12   of a supervisor when you have multiple companies
13   working together.  So you may have, say, two
14   fire engines working together on fire attack,
15   and in that case, you would have two
16   supervisors, because they're company officers,
17   and you can't have two people in charge of one
18   team.  So the group supervisor is designated to
19   ensure that the incident commander is giving
20   orders to one person and that one person is
21   giving the orders to the other personnel.
22       Q    Okay.  And who -- Like, who makes that
23   -- Who makes that designation?
24       A    The incident commander makes that
25   designation.

Page 61

1    Q   And how do they specifically say it?
2  Or how would it have to be designated?
3    A   They typically will say Engine's
4  assigned fire attack, Engine 2 fire attack,
5  Engine 1 -- or, Engine 2, you'll be working for
6  Engine 1, and, and establish that captain as the
7  group supervisor.
8    Q   Okay.  And it has to be very clear?
9    A   Yes.
10    Q   Okay.  If somebody is not designated
11  as a group supervisor, do the crews still report
12  to their own company?
13    A   Yes.  We call those unit leaders.
14    Q   Is it ever implied or assumed that
15  someone is a group supervisor without a specific
16  designation?
17    A   No.  The whole premises of the
18  Incident Command System is to ensure that there
19  are clear communications.  So there is -- There
20  is no implying in incident command.
21    Q   Okay.  In the radio transmissions that
22  you've listened to and read, at some point did
23  Ms. Benson ask to assist with ventilation?
24    A   Yes.
25    Q   Okay.  And was she told to assist with

Page 62

1  T8 ventilation?
2    A   Yes, and opening a door.
3    Q   Okay.  That's what that means?
4    A   Yes.
5    Q   Okay.  What does -- What does "assist
6  with" mean?
7    A   "Assist with" is, essentially, help
8  them.
9    Q   Okay.  Does, does the term "assist
10  with" mean that the person they're helping then
11  becomes a group supervisor?
12    A   No.
13    Q   Okay.  Did Ms. Benson arrive at the
14  fire before Captain Mahler?
15    A   Yes, I believe so.
16    Q   Okay.  And had she been in, in the
17  warehouse, to your knowledge, before Captain
18  Mahler had even entered?
19    A   Yes.
20    Q   And had come -- exited once before, as
21  well?
22    A   I believe so.
23    Q   Okay.  And that's all reflected in the
24  transmission; right?
25    A   Correct.

Page 63

1    Q   Okay.  Did it seem suspect to you that
2  Benson had her crew reenter the warehouse
3  without full air packs?
4    A   Yes.
5    Q   If it's dangerous in the fire, what do
6  you generally require or expect?
7    A   One of the things you want to do
8  before entering a fire once you've gone out is
9  check your air, and if your air is low, you
10  should replace the, the air cylinder to ensure
11  you've got enough air to, to continue
12  operations.
13    Q   Okay.  And it's your understanding
14  that Ms. Benson, after the fire, alleged that
15  Captain Mahler abandoned her and her crew in a
16  dangerous warehouse fire?
17    A   Yes, that was the report we received.
18    Q   Okay.  Did anybody raise any concerns
19  to you immediately after the fire that there had
20  been any safety violations or concerns regarding
21  Captain Mahler and Ms. Benson?
22    A   Not immediately, no.
23    Q   Okay.  When did that first come to
24  your attention?
25    A   Several days later.

Page 64

1    Q   Okay.  Did anybody immediately after
2  the fire mention that anybody had abandoned
3  someone else in that warehouse fire?
4    A   No.
5    Q   Okay.  Was there a safety officer at
6  the warehouse fire?
7    A   There was.
8    Q   And who was that?
9    A   Battalion Chief Mike Smith.
10    Q   Okay.  And what was his -- What's a
11  safety officer do at a fire?
12    A   The safety officer is designated to --
13  Because the incident commander is ultimately
14  responsible for safety and they're usually in a
15  stationary location where they can't move around
16  and see things, they will designate a safety
17  officer to do that for them.  So the safety
18  officer walks around, observes the conditions of
19  the, the fire, the building, and the personnel
20  and reports any safety concerns to the incident
21  commander.
22    Q   Okay.  Did Ms. -- Did Battalion Chief
23  Smith report any safety concerns to you after
24  the fire?
25    A   He did not.

Page 73

1     A  I was under -- I mean, generally, it
2  appeared that she was displeased with the
3  communication process between her and Mahler at
4  the fire.
5     Q  Okay.  On page 1, at the -- one, two,
6  three, four -- fifth paragraph down, she says,
7  "At this point I realized that Mahler had
8  abandoned us in an unsafe environment."
9     Did you take that allegation seriously?
10     A  Yes.
11     Q  Okay.  And on the second page of
12  Exhibit 15, at the very -- the last two
13  sentences she says, "It is especially dangerous
14  on a fire ground.  His refusal to communicate
15  could have injured or killed me, FAO Roberts and
16  FF Recruit Hurley."
17     Did you take that as a very serious
18  accusation?
19     A  Absolutely.
20     Q  Did it seem suspect to you that she
21  waited about a week to report this?
22     A  At the time I didn't think about it,
23  but over time, it seemed like for something as
24  drastic, that would be a long time.
25     Q  Okay.  And nonetheless, took her

Page 74

1  allegations seriously, and did you order an
2  investigation?
3     A  I did.
4     Q  Okay.  At some point did you order
5  that Mahler be placed on leave pending
6  investigation?
7     A  Yes.  That -- I believe it wasn't
8  immediate.  It was after she filed for the
9  injunction.
10     Q  Okay.  All right.
11     A  I may be wrong on that, but that's my
12  recollection.
13     Q  I think you're right.  Why -- Or, who
14  investigated and why?
15     A  I, again, had Administrative Officer
16  Witte, and I think Chief Smith might have
17  assisted her.
18     Q  Okay.  And she investigated
19  Ms. Benson's allegations?
20     A  Yes.
21     Q  What was the outcome of Ms. Witte's
22  investigation?
23     A  She felt it was unfounded.
24     Q  Okay.  And what --
25     THE ARBITRATOR:  And who did the

Page 75

1  -- I'm sorry, ma'am.  Who did the investigation?
2     THE WITNESS:  Aishah --
3  Administrative Officer Aishah Witte.
4     THE ARBITRATOR:  Spell it.
5     THE WITNESS:  W-I-T-T-E.
6     Q  (By Ms. Guttau)  And she's the one who
7  had done other investigations for you that you
8  talked about earlier?
9     A  Yes, she had done, I believe, all the
10  investigations up to that point.
11     Q  Okay.  Then if you want to turn to
12  Exhibit 44.
13     A  (Witness complies.)
14     THE ARBITRATOR:  44?
15     MS. GUTTAU:  Yes.
16     Q  (By Ms. Guttau)  And just the first
17  two pages, do you know, was that Witte's letter
18  sending the results or outcome to Ms. Benson?
19     A  Yes.
20     Q  Okay.  And the -- Reporting to her
21  that they -- she found the investigation did not
22  sustain a finding of retaliatory conduct?
23     A  Yes.
24     Q  Okay.  And in the pages after the
25  first two page [sic], we've got "Investigation

Page 76

1  Summary."  Is that Ms. Witte's investigation
2  summary, to your knowledge?
3     A  I believe it is.
4     Q  Okay.  And she indicated -- Did you
5  learn that she had indicated that Captain Mahler
6  and Captain Benson were operating in a peer
7  capacity?
8     A  Yes.
9     Q  And Benson had been in the structure
10  and was familiar with how to make a safe exit
11  prior to Mahler even arriving?
12     A  Yes.
13     Q  After the conclusion of that
14  investigation, did you receive a grievance
15  regarding the investigation at some point?
16     A  I did.
17     Q  Okay.  Let's turn to --
18     MS. GUTTAU:  This would be
19  Exhibit 18, sir.
20     THE ARBITRATOR:  Hold on a
21  minute.  18?
22     MS. GUTTAU:  Yep, 18.
23     Q  (By Ms. Guttau)  And what's Exhibit 18?
24     A  That's the grievance filed by Amanda
25  Benson.

Page 77

```
 1      Q   Okay.  And the Union signed, as well?
 2      A   Yes.
 3      Q   And what was the remedy that
 4   Ms. Benson and the Union were seeking?
 5      A   It wanted the department to conduct a
 6   thorough and honest investigation of her
 7   complaint, and that we take action to punish or
 8   otherwise discipline employees who have been
 9   found to breach the rules of conduct with favor
10   or bias and that Benson be made whole in all --
11   in all respects, to include that she should be
12   free from acts of retaliation in the workplace
13   in violation of the City's own policies and
14   rights of the grievant under the Collective
15   Bargaining Agreement.
16      Q   Once she made -- or, submitted that
17   grievance, what was the next step?  Oh,
18   actually, let me back up.  I skipped a page.  So
19   that grievance was June 9th; is that correct?
20      A   Yes.
21      Q   Okay.  A couple days later, did you
22   learn that Ms. Benson had filed a motion in
23   federal court regarding the warehouse fire?
24      A   Yes.
25      Q   And that was June 11th, 2021?
```

Page 78

```
 1      A   I believe so.
 2      Q   Let's turn to R46.
 3          THE ARBITRATOR:  When did this
 4   happen?
 5          MS. GUTTAU:  So this was June 11th.
 6          THE ARBITRATOR:  And the lawsuit
 7   was filed when?
 8          MS. GUTTAU:  So the lawsuit --
 9   This was a motion for preliminary injunction
10   that was filed in the pending lawsuit that's
11   been going since 2018.
12          THE ARBITRATOR:  And when was
13   that lawsuit filed?
14          MS. GUTTAU:  So that's the
15   lawsuit that has alleged that -- that he spoke
16   about earlier that alleged that Captain Mahler
17   and numerous other individuals -- I think there
18   is eight individuals -- in the City of Lincoln
19   are named.  I think there is nine defendants.
20   Regarding gender discrimination, harassment, and
21   retaliation.
22          THE ARBITRATOR:  Okay.  So she
23   conducted a superseding complaint?
24          MS. GUTTAU:  Yes.  So, yep, the
25   Court allowed a fourth amended complaint, and
```

Page 79

```
 1   at, at this point on June 11th -- And this is
 2   one I e-mailed you, sir.  So you'll get this in
 3   the mail tomorrow, but I e-mailed it to you.
 4   This is her motion for preliminary injunction
 5   that was filed with the Court.
 6          THE ARBITRATOR:  Okay.
 7          MS. GUTTAU:  Okay.
 8      Q   (By Ms. Guttau)  In her motion, what
 9   relief was she -- Let's see.  Let me find this
10   here.
11          THE ARBITRATOR:  Are we -- We're
12   past the grievance now?
13          MS. GUTTAU:  Yeah.  Yep, we'll
14   kind of -- It kind of all overlapped, so we'll
15   definitely come back to that, so.
16      Q   (By Ms. Guttau)  So in her motion for
17   injunction, they were filed two days apart.
18          If you look at paragraph 8, can you read
19   into the record what relief she was requesting.
20      A   (As Read) Plaintiff respectfully
21   requests that the Court order the City of
22   Lincoln to immediately initiate disciplinary
23   proceedings against Mahler; enjoin Mahler from
24   assignment/dispatch to any fire scene during the
25   pendency of disciplinary proceedings; and
```

Page 80

```
 1   appoint an independent, third-party investigator
 2   to investigate Plaintiff's complaint against
 3   Mahler's actions at the recent warehouse fire.
 4      Q   Okay.  And then if you want to flip
 5   back to Exhibit 19.
 6      A   (Witness complies.)
 7          THE ARBITRATOR:  Hold on a
 8   second.
 9          MS. GUTTAU:  Yep.
10          THE ARBITRATOR:  Okay.  19?
11          MS. GUTTAU:  Yep, 19.
12      Q   (By Ms. Guttau)  What is Exhibit 19?
13      A   That's the affidavit of Amanda Benson
14   in support of a motion for preliminary
15   injunction.
16      Q   Okay.  And to your knowledge, was this
17   publicly filed?
18      A   Yes.
19      Q   And was it widely reported after it
20   was filed?
21      A   It was.
22      Q   Okay.  And in her -- Let's look at
23   page 3 of Exhibit 19, paragraph 17.
24      A   (Witness complies.)
25      Q   Can you tell me what Ms. Benson stated
```

Page 81

1 under oath regarding the fire and Captain
2 Mahler?
3     A    "Mahler abandoned me, Roberts, and
4 Hurley in an IDLH (immediately dangerous to life
5 or health) with no direction."
6     Q    Okay.  And then if you want to look at
7 -- turn back to page 5.
8     A    (Witness complies.)
9         THE ARBITRATOR:  Where are you
10 now?
11        MS. GUTTAU:  So now I'm on page 5
12 of the same Exhibit 19.
13        THE ARBITRATOR:  Okay.
14        MS. GUTTAU:  Okay.
15     Q    (By Ms. Guttau)  And paragraph 33,
16 could you read that into the record.
17     A    "Included as Exhibit 3 to Plaintiff's
18 Index of Evidence is a true and current copy of
19 an email I sent to Faust and Witte after Mahler
20 abandoned me in a dangerous warehouse fire."
21     Q    And that's all part of her affidavit?
22     A    Yes.
23     Q    And Exhibit 3 of her index regarding
24 the e-mail to Faust and Witte, did you
25 understand that to be the same as Exhibit 15

Page 82

1 that we talked about?
2     A    That's correct.
3     Q    Okay.  And that was filed with the
4 Court?
5     A    Yes.
6     Q    All right.  And you said her
7 allegations did make national news?
8     A    Yeah, it was in fire journals, on
9 their news updates, and then I know Curt Varone,
10 who is -- who has a fire blog had it published
11 on there.
12     Q    Okay.  And if you want to look at
13 Exhibit 21.
14        MS. GUTTAU:  This will be Exhibit
15 21 of the City's exhibits.
16     A    (Witness complies.)  Yep, that's
17 Firehouse magazine.
18     Q    (By Ms. Guttau)  Okay.  And there is
19 actually -- If you flip through, are those some
20 of the articles that discuss the fire?
21     A    Yes.
22     Q    Okay.  And the first one's captioned
23 "Nebraska Fire Captain Abandoned Crew in Burned
24 Building"; correct?
25     A    That's true, yeah.  Correct.

Page 83

1     Q    Okay.  What does that type of coverage
2 mean for LFR, for Lincoln Fire & Rescue?
3     A    Well, it doesn't make us look good.
4     Q    Uh-huh.
5     A    And, again, it doesn't necessarily
6 help with recruiting efforts.
7     Q    So at that point, did you place
8 Captain Mahler on leave after she filed her
9 motion for a preliminary injunction?
10     A    I did.
11     Q    And so this --
12        MR. CORRIGAN:  I'm sorry.
13        MS. GUTTAU:  Uh-huh.
14        MR. CORRIGAN:  At what point
15 specifically did you make that decision?
16 Because there is -- there is -- there is the
17 dates on these -- Did you do it after the dates
18 on these news reports?
19        MS. GUTTAU:  No, I said after she
20 filed the motion for preliminary injunction on
21 June 11th.
22        MR. CORRIGAN:  So when, when --
23 Can you just say when you put him off of work?
24        THE WITNESS:  I cannot remember
25 the exact date.

Page 84

1     Q    (By Ms. Guttau)  Was it sometime after
2 the motion and grievance both were filed?
3     A    It was because one of the -- one of
4 the parts of the injunction was to ensure that
5 he wasn't going to respond with her to any
6 calls.
7     Q    Okay.
8     A    So that was my only choice at the
9 time, to ensure that they wouldn't respond
10 together.
11     Q    Okay.  When you placed him on leave at
12 that time, you didn't move him to a different
13 station.  Actually, what did you do?
14     A    I sent him home with pay.
15     Q    For about how long?  Do you recall?
16     A    I don't recall.
17     Q    Okay.  More than a month?
18     A    It, it was a long time.  The
19 investigation took a long time.  I would guess
20 it was more than a month.
21     Q    Was that disruptive to his crew?
22     A    Yes.
23     Q    And did that leave citizens without
24 the benefit of his experienced responses?
25     A    Yes.

Page 85

1    THE ARBITRATOR: Did the Court
2  order the investigation?
3    MS. GUTTAU: So the Court did
4  not, but we undertook one anyway. So that was
5  actually the next step in my questions, so
6  you're way ahead of me.
7    THE ARBITRATOR: Okay.
8    Q   (By Ms. Guttau) After that motion had
9  been filed, at some point did you become aware
10  that the City hired somebody to investigate?
11    A   Yes.
12    Q   Okay. Do you know who the City hired
13  to conduct the investigation?
14    A   They hired Torrey Gerdes.
15    Q   Okay. And was that paid by LFR or by
16  City law?
17    A   City law.
18    Q   Did you have any involvement in that
19  investigation?
20    A   I, I did answer some questions as far
21  as our policies, operations, and then I helped
22  facilitate person -- staffing to get personnel
23  to the, the meetings with her to, to conduct the
24  investigation.
25    Q   Okay. In your discussions -- And who

Page 86

1  was the investigator?
2    A   Torrey Gerdes.
3    Q   Okay. And do you know who she is or
4  with?
5    A   She's an attorney. I can't remember
6  the law firm.
7    Q   Is it Baylor Evnen?
8    A   Yes, it is.
9    Q   Okay. Did you know her at all before
10  this investigation?
11    A   I had never heard of her.
12    Q   Okay. In your discussions with her,
13  to you does she appear fair and unbiased?
14    A   Yes.
15    MR. CORRIGAN: Objection.
16  Relevance.
17    A   Yes.
18    MR. CORRIGAN: A, no --
19    MS. GUTTAU: Yes.
20    MR. CORRIGAN: -- there is an
21  objection to the relevance.
22    MS. GUTTAU: He has to rule.
23    MR. CORRIGAN: This is a lawyer
24  that is not --
25    MS. GUTTAU: I asked: In his

Page 87

1  experience, did she appear to him fair and
2  unbiased?
3    MR. CORRIGAN: Okay. And then
4  I'm objecting on the basis of relevance, given
5  the fact that this is a lawyer who the City
6  hired to provide an investigation -- perform the
7  investigation, yet, the City has not produced
8  this person as a witness and will not allow us
9  to review the underlying documentation with
10  respect to the investigation she conducted. So
11  whether she's -- His impressions of her are
12  irrelevant.
13    MS. GUTTAU: We've provided
14  everything from her investigation that we have.
15    THE ARBITRATOR: What are you --
16  What are you asking for, John?
17    MR. CORRIGAN: Well, the question --
18    THE ARBITRATOR: What don't you
19  have?
20    MR. CORRIGAN: All of the
21  underlying statements.
22    THE ARBITRATOR:
23  (Unintelligible.)
24    THE COURT REPORTER: I need -- I
25  -- I'm sorry, sir, I can't understand you. "Are

Page 88

1  you moving forward?" What did you just say?
2    THE ARBITRATOR: You can't
3  understand me?
4    THE COURT REPORTER: There you
5  go. Now I can.
6    THE ARBITRATOR: Sorry. I just
7  asked John if he could move forward so I could
8  see him.
9    MR. CORRIGAN: Oh, move forward.
10    THE ARBITRATOR: It would make it
11  easier for me to understand what he's saying.
12    MR. CORRIGAN: Okay.
13    THE ARBITRATOR: I'm half deaf
14  anyway, and then when I can't see you, I can't
15  fully hear.
16    MR. CORRIGAN: Well, I apologize
17  for the video hookup, but the -- Essentially,
18  our objection is the City's asking the fire
19  chief as to his judgment about the credibility
20  of the lawyer that they hired to conduct an
21  investigation, and pursuant to the arbitrator's
22  previous rulings in the case, we --
23    THE ARBITRATOR: Was that the --
24  Hold on -- Was that the question, whether --
25    MS. GUTTAU: No, my question was

Page 89

1    just --
2         THE ARBITRATOR:  In regards to
3    her veracity?
4         MR. CORRIGAN:  Yes, that's
5    exactly what she was asking.
6         THE ARBITRATOR:  Because if
7    that's what you're asking him, you can't.
8         MS. GUTTAU:  I'll withdraw it.
9    That's fine.  That's fine.  I just wanted to --
10        THE ARBITRATOR:  He has no way to
11   know that.
12        MS. GUTTAU:  Okay.
13   Q   (By Ms. Guttau)  In your --
14        THE ARBITRATOR:  Can you --
15        MS. GUTTAU:  Okay.
16   Q   (By Ms. Guttau)  In your experience,
17   had -- to your knowledge, had she ever
18   represented the fire -- Lincoln fire department
19   before?
20   A   No.
21   Q   Okay.  At this time the motion for
22   injunction's still pending; correct?
23   A   Correct.
24   Q   Okay.  And I want to turn to --
25        MS. GUTTAU:  This would be

Page 90

1    Exhibit 2, sir.
2         THE ARBITRATOR:  2.
3         MR. CORRIGAN:  Let's just clarify
4    that when you said "at this time," that meant
5    when she was hired, so it's not pending today;
6    right?
7         MS. GUTTAU:  I'm sorry.  Oh, no,
8    at this point, yep.  I gotcha.  I gotcha.  Yep.
9    So I should say -- John had a good point to
10   clarify.
11   Q   (By Ms. Guttau)  I should have asked:
12   At this point in time that we're discussing,
13   after the investigator had been hired, at some
14   point did you submit a declaration to federal
15   court?
16   A   I did.
17   Q   Okay.  Can you turn to Exhibit 2, sir?
18   A   (Witness complies.)
19   Q   What is Exhibit 2?
20   A   That's my declaration.
21        THE ARBITRATOR:  A declaration?
22        MS. GUTTAU:  Yes.  This is the
23   chief's declaration.
24        THE ARBITRATOR:  To what?
25        MS. GUTTAU:  He's gonna testify

Page 91

1    to it.  I just -- These were part of the court
2    filings, and so it's part of what he made his
3    decision on.  The federal court made a decision
4    based on these, and we've included that order.
5         So I'll have him testify to all
6    of these things because I know you want to hear
7    firsthand from the witnesses.
8         THE ARBITRATOR:  Okay.
9         MS. GUTTAU:  Okay.
10   Q   (By Ms. Guttau)  Can you tell us, in
11   -- As reflected in the declaration, at some
12   point did you reach a conclusion as to whether,
13   after you listened to the radio transmission --
14   and I'm looking at paragraph 7 just for
15   reference -- did you reach a conclusion that
16   Captain Mahler and Acting Captain Benson were
17   operating in a peer capacity?
18   A   I did, and that was based on two
19   things.  It was based on what I heard from the
20   fire ground radio transmissions and what the
21   incident commander had e-mailed me as to his
22   intentions, in an e-mail.
23   Q   Okay.  And turning to the next page --
24   A   (Witness complies.)
25   Q   -- you talk about Acting Captain

Page 92

1    Benson in Paragraph 9 as the supervisor had the
2    same expectations and rank as all other
3    captains.  Can you describe what you mean by
4    that.  What's that mean?
5    A   Our acting captains are considered,
6    while they're acting and they're not fully
7    promoted, they are still -- they still carry the
8    same expectation as a captain would.
9    Q   Okay.  And in Paragraph 10, you talk
10   about your conclusion regarding group
11   supervisor.  Can you tell -- describe that for
12   the arbitrator.
13   A   Again, there was -- there was never
14   any sort of designation of anyone being a
15   ventilation group supervisor during that
16   incident, and it was further clarified by the
17   incident commander that it was not his intention
18   to have a group supervisor or he would have
19   designated one.
20   Q   So if there is not a group supervisor,
21   who do the captains report to?
22   A   To their immediate captain, acting
23   captain, which is considered a unit leader at
24   that time.
25   Q   And then they report to the incident

Page 97

1    believe that Captain Mahler abandoned them in an
2    IDLH environment?
3        A   No one felt that way.
4        Q   Did any of them convey any concerns
5    about their safety or the safety of their crew
6    in the warehouse fire?
7        A   No.
8        Q   And they all submitted declarations to
9    federal court to that effect, didn't they?
10       A   I believe they did.
11           MS. GUTTAU:  And, again, sir,
12   those other declarations are Exhibits 3 through
13   9.  We will have those individuals all testify,
14   but we've included them because that was what
15   was before the Court.
16       Q   (By Ms. Guttau)  At some point did you
17   learn about a ruling by the federal court on
18   Ms. Benson's motion for a preliminary injunction
19   relating to the warehouse fire?
20       A   Yes, I did.
21       Q   In general terms, what did you
22   understand that ruling to be?
23       A   I believe they denied it.
24       Q   Okay.  And if you want to turn to --
25           MS. GUTTAU:  This is Exhibit 1,

Page 98

1    City, Respondent, Exhibit 1.
2        A   (Witness complies.)
3        Q   (By Ms. Guttau)  Is Exhibit 1 the
4    memorandum and order by the Court?
5        A   Yes.
6        Q   Okay.  Did the Court's findings raise
7    some concerns for you?
8        A   Yes, it did.
9        Q   Let's turn to page 12 of Exhibit 1.
10       A   (Witness complies.)
11       Q   So on page 12 of Exhibit 1, under the
12   equities, the Court talks about the evidence in
13   the second sentence.  Do you see that?
14       A   Yes.
15       Q   Okay.  Could you read that -- those
16   two sentences into the record.
17       A   "The evidence show" --
18           THE ARBITRATOR:  Where are you?
19   Hold on.  Say it again.
20           MS. GUTTAU:  So we're on
21   Exhibit 1, page 12.
22           THE ARBITRATOR:  Okay.  Hold on.
23   Go ahead.
24           MS. GUTTAU:  Okay.
25       Q   (By Ms. Guttau)  And what did the --

Page 99

1    What did the judge write starting at the second
2    sentence of the first full paragraph?
3        A   (As read)  The evidence shows that,
4    with the exception of the plaintiff, no person
5    on Mahler's and Plaintiff's crew, nor the
6    incident commander of the safe -- or the safety
7    officer believed that Mahler was a ventilation
8    group supervisor, that Mahler abandoned
9    Plaintiff and her crew in a dangerous situation,
10   or that Mahler was duty bound to direct or
11   supervise Plaintiff and her crew.
12       Q   Okay.  Thank you.  Did that cause you
13   concern?
14       A   Yes.
15       Q   Why?
16       A   Because that was directly opposite of
17   what was reported.
18       Q   Reported by who?
19       A   By Ms. Benson.
20       Q   Okay.  After the order came down, did
21   you, at some point, receive an investigation
22   report by Attorney Gerdes, that we referred to
23   earlier?
24       A   I did.
25       Q   Okay.  And Exhibit -- Let's turn to --

Page 100

1            MS. GUTTAU:  This will be Exhibit
2    -- One second.  Sorry.  Oh, sorry, Exhibit 11.
3        A   (Witness complies.)
4            THE ARBITRATOR:  Okay.
5        Q   (By Ms. Guttau)  And what was
6    Exhibit 11?
7        A   That was the investigation report.
8        Q   Okay.  And did you review that report?
9        A   Yes.
10       Q   Okay.  And what was your understanding
11   of her findings?
12       A   Her findings were that the -- that
13   Mahler was not designated as a group supervisor,
14   that he did not abandon anyone in a building,
15   and -- Let's see.  I'm trying to think what all
16   the findings were.
17           MR. CORRIGAN:  I, I would object
18   to his conclusions without referencing her exact
19   findings.
20           MS. GUTTAU:  We can reference her
21   findings.
22       Q   (By Ms. Guttau)  If you want to turn
23   to page -- Conclusions start on page 34, and
24   just for user reference, there is, maybe,
25   headings.

Page 101

1    A   Okay.
2    Q   Five headings.
3    A   Yep.  Number one.  Shawn Mahler was
4  not assigned as a ventilation group supervisor
5  during the April 26th, 2021, fire incident.
6         Number 2.  Shawn Mahler had no duty to
7  supervise Truck 1 or communicate in the role of
8  group supervisor with Truck 1's crew after
9  Truck 1 was assigned to assist with ventilation,
10  getting one of those doors open.
11         Number 3.  Shawn Mahler did not
12  abandon Truck 1 in an IDLH environment after
13  Truck 1 was assigned to assist with ventilation,
14  getting one of the doors open.
15         Number 4.  Captain Shawn Mahler did
16  not have an obligation to call a Mayday
17  regardless of whether he knew where Truck 1 was
18  physically located.
19         And Number 5.  Shawn Mahler did not
20  fail to follow reasonable communication protocol
21  by his communication with Acting Captain Amanda
22  Benson after incident command assigned Truck 1
23  to replace Truck 8.
24    Q   In your review of her report, did you
25  -- did you find it accurately reflected Lincoln

Page 102

1  Fire & Rescue protocol?
2    A   Yes.
3    Q   Okay.  At this point did you respond
4  -- or, after you received the investigation, the
5  Court order, did you respond to Ms. Benson's
6  June 9th, 2021, grievance that we referred to
7  earlier, which was Exhibit -- too many numbers
8  here.  Exhibit 18 was her grievance.  Did you
9  respond to that grievance at this point?  And
10  I'll turn to Exhibit 24.
11    A   Yes.  Exhibit 24 is my response.
12    Q   Okay.  And what, what did you decide
13  in regard to her grievance?
14    A   I denied her grievance.
15    Q   Okay.  Even after this grievance was
16  denied, did Ms. Benson, to your knowledge,
17  continue to make the allegations that Mahler had
18  abandoned her?
19    A   I believe so.
20    Q   Okay.  Was there at some point that
21  you were contacted by City council with concerns
22  about her allegations?
23    A   Yes.  I had a City councilman contact
24  me.
25    Q   Okay.  Tell me about that.

Page 103

1    A   A member of the community had met with
2  Ms. Benson, and Ms. Benson provided a number of
3  documents regarding her situation, and this
4  individual contacted a City councilman, who
5  contacted me and, and wanted to have a meeting
6  to go over these.
7    Q   At some point did you consider
8  disciplinary action against Ms. Benson?
9    A   I did.
10    Q   Why?
11    A   Because it, it vi -- This, this claim
12  was inconsistent with the information in the
13  investigation, and it violated a number of
14  policies, and, certainly, I felt harmed the
15  reputation of Lincoln Fire & Rescue.
16    Q   Did you listen to her -- the interview
17  by Torrey Gerdes of Ms. Benson?
18    A   I did.
19    Q   Okay.
20         MS. GUTTAU:  And just for
21  reference, sir, that's Exhibit 22 of the City's
22  exhibits, which is just an audio file.
23    Q   (By Ms. Guttau)  And we won't go into
24  that in detail because about how long is that
25  audio interview?

Page 104

1    A   It was greater than ten hours.
2    Q   Okay.  When you listened to that
3  audio, what was your impression?
4    A   At this point I don't even remember
5  for sure.  It was -- It was long.
6    Q   Okay.
7         THE ARBITRATOR:  What are you
8  talking about?  I missed that.
9         MS. GUTTAU:  Sorry.  Talking
10  about the audio file that we sent, Exhibit 22.
11  That's the recording of Ms. Gerdes' interview of
12  Grievant Benson.
13         THE ARBITRATOR:  Okay.
14    Q   (By Ms. Guttau)  Did -- When you
15  listened to her interview by Gerdes, did it
16  match what you -- had been reported to you
17  earlier?
18    A   No, it did not.
19    Q   In what ways?
20    A   If I remember right, at that point,
21  she had -- she had made statements that the
22  conditions weren't as bad as they were
23  originally portrayed to be, and that -- I don't
24  believe at that point she felt abandoned, but
25  she was mostly upset with what she felt was his

Page 105

1  failure to communicate with her.
2      Q   And her story was still different in
3  that reporting than everybody else's that you
4  had heard from the scene?
5      A   Yes, there were some inconsistencies.
6      Q   Okay.  At some point did you issue a
7  Notice of Pre-Disciplinary Meeting?
8      A   Yes, I did.
9      Q   Okay.  Let's turn to --
10         MS. GUTTAU:  This will be Exhibit
11  R25.
12      Q   (By Ms. Guttau)  What is R25?
13      A   That is a Notice of Pre-Disciplinary
14  Meeting.
15      Q   Okay.  And is this customarily sent
16  before discipline?
17      A   Yes, it is.
18      Q   Okay.  And did you inform Ms. Benson
19  of the allegations against her?
20      A   Yes.
21      Q   Can you read the first sentence under
22  the nature of the allegations against her.
23      A   "The nature of the allegations against
24  you is that you've made serious false
25  allegations against a fellow firefighter.

Page 106

1  Specifically, you stated that you and your crew
2  were abandoned in a dangerous burning warehouse
3  by Captain Shawn Mahler with zero visibility at
4  the April 26th, 2021, fire scene.  As a result
5  of your accusation, Captain Mahler had to be
6  placed on paid leave, and the City was without
7  the benefit of his services as an experienced
8  firefighter.  However, none of the evidence, the
9  audio recording/transcript, witness statements,
10  the findings of Ms. Gerdes, or the findings of
11  Judge Kopf lend any credibility to your
12  statements."
13      Q   Okay.  Do you take allegations -- the
14  allegation that she made against Captain Mahler
15  -- Let me strike that.
16          A firefighter like Captain Mahler, to
17  your knowledge, has he devoted his life to
18  public service?
19      A   Yes.
20      Q   Can you think of any more serious
21  accusation to make against a fellow firefighter?
22      A   That's a pretty serious allegation.
23      Q   Okay.  All right.  In the letter, you
24  also explained the evidence supporting your
25  allegation, correct, on page 2?

Page 107

1      A   That's correct.
2      Q   Before the pre-disciplinary hearing,
3  what were your intentions regarding her
4  employment?  So what I'm asking is:  Did you
5  intend to fire her?
6      A   No.  When we go into the
7  pre-disciplinary hearing, the desire is to, to
8  hear the person's perspective of what happened
9  and, and provide clarity to the situation.
10      Q   Okay.  Did you then have a
11  pre-disciplinary hearing?
12      A   We did.
13      Q   Okay.  Let's turn to Exhibit --
14         MS. GUTTAU:  This will be Exhibit
15  R27.
16         THE ARBITRATOR:  Hold on one
17  second.  So ask -- Could you re-ask that
18  question again about firing her?  What did you
19  ask him regarding --
20         MS. GUTTAU:  Yep.  Yeah.  Sure.
21         Before the hearing, what were
22  your intentions regarding her employment?
23      Q   (By Ms. Guttau)  And what I was asking
24  is:  Did you intend to fire her?
25      A   I didn't have any indication in my

Page 108

1  mind.  The pre-disciplinary hearing is designed
2  to allow the party to give their side of the
3  story.
4          So I didn't know what the discipline
5  outcome would be at that point.
6          THE ARBITRATOR:  All right.
7      Q   (By Ms. Guttau)  Did you --
8          THE ARBITRATOR:  Go ahead.
9          MS. GUTTAU:  Okay.
10      Q   (By Ms. Guttau)  Did you then have the
11  pre-disciplinary meeting?
12      A   Yes, we did.
13      Q   Okay.  And let's turn to Exhibit 27.
14  What is Exhibit 27?
15      A   I believe it's the transcript of the
16  pre-disciplinary hearing.
17          MS. GUTTAU:  And, Mr. Rutzick,
18  just so you know, Exhibit 26 is the audio of the
19  pre-disciplinary hearing, and then Exhibit 27 is
20  the transcript.
21      Q   (By Ms. Guttau)  Okay.  What date was
22  that pre-disciplinary meeting held upon?
23      A   October 12th, 2021.
24      Q   And who was present at that?
25      A   I know for, for the City I believe it

Page 109

1    was myself, Administrative Officer Witte, Chief
2    Smith, Daisy Brayton from HR.  I'm not sure --
3    Let's see here.  Ms. -- On the Union's side, I
4    know Ms. Benson, John Corrigan, Adam Schrunk,
5    and I believe they had Ed Hadfield, who was --
6    who was their expert witness.  It looks like
7    Battalion Chief Majors was also present and Ryan
8    Moser from the Union.
9        Q   Okay.  And generally, did anything
10   stick out in your mind?  Well, first of all --
11   Strike that.
12       What -- How was the hearing conducted?
13   What happens?
14       A   During the hearing, we asked questions
15   to just understand the situation better.  I
16   guess I don't know specifically what else.
17       Q   Everybody -- Is Ms. Benson given an
18   opportunity to, to speak and provide --
19       A   Yes.
20       Q   -- her side?
21       A   Yes.
22       Q   Okay.  What was your general
23   impression after the hearing regarding
24   Ms. Benson's testimony?
25       A   I, I didn't see a time where -- her

Page 110

1    claims of abandonment, and it didn't appear that
2    the, the situation was as dire as, as it had
3    been reported in the media and in the
4    injunction.
5        Q   And -- Sorry.  One moment.
6        Did you believe that there had been some
7    inconsistencies?
8        A   I did.
9        Q   Okay.  Do you recall any of those?
10       A   At this point, I, I don't recall
11   specific inconsistencies, other than there was
12   -- there was definitely not -- no one was
13   abandoned, and the -- I, I remember that early
14   on it was said that we needed to utilize a
15   thermal imagining camera to find our way around
16   and everything, and that was inconsistent with
17   all the witness statements.  So there were --
18   There were several inconsistencies that were a
19   concern.
20       Q   If you want to turn to page 10.
21       A   (Witness complies.)
22       Q   Can you describe what you're asking
23   about the low air alarm?  What does that mean?
24       A   Yeah, I was -- I was asking if, if it
25   was such a dangerous environment, why she felt

Page 111

1    comfortable allowing Fire Apparatus Operator
2    Roberts --
3        THE WITNESS:  Something just
4    happened here.
5        THE COURT REPORTER:  Wait a
6    second.  We're buffering.
7        THE ARBITRATOR:  I'm here.
8        MS. GUTTAU:  Can you hear us okay
9    again?
10       THE ARBITRATOR:  I'm sorry.
11   What?
12       MS. GUTTAU:  Can you hear us?
13       THE ARBITRATOR:  Yeah, I can hear
14   you.  Yeah, you're good.  You're all good.
15       MS. GUTTAU:  Okay.  We had a
16   moment there.
17       MR. CORRIGAN:  If you want to go
18   back to where he left off.
19       (The requested portion of the
20   record was read back.)
21       A   Yeah.  So why would she have been
22   comfortable allowing Fire Apparatus Operator
23   Roberts to enter the building with, with over a
24   half depleted cylinder of air.
25       Q   (By Ms. Guttau)  And did her

Page 112

1    explanation make sense to you?
2        A   No.
3        Q   Okay.  On page 9 -- Let's back up a
4    page.
5        A   (Witness complies.)
6        Q   -- on line 16, you asked:  "If you
7    felt abandoned in an unsafe environment, why
8    didn't you take action, like attempting radio
9    contact and reporting it?"
10       And she responded; correct?
11       A   Yes.
12       Q   And did her explanation make sense to
13   you there?
14       A   No.
15       Q   Okay.  Looking at page -- Looking at
16   page 12 of Exhibit --
17       THE ARBITRATOR:  Page 12?
18       MS. GUTTAU:  Page 12, yep.
19       THE ARBITRATOR:  Okay.
20       Q   (By Ms. Guttau)  It looks like you
21   asked her about the incident report.  Was that
22   the Prime report?  And this is at line 20.
23       A   Yes, that's the Prime report.
24       Q   Okay.  And why were you asking her
25   about that?

Page 113

```
 1      A   Because in the -- in the report, if
 2   she was assigned to work under another company,
 3   under a group supervisor, that should have been
 4   notated in the report.  That's pretty
 5   significant.
 6      Q   And did her explanation make sense
 7   there to you?
 8      A   No.
 9      Q   Okay.  Later on in the hearing, did
10   you -- did Ms. Benson talk about believing that
11   Torrey Gerdes had manipulated the record?
12      A   Yes.
13      Q   Okay.  Did that cause you concern when
14   she's expressing that about Ms. Gerdes?
15      A   Yes.
16      Q   And why?
17      A   I found it just far-fetched that the,
18   the recording would be manipulated.
19      Q   Did she also place blame at the
20   hearing on her -- Battalion Chief Faust?
21      A   I, I don't remember specifically.
22      Q   Okay.  And we'll get to the letter, so
23   that's fine.
24      What did you conclude after the hearing?
25      A   I concluded that the initial claims
```

Page 114

```
 1   were highly exaggerated and were inconsistent
 2   with what the investigation report found.
 3      Q   Okay.  If she now says she was --
 4      THE ARBITRATOR:  I have a
 5   question for you, Chief.
 6      THE WITNESS:  Yes, sir.
 7      THE ARBITRATOR:  On page 13 she
 8   indicated that she talked to this Curt Faust,
 9   who she said was like a mentor to her, and he
10   informed her, according to her, that it was way
11   more serious than she was telling him, and then
12   she should have reported it because of the
13   seriousness of the issue.
14      Did you talk to Curt Faust, and
15   is that somewhere here in the record?
16      THE WITNESS:  I believe I heard
17   from Faust on May -- The morning of May 5th, I
18   believe, was when he approached me and said,
19   Hey, there is -- there is a potential problem
20   here.
21      THE ARBITRATOR:  Did you talk to
22   him, though, after, after she, you know, made
23   this statement during your disciplinary hearing
24   to verify whether or not what she said here was
25   true or not?  Do you see what I'm getting at?
```

Page 115

```
 1   On the bottom of page 13.
 2      THE WITNESS:  Yes.
 3      THE ARBITRATOR:  "He was the one
 4   that directed me to escalate it and informed me
 5   about the seriousness of the issue."
 6      THE WITNESS:  Yes.  And he did --
 7   I didn't ask him specifically if he was the one
 8   that escalated -- or told, told her to escalate
 9   it.  I believe that that was probably accurate.
10      Q   (By Ms. Guttau)  And you would expect
11   him to escalate it if he understand -- if he
12   believed her accusations and took them
13   seriously?
14      A   Yes.  I mean, that would be the
15   expectation of any of our personnel.  If there
16   is a safety issue, then they would bring it to
17   me, and he did do that.  And I'm not a hundred
18   percent sure, but I think that was the morning
19   of May 5th.
20      Q   Okay.  If --
21      THE ARBITRATOR:  I'm not sure
22   what you're telling me.
23      MS. GUTTAU:  So the ques --
24      MR. CORRIGAN:  Don't cut him off.
25      MS. GUTTAU:  Oh.
```

Page 116

```
 1      MR. CORRIGAN:  Sorry.
 2      THE ARBITRATOR:  I'm still
 3   talking.
 4      MS. GUTTAU:  Okay.
 5      THE ARBITRATOR:  Did you talk to
 6   Mr. Faust or Officer Faust or Firefighter Faust
 7   in regard to what she told you, in regard to
 8   that on the bottom of page 13?
 9      THE WITNESS:  The only
10   conversation I had with him was when he reported
11   this to me.  I -- He and I did not talk about
12   that he directed her to escalate it or whatever
13   it says here.
14      THE ARBITRATOR:  All right.  I
15   guess my question is:  Did you specifically ask
16   him that?
17      THE WITNESS:  I did not.
18      THE ARBITRATOR:  Okay.  That's
19   all I wanted to know.  Continue on, Heidi.
20      MS. GUTTAU:  Sure.
21      Q   (By Ms. Guttau) Along those lines,
22   first of all, in regard to Faust, if -- He is
23   her supervisor; correct?
24      A   Correct.
25      Q   If she's reporting that another
```

Page 121

1    Battalion Chief Faust had instructed Ms. Benson
2    to lie about what happened at the fire?
3        A   No.
4        Q   Okay.  And you would expect him to
5    take her at her word?
6        A   Yes.
7        Q   Okay.  So then let's go through your
8    letter, and starting on page 2 -- or, I'm sorry,
9    on page 1, at the bottom two paragraphs, could
10   you describe to the Arbitrator, you know, what
11   your conclusion was as far as your findings
12   after the hearing and reviewing everything.
13       A   I found she made serious false
14   allegations against a fellow firefighter --
15   let's see -- that she had been abandoned in the
16   fire.
17       Q   Okay.  And had she also alleged that
18   his behavior could have injured or killed her
19   and her crew?
20       A   Yes.
21       Q   Okay.  At the top of page 2, you
22   indicated that "none of the evidence lent
23   credibility to your statements."  Is that what
24   you stated?
25       A   Yes.

Page 122

1        Q   And then you give some reasons why.
2    Could you describe those reasons, you've got, I
3    think, your first, second, third below that?
4        A   Sure.  That -- The first thing is that
5    the audio, there was no transmissions in any way
6    and no reports of her being in any sort of
7    danger or being abandoned or her crew
8    potentially being killed.  The, the crew had re
9    -- reported that the conditions weren't what she
10   had claimed, that they never felt like they were
11   in danger, and the evidence just did not show
12   the claims.
13       Q   And did you also rely upon the
14   investigation report and Judge Kopf's order?
15       A   I did.
16       Q   Okay.
17           MR. CORRIGAN:  When you say
18   "investigation report," can you clarify that.
19           MS. GUTTAU:  Yep.
20       Q   (By Ms. Guttau)  The Gerdes
21   investigation report?
22       A   Yes, the Gerdes investigation report,
23   Judge Kopf's findings, as well as our internal
24   investigation.  All three were considered.
25       Q   Okay.  At the bottom you said you felt

Page 123

1    that she then attempted to blame others or
2    discredit others with no basis.  At the top of
3    page 3, can you describe what you're referring
4    to there.
5        A   She had -- She had said that Curt
6    Faust forced her to report Captain Mahler.
7        Q   But he did not force her to make a
8    false report, did he?
9        A   No.
10       Q   Battalion Chief Smith, can you tell us
11   what you concluded in regard to information from
12   him.
13       A   He had -- He had reported that he made
14   contact at the fire scene and, and asked if
15   everything was all right, and at that point she,
16   she had said yes at the fire scene, and then she
17   claimed that he had never talked to her.
18       Q   And then you also mentioned you felt
19   that she tried to divert attention away from her
20   accusation -- or, divert attention from the real
21   issue by making serious accusations about
22   Ms. Gerdes; is that correct?
23       A   Yes.  She had stated that she felt
24   Ms. Gerdes had altered the recordings of the
25   interview.

Page 124

1        Q   Okay.  And what did you conclude in
2    that regard in the next paragraph?  It starts
3    with "In short."  Could you read that into the
4    record?
5        A   (As read)  In short, your attempt to
6    point fingers at others does not change the fact
7    that you -- that it was you who made the false
8    allegation of being abandoned in an IDLH
9    environment that you could have killed you and
10   your crew.
11       Q   That you stated?
12       A   Or, "that you stated could have killed
13   you and your crew."
14       Q   It's tiny print.
15          In the next half of the page to the top
16   of the next page, you talk about various
17   policies and codes that you believe were
18   violated?
19       A   Yes.
20       Q   I'd like to go through those real
21   briefly.
22       A   Okay.
23       Q   Let's see here.  First, you state that
24   she had violated, in number one, Lincoln Fire &
25   Rescue Management Policy, Professional Code of

Page 129

1        Q    And F, how did you believe she had
2   been either guilty of insubordination or conduct
3   unbecoming?
4        A    I felt reporting an incident that was
5   inconsistent is conduct unbecoming.
6   Insubordination, I had a couple of concerns
7   about how she had conducted herself on the
8   incident.
9        Q    Is it conduct unbecoming to make false
10  accusations, in your opinion?
11       A    Certainly, yeah.
12       Q    You also point, on the next page, to
13  subparagraph I of the Collective Bargaining
14  Agreement.  Can you tell me what that is, in a
15  nutshell.
16       A    (As Read) Violation of any lawful or
17  reasonable regulation made or given by the
18  employee's superior, where such violation or
19  failure to obey amounts to an act of
20  insubordination or serious breach of proper
21  discipline; or results, or might responsibly
22  [sic] have been expected to result in loss or
23  injury to the City, to (unintelligible) of the
24  City or to the public.
25       Q    In what ways did you believe she

Page 130

1   violated that?
2        A    I think allowing, allowing a
3   firefighter to go in with a lack of air -- I
4   don't think that's funny -- but a lack of air or
5   not following -- not following policy.
6        Q    Okay.
7             MR. CORRIGAN:  I'm sorry, Dave,
8   but you didn't put that in the letter, so it's a
9   little surprising to me --
10            MS. GUTTAU:  Well, let me tie it
11  in.
12            MR. CORRIGAN:  -- that you're
13  saying that here.
14            MS. GUTTAU:  Let me tie it in.
15       Q    (By Ms. Guttau)  So is it surprising
16  that she let a firefighter go in with a lack of
17  air at the same time she's claiming that it's
18  dangerous and risking her life?
19       A    Absolutely.
20       Q    Okay.  (As Read)  Commission of acts
21  or omissions unbecoming an incumbent of the
22  particular office or position held, which render
23  reprimand, suspension, demotion, or dismissal
24  necessary or desirable for the economical or
25  efficient conduct of the business of the City or

Page 131

1   the best interest of the government.
2        In what ways did you believe that had
3   been violated?
4        A    Well, again, reporting things that
5   didn't happen, not following policy.  Same, same
6   as before.
7        Q    Okay.  And did you -- K is willful
8   violation.  Did you believe that Ms. Benson was
9   willfully lying about Captain Mahler abandoning
10  her in a warehouse?
11       A    Yes.
12       Q    Okay.  Is -- To your knowledge, is
13  Captain Mahler also a union member?
14       A    He is.
15       Q    Okay.  This is a serious accusation to
16  make against a firefighter or a union member;
17  right?
18       A    That's correct.
19       Q    Was the decision to terminate solely
20  your decision?
21       A    Yes.
22       Q    Okay.  Why did you decide on --
23            THE ARBITRATOR:  Solely your --
24  I'm sorry.  Solely your decision, Chief?
25            THE WITNESS:  It is, yes.

Page 132

1             THE ARBITRATOR:  Okay.
2        Q    (By Ms. Benson)  Why did you decide on
3   termination and not some lesser level of
4   discipline?
5        A    There were a number of reasons.  One,
6   clearly, this was not a truthful accusation.
7             Two, we had a number of people that
8   were complaining about working with her.  We
9   were having trouble filling overtime shifts
10  because people felt like she would make
11  accusations against them.
12            Three, the City engaged in a very
13  expensive investigation that, that -- it, it
14  cost the law department, but it also cost us;
15  and then, four, reputation of the department,
16  which not only damages public trust, but it also
17  hinders our ability to recruit because it wasn't
18  -- it wasn't accurate with what actually goes on
19  in the department.
20            (Technical difficulties.)
21            THE COURT REPORTER:  There he is.
22            MS. GUTTAU:  There we go.  I
23  think we froze for a minute.  I don't know at
24  what point.
25            THE COURT REPORTER:  I have a

Page 133

1  feeling he could hear him, that it was just the
2  video.
3        MS. GUTTAU:  Can you hear us now,
4  sir?
5        THE ARBITRATOR:  I'm -- Say that
6  again.
7        MS. GUTTAU:  Did you hear any of
8  that?  We froze here for a second.
9        THE ARBITRATOR:  I'm not sure
10 what you're saying.  I'm sorry.
11       MS. GUTTAU:  Yeah.  Could you
12 hear Chief Engler's answer?  It, it froze for a
13 minute, and we weren't sure --
14       THE ARBITRATOR:  Right, and I
15 heard -- I heard his answer, yes.
16       MS. GUTTAU:  Okay.  Thank you,
17 sir.
18       THE ARBITRATOR:  Yep.
19    Q   (By Ms. Guttau)  Is it difficult to
20 undo the damage to the department in the
21 public's eyes?
22    A   Yes.
23    Q   Okay.  Is it difficult for Captain
24 Mahler to recover from such an accusation?
25    A   Yes.

Page 134

1        Q   Have you had any other cases, during
2  your tenure as chief, involving similar conduct
3  involving false accusations of such egregious
4  nature?
5     A   No.
6     Q   Okay.  Are you bound by all of your
7  predecessors' disciplinary decisions?
8     A   No.
9     Q   Nonetheless, do you believe others
10 have been previously terminated for dishonesty
11 or conduct discrediting LFR?
12    A   Yes.
13    Q   Can you give a few examples of that?
14    A   We had -- I'm trying to think of
15 names.  I, I can think of two individuals that
16 were, were not truthful that resigned in lieu of
17 termination.
18       We had another individual who had --
19 was drinking and driving, and he wasn't -- he
20 wasn't truthful, and he was terminated.  I
21 terminated an employee for, for lying, in
22 another case.
23    Q   And was that also in 2021?
24    A   Yes.
25    Q   Okay.  Just in closing, Chief, you're

Page 135

1  responsible for LFR and its reputation; right?
2     A   That's correct.
3     Q   Would you ever be able to place trust
4  in Ms. Benson again as a Lincoln firefighter?
5     A   No.
6        MS. GUTTAU:  Nothing further.
7  Nothing further at this time.  And could we take
8  a restroom break?
9        THE ARBITRATOR:  I think we need
10 to take a lunch break, don't we?
11       MS. GUTTAU:  Yeah.  I wasn't sure
12 what time it was.
13       THE ARBITRATOR:  How much time do
14 you folks need.
15       MS. GUTTAU:  Thirty?
16       MR. CORRIGAN:  In order to get
17 through everything today --
18       MS. GUTTAU:  I think 30.
19       MR. CORRIGAN:  Yeah.  Thirty
20 minutes.
21       THE ARBITRATOR:  I didn't hear
22 you.
23       MS. GUTTAU:  We're thinking 30 to
24 get through the witnesses that we need to today.
25       THE ARBITRATOR:  Okay.

Page 136

1        MS. GUTTAU:  Unless, unless you
2  want longer.  That's fine, too.  We weren't --
3  Do you know how late you could go, sir, today?
4  We're just trying to time it.
5        THE ARBITRATOR:  Four.  We're
6  going to go through till four.
7        MS. GUTTAU:  So four.  Okay.  All
8  right.
9        THE ARBITRATOR:  So it is 12:06.
10 12:45.
11       (A lunch recess was taken from
12 12:06 p.m. to 12:45 p.m., at which time the
13 proceedings continued as follows:)
14       THE ARBITRATOR:  Are we ready to
15 go?
16       MR. CORRIGAN:  Yes.
17       MS. GUTTAU:  Yes.
18       THE ARBITRATOR:  All right.
19 Chief, you're still under oath.
20       THE WITNESS:  Yes, sir.
21            CROSS-EXAMINATION
22 BY MR. CORRIGAN:
23    Q   All right.  Chief, I'm gonna ask you
24 just -- It might be a little easier if we use
25 the -- start with this notebook and the smaller

1    A  Yes.

2    Q  Specifically that she stated she and

3 her crew --

4      THE ARBITRATOR:  Hold on a

5 second.  Where are you?  What number?

6      MR. CORRIGAN:  It's on Exhibit

7 139, page 18, which is in the left-hand quadrant

8 of sheet 6.

9      THE ARBITRATOR:  Okay.

10    Q  (By Mr. Corrigan)  And the City

11 specifically stated that she and her crew -- by

12 alleging that, "She stated she and her crew were

13 abandoned in a dangerous, burning warehouse" by

14 Shawn Mahler with nearly zero visibility at this

15 April 26th, 2021, fire scene; right?

16    A  Yes.

17    Q  You also stated in your letter, that

18 is the pre-disciplinary letter, that the

19 evidence in position -- in the possession of the

20 City, that the City felt supported there were

21 allegations that there was a transcript or [sic]

22 audio recording of the radio traffic; right?

23    A  Yes.

24    Q  And that's, that's the transcript that

25 we've been talking about today of the radio

1 traffic from dispatch to when Truck 8 left?

2    A  Yes.

3    Q  And there was a memorandum and order

4 from Judge Kopf, dated August 26th, 2021; right?

5    A  Yes.

6    Q  Now, Judge Kopf, he never actually had

7 a hearing, did he, on this motion for a

8 temporary injunction?

9    A  Not that I was at.

10    Q  There was -- The declarations were

11 submitted, no witnesses testified?

12    A  I don't know exactly what the process

13 was.

14    Q  Okay.  But you didn't go up to the

15 court --

16    A  I was not at the courthouse.

17      THE ARBITRATOR:  Did you say no

18 witnesses testified?

19      MS. GUTTAU:  He said he didn't

20 know.

21      THE WITNESS:  I don't know.  I, I

22 was never at a court hearing.

23    Q  (By Mr. Corrigan)  But you signed the

24 declaration?

25    A  I did, yes.

1    Q  And that order of Judge Kopf was part

2 of the evidence that you believe supported the

3 conclusion that she engaged in misconduct?

4    A  Yes.

5    Q  And the report of Attorney Torrey

6 Gerdes, that was also among the evidence that

7 you considered that you felt supported she

8 engaged in misconduct?

9    A  Yes.

10    Q  These declarations of -- The other

11 people that signed declarations in opposition to

12 the motion for temporary injunction, those were

13 also things that you considered as being --

14 supporting she engaged in misconduct?  If you

15 want to look at the pre-disciplinary letter.

16    A  Yeah.  I don't remember -- I know her

17 declaration.  I don't know about the others.

18    Q  Okay.  Why don't you look at

19 Exhibit 138, page 2, paragraph 2(e).

20    A  (Witness complies.)

21      MS. LEASURE:  He dropped off.

22      THE COURT REPORTER:  Oh, we lost

23 him again.  Thank you, Tiffany.

24      (Technical difficulties.)

25      (An off-the-record discussion was

1 had.)

2      THE ARBITRATOR:  All right.  Can

3 you hear me now?

4      THE COURT REPORTER:  Yep.

5      THE ARBITRATOR:  I'm sorry.  This

6 computer is killing me.  All right.  How close

7 are you to being done, John.

8      MR. CORRIGAN:  I'm sorry.  It's

9 going to take a while.  What time is it?

10      MS. GUTTAU:  4:18.

11      THE ARBITRATOR:  You're 18

12 minutes past closing.

13      (An off-the-record discussion was

14 had, and at 4:21 p.m., the proceedings were

15 continued to June 21, 2022.)

16

17

18

19

20

21

22

23

24

25

Page 281

```
 1          FEDERAL MEDIATION AND CONCILIATION SERVICE
                 BEFORE ARBITRATOR STEVEN RUTZICK
 2

    LINCOLN FIREFIGHTERS   )  FMCS CASE NO.
 3  ASSOCIATION, IAFF LOCAL )  22103-00847
    644, and AMANDA BENSON,  )
 4                          )
             Grievants,     )
 5                          )
        vs.                 )   VOLUME II
 6                          )  PAGES 281-555
    CITY OF LINCOLN,        )
 7                          )
             Respondent.    )
 8                          )
                            )
 9
10          ARBITRATION HEARING held before
11  Arbitrator Steven Rutzick (via Zoom), with
12  Denise J. Lukasiewicz, CCR and Notary Public for
13  the State of Nebraska, counsel and all parties
14  present at the LFR Union 644 Hall, 241 Victory
15  Lane, Lincoln, Nebraska, beginning at 9:12
16  a.m., on the 21st day of June, 2022.
17
18
19
20
21
22          ** ** **
23
24
25
```

Page 282

```
 1              A P P E A R A N C E S
 2
 3  FOR THE GRIEVANTS:
 4
 5  MR. JOHN E. CORRIGAN
    DOWD & CORRIGAN, LLC
 6  6700 Mercy Road
    Suite 501
 7  Omaha, NE  68106
    402.913.9713
 8  jcorrigan@dowd-law.com
 9
    FOR THE RESPONDENT:
10
11  MS. HEIDI GUTTAU
    BAIRD HOLM LLP
12  1700 Farnam Street
    Suite 1500
13  Omaha, NE  68102
    402.344.0500
14  hguttau@bairdholm.com
15
16  MS. ABIGAIL LITTRELL
    ASSISTANT CITY ATTORNEY
17  555 South 10th Street
    Suite 300
18  Lincoln, NE  68508
19
20  ALSO PRESENT:  Mr. Ryan Moser, Vice President
    IAFF Local 644; Mr. Dave Engler, Fire Chief;
21  Tiffany Leasure, Paralegal for City of Omaha
22
23
24
25
```

Page 283

```
 1               I N D E X
                                 PAGE
 2  CASE CAPTION ......................  1
    APPEARANCES ........................  2
 3  INDEX ..............................  3
    TESTIMONY ..........................  19
 4  REPORTERS' CERTIFICATE .............  2084
 5
 6               WITNESSES
 7
    FOR THE CITY:
 8
 9  CHIEF DAVID ENGLER
10  Direct by Ms. Guttau.................  19
    Cross by Mr. Corrigan...............  136
11  Cross Cont'd by Mr. Corrigan........  253
    Cross Cont'd by Mr. Corrigan........  1070
12  Redirect by Ms. Guttau..............  1135
    Recross by Mr. Corrigan.............  1193
13  Further Redirect by Ms. Guttau......  1202
    Further Recross by Mr. Corrigan.....  1209
14
15  FAO JASON LOVE
16  Direct by Ms. Littrell.............  210
    Cross by Mr. Corrigan...............  230
17  Redirect by Ms. Littrell...........  247
    Recross by Mr. Corrigan.............  249
18
19  FAO MATTHEW ROBERTS
20  Direct by Ms. Guttau...............  295
    Cross by Mr. Corrigan...............  342
21  Redirect by Ms. Guttau..............  363
    Recross by Mr. Corrigan.............  367
22  Further Redirect by Ms. Guttau......  372
    Further Recross by Mr. Corrigan.....  372
23  Further Redirect Cont'd by Ms. Guttau  373
24
25
             ** ** **
```

Page 284

```
 1          WITNESSES, CONT'D
 2
    FOR THE CITY:
 3
 4  FF STEPHEN DYER
 5  Direct by Ms. Littrell.......  375
    Cross by Mr. Corrigan...............  395
 6  Redirect by Ms. Littrell.......  409
    Recross by Mr. Corrigan.............  410
 7
 8  FF MORGAN HURLEY
 9  Direct by Ms. Littrell.......  416
    Cross by Mr. Corrigan...............  447
10  Redirect by Ms. Littrell.......  464
    Recross by Mr. Corrigan.............  466
11
12  DIVISION CHIEF MICHAEL SMITH
13  Direct by Ms. Littrell.......  470
    Cross by Mr. Corrigan...............  505
14  Redirect by Ms. Littrell.......  569
    Recross by Mr. Corrigan.............  588
15  Further Redirect by Ms. Littrell....  610
    Further Recross by Mr. Corrigan.....  614
16
17  BC CURT FAUST
18  Direct by Ms. Guttau.................  618
    Cross by Mr. Corrigan...............  729
19  Redirect by Ms. Guttau.............  806
    Recross by Mr. Corrigan.............  820
20  Further Redirect by Ms. Guttau......  828
21
22  DEPUTY CHIEF GEORGE HEALY
23  Direct by Ms. Guttau.................  971
    Cross by Mr. Corrigan...............  1021
24  Redirect by Ms. Guttau.............  1054
    Recross by Mr. Corrigan.............  1055
25
```

Page 285

WITNESSES, CONT'D

FOR THE CITY:

AISHAH WITTE
Direct by Ms. Littrell............... 1214
Cross by Mr. Corrigan.............. 1263
Redirect by Ms. Littrell............ 1287
Recross by Mr. Corrigan........... 1297

CAPTAIN SHAWN MAHLER
Direct by Ms. Guttau................. 1554
Cross by Mr. Corrigan.............. 1671
Redirect by Ms. Guttau............ 1754
Recross by Mr. Corrigan........... 1771
Further Redirect by Guttau........ 1784
Further Recross by Corrigan........ 1787
Further Redirect Cont'd by Guttau... 1794

CAPTAIN ADAM SCHRUNK
Direct by Ms. Guttau................. 2059
Cross by Mr. Corrigan.............. 2073
Redirect by Ms. Guttau............ 2077

FOR THE UNION:

CHIEF EDWARD HADFIELD
Direct by Mr. Corrigan.............. 844
Cross by Ms. Guttau................. 888
Redirect by Mr. Corrigan........... 951
Recross by Ms. Guttau.............. 962

CAPTAIN MICHAEL WRIGHT
Direct by Mr. Corrigan.............. 1316
Cross by Ms. Littrell............... 1357
Redirect by Mr. Corrigan........... 1393
Recross by Ms. Littrell............. 1398

Page 286

WITNESSES, CONT'D

FOR THE UNION:

CAPTAIN DAN RIPLEY
Direct by Mr. Corrigan.............. 1399
Cross by Ms. Littrell............... 1405
Redirect by Mr. Corrigan........... 1421
Recross by Ms. Littrell............. 1429

NICHOLAS CUNNINGHAM
Direct by Mr. Corrigan.............. 1432
Cross by Ms. Littrell............... 1446
Redirect by Mr. Corrigan........... 1457

AMANDA BENSON
Direct by Mr. Corrigan.............. 1463
Cross by Ms. Guttau................. 1867
Redirect by Mr. Corrigan........... 2056

CAPTAIN BRIAN GILES
Direct by Mr. Corrigan.............. 1810
Cross by Ms. Littrell............... 1823
Redirect by Mr. Corrigan........... 1859
Recross by Ms. Littrell............. 1864

** ** **

Page 287

CITY EXHIBITS

EXHIBIT    DESCRIPTION

1    8/16/21 Memorandum and Order Denying
     Plaintiff's Motion for Injunction by
     Senior District Judge Richard G.
     Kopf, United States District Court
     for the District of Nebraska,
     8/15/21
2    Declaration of Fire Chief David
     Engler
3    Declaration of BC Michael Smith
4    Declaration of Captain Mahler
5    Declaration of FAO Matt Roberts
6    Declaration of FF Morgan Hurley
7    Declaration of FF Jason Love
8    Declaration of FF Stephen Dyer
9    Declaration of FF Trent Borchers
10   Statement of Curt Faust
11   8/19/21 Investigation Report into
     4/26/21 Fire Incident by Attorney
     Torrey Gerdes, Baylor Evnen Law Firm
12   Audio of Fire Department Radio
     Recording of 4/26/21 Warehouse Fire
13   Transcript of Fire Department Radio
     Recording of 4/26/21 Warehouse Fire
14   Declaration of Aishah Witte,
     Authenticating Audio Transcript
15   Benson's 5/5/21 Complaint Regarding
     the 4/26/21 Warehouse Fire
16   Warehouse Photographs

Page 288

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

17   LFR Prime Report of Warehouse Fire
18   Benson's 6/9/21 Grievance
19   Benson's 6/11/21 Affidavit
20   Benson's 8/9/21 Affidavit
21   Media Articles
22   Benson's Interview Audio 7/14/21
23   8 of '21 Grievance Hearing RE:
     June 9, 21 Grievance
24   9/24/21 Denial of 6/9/21 Grievance
     Letter to Benson
25   9/27/21 Pre-Disciplinary Meeting
     Notice Letter to Benson
26   Audio of 10/12/21 Pre-Disciplinary
     Meeting
27   Transcript of 10/12/21 Meeting
28   10/19/21 Termination Letter
29   CBA, 8/20/20 to 8/31/21
30   CBA, 8/19/21 to 8/30/23
31   LFR Professional Code of
     Ethics/Standard of Conduct Policy
32   LFR FF Safety Policy
33   LFR 2020 Annual Report
34   Captain Mahler's Awards
35   2017 Letter to Mahler
36   Terminal Building Fire Near-Miss
     Report, 2/19/18

Page 289

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 37 | Chief Engler's Video Message | |
| 38 | Healy Expert Report | |
| 39 | Lincoln Municipal Code - Cause for Disciplinary Action | |
| 40 | Lincoln Municipal Code - Dismissal and Grievance Procedure | |
| 41 | Grievant's 11/3/21 Appeal E-mail | |
| 42 | Documents Regarding LFR Discipline | |
| 43 | Captain Mahler Notes for Investigator Gerdes | |
| 44 | Witte Investigation Correspondence | |
| 45 | Witte Investigative File | |
| 46 | Benson's Motion for Preliminary Injunction | |
| 47 | Benson's Brief ISO Preliminary Injunction | |
| 48 | Benson 2014 Complaint Retraction | |
| 49 | Mahler Discipline Reversal | |
| 50 | Management Policy | |
| 51 | Victim Removal Presentation | |

** ** **

Page 290

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 100 | CBA | |
| 101 | 4/27/2011 Suspension Notice | |
| 102 | 11/4/2014 Memo of BC Pashalek | |
| 103 | Dispositional Memorandum of Kimberly Taylor-Riley | |
| 104 | 4/4/21 Complaint | |
| 105 | E-mail of BC Curt Faust, 4/4/21 | |
| 106 | E-mail of BC Michael Smith, 4/7/21 | |
| 107 | E-mail of BC Curt Faust, 4/13/11 | |
| 108 | E-mail of Benson to Witte, 4/18/21 | |
| 109 | Transcript of Radio Traffic | |
| 110 | LFR Incident Report, 4/26/21 | |
| 111 | E-mail from Benson to Faust & Witte, 5/5/21 | |
| 112 | E-mail from Benson to Witte, 5/13/21 | |
| 113 | Witte Investigation Summary | |
| 114 | E-mail to Benson from Witte, 5/25/21 | |
| 115 | Transcript of Audio File | |
| 116 | E-mail from Smith to Witte, 5/26/21 | |
| 117 | Investigation Summary | |
| 118 | Grievance, 6/9/21 | |
| 119 | Benson Affidavit, 6/11/21 | |
| 120 | E-mail from Schrunk to Engler, 6/14/21 | |

Page 291

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 121 | E-mail from Kelly Brandon to Chris Connolly and Ms. Gerdes, 7/12/21 | |
| 122 | E-mail from Engler to Mahler, 7/1/21 | |
| 123 | Interview Audio Recording | |
| 124 | Letter to Ms. Gerdes | |
| 125 | Declaration of David Engler | |
| 126 | Declaration of Michael Smith | |
| 127 | Declaration of Matthew Roberts | |
| 128 | Declaration of Morgan Hurley | |
| 129 | Declaration of Trent Borchers | |
| 130 | Declaration of Stephen Dyers | |
| 131 | Declaration of Jason Love | |
| 132 | Declaration of Shawn Mahler | |
| 133 | Grievance Letter | |
| 134 | Declaration of Edward Hadfield | |
| 135 | Enhanced Fireground Safety, Effective Use of Division & Group Supervisors | |
| 136 | Transcript of Grievance Hearing, 8/20/21 | |
| 137 | Letter of Chief Engler Denying Grievance, 9/24/21 | |
| 138 | Notice of Pre-disciplinary Action, 9/27/21 | |
| 139 | Transcript of Pre-disciplinary Hearing | |

Page 292

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 140 | Termination Letter, 10/19/21 | |
| 141 | Underlying Confidential Correspondence Regarding Comparative Discipline | |
| 142 | Disciplinary Action, 10/14/11 to 10/14/21 | |
| 143 | Performance Evaluations | |
| 144 | Deposition of Shawn Mahler, 5/9/22 | |
| 145 | Awards and Recognitions | |
| 146 | LFR Best Practices No. 2-Division/ Group Supervision | |
| 147 | Daisy Brayton Investigation | |
| 148 | Text Message exchange between Faust and Benson | |
| 149 | Arbitration Award, RE: Dan Duncan | |
| 150 | Arbitration Award, RE: Jon Reed | |
| 151 | E-mail from Corrigan to McDaniel, 11/3/21 | |
| 152 | E-mail, Benson to Witte, 4/22/21 | |
| 153 | E-mail, BC Smith, 4/22/21 | |
| 154 | Discipline Letter, 5/24/21 | |
| 155 | Discipline Letter, 6/6/22 | |
| 156 | Telephone Log Activity | |
| 156 | E-mail from Mahler to Witte, 6/24/21 | |

** ** **

Page 293

1
2  * All exhibits offered with objections to
   Union's 101, 102, 103, 147, 149, 150; and City
3  Exhibits 20, 21, 38, 46, and 47

   * Union Exhibit 149 was offered and received on
4  page 142
5  * Union Exhibit 150 was offered on page 143 and
   received on page 144
6
   * Union Exhibit 156, Telephone Log Activity, was
7  marked on page 750
8  * City Exhibit 156, E-mail to Aishah from
   Mahler, was marked on page 1738
9
   * City Exhibit 50 was marked on June 22nd, 2022,
10 offered and received on page 571
11
12
13
14              ** ** **
15
16
17
18
19
20
21
22
23
24
25

Page 294

1       (On June 21, 2022, at 9:12 a.m.,
2  the proceedings continued as follows:)
3       MS. GUTTAU:  So, last night,
4  after we ended for the evening, John and I
5  spoke, and we actually have three firefighters
6  this morning that we're going to start with,
7  rather than with the chief, just due to
8  scheduling issues.  And so we're going to call,
9  our first witness this morning is Matthew
10 Roberts, who's a Lincoln firefighter.
11      THE ARBITRATOR:  Okay.
12      FAO MATTHEW ROBERTS,
13   having been sworn to tell the
     truth, the whole truth and nothing
14   but the truth, testified as follows:
15      THE ARBITRATOR:  Mr. Roberts --
16 (unintelligible) --
17      MS. GUTTAU:  Pardon?
18      THE ARBITRATOR:  Did you hear
19 what I said?
20      MS. GUTTAU:  No.
21      THE ARBITRATOR:  Can you please
22 state and spell your name for the record.
23      THE WITNESS:  Matthew,
24 M-A-T-T-H-E-W, Roberts, R-O-B-E-R-T-S.
25      THE ARBITRATOR:  All right.

Page 295

1  Proceed.
2       MS. GUTTAU:  Thank you.
3       DIRECT EXAMINATION
4  BY MS. GUTTAU:
5       Q   Mr. Roberts, can you tell us what your
6  current position is with Lincoln Fire & Rescue?
7       A   Fire apparatus operator.
8       Q   Okay.  And we'll talk a little bit
9  more about that later.  But, before we do that,
10 how long have you been a firefighter, in total?
11      A   24 years.
12      Q   And tell us a little bit about your
13 background, education, job history before you
14 joined Lincoln Fire & Rescue.
15      A   I have an Associate's degree in fire
16 protection technology.  I also have a year of
17 experience with the Columbus Fire Department.
18      Q   What year did you join Lincoln Fire &
19 Rescue?
20      A   1998.
21      Q   And have you worked for them
22 continuously since then?
23      A   Correct.
24      Q   All right.  What position were you
25 hired into?

Page 296

1       A   Firefighter.
2       Q   And, then, what other positions have
3  you held since then?
4       A   Fire apparatus operator.
5       Q   And tell us a little bit, in your
6  words, what's a fire apparatus operator do?  Did
7  you have to take a test to become that?
8       A   It's a promotional process.
9       Q   Promotion?
10      A   Yes.
11      Q   What do -- What's your role?
12      A   Obviously, to -- Upkeep of the
13 apparatus, responding to calls, knowing your
14 streets, your district, your buildings, and
15 maintenance of the equipment on the apparatus.
16 If there's any issues, report that to the proper
17 chain to get those issues taken care of.
18      Q   At a fire scene, what, what can be
19 your role, different roles?
20      A   Operation of the equipment as a
21 driver on a truck.  Oftentimes, my crew will
22 potentially go in on interior; oftentimes, I'll
23 stay exterior.
24      THE ARBITRATOR:  Heidi, it's --
25 his speaker is cutting off and on.

Page 301

```
 1      Q   Is he a stickler about it?
 2      A   Can be, yes.
 3      Q   And, so, on that day, you were
 4   assigned to Truck 1 with Ms. Benson and who
 5   else?
 6      A   Morgan Hurley.
 7      Q   What she's -- When Ms. Benson is your
 8   acting captain, what does that mean?
 9      A   Amanda took the promotional test,
10   scored well enough to be a candidate, to be put
11   into position to ride out a grade, to --
12   opportunity for Amanda to get -- or anybody on
13   that list -- to get some experience as a captain
14   before they're actually promoted.
15      Q   Okay.  And do you know about how long
16   Ms. Benson had been a firefighter at that time?
17      A   I would have to guess about eight
18   years, maybe.
19      Q   Okay.  And you'd been about 23, 24?
20      A   Correct.
21      Q   Okay.  How long had -- Was Morgan
22   Hurley on your crew?
23      A   Yes, she was.
24      Q   So was it just the three of you on
25   that crew that day?
```

Page 302

```
 1      A   Just the three of us, yes.
 2      Q   What was Morgan Hurley's role?
 3      A   She was the firefighter.
 4      Q   Okay.  And how long had she been a
 5   firefighter, approximately, if you know?
 6      A   I believe Morgan was on probation, so
 7   less than six months.
 8      Q   As your acting captain, was Ms. Benson
 9   responsible for her crew's safety?
10      A   Yes.
11      Q   If, if you -- If she felt you were
12   unsafe, at any time, did you expect her to
13   communicate that to you?
14      A   I would.
15      Q   Did she ever do that?
16      A   No.
17      Q   Let's talk a little bit about that
18   fire.  What kind of fire -- how would you
19   describe the fire at the warehouse?
20      A   I'd describe it as a small fire in a
21   pile of cardboard, in a big, open warehouse
22   building.
23      Q   Okay.  And when you were at the fire,
24   were you with Ms. Benson and Ms. Hurley during
25   the fire?
```

Page 303

```
 1      A   Yes, I was.
 2      Q   Okay.  So, let's back up a little bit.
 3   So how did you get called to this warehouse
 4   fire, what had your crew been doing?
 5      A   We were at Southeast Community
 6   College, Amanda gave us some firefighter
 7   survival training, and we were on our way back
 8   to the station.  We were at, roughly, 48th and
 9   Vine Street when the dispatch came in for the
10   fire.
11      Q   And do you know --
12          MS. GUTTAU:  Sorry.
13          THE ARBITRATOR:  Okay.  Go ahead.
14          MS. GUTTAU:  Can you hear us?
15          THE ARBITRATOR:  Yeah.  I lost
16   the audio, I just -- it came in a bit before
17   this.  Keep going.
18          MS. GUTTAU:  Keep going?  Okay.
19          THE ARBITRATOR:  I can hear you
20   perfect, but I'm trying to get a laptop in that
21   will work better for me, but, anyway, for right
22   now, let's keep going.
23          MS. GUTTAU:  Okay.
24      Q   (By Ms. Guttau)  Okay.  So you got --
25   you had been doing training and you get called
```

Page 304

```
 1   to the fire.  Do you know, had anybody arrived
 2   at that fire before, if you recall?
 3      A   Station 5, Engine 5, Truck 5 and
 4   Medic 5 arrived just ahead of us.
 5      Q   Okay.  What was Truck 1's job once you
 6   arrived, what did you do?
 7      A   We were assigned to go interior to
 8   check for fire extension.
 9      Q   What's fire extension, what's that
10   mean?
11      A   It means you locate the -- try to
12   locate the seed of the fire and determine if the
13   fire is extended anywhere else, and maybe
14   through the walls, into any other rooms.
15   Basically, get a handle on where the fire is
16   going and where it's at.
17      Q   And once you went in the first time --
18   Do you know about how long you were in there the
19   first time?
20      A   Approximately, 10 to 12 minutes.
21      Q   Okay.  And then you exited at that
22   time?
23      A   Correct.
24      Q   Okay.  Did you have any trouble
25   finding the exit?
```

Page 305

1  A  We followed the hose line out.
2  Q  And why did you follow the hose line
3  out?
4  A  Smoke conditions had become pretty
5  heavy. I felt that it was important that we,
6  we -- it's best practice, especially given that
7  Morgan is a young firefighter, I didn't feel
8  like we had any issues trying to find our exit,
9  but, again, I think it was a teaching moment to
10  find the hose line and give Morgan the
11  opportunity to follow it out.
12  Q  Okay. Was, was Ms. Benson and Morgan,
13  was their intention, did it appear to you, they
14  were not going to follow it out, at first, and
15  you asked them to follow it out?
16  A  I did ask them to follow it out. I
17  think Morgan and Amanda starting walking towards
18  the doors. Again, I stopped them and I said,
19  let's follow the hose line out.
20  Q  And, just as a teaching moment?
21  A  Correct.
22  Q  Would you have had any trouble walking
23  out if you hadn't have followed the hose?
24  A  No.
25  Q  We heard yesterday from Jason Love, an

Page 306

1  FAO, who talked about -- as an FAO, usually
2  outside the building, but, in this fire, were
3  you in the building with Ms. Benson?
4  A  I was.
5  Q  And why was that?
6  A  I asked Amanda, after we were given
7  the assignment to go interior, if she would like
8  me to go in with them, or work on the exterior,
9  and she stated that she would like for me to go
10  in with them.
11  Q  Okay. So, each time that Ms. Benson
12  and Ms. Hurley entered the warehouse and were
13  inside, you were also part of that crew inside
14  with them?
15  A  Yes, I was. The second time that we
16  entered, I was behind them by, approximately,
17  15 to 30 seconds, but, other than that, I was
18  with them, yes.
19  Q  The rest of the time?
20  A  Right.
21  Q  Okay. Who was the incident commander
22  for the fire scene?
23  A  Curt Faust.
24  Q  And he was an acting battalion chief?
25  A  Yes, he was.

Page 307

1  Q  Why did -- So you exited the first
2  time without any issue; correct?
3  A  Correct.
4  Q  Okay. What did you do when you were
5  on the outside? Was that -- All three of you
6  were on the outside at that point?
7  A  Yes.
8  Q  What did you do, then, at that time?
9  A  My initial intentions were to refill
10  my SCBA bottle, I was getting low on air, I was
11  under half. At that -- When we exited, I
12  started to take off my helmet, mask, gloves,
13  with the intentions of taking my bottle over to
14  Air 14 to replace it. I saw Truck 8 come around
15  the AB corner, I walked over. It appeared to me
16  that they were moving with purpose. Firefighter
17  Dyer and Firefighter Borchers had their masks
18  on. They appeared to me that they were going
19  towards the door to go interior. I walked over
20  to Captain Mahler, who appeared to be getting
21  ready to put his mask on, and I made a
22  face-to-face contact with them to explain that
23  when we were in the first time, that I had
24  noticed a possible ventilation exit above the --
25  generally, above the fire. Shawn acknowledged

Page 308

1  that, said okay, and they continued on towards
2  the overhead door.
3  Q  Okay. And what did you do next after
4  you had that encounter?
5  A  I walked back, I had placed my tools
6  on the ground, I walked back to those, with
7  intentions of taking my SCBA off. I noticed
8  that Amanda had made a face-to-face contact with
9  Shawn, I don't know what was said, it was very
10  brief.
11  Q  Was that -- just stopping you -- was
12  that on the exterior --
13  A  That was --
14  Q  -- of the building?
15  A  -- on the exterior, yes.
16  Q  Okay. And, then, what did you observe
17  next, or do next?
18  A  I was in the process, I was going to
19  take off my SCBA, then Amanda got my attention
20  and told me that we were going to -- going to go
21  back into the structure.
22  Q  And did she tell you why?
23  A  No.
24  Q  Okay. Did you have any understanding
25  of why?

Page 309

1    A   No.
2    Q   Okay.  Did it surprise you?
3    A   A little bit, yes.
4    Q   And why is that?
5    A   First of all, I was low on air.
6   Secondly, it was my opinion, or thought, that
7   Truck 8 was going in.  When they came around the
8   AB corner, that told me they had probably done a
9   360 of the structure.  I've worked enough with
10  Shawn to know that he always has a plan.  I saw
11  him giving some direction to his crew, so I
12  assumed that they were going to go in, possibly
13  open up some doors, and that they would give us
14  some direction on the exterior of what we needed
15  to do there.
16   Q   Okay.  At this point, you, Benson and
17  Hurley, your crew had been in and out of the
18  fire once before Truck 8, Captain Mahler, had
19  even arrived?
20   A   Yes.
21   Q   Was there doors open at this time?
22   A   There was two overhead doors open.
23   Q   Okay.  Can you describe these doors?
24  Are they big overhead doors or --
25   A   They were commercial-like, overhead

Page 310

1   doors.
2    Q   Okay.  When you were inside the fire,
3   or inside the warehouse, could you always see
4   the way out to the overhead doors?
5    A   The first time?
6    Q   Yeah.
7    A   No.
8    Q   Okay.
9    A   After we got up close to the fire,
10  when Engine 10 applied water to the fire, it
11  increased the smoke, decreased the visibility,
12  which is totally normal, and there was a point
13  where we were close to zero visibility and I
14  could no longer see the doors.
15   Q   And that was the first time?
16   A   That was the first time we were in,
17  yes.
18   Q   But then when it was time to exit, you
19  were able to see a way out?
20   A   As we got further -- or closer to the
21  doors, we got away from the fire, yes, we could
22  see where the doors were at.  I would estimate
23  20 to 30 feet from the doors.
24   Q   Okay.  So, then, as you stated, you
25  were outside the first time, you're instructed

Page 311

1   to -- that you're going to go back in by Acting
2   Captain Benson?
3    A   Correct.
4    Q   So what did you do when you get that
5   instruction, what do you do?
6    A   Got my gear back on, Amanda and Morgan
7   started proceeding towards the overhead doors
8   that were open; I continued to get my gear back
9   on.  When I completed that, I made my way to the
10  door.  Amanda and Morgan went in ahead of me.
11  When I got to the door, I could see that we were
12  back, close to the compactor, where we had been
13  previously.  At this time, the visibility had
14  improved.  I walked in, Engine 10, who had been
15  in there previously with us, they were exiting
16  because their low-air alarms were going off.  I
17  made contact with Amanda, asked her what we were
18  supposed to be doing, and she said -- stated
19  that she did not know.
20   Q   Okay.  So then what did you do?
21   A   Amanda had a thermal-imaging camera,
22  she was giving direction to crew on the nozzle,
23  I don't recall who the crew was, but it was my
24  impression that Amanda was looking for hot spots
25  and giving them direction where to apply the

Page 312

1   water.
2    Q   Okay.  What's a thermal-imaging
3   camera, just for our Arbitrator, and how does
4   that work?
5    A   It's a camera that detects heat.  It
6   also tells you actual temperatures of what
7   you're looking at.
8    Q   Was this fire, when you were inside,
9   unusually hot?
10   A   No.
11   Q   Okay.  Again, at this point, at -- you
12  go back in a second time, you said you're at the
13  door and Benson and Hurley had gone in, in front
14  of you?
15   A   Yeah.
16   Q   Okay.  Did you, when you're at the
17  door, did you have any trouble spotting them
18  inside?
19   A   No.
20   Q   Did you then make your way over to
21  them?
22   A   Yes.
23   Q   And when you're in there the second
24  time, did you, at any time, see Truck 8's crew?
25   A   The only person that I recall seeing

Page 313

1    from Truck 8 was Firefighter Borchers.  He had
2    actually crawled up on this machine and
3    requested a hose line, and that's the only
4    person I recall from Truck 8.
5        Q   Okay.  When he was up on the machine,
6    was he above you?
7        A   Yeah.
8        Q   A little bit?
9        A   Yeah, a little bit, yeah.
10       Q   Did you have any trouble seeing him?
11       A   I could make out his outline pretty
12   well.  I knew his trim because he has some
13   specific stickers on his helmet, we worked
14   together, he was on Truck 1, so I knew his trim.
15       Q   And you could see those stickers?
16       A   Correct.
17       Q   You said before you went back in the
18   second time, you had a concern with your SCBA.
19   Did Ms. Benson check on your air supply, or your
20   SCBA, before you went back in the second time?
21       A   No.
22       Q   Okay.  If this fire had been as
23   dangerous as she's claiming, would you have
24   gone back in with low oxygen?
25       A   With low air?

Page 314

1        Q   Low air.
2        A   No.
3        Q   But you felt it was okay to go back
4    in?
5        A   Yes.
6        Q   And, because you didn't think the
7    conditions were that dangerous?
8        A   Right.  I felt that whatever we needed
9    to do, we needed to get done, because I did have
10   low air, but I didn't feel uncomfortable doing
11   that.
12       Q   If it had been especially dangerous,
13   what would you have done, regarding your air, I
14   should say?
15       A   Yeah, I would have went to Air 14 and
16   got a new bottle and reported back.
17       Q   Was Captain Mahler, did you understand
18   him to be the group supervisor over you at this
19   time?
20       A   No.
21       Q   Did you understand him to be the group
22   supervisor over you at any time?
23       A   No.
24       Q   Did you ever believe you were
25   reporting to him instead of Ms. Benson?

Page 315

1        A   No.
2        Q   Did you ever hear Ms. Benson mention
3    to the incident commander that you could assist
4    with -- that Truck 1 could assist with
5    ventilation?
6        A   Can you repeat the question?
7        Q   Yeah.  Did you hear on the radio,
8    when Ms. Benson said, we can assist with,
9    essentially, assist with ventilation, and that
10   incident commander said, yes, assist with
11   ventilation?
12       A   That was the -- Battalion 1 gave us
13   that assignment, to assist with ventilation.
14       Q   Yeah, okay.  And --
15       A   Amanda requested ventilation,
16   Battalion 1 responded back that Truck 8 was
17   assigned to ventilation, and reassigned us to
18   assist them.
19       Q   Okay.  And does "assist with," to you,
20   in your experience and training, mean that you'd
21   been reported to Truck 8?
22       A   No.
23       Q   You still reported to Ms. Benson?
24       A   Correct.
25       Q   Okay.  In your 25 years of experience,

Page 316

1    is assisting another crew with a task, has it
2    ever meant to you that the -- that it's implied
3    that the captain that's working on the task the
4    first time, then, is somehow supervising the
5    second crew?
6        A   No.
7        Q   And you understood you were always
8    reporting to Benson?
9        A   Correct.
10       Q   As such, was she responsible for your
11   safety?
12       A   Yes.
13       Q   Did Captain Mahler ever abandon you
14   and your crew within an IDLH environment?
15       A   No.
16       Q   Did you know Ms. Benson claims that
17   Captain Mahler was not talking with her at the
18   fire -- Even if he was not talking with her, did
19   you ever believe that you or your crew was ever
20   abandoned by him in an IDLH environment?
21       A   No.
22       Q   Did you ever feel like you were left
23   by him in dangerous peril?
24       A   No.
25       Q   When you were in the warehouse with

Page 317

1    Ms. Benson the second time, and you were in
2    there with -- Truck 8 is in there somewhere as
3    well, or your understanding is?
4        A   Correct.
5        Q   Okay.  Crew, I should say, not the
6    truck.
7        A   Yeah.
8        Q   Could you always -- Were you with her
9    and you could see her and Morgan during that
10   second time you were in there?
11       A   Yes.  Overall, the smoke conditions
12   had improved the second time.  There was never a
13   time when we were in, on the second time, where
14   we could not see the exit, but the overhead
15   doors.  The sun was shining through the doors.
16       Q   And your understanding, from reading
17   the allegations, is that it was the second time
18   that you were in the warehouse that Ms. Benson
19   is claiming that Captain Mahler abandoned you
20   guys at the warehouse?
21       A   Yes.
22       Q   Did you have to crawl to get out the
23   second time?
24       A   No, we walked.
25       Q   You just walked?

Page 318

1        A   Yeah.  And we did not follow hose
2    line.
3        Q   And you did not follow hose line?
4        A   No.
5        Q   Okay.  Just walked to the door?
6        A   Correct.
7        Q   Because conditions had improved at
8    that point?
9        A   Yes.
10       Q   Did you enter -- So, skipping ahead a
11   little bit, did you go back in, at any time?
12       A   After we got our bottles filled, we
13   were outside for, approximately, 20 to 30
14   minutes, and we did, in fact, go in a third
15   time, yeah.
16       Q   And did you have any trouble going in
17   and out the third time?
18       A   At that point, there was virtually no
19   smoke, to speak of, and what we were doing was
20   called overhaul, we were digging into the pile
21   of cardboard, trying to finding hot spots.
22       Q   So, back to the second time, which is
23   the time period at issue that you're in the
24   fire, so do you -- approximately how long you
25   were in there the second time?

Page 319

1        A   I'd say 5 to 10 minutes.
2        Q   And did you do anything while you were
3    in there, or what were you doing?
4        A   Helped move a little bit of -- or
5    helped move a hose line.  Pretty much just
6    stayed behind Amanda.
7        Q   You felt safe the whole time?
8        A   Yeah.
9        Q   When did you -- or why did you guys
10   then exit at that time?
11       A   My low-air alarm went off.
12       Q   And so did you exit with Benson and
13   Hurley at the same time?
14       A   Yes.
15       Q   At that point, did -- had Captain
16   Mahler abandoned you in the warehouse?
17       A   No.
18       Q   In fact, at the time that Ms. Benson
19   is claiming that Mahler abandoned you and her
20   and Hurley in the burning warehouse, didn't you
21   and your crew actually exit the warehouse before
22   he did?
23       A   Yes, we did.
24       Q   Okay.  So he didn't abandon you or
25   leave you in there to, you know, be in harm's

Page 320

1    way, did he --
2            MR. CORRIGAN:  Objection.
3    Foundation.
4        Q   (By Ms. Guttau) -- if he --
5        A   No.
6            MR. CORRIGAN:  Hold on.
7            MS. GUTTAU:  He has to rule on it.
8            THE ARBITRATOR:  (Unintelligible.)
9            MS. GUTTAU:  Pardon?
10           THE ARBITRATOR:  What was the
11   question?
12       Q   (By Ms. Guttau)  Yeah.  The question
13   was, if you and your crew left the burning
14   warehouse before Mahler, he could not have
15   abandoned you inside it --
16           MR. CORRIGAN:  That's not the
17   question.
18           MS. GUTTAU:  We'll have to read
19   it back.
20           (The requested portion of the
21   testimony was read back by the Court Reporter.)
22           MR. CORRIGAN:  That's my
23   objection.  She said, fine, that Mahler had
24   some -- that he knows what Mahler's intention
25   was with regard to Mahler's actions in the fire.

Page 377

1  years.
2      Q   Ever permanently stationed with
3  Captain Mahler?
4      A   No.
5      Q   How would you describe Captain Mahler
6  as a captain?
7      A   I would say he's very knowledgeable in
8  his job, always very open with his knowledge as
9  far as making sure that we know everything that
10  he can possibly teach us about everything.
11      Q   Do you have -- believe, based on your
12  experience with him, that he takes safety
13  seriously?
14      A   Very much so.
15      Q   At a fire incident, do you observe him
16  to be what I call chatty, does he talk a lot at
17  incidents?
18      A   No.
19      Q   Do you know if Captain Mahler is hard
20  of hearing?
21      A   He is, yes.
22      Q   And how do you know that?
23      A   He now has hearing aids that he got in
24  the last couple of months.
25      Q   Before that, could you tell, by your

Page 378

1  observations, that he was hard of hearing?
2      A   Yeah, you'd have to repeat yourself
3  once in awhile to him.
4      Q   Do you know Ms. Benson?
5      A   I do.
6      Q   And how do you know Ms. Benson?
7      A   I've worked with her on a few
8  occasions throughout the years.  When I was
9  stationed at Station 1, she was also stationed,
10  on a different shift, at Station 1.
11      Q   Did you ever work under Ms. Benson as
12  an acting captain?
13      A   A few times, yes.
14      Q   Anything that you can share about your
15  impressions of her as an acting captain?
16      A   Nothing really of note, honestly, no.
17      Q   Okay.  So I'm going to take us to
18  April 26th, 2021, and we've been calling that
19  incident the warehouse fire, so you'll know what
20  I'm talking about when I say "the warehouse
21  fire"?
22      A   Correct.
23      Q   You were stationed at Station 8 that
24  day?
25      A   Correct.

Page 379

1      Q   Truck 8?
2      A   Correct.
3      Q   Reporting to Captain Mahler?
4      A   Yes.
5      Q   And who was on your crew with you?
6      A   It was Captain Mahler, Jason Love was
7  driving, and myself and Trent Borchers in the
8  back.
9      Q   When you got to the warehouse fire,
10  you weren't the first truck to arrive; correct?
11      A   No.
12      Q   Who else was there?
13      A   I believe Truck 5 and Truck 1 were
14  both there before us.
15      Q   Did you see Truck 1 when you arrived?
16  Did you see them on the exterior?
17      A   I don't remember noticing them, no.
18  We kind of went to the Charlie side of the
19  structure.
20      Q   FAO Love and Firefighter Roberts have
21  testified already, so, if -- from what I -- from
22  what we've heard so far, I understand that
23  Truck 8's first assignment was to check the
24  utilities; is that right?
25      A   That's correct.

Page 380

1      Q   And when you accomplished that task,
2  you returned to the exterior of the building?
3      A   Correct.
4      Q   And, then, you were assigned to
5  ventilation; is that right?
6      A   Correct.
7      Q   Okay.  When you were assigned the
8  ventilation task, do you know where Truck 1 was?
9      A   I don't.
10      Q   Did you observe Ms. -- Acting Captain
11  Benson speak with Captain Mahler outside the
12  building?
13      A   I never saw that, no.
14      Q   Okay.  Can you walk me through what
15  the ventilation task was and how you
16  accomplished that?
17      A   Firefighter Borchers and I went in and
18  opened up a big garage door, that was kind of
19  the gist of what we could accomplish with
20  ventilation at that point.
21      Q   And where was Captain Mahler when you
22  and Firefighter Borchers were opening the
23  overhead door?
24      A   Somewhere close to us.  He kind of
25  sent us on our mission and kind of stays

Page 381

1   oriented to where we needed to go.
2       Q   Can you describe how you opened that
3   door?  Were you opening it from the interior or
4   the exterior?
5       A   We opened it from the interior.
6       Q   What were the conditions like when you
7   opened that door, when you entered the building
8   to open the door?
9       A   It was fairly smoky, but that started
10  to clear up quite a bit --
11      Q   And it --
12      A   -- almost instantly, when we opened
13  that big garage door.
14      Q   So the clearing conditions was a
15  result of opening the door?
16      A   Correct.
17      Q   And were there any other ventilation
18  tasks that you accomplished after opening the
19  door?
20      A   I don't believe so.
21      Q   There's been testimony from FAO Love
22  that Captain Mahler instructed him to pull some
23  tools, I'm thinking, some sort of saw and some
24  sort of hook?
25      A   Correct.  That was initially when we

Page 382

1   were given the task of ventilation, he sent FAO
2   Love around, back to the rig, to get a few tools
3   that we didn't bring with us in case we were to
4   need them.
5       Q   Did you end up needing those tools?
6       A   No.
7       Q   Okay.  So I want to go back to opening
8   the garage door, or the overhead door.  So you
9   opened the door, you and Borchers and Mahler are
10  on the interior; correct?
11      A   Honestly, I'm not a hundred percent
12  for sure if Captain Mahler walked in with us at
13  that point or if he was waiting by the walk-in
14  door.  We didn't have to go very far inside the
15  structure to open that big door.
16      Q   Okay.  And what -- Who else was in
17  there, who did you see?
18      A   I don't remember seeing anybody else
19  at that point.
20      Q   At some point, on the interior, did
21  you see the crew of Truck 1?
22      A   Once we got to the handline, I noted
23  that they were there with us.
24      Q   Can you just walk through how -- what
25  happened between those two points in time?

Page 383

1       A   We were making our way back, towards
2   where the fire seemed to be coming from, and I
3   believe it was Engine 10 -- don't quote me on
4   what exact rig it was -- they were running
5   out of air as we got there, so they were
6   going to have to put down their handline, so
7   Firefighter Borchers and I took it over and
8   started trying to extinguish the fire that ended
9   up being some sort of a cardboard compactor
10  machine thingamajigger.
11      Q   And when you say "handline," you're
12  referring to a hose?
13      A   Correct.
14      Q   And, at that point, did you see the
15  crew of Truck 1?
16      A   Yes.
17      Q   Okay.  And who did you see?
18      A   I saw Acting Captain Benson and
19  Probationary Firefighter Morgan Hurley.
20      Q   Did you see FAO Roberts?
21      A   I don't remember seeing him.
22      Q   Okay.  What did you see Captain --
23  Acting Captain Benson doing, what was she doing
24  in there?
25      A   I'm not a hundred-percent sure.  I

Page 384

1   would assume -- Well, I'm not going to assume.
2       Q   What did you see Firefighter Hurley
3   doing?
4       A   She was trying to assist Borchers and
5   I with the nozzle.
6       Q   Okay.  Did she seem to be enjoying
7   that?
8       A   Yeah.
9       Q   Was -- Is it typical for a truck crew
10  to be operating a nozzle?
11      A   Not normally, no.
12      Q   Okay.  And, so, at that point, after
13  you had opened the door and then were helping
14  with the hose line, did you consider that
15  ventilation task done?  Did you know what your
16  assignment was at that point?
17      A   At that point, Captain Mahler was
18  doing some sort of an assessment, I assume, on
19  if we were going to do any more, further
20  assessment.  Trent and I kind of took over the
21  nozzle just so that there was some sort of fire
22  suppression going on while they were switching
23  out handline crews.
24      Q   Okay.  And did you see -- Did you see
25  Captain Mahler, at all, in the interior of that

1  that an attorney named Torrey Gerdes was
2  investigating this incident?
3      A   Correct.
4      Q   And were you interviewed by
5  Ms. Gerdes?
6      A   Yes I was.
7      Q   Did you provide her truthful
8  information?
9      A   I did.
10      Q   And have you had an opportunity to
11  review her report --
12      A   Yes.
13      Q   -- portions of the report that refer
14  to statements you made?
15      A   Correct.
16      Q   And were these accurately reflected in
17  the report?
18      A   Yes.
19      Q   So I'm going to ask you, in front of
20  you, to turn to City Exhibit Number 8.  Do you
21  recognize this document?
22      A   Yes.
23      Q   And this is a Declaration that you
24  submitted, you'll see it's dated on the third
25  page there, the 21st of July, 2021?

1      A   Correct.
2      Q   And was that about, oh, three or four
3  months after the warehouse fire?
4      A   Yeah.  The fire was in April and this
5  says it was July when I signed it.
6      Q   Okay.  You didn't write this, actually
7  sit down and type it; correct?
8      A   Correct.
9      Q   When it was provided to you, did you
10  review it carefully?
11      A   I did.
12      Q   Did you understand that by signing
13  your name to it, you were attesting that
14  everything in it was -- reflected what you knew?
15      A   Correct.
16      Q   Did you ask for any changes to be made
17  to it before you signed it?
18      A   I did.  I don't remember what they
19  were, to be absolutely honest with you.
20      Q   Okay.
21      A   I believe it was more of, I think I
22  was listed as an FAO, and I wasn't.
23      Q   Okay.
24      A   It was some minor things like that, I
25  believe.

1      Q   But you, you read it and you
2  understood that it was under penalty of perjury --
3      A   Correct.
4      Q   -- when you signed it; right?
5      Can you turn to page 2 of that document?
6      A   Yes.
7      Q   And we just talked about this, on
8  paragraph 7, "At this incident, at no time did
9  you consider Shawn Mahler to be a group
10  supervisor over ventilation"; is that correct?
11      A   Correct.
12      Q   Have there been other incidents where
13  your crew has been group supervisor?
14      A   I would imagine so.
15      Q   Did you, in your experience, did you
16  always know when that was happening?
17      A   Usually, it's radio traffic that
18  catches your ear, uh-huh, yeah.
19      Q   Paragraph number 9 says, Truck 8 was
20  assigned to ventilation tasks after working on
21  cutting the power to the structure.  Truck 8 got
22  the overhead door open; is that true?
23      A   Yes.
24      Q   And is that also true that that was,
25  essentially, the end of the ventilation tasks?

1      A   Correct.
2      Q   Maybe a little bit later, did you work
3  on getting a fan on?
4      A   I was never a part of a fan, that I
5  can remember.
6      Q   Okay.  Paragraph number 12, you didn't
7  observe any action by Captain Mahler at the
8  incident, to be abandoning the Truck 1 crew in
9  an IDLH environment?
10      A   No, I did not.
11      Q   In fact, your recollection that
12  Truck 1 left before Truck 8 left the interior of
13  that building?
14      A   Correct.
15      Q   Paragraph number 15 states that,
16  again, after you got that door open, The Truck 8
17  crew was able to navigate and exit the structure
18  multiple times, without danger, and no immediate
19  concerns regarding your safety; that's a
20  truthful statement?
21      A   Correct.
22      Q   And, then, paragraph 16, on the last
23  page, says, If any captain that was your direct
24  supervisor felt that the environment in the
25  structure at the incident was putting anyone in

Page 441

1  true?
2     A   Yes.
3     Q   When you signed this, did you consult
4  the LFR management policies to see if there was
5  a specific policy or reference material --
6  reference?
7     A   I didn't, no.
8     Q   Did you assume that, that LFR
9  policies, somewhere, require that captains
10 remove their crews from situations that put them
11 in peril?
12    A   Yes.
13    Q   Based on your training, do you believe
14 that if a captain is in that situation, they
15 should report it to the incident commander?
16    A   Yes.
17    Q   Has Ms. Benson said things about you
18 that are untrue?
19    A   Yes.
20    Q   Can you tell me about that?
21    A   I, at the time, had left Station 1, I
22 was doing my ALS Academy.  There was one day I
23 was off-duty, my friends, we were going to go to
24 the lake, we decided to car pool, we met at
25 Station 1, we went to the lake, had a really fun

Page 442

1  time, we were there for pretty much the entire
2  day, got back and there was a member that had
3  pranked us, Matt Woitalewicz had greased our
4  handle on our vehicle, so we had to go inside.
5  We weren't planning on going in, we weren't
6  planning on, really, communicating with anyone
7  there, but we went in, and that's when we ran
8  into the crew, Truck 1, Engine 1, and we all
9  started talking, talking about the day, talking
10 about how ALS Academy was going, and we just
11 kind of told them what we were doing at the
12 lake, and it was fun, and then we left.  And,
13 then, later, I found out there was an accusation
14 that myself and another member were intoxicated
15 at the station.  And then I was asked to, kind
16 of, write down what happened, and everyone that
17 was there at the table in the bay were all asked
18 to give statements, and they all agreed, we were
19 not intoxicated, which we were not.  We did -- I
20 did -- I did admit to drinking that day, but I
21 said, because I was drinking, I had stopped
22 hours before even driving, because I knew I was
23 still on probation, and that's just something --
24 I wouldn't do that, you know.  So, the whole
25 allegation came out, the whole getting

Page 443

1  everyone's interviews, and her accusing me of --
2  I believe, at one point --
3        MR. CORRIGAN:  I'm sorry, did you
4  say, her accusing me?
5        THE WITNESS:  Her?
6        MR. CORRIGAN:  Yeah.
7        THE WITNESS:  Amanda Benson was
8  the one that reported me.
9        MR. CORRIGAN:  Okay.  I'm sorry
10 to interrupt you.  I didn't hear you.
11    Q   (By Ms. Guttau)  You can continue.
12    A   And when I had heard that there was an
13 accusation, I was asked to e-mail my battalion
14 chief the whole story, which I did, so...
15    Q   When did this happen?
16    A   It was sometime in July, I think.
17    Q   Of 2021?
18    A   Yes.
19    Q   And you weren't on duty?
20    A   No, I was not.
21    Q   And you said you had drank during the
22 day --
23    A   Yes.
24    Q   -- but you weren't intoxicated at that
25 time?

Page 444

1     A   No.
2     Q   And you said that was because you were
3  on probation.  Why would it matter if you were
4  on probation?
5     A   Well, I mean, probation, you're not
6  really protected by the Union, you're not, like,
7  you know, if anything happens while you're an
8  official employee, you have the backing of the
9  Union.  And that's what I was told, like, you
10 know, if anything goes wrong, you can just be
11 fired like that, so that was my, my worry, you
12 know, just being safe and keeping your head down
13 until you pass your six months of probation.
14    Q   Is your job important to you?
15    A   Absolutely.
16    Q   Is your reputation important to you?
17    A   Of course, yes.
18    Q   And do you feel like accusations that
19 you're drunk at the station impact your
20 reputation?
21    A   Oh, yeah, absolutely.
22    Q   Did Ms. Benson ever talk to you about
23 that incident and about reporting that?
24    A   It wasn't until afterwards where I --
25 we were in the locker room, and she -- I can't

Page 493

1    they acknowledged that.
2        Q    And he would say those words "group
3    supervisor"?
4        A    Yes.
5        Q    And "working for"?
6        A    Yes.
7        Q    Did anyone at all, that day, raise
8    concerns about safety to you at that fire?
9        A    Nope, not to me.
10       Q    Did Captain Giles say something to you
11   later in the afternoon?
12       A    He just -- He didn't say anything
13   about safety, just said he was not concerned
14   about that at the time, that there was a lot of
15   smoke, and we needed to get the ventilation
16   going.
17       Q    And was that at the same -- Captain
18   Giles is on Engine 16; correct?
19       A    Correct.
20       Q    And was Engine 16 there at the same
21   time that Truck 1 was there?
22       A    I believe so. I had left for a little
23   bit, and they were there when I got back.
24       Q    Station -- Engine 16?
25       A    Engine 16 was, yes.

Page 494

1        Q    Okay. Did he speak to Ms. Benson at
2    all?
3        A    Yes.
4        Q    When did you speak with her?
5        A    At one time, when they came out, her
6    and her crew were standing outside, rehabbing,
7    having some water, and I just, as I do with
8    everybody, asked if everything was okay, if
9    there's any injuries or issues.
10       Q    Do you know if that was shortly before
11   they left?
12       A    I don't recall exactly.
13       Q    Okay. Is it part of the standard
14   practice of the safety officer to ask captains
15   if -- how things are going?
16       A    Yes.
17       Q    And do you solicit information about
18   safety concerns?
19       A    Yes.
20       Q    And did you do that with Ms. Benson?
21       A    Yes.
22       Q    And did she tell you anything?
23       A    She told me no, no injuries, no
24   issues.
25       Q    You understand that Ms. Benson is

Page 495

1    alleging that Captain Mahler's actions could
2    have killed her, Morgan Hurley and Matt Roberts;
3    yes?
4        A    Yes.
5        Q    If she felt that way at this fire,
6    what should she have done?
7        A    Communicated that with the incident
8    commander, hit her Mayday button, let Safety
9    know.
10       Q    To your knowledge, did she do any of
11   those things?
12       A    No.
13       Q    You learned that, eventually,
14   Ms. Benson, after that May 20 -- excuse me --
15   After the May 26th meeting where Ms. Benson was
16   informed that her -- all of her allegations
17   against everyone were found to be unfounded, she
18   filed a motion for an injunction; you're aware
19   of this?
20       A    Yes.
21       Q    I'm going to ask you to look at City
22   Exhibit, now, Number 1. And I'd like you to
23   look at the second paragraph, and, I guess, just
24   for the record, this is City's Exhibit R1, and
25   this is Memorandum and Order from Judge Kopf,

Page 496

1    United States District Court for the District
2    of Nebraska. And do you see in that -- in the
3    second paragraph, the second sentence, would
4    you just read that, where it starts with
5    "For relief"?
6        A    "For relief, Benson requests, quote,
7    that the Court, 1, order the City of Lincoln to
8    immediately initiate disciplinary procedures
9    against Mahler; 2, enjoin Mahler from
10   assignment/dispatch to any fire scene during the
11   pendency of the -- of disciplinary proceedings;
12   and, 3, appoint an independent, third-party
13   investigator to investigate plaintiff's
14   complaint about Mahler's actions at the recent
15   warehouse fire."
16       Q    So, do you read that second -- the
17   second thing she's asking for, enjoin Mahler
18   from assignment/dispatch to any fire scene
19   during the pendency of the disciplinary
20   proceedings, do you understand that to mean that
21   she thought he was so dangerous he shouldn't be
22   dispatched to any fires?
23       A    Can you repeat that? How do you want
24   me to --
25           THE ARBITRATOR: Why don't you

Page 553

```
 1        A   Correct.
 2        Q   And that would have an adverse affect
 3   on her as well?
 4        A   It could.
 5        Q   Did you ever -- Were you ever
 6   interviewed by Ms. Gerdes?
 7        A   Yes.
 8        Q   Did she ever ask you about what Mahler
 9   told you between the dates of May 5th and
10   May 26th?
11        A   I don't recall, specifically, what we
12   talked about, but I gave her information on the
13   fire, the safety officer and everything.
14        Q   But, specifically, about Mahler
15   saying, I never talked to her, I didn't
16   encounter her in the fire, did you give her that
17   information?
18        A   I believe I probably would have just
19   talked what I've already wrote down about
20   meeting at the AB corner, whatever I knew about
21   that.
22        Q   Your e-mail?
23        A   Yes.
24        Q   You think she had that?
25        A   I don't know if she got that or not.
```

Page 554

```
 1   I couldn't tell you that.  I wasn't part of
 2   that.
 3             MR. CORRIGAN:  Okay.  Those are
 4   the questions I have.
 5             MS. LITTRELL:  All right.
 6             THE ARBITRATOR:  Any -- can we
 7   get done with Redirect, or are we going to
 8   shut 'er down?
 9             MS. LITTRELL:  We may want to
10   shut 'er down.
11             MS. GUTTAU:  Are you free
12   tomorrow?
13             THE WITNESS:  Yes.
14             MR. LITTRELL:  Yeah, it may be
15   best to do it tomorrow, and we can just do it
16   all at once.
17             Sir, is that okay?
18             MR. CORRIGAN:  It's like
19   yesterday, it immediately shuts off.
20             MS. GUTTAU:  I think we lost you,
21   Mr. Rutzick.
22             I'm not sure you can hear us.  If
23   you can, we decided it's probably best to
24   reconvene in the morning.
25             THE ARBITRATOR:  (No audible
```

Page 555

```
 1   response.)
 2             (Reconnecting with the Arbitrator
 3   via telephone.)
 4             MS. GUTTAU:  I didn't know if you
 5   heard us say, we think it probably is best to
 6   wrap up, because it'll take a little while yet.
 7             THE ARBITRATOR:  All right.  Why
 8   don't we just end there?
 9             MS. GUTTAU:  Okay.
10             THE ARBITRATOR:  And we'll try
11   again tomorrow.
12             MS. GUTTAU:  All right.
13             MR. CORRIGAN:  All right.  Thank you.
14             (At 3:50 p.m., the proceedings
15   were continued to June 22, 2022.)
16
17
18
19
20
21
22
23
24
25
```

Page 556

```
 1        FEDERAL MEDIATION AND CONCILIATION SERVICE
             BEFORE ARBITRATOR STEVEN RUTZICK
 2
     LINCOLN FIREFIGHTERS    )   FMCS CASE NO.
 3   ASSOCIATION, IAFF LOCAL )   22103-00847
     644, and AMANDA BENSON,  )
 4                            )
              Grievants,      )
 5                            )
          vs.                 )      VOLUME III
 6                            )   PAGES 556-830
     CITY OF LINCOLN,         )
 7                            )
              Respondent.     )
 8                            )
                              )
 9
10        ARBITRATION HEARING held before
11   Arbitrator Steven Rutzick (via Zoom), with
12   Denise J. Lukasiewicz, CCR and Notary Public for
13   the State of Nebraska, counsel and all parties
14   present at the LFR Union 644 Hall, 241 Victory
15   Lane, Lincoln, Nebraska, beginning at 9:07
16   a.m., on the 22nd day of June, 2022.
17
18
19
20
21
22                      * * * * *
23
24
25
```

Page 557

```
 1        A P P E A R A N C E S
 2
 3   FOR THE GRIEVANTS:
 4
 5   MR. JOHN E. CORRIGAN
     DOWD & CORRIGAN, LLC
 6   6700 Mercy Road
     Suite 501
 7   Omaha, NE  68106
     402.913.9713
 8   jcorrigan@dowd-law.com
 9
10   FOR THE RESPONDENT:
11   MS. HEIDI GUTTAU
     BAIRD HOLM LLP
12   1700 Farnam Street
     Suite 1500
13   Omaha, NE  68102
     402.344.0500
14   hguttau@bairdholm.com
15   MS. ABIGAIL LITTRELL
16   ASSISTANT CITY ATTORNEY
     555 South 10th Street
17   Suite 300
     Lincoln, NE  68508
18
19
20   ALSO PRESENT:  Mr. Ryan Moser, Vice President
     IAFF Local 644; Mr. Dave Engler, Fire Chief;
21   Tiffany Leasure, Paralegal for City of Omaha
22
23
24
25
```

Page 558

```
 1              I N D E X
 2                                    PAGE
     CASE CAPTION ...................    1
 2   APPEARANCES .....................   2
 3   INDEX ..........................    3
     TESTIMONY .......................  19
 4   REPORTERS' CERTIFICATE ..........  2084
 5
 6              WITNESSES
 7
     FOR THE CITY:
 8
 9   CHIEF DAVID ENGLER
10   Direct by Ms. Guttau...............   19
     Cross by Mr. Corrigan...............  136
11   Cross Cont'd by Mr. Corrigan........  253
     Cross Cont'd by Mr. Corrigan........  1070
12   Redirect by Ms. Guttau..............  1135
     Recross by Mr. Corrigan.............  1193
13   Further Redirect by Ms. Guttau......  1202
     Further Recross by Mr. Corrigan.....  1209
14
15   FAO JASON LOVE
16   Direct by Ms. Littrell..............  210
     Cross by Mr. Corrigan...............  230
17   Redirect by Ms. Littrell............  247
     Recross by Mr. Corrigan.............  249
18
19   FAO MATTHEW ROBERTS
20   Direct by Ms. Guttau................  295
     Cross by Mr. Corrigan...............  342
21   Redirect by Ms. Guttau..............  363
     Recross by Mr. Corrigan.............  367
22   Further Redirect by Ms. Guttau......  372
     Further Recross by Mr. Corrigan.....  372
23   Further Redirect Cont'd by Ms. Guttau  373
24
25
              ** ** **
```

Page 559

```
 1           WITNESSES, CONT'D
 2
 3   FOR THE CITY:
 4   FF STEPHEN DYER
 5   Direct by Ms. Littrell..............  375
     Cross by Mr. Corrigan...............  395
 6   Redirect by Ms. Littrell............  409
     Recross by Mr. Corrigan.............  410
 7
 8   FF MORGAN HURLEY
 9   Direct by Ms. Littrell..............  416
     Cross by Mr. Corrigan...............  447
10   Redirect by Ms. Littrell............  464
     Recross by Mr. Corrigan.............  466
11
12   DIVISION CHIEF MICHAEL SMITH
13   Direct by Ms. Littrell..............  470
     Cross by Mr. Corrigan...............  505
14   Redirect by Ms. Littrell............  569
     Recross by Mr. Corrigan.............  588
15   Further Redirect by Ms. Littrell....  610
     Further Recross by Mr. Corrigan.....  614
16
17   BC CURT FAUST
18   Direct by Ms. Guttau................  618
     Cross by Mr. Corrigan...............  729
19   Redirect by Ms. Guttau..............  806
     Recross by Mr. Corrigan.............  820
20   Further Redirect by Ms. Guttau......  828
21
22   DEPUTY CHIEF GEORGE HEALY
23   Direct by Ms. Guttau................  971
     Cross by Mr. Corrigan...............  1021
24   Redirect by Ms. Guttau..............  1054
     Recross by Mr. Corrigan.............  1055
25
```

Page 560

```
 1           WITNESSES, CONT'D
 2
 3   FOR THE CITY:
 4   AISHAH WITTE
     Direct by Ms. Littrell..............  1214
 5   Cross by Mr. Corrigan...............  1263
     Redirect by Ms. Littrell............  1287
 6   Recross by Mr. Corrigan.............  1297
 7
 8   CAPTAIN SHAWN MAHLER
     Direct by Ms. Guttau................  1554
 9   Cross by Mr. Corrigan...............  1671
     Redirect by Ms. Guttau..............  1754
10   Recross by Mr. Corrigan.............  1771
     Further Redirect by Ms. Guttau......  1784
11   Further Recross by Corrigan.........  1787
     Further Redirect Cont'd by Ms. Guttau 1794
12
13   CAPTAIN ADAM SCHRUNK
14   Direct by Ms. Guttau................  2059
     Cross by Mr. Corrigan...............  2073
15   Redirect by Ms. Guttau..............  2077
16
17   FOR THE UNION:
18   CHIEF EDWARD HADFIELD
19   Direct by Mr. Corrigan..............  844
     Cross by Ms. Guttau.................  888
20   Redirect by Mr. Corrigan............  951
     Recross by Ms. Guttau...............  962
21
22   CAPTAIN MICHAEL WRIGHT
23   Direct by Mr. Corrigan..............  1316
     Cross by Ms. Littrell...............  1357
24   Redirect by Mr. Corrigan............  1393
     Recross by Ms. Littrell.............  1398
25
```

## Page 561

WITNESSES, CONT'D

FOR THE UNION:

CAPTAIN DAN RIPLEY
Direct by Mr. Corrigan.............. 1399
Cross by Ms. Littrell................ 1405
Redirect by Mr. Corrigan........... 1421
Recross by Ms. Littrell............. 1429

NICHOLAS CUNNINGHAM
Direct by Mr. Corrigan.............. 1432
Cross by Ms. Littrell................ 1446
Redirect by Mr. Corrigan........... 1457

AMANDA BENSON
Direct by Mr. Corrigan.............. 1463
Cross by Ms. Guttau................. 1867
Redirect by Mr. Corrigan........... 2056

CAPTAIN BRIAN GILES
Direct by Mr. Corrigan.............. 1810
Cross by Ms. Littrell................ 1823
Redirect by Mr. Corrigan........... 1859
Recross by Ms. Littrell............. 1864

** ** **

## Page 562

CITY EXHIBITS

EXHIBIT   DESCRIPTION

1   8/16/21 Memorandum and Order Denying
Plaintiff's Motion for Injunction by
Senior District Judge Richard G.
Kopf, United States District Court
for the District of Nebraska,
8/15/21

2   Declaration of Fire Chief David
Engler

3   Declaration of BC Michael Smith

4   Declaration of Captain Mahler

5   Declaration of FAO Matt Roberts

6   Declaration of FF Morgan Hurley

7   Declaration of FF Jason Love

8   Declaration of FF Stephen Dyer

9   Declaration of FF Trent Borchers

10   Statement of Curt Faust

11   8/19/21 Investigation Report into
4/26/21 Fire Incident by Attorney
Torrey Gerdes, Baylor Evnen Law Firm

12   Audio of Fire Department Radio
Recording of 4/26/21 Warehouse Fire

13   Transcript of Fire Department Radio
Recording of 4/26/21 Warehouse Fire

14   Declaration of Aishah Witte,
Authenticating Audio Transcript

15   Benson's 5/5/21 Complaint Regarding
the 4/26/21 Warehouse Fire

16   Warehouse Photographs

## Page 563

CITY EXHIBITS, CONT'D

EXHIBIT   DESCRIPTION

17   LFR Prime Report of Warehouse Fire

18   Benson's 6/9/21 Grievance

19   Benson's 6/11/21 Affidavit

20   Benson's 8/9/21 Affidavit

21   Media Articles

22   Benson's Interview Audio 7/14/21

23   8 of '21 Grievance Hearing RE:
June 9, 21 Grievance

24   9/24/21 Denial of 6/9/21 Grievance
Letter to Benson

25   9/27/21 Pre-Disciplinary Meeting
Notice Letter to Benson

26   Audio of 10/12/21 Pre-Disciplinary
Meeting

27   Transcript of 10/12/21 Meeting

28   10/19/21 Termination Letter

29   CBA, 8/20/20 to 8/31/21

30   CBA, 8/19/21 to 8/30/23

31   LFR Professional Code of
Ethics/Standard of Conduct Policy

32   LFR FF Safety Policy

33   LFR 2020 Annual Report

34   Captain Mahler's Awards

35   2017 Letter to Mahler

36   Terminal Building Fire Near-Miss
Report, 2/19/18

## Page 564

CITY EXHIBITS, CONT'D

EXHIBIT   DESCRIPTION

37   Chief Engler's Video Message

38   Healy Expert Report

39   Lincoln Municipal Code - Cause for
Disciplinary Action

40   Lincoln Municipal Code - Dismissal
and Grievance Procedure

41   Grievant's 11/3/21 Appeal E-mail

42   Documents Regarding LFR Discipline

43   Captain Mahler Notes for
Investigator Gerdes

44   Witte Investigation Correspondence

45   Witte Investigative File

46   Benson's Motion for Preliminary
Injunction

47   Benson's Brief ISO Preliminary
Injunction

48   Benson 2014 Complaint Retraction

49   Mahler Discipline Reversal

50   Management Policy

51   Victim Removal Presentation

** ** **

Page 565

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

100    CBA

101    4/27/2011 Suspension Notice

102    11/4/2014 Memo of BC Pashalek

103    Dispositional Memorandum of Kimberly Taylor-Riley
104    4/4/21 Complaint
105    E-mail of BC Curt Faust, 4/4/21
106    E-mail of BC Michael Smith, 4/7/21
107    E-mail of BC Curt Faust, 4/13/11
108    E-mail of Benson to Witte, 4/18/21
109    Transcript of Radio Traffic
110    LFR Incident Report, 4/26/21
111    E-mail from Benson to Faust & Witte, 5/5/21

112    E-mail from Benson to Witte, 5/13/21

113    Witte Investigation Summary

114    E-mail to Benson from Witte, 5/25/21

115    Transcript of Audio File

116    E-mail from Smith to Witte, 5/26/21

117    Investigation Summary

118    Grievance, 6/9/21

119    Benson Affidavit, 6/11/21

120    E-mail from Schrunk to Engler, 6/14/21

Page 566

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

121    E-mail from Kelly Brandon to Chris Connolly and Ms. Gerdes, 7/12/21
122    E-mail from Engler to Mahler, 7/1/21
123    Interview Audio Recording
124    Letter to Ms. Gerdes
125    Declaration of David Engler
126    Declaration of Michael Smith
127    Declaration of Matthew Roberts
128    Declaration of Morgan Hurley
129    Declaration of Trent Borchers
130    Declaration of Stephen Dyers
131    Declaration of Jason Love
132    Declaration of Shawn Mahler
133    Grievance Letter
134    Declaration of Edward Hadfield
135    Enhanced Fireground Safety, Effective Use of Division & Group Supervisors
136    Transcript of Grievance Hearing, 8/20/21

137    Letter of Chief Engler Denying Grievance, 9/24/21
138    Notice of Pre-disciplinary Action, 9/27/21

139    Transcript of Pre-disciplinary Hearing

Page 567

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

140    Termination Letter, 10/19/21

141    Underlying Confidential Correspondence Regarding Comparative Discipline

142    Disciplinary Action, 10/14/11 to 10/14/21
143    Performance Evaluations
144    Deposition of Shawn Mahler, 5/9/22
145    Awards and Recognitions
146    LFR Best Practices No. 2-Division/ Group Supervision

147    Daisy Brayton Investigation

148    Text Message exchange between Faust and Benson
149    Arbitration Award, RE:  Dan Duncan
150    Arbitration Award, RE: Jon Reed
151    E-mail from Corrigan to McDaniel, 11/3/21

152    E-mail, Benson to Witte, 4/22/21

153    E-mail, BC Smith, 4/22/21

154    Discipline Letter, 5/24/21

155    Discipline Letter, 6/6/22

156    Telephone Log Activity

156    E-mail from Mahler to Witte, 6/24/21

** ** **

Page 568

* All exhibits offered with objections to Union's 101, 102, 103, 147, 149, 150; and City Exhibits 20, 21, 38, 46, and 47

* Union Exhibit 149 was offered and received on page 142
* Union Exhibit 150 was offered on page 143 and received on page 144

* Union Exhibit 156, Telephone Log Activity, was marked on page 750
* City Exhibit 156, E-mail to Aishah from Mahler, was marked on page 1738

* City Exhibit 50 was marked on June 22nd, 2022, offered and received on page 571

** ** **

Page 569

1    (On June 22, 2022, at 9:07 a.m.,
2  the proceedings continued as follows:)
3    THE ARBITRATOR: Let's begin.
4    MS. LITTRELL: Good morning.
5  We're going to resume with Redirect of Mike Smith.
6    THE ARBITRATOR: Okay. All
7  right. Mr. Smith, you're still under oath.
8    THE WITNESS: Yes.
9    REDIRECT EXAMINATION
10  BY MS. LITTRELL:
11    Q   All right. Chief Smith, I'm going
12  to ask you to flip between a few different
13  documents here, so you've got the big binders in
14  front of you. First, that one that you've got
15  in your hand there, I'd like you to go to
16  Exhibit 146, this is Union 146, and can you tell
17  me what this document is?
18    A   It states here, "Lincoln Fire & Rescue
19  Best Practices."
20    Q   And is it "Best Practice 2,
21  Division/Group Supervision"?
22    A   Yes.
23    Q   I'd like you to turn to page 17 of
24  that exhibit, and the numbers are in the lower
25  right-hand corner.

Page 570

1    A   (Witness complied.)
2    Q   Under "Decision Points," I'd like you
3  to read into the record the sentence that starts
4  with "A Mayday," and read all the way, just the
5  first two sentences there.
6    A   "A Mayday can occur at any time during
7  the incident and every firefighter on scene is
8  encouraged to call for help any time he/she
9  perceives trouble. Additionally, crew members
10  and especially division/group supervisors should
11  be proactive in calling for a Mayday early if
12  accountability is lost, a collapse occurs, or a
13  firefighter becomes disoriented."
14    Q   So according to this Best Practice, is
15  a firefighter only to call Mayday if she
16  absolutely is certain that she's in a dire
17  situation, or does LFR encourage that she call
18  if she even perceives trouble?
19    A   We would encourage if they perceive
20  trouble.
21    Q   Is becoming disoriented trouble?
22    A   Yes.
23    Q   So now we're going to flip to City's
24  exhibits and what is marked R50, so, Exhibit 50.
25    A   Did you say 50?

Page 571

1    MS. LITTRELL: And Mr. Rutzick,
2  this is what was e-mailed this morning to you.
3    THE ARBITRATOR: All right.
4    MS. LITTRELL: And Mr. Corrigan
5  produced this document yesterday, but I
6  don't think it was offered, so I would offer
7  Exhibit 50.
8    MR. CORRIGAN: No objection.
9    THE ARBITRATOR: Received.
10    Q   (By Ms. Littrell) Mr. Smith, what is
11  Exhibit 50?
12    A   The Fire & Rescue Fireground RIT,
13  R-I-T, Management Policy, 855.02.
14    Q   And is this the Mayday and emergency
15  traffic --
16    A   Yes.
17    Q   -- policy?
18    A   Yes, correct.
19    Q   I'd like you to read, under
20  "Procedure" paragraph big 'I' "Mayday," just
21  what appears in that one sentence under
22  "Mayday"?
23    A   "Used for actual or potential peril to
24  firefighters and can be called by the person
25  affected or someone witnessing the event. A

Page 572

1  Mayday can be declared by anyone."
2    Q   And, so, again, is this policy, does
3  it require that there always be an actual
4  immediate, dire emergency to call the Mayday?
5    A   No.
6    Q   And are firefighters and all crew
7  members required to call, or encouraged to call,
8  if there's even the potential for peril?
9    A   Yes.
10    MR. CORRIGAN: I'm sorry, I'm
11  going to object to the form of the question.
12    MS. LITTRELL: Okay. I'll restate.
13    THE ARBITRATOR: All right.
14    Q   (By Ms. Littrell) Is a call notifying
15  the team that there is potential for peril a
16  Mayday call?
17    A   Can you repeat that?
18    Q   A firefighter can hit Mayday, can make
19  a Mayday call, if they perceive a potential for
20  peril; correct?
21    A   Correct, correct.
22    Q   And then, under that, there's a list
23  of examples of Mayday.
24    A   (Witness indicating.)
25    Q   And Number 5, will you read what

Page 641

1  firefighter on-scene, employee, for that matter,
2  whether you're on a medic unit, an engine, a
3  truck or a battalion chief, that is when you
4  assume command, so Truck 5 was the first one on
5  location, he assumed command. He might have
6  made Engine 5, gave them an assignment, and
7  then -- and, then, when I got there, I assumed
8  command from Truck 5 and he could join his crew.
9      Q   And so you became the incident
10  commander --
11     A   Correct.
12     Q   -- just a few seconds after you
13  arrived?
14     A   Correct.
15     Q   And did you remain incident commander
16  throughout the end of it?
17     A   I did not.
18     Q   When did your time as incident
19  commander end?
20     A   I would say, maybe -- it was into the
21  afternoon, four or six hours later.
22     Q   Okay. And was the fire still
23  smoldering then?
24     A   Yes.
25     Q   Somebody else took over, then?

Page 642

1      A   Yes, Chief Smith took over.
2      Q   What is your role as incident command?
3      A   That is when you develop a strategy
4  and you make assignments, you look at the
5  priorities that you need done, and who's going
6  to complete those assignments. That's your --
7  that's your basic role, you're calling for
8  more resources, like this one here was very
9  resource-intensive, we're going to be there
10  quite a while.
11     Q   And does the length of the fire, just
12  because it lasted a long time, did it make it
13  especially dangerous, or how would you
14  characterize that?
15     A   Not dangerous due to, like, a hostile
16  fire event, but I wouldn't even say dangerous
17  for a physical. At that time, it was a very
18  warm day, so, rotating crews without working
19  them too hard, that was -- that was the struggle
20  for the day was, was trying to maintain proper
21  workload, where you get the most out of your
22  crews, yet not work them too much, and then, on
23  the backside, trying to get other crews in, in
24  time to relieve them.
25     Q   So try and keep everybody rested,

Page 643

1  hydrated?
2      A   Right.
3      Q   Okay. So explain to me, then, when
4  you became incident command, like, where do you
5  locate yourself at the fire, and where do you
6  sit in conjunction to the warehouse and that
7  type of thing?
8      A   I located on this fire, there was two
9  overhead doors, we'll call that the Alpha side,
10  that's the south side, and I think that is in
11  between, right behind Truck 5 and right in front
12  of Engine 5, so I had a clear vantage point of
13  the south side of the structure.
14     Q   And you said two doors were open?
15     A   Two overhead doors.
16     Q   And could you see in the doors?
17     A   Yeah, I could see in both of them.
18  They were open all the way.
19     Q   What was on the opposite side? Were
20  there walk-through doors, if you recall?
21     A   I didn't learn that there was only
22  walk-in doors until later on in the fire. I
23  assumed there was an overhead door over there,
24  but there wasn't, it was just, basically, just
25  one exit door.

Page 644

1      Q   Okay. And how many overhead doors, if
2  you recall -- And, actually, let's turn to the
3  photos. So, if you want to grab the other
4  binder.
5          MS. GUTTAU:  So, sir, I'm going
6  to move to -- so, it would be the other black
7  binder -- City Exhibit 16.
8      Q   (By Ms. Guttau)  And 16 is some
9  photographs, if you want to flip back to those.
10  So we are on City Exhibit 16, and, first, I'd
11  ask to turn to page 3 of that, the aerial view,
12  so we're on the aerial view, page 3 of
13  Exhibit 16.
14     So as you're -- can you explain on here,
15  you said -- which side did you arrive at?
16     A   I came in off of 48th Street.
17     Q   Which is where, 'A,' 'B,' 'C,' 'D'?
18     A   'B'.
19     Q   And where did you set up your incident
20  command location?
21     A   That was on the Alpha side, not quite
22  halfway down, a third.
23     Q   And about how far from -- When you set
24  up incident command, where -- what are you --
25  are you sitting in a truck, or what are you

Page 649

1  turn your truck on, then the radio resets, so
2  you don't always hear that.  That's fairly
3  common.  And, then, early on, they called for a
4  second alarm, and that's about the time Truck 8
5  showed up, so I just kept them there because we
6  were going to have work to do.
7      Q   Okay.  Describe when you first got
8  there.  When you looked in the building, can you
9  describe the smoke conditions when you first
10  arrived?
11      A   Yeah, I had smoke coming out the open
12  overhead doors, and it was light brown smoke, it
13  was light brown in color, but I describe it as
14  it doesn't have a lot of energy, so it didn't
15  have the heat to come out to the atmosphere and
16  then go straight up, it was just kind of wafting
17  out the door, it didn't have a whole lot of
18  movement to it.
19      Q   And, so, for a non-firefighter and
20  lawyer that knows nothing about fires, what do
21  you mean "energy," like, can you describe that a
22  little more?
23      A   Hot air rises, so when you have fire,
24  or smoke that is pushed by fire and it's -- and
25  it's super heated, when that gets to an area

Page 650

1  where it can rise up, it'll go up at a high rate
2  of speed.
3      Q   And you didn't observe that here?
4      A   We did not have that here.
5      Q   When Ms. Benson arrived, do you know
6  who was on her crew?
7      A   Yeah, it would have been Matt Roberts
8  and Morgan Hurley.
9      Q   And, to your knowledge, was Matt
10  Roberts an experienced firefighter?
11      A   Yes.
12      Q   Describe his skill level, is he -- how
13  is he as a firefighter?
14      A   He was (sic) a very good firefighter.
15  He was on Engine 1, which was busy, and then
16  Engine 3, which is also very busy, they get the
17  bulk of our fires.  He had (sic) a lot of
18  experience.  And, then, as a driver, he was
19  (sic) one of the best that I've had.
20      Q   Uh-huh.  And he told us, he testified
21  earlier, he was FAO; correct?
22      A   Yes.
23      Q   And that usually FAOs stay outside the
24  building in a lot of fires; is that correct?
25      A   That's correct.

Page 651

1      Q   However, in this fire, in this
2  warehouse fire, he went -- he was in the
3  building with his crew; correct?
4      A   Correct.
5      Q   Okay.  Do you know why that was?
6      A   Yeah, he, he -- since Amanda was
7  acting captain and had a recruit, I think Matt
8  took it upon himself, what he told me, he took
9  it upon himself to go in and just help out.
10      Q   Yep.  And do you know Morgan Hurley?
11      A   Yes.
12      Q   And I know she's fairly new.  Is she a
13  good firefighter, though?
14      A   Yeah, comparable with a recruit at the
15  time, she had a lot of, you know, natural skills
16  and ability, and she did a good job.
17      Q   As acting captain, was Benson
18  responsible for her T1 truck crew safety?
19      A   Yes.
20      Q   Do you know who was on Captain
21  Mahler's crew?
22      A   Yes, Jason Love, Trent Borchers, and,
23  I believe, Steve Dyer was also there --
24      Q   Okay.
25      A   -- assigned to Truck 8.

Page 652

1      Q   And they arrived a little bit after
2  Truck 1; correct?
3      A   Correct.
4      Q   Okay.  And you said earlier, Captain
5  Mahler, is a good firefighter, has good
6  firefighting skills?
7      A   Yes.
8      Q   Have you ever seen Captain Mahler
9  endanger anyone at a fire?
10      A   No.
11      Q   Do you believe he would ever do that?
12      A   No.
13      Q   Have you listened to the recordings
14  since the fire?
15      A   Yes.
16      Q   Okay.  When was -- when did you first
17  listen to it after this all, kind of -- the
18  fire, when was the first time you listened
19  to it?
20      A   I don't have an exact date, but it
21  would be the middle to the end of May.
22      Q   Okay.  When you arrived, could you
23  see, when you were looking in the doors on the
24  Alpha side, could you see firefighters inside?
25      A   Yes.

Page 657

1    he has, but it compresses it down, so there's,
2    you know, it eliminates the gaps, for size.
3        Q    So it may not be a real-time, it
4    eliminates the waiting gaps in between?
5        A    Correct.
6        Q    Okay.  So as the transcript is
7    written, it's not like these conversations are
8    going on constantly, in one, long flow?
9        A    Correct, it's broken.
10       Q    Okay.  All right.  And that would be
11   reflected in the original audio that might show
12   that, or have time-stamps?
13       A    Time-stamps, yeah.
14       Q    Okay.  Thank you.  So you assign
15   Mahler's crew, you said, to -- first, to what,
16   utilities?
17       A    Utilities.
18       Q    What's that mean?
19       A    Control the electricity.  We had water
20   flowing on a compactor, high electricity, high
21   hazard.
22       Q    Okay.  You wanted to make sure nobody
23   got shocked?
24       A    Yep.
25       Q    Were the sprinklers going in the

Page 658

1    warehouse?
2        A    Yes.
3        Q    Did Mahler complete, or report back on
4    utilities, if you recall?
5        A    Yeah, there was several back and
6    forth, because we had management there, their
7    maintenance, so we got Truck 8 into the correct
8    door, the location, but, yeah, he reported back.
9        Q    Okay.  And, then, what assignment did
10   you give Truck 8 next?
11       A    I believe it was to open up some
12   overhead doors, ventilation.
13       Q    Okay.  Tell me what -- ventilation,
14   some of these terms sound kind of fancy, but can
15   ventilation just be opening up a door?
16       A    Yeah, that's -- ventilation can be
17   opening up a door, cutting a hole in the roof,
18   or taking a window.
19       Q    We'll also hear -- or talk about
20   people being assigned fire attack, what's that
21   mean?
22       A    Fire attack is advancing a hose line
23   to the seed of the fire.
24       Q    Okay.  So you assigned Truck 8, then,
25   to open an overhead door?

Page 659

1        A    Correct.
2        Q    Okay.  So, let's talk about, let's
3    look at that on -- if you want to turn to -- so
4    it's going to be pages we'll call sheets here,
5    so it's going to be on sheet number -- let me
6    find it here.  Sheet number 3, and it's going to
7    be depo -- or transcript page 9.
8        A    Okay.  I've got 3 of 16, is that what
9    you're looking at?
10       Q    That's correct.
11       A    Okay.
12       Q    So, in the top left quadrant is page 9
13   of the transcript, and it states there, Mahler
14   says, "Truck 8 to Command, you've got heavier
15   smoke conditions to the west end of the
16   building, west end of the building," and what do
17   you say?
18       A    "Clear."
19       Q    And then Benson says, "Truck 1 to
20   Command, we're going to need some sort of
21   ventilation in here."  So she's in there at that
22   time?
23       A    Yes.
24       Q    Okay.  And what do you respond?
25       A    I said "clear," and then reassigned

Page 660

1    Truck 8 to ventilation.
2        Q    Okay.  "Command to Truck 8, I'm going
3    to reassign you to ventilation"?
4        A    Correct.
5        Q    And then Wright, who is Wright, I
6    guess, in the next entry?
7        A    Mike Wright, he's the captain of
8    Truck 5 C shift.
9        Q    And "Truck 5 to Command," he says, "If
10   we can get a door on the Charlie side open, in
11   close proximity of the fire, that would be
12   good," and you respond how?
13       A    I asked, "Truck 8, can you make that
14   happen?"
15       Q    And Mahler responds, "Truck 8 is par 3
16   interior."  What's that mean?
17       A    That means he is inside the building,
18   but I also knew that he was inside the
19   electrical room, not inside the fire room.
20       Q    Okay.  He was in the smaller
21   electrical room?
22       A    Correct.
23       Q    And he'll say, he goes, "We'll be
24   delayed to get the roof -- to the roof, or
25   whatever you need for vent."  And you respond?

Page 661

1    A   "Truck 8, repeat, you got electrical
2   shut off."
3    Q   And then he confirms electrical is
4   off?
5    A   Correct.
6    Q   And then it says -- You say, after
7   that, what do you say?  And it goes -- I'll tell
8   you, it goes over, then, to 10 is on the right
9   side, at the top there.
10    A   I ask Truck 8 if he can get a door
11   open.
12    Q   Okay.  "Can you get a door open?"  And
13   then Benson says, "Truck 1 to Command, would you
14   like us to assist with ventilation"; is that
15   correct?
16    A   Correct.
17    Q   And how do you respond?
18    A   "Yeah, if you can -- if you can
19   hook up with Truck 8, you can assist with
20   ventilation, getting one of the doors open."
21    Q   And she responds, "Clear"?
22    A   "Clear."
23    Q   Okay.  And, so, in doing that, in her
24   asking to assist with something, do you know if
25   she completed the extension task that you'd

Page 662

1   given her at that time?
2    A   I don't recall if I had enough
3   information where I didn't need that anymore or
4   if she reported back.
5    Q   Okay.  Do you know if it's recorded in
6   here that she had completed that?
7    A   I don't know that.
8    Q   Okay.  If she had, should she report
9   that to you --
10    A   Yes.
11    Q   -- on the -- on the recording?
12    A   Yeah, yeah.
13    Q   Okay.  When, when you assigned,
14   earlier, on page 9, when you assigned Mahler to
15   ventilation, reassigned to ventilation, did that
16   make him a group supervisor over anybody else
17   doing ventilation?
18    A   No.
19    Q   In fact, had group -- had Truck -- or
20   E5 -- or Truck 5 been doing ventilation first?
21    A   Truck 5 was working on ventilation
22   also.
23    Q   And who was that captain?
24    A   Mike Wright.
25    Q   Okay.  And, so, when you assigned --

Page 663

1   When you reassigned Mahler to ventilation, even
2   though Truck 5 had already been assigned to it,
3   then, was Mike Wright the group supervisor over
4   ventilation?
5    A   No.
6    Q   Okay.  Was Captain Mahler ever
7   reporting to Mike Wright as a result of that
8   assignment?
9    A   No.
10    Q   And so, then, you -- On page 10,
11   Benson asked to assist with ventilation;
12   correct?
13    A   Correct.
14    Q   And you say, "Yes, you can assist with
15   ventilation."  What is "assist with"?
16    A   Assist means you're doing the same
17   task, but separate, so Truck 8 was on the
18   Charlie side, Truck 1 was on the Alpha side,
19   interior, but we did an overhead door, there's
20   several overhead doors to be opened.  Truck 8
21   initially was Charlie side, north side, to open
22   a door over there, and, then, either Amanda
23   would be on the south side with Truck 1 --
24    Q   Okay.
25    A   -- to try to get some doors open, or

Page 664

1   the possibility could be she could go to the
2   Charlie side and open up.  There's no set
3   assignment of where Truck 1 could operate, or
4   Truck 8, for that matter.
5    Q   Okay.  What kind of doors were on the
6   Charlie side?
7    A   Well, myself and Truck 5 were both
8   hoping for, since we didn't see it, we were
9   hoping for an overhead door, and that could
10   allow a clear path to just go straight through,
11   but what we had was just a walk-in door.
12    Q   Okay.  And, so, when you say -- you
13   said, yes, you can assist with ventilation
14   getting one of those doors open, did you then
15   make -- did that wording make Captain Mahler the
16   group supervisor of ventilation?
17    A   No.
18    Q   Did it make him the supervisor over
19   Truck 1 and Benson?
20    A   No.
21    Q   If Truck 5 was actually the first one
22   assigned to ventilation, then, logically,
23   would -- does that mean that if, if the "assist
24   with," does that mean that Truck 5 was the group
25   supervisor, then, over Benson?

Page 673

1          THE ARBITRATOR:  I did not.  Say
2    it again.  Go ahead.
3          MR. CORRIGAN:  Did you hear the
4    question?
5          MS. GUTTAU:  Did you hear the
6    question?
7          THE ARBITRATOR:  No, I didn't
8    hear the question.  I'm sorry.
9          MS. GUTTAU:  No, that's fine.  I
10   forgot how I stated it, do you want -- Let me
11   try restating it.
12         THE ARBITRATOR:  Thank you.
13   Q    (By Ms. Guttau)  If, if somebody -- If
14   a firefighter -- strike that.
15      If Benson did not notify Mahler that she
16   was leaving, would that suggest to you, in your
17   experience, that she was not treating him as her
18   supervisor?
19   A    I would agree with that.
20   Q    Did anybody -- We talked about Chief
21   Smith.  Did anybody else raise any safety
22   concerns to you, during the warehouse fire,
23   while Benson and Mahler were present at the
24   fire?
25   A    No.

Page 674

1    Q    Okay.  Did Benson come talk to you
2    during or after the fire?
3    A    Yes.
4    Q    Okay.  Did she ever -- Was it during
5    or --
6    A    It was during the fire, and it was --
7    I believe she was assigned to rehab, and then
8    close to being returned to service.
9    Q    Okay.  What's "rehab" mean?
10   A    Get some water, take your gear off,
11   cool down.
12   Q    And what is return to service?
13   A    Returning to quarters.
14   Q    Have some rest?
15   A    Yeah, you're leaving the fire scene.
16   Q    Okay.  Do you know about what time
17   period -- Did you talk to her about that after
18   they exited the second time?
19   A    Yeah, I would say that Truck 1
20   probably was after their second SCBA bottle,
21   their air, and so it was late, later into the
22   fire.
23   Q    Okay.  So it might have been after
24   they exited the third time?
25   A    Correct.

Page 675

1    Q    Either way, does she report to you
2    that Captain Mahler had endangered her?
3    A    No.
4    Q    Did she report to you having any
5    issues exiting the structure?
6    A    The only issue that -- Nothing for
7    exiting the structure.  The only issue that was
8    reported is Shawn wouldn't, wouldn't talk to
9    her, and then she had to track him down, that
10   was the only issue reported.
11   Q    Okay.  Did she indicate to you --
12         MS. GUTTAU:  Oh, yep.
13         THE ARBITRATOR:  Hold on.  When
14   did she -- when did she talk to you about saying
15   he wouldn't talk to her?
16   Q    (By Ms. Guttau)  When did she tell you
17   that?
18   A    That was -- I was inside the fire car,
19   and that was after her second tank, so we're
20   probably an hour and a half into this, I think
21   it was right before Truck 1 was returning to
22   service.
23         MR. CORRIGAN:  Just to clarify,
24   when you say "return to service," do you mean --
25         MS. GUTTAU:  Back to the station.

Page 676

1          MR. CORRIGAN:  -- going back to
2    the station?
3          THE WITNESS:  Back to Station 1.
4          MR. CORRIGAN:  I'm sorry to
5    interrupt.
6          MS. GUTTAU:  No, nope, that's
7    fine.
8          THE ARBITRATOR:  So you're
9    saying -- hold on.  During the event, when I say
10   "the event," the fire event, she did tell you
11   that Mahler did not speak with her; is that
12   correct?
13         THE WITNESS:  The only -- the
14   only thing that was brought up on the fireground
15   is, Amanda and I were talking, and kind of a
16   little bit of a smile on her face, and she said,
17   I couldn't get him to talk to me.  So it's,
18   like, well, what do you mean, and I responded
19   back that, well, when he was coming in, you
20   know, he's going to work, so it's not a real
21   chatty environment.  And, at that point, she
22   said that she said something to Shawn and he
23   kept walking, so then she had to take a -- kind
24   of catch up to him, and then he replied back of
25   closing overhead doors, or he responded before

Page 677

1   he went in, Mahler responded before he entered.
2        THE ARBITRATOR:  Okay.  And was
3   she telling you this on the radio or was she
4   talking to you person-to-person?
5        THE WITNESS:  This was
6   face-to-face, I was inside the fire car
7   and Amanda still had her gear on, and I
8   believe the rest of the crew was in rehab,
9   and then she was getting ready to put her gear
10  back, gather tools, and return to service.  So
11  she was standing outside the, the pickup door.
12       THE ARBITRATOR:  Okay.  Thank you.
13       MS. GUTTAU:  Thank you.
14   Q   (By Ms. Guttau)  Before that, so at
15  least we know that they've been in and out a
16  second time, at least, when you had this
17  conversation?
18   A   Correct.
19   Q   So had she exited -- she, Truck 1,
20  exited, at that point, even before Truck 8?
21   A   They did, but I was not aware that she
22  was in there and then followed Truck 8 back in.
23   Q   Okay.  And, then, when they exited,
24  though, after that, do you know if Truck -- do
25  you recall if Truck -- Benson and Truck 1 exited

Page 678

1   first?
2    A   Yes, Truck 1 came out because they had
3   a low air alarm for Matt Roberts.
4    Q   And Truck 8 and crew was still inside?
5    A   Correct.
6    Q   Okay.  And did you observe at all, the
7   second time she exited -- Did you observe that,
8   Truck 1 exit the second time?
9    A   I, I can't say if I saw her come out
10  or noticed it, or --
11   Q   Okay.  That's fine.
12       Nobody notified you of any issues
13  regarding difficulty exiting the building?
14   A   No, no.
15   Q   Did they, at any time during that
16  fire, while Benson and Mahler were there?
17   A   No.
18   Q   Were you ever made aware of
19  conditions -- You're aware that Ms. Benson has
20  alleged that Mahler abandoned her in the
21  warehouse in dangerous conditions that could
22  have killed or injured her?
23   A   Yes.
24   Q   Were you aware of any conditions, at
25  any time while they were there, that were

Page 679

1   serious enough to have killed or injured
2   anybody?
3    A   No.
4    Q   And nobody raised any safety concerns
5   to that effect to you during that fire while
6   they were there?
7    A   No.
8    Q   And when I say "they," I mean Mahler
9   and Benson; do you understand that?
10   A   Correct, yeah.
11   Q   So you have this conversation before
12  she goes back to return to service, which means
13  go back to the station for rest?
14   A   Correct.
15   Q   Did not mention that her life was in
16  danger?
17   A   There was no mention of that.
18   Q   Would you expect, as incident
19  commander, for that to be reported to you?
20   A   Yes, either me or Chief Smith, one of
21  us for sure.
22   Q   Okay.  And you said Chief Smith never
23  reported anything like that to you?
24   A   No.
25   Q   When was the first time, then, that

Page 680

1   you learned that Ms. Benson was claiming that
2   Shawn Mahler abandoned her in a dangerous
3   warehouse in which she could have died or been
4   injured?
5    A   I don't have an exact date I can come
6   up with, offhand.  There was some communication,
7   but I -- I was aware that Shawn didn't talk to
8   her, but when you use the term "abandon," you
9   know, injured and killed, that was -- that was
10  much later on, that was prior to the next set, I
11  think is when it was.
12   Q   Okay.  So that was never initially --
13  those words were never --
14   A   No.
15   Q   -- reported to you --
16   A   No.
17   Q   -- by her?
18   A   No.
19   Q   Okay.  So let's talk about when she
20  returns to the station, that's Station 1;
21  correct?
22   A   Correct.
23   Q   As acting -- Do you know when you went
24  back to Station 1 that evening?
25   A   I left the fire scene and went

Page 681

1   straight to Station 1. It was still daylight
2   out, it was 8, 9 o'clock at night.
3       Q   And do you know if she was there at
4   the same time?
5       A   Yeah, I believe they had all their --
6   they were all cleaned up and put back in
7   service, ready to go on another call.
8       Q   How late were you there that evening,
9   if you recall, approximately?
10      A   I'd have to look, but it was
11  8, 9 o'clock, somewhere around there.
12      Q   Okay. And did their -- Benson and
13  Truck 1 shift would end the next morning at 7?
14      A   Correct.
15      Q   And so when you got back to the
16  station, did Ms. Benson ever report to you that
17  Mahler had abandoned her in dangerous
18  conditions?
19      A   No.
20      Q   Okay. Never reported that her life
21  was in danger?
22      A   No.
23      Q   When did she first report that he --
24  When did she first raise a complaint, then, to
25  you about it?

Page 682

1       A   I believe that was when I received an
2   e-mail, that might have been the Wednesday of
3   the following set.
4       Q   Backing up a minute. Based on your
5   role as incident commander, and after listening
6   to the recording and being present at the fire,
7   do you believe Ms. Benson's accusation that
8   Captain Mahler abandoned her and her crew in a
9   dangerous warehouse that could have killed or
10  injured them, do you believe that's a false
11  accusation?
12      A   Yes.
13      Q   So then we talk about she submitted
14  a -- or talked to you about a complaint. Do you
15  know if she called you first?
16      A   We talked about -- So it kind of -- it
17  kind of changed from the warehouse, so, that
18  night, after -- it was Battalion 1's office, it
19  was brought up that she couldn't talk to Shawn,
20  but this injured or killed comment and the
21  seriousness changed from that conversation to
22  Kelly days, and then it was safety injunction
23  and --
24      Q   So when you say Kelly days, so it was
25  about a week later was the first time that it

Page 683

1   had escalated?
2       A   Correct.
3       Q   Okay. So, let's turn to R10 -- one
4   second. I want to look at, first, R --
5           THE ARBITRATOR: Where are you?
6           MS. GUTTAU: One second, I'm
7   trying to find the right number. That one I
8   didn't write down.
9           THE ARBITRATOR: Okay.
10          MS. GUTTAU: Okay. So I want to
11  look, first, at Exhibit 15. I'm going to be on
12  Exhibit 15.
13          THE ARBITRATOR: That's your
14  exhibit; correct?
15          MS. GUTTAU: Yes, City Exhibit R15.
16          THE ARBITRATOR: Got it.
17          MR. CORRIGAN: Is the Prime
18  report?
19          MS. GUTTAU: No, it's her
20  complaint of May 5th.
21      Q   (By Ms. Guttau) Do you know what
22  Exhibit 15 is?
23      A   Yeah.
24      Q   Okay. What is that?
25      A   That is her documentation of the

Page 684

1   cardboard fire.
2       Q   Did you have a conversation with her,
3   before that, about the fire?
4       A   Yeah.
5       Q   Okay. And tell me about that
6   conversation, what you recall.
7       A   I believe there was some text messages
8   over Kelly days on that, but this was in
9   Battalion 1's office, probably the night of --
10  the evening of the fire, and, you know, that --
11  it was brought up that she had a lawsuit against
12  Mahler, and, then, you know, that was her
13  concern, going way back to the start of the
14  lawsuit that there was, Shawn was going to hurt
15  her at a fire, so that is, you know, she always
16  had that concern, going back to 2016.
17      Q   And she told you that?
18      A   She told me that, yeah.
19      Q   Okay. And what else do you recall
20  about that conversation?
21      A   We talked a little bit -- Well, we
22  talked about the fire conditions there. It
23  seemed to be, like -- (unintelligible) --
24          THE COURT REPORTER: Say that
25  again.

Page 789

1   of 2021, where she had been at the lake and
2   showed up at the fire station after that.  Do
3   you have any idea what I'm talking about?
4       A   Yes.
5       Q   What do you know about that?  What
6   happened?
7       A   It was Morgan Hurley and Karen Kelsey
8   were the two.  I think they were on probation or
9   new -- or just right off probation.  They parked
10  at Station 1, they went out and went boating for
11  the day, and then picked up their cars, whenever
12  it was, 7-ish at night.  And then Amanda
13  reported to me that she could smell alcohol, and
14  this all happened at the table downstairs on the
15  app floor at Station 1, and I was down there for
16  part of that, and I did not see any signs of
17  alcohol by either one of those two.
18      Q   Did Amanda make a complaint to you
19  about it?
20      A   Yeah.
21      Q   In what form?
22      A   That it was wrong that those two were
23  coming in, and intoxicated, and, and there
24  was -- just that they came in to talk to Matt
25  Woitalewicz.

Page 790

1       Q   And did she, like, send you an e-mail
2   complaining about it, or how did you become
3   aware of it?
4       A   No, there was -- I don't think there
5   was an e-mail on that one.
6       Q   She verbally talked to you about it?
7       A   Yeah, she didn't like that, that
8   Morgan came in and was drinking.
9       Q   So -- And did you confront Morgan
10  about it and tell her that Amanda had made a
11  complaint against her?
12      A   I don't know if I used the word
13  "complaint," but I asked for Morgan to -- and
14  others -- to document that event before it got
15  too far away.
16      Q   Did you talk to Morgan about it?
17      A   Yeah, I believe I talked to her in
18  person to send me something by e-mail.
19      Q   Did she do that?
20      A   Yeah.
21      Q   And she denied having consumed
22  alcohol, or been intoxicated?
23      A   She denied -- well, yeah.  Then even
24  put in there that both of them drove home.  And
25  I asked others for documentation on that as

Page 791

1   well.
2       Q   Did they give it to you?
3       A   Yeah.
4       Q   But Amanda didn't put any -- anything
5   in writing to you saying that I -- I'm
6   complaining there was misconduct by another
7   firefighter, did she?
8       A   I, I don't think I received anything
9   in writing, I -- I don't remember reviewing any
10  of this, anything that came up, either.
11      Q   So you asked Hurley to document it.
12  Was there anybody else that you asked to
13  document it, that you can recall?
14      A   I know I asked Cole Henn.  And I, I
15  don't remember if, if Mark Majors, if he had any
16  documentation on that or not.
17      Q   What about Woitalewicz?
18      A   I don't think I asked Woitalewicz to
19  document anything either.
20      Q   Did you tell Benson to document it?
21      A   No, I was confident that this was
22  going to be documented without telling her to
23  document it.
24      Q   Did she mention anything about any
25  animosity towards Ms. Hurley at the time,

Page 792

1   meaning Ms. Benson?
2       A   Say that again.
3       Q   Did Ms. Benson say that she had any
4   animosity against Ms. Hurley at that point in
5   time?
6       A   No.
7       Q   And there was some discussion about,
8   in your report in Exhibit 10, about the -- using
9   the term "assist with" would not connote placing
10  under supervision; do you remember that?
11      A   Yes.
12      Q   Either before this fire in April
13  of 2021, or after that -- thereafter, did
14  you ever receive any communication from the
15  fire department that they wanted people
16  to discontinue using this term in -- on
17  firegrounds?
18      A   Yeah, Chief Engler addressed it, that
19  we need to go away from using the word "assist."
20  And, then, I believe that word is still in the
21  policy right now, and so it's still being used
22  today, so we haven't -- I don't know if there's,
23  really, another word that we could use, because
24  we've been using it for so long, for assist,
25  it's, like, "assist" means "assist," so that's

Page 805

1  witnessed her always performing at a high level;
2  right?
3      A   Correct.
4      Q   You wrote, (as read), When Amanda
5  assigned -- is assigned a task, I have
6  confidence that she will get it done and that it
7  will be done on time or early.
8      A   That's correct.
9      Q   And she got an overall ranking of 94
10 out of 100; right?
11     A   Correct.
12     Q   And her pay increase was approved?
13     A   I don't know if this was a merit raise
14 or not, but it would have been approved if it was.
15     Q   Well, do you see -- if look at the pay
16 action box below your signature --
17     A   Okay.
18     Q   -- and it says, pay increase approved,
19 and that's checked?
20     A   Correct.
21     Q   And that was just a few days -- 12
22 days after she had told you in an e-mail that
23 she felt like she'd been abandoned by Mr. Mahler
24 at a fire?
25     A   Correct.

Page 806

1          MR. CORRIGAN:  I don't have any
2  other questions.
3          MS. GUTTAU:  May I proceed with
4  Redirect?
5          THE ARBITRATOR:  Yep.
6          MS. GUTTAU:  Okay.  Thank you.
7          THE ARBITRATOR:  Go ahead.
8          MS. GUTTAU:  Thank you.
9          REDIRECT EXAMINATION
10 BY MS. GUTTAU:
11     Q   Chief, I want to start first, you were
12 asking a few follow-up questions about -- or
13 questions about Morgan Hurley, and Ms. Benson's
14 accusation that she was at the fire station,
15 intoxicated; do you recall that?
16     A   Yes.
17     Q   Okay.  Is that the kind -- And
18 Ms. Benson did make that allegation against
19 Hurley to you; right?
20     A   Yes.
21     Q   Is that the kind of allegation that
22 can be especially harmful for a probationary or
23 new firefighter?
24     A   Very much so, yes.
25     Q   Can it be career-ending?

Page 807

1      A   Yes.
2      Q   And after talking to everybody else,
3  or receiving information, and based on your
4  knowledge, concluded that accusation to be
5  untrue?
6      A   That was untrue.
7      Q   And Morgan was not intoxicated at the
8  station?
9      A   No.
10     Q   You mentioned to -- Mr. Corrigan asked
11 you "assist with," you were talking about the
12 term "assist with," and you said it's still used
13 today?
14     A   Yes.
15     Q   Just used yesterday, you said?
16     A   Correct.
17     Q   Do you know of anyone else, in all of
18 your years, who believed that the term "assist
19 with" created a group supervisor?
20     A   No one.
21     Q   Has anyone else, to your knowledge,
22 been confused by that term as to who (sic) the
23 group supervisor was?
24     A   No.
25     Q   If Ms. Benson is claiming she was

Page 808

1  abandoned in such danger that could have killed
2  or harmed her or her crew, that's a Mayday
3  situation; right?
4      A   Yes.
5      Q   So, if she didn't do that in such
6  perilous danger, does that suggest to you that
7  it was not as dangerous as she's claiming now?
8      A   Correct.
9      Q   And the fact that it was not as
10 dangerous as she's claiming now, that matches
11 your recollection of the fire, too; right?
12     A   That's correct.
13     Q   It was not a life-and-death fire, was
14 it?
15     A   No, that was -- no.
16     Q   Just to clarify, when she came out the
17 second time, and I think you said she talked to
18 you at your window?
19     A   Yes.
20     Q   And that's when you're incident
21 command and sitting in the truck?
22     A   Correct.
23     Q   And, tell me, again, what you recall
24 she said.
25     A   That was when she described to me that

Page 809

1   there was, like, the, in-passing, the quick
2   conversation, and then Mahler -- she said -- she
3   said, he wouldn't talk to me.  But, you know, in
4   reading her body language, and what she was
5   telling me, is kind of a little bit of a smirk,
6   or a smile, like, shaking-her-head-type deal,
7   like, he wouldn't talk to me.
8       Q   Not like she was scared?
9       A   No, no.
10      Q   Did she seem almost happy to you that
11  he didn't talk to her?
12      A   I don't -- wouldn't use the word
13  "happy" or not, but it was, like, you put your
14  shoulders up in the air and shake your head and
15  go (indicating), you know, wouldn't talk to me.
16      Q   Didn't seem alarmed by it?
17      A   No, there was no -- no.
18      Q   Were you ever asked to talk to Shawn
19  Mahler about the complaint that Amanda made on
20  May 5th?
21      A   No.
22      Q   That's not your role --
23      A   No.
24      Q   -- at that time, was it?
25      A   No.

Page 810

1       Q   And you can't undertake investigations
2   unless you're assigned that by the chief?
3       A   Correct.
4       Q   When -- Jumping around a little bit,
5   but back when Ms. Benson and -- when T1 and T8
6   are in the fire, the second time that T1 had
7   gone in, the rest of T8 was in there, too;
8   right?  Borchers and Dyer, at least?
9       A   Borchers and Dyer.  Love, I don't
10  think Love ever made entry --
11      Q   Okay.
12      A   -- other than the utility room, or
13  mechanical room.
14      Q   Okay.  And at that time she's alleged
15  she was abandoned, were there other people in
16  that fire?
17      A   Yes, everybody -- it was a room, just
18  say it was, roughly, this size, so there was
19  16 people working in that area around the trash
20  compactor fire.
21      Q   In the area where she was?
22      A   Yes.
23      Q   And they were all still in there when
24  she left before them?
25      A   Correct.  Several crews.

Page 811

1       Q   Several crews were in there?
2       A   Yes.
3       Q   Can you approximate how many people
4   that would be?
5       A   I would say, at that time, there was
6   probably, you know, 12 to maybe -- just say,
7   roughly, 12 people.
8       Q   You're not friends with Mahler, are
9   you?
10      A   Not -- we don't, like, hang out on our
11  day off.  I'm not real good friends with him, no.
12      Q   Fair characterization that you were
13  better friends with Benson than Captain Mahler
14  in 2021?
15      A   That's correct.
16      Q   Felt like you had a good relationship
17  with her?
18      A   Yes.
19      Q   Just saw you gave her good reviews?
20      A   I -- my daughter was dog-sitting for
21  her.  We were texting on our day off.  My
22  daughter does not dog-sit for Shawn.  It's -- we
23  had -- we had a pretty good working relationship
24  is the way I would describe it.
25      Q   Does that make it even harder to come

Page 812

1   here today?
2       A   Yes, it does.  Yes.
3       Q   And are you being truthful, though,
4   for the Arbitrator?
5       A   Yes.
6       Q   So we're not just talking about --
7   Amanda Benson didn't just accuse Shawn Mahler of
8   not talking to her, she accused him of not
9   talking to her, abandoning her in a warehouse
10  that was a dangerous warehouse fire that was
11  threatening to her life; correct?
12      A   That is correct.  And her crew.  So
13  two other people is the way I -- is the way I
14  understand this, a total of three.
15      Q   Okay.  And, so, when you take it that
16  far, and abandoning in a dangerous, deadly
17  condition, that's a serious accusation?
18      A   Very serious.
19      Q   How would you have felt if that
20  accusation had been made against you?
21      A   If I would have been in Truck 8's
22  position?
23      Q   Yeah.
24      A   I, I would have been very confused how
25  you could even make that accusation, based on

Page 965

1    Q   (By Ms. Guttau)  And I can point it
2  out to you, if you--
3    A   (Witness reading.)  Yes, I have found
4  it.
5    Q   Okay.  So T5 reports "T5 was then
6  assigned ventilation to approve conditions for
7  equipment operators to start moving the
8  cardboard pile outside.  T5 then reentered the
9  building to find improved visibility with
10  lingering smoke.  T5 worked to improve
11  conditions with controlling some doors and
12  utilizing negative pressure."
13       Did I read that correctly?
14    A   Yes.
15    Q   Okay.  And so earlier when we had
16  talked about Truck 5, this -- their report
17  indicates that they were also assigned and did
18  perform the task of ventilation; correct?
19    A   Yes, that's correct.
20    Q   Okay.  And so if they were the first
21  ones to be assigned ventilation, would it be
22  reasonable or possible to assume that they were
23  actually the vent group supervisor?
24    A   No, ma'am.
25    Q   Or the supervisor over ventilations

Page 966

1  tasks?
2    A   It would be reasonable to assume that
3  they were the initial primary ventilation task,
4  yes.
5    Q   Okay.
6    A   But not a vent group supervisor
7  because that was not assigned to them.
8    Q   How about a vent supervisor or
9  supervisor over that task?
10    A   The supervisor over that task, yes,
11  ma'am.
12    Q   So that would be reasonable to assume
13  that they were that because you had testified
14  earlier --
15    A   Yes, ma'am.
16    Q   -- the first one assigned is that.
17    A   Yes, ma'am.
18    Q   Okay.  And just to make sure I'm
19  correct, it is -- it's important to report
20  safety concerns as soon -- as quickly as
21  possible?
22    A   Yes, ma'am.
23    Q   You, you said that it may be
24  reasonable for Ms. Benson to have complained
25  that Captain Mahler ignored her; correct?

Page 967

1    A   I'm sorry.  One more time, ma'am.
2    Q   You testified earlier that it might
3  have been reasonable for Captain Mahler to -- or
4  for Captain Benson to complain if Captain Mahler
5  ignored her?
6    A   It would be reasonable, yes.
7    Q   But you're not offering an opinion as
8  to whether or not it was reasonable for her to
9  publicly accuse him of abandoning her to die?
10    A   No, ma'am.
11    Q   Okay.  Ope, sorry.  I should have had
12  you keep that book.
13    A   Sorry.
14    Q   More weightlifting.  I want to turn to
15  Exhibit 19.
16    A   (Witness complies.)
17    Q   And, actually, before I get to that,
18  would you agree -- Is it a serious accusation
19  for a firefighter to accuse a fellow firefighter
20  of putting their life in danger?
21    A   Yes.
22    Q   I want to turn, then, to Exhibit 19,
23  and I want to turn to page 2, No. 8.
24    A   (Witness complies.)
25    Q   And this -- And I'll -- You recognize

Page 968

1  this as Ms. Benson's sworn affidavit in federal
2  court?
3    A   Yes.
4    Q   Okay.  And you've seen this before?
5    A   I recall seeing it, yes.
6    Q   This is what I could not find earlier
7  when we were talking about this.
8       In No. 8, she states in the second
9  sentence, "Mahler was in charge of a separate
10  team and also served as the group supervisor."
11  That's not correct, is it?
12    A   Ma'am, I apologize.  That's not what
13  -- That's not what I have.  I have --
14    Q   Exhibit --
15    A   -- page 2 --
16    Q   Yep.
17    Q   Exhibit --
18    Q   Number 8 right there (indicating).
19    A   "My" --
20    Q   Right there (indicating).  Second
21  sentence.
22    A   Okay.  I'm sorry.
23    Q   Yep.  The second sentence says,
24  "Mahler" --
25    A   Mahler was in charge of a separate

Page 969

1  team, Team 8, and also served as the group
2  supervisor overseeing Truck 1. Yes.
3      Q   So that is not a correct statement
4  that he was the group supervisor, is it?
5      A   That is not a correct statement.
6      Q   Okay.
7          MS. GUTTAU: Nothing further.
8          THE ARBITRATOR: How about lunch?
9  You guys hungry?  Or you want to just --
10         MS. GUTTAU: Yeah.
11         THE ARBITRATOR: -- soldier on?
12         MS. GUTTAU: It's up to you, sir.
13  Yeah, I'm fine with soldiering on or if you want
14  to take ten minutes and then come back?  We've
15  been going at it for about three hours.
16         THE ARBITRATOR: No, I got to get
17  something to eat here, folks.
18         MR. CORRIGAN: Okay.
19         THE ARBITRATOR: I don't know.
20  How many more witnesses did you want to try to
21  get through today?
22         MS. GUTTAU: So we have our
23  expert.  He can come -- He's going to be video
24  Zoom with us.
25         THE ARBITRATOR: He's video

Page 970

1  already?
2          MS. GUTTAU: Yeah.  No, he's not
3  here yet.  We'll have him join whenever we come
4  back for lunch.
5          THE ARBITRATOR: Okay.
6          MS. GUTTAU: He's not on yet.
7          THE ARBITRATOR: Okay.
8          MS. GUTTAU: And then if we get
9  through him, we'll resume back to fact
10  witnesses, if we can.
11         THE ARBITRATOR: Okay.  We're
12  gonna be done at four.
13         MS. GUTTAU: That helps us plan,
14  so we'll get that figured out over lunch.
15         THE ARBITRATOR: Sounds good.
16  All right.  So it's 1:30.  Be back here at two
17  o'clock.
18         MS. GUTTAU: All right.
19         MR. CORRIGAN: All right.
20         MS. GUTTAU: Thank you.
21         (A 30-minute lunch recess was
22         taken, after which time the
23         following proceedings were had:)
24
25

Page 971

1      DEPUTY CHIEF GEORGE HEALY,
2      Having been sworn to tell the truth,
       the whole truth and nothing but the
       truth, testified as follows:
3
4          THE ARBITRATOR: Please state and
5  spell your name for the record.
6          THE WITNESS: George Healy,
7  G-E-O-R-G-E, H-E-A-L-Y.
8          THE ARBITRATOR: Thank you.  You
9  can proceed, Counsel.
10         MS. GUTTAU: Thank you.
11         DIRECT EXAMINATION
12  BY MS. GUTTAU:
13     Q   Chief Healy, can you tell us what your
14  current job title is?
15     A   I'm a deputy chief of the FDNY
16  (unintelligible).
17     Q   The New York fire department?
18     A   Yes, ma'am.
19     Q   Okay.  And before we talk about your
20  employment, can you tell the Arbitrator a little
21  bit about your education.
22     A   Well, I'm a graduate of St. John's
23  University.  I graduated in 1990 with a BS in
24  business administration, and in 1991 I came on
25  the New York City Fire Department.

Page 972

1      Q   And tell us a little bit about the
2  roles you've held at the New York City Fire
3  Department.
4      A   I was the supervisor for close to ten
5  years.  I got promoted in 2000 to lieutenant,
6  and I served as lieutenant, or company officer,
7  for about ten and a half years in an assignment
8  to the truck company of Brooklyn, and then I got
9  promoted captain, and I roughly spent about two
10  and a half years as a captain.  Part of that
11  time I was a company officer in Northern Queens,
12  and after about six months, I went to our
13  special operations command where I worked a lot
14  of rescue companies and squad companies.  They
15  go to fires very regularly, and they also do
16  tech rescue including scuba, rope work, trench
17  collapse, high angle rope work, structural
18  collapse.
19         And upon promotion, I was a battalion
20  chief in South Queens from, I think, 2005 to
21  2013.  At that time I got promoted to deputy
22  chief, and I've been a deputy chief -- I was
23  assigned to Brooklyn for a short time, but I
24  returned to South Queens I think in 2014, maybe
25  2015, and I've been in South Queens since that

Page 1053

1      Q   I mean, that's when you became a
2   company officer?
3      A   2000.
4      Q   Okay.  Did you talk to any other
5   firefighters when you came to Omaha -- I'm
6   sorry, to Lincoln to -- other than Mr. Mahler?
7      A   I recall talking in person with Faust,
8   and I believe I spoke with Smith, and it might
9   not have been in person, but I'm not a hundred
10  percent certain, and, certainly, I was
11  introduced to the chief of the department, also.
12     Q   So in addition to Mahler, you may have
13  spoken with Faust, Smith, and Engler?
14     A   I believe that would be -- I mean, I
15  spoke to other people, but I don't think -- You
16  know, I met other people.  I don't think anyone
17  else specifically related to these events --
18     Q   Okay.  So what --
19     A   -- on the uniform side.
20     Q   I think you identified the
21  Declarations of Mr. Roberts, Firefighter Hurley,
22  Borchers, Dyer, Love.  Those were people that
23  you actually spoke to?
24     A   No, sir.  I just read the documents
25  provided, the exhibits provided.

Page 1054

1      Q   Those Declarations?
2      A   Correct.
3      Q   Okay.
4          MR. CORRIGAN:  If I can take a
5   minute.
6          (A short recess was taken.)
7          MR. CORRIGAN:  I don't have any
8   other questions.  Thank you, Mr. Healy.
9          THE ARBITRATOR:  All right.  Go
10  ahead, Heidi.
11         MS. GUTTAU:  At break he limited
12  me to four questions, so that means you get a
13  fourth of a question.
14         REDIRECT EXAMINATION
15  BY MS. GUTTAU:
16     Q   In Ms. Benson's affidavit to the
17  federal court requesting that Captain Mahler be
18  removed from duty due to endangering her, she
19  alleges in her affidavit under oath that he was
20  her group supervisor.
21      That's not true, is it?
22     A   Nothing that I have reviewed leads me
23  to make that assumption.
24     Q   Okay.
25     A   There is nothing indicating that in

Page 1055

1   everything I reviewed, that he or anybody else
2   was her group supervisor.
3      Q   And regardless of who said what, he
4   said, she said, if he ignored her, did his
5   ignoring her, if that happened, based on what
6   you reviewed and based on your experience, did
7   that endanger her life?
8      A   I do not believe so.
9      Q   If it did, was she required to call a
10  Mayday?
11     A   If your life or your crew's life is in
12  danger, you're required to give a Mayday.
13         MS. GUTTAU:  Nothing further.
14         THE ARBITRATOR:  Okay.  Anything,
15  John?
16         MR. CORRIGAN:  Yeah.
17         THE ARBITRATOR:  Go ahead.
18         RECROSS-EXAMINATION
19  BY MR. CORRIGAN:
20     Q   It is true, sir, though, that failure
21  to communicate on the fireground could cause a
22  diminution of firefighter safety?
23     A   Failure to communicate on the
24  fireground absolutely can, in fact, threaten
25  firefighter safety.

Page 1056

1          MR. CORRIGAN:  I don't have any
2   other questions.
3          THE ARBITRATOR:  All right,
4   folks.  We're gonna adjourn.  We'll see you --
5   Can we start at ten tomorrow?  Is that okay with
6   you guys?
7          MS. GUTTAU:
8          MR. CORRIGAN:  Can we go till
9   five?
10         THE ARBITRATOR:  Again?
11         MR. CORRIGAN:  Can we skip lunch
12  or maybe take a shortened lunch?
13         THE ARBITRATOR:  You know what?
14  I'm about 30 pounds overweight.  We can probably
15  do that.
16         MR. CORRIGAN:  All right.
17         (At 4:03 p.m., the proceedings
18  were continued to August 2, 2022.)

## Page 1057

```
 1          FEDERAL MEDIATION AND CONCILIATION SERVICE
            BEFORE ARBITRATOR STEVEN RUTZICK
 2

    LINCOLN FIREFIGHTERS   )  FMCS CASE NO.
 3  ASSOCIATION, IAFF LOCAL )   22103-00847
    644, and AMANDA BENSON, )
 4                          )
              Grievants,    )
 5                          )
         vs.                )   VOLUME V
 6                          )   PAGES 1057-1302
    CITY OF LINCOLN,        )
 7                          )
              Respondent.   )
 8                          )
                            )
 9
10          ARBITRATION HEARING held before
11  Arbitrator Steven Rutzick (via Zoom), with
12  Vickie L. Quinn, CCR and Notary Public for the
13  State of Nebraska, counsel and all parties
14  present at the City-County Building, 555 South
15  10th Street, Suite 300, Lincoln, Nebraska,
16  beginning at 10:04 a.m., on the 2nd day of
17  August, 2022.
18
19
20
21
22
23          ** ** **
24
25
```

## Page 1058

```
 1               A P P E A R A N C E S
 2
 3  FOR THE GRIEVANTS:
 4
    MR. JOHN E. CORRIGAN
 5  DOWD & CORRIGAN, LLC
    6700 Mercy Road
 6  Suite 501
    Omaha, NE  68106
 7  402.913.9713
    jcorrigan@dowd-law.com
 8
 9
    FOR THE RESPONDENT:
10
11  MS. HEIDI GUTTAU
    BAIRD HOLM LLP
12  1700 Farnam Street
    Suite 1500
13  Omaha, NE  68102
    402.344.0500
14  hguttau@bairdholm.com
15
    MS. ABIGAIL LITTRELL
16  ASSISTANT CITY ATTORNEY
    555 South 10th Street
17  Suite 300
    Lincoln, NE  68508
18
19
20  ALSO PRESENT:  Mr. Ryan Moser, Vice President
    IAFF Local 644; Mr. Dave Engler, Fire Chief;
21  Tiffany Leasure, Paralegal for City of Omaha
22
23
24
25
```

## Page 1059

```
 1               I N D E X
                            PAGE
 2  CASE CAPTION ......................  1
    APPEARANCES .......................  2
 3  INDEX .............................  3
    TESTIMONY .........................  19
 4  REPORTERS' CERTIFICATE ............  2084
 5
 6              WITNESSES
 7
    FOR THE CITY:
 8
 9  CHIEF DAVID ENGLER
10  Direct by Ms. Guttau................  19
    Cross by Mr. Corrigan...............  136
11  Cross Cont'd by Mr. Corrigan........  253
    Cross Cont'd by Mr. Corrigan........  1070
12  Redirect by Ms. Guttau..............  1135
    Recross by Mr. Corrigan.............  1193
13  Further Redirect by Ms. Guttau......  1202
    Further Recross by Mr. Corrigan.....  1209
14
15  FAO JASON LOVE
16  Direct by Ms. Littrell.............. 210
    Cross by Mr. Corrigan...............  230
17  Redirect by Ms. Littrell...........  247
    Recross by Mr. Corrigan.............  249
18
19  FAO MATTHEW ROBERTS
20  Direct by Ms. Guttau...............  295
    Cross by Mr. Corrigan...............  342
21  Redirect by Ms. Guttau.............  363
    Recross by Mr. Corrigan............  367
22  Further Redirect by Ms. Guttau......  372
    Further Recross by Mr. Corrigan.....  372
23  Further Redirect Cont'd by Ms. Guttau  373
24
25          ** ** **
```

## Page 1060

```
 1           WITNESSES, CONT'D
 2
    FOR THE CITY:
 3
 4  FF STEPHEN DYER
 5  Direct by Ms. Guttau...............  375
    Cross by Mr. Corrigan...............  395
 6  Redirect by Ms. Littrell...........  409
    Recross by Mr. Corrigan.............  410
 7
 8  FF MORGAN HURLEY
 9  Direct by Ms. Littrell.............  416
    Cross by Mr. Corrigan...............  447
10  Redirect by Ms. Littrell...........  464
    Recross by Mr. Corrigan.............  466
11
12  DIVISION CHIEF MICHAEL SMITH
13  Direct by Ms. Littrell.............  470
    Cross by Mr. Corrigan...............  505
14  Redirect by Ms. Littrell...........  569
    Recross by Mr. Corrigan.............  588
15  Further Redirect by Ms. Littrell...  610
    Further Recross by Mr. Corrigan.....  614
16
17  BC CURT FAUST
18  Direct by Ms. Guttau...............  618
    Cross by Mr. Corrigan...............  729
19  Redirect by Ms. Guttau.............  806
    Recross by Mr. Corrigan.............  820
20  Further Redirect by Ms. Guttau......  828
21
22  DEPUTY CHIEF GEORGE HEALY
23  Direct by Ms. Guttau...............  971
    Cross by Mr. Corrigan...............  1021
24  Redirect by Ms. Guttau.............  1054
    Recross by Mr. Corrigan.............  1055
25
```

Page 1061

WITNESSES, CONT'D

FOR THE CITY:

AISHAH WITTE
Direct by Ms. Littrell.............. 1214
Cross by Mr. Corrigan.............. 1263
Redirect by Ms. Littrell.............. 1287
Recross by Mr. Corrigan............. 1297

CAPTAIN SHAWN MAHLER
Direct by Ms. Guttau.............. 1554
Cross by Mr. Corrigan.............. 1671
Redirect by Ms. Guttau.............. 1754
Recross by Mr. Corrigan............. 1771
Further Redirect by Guttau.... 1784
Further Recross by Corrigan........ 1787
Further Redirect Cont'd by Guttau... 1794

CAPTAIN ADAM SCHRUNK
Direct by Ms. Guttau.............. 2059
Cross by Mr. Corrigan.............. 2073
Redirect by Ms. Guttau.............. 2077

FOR THE UNION:

CHIEF EDWARD HADFIELD
Direct by Mr. Corrigan.............. 844
Cross by Ms. Guttau.............. 888
Redirect by Mr. Corrigan............. 951
Recross by Ms. Guttau.............. 962

CAPTAIN MICHAEL WRIGHT
Direct by Mr. Corrigan.............. 1316
Cross by Ms. Littrell.............. 1357
Redirect by Mr. Corrigan............. 1393
Recross by Ms. Littrell............. 1398

Page 1062

WITNESSES, CONT'D

FOR THE UNION:

CAPTAIN DAN RIPLEY
Direct by Mr. Corrigan.............. 1399
Cross by Ms. Littrell.............. 1405
Redirect by Mr. Corrigan............. 1421
Recross by Ms. Littrell............. 1429

NICHOLAS CUNNINGHAM
Direct by Mr. Corrigan.............. 1432
Cross by Ms. Littrell.............. 1446
Redirect by Mr. Corrigan........... 1457

AMANDA BENSON
Direct by Mr. Corrigan.............. 1463
Cross by Ms. Guttau.................. 1867
Redirect by Mr. Corrigan........... 2056

CAPTAIN BRIAN GILES
Direct by Mr. Corrigan.............. 1810
Cross by Ms. Littrell.............. 1823
Redirect by Mr. Corrigan............. 1859
Recross by Ms. Littrell............. 1864

** ** **

Page 1063

CITY EXHIBITS

EXHIBIT     DESCRIPTION

1     8/16/21 Memorandum and Order Denying Plaintiff's Motion for Injunction by Senior District Judge Richard G. Kopf, United States District Court for the District of Nebraska, 8/15/21
2     Declaration of Fire Chief David Engler
3     Declaration of BC Michael Smith
4     Declaration of Captain Mahler
5     Declaration of FAO Matt Roberts
6     Declaration of FF Morgan Hurley
7     Declaration of FF Jason Love
8     Declaration of FF Stephen Dyer
9     Declaration of FF Trent Borchers
10    Statement of Curt Faust
11    8/19/21 Investigation Report into 4/26/21 Fire Incident by Attorney Torrey Gerdes, Baylor Evnen Law Firm
12    Audio of Fire Department Radio Recording of 4/26/21 Warehouse Fire
13    Transcript of Fire Department Radio Recording of 4/26/21 Warehouse Fire
14    Declaration of Aishah Witte, Authenticating Audio Transcript
15    Benson's 5/5/21 Complaint Regarding the 4/26/21 Warehouse Fire
16    Warehouse Photographs

Page 1064

CITY EXHIBITS, CONT'D

EXHIBIT     DESCRIPTION

17    LFR Prime Report of Warehouse Fire
18    Benson's 6/9/21 Grievance
19    Benson's 6/11/21 Affidavit
20    Benson's 8/9/21 Affidavit
21    Media Articles
22    Benson's Interview Audio 7/14/21
23    8 of '21 Grievance Hearing RE: June 9, 21 Grievance
24    9/24/21 Denial of 6/9/21 Grievance Letter to Benson
25    9/27/21 Pre-Disciplinary Meeting Notice Letter to Benson
26    Audio of 10/12/21 Pre-Disciplinary Meeting
27    Transcript of 10/12/21 Meeting
28    10/19/21 Termination Letter
29    CBA, 8/20/20 to 8/31/21
30    CBA, 8/19/21 to 8/30/23
31    LFR Professional Code of Ethics/Standard of Conduct Policy
32    LFR FF Safety Policy
33    LFR 2020 Annual Report
34    Captain Mahler's Awards
35    2017 Letter to Mahler
36    Terminal Building Fire Near-Miss Report, 2/19/18

## Page 1065

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 37 | Chief Engler's Video Message | |
| 38 | Healy Expert Report | |
| 39 | Lincoln Municipal Code - Cause for Disciplinary Action | |
| 40 | Lincoln Municipal Code - Dismissal and Grievance Procedure | |
| 41 | Grievant's 11/3/21 Appeal E-mail | |
| 42 | Documents Regarding LFR Discipline | |
| 43 | Captain Mahler Notes for Investigator Gerdes | |
| 44 | Witte Investigation Correspondence | |
| 45 | Witte Investigative File | |
| 46 | Benson's Motion for Preliminary Injunction | |
| 47 | Benson's Brief ISO Preliminary Injunction | |
| 48 | Benson 2014 Complaint Retraction | |
| 49 | Mahler Discipline Reversal | |
| 50 | Management Policy | |
| 51 | Victim Removal Presentation | |

** ** **

## Page 1066

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 100 | CBA | |
| 101 | 4/27/2011 Suspension Notice | |
| 102 | 11/4/2014 Memo of BC Pashalek | |
| 103 | Dispositional Memorandum of Kimberly Taylor-Riley | |
| 104 | 4/4/21 Complaint | |
| 105 | E-mail of BC Curt Faust, 4/4/21 | |
| 106 | E-mail of BC Michael Smith, 4/7/21 | |
| 107 | E-mail of BC Curt Faust, 4/13/11 | |
| 108 | E-mail of Benson to Witte, 4/18/21 | |
| 109 | Transcript of Radio Traffic | |
| 110 | LFR Incident Report, 4/26/21 | |
| 111 | E-mail from Benson to Faust & Witte, 5/5/21 | |
| 112 | E-mail from Benson to Witte, 5/13/21 | |
| 113 | Witte Investigation Summary | |
| 114 | E-mail to Benson from Witte, 5/25/21 | |
| 115 | Transcript of Audio File | |
| 116 | E-mail from Smith to Witte, 5/26/21 | |
| 117 | Investigation Summary | |
| 118 | Grievance, 6/9/21 | |
| 119 | Benson Affidavit, 6/11/21 | |
| 120 | E-mail from Schrunk to Engler, 6/14/21 | |

## Page 1067

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 121 | E-mail from Kelly Brandon to Chris Connolly and Ms. Gerdes, 7/12/21 | |
| 122 | E-mail from Engler to Mahler, 7/1/21 | |
| 123 | Interview Audio Recording | |
| 124 | Letter to Ms. Gerdes | |
| 125 | Declaration of David Engler | |
| 126 | Declaration of Michael Smith | |
| 127 | Declaration of Matthew Roberts | |
| 128 | Declaration of Morgan Hurley | |
| 129 | Declaration of Trent Borchers | |
| 130 | Declaration of Stephen Dyers | |
| 131 | Declaration of Jason Love | |
| 132 | Declaration of Shawn Mahler | |
| 133 | Grievance Letter | |
| 134 | Declaration of Edward Hadfield | |
| 135 | Enhanced Fireground Safety, Effective Use of Division & Group Supervisors | |
| 136 | Transcript of Grievance Hearing, 8/20/21 | |
| 137 | Letter of Chief Engler Denying Grievance, 9/24/21 | |
| 138 | Notice of Pre-disciplinary Action, 9/27/21 | |
| 139 | Transcript of Pre-disciplinary Hearing | |

## Page 1068

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | | |
|---|---|---|
| 140 | Termination Letter, 10/19/21 | |
| 141 | Underlying Confidential Correspondence Regarding Comparative Discipline | |
| 142 | Disciplinary Action, 10/14/11 to 10/14/21 | |
| 143 | Performance Evaluations | |
| 144 | Deposition of Shawn Mahler, 5/9/22 | |
| 145 | Awards and Recognitions | |
| 146 | LFR Best Practices No. 2-Division/ Group Supervision | |
| 147 | Daisy Brayton Investigation | |
| 148 | Text Message exchange between Faust and Benson | |
| 149 | Arbitration Award, RE: Dan Duncan | |
| 150 | Arbitration Award, RE: Jon Reed | |
| 151 | E-mail from Corrigan to McDaniel, 11/3/21 | |
| 152 | E-mail, Benson to Witte, 4/22/21 | |
| 153 | E-mail, BC Smith, 4/22/21 | |
| 154 | Discipline Letter, 5/24/21 | |
| 155 | Discipline Letter, 6/6/22 | |
| 156 | Telephone Log Activity | |
| 156 | E-mail from Mahler to Witte, 6/24/21 | |

** ** **

Page 1069

1
 * All exhibits offered with objections to
2   Union's 101, 102, 103, 147, 149, 150; and City
    Exhibits 20, 21, 38, 46, and 47
3
    * Union Exhibit 149 was offered and received on
4   page 142
5   * Union Exhibit 150 was offered on page 143 and
    received on page 144
6
    * Union Exhibit 156, Telephone Log Activity, was
7   marked on page 750
8   * City Exhibit 156, E-mail to Aishah from
    Mahler, was marked on page 1738
9
    * City Exhibit 50 was marked on June 22nd, 2022,
10  offered and received on page 571
11
12
13
14                    ** ** **
15
16
17
18
19
20
21
22
23
24
25

Page 1070

1             (On August 2, 2022, at 10:04
2   a.m., the proceedings continued as follows:)
3             THE ARBITRATOR:  All right.
4   Let's go back on the record.
5             MS. GUTTAU:  I think we're
6   starting where we left off with the chief's
7   cross five weeks ago.
8             THE ARBITRATOR:  Is that right?
9   Okay.
10            CHIEF DAVID THOMAS ENGLER,
11  Having been sworn to tell the truth,
        the whole truth and nothing but the
12      truth, testified as follows:
13            CROSS-EXAMINATION, CONT'D
14  BY MR. CORRIGAN:
15     Q   Good morning, Chief Engler, and
16  welcome back to the hearing.
17     A   Good morning.
18     Q   I wanted to talk a little bit about
19  the practices in the fire department for
20  incident command first, if you don't mind.
21      So I'm going to ask you to take a look at
22  Exhibit 146.
23     A   (Witness complies.)
24     Q   And do you recognize that document?
25     A   Yes.

Page 1071

1      Q   And is that a working document in the
2   fire department now, or is this something that
3   you've overrun with another newer policy?
4      A   It still exists.
5      Q   And it lists out in that document the
6   NIOSH top five causal factors for firefighter
7   deaths; right?
8      A   Yes.
9      Q   Including lack of incident command,
10  lack of accountability, inadequate
11  communications and failure to -- or lack of SOGs
12  or failure to follow established SOGs; right?
13     A   Yes.
14     Q   And just looking at page 3, you have a
15  definition section -- or Terminology Review, and
16  what's the definition under the Terminology
17  Review for a group?
18     A   A group is "A functional assignment on
19  the incident scene; also an organizational level
20  in the incident organization chart."
21     Q   And what's a single resource?
22     A   "A crew, team or company on the
23  incident scene that may operate under a
24  division/group supervisor, or may be assigned as
25  a standalone crew and is managed by a unit

Page 1072

1   leader."
2      Q   And what is the definition of
3   "tactics"?
4      A   "The deployment of resources to
5   accomplish incident objectives involving the
6   delegation of tasks."
7      Q   So if we're going to engage in
8   ventilation, is that an incident objective or a
9   task?
10     A   I guess I would say ventilation itself
11  is an objective.
12     Q   And if you go forward to page 8 --
13     A   (Witness complies.)
14     Q   -- that gives us a table of an
15  incident organizational chart for a working
16  incident in a small structure using division and
17  groups; right?
18     A   Yes.
19     Q   So under that working incident, the --
20  Battalion 1 would be the incident commander, and
21  there are different -- an interior division, a
22  roof division, and then a single resource for
23  rescue or R-I-T, RIT; right?
24     A   Yes.
25     Q   And a medic unit as a single resource

Page 1141

1    Q   Okay.  And it also did conflict with
2  Judge Kopf's findings and orders, as well?
3    A   Correct.
4    Q   Okay.  So it wasn't just two
5  conflicting statements.  As far as being
6  abandoned to die in a dangerous warehouse fire,
7  taking it that far is contradicted by every
8  other piece of evidence that you had; correct?
9    A   That is correct.
10   Q   Okay.  And she did make it public
11 because she filed it publicly in the federal
12 court; correct?
13   A   It was made public, and I'm assuming
14 that was one of the ways that it got public.
15   Q   And this lawsuit has been widely
16 reported over time; correct?
17   A   That's correct.
18   Q   Is it an accusation that another
19 firefighter abandoned you in a way that could
20 have killed or injured you, is that probably one
21 of the most egregious types of accusations you
22 can make against another firefighter?
23   A   Yes.  I don't recall seeing that
24 before.
25   Q   Ever in your experience?

Page 1142

1    A   I'm not going to say it hasn't
2  happened, but I've never -- I don't ever recall
3  seeing it.
4    Q   And taking it that far, making that
5  allegation, that can -- that can ruin a
6  firefighter's career; correct?
7    A   Yes.
8    Q   Okay.  Meaning Captain Mahler?
9    A   Yeah.
10   Q   Yeah?
11   A   Absolutely.
12   Q   Yeah.  And it also damaged the
13 reputation of LFR?
14   A   I believe so.
15   Q   Again, if she had just come to you and
16 said, He didn't talk to me, that would be a
17 different thing than what we're here for today;
18 correct?
19   A   That is correct.
20   Q   In your experience --
21       THE ARBITRATOR:  I have a
22 question for the chief.
23       MS. GUTTAU:  Yes.
24       THE ARBITRATOR:  Would we be
25 sitting here today, would you have -- and/or

Page 1143

1  would you have fired Ms. Benson if these
2  allegations or the incident report to you had
3  not been picked up by the newspapers?
4        THE WITNESS:  I don't -- I don't
5  necessarily believe so.  I believe the, the
6  point -- the point of concern was initially,
7  when the assignment -- the ventilation
8  assignment was made -- And there is a dispute
9  whether the -- whether there was a group
10 supervisor and whether Truck 1 was working for
11 that group supervisor, and I think that if that
12 -- if, if the call had played out and that was
13 brought up, it would have been handled
14 completely differently than, than what it was
15 made to be.
16       THE ARBITRATOR:  All right.
17 You're not answering my question.
18       THE WITNESS:  Oh, I'm sorry.  I
19 must have misunderstood.
20       THE ARBITRATOR:  Would you have
21 fired her if the papers had not picked up this
22 story?
23       THE WITNESS:  I would say that
24 that played a major role.  The other major role
25 was the City spent a significant amount of money

Page 1144

1  doing an investigation that, that really
2  resulted in the -- in the same finding by our
3  internal investigation.  So those two things,
4  but I would say likely not.
5        THE ARBITRATOR:  So if I'm
6  hearing you, the fact that the newspapers picked
7  it up and it became a story, quote, unquote, and
8  the other part was that because the City had to
9  spend money?
10       THE WITNESS:  Well, no, the, the
11 fact that our internal investigation wasn't
12 found to be sufficient, although the, the same
13 conclusion was arrived at, but that the -- that
14 I put Captain Mahler on a leave with pay for,
15 for three months, and then the investigation was
16 incredibly expensive, to determine whether they
17 were -- they could have been killed or injured
18 in a dangerous burning warehouse, and then to
19 find out that, hey, that, that wasn't the case,
20 a significant amount of money was spent on, on
21 what I determined to be, out of the chute, a
22 serious allegation, and then found out that that
23 actually wasn't factual.
24       THE ARBITRATOR:  Okay.  Go ahead.
25   Q   (By Ms. Guttau)  I want to talk a

Page 1149

1  officer about drinking; that person was also
2  dismissed?
3      A   Yes.
4      Q   Okay.  And then there -- Have there
5  been times when people have been dishonest and
6  they took resignation in lieu of being
7  terminated?
8      A   Yes.
9      Q   So it's not unusual to terminate
10 somebody for dishonesty at LFR, is it?
11     A   No.
12     Q   And didn't -- Has -- When you took
13 over as chief, was there -- did you have any
14 discussions with the Union as far as discipline
15 issues or accountability going forward?  Was
16 that a discussion you had?
17     A   It was a -- I had the discussion with
18 many.  I did have the discussion with, with
19 Local 644 representatives, but also throughout
20 the department, that everyone recognized that
21 there were some cultural issues within the
22 department, and that there were some
23 accountability issues.
24         And I think when we looked back at
25 some of the, the allegations that we talked

Page 1150

1  about and the discipline that matches, it
2  probably was a little bit of a mismatch, and
3  those things do lead to a lack of
4  accountability.
5         And so one of the things, hearing this
6  accountability and cultural piece, I, I did make
7  it very clear that, that it was my intent to
8  change the culture and make it a better
9  environment for everybody.  I do recall
10 Ms. Benson handing me a paper that actually
11 recognized that the culture -- there were
12 cultural problems and that we needed
13 accountability.  And so it wasn't just one
14 person.  It wasn't just two people.  It wasn't
15 just the Union.  It was a -- It was a number of
16 people.
17        And I'm committed to trying to change
18 the culture of the organization, which is tough.
19 I mean, it's a big organization, but, you know,
20 we had a pre-disciplinary hearing the other day
21 where a member recognized that, that we are
22 making efforts to change the culture.  So I
23 believe it's happening, but it takes work, and
24 it does take a change in the discipline
25 philosophy to make that happen, and that's,

Page 1151

1  that's what I'm trying to do as fire chief.
2      Q   And then backing up to, actually,
3  Mr. Rutzick's questions.  So you said the big
4  issues were that you -- because of her false
5  allegation, you placed Captain Mahler on leave
6  for three months; correct?
7      A   I did, yes.
8      Q   And that's a cost to the -- a great
9  cost to the City?
10     A   I can't remember the amount, but it,
11 it was more significant than I thought.
12     Q   Uh-huh.
13     A   Yeah.
14     Q   And that leaves the City without his
15 experience, services during that time; correct?
16     A   Sure.  Yeah.
17     Q   He's been publicly recognized for
18 saving lives, hasn't he?
19     A   Yes, he has.  Yeah.
20     Q   And you said the cost of the Gerdes
21 investigation.  Because she -- Because Benson's
22 perpetuated her claim that she had been
23 abandoned to die, the City engaged an
24 investigator; correct?
25     A   They did, yes.

Page 1152

1      Q   And that's what you're referring to as
2  the Gerdes investigation?
3      A   Yes.
4      Q   And that cost tens of thousands of
5  dollars, to your knowledge?
6      A   I've heard upwards of 80.
7      Q   Yep.  Okay.  And then also that she
8  made it public herself?
9      A   Yes.
10     Q   And then it was picked up by the
11 papers; correct?
12     A   It was.
13     Q   Okay.  Is it -- At the beginning of
14 the testimony today, Mr. Corrigan asked you
15 about a best-practices exhibit.  Is a
16 best-practice document the same as a policy?
17     A   No, it's not.
18     Q   Okay.  And is a policy what is
19 binding?  Or how would you describe the
20 difference, I guess?
21     A   A policy would be binding.  Best
22 practice?  It was put together, I believe, in
23 2014 by a couple of individuals and, and in all
24 fairness, it was to bridge a clear gap that we
25 had and probably continue to have.  I don't know

Page 1153

1    if all of the information in there is, today,
2    best practice.  We've -- We did put in for a
3    grant for some incident command training to get
4    the newest and greatest, but as with everything,
5    there, there are changes in practices and that
6    sort of thing.
7         For instance, in -- nowhere in
8    incident command can I find anything that says
9    "assist with," and then "our best practices" is
10   written in there.  So there are some things in
11   there that are probably not best practice.
12       Q   And, again, Ms. Benson wasn't
13   terminated for an interpretation of "assist
14   with" or not; it was taking it to the point of
15   accusing somebody of abandoning them and to die
16   [sic]; right?
17       A   That's correct.
18           MR. CORRIGAN:  I'm going to
19   object to the form of that question.  I think
20   that is a misstatement of Ms. Benson's actual
21   statements that led to her termination,
22   according to Mr. -- according to the chief,
23   because she never said that he abandoned us and
24   left us to die.
25           MS. GUTTAU:  I'll restate with

Page 1154

1    his exact -- with her exact language.  Okay.
2           MR. CORRIGAN:  Within the
3    documents that were --
4           MS. GUTTAU:  Yes.
5           MR. CORRIGAN:  -- that were
6    relied upon --
7           MS. GUTTAU:  I'll quote her.
8           MR. CORRIGAN:  -- by the chief.
9           MS. GUTTAU:  Yeah, they are
10   quoted in his -- in his statement.
11           MR. CORRIGAN:  Okay.
12       Q   (By Ms. Guttau)  She said, "You also
13   stated his behavior could have injured or killed
14   you, Roberts, and Hurley."
15           That's taking it further than just
16   saying, Oh, I wasn't sure what to -- what
17   "assist with" meant, isn't it?
18       A   Yes.
19       Q   Okay.  And that's accusing somebody of
20   abandoning them, because she also stated,
21   "abandoned in a dangerous burning warehouse by
22   Captain Shawn Mahler"; correct?
23       A   That's correct.
24       Q   Okay.  And that's the big -- Is that
25   the issue here for you?  Can you explain to the

Page 1155

1    Arbitrator why that's a problem?
2        A   Well, again, there is -- there is --
3    It was said a "dangerous burning warehouse."  At
4    the time of the incident, the, the fire was
5    reported under control.  The warehouse wasn't
6    burning.  There were -- There were some contents
7    in the warehouse and in the compactor that were
8    burning.  In fact, I think it was spot fires at
9    that point in time.
10           The behavior could have injured or
11   killed you, FAO Roberts, and Recruit Hurley.
12   Everyone testified, including, Ms. Benson, I
13   think, in the -- in the Gerdes [sic], that they
14   didn't feel their lives were in jeopardy.  So
15   that -- That's just inconsistent with what was
16   originally reported.
17       Q   And, and it's a serious accusation?
18       A   That's a ser -- When you say "You
19   could have killed me," that's a serious
20   accusation.
21       Q   Okay.  I want to back up to Union
22   Exhibit -- So back to the black binder.  Sorry.
23       A   (Witness complies.)  Okay.
24       Q   Okay.  So -- And, actually, let's just
25   back up real quick to what I was asking about.

Page 1156

1    So in court, if you want to -- Sorry.  Now I'm
2    going to have you grab the red one.
3        A   The red one?  All right.  (Witness
4    complies.)  Okay.
5        Q   So let's turn -- We were talking about
6    the language that -- where Ms. Benson made the
7    accusation, so I want to make sure we understand
8    where that was coming from.
9        A   Okay.
10       Q   So if you want to turn to Exhibit 19
11   and paragraph 17.
12       A   (Witness complies.)
13       Q   She states, "Mahler abandoned me,
14   Roberts, and Hurley in an IDLH environment
15   (immediately dangerous to life or health) with
16   no direction."
17           So that was part of her allegation;
18   correct?
19       A   Yes.
20       Q   This is her affidavit in federal
21   court?
22       A   Correct.
23       Q   And then turn back a couple of pages
24   to paragraph 33.
25       A   (Witness complies.)

Page 1173

1    to make sure her crew has appropriate air
2    levels?
3        A    We don't have any sort of policy.
4    There are -- I mean, there are, I guess you
5    could say, best practices even, but we don't
6    have anything written down.  But the general
7    understanding is, is if you're going to go -- if
8    you're gonna exit and you're, you know, you're
9    at half or so, I mean, it's a good idea,
10   especially when you're going into a bigger
11   building.  But we don't have anything specific.
12       I think, as, as a captain, as in any
13   position, I would want to make sure I had plenty
14   of air, just in case, because you never know
15   what's gonna happen.
16       Q    Okay.  And she did not do that in this
17   fire because Roberts' low air alarm went off
18   shortly after they had gone back into the
19   warehouse, didn't it?
20       A    That's my recollection, yes.
21       Q    Okay.  Would you expect a firefighter
22   to experience a safety incident or had safety
23   concerns at a fire to report that to a safety
24   officer immediately?
25       A    There is -- There is a number of

Page 1174

1    things that could be done.  I think probably
2    reporting it to the safety officer would be a
3    good idea to prevent any further potential
4    incidents.  You could report it to the incident
5    commander.
6        And then following the incident, we
7    have a policy on what we call near-miss, so we
8    do near-miss reports, and the idea behind that
9    is to identify those things that ended up they
10   were -- they were wrong but didn't end up in a
11   catastrophe, and then correcting them down the
12   road.
13       Q    And did any of that -- Did Ms. Benson
14   initiate any of that in regard to this, this
15   fire on the 26th?
16       A    No.  The, the first time I believe I
17   was made aware of it was in her report on the
18   5th.
19       Q    Okay.  If a firefighter is disoriented
20   or trapped or lost, is it -- is that -- do you
21   call a Mayday?
22       A    You're supposed to, yes.
23       Q    Okay.  If you think your life is in
24   mortal danger, that you think there is maybe a
25   chance you can get yourself out, is it still a

Page 1175

1    best practice to call a Mayday?
2        A    It's highly encouraged to call a
3    Mayday because, while you may think you're okay
4    or you may think you can get your way out, time
5    goes by quickly, and the earlier that people
6    respond, the better.
7        Q    In her May 5th complaint, which
8    was Exhibit 15, which might be in the red one --
9        A    The red one?
10       Q    So as we talked about earlier, we read
11   where she said, "At this point" -- the fifth
12   paragraph down -- "I realized that Mahler had
13   abandoned us in an unsafe environment."  And
14   later on in her letter she claims that they
15   could have been killed because of his
16   abandonment.
17          MR. CORRIGAN:  Objection to the
18   characterization.
19       Q    (By Ms. Guttau)  Well, later on she
20   says, "His refusal to communicate could have
21   injured or killed me, Roberts, and Hurley," her
22   crew; correct?
23       A    Yes.
24       Q    Okay.  So if she says in the fifth
25   paragraph, "At this point I realized he had

Page 1176

1    abandoned us in an unsafe environment," is that
2    the point that a Mayday should be called, if you
3    fear for your life?
4        A    That would be a good time to do it,
5    yes.
6        Q    Okay.  Was it suspicious to you that
7    someone would later claim that they could have
8    been killed or injured in a fire in which they
9    never reported any unsafe conditions or called a
10   Mayday?
11       A    I would expect that it would be done
12   fairly quickly after the incident occurred.
13       Q    And it should be included in the Prime
14   report, the incident report, if there was a
15   safety incident?
16       A    Yes, or a near-miss, yes.
17       Q    And that wasn't included by Benson,
18   was it, in her report?
19       A    No.
20       Q    In the first part of the arb -- Ope.
21   Okay.
22       In the first part of the arbitration, you
23   were asked quite a few questions about Battalion
24   Chief Faust and Mrs. Ben -- or Ms. Benson's
25   report.

Page 1181

1  longer unfairly scrutinized regarding my pending
2  lawsuit against me [sic].
3      And it goes on to explain what
4  Ms. Lundvall conveyed to her; correct?
5      A   Yes.
6      Q   And so in her own words, she's saying
7  she got that phone call from Jessie Lundvall at
8  11:48, and at some time within the next -- She
9  sends this to Aishah 36 minutes later
10 approximately; correct?
11     A   Yes, that's correct.
12     Q   And had talked to Aishah sometime
13 within that 36 minutes, according to her e-mail;
14 correct?
15     A   That's what it looks like.
16     Q   So she immediately reports a rumor
17 that she hears within 30-something minutes;
18 correct?
19     A   Yes.
20     Q   Did it seem troublesome to you that
21 she waited days to report what she states was a
22 condition that Captain Mahler placed her in that
23 could have killed or injured her and her crew?
24     A   Seems like a long time.
25     Q   And did that raise concerns for you in

Page 1182

1  the credibility of her complaint of being
2  abandoned?
3      A   Yeah.  I would say initially I just
4  looked at the complaint itself and I didn't even
5  take that into consideration, but looking back
6  on it, that's, that's a long time for such a
7  substantial complaint.
8      Q   And you knew that she had made other
9  complaints pretty quickly when she had issues
10 with other firefighter, such as Woitalewicz and
11 Roof?
12     A   Yes.
13     Q   And those were just personnel kind of
14 issues, nothing that was life threatening?
15     A   That's correct.
16     Q   Okay.  As far as -- To your knowledge,
17 has Ms. Benson received -- only been a
18 firefighter at -- Let me rephrase that.
19     Until the time of her termination, to
20 your knowledge, had Ms. Benson started her
21 career at LFR and only been a firefighter at
22 LFR?
23     A   As far as I know.
24     Q   So she received her training as a
25 firefighter at LFR; correct?

Page 1183

1      A   I believe so.
2      Q   And should be familiar with LFR
3  practices and procedures; correct?
4      A   Yes.
5      Q   Okay.  All the other firefighters who
6  were present on her crew or Mahler's crew at the
7  warehouse scene, within those ten minutes that
8  they were inside together, or even before, they
9  all testified that they, they had no belief that
10 Captain Mahler was their supervisor?
11     A   They did testify to that.  The other
12 -- The other thing I -- that weighed heavily on
13 my opinion was, was I asked the incident
14 commander what his intent was, and he said it
15 was not his intent to have Mahler as a group
16 supervisor.  So, you know, I think that's
17 probably bigger than what the other people
18 believed, too.
19     Q   Okay.  But in their training at LFR,
20 they reached the conclusion that they had no --
21 they didn't think he was their supervisor?
22     A   That's correct.  And when we -- When
23 we do those group assignments, it's, it's very
24 clear on the radio what the -- what we do.
25 We've got a system, and it may be different from

Page 1184

1  other departments, I don't know, or it may be
2  the same, but it's, it's very clear.
3      Q   Okay.  And just because somebody has a
4  mistaken impression, that doesn't mean that
5  other person becomes their supervisor, does it?
6      A   No.
7      Q   And would it be reasonable for
8  Captain Mahler to have a -- have less knowledge
9  about the interior of the warehouse than
10 Ms. Benson since he hadn't been in there yet?
11     A   Yes.  He had not been in there yet,
12 and, therefore, he, he wouldn't have any
13 knowledge as to the conditions inside.
14     Q   Okay.  Is it reasonable for
15 firefighters to walk in and assess the interior
16 before maybe determining what to do next?
17     A   As a firefighter, and especially a
18 captain, you're constantly sizing up the
19 situation.  You're starting with the outside,
20 and as you move into the inside, you're doing
21 the same.
22     Q   Is it typical at LFR for one captain
23 to request an assignment from incident command
24 for another captain?
25     A   No, not at all.

Page 1185

1    Q    And Captain Mahler didn't have an
2    obligation to monitor if Benson got an
3    assignment from, from incident command, did he?
4    A    No.
5    Q    Okay.  Do you believe at LFR that
6    every face-to-face communication in a fire is
7    critical to safety?
8    A    No.
9    Q    Okay.  Have you had experiences where
10   face-to-face communication is not critical to
11   safety?
12   A    There is -- There is a lot of
13   face-to-face communications that aren't critical
14   to safety, and, and things that are critical to
15   safety are typically radioed because if they're
16   -- if they're critical to safety at that point,
17   they're critical to the safety of everyone on
18   the scene.
19   Q    Did anything you review lead you to
20   believe that Mahler allegedly not responding to
21   Benson interior endangered her life?
22   A    I didn't see any evidence of danger.
23   Q    Okay.  Did anything that Mr. Corrigan
24   had you review from Mahler's deposition change
25   your opinion that her accusation that he

Page 1186

1    abandoned her and her crew in a dangerous fire
2    that could have killed them was a false
3    accusation?
4    A    Nothing changed my mind.  Going back
5    to the question of, did he have any obligation,
6    and I would say, absolutely not.
7    Q    You also knew when you made your
8    decision that Ms. Benson had been in and out of
9    the warehouse fire without any trouble before
10   Mahler even arrived, correct, based on the
11   radio?
12   A    That's correct.
13   Q    And you also knew she had exited first
14   before him and there were still firefighters
15   inside at the time she claimed she was abandoned
16   in the warehouse?
17   A    That's correct.
18   Q    Mahler and his crew and at least some
19   members of other crews were still inside --
20   A    Yes.
21   Q    -- based on the radio?
22   A    Yes.
23   Q    And so based on that, it would be
24   impossible for Ms. Benson to claim that Mahler
25   abandoned her and left her inside if he was

Page 1187

1    still in there when she left; correct?
2    A    That would be my position.
3    Q    You came to an understanding, at some
4    point, Ms. Benson expressed she was not happy
5    with Ms. Witte's investigation; correct?
6    A    Yes.
7    Q    Okay.  And she filed a motion for
8    injunction and asked for an investigation;
9    correct?
10   A    Yes.
11   Q    All right.  And the City did that?
12   A    Yes, they did.
13   Q    All right.  And Ms. Benson was -- she
14   was given an opportunity to provide whatever
15   information Ms. Gerdes asked her or whatever she
16   wanted to provide; correct?
17   A    I believe so.
18   Q    Okay.  And you were asked whether or
19   not she had -- Or, you were asked about an
20   e-mail on Union representation during the Gerdes
21   interview.  To your knowledge, was her Union
22   representative present during her interview by
23   Ms. Gerdes?
24   A    I believe so.
25   Q    Okay.  You said that you had

Page 1188

1    determined that her story had changed, and you
2    also listened to the audio, not just based on
3    the report; correct?
4    A    That's correct.
5    Q    And when I say "audio," I should
6    clarify that's the audio of her interview by
7    Ms. Gerdes?
8    A    Yes.
9    Q    Okay.  And just for the record, that
10   audio is -- just for further reference, Exhibit
11   12.  Nope.  Let me find it.  I had all these
12   numbers memorized in June.
13        MS. GUTTAU:  Exhibit 22, just for
14   your reference, Mr. Rutzick, when I refer to
15   audio.
16        THE ARBITRATOR:  Okay.
17   Q    (By Ms. Guttau)  If you go to
18   Ms. Gerdes's report, Exhibit 11 -- So we're back
19   in the red book.
20        MS. GUTTAU:  We're at Exhibit 11.
21   Q    (By Ms. Guttau)  And about No. 4, in
22   the second paragraph -- I'm sorry.  Page 40.
23   All the way in the back.
24   A    (Witness complies.)
25   Q    Ms. Gerdes includes, from the audio,

Page 1189

1    that -- at the last sentence -- "Acting Captain
2    Benson stated during her interview that she
3    never felt her crew was facing sufficient safety
4    risk to utilize a Mayday."
5        Was that significant to you?
6        A   Well, it, it certainly is counter to
7    the "we could have been killed or injured"
8    statement, yes.
9        Q   Okay.  So then in -- Let's now turn to
10   Exhibit 23.
11       A   (Witness complies.)
12       Q   And if you want to keep Exhibit 11
13   kind of handy.
14           MR. CORRIGAN:  We're gonna look
15   at what?
16           MS. GUTTAU:  Exhibit 23.
17       Q   (By Ms. Guttau)  If you want to turn
18   to page 16 of 23 or -- yeah.  So this was a
19   transcript of the grievance hearing you held on
20   her grievance regarding an investigation on
21   August 20th, 2021; correct?
22       A   Correct.
23       Q   Okay.  And if you look back on page --
24   If you look back from page fif -- 16 to figure
25   out who's talking and go back to the page

Page 1190

1    before, it indicates that that's Amanda Benson.
2        Do you see that?
3        A   Yes.
4        Q   Okay.  So I want to go to 16, and then
5    the third paragraph down it says "The
6    firefighters."
7        A   Okay.
8        Q   So in that grievance hearing -- you
9    were present at that; correct?
10       A   I was.
11       Q   And she stated to you, "The
12   firefighters had to be physically led out of the
13   door because they were so disoriented and did
14   not realize that it was a way out."
15       So then if we want to turn to page 29 of
16   the Gerdes report -- Well, actually, back on
17   that statement, didn't Matt Roberts indicate
18   that he didn't have to be led out?
19       A   Yes, he did.
20       Q   Okay.  And he was her FAO?
21       A   Yes.
22       Q   So his, his statement contradicted
23   hers; correct?
24       A   That's correct.
25       Q   Okay.  And he's a -- How long has he

Page 1191

1    been with the fire department?
2        A   I'm going to guess 25 years.
3        Q   Okay.  So then back on Ms. Gerdes's
4    report, I want to look at page 29.
5        A   (Witness complies.)
6        Q   And paragraph 83(a), Ms. Gerdes
7    reports that Ms. Benson told her -- Let's go to
8    the -- one, two -- third sentence.  "Benson
9    stated she was comfortable staying interior
10   until the low air alarm was activated because
11   she knew the path out.  They did not have to use
12   the TIC to exit the building.  They could see
13   daylight about 10 to 15 feet from the exit door.
14   Benson stated that T1 was not lost in the
15   building.  Benson knew where they were, and they
16   were oriented to exit."
17       Does that seem different than what you
18   had been told at the grievance hearing?
19       A   Yes, that's different.
20       Q   And you also knew, at this point of
21   the grievance hearing, that none of her crew
22   members had described the conditions as, as bad
23   as she had; correct?
24       A   That's correct.
25       Q   And none of them had indicated they

Page 1192

1    had to be led out in any way, did they?
2        A   That's correct.
3        Q   The bottom line is -- You know, we
4    heard some testimony in the first round, and
5    somebody said Captain Mahler may rub people the
6    wrong way.
7        Would you agree with that?
8        A   Yeah.  Yes.
9        Q   And if a firefighter rubs people the
10   wrong way, does that mean he deserves to be
11   falsely accused of endangering others?
12       A   No.
13       Q   And so regardless of what we talked
14   about as far as incident command and he said,
15   she said and what -- whether or not he should
16   have talked to her on the inside, aside from
17   that, the bottom line is:  Did you find any
18   evidence that Captain Mahler had abandoned
19   Benson, Hurley, and Roberts in a dangerous
20   warehouse fire that could have killed or injured
21   them?
22       A   No.
23       Q   Okay.
24           MS. GUTTAU:  Nothing further.
25   Nothing further, sir, at this point.

Page 1233

1  and I spoke with Morgan Hurley, who was also a
2  firefighter at the time, who was the recruit
3  assigned to the station and working on both
4  engines, were present.  And I believe on this
5  one I also talked with Captain Faust or Chief
6  Faust.
7      Q   And did you find that the complaint
8  had any merit?  Was Roof talking -- speaking
9  negatively about Ms. Benson because she brought
10 a lawsuit against the City?
11     A   Not at all.  And I think -- The only
12 conversation that I think this -- that, you
13 know, was taking place at different times where
14 -- No one seemed to -- Captain Faust -- Chief
15 Faust remembered the conversation, but a lot of
16 the details of the conversation that were sort
17 of like -- She -- Ms. Benson reported that
18 Captain Roof said that he would blow his brains
19 out, or something, if he was part of a lawsuit
20 against the City, disparaging the department, or
21 something to that effect.  And there were --
22 There were lots of aspects of the conversation
23 that nobody else remembered.  It appeared to
24 have corresponded, I think, with an article in
25 the paper about another lawsuit settlement, and

Page 1234

1  so it was just kind of an observation.
2      But what -- what's been my take and
3  what I've observed from others in the department
4  is that these articles in the paper about the
5  lawsuits have a really -- like, a deep,
6  emotional impact on the firefighters because
7  they feel a commitment to the department and
8  have, you know, a different experience and a
9  positive experience.  And it's difficult for
10 you know, their neighbors and their mom [sic]
11 and everyone else to see these things that are
12 alleged about the department that are so
13 disparaging about the department in the newspaper.  So I think that
14 that's -- that was what happened there.  But it
15 sounded like it was just sort of a conversation
16 in the apparatus thing.
17     Q   Allegation No. 2 here was that Roof
18 called firefighting blue-collar work and said
19 that women don't have the work ethic to do it,
20 and women are being held to standards that they
21 -- are not being held to standards that they
22 should just to do the work in hiring.
23     Just real briefly, did you find that that
24 allegation had any merit?
25     A   I didn't, and, in fact, I found that

Page 1235

1  that the allegation, it was really completely
2  the opposite in terms of what the context of it
3  was.  It wasn't at all that women weren't able
4  to do it, as that they were working really hard
5  to come up with different ways to make the
6  requirements of the job accessible to people of
7  all sizes and strength levels.
8      Q   And Ms. Benson was alleging that
9  Captain Roof was treating women unfairly and
10 said that they couldn't do firefighting work?
11     A   Yes.  I think that was the allegation,
12 essentially.
13     Q   And what was the truth of that
14 situation that you discovered?
15     A   Well, the truth was really the
16 opposite.  Everyone I spoke to said that, you
17 know, he has a -- historically had a strong
18 history of being really supportive of women in
19 the fire service, and that he -- that in this
20 particular instance, the context of which this
21 all arose was actually looking for ways to make
22 the job more accessible and that he had spent a
23 lot of time, his own time and effort that he
24 didn't really have to spend working with, with a
25 particularly smaller recruit in this sort of

Page 1236

1  situation and that --
2      Q   And that -- And that recruit was a
3  woman?
4      A   Yes.
5      Q   And that was who Ms. Benson was
6  pointing to as an example of someone being
7  treated differently by --
8      A   Correct.
9      Q   -- Roof?
10     A   Yes.
11     Q   Okay.  Number 3 is a report that, that
12 allegedly Brady Papik said that Ms. Benson was
13 not training, and that how -- was somehow
14 raising a safety issue and creating a hostile
15 work environment.
16     What was the nature of that complaint,
17 and what did you conclude, and how did you reach
18 that conclusion?
19     A   I think it sort of stemmed, in part,
20 from -- she had this belief, that was later
21 retracted -- that she later retracted, that
22 Woitalewicz and Papik had filed some sort of
23 safety complaint against her for not training,
24 and that there had also been another captain
25 that had had a similar complaint made against

1   them.  But, in actuality, there was no complaint
2   at all made about safety concerns for not
3   training by a captain, and so that was part of
4   somewhat of a retraction on this, I think.
5        But there was a specific instance
6   where, supposedly, the crews were sitting at
7   the, the table and discussing and Papik
8   reportedly said that -- something about Benson
9   that not, not training was a safety concern and
10  that she was creating a hostile work
11  environment.
12       But, in fact, when I talked to
13  everyone, no one at all recalled that aspect of
14  the conversation or him saying that, and I also
15  learned that -- She reported that she had said
16  it to Woitalewicz, and everyone else reports
17  that Woitalewicz had overslept that day or was
18  sleeping in and not even at the table.
19    Q   Okay.  Number 4, on the next page, is
20  "that Woitalewicz was 'openly' and 'angrily'
21  discussing Amanda's complaint with the crews
22  when he was displaced."
23       This was when he was moved to another
24  station pending investigation?
25    A   Correct.

1    Q   And what did you discover about the
2   merit of that complaint?
3    A   That it was completely unfounded.  In
4   fact, multiple people said that when he was
5   questioned about why he was displaced or what
6   was going on or what was going on at Station 1,
7   that he wouldn't reply, wouldn't -- would --
8   didn't want to talk about it, and --
9    Q   Okay.  So that kind of ends what you
10  were investigating with Woitalewicz, Roof, and
11  Papik.  So did -- With regard to those three,
12  did you find that there was any merit in any of
13  Ms. Benson's complaints about them?
14    A   No.  I mean, there was -- There was no
15  retaliation.  There was no other issues that
16  arose that were actionable or problematic.
17    Q   And they're not involved in
18  Ms. Benson's lawsuit, like you said from the
19  beginning; right?
20    A   Yes.
21    Q   So they're just kind of these outside
22  actors that she believed generally were
23  retaliating against her?
24    A   Yes.
25    Q   Okay.  When we get to No. 5 in Exhibit

1   44, here's where we get to the ladder training.
2   Can you -- I'd like to talk about this one in a
3   little more detail.  What exactly was
4   Ms. Benson's complaint about what Captain Mahler
5   allegedly did bad at the ladder training?
6    A   Alleged -- What Captain Mahler
7   allegedly had said was something to the effect
8   that he was happy that Ms. Benson had found a
9   new target for her lawsuit or a new -- what was
10  this [sic].
11    Q   And when he -- Who was this new
12  target, supposedly?
13    A   Captain Roof.
14    Q   Okay.  And how did Ms. Benson learn
15  that Captain Mahler allegedly made this comment?
16    A   A firefighter assigned to the training
17  division, Jessie Lundvall, had apparently
18  reported it to her.
19    Q   Okay.  And you're aware that
20  Ms. Lundvall currently has a lawsuit pending
21  against the City of Lincoln?
22    A   Yes.
23    Q   Okay.  And so Ms. Benson wasn't at
24  this training?
25    A   No.

1    Q   And this was documented in an e-mail
2   she sent just minutes after learning about it;
3   right?
4    A   That's my understanding.
5    Q   And what did you do to investigate?
6    A   In this situation, I spoke to the
7   chief about it, and he requested an e-mail from
8   Ms. Lundvall, but I also spoke to Mahler, McIn-
9   -- I didn't speak -- yeah, Mahler, McIntosh,
10  Borchers, Hansen, Christen, and Urkoski.  I
11  actually didn't speak to McIntosh, but the
12  others I spoke with.
13    Q   Did you speak to Mahler himself?
14    A   I did.
15    Q   And what did he say?
16    A   So he said he wasn't talking about her
17  at all, and that they were -- they had been
18  talking about mountain climbing, essentially.
19    Q   How would this come up in the context
20  of mountain climbing?  Why, why do you think
21  there was a misunderstanding?
22    A   It was something like Chief Mahler --
23  or, Captain Mahler is, like, is a climber and
24  that he was graduating on from, what,
25  fourteeners, or whatever, to the next higher

Page 1241

1  level. It was a, no, I've got my eyes set on
2  new targets, or something like that. The other
3  crew member had asked him about where -- you
4  know, if he had been climbing lately or
5  whatever, and that's how he responded.
6      Q   And did anyone corroborate Captain
7  Mahler's description of that conversation?
8      A   No. In fact, everyone said that it
9  was a very limited conversation where it was
10 only about mountain climbing.
11     Q   That's what I'm asking.
12     A   Yes.
13     Q   Did the other witnesses confirm that
14 Captain Mahler was talking about mountain
15 climbing?
16     A   Yes.
17     Q   When you spoke with Captain Mahler
18 about this, did you say that it was Acting
19 Captain Benson who had made the complaint?
20     A   No.
21     Q   What did you -- How did you describe
22 kind of your inquiry to him?
23     A   Well, we came out to talk about --
24 There was -- So there -- I think at that point I
25 had talked with a lot of people about this

Page 1242

1  investigation, and so I think there was already
2  sort of a -- you know, maybe some -- an
3  awareness that this was happening.
4      So we came to talk to Mahler and I
5  informed him that I was there to talk about
6  complaints of retaliation that had been made and
7  that we wanted to talk about a specific
8  incident.
9      Q   So it's possible, I mean, that he knew
10 it was Benson who made the complaint; right?
11     A   Yes.
12     Q   Okay. Did he seem angry when you
13 spoke with him?
14     A   No.
15     Q   Did he seem frustrated?
16     A   No. Well, I mean, he -- not about
17 this particular incident, no.
18     Q   Okay. And so your ultimate finding
19 was this conversation had nothing to do with
20 Ms. Benson and that it was about rock climbing?
21     A   Correct.
22     Q   Did Jessie Lundvall actually overhear
23 the conversation?
24     A   That's my understanding, yeah.
25     Q   But no one else corroborated what

Page 1243

1  Ms. Lundvall believed she heard?
2      A   No, and, in fact, she had a detailed
3  description that included a crew member that
4  wasn't a part of the conversation or group.
5      Q   Okay. So then the last part here is
6  really kind of the crux of this case, is the
7  complaint about the warehouse fire, and that, I
8  believe, came to you around May 5th; is that
9  right?
10     A   Yes.
11     Q   Okay. So at the time that that
12 complaint came to you or came to your attention,
13 had you finished this first part regarding the
14 staff at Station 1 and the ladder training or
15 was that sort of ongoing?
16     A   It was ongoing.
17     Q   And we've looked at the e-mail, a
18 bunch, from Ms. Benson to, to Curt Faust and you
19 and Engler. I believe it's Exhibit 15. If you
20 can flip to it and kind of keep your spot in
21 your Exhibit 44, though.
22     A   (Witness complies.)
23     Q   Okay. So this is actually -- Exhibit
24 15 is addressed to you and Curt Faust. No --
25 It's addressed to you and Curt Faust.

Page 1244

1      Did you -- Were you the one who made
2  Chief Engler aware that this allegation was
3  made?
4      A   Yes.
5      Q   That Captain Mahler had abandoned
6  Ms. Benson and her crew in an unsafe
7  environment?
8      A   Yes.
9      Q   And what did he ask you -- What did --
10 How did he respond? What were the next steps
11 that were taken?
12     A   To investigate it, as well.
13     Q   He asked you to investigate it?
14     A   Yes.
15     Q   Okay. In a little bit of detail, can
16 you walk me through what you did to investigate?
17     A   All right. First, I talked
18 extensively with Chief Smith and Acting Chief
19 Faust, who were the incident commander and the
20 safety officer at the fire --
21     Q   And what did they --
22     A   -- for their accounts.
23     Q   What did they tell you? And you can
24 flip back to 44 now, if that helps. Page 6 or
25 -- it's page 5 of the investigation, which is

Page 1289

1  complaints about Mahler.  What did you say?
2      THE WITNESS:  I guess, off the
3  top of my head, I believe maybe 2014 or prior.
4      THE ARBITRATOR:  You said 2014?
5      THE WITNESS:  Yes, sir.
6      THE ARBITRATOR:  Okay.  You're
7  kind of hard to understand sometimes.
8      THE WITNESS:  I know.
9      MS. GUTTAU:  We'll get you a good
10 transcript, thanks to Vickie.
11     THE ARBITRATOR:  All right.  Go
12 ahead.
13     THE WITNESS:  I tried to be less
14 caffeinated, though, just for this purpose,
15 but...
16  Q    (By Ms. Littrell)  Do you know if
17 Captain Mahler and Acting Captain Benson worked
18 together since 2014?  Have they been assigned to
19 other fires other than the warehouse fire?
20  A    Yes, quite a few.
21  Q    How do you know that?
22  A    I actually looked into it to see what
23 the number -- total number of incidents in which
24 they both responded to were over the years.
25  Q    And do you recall what that number

Page 1290

1  was?
2  A    It was high.  I don't recall exactly.
3  Q    More than ten?
4  A    More than ten, yeah.
5  Q    More than 20?
6  A    Yes.
7  Q    More than 30?
8  A    It was more than a hundred.
9  Q    More than a hundred times they've been
10 at the same incident at the same time?
11 A    I believe so, yes.
12 Q    Since 2014, when she sued him in
13 federal court.
14     MR. CORRIGAN:  Objection.
15 A    Yeah, I don't -- I don't --
16     MR. CORRIGAN:  (Unintelligible.)
17 A    It was a high number.
18     MS. LITTRELL:  Hold, hold on.
19     THE COURT REPORTER:  Hold on.
20     THE ARBITRATOR:  What's the
21 objection?
22     MR. CORRIGAN:  She didn't sue him
23 in federal court in 2014.  That's a misstatement
24 of the facts.
25     THE ARBITRATOR:  Okay.

Page 1291

1  Q    (By Ms. Littrell)  Since she filed her
2  federal lawsuit in 2018?
3  A    I don't know the number of events, but
4  there were quite a few per year.  I don't recall
5  off the top of my head what they were, but...
6  Q    But a lot?
7  A    It was significant, yeah.
8  Q    Okay.  And other than this warehouse
9  fire, do you recall any other incidents at a
10 working fire where they were not able to work
11 together?
12 A    No.
13 Q    Any other working-fire incident where
14 Ms. Benson complained to you that Captain Mahler
15 create -- was creating an unsafe environment --
16 A    No.
17 Q    -- for her?
18 A    No.
19 Q    When you were investigating
20 Ms. Benson's complaints about Captain Mahler in
21 the warehouse -- oh, excuse me.
22     When Ms. Gerdes was investigating
23 Ms. Benson's complaints about the warehouse
24 fire, do you know if Captain Mahler was removed
25 from duty?

Page 1292

1  A    He was.
2  Q    And where was he moved to?
3  A    He was put on a leave, basically, a
4  paid leave.
5  Q    Do you know how much the City of
6  Lincoln paid Captain Mahler to not worked?
7  A    It was about eighteen thousand, almost
8  nineteen thousand, dollars.
9  Q    And how long was he on leave?
10 A    From early June through August time
11 frame.
12 Q    You were asked some questions about
13 Captain Roof maybe misrepresenting what happened
14 at a fire with Ms. Benson?
15 A    Yes.
16 Q    Do you recall that?
17 A    Yes.
18 Q    Did Captain Roof make
19 misrepresentations that amounted to accusing a
20 colleague of putting him at harm?
21 A    No.
22 Q    Did his misrepresentations have
23 anything to do with safety?
24 A    No.
25 Q    If they were misrepresentations?

Page 1417

1    Q   And then, "getting one of those doors
2  open," that would be the objective?
3    A   Correct.
4    Q   And so that's Ms. Benson's assignment
5  there, to assist Truck 8 with getting one of the
6  doors open?
7    A   Correct.
8    Q   Would you read this to mean that she's
9  now, you know, permanently reassigned to all
10 ventilation tasks working for Captain Mahler?
11   A   If I was the incident commander, that
12 not how I would have given -- no, it's not.
13 It's not the -- she's not working for him, no.
14 It's a somewhat poorly communicated assignment.
15   Q   But she's got the assignment and the
16 task --
17   A   Correct.  Yes.
18   Q   -- like you just described to us?
19   A   Yes.
20   Q   Okay.  And then back to Exhibit 11,
21 page 35, at the beginning of the second full
22 paragraph on that page.  Ms. Gerdes
23 communicated, "These supervisor assignments are
24 not implied or created by default, they're
25 expressly declared."

Page 1418

1      Do you agree with that statement?
2    A   Yes, ma'am.
3    Q   Just generally, if you are captain,
4  and you've got people working for you, and
5  you're at an incident, and you believe that
6  you're in a situation where you could be killed
7  or injured, your life is in peril, what should
8  you do?
9    A   Immediately communicate that threat on
10 the radio, or concern.
11   Q   Who would you communicate the threat
12 to?
13   A   Incident command.
14   Q   Even if you think you might be able to
15 figure it out eventually, should you still put
16 it on the radio?
17   A   Yes, ma'am.
18   Q   And you can do that through calling a
19 Mayday or initiating emergency traffic; right?
20   A   Correct.
21   Q   And have you ever called a Mayday?
22   A   Yes, ma'am.
23   Q   When was that?
24   A   I've called two Maydays in my career.
25   Q   Okay.  Was there a time you called a

Page 1419

1  Mayday in the Terminal Building?
2    A   Yes, ma'am, there was.
3    Q   And was Ms. Benson present for that?
4    A   Yes, she was.
5    Q   If you believe that another company
6  officer had engaged in conduct that put you and
7  your crew at risk of injury or death, you would
8  report that immediately, wouldn't you?
9    A   Yes, ma'am, I would.
10   Q   If you were asked by a battalion chief
11 at the scene of a fire where you believed you
12 were in a situation that could have killed or
13 injured you, whether you had a safety concern,
14 you'd have to duty to answer that; right?
15   A   Yes, ma'am.  I would.
16   Q   That was a terrible question.
17      Do you know Captain Mahler?
18   A   Yes, I do.
19   Q   So you believe him to be a very
20 capable firefighter?
21   A   I do.
22   Q   How long have you been a captain?
23   A   I've been a captain right around ten
24 years.
25   Q   Have you responded to fires with

Page 1420

1  Captain Mahler?
2    A   Yes, ma'am.
3    Q   In your ten years of being a peer,
4  being a captain, is there anything in your
5  experience that would lead you to believe he
6  would intentionally put anyone at risk of injury
7  or death?
8    A   No, ma'am.
9    Q   I'm going to ask you to turn to
10 Exhibit 19.  And this is an affidavit that Ms.
11 Benson submitted in her court case.  And I'm
12 going to ask you to go to paragraph 33 of that
13 page 5.
14   A   Okay.
15   Q   And at the end of paragraph 33 it
16 says, "Mahler abandoned me in a dangerous
17 warehouse fire."
18      Would you agree with me that this is a
19 very serious accusation?
20   A   Yes, ma'am.
21   Q   In your time at the Lincoln Fire &
22 Rescue, can you recall any other circumstance
23 where one firefighter, a captain or anyone, made
24 a public accusation that another firefighter, a
25 captain or anyone, abandoned them in a dangerous

Page 1437

1    A   Lincoln Fire Station 8.  And the exact
2   year escapes me.  It's been probably -- gosh, I
3   would hate to even speculate.  Probably eight
4   years ago, seven years ago, for about a year.
5        Q   What job were you assigned to?
6        A   I was assigned to Engine 8.  So on the
7   day-to-day, I was not directly assigned to
8   Captain Mahler.  However, when I was required to
9   rotate from the engine company to the truck
10  company, I -- when he was at Station 8, for the
11  roughly 12-month time period I was there, I was
12  assigned to the engine, and I did not report
13  directly to Captain Mahler unless I was assigned
14  to the truck for that day, which happened on
15  occasion.
16       Q   How many apparatus were stationed at
17  Station 8?
18       A   There were three.  There was Engine 8,
19  Truck 8, and Medic 8.
20       Q   And if each one of those units were
21  fully staffed, you'd have ten firefighters in
22  the station?
23       A   Correct.
24       Q   Well, not firefighters, but ten staff
25  members of differing ranks; right?

Page 1438

1        A   Yes, sir.
2        Q   And in those instances or time periods
3   when you're not on call, there's common areas
4   where the firefighters had access to either a
5   kitchen or to watch TV or to be relaxed while
6   they are waiting to be engaged -- to be called;
7   right?
8        A   Yes.
9        Q   So you had a lot of interaction with
10  those people assigned to that house on that
11  shift?
12       A   Yes, a lot of interaction.
13       Q   When you were there, what would be
14  your best estimate of the average daily call
15  volume for the engine?
16       A   Again, I'm just estimating.  I think
17  it's fair to say ten probably, -ish, if not more
18  at that time.  I think ten probably is safe to
19  say.
20       Q   So the engine would leave the house
21  about ten times per 24-hour shift?
22       A   Yeah, that seems about right.
23       Q   And would that be more or less than
24  what the truck company would be called upon to
25  respond to?

Page 1439

1        A   On a typical day, it was probably
2   three times as often as the truck would go out.
3        Q   Why is that?
4        A   The nature of the responses the engine
5   was required to go to are far more common than
6   the responses the truck would be required to go
7   to.  The engine company primarily responded to
8   all medical calls whereas the truck would be
9   more likely to respond to entrapments, rescues,
10  gas leaks, less common occurrences typically.
11       Q   And would you agree that Mr. Mahler is
12  a highly competent fire officer?
13       A   Yes, I think he's very knowledgeable.
14       Q   Did you ever observe instances when
15  you were working with him where he would engage
16  in behavior to ignore or shun people who he was
17  angry at?
18       A   Yes.
19       Q   Can you describe that for us?
20       A   Yes.  One instance in particular, the
21  engine was sent to a gas leak call, which is not
22  something that engines would typically go on at
23  the time because we didn't even have monitoring
24  equipment.  And he was upset that day about
25  something, I don't even remember what, it's been

Page 1440

1   so long ago, and he just simply just decided not
2   to go.  So the engine had to end up taking the
3   response.
4            Another one -- just off the top of my
5   head, there was another time where he had
6   accidentally left his helmet at the station,
7   which we've all done at one time or another
8   during the course of our careers, at least most
9   people I know have, and somebody, I don't even
10  remember who it was, made a comment to him when
11  he came back, and he literally stormed upstairs
12  and locked himself in the bedroom and didn't
13  come down for the whole rest of the day.  And
14  that's the whole rest of the 24-hour shift, so
15  somewhere in the neighborhood of 18 to 20 hours.
16       Q   Have you ever observed instances where
17  people tried to talk to him, and if he was mad
18  at them, he wouldn't do it, he wouldn't engage
19  with people?
20       A   Yeah.  Me.  I had asked him about
21  equipment on multiple occasions because I didn't
22  have very much truck experience.  And his
23  typical answer to me was he would just kind of
24  blow me off and tell me to go Google it or read
25  the manual.  I just did not -- I just had a very

Page 1441

1    difficult time with that.
2        Q   What about not speaking to you or to
3    others at all who made comments to him, did you
4    ever observe that behavior?
5        A   I don't recall witnessing him ignoring
6    people in front of me, per se, other than him
7    giving kind of the blatant cold shoulder to
8    people he wasn't very happy with.
9            I don't know if that makes sense or
10   not. I'm sorry.
11       Q   Describe for me what you mean by
12   giving the cold shoulder to people he wasn't
13   happy with.
14       A   Clearly blowing people off,
15   disregarding their questions, making it clear
16   that he didn't want you on his rig, just general
17   things like that.
18       Q   And do you have any specifics you can
19   share with us with regard to people he didn't
20   want on his rig?
21       A   Yeah. One time in particular we went
22   to a *threat-of-fire, fire call, not a big deal.
23   There was a little bit of light smoke in the
24   building. And I was unable to get a ventilation
25   fan started, which turned out after we got back

Page 1442

1    to the station that there was something wrong
2    with it, it had nothing do with me, because I
3    have lots of power equipment at my house and I
4    know how to start engines.
5            But he made it extremely clear in a
6    yelling voice that if I wanted to be on his
7    truck, I better get my shit together or I'm not
8    going to be on it anymore.
9    And there were some other comments, but I don't
10   recall exactly what those were.
11       Q   Did you have any occasions to work
12   with Amanda Benson as a firefighter or as a fire
13   captain?
14       A   When I was out riding the seat, as we
15   call it, which is filling in for other captains,
16   before I was promoted, I had the opportunity to
17   work with her a couple times in Station 3, I
18   believe.
19       Q   Did you ever have any negative
20   interactions with her with regard to her
21   performance or her judgment as a firefighter?
22       A   No.
23       Q   If the City was required to reinstate
24   her employment, would you have any objection or
25   hesitancy in working with her in the future?

Page 1443

1        A   Not in the least.
2        Q   And do you know why she got fired?
3        A   I know everything I've read in the
4    papers and, you know, Google searches and that
5    kind of stuff, and just being a friend.
6        Q   Well, you understand that at least the
7    City maintains that they terminated her because
8    she made a false allegation about Mr. Mahler
9    that he abandoned her in a dangerous environment
10   and she could have been killed; right?
11       A   Yes.
12       Q   Even knowing that allegation that the
13   City has made, you wouldn't have any reservation
14   about returning to work with her?
15       A   No. I typically judge people on how I
16   interact with them, and I've never had an issue
17   interacting with her in the least.
18       Q   In this case, there's an exhibit
19   that's been presented, which is an affidavit
20   that Ms. Benson submitted to the federal court
21   which I'm going to identify as Exhibit 20, R-20,
22   which is in the City's notebook. And in that,
23   she attributes some information to you about
24   incident command.
25       A   Okay.

Page 1444

1        Q   And I'm going to ask you some
2    questions about that.
3            Is it your understanding that under the
4    Incident Command System, there can only be one
5    supervisor for a functional path like
6    ventilation?
7        A   That's my understanding.
8        Q   Now, in this case, we had a situation
9    where at the sort of important time in the fire
10   at the warehouse, the incident commander, Faust,
11   assigned ventilation to Truck 8, which was
12   Mahler's crew. And there's been evidence in the
13   case that Ms. Benson, as the acting captain of
14   Truck 1, asked Mr. Faust whether Truck 1 should
15   assist Truck 8 with ventilation.
16           I'm just laying those facts out to you.
17   I don't know whether you know that or not.
18           If she was advised by the incident
19   commander, "Yes, hook up with Truck 8, you can
20   assist with ventilation, getting one of those
21   doors open," would it be reasonable for her to
22   conclude that she was to find the Truck 8
23   captain and get direction from him on what she
24   should do?
25       A   I think it's reasonable to assume

Page 1453

1  did he do that to certain people more than other
2  people?
3      A   Yes.
4      Q   Who did he seem to give the cold
5  shoulder to?
6      A   People who were not assigned to his
7  apparatus.
8      Q   Women and men?
9      A   There were no other women at the
10  station at that time, so I can only comment on
11  my co-workers at that time, which were all men.
12      Q   And he would give them the cold
13  shoulder?
14      A   Yes, routinely.
15      Q   Would he try to kind of manipulate the
16  schedule to keep them from being put on his
17  truck?
18      A   Routinely.
19      Q   My office sent you some exhibits this
20  morning.  Did you get those e-mails?  Or I think
21  they may have come from Mr. Schrunk.
22      A   Yes, ma'am, I have them.
23      Q   And Mr. Corrigan asked you if you were
24  a fan of Shawn Mahler, and you said no.  And I
25  believe after that, you said you didn't wish him

Page 1454

1  any ill will.
2      Do you remember that?
3      A   That's correct.
4      Q   Okay.  I'm looking at City's Exhibit
5  No. 53.  Do you have that?  It's a text message.
6      A   Yes, I do.  I have it in front of me
7  right now.
8      Q   Do you recognize that conversation?
9      A   I don't recall it because it's been
10  quite a long time ago, but it sure looks like it
11  to me.
12      Q   Okay.  And I'll represent to you that
13  there's a link in this first bubble here --
14  well, first -- I'll tell you this:
15      This was provided to the City in Ms.
16  Benson's other lawsuit from her attorneys.  And
17  we believe this is a conversation between you
18  and she.
19      This first link is an article about a
20  lawsuit filed by Captain Giles, who you
21  mentioned earlier, in 2017.  And here I think in
22  that third bubble down it says, "Shawn, you see
23  that glow in the corner of your eye?  That's
24  your career dissipation light.  It just went
25  into high gear."

Page 1455

1      What did you mean by that?
2      A   Well, I didn't mean anything by it.
3  It's actually a joke.  It's a line from the
4  movie Backdraft that firefighters kind of joke
5  with each other about from time to time.  That's
6  pretty much all there is to it.
7      Q   What does "career dissipation" mean?
8      A   It's a movie quote from the movie
9  Backdraft.  There is a couple scenes in the
10  movie -- it's kind of an ongoing firefighter
11  joke over the years.  That's pretty much all
12  there is to it.
13      Q   So you were making a joke about Shawn?
14      A   I couldn't even tell you at the time,
15  it's been long enough ago.  But it's a movie
16  quote from the movie Backdraft that was probably
17  an ill-placed joke, but that's all it is.
18      Q   And then you say, "I highly doubt he's
19  going to sleep well, that's for sure," and a
20  crying emoji.
21      Were you hoping he wouldn't sleep well
22  after this article was published in the paper?
23      A   As I stated before, I wish no ill will
24  upon anybody anywhere.
25      Q   You were asked, I think, to conduct --

Page 1456

1  strike that.
2      Your testimony is that only one
3  supervisor can be assigned to a functional task
4  at a fire incident.
5      Did I state that correctly?
6      A   That's my understanding, yes.
7      Q   There's been some testimony today from
8  another fire captain, Captain Ripley, that it's
9  not uncommon to have, say, two or three engines
10  assigned to the functional task of fire
11  suppression, fire attack.
12      Would you dispute that?
13      A   No, I wouldn't dispute that.
14      Q   And that they're each, you know,
15  separate individual units each performing fire
16  attack and each having reporting obligations to
17  the incident commander; correct?
18      A   It depends on the size of the
19  incident.  If there's an incident of -- well, in
20  my opinion -- I'm not going to dispute Captain
21  Ripley.  He's highly respected by myself as well
22  as everybody else.
23      That being said though, depending on
24  the size of the incident, there would be a
25  functional group supervisor depending on where

1   believe City legal, and then the fire department
2   were working on a memorandum of understanding
3   because I wanted to be removed from the fire
4   station or given a break from that environment,
5   but moving me out would violate the Union
6   contract. So they came to an agreement that
7   they would do an MOU for 90 days and essentially
8   displace me for 90 days, and at the end of that
9   90 days I could make my decision.
10       And I just happened to be injured and
11  had surgery. I was out on surgery leave when
12  the MOU expired. And I believe Kimberly
13  Taylor-Riley's report included -- I got a
14  notification from the mayor -- and there's a
15  clear timeline, so I'm just trying to recall the
16  best I can. The mayor said that the report
17  found no merit, or something along those lines,
18  and requested that I meet with Doug McDaniel and
19  Director Casady --
20       Q   And McDaniel was the Human Resources
21  director and Mr. Casady was the Public Safety
22  director over the police and fire department;
23  right?
24       A   Yes.
25       So at this point I e-mailed my captain

1   at the time, Merryman, and told him that I would
2   like to terminate my assignment at Station 8, I
3   did not want to return, that I did not feel like
4   the problem had been remedied and I did not feel
5   like the concerns were being taken seriously, or
6   something along those lines.
7        And then Director Casady and McDaniel
8   had a long meeting with me discussing whether or
9   not -- what it would take to get me to go back
10  to Station 8.
11       And so at that point we just had a new
12  fire chief, Michael Despain. He had just got
13  there and contacted me to meet with me and
14  discuss where I would like to go. And there was
15  a vacancy at Station 3. One of the firefighters
16  there wanted my position at
17  Station 8, so they coordinated a swap. And
18  that's how I ended up at Station 3.
19       I could be missing, obviously,
20  information. But that's what I've got right
21  now.
22       MR. CORRIGAN: To the extent that
23  it hasn't been received into evidence, we would
24  offer Exhibit 103, not necessarily for the truth
25  of the matter asserted but simply as the

1   background for what happened with the
2   investigation of her complaints initially.
3        MS. GUTTAU: No objection.
4        THE ARBITRATOR: What's your
5   objection?
6        MS. GUTTAU: I said no objection.
7        THE ARBITRATOR: No objection.
8   Okay. Received.
9        (Exhibit No. 103 was received into
10  evidence.)
11       Q   (By Mr. Corrigan) Going forward now
12  to -- well, so what happened at Station 3?
13       So at Station 3 I worked under Dan
14  Ripley, had a great working relationship with my
15  crew and my supervisor, was very happy there. I
16  had one issue with Shawn Mahler, and it followed
17  inappropriate touching. There was another
18  officer on the job who hit me in the back of my
19  pants when I was getting up into the ambulance.
20  It was a case of mistaken identity, and he was
21  very upset, apologetic, came out to the fire
22  station, sat down and talked with us, not a big
23  deal. It was handled in-house.
24       And then a period of time later, if I
25  remember correctly, it was a couple months later

1   maybe, I was approached by Shawn Mahler at fire
2   scene when I was by myself. And he informed me
3   that he had witnessed the interaction and wanted
4   to know why I didn't report that officer. And I
5   was very uncomfortable with the conversation. I
6   didn't think it was appropriate for him to come
7   to me to talk about that. I thought he should
8   come to my officer or report it if he had seen
9   something. And I took it as him reminding me
10  that he was monitoring me and kind of poking at
11  me almost -- my interpretation was that he was
12  saying, well, if you reported me, why didn't you
13  report this guy.
14       Q   Why didn't you report that guy?
15       A   Because that guy was friendly with me.
16  That guy communicated with me. He was an active
17  part of my Station 3 family. That guy was there
18  all the time. He wasn't intentionally doing
19  something to harm me, whereas Shawn Mahler was
20  not friendly to me, did not like me, did not
21  speak to me. So in my mind, there's a very big
22  difference. The context is everything.
23       Q   So was there some -- did you raise
24  this issue with the fire management?
25       A   Yes, I brought it to Captain Ripley.

Page 1481

1   negatively impact your crew.  But there was less
2   of a chance of that at 1 because of how many
3   people that we had there, and we didn't have a
4   medic unit.  So when that opening came open,
5   that's --
6       Q   You transferred there?
7       A   Yes.
8       Q   When did the captains promotional
9   process start that you were eligible for?
10      A   The process I believe started in the
11  fall of 2019.  Yeah, it would have been the fall
12  of 2019.
13      Q   Then did you get on the list?
14      A   Yes.
15      Q   And did you act?
16      A   Yes, I did.
17      Q   Did you ever get promoted?
18      A   No, I did not.
19      Q   What's your understanding of the
20  promotional process for captains in the sense
21  that once the list is certified, what does the
22  City do to fill vacancies in the captain rank?
23      A   The City pulls from the eligibility
24  list.  And it goes by shift.  So there's a large
25  list of all the candidates.  And then if it's A

Page 1482

1   shift, they pull the top off of that list from A
2   shift, B shift and C shift.  And at one point I
3   was the top on C shift for the rest of my time
4   at LFR.
5       Q   Meaning that you had the -- you were
6   the top ranking person still on the list who
7   hadn't been given a promotion?
8       A   Yes, on C shift.  So every day I was
9   filling a vacancy for a captain pretty much.
10      Q   And if a promotion were to be made on
11  C shift, you would have received the next
12  available promotion regardless of whether the
13  department -- it's without any discretion, isn't
14  it?
15      A   The next person in line would have
16  whether they were on A, B or C shift.
17      Q   And so the promotion to captain is a
18  rank-for-rank basis, meaning the City has an
19  obligation to promote the next person up when
20  there's a permanent vacancy that occurs; right?
21      A   Yes.
22      Q   And did the list ever expire while you
23  were on it?
24      A   No.
25      Q   Okay.  Now, so because of this

Page 1483

1   voluntary transfer from Station 3, and your
2   acting as Captain 1 on the truck company,
3   Station 1, now tell us what was going on in
4   April of 2021 that led to your complaint that is
5   embodied in Exhibit 104?
6       A   Okay.  So I had been injured again and
7   had another surgery.  And while I was on injury
8   leave, a captain for Engine 1 named Chad Roof
9   had transferred out prior to my arrival there,
10  and then there was a vacancy on Engine 1 again
11  while I was on injury leave, and he transferred
12  back in.  When I returned back to the station,
13  he was there, and there was some butting of
14  heads, and it sort of escalated to the point
15  where he had made comments regarding people who
16  had lawsuits against the City of Lincoln.  He
17  had made comments that I thought were just
18  inappropriate in general.  They were comments
19  about female -- the ability of female
20  firefighters and whether or not our physical
21  requirements to get on the job were too lax.
22  And that was kind of the nature of the issue.  I
23  had some issues with his immediate subordinate,
24  whose name is Matt Woitalewicz, and I had
25  communicated with Kurt Faust, who is my captain,

Page 1484

1   some of these concerns.
2       Q   So he was the captain of Truck 1.  And
3   because he was acting battalion chief, you were
4   the acting captain; right?
5       A   Yes.  At some point, Matt Woitalewicz
6   transferred over to the truck, and while I was
7   acting captain, he became my direct subordinate.
8   And there were issues involving Matt complaining
9   about training and Chad Roof making comments
10  about officers.  And it was kind of like public
11  -- public attempts to kind of attack me in front
12  of --
13      Q   When you say "public attempts," you're
14  talking about within the station house?
15      A   Yes.  I would deal with kind of being
16  ganged up on.  And I had indicated to Chief
17  Engler some of the stuff that was going on.  And
18  he -- I can't remember exactly at this time --
19  I'm sure it's in documents somewhere.  But I
20  believe he had Chief Faust and Chief Smith
21  counsel Chad maybe.  And then I was worried that
22  he would get upset with me for this and then
23  basically make my life worse at the fire
24  station.  And they assured me that this wouldn't
25  happen.  And by "they," I mean -- I believe it

Page 1489

1  believe that I should be able to address problem
2  behavior at work that interrupts my ability to
3  work, interrupts my ability to lead. At the
4  time, I was an acting captain, and I was dealing
5  with a subordinate who was being inspired to
6  partake in this behavior that undermines my
7  ability on the job. And the rumor mill is toxic
8  in the fire service. And I just was so tired of
9  what felt like constant retribution for asking
10  to be left alone. My request was just fix this
11  so I can be left alone, I don't want to be
12  talked -- like I don't want to be communicated
13  with like this by my peers, by my supervisors, I
14  just want to be treated like everybody else.
15  And the communications that appeared to still be
16  happening undermined that.
17     Q   So the complaint that you made that's
18  embodied in Exhibit 152, that was purely based
19  off of what Ms. Lundvall had told you; right?
20     A   Yes.
21     Q   The next thing that happens is the
22  warehouse fire; right?
23     A   Yes.
24     Q   So if you go back to -- we'll go back
25  to Exhibit 109. That's the transcript of the

Page 1490

1  audio.
2     A   Okay.
3     Q   Where were you when you got that call?
4     A   We were approximately 48th and
5  Holdrege. I had the crew out at the community
6  college doing captain-initiated training, and so
7  we were driving back to our area.
8     Q   And the call came in, so you jumped
9  the call, as they say, is the jargon?
10     A   Yes.
11     Q   What does that mean?
12     A   Well, I had not pressed a button to
13  put us back into service yet because we were
14  still driving that direction. And because of
15  that, the CAD system did not dispatch us onto
16  that call even though that would have been Truck
17  1's call.
18     Q   So had you been in service, you would
19  have been dispatched there?
20     A   Correct. And not only that, we were
21  very close.
22     Q   So you heard the call on the radio,
23  put yourself in service, and went out there;
24  right?
25     A   Yes.

Page 1491

1     Q   Why don't you tell us what you think
2  happened?
3     A   We arrived on scene. And Truck 5 I
4  think had initial command. Battalion 1 had come
5  in right with us pretty much. We met Truck 5 at
6  an intersection, 47th and Superior, and then we
7  blocked for them so they could go through. So
8  that's how close we all were. I believe my
9  initial assignment was to check for extensions.
10  So I had Matt Roberts and Morgan Hurley. And
11  Morgan Hurley is a recruit.
12        And so we geared up, grabbed our tools
13  and made entry, and made our way towards where
14  the bulk of the incident was, which would be the
15  trash compactor. Had poor visibility to the
16  point where the fire attack crews could not see
17  that they were missing the fire with the water.
18  So when you looked at it with a TIC, you could
19  see the heat exchange, you could see the water
20  going over top of the flames. And so there was
21  several TICs, the thermal imaging cameras.
22        And we assisted the nearby -- well, my
23  firefighter, Morgan, assisted the nearby hose
24  line so that they could actually see where the
25  fire was at and see that they were hitting it.

Page 1492

1        And during that point, I was on the
2  Bravo side of the trash compactor, and I took
3  the TIC from Morgan because I saw a significant
4  amount of heat underneath an object, and I was
5  not sure what the object was because the
6  visibility was so bad. And then I took the TIC
7  around to the side, which would be the Bravo
8  side of the trash compactor, and looked upward
9  and saw fire above that same portion.
10        And so I believe it was George Gasper.
11  I don't know what -- he might have been on
12  Engine 10 that day, but he was there. I got
13  him, or somebody, to bring a hose line over to
14  the side, and then I continued with the TIC and
15  could see like little hot spots, residual hot
16  spots, what appeared to be like down like a
17  pile, or which I found out later was a ramp.
18  And so at this point we still can't see.
19        It was my impression -- what I felt
20  like was you could see an outline of a person
21  when you're about five feet away from them, but
22  you had to be right up into their face to be
23  able to read the information on their helmet.
24  So you could see the outline, but you had to get
25  really close to see details. And it just --

1   there was so much lingering smoke, we just
2   needed it out.
3       And so Kurt called me on the radio at
4   some point asking for an update, and I told him
5   that I think it's confined to the pile, I
6   believe, something along that line.  And then we
7   continued to talk on the interior, Matt Roberts
8   and myself, about the need for ventilation.
9   I contacted Kurt on the radio and said, hey, we
10  need ventilation.  My interpretation was that we
11  were not going anywhere until we got the smoke
12  out there because it just made everything
13  difficult, it made things more dangerous, and
14  why keep working when you can't see what you're
15  doing.
16      So at that point he assigned Truck 8 to
17  ventilate.  And I don't remember how long it
18  was.  There was a break in the radio.  And at
19  that point I offered
20  to -- I offered -- asked if Truck 1 -- if he
21  wanted
22  Truck 1 to assist.
23      Q   Look at page 3 of -- it's sheet 3,
24  page 10.
25      A   (Witness complies.)

1       Q   So you previously on the radio said,
2   we need some sort of ventilation?
3       A   Yes.
4       Q   And Mahler gets -- Truck 8 gets
5   assigned the ventilation task?
6       A   Yes.
7       Q   And you asked, "Truck 1 to command,
8   would you like us to assist with ventilation"?
9       Right?
10      A   Yes.
11      Q   And what was your purpose in doing so?
12      A   I figured that there were so many
13  people in -- where we were at focusing on
14  missing this fire, that we just needed resources
15  to help orchestrate ventilation.  I didn't know
16  what the route would be.  I didn't know what the
17  opposite side of the building looked like.  And
18  we have extra fans, the truck companies have
19  fans.  I didn't know what they were going to do,
20  but I figured since it was such a large
21  building, you would need a group of people in
22  order to execute it.
23      Q   And you knew when you requested that
24  or made that ask to the incident commander that
25  Mahler was assigned to ventilation; right?

1       A   Either before or right after when he
2   said to hook up with Truck 8.  I don't remember
3   -- they've had me listen to the recording so
4   many times, I don't remember if I heard the
5   initial "Truck 8 assignment to ventilation" or
6   not.
7       Q   Did it matter to you?
8       A   No.
9       Q   You knew the ventilation was the
10  important thing, it wasn't who was going to do
11  it; right?
12      A   Yeah.
13      Q   So the response, at least according to
14  the transcript, is, "Yeah, if you can, if you
15  can hook up to Truck 8, you can assist with
16  ventilation, getting one of those doors open."
17      We've had this conversation with a lot
18  of witnesses.
19      A   Yes.
20      Q   When that language was communicated,
21  what did you understand?
22      A   Well, when I was first asked about
23  this -- and I have to look at my initial
24  interview about it --
25      Q   With who?

1       A   Torrey Gerdes.
2       Q   So the City never interviewed you
3   about this?
4       A   No, no one ever talked to my about
5   this.
6       Q   When you gave the e-mail to Kurt
7   Faust, he sent it up the chain of command, and
8   then you were never questioned about it?
9       A   Nobody else ever talked to me about it
10  until Torrey Gerdes.
11      Q   Okay. So what did you understand that
12  communication to mean at the time that it took
13  place?
14      A   During my initial interview, I
15  probably -- I could have had better recollection
16  of what was new information to me and what
17  wasn't.  I had never read or seen the radio
18  traffic from the fire to the Torrey Gerdes --
19  she provided it to me a couple days before.  So
20  after listening to it so many times -- I'm not
21  the best historian on when -- if I heard things
22  first at the fire or later.  I believe when I
23  talked to Torrey Gerdes, I missed the second
24  half of that transmission and just heard -- I
25  believe I remember hearing, "if you can hook up

Page 1497

1  with Truck 8, you can assist with ventilation."
2  And I do not remember hearing "getting one of
3  those doors open."
4      Q   But you said, "clear"?
5      A   Yes.
6      Q   And by saying "clear," that's
7  acknowledging the assignment; right?
8      A   Yes.
9      Q   What happened once that communication
10  took place between you and Mr. Faust?  What did
11  you do next?
12      A   At this point I collected Hurley and
13  Roberts and we left the structure.  It was still
14  poor visibility.
15  From where we were at the compactor, the smoke
16  was very thick, and you could not see the door
17  from the trash compactor.  And initially we had
18  to walk towards -- like on the hose line.  Per
19  Matt Roberts, he said, this is great training,
20  whatever, for Morgan, this situation is why you
21  never just walk to a door.  So we showed her how
22  to walk out over the hose line and said, see,
23  when you get close enough to the door, you can
24  see the light, and then you walk out.
25      So we walked out.  We kind of walked

Page 1498

1  away from the building.  And then I turned to my
2  right, which would have been towards the
3  Alpha/Bravo corner of the building.  And at that
4  point, I believe that is when I saw Truck 8
5  crew in that corner, and so I started walking
6  towards that corner.
7      Q   When you say you saw Truck 8 crew, can
8  you tell us who you saw?
9      A   I saw Mahler and I thought Trent
10  Borchers.  Steve Dyer might have been there.
11  But I thought there were only three of them.
12      Q   Well, Mr. Love was in the crew.  Was
13  he somebody that you remember seeing?
14      A   I don't remember seeing Love the whole
15  fire.
16      Q   So what did you do when you say the
17  Truck 8 crew of Mahler, Borchers and maybe Dyer?
18      A   I walked towards them.  When I got
19  closer to them, Mahler -- I was walking towards
20  them.  They were walking towards the direction I
21  had come from.  And Mahler stepped around to
22  walk around me, and so I turned around and
23  walked alongside him until I could get kind of
24  in front of him to stop and said, hey, Truck 1's
25  assigned to assist you with this, something

Page 1499

1  along the lines of, what's your game plan, what
2  do you need.
3      Q   Were you on air at the time that you
4  had that conversation?
5      A   I don't remember.  I remember on one
6  of the exits -- usually we pop our regulators
7  off but still stay masked up.  So we could have
8  been popped off there.
9      Q   But still be masked up?
10      A   Yeah, could have been.  Yes.
11      Q   What about Mr. Mahler?
12      A   I don't remember.
13      Q   Once -- so when he walked around you
14  and you caught up in front of him, was that the
15  first time you actually said anything to him?
16      A   I don't remember.  I might have
17  started talking to him initially, and I think I
18  just chalked it up to I need to talk louder.
19      Q   In your experience with him, has he
20  ever engaged in activity or shown signs of
21  having a hard time hearing you?
22      A   Not really to me directly.  I know
23  like just through statements, I know we both
24  have hearing problems.
25      Q   So you get to the point where you're

Page 1500

1  in front of him to stop him and say, Truck 1 is
2  assigned to assist you, what's your plan, or
3  something to that effect.
4      What happened?
5      A   He said something along the lines of,
6  Truck 8 is going to open an overhead door, and
7  then kept walking.  So I turned around, grabbed
8  Hurley and Roberts.  They were standing -- like
9  I remember making contact -- like going interior
10  with Morgan Hurley right by the door that we had
11  walked out of, that door.  And I grabbed her and
12  walked alongside the wall to the left, and I
13  told her like kind of what we were doing is
14  checking the overhead.  So I wanted to make sure
15  that the door that they were opening didn't have
16  a whole bunch of rubbish like piled up behind it
17  so there would be air flow.  It didn't really
18  matter, because by the time we had gotten close
19  to that door, it was already opening so you
20  could kind of see the sunlight around the door.
21      I then ran into who I thought was Trent
22  Borchers right inside there.  And he said
23  something about was this the right door,
24  something along those lines.  There was an
25  exchange, is this the right door, and then a

Page 1501

1    quick -- I don't know.  And I don't know how
2    Trent left, whether he went under the door or
3    whether he -- I don't know.
4    But at that point I turned with Hurley, we
5    walked back alongside the wall and went exterior
6    back out the door we came in, and we were like
7    arm on the wall, like within two or three feet
8    of the wall the whole way, and then went out.
9        And at that point --
10       Q    I'm going to stop you.  I want to ask
11   you to -- if you look at the overhead in the red
12   book, Exhibit 16.  And go to page 2 of Exhibit
13   16, R-16.
14       A    (Witness complies.)
15       Okay.
16       Q    The door that we're talking about
17   getting open, which one -- is it depicted on
18   this photograph?
19       A    It's kind of a guess.  This photograph
20   is different from the day of the fire.  I
21   believe it was one of the, like, smaller
22   overhead doors to the left where there's two
23   right there.  I believe one of those had a
24   tractor trailer in front it, or something in
25   front of it on the outside.

Page 1502

1        Q    But your egress and your entrance were
2    from the large overhead door?
3        A    Yes.
4        Q    The first one in the middle of the
5    page?
6        A    Yes.  I believe so, yes.
7        Q    So going in that door and going over
8    to the smaller doors to the left?
9        A    Yes.
10       Q    All right.  As we look at page 2.
11       And after you and Firefighter Hurley
12   exited the structure, after the door got open,
13   what happened after that?
14       A    After we exited?
15       Q    Yes.
16       A    Truck 8 and like Roberts and Hurley
17   and myself, we were all standing in front of
18   that big door.  And I was trying to communicate
19   with Shawn.  I was trying to ask him -- well, I
20   was asking him what the plan was, something
21   along those lines, as they started to walk
22   interior.  So I started walking interior with
23   Mahler.
24   And as we went interior, I continued to try to
25   talk to him, find out what his plan was.  I made

Page 1503

1    a comment about whether or not Roberts had seen
2    the skylight.  Roberts grabbed me at one point
3    and asked me if Mahler knew about the skylight.
4    So I turned around to Roberts, and then I turned
5    back around to Mahler, grabbed Mahler, got my
6    face right to the side of his face and said,
7    Roberts saw a skylight, what do you think, or
8    something along that line.
9        And after that, he didn't really say
10   anything.
11   I turned back around to Roberts.  And by the
12   time I turned back around to Mahler, I was just
13   seeing him kind of disappear in the smoke.  And
14   so at that point Roberts was still asking, hey,
15   what are we doing, what's our assignment.  And
16   we had walked in at an angle -- like that big
17   door, if my memory serves me correctly, when you
18   walk into that big door, the trash compactor was
19   slightly to the right.  And when we had walked
20   in, I wasn't entirely sure if we had walked more
21   straight or more to the left or what.  But at
22   that moment I wasn't oriented, and I realized I
23   wasn't oriented.  And I realized that it was a
24   safety issue.  So I grabbed the TIC and was
25   facing what I believed to be -- because when you

Page 1504

1    go in there, I'm forward, then I'm backwards,
2    then I'm forward.  I could be facing way left of
3    where I think I am; I could be facing way more
4    right of where I think I am.  I grabbed the TIC,
5    scanned, see the fire to my right, and I see
6    people next to it, and I assume that that's
7    Truck 8.
8        So I take Morgan and Roberts to the
9    trash compactor, make contact with who I think
10   is there.  At this point, my time of being
11   disoriented was seconds.  I just realized that I
12   was, and oriented because I knew trash
13   compactor, I've already been there.  That's
14   where all the hoses are.  That I know.  I know
15   where the door is from that.  So we get to the
16   trash compactor.  I believe I see who I believe
17   is Borchers.  I ask where Mahler is.  He says, I
18   don't know.  At this point he said something
19   along the lines of, I'm going up, and he started
20   climbing on top of the trash compactor, handed
21   me his Halligan, starts climbing up the
22   compactor --
23       Q    What is that?
24       A    The Halligan is -- it's like a metal
25   tool, like --

Page 1505

1    Q   Multi tool, like an axe or a poker?
2    A   Yeah.  It goes with an axe.  It's used
3  to pry things open.  It's used for a lot of
4  things, but it usually goes with an axe.  It's
5  just a kind of large, clunky tool.
6        And he handed me the Halligan.  I
7  believe Morgan was -- she had gotten down, kind
8  of on the ground in front of me, and she was on
9  a hose line or something.
10  And I called for a hose line.  Hose line came
11  over to the side.  I helped get the hose line up
12  to Borchers.  And then shortly around this time,
13  Roberts' low air alarm started going off, so I
14  took Hurley and him and we walked out.
15    Q   And you reported that on the radio?
16    A   Yes.
17    Q   How many times do you think you
18  approached Mahler inside the fire and asked him
19  whether he was going to have any direction or
20  whether he needed you to do anything?
21    A   Not talking about the outside, it
22  started when we were just outside the door and
23  then we were walking in.  And I just kept kind
24  of saying things as we were walking in, numerous
25  things, what's your game plan, what do you want,

Page 1506

1  what do you think about this, numerous times.
2    Q   And did he ever respond to you?
3    A   No.
4    Q   Other than outside the fire when he
5  said that we were going to open some doors, did
6  he ever say anything to you after that other
7  than when he exited the building?
8    A   At our exchange?
9    Q   When you exchanged, took over?
10    A   No, he did not say anything after,
11  "Truck 8 is going to open some overhead doors."
12    Q   There's been some testimony about the
13  City's objection to the use of the word
14  "abandon."
15        At what point -- or what things
16  happened that led you to believe that you had
17  been abandoned by
18  Mr. Mahler?
19    A   My repeated questions to him, him -- I
20  took -- when I actually physically grabbed him
21  to ask about the skylight, he faced me.  Like I
22  felt like he was hearing me.  And then his
23  decision to not say anything at all and then
24  just completely walk away, that is what I
25  constituted as "abandoned."  He knew -- in my

Page 1507

1  mind, he knew -- it was unmistakable at that
2  point that I was trying to get direction from
3  him, and he just walked away.
4    Q   Did he ever say to you on the exterior
5  of the fire that, if you need an assignment, you
6  need to contact incident command or you should
7  contact incident command?
8    A   No.
9    Q   No words to that effect?
10    A   No.
11    Q   When was the first time that you had
12  heard that he made that comment?
13    A   Maybe the Gerdes report.
14    Q   And you got a copy of that in August
15  of 2021 prior to your grievance hearing; right?
16    A   Yeah.
17    Q   And if he had said that to you, would
18  you have done anything?  Would you contact
19  incident command at that point?
20    A   Yeah, I would have -- I didn't know
21  why he wasn't communicating.  And I kept
22  attempting to make contact with him, and even
23  attempted to continue to find him by going
24  towards the trash compactor.  That never would
25  have happened if he would have made it clear

Page 1508

1  from the beginning that I needed to contact
2  Battalion 1.
3    Q   You wouldn't have taken the crew back
4  inside; right?
5    A   Correct.
6    Q   Unless Battalion 1 told you to?
7    A   Correct.
8    Q   Why didn't you call a Mayday?
9    A   I didn't think I needed to.
10    Q   Have you ever call a Mayday?
11    A   No.  I've been there when one was
12  called, but it's not something anybody wants to
13  be involved with.  I think -- in my experience,
14  people are pretty resistant to call them.  But I
15  was able to orient, so why would I have needed
16  -- I didn't need rescue.  I could still
17  problem-solve my way.  I was attempting to
18  anyways.
19    Q   The fact that you didn't need rescue,
20  that doesn't mean that you didn't feel as if you
21  had been abandoned, did it?
22    A   Say that again.
23    Q   The fact that you didn't need to be
24  rescued didn't change the fact that you felt you
25  had been abandoned?

1    sent him, or did you go through it with him
2    before you sent it?
3         A   No.  We had just talked about it on
4    the phone before, so --
5         Q   Did you explain to him that you
6    thought he was your supervisor at that fire when
7    you were trying to communicate with Mahler?
8         A   I'd have to look at the e-mail to see
9    it verbatim.
10        Q   Do you want to look at Exhibit 111?
11        A   Yes.
12           (Witness reviews document.)
13        A   Yeah, just in the second -- at the end
14   of the second paragraph --
15        Q   Okay.
16        A   -- when I basically say, "Reassign
17   Truck 1 to Truck 8."
18        Q   But did you talk to Mr. Faust about
19   that, that you felt that you were assigned --
20   based on his communication of radio traffic,
21   that Mahler was going to be directing you in
22   that fire for any reason?
23        A   Yes.
24        Q   Did he ever tell you that that wasn't
25   the case, that you were just mistaken about

1    that?
2         A   No, he never told me that.
3         Q   Had either one of you listened to the
4    radio communication before you sent the
5    complaint?
6         A   No.
7         Q   So there's been a lot of questioning
8    of witnesses as to whether -- if they thought
9    they were in danger, wouldn't they contact
10   incident command at the fire, call a Mayday or
11   get on emergency traffic, and the fact that you
12   didn't do those things in the manner that was
13   alleged somehow affects the credibility of your
14   accusations.
15           What is your response to that?
16        A   There's no need to call a Mayday when
17   you problem-solved the issue already.  And my
18   decision -- there's no management policy stating
19   when that has to happen.  And, you know, after
20   all this time, to assert that when -- I
21   continued to ride the seat as an out-of-grade
22   captain until my termination, and not once did
23   anyone come to me and tell me I had done
24   anything wrong.
25        Q   So from April -- May 5th you sent the

1    complaint; right?  Of '21?
2         A   Correct.
3         Q   And they gave their determination to
4    you on the 26th of May at that meeting with Ms.
5    Witte and, I believe, Chief Smith; right?
6         A   Correct.
7         Q   And you filed a grievance -- you went
8    to the Union and asked the Union to assist you
9    with filing a grievance requesting a thorough
10   investigation of that; right?
11        A   Yes.
12        Q   And that if anybody violated work
13   orders, they should be disciplined; right?
14        A   Correct.
15        Q   And then you sought a motion for a
16   temporary injunction about roughly the same
17   time; right?
18        A   Correct.
19        Q   During all that period of time, you
20   were continuing to show up to work roughly ten
21   days a month, 24-hour shifts as captain?
22        A   Correct.
23        Q   On Truck 1?
24        A   Truck 1 and then other rigs.  When
25   Mark Majors was promoted, Kurt Faust no longer

1    took that position, so he went back to Truck 1
2    and I was displaced, and I was captain at other
3    units across town.  But yeah, every day I was an
4    acting captain somewhere.
5         Q   And that continued after you were
6    interviewed for ten hours or so by Ms. Gerdes?
7         A   Yes.
8         Q   And during the pendency of the time
9    that her report was pending and your motion for
10   the temporary injunction; right?
11        A   Yes.
12        Q   We talked with Mr. Ripley, Captain
13   Ripley, about his opinions about incident
14   command.  You cited him in your affidavit, your
15   second affidavit, Exhibit 20 in the red book as
16   being a source -- and you don't need to find it
17   -- that he was a source of some information
18   regarding your understanding of the ICS process;
19   right?
20        A   Yes.
21        Q   Why did you go to him?
22        A   I trusted him.  He is very by the
23   book.  He ran things -- he always ran things
24   appropriately and managed things so effectively.
25        Q   And did you also seek out advice on

Page 1517

1 the incident command system from Mr. Hadfield?
2    A   Yes.
3    Q   And was he somebody that -- he's also
4 somebody you retained as an expert for your
5 federal litigation?
6    A   Yes.
7    Q   Did you make all this up in order to
8 try to win a lawsuit?
9    A   No.
10    Q   Were you lying about Shawn Mahler to
11 get money?
12    A   No.
13    Q   Speaking of that, after you were
14 terminated, what did you do for work?
15    A   Once I was terminated, I got a job in
16 Omaha at the Level 1 Trauma Center called Bergan
17 Mercy, and I work in their emergency department
18 as a paramedic.  And I also sometimes teach
19 paramedic students at Southeast Community
20 College.
21    Q   But have you suffered a wage loss --
22       THE ARBITRATOR:  Do you currently
23 hold that position?
24       THE WITNESS:  Say that again.
25       THE ARBITRATOR:  Do you currently

Page 1518

1 hold that position?
2       THE WITNESS:  Yes.
3    Q   (By Mr. Corrigan)  Have you suffered a
4 diminution in your wages?
5    A   Yeah.  I took -- I believe, if I
6 remember correctly, it's about -- based off of
7 what I would have earned if I would have
8 completed my 2021, I'm on par by my estimate to
9 have about a 60 percent pay cut.
10    Q   And you never went to the media with
11 this information?
12    A   No.
13    Q   And you don't have any idea how the
14 fire blog and all the other people who wrote
15 articles about it, the local Journal Star
16 newspaper or other outlets, how they got that
17 information, do you?
18    A   I was told by my attorney at the very
19 beginning that when things would get filed,
20 sometimes the news would pick them up, sometimes
21 they wouldn't.  And she told me this because
22 it's public information and because I have a lot
23 of anxiety about that sort of thing.  So every
24 time that there was something, they would -- my
25 attorney would let me know so that I could brace

Page 1519

1 for it.
2 I never, ever talked to media myself.
3    Q   And did you ever direct anybody to do
4 it for you?
5    A   No.
6    Q   So you met with Ms. Witte and the fire
7 chief -- and I'm talking about Exhibit 115 now,
8 the meeting that you had.
9       And I'm going to ask you to go to page
10 6 of that exhibit and look at page -- sheet 6,
11 page 19 beginning at line 25 there and then
12 going up to line 20 on the opposite column --
13 I'm sorry -- page 20 on the opposite column.
14    A   Okay.
15    Q   This is where you're asking Aishah,
16 "What is being done about the fact that Mahler
17 walked away from me in a fire scene?"
18       Do you see that?
19    A   Yes.
20    Q   What was your impression at that point
21 of what the City was going to do about this?
22    A   I believed that they were going to do
23 nothing about it.  And my biggest concern was
24 that this would be an escalating issue and that
25 it would continue to happen and that something

Page 1520

1 really bad was going to happen.
2    Q   Your concern was the potential for
3 danger because of the failure to communicate?
4    A   Yes.
5    Q   All right.  Now -- and you didn't
6 write any of the newspaper articles; right?
7    A   No.
8    Q   And you didn't write the briefs of
9 your attorneys; correct?
10    A   No.
11    Q   I'll ask you to go to Exhibit 132,
12 which is Mahler's declaration that was submitted
13 on the motion.
14    A   (Witness complies.)
15       Okay.
16    Q   Now, with respect to Mr. Mahler, you
17 wouldn't dispute the testimony we've heard from
18 witnesses throughout this matter that he is an
19 exceptional or a competent captain; right?
20    A   Correct.
21    Q   Look at page 2, his statement.
22    A   (Witness complies.)
23       "I did not ignore or avoid Ms. Benson
24 at the incident on April 26, 2021."
25       In your judgment, is that an accurate

**Page 1537**

1  Q   Okay.  But ultimately, the City did
2  promote Faust?
3  A   Yes.
4  Q   But in terms of initially when you
5  talked to him about this and Mahler's conduct at
6  the fire and reporting it, you felt like he was
7  supporting you, didn't you?
8  A   Yes.
9  Q   And he didn't raise any issues with
10  your concern that you were actually working
11  under Mahler's supervision once he assigned you
12  to assist with ventilation?
13  A   No.  And he had ample opportunities to
14  tell me that I was mistaken about that.
15  Q   That's certainly what he testified to
16  later, that he did not intend to make Mahler the
17  group supervisor --
18  A   Correct.
19  Q   -- in this proceeding?
20  A   In this proceeding, that's what he
21  said.
22  Q   Whether he intended it or not, that's
23  what you understood to be happening at that
24  time; right?
25  A   Yes.  And he never told me that it was

**Page 1538**

1  -- like he never told me that he didn't agree
2  with me.  I believe the first time I heard of --
3  when he was deposed in this case, I believe that
4  he had made a statement along the lines of he
5  actually believed that he had assigned Mahler
6  the group supervisor until he listened to the
7  radio.  And I had never gotten to listen to the
8  radio until the Torrey Gerdes investigation, so
9  I'm not sure.
10  Q   Did he ever tell you prior to your
11  termination that he was afraid to work with you?
12  A   No.
13  Q   And prior to him being promoted, did
14  he ever tell you that?
15  A   No.
16  Q   What is it that you're asking the
17  arbitrator to do in this case?
18  A   Help right some of this wrong, help
19  make me whole again.
20       MR. CORRIGAN:  That's all the
21  questions I have.
22       (Discussion off the record.)
23       (Recess taken.)
24       THE ARBITRATOR:  I have a
25  question.

**Page 1539**

1       Why didn't you think it was appropriate
2  to call a Mayday?
3       THE WITNESS:  Because I was able
4  to orient myself.
5       THE ARBITRATOR:  Okay.  And I
6  know it will be in the transcript.  But the
7  question, what do you want me do, tell me again,
8  slowly.
9       THE WITNESS:  It was kind of
10  two-part.  And I said to help right this wrong
11  and to help make me whole again after this.
12       (Discussion off the record.)
13       THE ARBITRATOR:  We'll start at
14  9:30 on the 22nd.
15       (At 3:50 p.m., the proceedings were
16  continued to August 22, 2022.)

**Page 1540**

1  FEDERAL MEDIATION AND CONCILIATION SERVICE
   BEFORE ARBITRATOR STEVEN RUTZICK
2
   LINCOLN FIREFIGHTERS   )   FMCS CASE NO.
3  ASSOCIATION, IAFF LOCAL )   22103-00847
   644, and AMANDA BENSON, )
4                          )
        Grievants,   )
5                          )
   vs.            )   VOLUME VII
6                    )   PAGES 1540-1796
   CITY OF LINCOLN,      )
7                          )
        Respondent.  )
8                          )
                      )
9
10      ARBITRATION HEARING held before
11  Arbitrator Steven Rutzick (via Zoom), with Sally
12  R. Parrack, RPR, CSR and Notary Public for the
13  State of Nebraska, counsel and all parties
14  present at the City-County Building, 555 South
15  10th Street, Suite 300, Lincoln, Nebraska,
16  beginning at 9:30 a.m., on the 22nd day of
17  August, 2022.
18
19
20
21
22
23           ** ** **
24
25

Page 1541

```
 1              A P P E A R A N C E S
 2
 3   FOR THE GRIEVANTS:
 4
     MR. JOHN E. CORRIGAN
 5   DOWD & CORRIGAN, LLC
     6700 Mercy Road
 6   Suite 501
     Omaha, NE  68106
 7   402.913.9713
     jcorrigan@dowd-law.com
 8
 9
     FOR THE RESPONDENT:
10
11   MS. HEIDI GUTTAU
     BAIRD HOLM LLP
12   1700 Farnam Street
     Suite 1500
13   Omaha, NE  68102
     402.344.0500
14   hguttau@bairdholm.com
15
     MS. ABIGAIL LITTRELL
16   ASSISTANT CITY ATTORNEY
     555 South 10th Street
17   Suite 300
     Lincoln, NE  68508
18
19
20   ALSO PRESENT:  Mr. Ryan Moser, Vice President
     IAFF Local 644; Mr. Dave Engler, Fire Chief;
21   Tiffany Leasure, Paralegal for City of Omaha
22
23
24
25
```

Page 1542

```
 1              I N D E X
 2                        PAGE
 3   CASE CAPTION .......................  1
     APPEARANCES ......................  2
 4   INDEX ...............................  3
     TESTIMONY .........................  19
 5   REPORTERS' CERTIFICATE .............  2084
 6
 7              WITNESSES
 8
     FOR THE CITY:
 9
10   CHIEF DAVID ENGLER
11   Direct by Ms. Guttau.................  19
     Cross by Mr. Corrigan...........  136
12   Cross Cont'd by Mr. Corrigan.........  253
     Cross Cont'd by Mr. Corrigan.........  1070
13   Redirect by Ms. Guttau...............  1135
     Recross by Mr. Corrigan.............  1193
14   Further Redirect by Ms. Guttau.......  1202
     Further Recross by Mr. Corrigan....  1209
15
16   FAO JASON LOVE
17   Direct by Ms. Littrell...............  210
     Cross by Mr. Corrigan...........  230
18   Redirect by Ms. Littrell.........  247
     Recross by Mr. Corrigan.........  249
19
20   FAO MATTHEW ROBERTS
21   Direct by Ms. Guttau.................  295
     Cross by Mr. Corrigan...........  342
22   Redirect by Ms. Guttau...........  363
     Recross by Mr. Corrigan.........  367
23   Further Redirect by Ms. Guttau.......  372
     Further Recross by Mr. Corrigan......  372
24   Further Redirect Cont'd by Ms. Guttau  373
25
```

Page 1543

```
 1           ** ** **
 2         WITNESSES, CONT'D
 3
     FOR THE CITY:
 4
 5   FF STEPHEN DYER
 6   Direct by Ms. Littrell...............  375
     Cross by Mr. Corrigan...........  395
 7   Redirect by Ms. Littrell.........  409
     Recross by Mr. Corrigan.........  410
 8
 9   FF MORGAN HURLEY
10   Direct by Ms. Littrell...............  416
     Cross by Mr. Corrigan...........  447
11   Redirect by Ms. Littrell.........  464
     Recross by Mr. Corrigan.........  466
12
13   DIVISION CHIEF MICHAEL SMITH
14   Direct by Ms. Littrell...............  470
     Cross by Mr. Corrigan...........  505
15   Redirect by Ms. Littrell.........  569
     Recross by Mr. Corrigan.............  588
16   Further Redirect by Ms. Littrell....  610
     Further Recross by Mr. Corrigan.....  614
17
18   BC CURT FAUST
19   Direct by Ms. Guttau.................  618
     Cross by Mr. Corrigan...........  729
20   Redirect by Ms. Guttau...........  806
     Recross by Mr. Corrigan.........  820
21   Further Redirect by Ms. Guttau......  828
22
23   DEPUTY CHIEF GEORGE HEALY
24   Direct by Ms. Guttau.................  971
     Cross by Mr. Corrigan...........  1021
25   Redirect by Ms. Guttau...............  1054
     Recross by Mr. Corrigan.............  1055
```

Page 1544

```
 1
 2         WITNESSES, CONT'D
 3
     FOR THE CITY:
 4
     AISHAH WITTE
 5
     Direct by Ms. Littrell..............  1214
 6   Cross by Mr. Corrigan...........  1263
     Redirect by Ms. Littrell.........  1287
 7   Recross by Mr. Corrigan.............  1297
 8
 9   CAPTAIN SHAWN MAHLER
10   Direct by Ms. Guttau.................  1554
     Cross by Mr. Corrigan...........  1671
11   Redirect by Ms. Guttau...........  1754
     Recross by Mr. Corrigan.........  1771
12   Further Redirect by Guttau.........  1784
     Further Recross by Corrigan.......  1787
     Further Redirect Cont'd by Guttau...  1794
13
14   CAPTAIN ADAM SCHRUNK
15   Direct by Ms. Guttau.................  2059
     Cross by Mr. Corrigan...........  2073
16   Redirect by Ms. Guttau...........  2077
17
     FOR THE UNION:
18
19   CHIEF EDWARD HADFIELD
20   Direct by Mr. Corrigan.................  844
     Cross by Ms. Guttau...........  888
21   Redirect by Mr. Corrigan.........  951
     Recross by Ms. Guttau.........  962
22
23   CAPTAIN MICHAEL WRIGHT
24   Direct by Mr. Corrigan.................  1316
     Cross by Ms. Littrell...........  1357
25   Redirect by Mr. Corrigan.........  1393
     Recross by Ms. Littrell.........  1398
```

386 (Pages 1541 to 1544)

Page 1545

```
 1
 2                WITNESSES, CONT'D
 3
     FOR THE UNION:
 4
 5     CAPTAIN DAN RIPLEY
 6     Direct by Mr. Corrigan..............  1399
       Cross by Ms. Littrell...............  1405
 7     Redirect by Mr. Corrigan...........   1421
       Recross by Ms. Littrell.............  1429
 8
 9     NICHOLAS CUNNINGHAM
10     Direct by Mr. Corrigan..............  1432
       Cross by Ms. Littrell...............  1446
11     Redirect by Mr. Corrigan...........   1457
12
13     AMANDA BENSON
14     Direct by Mr. Corrigan..............  1463
       Cross by Ms. Guttau................   1867
       Redirect by Mr. Corrigan...........   2056
15
16     CAPTAIN BRIAN GILES
17     Direct by Mr. Corrigan..............  1810
       Cross by Ms. Littrell...............  1823
18     Redirect by Mr. Corrigan...........   1859
       Recross by Ms. Littrell.............  1864
19
20
21
22
23
24               ** ** **
25
```

Page 1546

```
 1                    CITY EXHIBITS
 2
     EXHIBIT      DESCRIPTION
 3
     1   8/16/21 Memorandum and Order Denying
 4       Plaintiff's Motion for Injunction by
         Senior District Judge Richard G.
 5       Kopf, United States District Court
         for the District of Nebraska,
 6       8/15/21
 7   2   Declaration of Fire Chief David
         Engler
 8
 9   3   Declaration of BC Michael Smith
10   4   Declaration of Captain Mahler
11   5   Declaration of FAO Matt Roberts
12   6   Declaration of FF Morgan Hurley
13   7   Declaration of FF Jason Love
14   8   Declaration of FF Stephen Dyer
15   9   Declaration of FF Trent Borchers
16   10  Statement of Curt Faust
17   11  8/19/21 Investigation Report into
         4/26/21 Fire Incident by Attorney
         Torrey Gerdes, Baylor Evnen Law Firm
18
19   12  Audio of Fire Department Radio
         Recording of 4/26/21 Warehouse Fire
20   13  Transcript of Fire Department Radio
         Recording of 4/26/21 Warehouse Fire
21
22   14  Declaration of Aishah Witte,
         Authenticating Audio Transcript
23   15  Benson's 5/5/21 Complaint Regarding
         the 4/26/21 Warehouse Fire
24
25   16  Warehouse Photographs
```

Page 1547

```
 1               CITY EXHIBITS, CONT'D
 2
     EXHIBIT      DESCRIPTION
 3
     17   LFR Prime Report of Warehouse Fire
 4
     18   Benson's 6/9/21 Grievance
 5
     19   Benson's 6/11/21 Affidavit
 6
     20   Benson's 8/9/21 Affidavit
 7
     21   Media Articles
 8
     22   Benson's Interview Audio 7/14/21
 9
     23   8 of '21 Grievance Hearing RE:
10       June 9, 21 Grievance
11   24   9/24/21 Denial of 6/9/21 Grievance
         Letter to Benson
12
     25   9/27/21 Pre-Disciplinary Meeting
13       Notice Letter to Benson
14   26   Audio of 10/12/21 Pre-Disciplinary
         Meeting
15
     27   Transcript of 10/12/21 Meeting
16
     28   10/19/21 Termination Letter
17
     29   CBA, 8/20/20 to 8/31/21
18
     30   CBA, 8/19/21 to 8/30/23
19
     31   LFR Professional Code of
20       Ethics/Standard of Conduct Policy
21   32   LFR FF Safety Policy
22   33   LFR 2020 Annual Report
23   34   Captain Mahler's Awards
24   35   2017 Letter to Mahler
25   36   Terminal Building Fire Near-Miss
         Report, 2/19/18
```

Page 1548

```
 1               CITY EXHIBITS, CONT'D
 2
     EXHIBIT      DESCRIPTION
 3
     37   Chief Engler's Video Message
 4
     38   Healy Expert Report
 5
     39   Lincoln Municipal Code - Cause for
 6       Disciplinary Action
 7   40   Lincoln Municipal Code - Dismissal
         and Grievance Procedure
 8
     41   Grievant's 11/3/21 Appeal E-mail
 9
     42   Documents Regarding LFR Discipline
10
     43   Captain Mahler Notes for
11       Investigator Gerdes
12   44   Witte Investigation Correspondence
13   45   Witte Investigative File
14   46   Benson's Motion for Preliminary
         Injunction
15
     47   Benson's Brief ISO Preliminary
16       Injunction
17   48   Benson 2014 Complaint Retraction
18   49   Mahler Discipline Reversal
19   50   Management Policy
20   51   Victim Removal Presentation
21
22
23
                 ** ** **
24
25
```

## Page 1549

UNION EXHIBITS, CONT'D

EXHIBIT     DESCRIPTION

| | |
|---|---|
| 100 | CBA |
| 101 | 4/27/2011 Suspension Notice |
| 102 | 11/4/2014 Memo of BC Pashalek |
| 103 | Dispositional Memorandum of Kimberly Taylor-Riley |
| 104 | 4/4/21 Complaint |
| 105 | E-mail of BC Curt Faust, 4/4/21 |
| 106 | E-mail of BC Michael Smith, 4/7/21 |
| 107 | E-mail of BC Curt Faust, 4/13/11 |
| 108 | E-mail of Benson to Witte, 4/18/21 |
| 109 | Transcript of Radio Traffic |
| 110 | LFR Incident Report, 4/26/21 |
| 111 | E-mail from Benson to Faust & Witte, 5/5/21 |
| 112 | E-mail from Benson to Witte, 5/13/21 |
| 113 | Witte Investigation Summary |
| 114 | E-mail to Benson from Witte, 5/25/21 |
| 115 | Transcript of Audio File |
| 116 | E-mail from Smith to Witte, 5/26/21 |
| 117 | Investigation Summary |
| 118 | Grievance, 6/9/21 |
| 119 | Benson Affidavit, 6/11/21 |
| 120 | E-mail from Schrunk to Engler, 6/14/21 |

## Page 1550

UNION EXHIBITS, CONT'D

EXHIBIT     DESCRIPTION

| | |
|---|---|
| 121 | E-mail from Kelly Brandon to Chris Connolly and Ms. Gerdes, 7/12/21 |
| 122 | E-mail from Engler to Mahler, 7/1/21 |
| 123 | Interview Audio Recording |
| 124 | Letter to Ms. Gerdes |
| 125 | Declaration of David Engler |
| 126 | Declaration of Michael Smith |
| 127 | Declaration of Matthew Roberts |
| 128 | Declaration of Morgan Hurley |
| 129 | Declaration of Trent Borchers |
| 130 | Declaration of Stephen Dyers |
| 131 | Declaration of Jason Love |
| 132 | Declaration of Shawn Mahler |
| 133 | Grievance Letter |
| 134 | Declaration of Edward Hadfield |
| 135 | Enhanced Fireground Safety, Effective Use of Division & Group Supervisors |
| 136 | Transcript of Grievance Hearing, 8/20/21 |
| 137 | Letter of Chief Engler Denying Grievance, 9/24/21 |
| 138 | Notice of Pre-disciplinary Action, 9/27/21 |
| 139 | Transcript of Pre-disciplinary Hearing |

## Page 1551

UNION EXHIBITS, CONT'D

EXHIBIT     DESCRIPTION

| | |
|---|---|
| 140 | Termination Letter, 10/19/21 |
| 141 | Underlying Confidential Correspondence Regarding Comparative Discipline |
| 142 | Disciplinary Action, 10/14/11 to 10/14/21 |
| 143 | Performance Evaluations |
| 144 | Deposition of Shawn Mahler, 5/9/22 |
| 145 | Awards and Recognitions |
| 146 | LFR Best Practices No. 2-Division/ Group Supervision |
| 147 | Daisy Brayton Investigation |
| 148 | Text Message exchange between Faust and Benson |
| 149 | Arbitration Award, RE:  Dan Duncan |
| 150 | Arbitration Award, RE: Jon Reed |
| 151 | E-mail from Corrigan to McDaniel, 11/3/21 |
| 152 | E-mail, Benson to Witte, 4/22/21 |
| 153 | E-mail, BC Smith, 4/22/21 |
| 154 | Discipline Letter, 5/24/21 |
| 155 | Discipline Letter, 6/6/22 |
| 156 | Telephone Log Activity |
| 156 | E-mail from Mahler to Witte, 6/24/21 |

** ** **

## Page 1552

* All exhibits offered with objections to Union's 101, 102, 103, 147, 149, 150; and City Exhibits 20, 21, 38, 46, and 47

* Union Exhibit 149 was offered and received on page 142

* Union Exhibit 150 was offered on page 143 and received on page 144

* Union Exhibit 156, Telephone Log Activity, was marked on page 750

* City Exhibit 156, E-mail to Aishah from Mahler, was marked on page 1738

* City Exhibit 50 was marked on June 22nd, 2022, offered and received on page 571

** ** **

Page 1553

1          (On August 22, 2022, at 9:30
2    a.m., the proceedings continued as follows:)
3          THE ARBITRATOR:  Are you ready to
4    go?
5          MS. GUTTAU:  We are.
6          THE ARBITRATOR:  All right.  And
7    back on the record?
8          MS. GUTTAU:  Yeah.
9          THE ARBITRATOR:  Let's see.
10   Where were we?  Doing cross?
11         MS. GUTTAU:  We were going to do
12   cross.  But John and I agreed we would go ahead
13   and do our case-in-chief.  So we're calling
14   Captain Mahler.
15         THE ARBITRATOR:  Okay.  Go ahead.
16         MS. GUTTAU:  Okay.
17

           SHAWN MAHLER,

18      Having been sworn to tell the truth,
19       the whole truth and nothing but the
         truth, testified as follows:
20
21         THE WITNESS:  Yes, I do.
22         THE ARBITRATOR:  Would you state
23   and spell your name for the record?
24         THE WITNESS:  Shawn Mahler,
25   S-H-A-W-N, M-A-H-L-E-R.

Page 1554

1          THE ARBITRATOR:  You may proceed.
2          MS. GUTTAU:  Thank you.
3          DIRECT EXAMINATION
4    BY MS. GUTTAU:
5      Q   Captain Mahler, how long have you been
6    a firefighter with Lincoln?
7      A   I was hired April 4th, 1995.
8      Q   And how long have you been a captain
9    with Lincoln Fire and Rescue?
10     A   Since January of 2004.
11     Q   Okay.  Would you have -- would you
12   ever abandon anybody in a fire?
13     A   No, I would not.
14     Q   Have you spent your career saving
15   people from fires?
16     A   Yes, I have.
17     Q   Did you abandon Amanda Benson, Morgan
18   Hurley, and Matt Roberts in a dangerous
19   warehouse fire on April 26th, 2021?
20     A   No, I did not.
21     Q   I want to back up and talk a little
22   bit about your education and job history.  Could
23   you tell the Arbitrator a little bit about your
24   education?
25     A   Yeah.  I received a bachelor's degree

Page 1555

1    from the University of Nebraska.  It was a
2    secondary teaching education degree.  Went on to
3    get employed with Lincoln Fire and continued my
4    training with Lincoln Fire.
5      Q   Okay.  And you said that was in 1995
6    you joined Lincoln?
7      A   Yes.
8      Q   Okay.  What was -- what position were
9    you hired into first?
10     A   Originally, I was a firefighter
11   recruit and then passed the probationary process
12   and became a Lincoln firefighter.
13     Q   Okay.  And did you receive any
14   promotions since then?
15     A   The only promotion that I've received
16   and have taken is the promotion to be a company
17   officer.
18     Q   Is that a captain?
19     A   Yes, captain.
20     Q   Okay.  What are -- what's the
21   responsibilities of a captain at LFR?
22     A   Essentially, you're going to be in
23   charge of an apparatus, or in fire terms an
24   engine company or a truck company.  And I'm a
25   captain of a truck company.

Page 1556

1          I've spent the majority of my career
2    on a truck company.  I'm in charge of three
3    other personnel.  Make sure that they are
4    trained and proficient in the duties and the
5    responsibilities that we carry out both for
6    emergent and nonemergent activities.
7      Q   Okay.  And just as kind of a refresher
8    since it's been a while since we've talked about
9    this case again.  What's the different roles
10   between truck and engine at a fire scene?
11     A   At a fire scene, engine companies
12   again are staffed, fully staffed with four
13   personnel.  And their responsibilities are
14   essentially making sure water or a water source
15   is secured.  And they're in charge of moving
16   hand lines and extinguishing the fire.  Whereas,
17   as truck companies are in charge of rescue,
18   technical rescue, ventilation-type activities.
19     Q   Okay.  What other -- have you had some
20   -- any other roles in -- in regard to safety
21   during your time at Lincoln?
22     A   Yes.  In 2002, the responsibilities of
23   turnout gear, repair, and the management of that
24   budget was passed onto me by the department.
25   And I performed that role for eight-plus years.

Page 1565

1  MS. GUTTAU: Yeah. Here's an
2  updated one too. I think this was the first two
3  pages that maybe didn't make it in that book.
4  THE WITNESS: Okay. Thank you.
5  Q  (By Ms. Guttau) Have you received
6  awards and recognition for your firefighting
7  services over the years?
8  A  Yes, I have. I have received multiple
9  unit performance awards. I've received
10 firefighter of the month. I've received
11 firefighter of the year from local
12 organizations.
13 Q  Okay. And is Exhibit 34 some of the
14 awards that you've received?
15 A  Yes. This would be one of the most
16 current awards I received, and it appears that
17 this is the VFW Firefighter Award.
18 Q  Okay. Tell me a little bit more about
19 the national award that you recently received.
20 A  The -- the award that's Exhibit 34 is
21 awarded to me by the local chapter of the VFW.
22 And then -- I was unaware of it. They had
23 submitted my name throughout the State. And a
24 few months ago, I received a letter that I was
25 awarded the State VFW Firefighter of the Year

Page 1566

1  with national recognition.
2  Q  Thank you.
3  A  Uh-huh.
4  Q  Have you saved lives over the years as
5  a Lincoln firefighter?
6  A  I have saved lives. I've removed
7  victims that went on to continue to have a
8  viable life. And it -- it's -- again, that's
9  one of the main responsibilities of truck
10 companies. And something that I take a
11 tremendous amount of pride and proficiency in.
12 Q  Okay. You understand that the reason
13 we're here today is because Ms. Benson has
14 alleged that you abandoned her and Ms. --
15 Firefighter Hurley and FAO Roberts in a
16 dangerous burning warehouse; is that correct?
17 A  That's correct.
18 Q  Okay. Can you tell us about a time
19 where your conscientiousness about safety
20 actually saved her and her crew from harm?
21 A  I believe it would have been in late
22 2018. It would have been perhaps the terminal
23 building fire.
24 Q  Tell us what you did there that
25 specifically prevented Captain Ripley and

Page 1567

1  Firefighter Benson at that time from harm?
2  A  This particular incident originally
3  came in as a fire Alpha. It was quickly
4  upgraded by Captain Ripley as fire Charlie. As
5  the -- as that upgrade, that meant that Truck 8
6  was going to respond to this incident. Truck 8
7  responded. We set the aerial for rescue, and we
8  -- we did a corner set, meaning that this gave
9  us two options for rescues. The incident
10 commander asked that we go in on the main level,
11 establish lobby control, verify how many floors
12 or how many rooms were on the fire alarm panel.
13 So we had some internal activities, and that
14 involved also setting the positive pressure fan,
15 which is a large gas-powered fan that introduces
16 fresh air into the structure of the building.
17 And we usually typically on a high-rise fire we
18 create a charged or a positive pressure in the
19 escape stairway. So that was some of our
20 initial assignments.
21 But as a truck company officer and in
22 a high-rise, we're going to be dealing with
23 obviously having to navigate multiple floors.
24 And underneath my seat where I sit are the
25 elevator keys. Just as a -- a conscientious

Page 1568

1  effort to know that if we're going to need
2  elevator keys, we certainly don't need them
3  underneath my seat.
4  So in grabbing my cache of equipment,
5  I obtained the elevator keys. As I was -- made
6  the lobby, there's two banks of elevators. I
7  took the elevator keys. They're in a red case.
8  I set them on the floor between the two elevator
9  doors and then went about my business of what
10 the incident command had asked me to do.
11 Q  Okay. Did you later learn that those
12 elevator keys were important in assisting
13 Captain Ripley's crew?
14 A  Yes. Later on in the fire event,
15 Truck 8 and my crew, we were up on the upper
16 floors. So we were multiple floors, seven or
17 eight floors above the lobby and away from the
18 keys. And Captain Ripley, I believe through a
19 course of events, called for a Mayday as smoke
20 was filling the elevator car that multiple
21 firefighters were in.
22 And once the Mayday was called, the
23 incident commander tasked other individuals to
24 help with the egress or the escape of the
25 firefighters that were in that. And they had

Page 1573

1    inhalation severity could be. And so I had the
2    side door open on Medic 3 and was talking to
3    Captain Ripley. And then another individual
4    with LFR came over and created a gesture of
5    movement of inappropriate behavior of touching
6    Firefighter Benson.
7       Q   Okay. And then did you talk with her
8    about that at some point?
9       A   Yes. It was sometime later. I
10   believe the fire was -- was -- happened late on
11   a Monday. And then I went on vacation for the
12   next work set. So I was gone for about
13   twenty-nine days.
14          And just because I was, as a
15   supervisor and I was in such close proximity,
16   there was no way for me to deny that I didn't
17   witness this. And later on, I -- we were back
18   to work, and we were at another fire scene. And
19   I asked Ms. Benson if -- if she minded if I
20   asked her a few questions about that event that
21   had happened. And she agreed, and we had about
22   a, oh, forty-five second to a minute-and-a-half
23   conversation about it. And just asked her that
24   I was -- if there was anything that I could do
25   for her or if there was anything that she needed

Page 1574

1    from me, depending on how that event was playing
2    out, that I would be more than happy to help her
3    in any way necessary.
4       Q   Okay. What happened after that?
5       A   That didn't go as planned. And that
6    within -- later that afternoon, my battalion
7    chief was out. He asked me to e-mail him the
8    events. And so I e-mailed the events and the
9    circumstances surrounding that conversation.
10          And eventually, I -- I don't know how
11   much time had passed. But -- but maybe days or
12   a week later, then-Chief Despain comes out, and
13   we have a private conversation, and he offers me
14   and let's me know there's going to be a letter
15   introduced into my file that is a no contact
16   letter. It's not disciplinary. It's just a way
17   for Firefighter Benson and I to maybe prevent
18   these conversations from being misconstrued or
19   uncomfortable for either one of us.
20      Q   Okay. So you had a brief conversation
21   with her, and that then resulted in you getting
22   a no contact order imposed?
23      A   That's correct.
24      Q   Okay. So let's turn to R35.
25          MS. GUTTAU: This would be City

Page 1575

1    35.
2          THE WITNESS: (Witness complies.)
3       Q   (By Ms. Guttau) And is R35 the no
4    contact order?
5       A   Yes. I recognized that as a letter
6    that was given to me that day.
7       Q   Okay. That was then by then-Fire
8    Chief?
9       A   Chief Despain, yes.
10      Q   Okay. And the first sentence says,
11   effective immediately until rescinded. Has it
12   ever been rescinded?
13      A   It has not. It's still in my file
14   currently.
15      Q   Okay. You are to have no one-on-one
16   contact with Firefighter Amanda Benson except
17   under the following conditions: One, contact
18   must include the presence of her direct
19   supervisor or any chief officer. Two, orders
20   given to Firefighter Amanda Benson directly
21   related to and in the course of an emergency
22   situation.
23          And you understood that you must still
24   abide by that? That -- of up through the
25   warehouse fire and beyond?

Page 1576

1       A   Yeah. It was -- I'm well aware of the
2    letter, and I knew that it was still in my file,
3    and I was doing my best ability to abide by.
4       Q   Okay. And at the time this was issued
5    in 2017, were you -- were you superior in rank
6    to her?
7       A   Yes, I was. I was again promoted
8    captain, and Ms. Benson was a firefighter.
9       Q   Okay. And you understood that under
10   this any contact must be in the presence of her
11   direct supervisor, chief officer, and must be
12   orders given to her directly related to and in
13   the course of an emergency situation; correct?
14      A   Yes. It was very clear of what the
15   expectation was. And -- and in all honestly, it
16   actually helped me. It made me feel a little
17   more comfortable because there was some guidance
18   on -- on how -- because we're on the same shift,
19   we were going to run calls together.
20          So it -- it certainly would provide
21   and promote a better environment to not have any
22   awkward conversations perceived by either one of
23   us.
24      Q   Okay. Did you always try to keep the
25   guidelines and orders in mind?

Page 1577

1    A   Oh, certainly.
2    Q   Okay.
3    A   I aimed to please and follow orders.
4    Q   Okay.  And so by the time of the
5  warehouse fire, you were then equal rank captain
6  and acting- captain; is that correct?
7    A   Yes, that would be correct.
8    Q   Okay.  So at that point you could only
9  give her orders under certain circumstances;
10  correct?
11    A   That would be correct.  In very
12  specific circumstances.
13    Q   Okay.  For example, at the warehouse
14  fire, you can't just give Ms. Benson orders just
15  because you wanted to; right?
16    A   No.  Because we would pull the same
17  rank essentially.  So it's peer to peer, and I
18  would have no authority from captain to captain.
19  We're equals.  So there would be no authority
20  for me to give orders to -- to another officer.
21    Q   Okay.  And you could only get that
22  authority if the incident commander gave you
23  such authority; correct?
24    A   That would be correct, yes.
25    Q   Okay.  Have there been situations

Page 1578

1  where Ms. Benson has -- has attempted to
2  interact with you that has made it difficult to
3  know when you can talk to her and when you
4  can't?
5    A   There have been situations that have
6  created challenges, yes.
7    Q   Can you explain one of those?  For
8  example, the extrication training?
9    A   Yes.  Again, as I mentioned earlier
10  that Lincoln Fire was taking a very aggressive
11  approach to revitalizing some technical rescue.
12  I had participated and coordinated some auto
13  extrication for the department.  And I was the
14  lead instructor for that.  And on one of the
15  training days that I was going to be an
16  instructor -- one of the three instructors, Ms.
17  Benson and Truck 1 Apparatus was going to be at
18  that training.
19    Q   Okay.  And then what -- what
20  interactions did you have with her at that
21  point?
22    A   The morning started as all other
23  sources had.  We had about a 30- to 45-minute
24  safety briefing.  And it was an opportunity for
25  everybody to kind of understand the parameters

Page 1579

1  that we were working with live loads, and we
2  really set the tone while it's going to be
3  valuable training that we have to, again, do so
4  under certain parameters.  So there would have
5  been again that thirty to forty-five minutes of
6  dialogue for anybody to share any nuances,
7  questions what the training was going to
8  contain.  And there was no dialogue between
9  myself, Ms. Benson, the captain of Truck 1, and
10  we all headed out to the training event.
11      There was two separate scenarios set
12  up.  They were identical scenarios, just about
13  50 feet apart so that each truck company could
14  perform these skills without having to kind of
15  stand back and watch somebody else do it.
16      So I was an instructor with the
17  Truck 1 company, and the other two instructors
18  were teaching the other company.
19      And I was doing again a little bit of
20  an introduction in what we were doing and
21  setting up the tone for the training.  And it
22  got to be about the time that it was -- we were
23  going to don our gear, and they were going to go
24  start the extrication training.
25      Firefighter Benson at the time again

Page 1580

1  was a firefighter on Truck 1.  There was an
2  overtime captain that was in charge of Truck 1.
3  And again, at the time that we're getting ready
4  to start the training, Ms. Benson comes to me
5  and says that because she's been riding out of
6  grade or performing acting captain role, that
7  instead of doing the skills, she wanted me to
8  teach her and show her all of the rescue group
9  supervisor skills and recognition of progressing
10  through the incident.  And again, that, there
11  was no opportunity for me to know that that was
12  coming.
13      Again, we had -- the safety briefing
14  would have been a good time for the captain of
15  Truck 1 and Ms. Benson to come to me and say,
16  hey, we're changing some roles.  That would have
17  given me a heads-up that the training was going
18  to change a little bit.
19      And the reason that's important to me
20  is because when Ms. Benson approaches me, now
21  it's putting me in a very difficult situation
22  because I'm not supposed to talk to her
23  one-on-one.
24      Had everything stayed in play, I would
25  have communicated with the overtime captain and

Page 1581

1    that individual would have relayed any of those
2    directions or training skills would have been
3    disseminated down to Ms. Benson and the rest of
4    the crew, and that would have allowed me to stay
5    within the parameters of the no contact order.
6        Q.   Okay.  That kind of puts you between a
7    rock and hard place knowing what to do?
8        A.   Yeah.  It was -- it was very
9    difficult.  Because in order for Ms. Benson and
10   I to have proper communication, there -- when
11   we're doing extrication training that means the
12   general public knows that -- knows it as the
13   jaws of life.
14       Q.   Uh-huh.
15       A.   We refer to it as the Holmatra
16   equipment, which is just a name brand, but
17   there's a gas motor, essentially like a lawn
18   mower that's running, and it powers a hydraulic
19   pump that makes the tools operate.
20            So in order for Ms. Benson and I to
21   have effective communication, we would have to
22   step back 5 to 10 feet away from the training
23   area.  We would have some dialogue, and then we
24   would step back up, and then she would coach
25   that crew on what things to do.

Page 1582

1            What made me feel uneasy about that is
2    that at this point now we're having
3    communications, and there's no witness and
4    violating the contact order.  And the reason
5    that I chose to go down that path.  One, my
6    passion for education and training in that I
7    tried to rise above maybe some of the things
8    that have happened over the years, and my goal
9    is to teach and train people.
10           Secondly, yes, I was in a no-win
11   situation.  Because if I talk, then I violate
12   the order.  If I don't talk, now I'm accused of
13   not talking or not training Ms. Benson.
14       Q.   Uh-huh.  At the time this happened in
15   2021, the lawsuit was still pending; correct?
16       A.   Yes, that's correct.
17       Q.   And in that same lawsuit, she had
18   asserted claims against you alleging
19   discrimination when you didn't talk to her and
20   sometimes when you did talk to her; correct?
21       A.   That's accurate.
22       Q.   Okay.  Let's move ahead then to April
23   of 2021.  Do you recall attending a ladder
24   training on April 22nd, 2021, with your crew and
25   system other -- other firefighters?

Page 1583

1        A.   Yes.  The training -- I remember the
2    training.  It was conducted at Southeast
3    Community College Training Center.
4        Q.   Okay.  What was that training?
5        A.   It was referred to as micro ladder
6    training.  It was supposed to be a fifteen-,
7    twenty-minute event.  But -- LFR-sponsored
8    training.  It was organized by LFR's training
9    division.
10       Q.   Okay.  Was Benson at the training with
11   you?
12       A.   No, she wasn't.
13       Q.   Okay.  After the training, did -- did
14   Chief Smith ask you some questions about it?
15       A.   Chief Smith did come -- have a
16   conversations with me.  And that was once we had
17   returned to the fire station or the -- we were
18   back in quarters.  It was approximately ninety
19   minutes after we had been at the training, Chief
20   Smith was at the station, yes.
21       Q.   Okay.  What did he ask you?
22       A.   He -- he asked me -- he repeated a
23   couple of conversations or statements that I had
24   supposedly made while I was at the training.
25   And he asked me, did you say these things?  And

Page 1584

1    I'm, like, no, that's not anything I would have
2    said.
3        Q.   Okay.  And did you even know at the
4    time that Benson had made a complaint that
5    triggered Chief Smith to ask you those
6    questions?
7        A.   I would have no knowledge of why he
8    was coming out there to ask me that.  And if he
9    asked me a few questions, I said no.  And it was
10   a brief interaction between us.
11       Q.   And she wasn't even at the ladder
12   training at -- anyway; right?
13       A.   No.
14       Q.   Okay.
15       A.   No.
16       Q.   Did you later learn that it was Ms.
17   Benson who had made a complaint that you were
18   talking or defaming her at the ladder training?
19       A.   It would have been a follow-up perhaps
20   a week later.  I think as Chief Smith and Aishah
21   were looking into it.  They came to the station,
22   and we talked about it.
23           Again, some similar questions.  And --
24   and that was where it just seemed like it was
25   odd that I was being asked again that if I made

Page 1585

1  these statements, and I didn't.
2     Q   Okay.  And was that after the
3  warehouse fire that they came back out to talk
4  to you about it?
5     A   Yeah.  I believe so.
6     Q   Okay.  Did you later learn that the
7  other firefighters at the ladder training
8  confirmed that they had not heard you say what
9  she's accusing you of?
10    A   Yes, I did learn that everybody that
11 attended the training collaborated the story
12 that there was no comments like that made.
13    Q   Okay.  Even if you had known that she
14 made the complaint or had made an assumption, by
15 this time you had been embroiled in litigation
16 with her since 2018; correct?
17    A   Yeah.  It -- there was -- I was
18 involved in it, and I wasn't getting out of it.
19 So --
20    Q   And that lawsuit had been reported at
21 various times in the news; correct?
22    A   That's correct.
23    Q   You had worked at various fires with
24 her during that time period without incident;
25 correct?

Page 1586

1     A   Correct.
2     Q   So there's -- was there any reason
3  that even an allegation about a false rumor that
4  you talked to a friend about her that would make
5  you want to suddenly endanger her life?
6     A   No.  It would give me no cause to do
7  anything of that nature.
8     Q   Okay.  Let's move ahead now four days
9  to the April 26th warehouse fire.
10       What were -- what was your position that
11 day?  What was your role?
12    A   Again, I was the company officer on
13 Truck 8 and was staffed with my full crew, and
14 we were in quarters.
15    Q   Okay.  And when you say
16 company-officer, captain; correct?
17    A   Captain, yes.
18    Q   Okay.  And who was your crew that day?
19    A   My driver was Jason Love, Firefighter
20 Steven Dyer, and Firefighter Trent Borchers.
21    Q   Okay.  Do you recall about what time
22 of day you were called to the fire?
23    A   I would say it was mid-morning that we
24 were called.
25    Q   Okay.  Tell me about your crew members

Page 1587

1  and their skill level.  Love, let's start with
2  Love.  Tell me about what is -- is he a good
3  firefighter?
4     A   He is a very good firefighter.  He
5  also has truck experience.  He would have spent
6  several years on another shift at Truck 1.  And
7  he is my driver.
8        So over the past, oh, previous --
9  about six months previous to him coming to me,
10 he had got promoted to driver, and he kind of
11 wanted to get back to truck work.  So then he
12 transferred to Truck 8 to be my driver on Truck
13 8.
14    Q   Okay.  And then tell me about Dyer's
15 role and how he is as a firefighter.
16    A   Again, Firefighter Dyer is coming from
17 Station 1, a very busy station as well.  Highly
18 skilled.  Very talented and has a really good,
19 solid work ethic and wants to do things the
20 right way.
21    Q   How about Firefighter Borchers?
22    A   Ditto on Firefighter Borchers.  Again,
23 he was on C shift.  He had spent approximately
24 the last eleven years on Truck 1.  And something
25 that he always wanted to do was come work for

Page 1588

1  me.  And there was an opening due to one of my
2  firefighters getting promoted to driver.  So he
3  transferred to Truck 8.
4        And my crew are tremendously
5  proficient.  They're very talented.  And that's
6  not -- I don't deserve all the credit for that.
7  They are dedicated firefighters.
8        When they transfer to be on my
9  apparatus, I have a very simple expectation.
10 And that is:  I don't ever want to look stupid.
11       And when -- when they hear me say
12 that, that means that they are going to adopt
13 that same mentality.  And that when you fall in
14 line and I say, I don't want my company officer
15 or my captain to look stupid, that means that
16 you are going to be talented.  You're going to
17 train.  You're going to be proficient.
18       So it speaks highly of their work
19 ethics and their desire to not only be a member
20 of a good crew, but it speaks highly of their
21 desire to do what's right for the department and
22 the City.
23    Q   You said one of them had wanted to --
24 always wanted to come to your crew.  Have you
25 heard of others that have wanted to work with

Page 1589

1  you?
2     A   Yes.  There's many, both male and
3  female firefighters, that have told me
4  personally -- they've communicated to battalion
5  chiefs.  I know there are battalion chiefs that
6  say, hey, if you want to learn, this is the
7  place to go.  You're going to be busy.  You're
8  going to train.  But if you want to be
9  proficient in your career and your talent and
10  raise your talent level, this is the place to
11  go.
12        I appreciate the accolades.  I just do
13  what I do.  And everything else kind of falls in
14  line after that.
15     Q   Okay.  As -- if you were doing -- do
16  you believe your crew on that day are honest
17  individuals?
18     A   Oh, yes.  Definitely.
19     Q   If you were doing anything unsafe,
20  would your crew call you out on it?
21        MR. CORRIGAN:  Objection.
22        MS. GUTTAU:  I'll restate it.
23     Q   (By Ms. Guttau)  In your experience
24  with your crew, if -- if you were doing anything
25  unsafe, do you believe they would call you out

Page 1590

1  and bring it to your attention?
2     A   I feel comfortable in agreeing with
3  that.  Again, through conversations.  Even as I
4  stated earlier whether -- whether they're
5  comfortable or not, they have the right to
6  question something on safety.
7        I promote within my crew in the work
8  that we do and that we are a team.  I don't have
9  all the answers.  I may have certain talents.
10  But each one of those individuals have
11  specialized talents, and I rely on that
12  diversity to really make Truck 8 the company
13  that it is.
14     Q   And was Ms. Benson's crew also called
15  out to the warehouse fire?
16     A   Yes.  Truck 1 was present at the
17  scene.
18     Q   Okay.  And they were -- actually
19  arrived before you; correct?
20     A   Yes.  Many -- several minutes prior to
21  our arrival.
22     Q   Okay.  What was your understanding of
23  her role at the time for Truck 1?
24     A   Each morning, there's a morning
25  briefing.  We can check -- if you want, each

Page 1591

1  individual can look at the staffing roster, and
2  you can see where everybody is situated within
3  the department.
4        I knew that just by looking at the
5  training calendar that particular morning that
6  Truck 1 had some captain-initiated training.  So
7  just looking at the roster, I knew what the
8  staffing was of that particular apparatus.
9     Q   You knew she was the acting captain
10  that day for Truck 1?
11     A   Yes, I do.
12     Q   Okay.  Do you know who was on her crew
13  that day?
14     A   The FAO, the fire apparatus operator,
15  was Matt Roberts.  And I believe that Morgan
16  Hurley was also on the apparatus, and she was a
17  trainee or a recruit firefighter at the time.
18     Q   Okay.  And we've heard previously from
19  Firefighter Roberts, is he an experienced
20  firefighter?
21     A   Yes, he is.  He spent time as a
22  firefighter on Truck 1.  Got promoted to driver
23  and was back on Truck 1.
24     Q   Okay.  And do you believe he's a good
25  firefighter?

Page 1592

1     A   Most definitely.
2     Q   Okay.  As acting captain, was Benson
3  responsible for her own crew's safety?
4     A   Yes.
5     Q   As captain for Truck 8, are you
6  responsible for your crew's safety?
7     A   Yes.
8     Q   Okay.  When you get called to the
9  fire, tell me what happens when you first
10  arrive.
11     A   The -- the situation of getting on
12  location was just a little bit -- when I say not
13  normal.  While it was a fire Charlie, I believe
14  originally Truck 1 was out of service for the
15  training.  And -- and the reason that Truck 8 is
16  now dispatched to the location of this fire,
17  which is diagonally across town was due to
18  Truck 1 being out of service.
19        So essentially what it ended up
20  happening was there was three truck companies
21  that arrived on location at the warehouse fire.
22  And I believe that Truck 8 just by the
23  geographic location we were the last suppression
24  unit to arrive on the first original dispatch.
25     Q   When you say "suppression" unit, what

Page 1597

1    A   (Witness complies.)

2    Q   And it's an aerial view; correct?

3    A   That's correct.

4    Q   Okay.  So when you arrive at the fire,
5   can you tell me where you arrive, what area?

6    A   We are essentially -- the crews were
7   directing us to not pull into the A side, and it
8   didn't look advisable anyway because of the
9   congestion.  So essentially Truck 8 stayed where
10   we see it says Doris Bair Circle.

11    Q   Uh-huh.

12    A   The front of the apparatus would have
13   been just behind the "D" of Doris.

14    Q   Do you know where Truck 1, Ms.
15   Benson's truck was at that time?

16    A   I don't know their specific location.
17   But I know that it was near the A side of the
18   structure.

19    Q   Okay.  So what's your mindset when you
20   arrive as far as what -- what are you going to
21   do next?

22    A   Again, it was -- this -- the response
23   was very long.  It took us in excess of twelve
24   minutes to get on location.  Other units were
25   arriving essentially in four minutes.  We had

Page 1598

1   interior activities happening at six and seven
2   minutes.

3    So we're still en route for five-plus
4   minutes while there's actually interior
5   activities.

6    This particular address is in Station
7   5's area.  So because of the eight years that I
8   spent at Fire Station 5, I'm familiar with this
9   particular area.  It's more of an industrial
10   area.  So I knew that we were going to be
11   responding to a big building.

12    Q   Uh-huh.  Okay.  And what is your
13   assignment, or how do you know what to do when
14   you first arrive?

15    A   So the assignment from the
16   acting-Captain Faust was utility control.  And
17   for the most part, utility control means that we
18   are going to locate the gas meter and the
19   electrical supplies that -- that essentially
20   that would stop or control the branch circuits
21   from the electrical panel.

22    Q   And did you -- did you indeed do that?

23    A   Yes.  And -- and honestly, by -- I
24   think some of the staff that was on scene, they
25   were in communication with Chief Faust.  And he

Page 1599

1   provided me direction of where it was probably
2   located.  And that when it came to the
3   electrical side, he gave a description of an
4   individual that was going to come over to assist
5   us to help us identify the electrical utilities.

6    Q   Okay.  And there's a part where the
7   first crew on the scene only calls for a
8   watering can.  What is that?  What's a watering
9   can, what's that mean?

10    A   A water can is -- is -- essentially,
11   looks like a fire extinguisher.  It's 2 -- it
12   contains 2-1/2 gallons of pressured water with a
13   little bit of a foam additive to it.  But,
14   again, it's 2-1/2 gallons of water.

15    Q   Okay.  What does that convey to you
16   about the fire?

17    A   That whatever the size-up of the
18   approach of the first arriving units, that if
19   we're going to attempt to extinguish a fire with
20   a water can that is relatively small.

21    Q   Okay.  Once you complete utility
22   control, then what's your next job?  How is that
23   determined?

24    A   Utility control for me involved
25   obviously shutting off the gas meter, and that

Page 1600

1   was in close proximity.  So it didn't take much
2   time.

3    But in order to control the electrical
4   utilities, we had to navigate down the Charlie
5   side about 200 feet.  And, again, Chief Smith
6   was tracking with us.  I'm receiving questions
7   from, I think, interior crews or from Faust of
8   what -- what do I see on the Charlie side.  And
9   I give a brief report of the smoke conditions.
10   And then it becomes apparent if we're going to
11   go in and secure the electrical utilities, that
12   we're going to have to go on air and don our
13   face pieces and perform the utility control in
14   an environment that is going to be obscured by
15   the smoke.

16    Q   Okay.  And at this time, did you have
17   an understanding of what Truck 1, Benson's crew,
18   was doing or assigned to?

19    A   That assignment was made while we were
20   en route.  So, essentially, while we're en
21   route, we have the luxury of hearing all of the
22   radio traffic and where we can focus on it
23   instead of trying to work and hear radio
24   traffic.

25    So Truck 1's assignment was to -- fire

1  extension was the assignment for Truck 1.
2      Q   What's fire extension?
3      A   Fire extension is -- predominantly I
4  would say is -- is an activity that's handed off
5  to truck companies.  Again, we have engine
6  companies that are deploying hand lines, hose
7  lines of various sizes.  And that fire
8  extension -- essentially what is happening at
9  this particular time in the incident because it
10 was determined by both the first-arriving unit
11 and by the people that worked there that
12 everybody was out of the building and that
13 search was not necessary.
14     So the fire extension assignment
15 essentially puts you in close proximity to fire
16 attack.  You're trying to establish how big is
17 the fire, what's the involvement of the fire.
18 And that becomes a very easy question.  Do I
19 have a room on fire, or do I have a building on
20 fire?  This essentially was a room on fire or an
21 object on fire.  And you're just trying to
22 establish what is the -- how big is it.  And
23 fire extension means that you might be, if it's
24 in a residential structure, you might be opening
25 walls, maybe pulling ceiling to allow the engine

1  company access to the seat of the fire or the
2  origin of the fire.
3      And to be honest with you,
4  firefighters that's -- that's their goal.  They
5  either want to be on the nozzle or they want to
6  be inside.  I mean, that's what you talk about
7  for the rest of the day is being inside.
8  Utility control, there's not a lot of excitement
9  in that.
10     Q   And fire extension -- well, first of
11 all, were there sprinklers also in this
12 warehouse that were going off at times?
13     A   Yes.  It was sprinkled and they were
14 activated in areas above the fire.
15     Q   Okay.  And so fire extension at this
16 fire, what did that -- what was your
17 understanding that Benson's crew or Truck 1 then
18 would be doing, or had that ended at some point?
19 What did you understand was her role?
20     A   No.  There's -- fire extension is very
21 important to the scene and to the success of the
22 scene.  That once you're assigned inside the
23 structure, there's -- there might be a few
24 parameters for the reason to leave.  You maybe
25 found a victim.  Maybe you had an air

1  malfunction or the incident commander -- there's
2  some other -- a building collapsed or something,
3  something imperative that is going to happen.
4  But really you're -- fire extension, you're
5  essentially in the building until you -- either
6  -- the fire is extinguished or you get low on
7  air.  And then -- then you come out.
8      So it's -- that's that activity.  And
9  part of that activity is relaying information to
10 the incident commander.  You're essentially like
11 a forward set of eyes to the incident commander.
12 You're reporting what you're finding.  Is the
13 fire big.  Is it small.  Are the -- do you have
14 access to it, or is the hose line making
15 progress.  So, again, it's a very critical role
16 to -- to stay with that assignment and perform
17 that assignment with proficiency.
18     Q   So if you're on extension, should you
19 get frequent updates to the incident commander?
20     A   Yeah.  I think that you're not going
21 to be radio traffic, you know, every one of your
22 events.  But you're going to be providing
23 updates that as a company officer that you think
24 are important or, you know, critical to the
25 incident because that's essentially confirming

1  the action plan -- we're doing an interior
2  attack.  It's an offensive attack.  By what
3  you're relaying back to the incident commander,
4  that starts to make sense.  Hey, that's the plan
5  I put in place.  That sounds like it's working.
6      If the fire extension or fire attack
7  is saying the fire is getting bigger, we're not
8  making a difference, that gives them a clue I
9  need to change my strategy.
10     Q   Was Ms. Benson when she was on fire
11 extension giving updates to -- frequent updates
12 to Chief Faust?
13     A   Not that I'm aware of.  But, again,
14 upon review of the audio, it became clear that
15 there were no updates to Chief Faust.
16     Q   Okay.  Did Chief Faust have to reach
17 out to her for status update?
18     A   Yes.  Again, after reviewing the
19 audio, Chief Faust -- I refer to it as pings
20 Truck 1 to make sure that they're okay and the
21 conditions are tenable inside the structure.
22     Q   There's a portion of the fire
23 transcript, and we can go through it in more
24 detail in a bit, but where the incident
25 commander says, Truck 8 assist Truck 12.  Did

Page 1605

1   that make Truck 12 the group supervisor over
2   you?
3       A   That might be in error because Truck
4   12 wasn't there.
5       Q   I probably got the wrong number. Let
6   me look here.
7       A   I'm going to make the assumption it
8   was Truck 1.
9       Q   Truck 1. Sorry. Yeah.
10      A   So the three trucks that were there
11  were Trucks 1, 8, and 5.
12      Q   Was there a time you were told to
13  assist anybody?
14      A   No.
15      Q   Okay.
16      A   No.
17      Q   Okay. I may have misread that part.
18  So I'm back before you're getting to. So
19  probably out of order here.
20          When you arrived, did you -- when you
21  first arrived, did you think you would be
22  helping Truck 5?
23      A   When I first arrived, my assignment
24  was utility control.
25      Q   Okay.

Page 1606

1       A   And I'm -- I'm going to complete that
2   assignment unless I come up against some
3   variables, whether it's a fence or something
4   that prevents me from completing that
5   assignment. Perhaps the gas meter is inside the
6   structure. So I'm not going to be able to shut
7   the gas off. I would be communicating that to
8   Chief Faust saying hey, we've walked the
9   perimeter of the building. We have no gas
10  meter. So obviously it's going to be interior,
11  and that's going to be done at a later time.
12          And the reason that's important is
13  because he will announce that over the radio and
14  that crews will know that while we made an
15  effort to secure the utility, whether it's gas
16  and/or electric, that if we didn't shut the gas
17  off, just to be aware of that. That's still
18  activity in the building.
19          So my focus was to complete that
20  assignment. And when that happens, my typical
21  behavior is that once I've been given an
22  assignment if -- if there's no challenges to it,
23  I'll complete that assignment. Once the
24  assignment has been completed, I'll radio to
25  command that these activities have been -- your

Page 1607

1   current assignment to Truck 8, that has been
2   completed. We're ready to be reassigned.
3       Q   Okay. So jumping, I think, ahead to
4   what you're talking about, was there a time
5   where Benson volunteered her crew to assist with
6   ventilation and the incident command instructed
7   them to assist with in opening an overhead door?
8   As you read the transcript, did you see that at
9   some point?
10      A   Yes. At some point that became clear
11  that that radio traffic supported that.
12      Q   Okay. At the time at the fire, did
13  you hear that?
14      A   No, I -- I did not.
15      Q   Okay. And is it -- it wouldn't be --
16  Benson and -- Captain Benson and Captain Wright
17  also testified they did not hear everything
18  on radio transmission. Fair to say that not
19  everybody hears everything on the radio?
20      A   That is a fair assessment. There's a
21  number of variables that would prevent people
22  from hearing all of the radio transmissions.
23          Again, I think in this first hour,
24  there's roughly 200 radio transmissions. And it
25  -- again, when I'm performing utility control,

Page 1608

1   the incident commander knows what I'm doing.
2   He's not expecting to hear from me unless I have
3   any challenges. And I'm focused on what we're
4   doing. I'm focused on directing the crew.
5   Making sure that we are doing that in a safe
6   way. We're being proficient. So there's an
7   opportunity to miss radio traffic.
8           I would compare it to when you're at a
9   party or a gathering and there's multiple
10  conversations going on. But until somebody says
11  your name, you're like, oh, I perk up. Like,
12  hey, what do you want? So I'm listening to the
13  radio. I hear the traffic.
14          But unless I hear somebody say and
15  command to Truck 8 or Truck 8, I'm just letting
16  those kind of go in the background. I'm aware
17  of them, but they're pertaining to somebody else
18  and their activities.
19      Q   Okay. And so you didn't know what
20  incident command had told to -- that they had --
21          MS. GUTTAU: Strike that.
22      Q   (By Ms. Guttau) You did not know that
23  incident command had told T1 to assist T8 with
24  ventilation?
25      A   No, I did not catch that radio

Page 1609

1    traffic.
2        Q   What would you have been doing around
3    that time period, just physically doing or
4    jobwise?
5        A   At that particular point in time --
6    myself, Dyer, and Borchers -- are on Charlie
7    side.  We're essentially inside of the building
8    in a room that is maybe 10 by 14.  And it is
9    where the service -- electrical service entrance
10   is coming in.  And so I would estimate there
11   could have been six, maybe eight electrical
12   panels, and we're trying to determine which one
13   is going to shut off the electrical power to
14   that portion of the building but not affect
15   other portions of the commercial building.
16       Q   Okay.  And did you ever hear incident
17   command make you her -- Benson's group
18   supervisor?
19       A   No.
20       Q   Okay.
21       A   Never heard that.
22       Q   Did you ever hear incident command
23   make you T1 or Benson's supervisor in any way at
24   the warehouse fire?
25       A   No.  That radio traffic never

Page 1610

1    happened.
2        Q   Okay.  Her -- Ms. Benson's expert,
3    Mr. Hadfield, testified that the first person
4    assigned ventilation always then supervises
5    everyone after that who is assigned to assist.
6    Is that how it has worked or works now at LFR?
7        A   It's never worked that way.  It's --
8    it's never implied.  It's not part of -- like we
9    talked earlier, about NIMS.  That does not meet
10   the NIMS or the ICS structure.  And there's one
11   and one person only that creates the structure,
12   and that's the incident commander.
13       Q   So even if you had heard she was
14   assigned to assist T8 with ventilation, opening
15   an overhead door, would that make you her
16   supervisor in any way in a manner that would
17   allow you to give her orders?
18       A   No.  We -- at best, we're working in
19   peer capacity to one another.
20       Q   Okay.  And the only one that could
21   give her orders would be incident command; is
22   that correct?
23       A   That's correct.
24       Q   Okay.  At any time at the warehouse
25   fire, did you have authority to give Ms. Benson

Page 1611

1    orders?
2        A   No.  We're equals at that point.
3        Q   Okay.  And under your no contact
4    order, you're not to communicate with her unless
5    a superior is present and you're giving -- or
6    you're giving orders; correct?
7        A   Correct.
8        Q   Okay.  You didn't have authority to do
9    that?
10       A   No.  It was essentially perhaps
11   undermined --
12       Q   Okay.
13       A   -- the strategic plan for the incident
14   commander.
15       Q   How so?
16       A   If -- if I was to give a direction or
17   an assignment to another company in person, even
18   over the radio, one, I don't have any authority
19   to -- to do that.  Secondly, if it's in person,
20   it creates a lot of challenges.  It creates
21   challenges for the safety officer.  It creates
22   challenges for the RIT team.  The RIT team is a
23   group of individuals that are put in place for
24   the safety of the firefighters.  So if somebody
25   goes missing or a Mayday is called, the RIT team

Page 1612

1    is essentially deployed first.  And essentially
2    and most importantly to give an order or an
3    assignment off radio the incident commander is
4    completely unaware of that.
5            And finally, I may not know what I'm
6    talking about.  I could give somebody an
7    assignment that is completely in error and put
8    them at risk.  So that's why the incident
9    command structure exists is that you have one
10   person in charge making assignments.
11       Q   When you're inside the warehouse with
12   her -- and we'll get to that in a little more
13   detail -- there's no -- the incident commander
14   isn't present inside the warehouse fire with
15   you, is he?
16       A   No.  They're out in the command
17   vehicle.
18       Q   So if you're equals at the fire, you
19   can only give her orders if you're designated as
20   a group supervisor over her; correct?
21       A   Under the parameters of incident
22   command, yes.
23       Q   Okay.  And other than that, no contact
24   under your no contact order; correct?
25       A   Correct.

Page 1613

1    Q   Okay.  So, again, at a scene like
2  this, if she had approached you on the outside
3  of the warehouse fire does that put you in
4  between a rock and a hard place again?
5    A   Yes.  And -- and that did occur.
6    Q   Okay.  Tell me about that.  So I want
7  to talk about that.  Where did you first
8  encounter Ms. Benson at the warehouse fire if we
9  look at Exhibit 16, the aerial view?
10    A   I assume everybody has the same red
11  letter "B" on their paper.
12    Q   Correct.
13    A   It would be directly below that, and
14  you can see there's a grass median.  And we
15  would have met at kind of right just shy of the
16  radius of the grass median below the "B."
17    Q   Okay.  And, again, at the time you
18  met, you have not heard that she had been asked
19  to assist you or been told to assist with
20  ventilation, opening an overhead door?
21    A   No.  We had completed -- Truck 8, we
22  had completed -- we're in the process of
23  completing our electrical control.
24        And command was asking us -- multiple
25  units interior were asking for ventilation.  And

Page 1614

1  Chief Faust was asking me to perform ventilation
2  activities.  I reported to him that we had not
3  completed our assignment yet.  That we were
4  still actively engaged in that, and that any
5  ventilation that we would have to offer would be
6  delayed because we had not completed that.
7        Within a few moments, we were able to
8  complete that, exit it, had a brief conversation
9  with Chief Smith.  And then he said, hey, Faust
10  is asking you guys to come over and open an
11  overhead door.  And that's what Faust radio
12  traffic was asking us to come to the Alpha side
13  essentially and open an overhead door.
14    Q   So you're coming around from C to B
15  heading towards A to open an overhead door, and
16  you encounter Benson at the -- kind of at the
17  corner, you said?
18    A   Uh-huh.
19    Q   What happened at that corner?
20    A   We were -- we had -- we had left that.
21  We had gone back to Truck 8.  Because we were
22  asked to essentially open an overhead door, that
23  was going to require a different cache of
24  equipment for us.
25        So all four of Truck 8's crew was back

Page 1615

1  at Truck 8 for a few moments.  We gathered that
2  cache of equipment, and then all four of us were
3  headed to this location.  And we -- obviously,
4  it's a fire.  We're hustling.  We're not
5  walking.  It's kind of a quick walk or a jog,
6  carrying equipment.  And as we kind of approach
7  that corner, that is when the Truck 1 crew --
8  let me stop for a second.
9        Because that we were completing
10  our electrical assignment, utility control, we
11  were on face pieces.  And we were breathing air
12  from our SCBAs.  As a way to minimize the
13  delays, we kept our face pieces on, but we were
14  not breathing the air from the SCBAs.
15        So when we come around that
16  corner, we're in our face pieces, and Truck 1
17  essentially is in their face pieces.  And we're
18  going to the A side, and Truck 1's crew is going
19  the opposite direction we are, which kind of
20  like shocked me, because their assignment was
21  fire extension.  I was surprised to see them on
22  the exterior of the building.
23    Q   Let me interrupt you.  Because you had
24  not heard any other assignment at that point
25  given to them?

Page 1616

1    A   No.  I'm operating under the pretense
2  they're still inside the fire on their original
3  assignment.
4    Q   Okay.  So they encounter you.  Sorry
5  to interrupt.
6    A   That's okay.
7    Q   Continue what happened.
8    A   Acting-Captain Benson says something
9  to the effect of "what would you like us to do"?
10  And, of course, I'm thinking to myself, well, I
11  don't know what you guys are doing, because
12  we're going in opposite directions.  We can't be
13  doing the same thing if we're going in opposite
14  directions.
15        I replied back that we're going over
16  to open an overhead door.  If you need an
17  assignment, you need to call command.
18    Q   Uh-huh.
19    A   For all the reasons that I just stated
20  a few moments ago, so that it's on the radio and
21  documented and -- and everybody knows what
22  everybody is doing.
23    Q   Okay.  And then what did you do?
24    A   We attempted to continue to move
25  towards -- again, at this point, I have not seen

Page 1617

1    the A side.  If we look at, again, the photo --
2    I think this is 16 again.  And the semi tractor
3    trailer that's parked is -- is very close, the
4    same way that it was positioned the day of the
5    fire.
6          So when I glanced to essentially my
7    left, like, I want to see the A side, I want to
8    start my size-up process.  I can't see any of
9    the doors.  All I see is this semitrailer.
10         So I'm wanting to get to the A side,
11   one, to see which door I'm opening and what's
12   the conditions, what's going on, I want to lay
13   some eyes on the A side.
14       Q   So if you haven't seen it, you
15   wouldn't know what to tell anybody to do over
16   there anyway?
17       A   No.  I need to do my size-up.
18       Q   Okay.  Is that typical to have to do a
19   size-up at a fire scene when you're trying to
20   figure out what to do?
21       A   Yeah.  You better have a plan before
22   you put a bad plan in action.
23       Q   Okay.  There's been testimony -- and
24   I'm sure you'll be asked -- that the first time
25   you reported that you told Ms. Benson outside

Page 1618

1    the warehouse that, you know, hey, if you need
2    something to do to contact incident command, the
3    first time that was reported in writing was in
4    Ms. Gerdes' investigation.  Are you aware of
5    that?
6        A   Yes.
7        Q   When was the first time you were asked
8    to go in detail what happened at the warehouse
9    fire?
10       A   It would have been during Ms. Gerdes'
11   investigation -- or I guess my testimony with --
12   with her.
13       Q   Okay.  So even if her question to you
14   at that corner, as you're heading in different
15   directions about what to do indicated to you
16   that she thought maybe her crew was to be
17   helping you.  You still hadn't heard any order
18   to that effect at this point; correct?
19       A   That's correct.  I have not.
20       Q   You have -- you're not her group
21   supervisor?
22       A   I have not been designated that.
23       Q   And you never were?
24       A   Never were.
25       Q   And you can't give her orders, can

Page 1619

1    you?
2        A   I cannot.
3        Q   Okay.  And her assumptions don't make
4    you a group supervisor, do they?
5        A   No, they do not.
6        Q   So then what happens once you get
7    around to the A side?  What do you do?
8        A   Again, listening to the radio traffic
9    coming in, approach reports.  You know, Truck 5
10   is reporting that they have two large overhead
11   doors open.  Again, I don't know what size of
12   door that we're going to be opening when we're
13   going over there.  But once I come around the
14   corner, really the only door that is left to be
15   open is I refer to as a small commercial door.
16   It's essentially the size of a semi tractor
17   trailer, kind of the back end on a loading dock.
18   So, I mean, essentially we're probably dealing
19   with a door that might be 9 or 10 feet wide and
20   perhaps 10, 12 feet tall.
21       Q   Okay.  Let's flip one sheet back on
22   Exhibit 16.  Sorry.  Backwards one page.
23       A   (Witness complies.)
24       Q   So it looks like the door side.
25       A   Yeah.

Page 1620

1        Q   Is that the A side that you're
2    referring to of the warehouse?
3        A   Yes.
4        Q   So do you recall which -- which doors
5    were already open and what you're talking about
6    a small commercial door?
7        A   Like I had mentioned earlier, Google
8    Images obviously are taken at different times.
9        Q   Right.
10       A   And that the aerial one correctly
11   positions that first tractor trailer to be on
12   those -- in this image on the far left.  It's
13   parked at one of those -- it's at the far left
14   door.
15       Q   Okay.
16       A   So the door that we essentially opened
17   is the smaller door to the right.
18       Q   Okay.
19       A   The doors that Truck 5 refers to, I
20   believe, are the two tall doors --
21       Q   Okay.
22       A   -- that are opened.
23       Q   Okay.  Those were already opened when
24   you got on the A side?
25       A   Yeah.

1    Q   So you opened the second one from the
2   right -- or from the left?  Sorry?
3    A   Yes.
4    Q   The small one?
5    A   Yes.
6    Q   All right.  And then what -- what do
7   you do next then at the fire scene?
8    A   So we -- we open the door.  Again,
9   there's some long ramps.  So I open the door.
10  My crew is kind of climbing the ramp.  They ask,
11  hey, do you want us to go and finish opening the
12  door?  I'm like, yeah, let's get that door open.
13  That was our assignment.  We're accomplishing
14  our mission.
15   Q   Right.
16   A   And this -- the process of me putting
17  -- or Truck 8 putting eyes on this door from the
18  time that we see it until the time it's opened,
19  it could be a minute.
20       So the assignment from Chief Faust of
21  coming and opening this overhead door, while we
22  may have spent some time navigating back to the
23  rig and getting over there, it was probably five
24  to six minutes that -- that this is all
25  occurring.  But the actual act of raising the

1   door, it wasn't locked, it took forty-five
2   seconds to a minute to get it done.
3        I then have to kind of walk down to
4   get to the lower portion of the ramp.  Me and my
5   crew essentially meet at the -- at the --
6   there's a walk- through door in that photo.  And
7   there's some pallets.  We essentially meet at
8   the tall overhead door.
9    Q   Okay.  And then what do you proceed to
10  do?
11   A   We're now about twenty-six to thirty
12  minutes into this incident.  We had water on the
13  fire early.  But by the sound of radio traffic,
14  smoke conditions, like we are not getting a
15  handle on this.
16   Q   Uh-huh.
17   A   And so, again, ventilation -- you just
18  can't impose various ventilation tactics without
19  doing additional size-up.  Because now we have
20  multiple firefighters inside the structure.  And
21  changing the flow path is what it's referred to,
22  creating excessive holes or -- or ventilation in
23  the wrong way can actually enhance the fire and
24  cause it to grow, which essentially puts
25  people's life (sic) at risk when done

1   incorrectly.
2        The assignment was to open an overhead
3   door.  There's variable types of ventilation:
4   horizontal, positive pressure, vertical
5   ventilation.  Those were not given.  It was very
6   specific to open an overhead door.
7        So once that happens, the ventilation
8   activity is essentially completed.  Until we
9   understand or, at least for me, understand
10  the -- the involvement of the fire is
11  internally, I cannot get -- or ventilation
12  cannot get aggressive.  Okay.
13   Q   At this point you still haven't been
14  inside the -- where the -- the fire is going on?
15   A   No.  I've never been interior other
16  than the electrical vault.  But like I said, it
17  was a small room divisioned off from the main
18  part of the building.
19   Q   Okay.  And Benson -- Ms. Benson and
20  her crew at this point had been inside already;
21  correct?
22   A   Yes.  Clearly, their assignment --
23  they reported that they were in the fire, at the
24  seat of the fire, origin of the fire.  There was
25  some radio traffic kind of -- clearly

1   identifying their location, and they had been
2   there for nine or ten minutes --
3    Q   Okay.
4    A   -- prior to our encounter on the A/B
5   corner.
6    Q   So you go in for the first time.  What
7   do you observe?
8    A   We navigate in.  There's -- again,
9   this is a large structure.  There -- the smoke
10  kind of ebbs and flows, but you can -- you can
11  look into the structure maybe 20, 30 feet, and
12  you can see smoke.  You have got smoke overhead
13  (indicating).
14       But as we got closer and closer to the
15  fire and essentially we're navigating by sound
16  at this point.  We can hear firefighters.  We
17  can hear water application going on.  So we're
18  kind of navigating towards that direction.  I
19  believe Firefighter Dyer would have this thermal
20  imager.  And we -- we share that amongst
21  ourselves, depending on what one another's
22  activities are.  So that would have helped us,
23  you know, to get where everybody is at.
24       So essentially we're trying to get to
25  the area of the fire to see the extent of the

Page 1625

1    fire, and I'm beginning my own size-up of what I
2    see and can ascertain.
3         Q   Okay.  Before we get into more detail,
4    when you say "thermal imager," is that the same
5    thing as TIC?
6         A   Yes.  TIC is an acronym for thermal
7    imaging camera.
8         Q   Okay.  What is that used for?
9         A   It's been in the fire service.  We --
10   Lincoln Fire had one when -- when I started my
11   employment.  Throughout the years, I -- I was an
12   individual that spearheaded and researched
13   thermal imagery.  And we've -- I acquired four
14   thermal imagers back in 2001, I believe.  They
15   went on the truck companies, and there has been
16   -- I've been on that committee for many, many
17   years.
18        And the project came back up.  And in
19   cooperation with Chief Engler and the diligence
20   of many firefighters, that committee put
21   together a proposal.  And now every fire company
22   in town has a thermal imager, which promotes for
23   the safety of the firefighter.  And it helps
24   facilitate rescues of civilians.
25        Q   Okay.  So then -- you were talking

Page 1626

1    about you enter the warehouse.  You're doing
2    your size-up.  What do you do next?
3         A   So essentially there's a lot going on
4    in the interior.  There's, again, on -- when --
5    prior to entry, I had mentioned earlier that
6    Truck 8 was Par 4 coming on the A/B corner.
7         Q   What does that mean?
8         A   That means I'm Par 4.  Myself and my
9    three crew members, we are all currently
10   together.
11        Q   Okay.
12        A   When I kind of come around and we're
13   opening this door, my driver, Jason Love, he is
14   now in his turnout gear, air pack, he's ready to
15   go in with this.
16        I don't normally use my driver on the
17   interior.  I want my driver doing support
18   activities on the outside.
19        Q   What are the support activities that
20   your driver does?
21        A   He may be bringing additional
22   equipment --
23        Q   Uh-huh.
24        A   -- to -- whatever we are assigned,
25   we've talked and trained like, hey, if we get

Page 1627

1    this assignment, this is the complement of cache
2    that we bring.  We can only carry so much.
3         So he might be bringing like
4    stepladders, additional tools, things like that.
5    At this particular moment because we're now deep
6    into this incident and it's not been declared
7    under control and given the location to where
8    Truck 8 previously had positioned, that was not
9    adequate to do any type of rooftop activities.
10   Whether this has now changed from an offensive
11   attack to a defensive attack.  I asked him, I
12   need you to go back to Truck 8, and I need you
13   to do a corner set on the Bravo/Charlie corner.
14   So he is now doing that activity.  So I'm
15   managing that.  I get inside knowing that we
16   still don't have control of the fire.  I'm doing
17   my size-up.
18        Again, one of the activities that --
19   when we were on utility control and my size-up
20   on the exterior of the building, I recognized
21   that there was two large negative pressure fans
22   to help ventilate the structure.  During just
23   normal operations, they can turn the fans on,
24   much like a bathroom exhaust fan to help that.
25   I make note of that.

Page 1628

1         And I'm wondering all -- like, when
2    can I put those in play?  When can I use them?
3    But in order for me to use them, I have to make
4    sure that the fire has been extinguished again
5    because of flow path and air path and all those
6    type of things.
7         So we get interior.  The original
8    crews that were in there, like Engine 5, perhaps
9    Engine 2, Engine -- Engine 10, they are now kind
10   of exhausting their air supply of their packs.
11   But because we had spent -- late on arrival and
12   less time on air, we're going to have ample
13   supply of air.  And it's documented in the radio
14   transcript that about the time we're going in,
15   they spend a few minutes in there.  Now, they're
16   on low air.  So they are exiting.
17        So there's a multitude of things that
18   we're going to have to be doing here in the next
19   few minutes.  Locate the fire, the seat of the
20   fire.  Probably fire extinguishment because
21   crews are leaving.
22        Q   The crews that were leaving at the
23   time, did you observe them having any difficulty
24   finding and exiting -- finding an exit and
25   exiting?

Page 1629

1    A   No.  The incident command would radio
2  them:  You're low on air.  And they would exit,
3  and there's no conversations, no problems.  They
4  just left the building.
5    Q   Okay.  And so you're sizing this up.
6  Evaluating all of this.  This is at the same
7  time.  And at this time you still have not heard
8  any order that Benson or Truck 1 is to report to
9  you or assist you; correct?
10    A   I'm still operating as a single
11  resource.  I'm in charge of nobody but myself
12  and my crew.
13    Q   Okay.  And during this time is when
14  Ms. Benson said she was approaching you, asking
15  you what to do.  Do you recall that?
16    A   When we got in and around the trash
17  compactor, again, I'm trying to do a multitude
18  of things.  And Ms. Benson was repeatedly asking
19  me what -- what she should do or what -- what
20  Truck 1 should do.
21        And while I'm aware of that, again
22  I've got multiple activities I'm trying to kind
23  of juggle at the same time.
24    Q   Okay.
25    A   And after several minutes, both FAO

Page 1630

1  Roberts and Morgan Hurley, the trainee, they
2  finally understood.  Like, if we just do what
3  Truck 8 is doing, if we just complement their
4  effort, that's what we're doing.  It's going to
5  help put the fire out.
6    Q   So Roberts and Hurley were helping do
7  that?  Knew to do that?
8    A   Yeah.  They were helping move hand
9  lines.  I think at one point -- because Morgan
10  was a recruit and I think that either Dyer or
11  Borchers handed off the hand line to her so she
12  could get some nozzle time and experience and
13  that.  So, yeah, we were working as a group at
14  that point.
15    Q   You didn't have to tell Roberts or
16  Hurley what to do?
17    A   No.  They chipped in and started
18  helping.
19    Q   Okay.  And at this time also if Ms.
20  Benson is asking you what to do, what to do, do
21  you have any authority to give her orders?
22    A   No.  I'm not under the impression that
23  I have to be not only assigning my crew to
24  activities, nor to the Truck 1 crew.  They're
25  not my responsibility.

Page 1631

1    Q   Okay.  And you had your own
2  responsibilities to complete; correct?
3    A   Yes.
4    Q   Okay.  Would it be normal to stop and
5  explain in detail what somebody should do at a
6  fire scene in that scenario?
7    A   There was a handful of things that
8  were kind of uncommon that were happening in
9  this time frame.  But to be engaged in an active
10  fire scene, trying to mitigate the fire scene,
11  direct your crew, worry about aerial
12  positioning, sprinklers, fire extension control,
13  those are emergent activities.  Those are things
14  that have to happen right now.  And trying to
15  stop and tell somebody what to do, how to do it,
16  that doesn't happen in the emergent scene.  That
17  happens at the training scene.  And the emergent
18  scene is not a training ground.  It's a proving
19  ground.
20    Q   We've heard other firefighters testify
21  that you're a man of few words at fires.  Would
22  you agree with that?
23    A   Yes, I would agree with that.  I
24  believe in actions and not words.
25    Q   Okay.  Ms. Benson claims that you were

Page 1632

1  ignoring her.  Were you ignoring her at the fire
2  trying to put her in danger in any way?
3    A   No.  I was attempting to assess what
4  was going, size-up, and actually perform fire
5  extension activities.
6        Once we got there, the other crews had
7  left.  We are now performing, which, again, as I
8  stated earlier, is a very common assignment for
9  a truck company.  That was Truck 1's original
10  assignment, fire extension.  And now I have
11  entered the building to work on fire extension.
12  And when I mentioned a moment ago, like uncommon
13  things going on, Truck 1's original assignment
14  was fire extension.
15        And as I've explained that, unless you
16  encumber some kind of difficulty, you're
17  expected to complete your assignment.  Once you
18  do that, you tell command.  If you can't, you
19  tell command.  But to be in the role of fire
20  extension and its importance to stop that and
21  volunteer for another assignment, that is
22  just -- that's not common.
23    Q   So what she had done was uncommon in
24  your experience?
25    A   Yes.

1    Q   Okay.  And should Benson have known --
2  do you believe Benson should have known what to
3  do at the warehouse fire given her years of
4  experience at that point?
5    A   Yeah, I believe so.  I feel like that
6  Firefighter Benson had maybe been assigned to
7  Truck 1 for one to two years.  And, again, the
8  common practice of fire extension is essentially
9  performed, or it's an assignment at almost every
10  fire Charlie that we go to.  It should be a very
11  learned skill.
12    Q   So fair to say you were busy fighting
13  the fire.  And in the back of your mind, you
14  also have this no contact order you have to
15  abide by; correct?
16    A   Correct.
17    Q   And you can't give her orders because
18  you're not her supervisor; correct?
19    A   Right.
20    Q   In the time frame that you're interior
21  together -- or inside the warehouse with Benson,
22  was that about ten minutes, tops?
23    A   Yeah.  It was somewhere between nine
24  and ten minutes that we were in and around the
25  trash compactor together.

1    Q   Okay.  But you were doing other things
2  as well at that time?  You wouldn't necessarily
3  always stand by the other firefighters or even
4  your crew members physically?
5    A   Yeah, that would be correct.  As a
6  company officer, again, just like the incident
7  commander, you want your incident commander to
8  be about five steps ahead of the current event.
9        As a company officer, I want to be a
10  couple of steps at least ahead of what the
11  activities that my firefighters are doing.  So
12  there's the overall plan, the action plan for
13  the incident.  But as I go and do my size-up, I
14  do a size-up.  I give an assignment to my
15  firefighters, do this.  But then I'm off like --
16  I'm expecting that to be successful.  I'm
17  looking, okay, what's going to happen next to
18  help mitigate the fire.
19        So I may have dialogue with them.  I
20  might be looking at the trash compactor.  Again,
21  I'm trying to coordinate the opening of a
22  Charlie walk-through door that we had forced
23  earlier.  So that's putting me geographically
24  covering, you know, 30 to 40 feet in and around
25  the fire area.

1    Q   Okay.  So when you were walking to and
2  from your crew and other people, that would be
3  common within the fire scene?
4    A   Yes.
5    Q   Okay.  And walking away and to --
6  you're not abandoning your crew by leaving their
7  physical area, are you?
8    A   No.  I'm oriented within the
9  structure.  They know where they're at.  Again,
10  that all depends on your comfort of training.
11  And like I stated, I have a highly trained crew,
12  and one I'm very proud of.
13    Q   Okay.  Did you do anything to cause
14  Ms. Benson to be disoriented?
15    A   No.
16    Q   Okay.  Ms. Benson claims as you know
17  in her federal affidavit that she filed that you
18  abandoned her in a dangerous burning warehouse,
19  and you understand that allegation was made;
20  correct?
21    A   I do.  But not only --
22        MR. CORRIGAN:  I'm sorry.  Would
23  you cite the page and line that you're
24  referencing in the affidavit?
25        MS. GUTTAU:  Sure.  If you want

1  to look at 19, she says -- paragraph 17:  Mahler
2  --
3        MR. CORRIGAN:  Let me get there.
4  One second.
5        MS. GUTTAU:  Exhibit 19.
6        MR. CORRIGAN:  Okay.  And page.
7        MS. GUTTAU:  Yeah.  Page 3,
8  paragraph 17.
9        So, first, she says, Mahler
10  abandoned me, Roberts, and Hurley in an IDLH
11  environment immediately dangerous to life or
12  health with no direction.
13        MR. CORRIGAN:  Okay.
14        MS. GUTTAU:  She then goes on to
15  say that, in paragraph 33, she refers to her
16  complaint on May 5th and says that she sent this
17  to Faust and Witte after Mahler abandoned me in
18  a dangerous warehouse fire.
19        And then in the complaint that
20  she cited, which is -- let me find that.  15,
21  R15 -- she talks about that abandonment.  At
22  this point I realized Mahler had abandoned us in
23  an unsafe environment.  And she states in her
24  last sentence:  His refusal to communicate could
25  have injured or killed me, FAO Roberts, and FF

Page 1637

1  Recruit Hurley.
2      Q   (By Ms. Guttau)  So in regards to the
3  time frame where she claims that you abandoned
4  her in a dangerous burning warehouse, did she
5  actually exit the warehouse before you?
6      A   I just want to make sure that it's
7  clear that I didn't -- the accusation is that I
8  didn't just abandon her.
9      Q   Right.
10      A   That I abandoned two other colleagues
11  as well.
12      Q   Yeah.  So in regard to the time frame
13  where she claims you abandoned her, Hurley, and
14  Roberts in a dangerous burning warehouse, did
15  she and they actually exit the warehouse before
16  you?
17      A   Yes, she did.
18      Q   Okay.  If she thought she was
19  reporting to you at the time as she later
20  claimed, she should tell you if she was leaving
21  the warehouse; correct?
22      A   If -- if she truly believed that she
23  was working for me under the capacities in which
24  her documents say, it is her responsibility to
25  tell me, whether in person or via the radio,

Page 1638

1  that they were exiting low on air.
2      Q   Okay.  That never happened, did it?
3      A   No.  That's also supported by the
4  radio traffic because the communications are
5  between Faust and Truck 1, which further
6  substantiates that nobody believed that they
7  were working for Truck 8.
8      Q   Okay.  And when she claims that you
9  abandoned her and her crew, were there other
10  firefighters still in the warehouse with you?
11      A   Well, certainly myself, Steve Dyer,
12  and Trent Borchers were in there.  There could
13  have been maybe lingering crews re- -- like I
14  had stated earlier, Engines 5 and 10 were coming
15  out, and perhaps some other crews were coming in
16  to replace them.  But I would -- I would have to
17  review the timeline on that.
18      Q   Okay.  And you seen the affidavits
19  from the other -- your crew members and her crew
20  members where they all indicated that they did
21  not believe they had been or that you had
22  abandoned anybody in an unsafe environment.
23  Have you seen those affidavits?
24      A   I've seen those documents, yes.
25      Q   Do you agree with their assessment?

Page 1639

1      A   I agree with their assessment.
2      Q   Okay.  Ms. Benson testified earlier
3  last time that she's not stating -- now she's
4  not stating you abandoned her and her crew in a
5  dangerous burning warehouse, but rather she
6  meant that you left her and her crew without
7  orders or directions, which could have
8  endangered her.
9          Did you leave her without orders or
10  directions in a manner that would have
11  endangered her?
12      A   No.  But I guess that's a different
13  position than the position that we would have
14  had either a year ago or during the injunction.
15      Q   Okay.  What was your understanding of
16  the position then?
17      A   The injunction essentially was very
18  clear that I had abandoned them and to -- either
19  injured or to be killed, all three of them.  And
20  that the injunction also was asking an
21  investigation, essentially discipline, on me.
22          So that is very clear what -- what Ms.
23  Benson wanted at the time.  And now we're --
24  again, it sounds like we're minimizing from what
25  we did a year ago or what they were asking for.

Page 1640

1      Q   You didn't have authority to give her
2  orders at that warehouse fire anyway, did you?
3      A   No.
4      Q   You said it seemed to minimize.
5  Because at the time, she asked a federal judge
6  to remove from your position, didn't she?
7      A   That's correct.
8      Q   Okay.  And the papers certainly
9  reported that you had abandoned her and her
10  crew, didn't they?
11      A   I Googled my name this morning.  I
12  would encourage everybody to do the same, and
13  you'll see the first thing that pops up.
14      Q   Okay.
15          MS. GUTTAU:  Can we take a --
16  just a few minutes' break, sir?  Restroom break?
17          THE ARBITRATOR:  Yeah.  What do
18  you need?
19          MS. GUTTAU:  Just five.
20          THE ARBITRATOR:  Okay.  Off the
21  record.
22          (Recess at 11:13 a.m.)
23          (Resumed at 11:23 a.m.)
24          THE ARBITRATOR:  Are you ready?
25          MS. GUTTAU:  We are.

Page 1641

1    THE ARBITRATOR: All right. Go
2  ahead.
3        MS. GUTTAU: Okay. Thank you.
4    Q   (By Ms. Guttau) So we'll kind of talk
5  about the tail end of the April 26 warehouse
6  fire.
7     I'm sure Mr. Corrigan will ask you about
8  your deposition that you gave in the federal
9  case; correct?
10   A   Yes.
11   Q   Okay. And in your deposition, you
12  testified that it did become apparent to you
13  that Benson thought she was probably reporting
14  to you. Do you recall that?
15   A   Yes.
16   Q   Okay. Does that change anything in
17  your mind? Do you have authority to tell her
18  what to do just because she thinks you should?
19   A   No. Again, it can't be implied. Just
20  because somebody thinks that something is so,
21  that doesn't put it in play or make it right.
22   Q   All right. Explain how that would --
23  how NIMS affects that, how -- under NIMS, just
24  because something -- somebody believes something
25  might be true, does that mean under ICS or NIMS

Page 1642

1  or any of the protocols you follow, that -- that
2  you meant that gives them orders?
3     A   Well, let me see if I can speak just
4  to the NIMS component of this. That -- well,
5  okay, I don't work at NIMS. I don't have an
6  intimate knowledge of NIMS.
7     Q   Uh-huh.
8     A   But if just we look at it purely from
9  a standpoint that each and every firefighter can
10  have a thought or a comment that, well, I
11  believe this. I either have the training or
12  attended training, so I'm just going to
13  implement this technique, that completely
14  undermines the incident command structure and
15  doesn't follow NIMS.
16     So, again, the reason we do training,
17  the reason that the skill sets are repeated and
18  practiced is to establish a baseline of
19  communication and expectations and that you just
20  can't insert your own idea and expect people to
21  know that or operate under those parameters.
22     Q   Okay. And if you had given her orders
23  without authority to do so, do you believe that
24  would have backfired and she would have
25  complained about that?

Page 1643

1     A   Most definitely.
2     Q   Okay. How could you have abandoned
3  Benson, Hurley, and Roberts if they left before
4  you?
5        MS. GUTTAU: Are you able to
6  hear?
7        THE ARBITRATOR: I can hear you.
8  But we're having a problem here.
9        MS. GUTTAU: Okay. We'll hold
10  on.
11        THE ARBITRATOR: We're going to
12  take another little break. We're going to jump
13  off and then jump back on. See if that works.
14        MS. GUTTAU: Okay. Thank you.
15        (Short recess.)
16        THE ARBITRATOR: Go ahead. Sorry
17  about that.
18        MS. GUTTAU: No problem.
19     Q   (By Ms. Guttau) How could you abandon
20  Benson and her crew, Morgan Hurley and Matt
21  Roberts, if they left before you?
22     A   Under the definition of "abandonment"
23  in Webster's Dictionary, that would be
24  impossible to abandon somebody if they left
25  prior to you.

Page 1644

1     Q   So Benson and her crew leave the
2  warehouse interior before you. What happens
3  next in the fire?
4     A   So essentially at that point, it's
5  going to be myself, Dyer, and Borchers. And
6  again, we're performing those same activities in
7  and around the Dumpster fire. I've got them up
8  on top of it. And now we have water application
9  inside of this particular type of device.
10     Again, I'm communicating with Chief
11  Smith and FAO Love about these negative pressure
12  fans. And it's becoming -- as we spend the
13  next, I'll say five to twelve minutes, we are
14  now getting water applied to the seat of the
15  fire. It's -- there's natural ventilation
16  occurring. And the building starts to clear
17  visibly. And I -- at some point, I report to
18  command that the fire is now under control and
19  that we're hitting a few hot spots in order to
20  fully extinguish the fire. More than likely,
21  we'll need a K-12 saw, cut a hole in it, put
22  some more water on it.
23     Now, this fire is out, and I'm deeming
24  it under control.
25     Q   Okay. And if you're deeming it under

Page 1645

1   control at that time, before that time period,
2   did you believe that you or your crew's lives
3   were in danger, injury, or death?
4       A   No.  That's confirmed by another radio
5   transmission that -- that is provided that they
6   basically say, earlier on, we have water on the
7   fire and the temperature is below 100 degrees.
8       Q   How is that significant?  What's that
9   mean?
10      A   Well, the conditions of, say,
11  spontaneous combustion or other items catching
12  on fire are greatly reduced because, as we know,
13  100 degrees is just a couple of degrees above
14  our body temperature.  So that really does not
15  give any alarm bells to anybody that we have
16  high heat inside the structure.
17      Q   Okay.  And so when you exit the
18  structure, what happens then?  Who takes your
19  place, or how does that all happen?
20      A   So, again, at some point, we have a
21  defined amount of time that we're going to spend
22  on the interior.  Our air is going to run low.
23  And I thought that Chief Faust did a very good
24  job of monitoring the crews inside, and he
25  radios me and says, hey, there's a Truck 8.  I

Page 1646

1   don't think there was a low air alarm.  He just
2   -- he can look at a device in his vehicle that
3   is monitoring everybody's air supply.  And he
4   just kind of notes, hey, somebody on Truck 8 has
5   got -- their air is getting low.  Can you look
6   into that for me?
7          And I find my firefighters.  And I
8   know the air consumption rates essentially.  I
9   know who is going to run out of air before the
10  next one.  So I find them.  And they're like,
11  yeah, we're getting low on air.  It's now under
12  control.  We can see.  And essentially then we
13  advise that we're come out, low on air.  And I
14  think even before that happens, Faust is
15  contacting Truck 1's crew saying, hey, Truck 8
16  is going to be coming out soon.  I need you guys
17  to replace them, which, again, is another
18  indication that they are outside long before we
19  are.  So the abandonment thing is a moot point
20  also.
21         And as we exit the structure, Truck 1
22  is replacing us on the interior.
23      Q   Okay.  And had you heard Faust,
24  Incident Commander Faust say Truck 1 was to
25  replace you when you came out?

Page 1647

1       A   Uh-huh.  Yeah.
2       Q   Okay.  And so when you heard that,
3   then does Benson approach you as you're exiting
4   the structure?
5       A   Yeah.  We were walking out one of the
6   large overhead doors.  And essentially my goal
7   at this point, one, we've been working pretty
8   hard for the duration of our bottle, and we were
9   kind of getting it.  So I just kind of want to
10  get outside, get my face piece off, get a shot
11  of water.  I'm going to have a conversation with
12  Chief Faust, hey, this is kind of what is going
13  on.  I think he expects those updates from
14  people.  So I was exiting kind of going down the
15  ramp.  And Truck 1 or Firefighter Benson
16  approached me and said, well, what are we going
17  to be doing in there?  And I said we were
18  chasing hot spots on the Charlie side.  This is
19  what I advised her of what -- what our last
20  activity was.
21      Q   You advised her of that, because you
22  had heard the incident commander tell everyone
23  that they were going to replace your crew;
24  correct?
25      A   Yeah.  I heard that.  And

Page 1648

1   acting-Captain Benson approached me and said,
2   hey, what are we doing in there?  Again, I'm --
3   I'm not a wordy person.  So I just -- after
4   working that long, I just kind of said, hey,
5   this is what we're doing, and they were going
6   in.  They had already been in there a couple of
7   times.  So they knew where they were headed.
8   And it's pretty easy to kind of engage in that
9   activity, I guess I should say.
10      Q   Okay.  And then after that time that
11  you exited, what did your -- you and your crew
12  do next?
13      A    After having the dialogue with Benson,
14  I went over -- I told them to get their packs
15  off, replenish the air, a shot of water, cool
16  down.
17         I had a brief conversation with Chief
18  Faust.  At this point also Battalion Chief Smith
19  is on the A side because there were no actions
20  or any firefighters on the C side.
21         I had a brief conversation with him.
22  And it was because -- again, if we look back to
23  some earlier statements, like there's three
24  trucks there.  There's only four in the entire
25  City.

1    So Chief Smith says, hey, get your
2  crew, get your equipment.  We want you to get
3  back in service so that he can help serve the
4  rest of the City.
5    And so we kind of quickly -- we didn't
6  have a lot of equipment off, a lot of hand
7  tools.  I told Jason Love to get the aerial put
8  back away.  We refer to that as putting it back
9  in the bed.
10    And we're kind of rehydrating and --
11 within maybe ten minutes, we're back on the
12 road, headed back to quarters.
13   Q   Okay.  And back in service means go
14 back to the station, ready for a call?
15   A   Uh-huh.  Yes.
16   Q   Okay.  When you exited the warehouse
17 at that point as well, did you have any trouble
18 finding the exit?
19   A   No.  I -- I would say that there was a
20 few whiffs of smoke kind of in and around the
21 origin of the fire.  And we had complete
22 visibility walking out.
23   Q   And you could see the overhead doors
24 that were open?
25   A   Oh, yeah.  Plain as day.

1    Q   Okay.  So at the scene or shortly
2  after the fire, did anybody raise any concerns
3  to you that there has been safety violations --
4    A   No.
5    Q   -- by you?
6    A   None whatsoever.  In fact, as myself
7  and my crew kind of climbed back in the cab, we
8  were -- we were being in kind of an upbeat
9  spirit.  Thought we showed up and did some good
10 work and made a difference and helped out.  And
11 we were pretty proud of what we did as far as
12 our actions at the fire.
13   Q   Okay.  And at the fire immediately
14 thereafter, did anybody raise any concerns that
15 you had abandoned anybody in a dangerous
16 warehouse fire?
17   A   No.  I was not aware of anything like
18 that.
19   Q   Okay.  If -- if a captain feels unsafe
20 and -- and disoriented and their life or their
21 crew's life is in danger, what are they supposed
22 to do?
23   A   There's a number of things that you
24 can do, depending on the seriousness of that
25 feeling.  Maybe that feeling is I'm -- I need to

1  reorient myself or figure out where I'm at.
2    But, again, if it's like dangerous or
3  your life is at risk, you're going to certainly
4  have a thing that we call urgent traffic and
5  that it would be -- let's say it was me.  Truck
6  8 command, urgent traffic.  What that means is
7  that nobody else should be talking and that
8  you're having a dialogue.  Maybe it's something
9  that is critical to the success of the action
10 plan.
11    Another option would be a Mayday.
12 That if your life or your crew's life is in
13 peril, we have an emergency button both on the
14 radio and our lapel mic that you press that and
15 then I think it's been increased now to where,
16 when you press that button, you have fifteen
17 seconds of open mic time that nobody can walk
18 on.  You -- you can tell who you are, your
19 location, what you need, and then that goes off.
20 So there's the Mayday situation.  And, again,
21 it's something that LFR trains on.
22    And as we had stated earlier today,
23 the terminal building would have been a good
24 example of what conditions exist of when is it
25 appropriate to do a Mayday.

1    Q   Uh-huh.  Did you believe your life or
2  your crew's life was ever in peril when you were
3  in the warehouse?
4    A   No, it wasn't.
5    Q   In your opinion, was anybody's life in
6  peril during the warehouse fire while you were
7  there?
8    A   No.
9    Q   Did you observe any firefighters
10 during the time you were at the warehouse having
11 any difficulties entering and exiting the
12 warehouse?
13   A   Not to my knowledge, no.
14   Q   Okay.  So when did Ms. Benson's
15 accusation regarding you allegedly abandoned --
16 abandoning her in the April 26th warehouse fire?
17 When did that first come to your attention?
18   A   I -- I'm going to try to get as
19 accurate as possible.  But I believe I have
20 received a phone call from the City's law
21 office.  It may have been on a Saturday morning
22 informing me that these accusations had been
23 filed.  And that because those accusations and
24 the severity of that accusation contradict a
25 quality company officer or a captain, and that

Page 1653

1    the City of Lincoln had taken the advisement
2    that they could no longer represent me in this
3    particular case because of the severity.
4         THE ARBITRATOR: Do you have a
5    date on that, Captain? Do you know the date?
6         Q    (By Ms. Guttau) Do you know the
7    approximate date?
8         MS. GUTTAU: I can get you a
9    date. Let's turn to --
10        THE WITNESS: I'm sorry, sir. I
11   don't know the exact date at the minute -- at
12   the moment.
13        MS. GUTTAU: I can lead you
14   there.
15        THE ARBITRATOR: Just tell me
16   when?
17        MS. GUTTAU: It was June -- she
18   filed I on June 11th. So it would have been
19   June 12th, a Saturday.
20        MR. CORRIGAN: That's certainly
21   not when you knew the accusations occurred.
22        THE ARBITRATOR: All right. That
23   would be the first time you heard about it?
24        MR. CORRIGAN: Well --
25        Q    (By Ms. Guttau) The first time that

Page 1654

1    you heard she had abandoned you -- that you had
2    abandoned her in a dangerous warehouse fire?
3         A    Yeah. I --
4         Q    Okay. Did Aishah talk to you at all
5    before about it?
6         A    Not -- not to that degree.
7         Q    Okay. What was your understanding
8    when Aishah talked to you?
9         THE ARBITRATOR: Hold on a
10   second. I just thought you said the first time
11   you heard about these allegations were on a
12   Saturday morning.
13        MS. GUTTAU: Yeah.
14        THE ARBITRATOR: And, Counsel,
15   you just told me that Saturday morning would
16   have been June 11th.
17        MS. GUTTAU: 12th.
18        THE ARBITRATOR: Okay. So are
19   you saying that wasn't the first time you heard
20   about it?
21        MS. GUTTAU: Well, I'll ask a
22   clarifying question, because I think we're
23   asking two things.
24        THE ARBITRATOR: I think I'm
25   asking one thing. Go ahead.

Page 1655

1         Q    (By Ms. Guttau) Okay. There's first
2    an accusation that something had happened at the
3    warehouse fire, and you were approached by
4    Aishah to ask what happened at the warehouse
5    fire?
6         A    Yes.
7         Q    Okay. Were you informed at that time
8    by Aishah that you were being accused of
9    abandoning somebody in a dangerous warehouse
10   fire to die or be injured?
11        A    No, I was not.
12        Q    Okay. When was the first time that
13   you learned of that level of an allegation
14   against you?
15        A    It would have been the morning of June
16   12th that the City talked -- the officer's
17   attorney called me.
18        Q    So what -- what did Aishah just
19   generally ask you about? What did you convey?
20        A    It would have been more of like what
21   were your actions at the fire. What kind of
22   things did you do, your activities, that kind of
23   stuff.
24        Q    Okay. You weren't told Ms. Benson was
25   accusing you of abandoning her crew to -- to --

Page 1656

1    in conditions that could have killed or injured
2    her?
3         A    No. I think Aishah was just gathering
4    information what Truck 8's activities were.
5         MS. GUTTAU: Does that clarify,
6    sir?
7         THE ARBITRATOR: That's fine.
8         MS. GUTTAU: Okay.
9         Q    (By Ms. Guttau) So you get the call.
10   And after the motion for injunction is filed,
11   what was your understanding of what her motion
12   was requesting in regard to you?
13        A    I was pretty shocked. And I think the
14   first few minutes it was pretty blurry. I
15   couldn't grasp the gravity of what I was being
16   told.
17        I guess I was just focused on the fact
18   that the legal team that had been helping me is
19   now gone. And I'm just left wondering what --
20   what is my next move, what do I do next, how do
21   I -- how do I proceed.
22        So I don't think I even really
23   understood the gravity of the situation.
24        Q    Okay. And did you eventually come to
25   understand that she was asking a federal judge

Page 1657

1    to -- to remove you from your job of fighting
2    fires?
3        A    That's correct.
4        Q    How did that make you feel?
5        A    It gave me a sickness in my stomach
6    that hasn't left me yet.  Because at that point,
7    I had worked twenty-six years to try to
8    establish a distinguished career.  My work
9    product was in question.  I have trust issues.
10   I mean, there's a whole host of issues and
11   thoughts that come into my mind that these
12   accusations are undermining who I am as a
13   person, who I am as a professional.
14       Q    Okay.  And as a result of her
15   accusations and motion, were you removed from
16   work?
17       A    Yes, I was.
18       Q    For approximately how long?
19       A    Approximately three months.
20       Q    Okay.  And how did that affect you?
21       A    Just when you think it couldn't get
22   any worse, I received a call on Tuesday morning
23   from my battalion chief, Chief Smith, saying
24   that I am not to report to work and that there's
25   a pending investigation on what happened at the

Page 1658

1    warehouse fire.  And that's all he could provide
2    me.
3        Q    Okay.
4        A    So now I am not at work.  And I have
5    no legal representation.  And it was a very dark
6    time.
7        Q    Okay.  And Chief Smith told you this
8    shortly after, a few days after the motion for a
9    preliminary injunction had been filed?
10       A    Yeah.  I was -- we were on Kelly days.
11       Q    Uh-huh.
12       A    So I was returning to work on
13   Wednesday, and I believe he would have contacted
14   me Tuesday morning to inform me that I didn't
15   need to report to work.
16       Q    How long were you kept off of work?
17       A    Like about twenty-seven to thirty
18   shifts, I believe.  So that could be a duration
19   of right around three months.
20       Q    Okay.  And even though you were on
21   paid leave; correct?
22       A    Correct.
23       Q    Were you denied opportunities to work
24   overtime?
25       A    That's correct.

Page 1659

1        Q    So it caused you a financial burden?
2        A    Yes.
3        Q    Did it cause you emotional distress?
4        A    Tremendous emotional distress.
5        Q    In what ways?
6        A    I -- one, I'm home.  I take a lot of
7    pride of working at LFR.  My wife has a myriad
8    of questions.  My oldest son is a physician, and
9    he's asking questions.  He's being asked
10   questions in his particular field.  Like, hey,
11   is this your dad?  Yeah, it's my dad.  So my
12   whole family is impacted by this.
13            And before I have an opportunity to
14   even contact my parents, my parents are made
15   aware of it through the newspaper where they
16   live.  So now they're contacting me asking me
17   what is going on.
18            It just -- it's also picked up by the
19   AP.  It's now national news.  Again, it's just
20   like there was no -- no end to the bad press
21   that -- essentially that I was getting.
22       Q    Where do your parents live?
23       A    In northeast Nebraska near Sioux City.
24       Q    They got the news before you had a
25   chance to tell them?

Page 1660

1        A    Yes.
2        Q    Okay.  And she made -- Ms. Benson made
3    that accusation of abandonment in a dangerous
4    warehouse fire of her and her crew in a public
5    court filing, didn't she?
6        A    Correct.
7        Q    It was in her lawsuit that had been
8    pending; correct?
9        A    Yes.
10       Q    And that lawsuit had been reported
11   over the years at various times before, hadn't
12   it?
13       A    Yes, it has.
14       Q    Did you have to change any of your
15   family plans because of the investigation?
16       A    Yes.  I was going to be taking a
17   summer vacation.  And in discussions with my
18   battalion chief and Chief Engler, I needed to
19   know if -- if I am free to go on my vacation.
20   Do I need to cancel those plans?  Do I need to
21   be present for the independent investigation
22   that was going to happen.
23            And I was advised that I needed to be
24   available to -- to complete that investigation.
25   So I had to cancel all of my vacation plans.

1  Q  Okay.  And within LFR itself, how did
2  it affect you and -- and your crew?
3     A  The effect of this is far-reaching.
4  It goes beyond just myself, my family, and
5  certainly my crew.  But now my crew is left
6  without their company officer, their captain.
7  They're -- essentially their leader.  While
8  they're all talented individuals.
9        Now they're subjected to a million
10  questions from people.  Now, on the days that
11  I'm supposed to be at work, there's an overtime
12  captain that's filling in for me.  They don't
13  have their supervisor.  There's all of these
14  accusations and -- and rumor mill is -- you
15  know, they're -- they're kind of right there
16  behind me.  They're feeling it because they were
17  at the fire too.  So it -- it -- it affected
18  them greatly.  They were strong.  They supported
19  me.  But at the same time, you know, they needed
20  themselves taken care of.
21        And then as a result, they are all
22  then asked to come into the investigation.  And
23  it just kind of never stops.  It just kind of
24  snowballs on from there.
25  Q  Okay.  It's taken a lot of your time?

1     A  Yes, it has.
2  Q  Okay.  Was it disruptive to --
3  disruptive in the operation of your crew;
4  correct?
5     A  Certainly.  By -- by removing a senior
6  officer from the street with years of
7  distinguished service, it also doesn't -- it
8  takes away their leadership.  It takes my
9  ability to perform my role.  It's a financial
10  burden to the fire department to the City.
11  It's -- it -- really who's at most risk is the
12  citizens that -- that I'm asked to protect.
13  Because while there are lots of talented people
14  on Lincoln Fire, we're not a unit.  We're not a
15  team.  So whatever talents that I have to offer
16  the City, those are now off the shelf, so to
17  speak, or unavailable.
18  Q  So once the motion for injunction was
19  filed and also a grievance, did you have an
20  understanding that the City hired a separate law
21  firm to investigate Ms. Benson's accusations?
22     A  Yeah.  I'm not sure how I became aware
23  of that.  I think it was towards the end of the
24  investigation.  But, yeah, I was aware of that.
25  Q  Did you have any -- was that -- was

1  your understanding that investigation was by an
2  attorney, Torrey Gerdes?
3     A  Yes.
4  Q  Okay.  Did you have any involvement in
5  that investigation besides providing
6  information?
7     A  I was asked to come in and provide
8  information and did that at a very lengthy
9  visit.
10  Q  Okay.  Were you honest with Ms.
11  Gerdes?
12     A  Most certainly.
13  Q  Okay.  Did she appear impartial to
14  you, in your opinion?
15     A  Yeah.  I -- I, again, was very nervous
16  or skeptical going in.  But within a few
17  moments, I could tell that Ms. Gerdes was again
18  a professional and I felt comfortable in sharing
19  her -- the information that she was asking --
20  Q  Okay.
21     A  -- in an unbiased environment.
22  Q  Okay.  And then I want to turn to R43.
23        MS. GUTTAU:  This will be City
24  43.
25        THE WITNESS:  (Witness complies.)

1  Q  (By Ms. Guttau)  Can you tell me what
2  R43 is?
3     A  R43 is the transcript of radio
4  traffic.
5  Q  Okay.  And were these your notes that
6  you created from the radio traffic?
7     A  Yes.
8  Q  All right.
9     A  I spent several days listening to the
10  audio.  And to my best ability put down every
11  word that was on the audio.
12  Q  Okay.  But at the top of the first
13  page where you have realtime/compressed time,
14  tell me what -- what that means.
15     A  Originally, I was provided what's
16  known as the compressed time.  And the
17  compressed time is there would be a radio
18  transmission, and then a few seconds later there
19  would be another radio transmission.  What is
20  really happening is they're cutting all of the
21  dead airtime off of that.  But that does not
22  depict an accurate timeline or a duration of how
23  long did an event last when it's compressed.
24        I then asked for the uncompressed
25  audio.  So when we look at the column on the

Page 1665

1    left is the uncompressed, and on the right is
2    the compressed.  But really the main focus is
3    the -- the left column is -- is the true
4    timeline of the events that happened at the
5    warehouse fire.
6        Q   Okay.  The realtime elapsed?
7        A   Yes.
8        Q   Okay.  About halfway through that
9    packet, if you go to where it says at the
10   bottom, City 67598, and at the top it says
11   warehouse fire notes.
12       A   Uh-huh.
13       Q   Can you tell me what those are?
14       A   This is again another document that I
15   created.  And as -- on completion of the audio
16   transcribing, that began to allow me to focus on
17   what was -- what did each one of these radio
18   transmissions mean.  What does it mean and
19   what's expected of the crew to do and kind of
20   gives some context to that radio transmission.
21       Q   Uh-huh.  Okay.  And then at the very
22   end, there's those photographs that I think are
23   marked as a separate exhibit.  Were those photos
24   you had pulled from Google Map?
25       A   Yes.  Those --

Page 1666

1        Q   Yes.
2        A   Correct.
3        Q   At not from the day of the fire.  Just
4    Google Map in general?
5        A   Yeah.  I like to believe that I'm a
6    prepared individual.  And -- and these are
7    things that I prepared so that I could -- if I'm
8    asked questions, I can speak to it
9    knowledgeably.
10       Q   Okay.  After the motion for injunction
11   was filed, do you know how the Court ruled on
12   Ms. Benson's motion for an injunction relating
13   to her allegations against you?
14       A   I believe it was denied.
15       Q   Okay.  Then after Ms. Gerdes finished
16   her investigation, did you learn of the outcome
17   of her investigation at any time?
18       A   Not immediately.  While I would
19   have -- would assume that there was a report
20   going to be completed, I did not see that right
21   away.
22       Q   Okay.  And you're -- but after her
23   investigation was completed, you were returned
24   to duty then; correct?
25       A   Yes, I was.

Page 1667

1        Q   Okay.  Have you had a chance to review
2    her report since -- since it was issued?
3        A   Yes, I have.
4        Q   Okay.  And that would be R11.  I'm
5    going to flip back.
6            MS. GUTTAU:  We're at City 11,
7    R11.
8            THE WITNESS:  (Witness complies.)
9        Q   (By Ms. Guttau)  And is that the
10   report that you saw that Ms. Gerdes issued?
11       A   Yes, this is the report.
12       Q   Okay.  Did you have a chance to read
13   it?
14       A   I have.  A couple of times in fact.
15       Q   Does her report accurately reflect
16   what you told her in the places that she cited
17   to you?
18       A   Yes.
19       Q   Okay.  Do you believe that Ms. Benson
20   has been trying to get you disciplined for years
21   now?
22       A   I do believe that.
23       Q   Even though you've returned to work
24   since the motion was denied and Ms. Gerdes
25   finished her investigation, does Ms. Benson's

Page 1668

1    public accusations still affect you today?
2        A   Yes, they do.
3        Q   In what ways?
4        A   I would say currently or -- or let's
5    just say in the last sixteen months -- I've been
6    a company officer since 2004.  Typically, a
7    normal timeline for a captain is that you have
8    the desire to take the next promotional exam.
9    And there's been one time period that I could
10   have taken the test to be a battalion chief.
11   One just got posted, I believe, yesterday.  And
12   my enthusiasm for the job has been curtailed by
13   these activities for the past seven years.
14   Whereas, I should be looking to use my talents
15   and my experience in different ways.
16       I feel like that the time dedicated to
17   this event and the emotional distress prevents
18   me from furthering my career.  And it has even
19   made me contemplate early retirement.
20       Q   Do you have one of your children on
21   the job now?
22       A   Yes, I do.  My middle son is now
23   employed with Lincoln Fire, which I'm very proud
24   of.
25       Q   And you should be.  Has Ms. Benson's

Page 1669

1  actions affected your children and your wife?
2      A   Yes.  Obviously, my son that was --
3  that is now on the job was going through the
4  hiring process, and both my wife and I had
5  concerns that, if Ms. Benson was comfortable
6  making accusations towards me, that once my son,
7  if and when, he was on the job and she was
8  employed, that that type of behavior would carry
9  over to him as well.
10     Q   Okay.  How serious in your mind is an
11  accusation that a fire captain abandoned
12  somebody in a burning dangerous warehouse that
13  could have killed or injured them?
14     A   In this particular profession, it is
15  the most malicious and egregious accusation that
16  could be made.
17     Q   You've dedicated your career to saving
18  people's lives, haven't you?
19     A   Yes, I have.
20     Q   Do her accusations against you hit at
21  the heart of what you do?
22     A   Yes, they do.
23     Q   Did you abandon Ms. Benson, Ms.
24  Hurley, and Mr. Roberts in a burning dangerous
25  warehouse fire on April 26, 2021?

Page 1670

1      A   I did not.
2      Q   Do you believe the damage that she has
3  caused you and LFR by her accusations can be
4  undone?
5      A   That bell cannot be unrung.
6      Q   Okay.
7          MS. GUTTAU:  Thank you.  I have
8  nothing further at this time.
9          THE ARBITRATOR:  Okay.  So a
10  little lunch break now.
11         MS. GUTTAU:  Okay.
12         THE ARBITRATOR:  Do you have
13  questions?  Are you going to have some cross?
14         MR. CORRIGAN:  I will, yes.
15         THE ARBITRATOR:  Okay.  Just
16  checking.
17         MR. CORRIGAN:  Yeah.
18         THE ARBITRATOR:  So, let's see.
19  Twelve o'clock, 12:02.  How much time do you
20  guys want?
21             What other witnesses are we going
22  to have today?
23             MR. CORRIGAN:  I think we should
24  be able to finish with Mr. Mahler this
25  afternoon, if we take maybe a half hour,

Page 1671

1  forty-five minutes for a lunch break.  And then
2  we will resume with Ms. Benson after that.  And
3  that should take us to the end of the day.
4          THE ARBITRATOR:  All right.
5  Sounds good.  12:45.
6          (Recess at 12:02 p.m.)
7          (Resumed at 12:43 p.m.)
8          THE ARBITRATOR:  Ready to go?
9          MS. GUTTAU:  I think so.
10         THE ARBITRATOR:  John?
11         MR. CORRIGAN:  Yes.
12         THE ARBITRATOR:  I can't hear
13  you.
14         MS. GUTTAU:  There you go.  Can
15  you hear us now?
16         THE ARBITRATOR:  Yes.
17         MS. GUTTAU:  Okay.  Sorry.
18         MR. CORRIGAN:  Okay.  So whenever
19  you're ready, we'll get started.
20         THE ARBITRATOR:  All right.  Go
21  ahead.
22             CROSS-EXAMINATION
23  BY MR. CORRIGAN:
24     Q   Good afternoon, Captain Mahler.
25         Just while we're on the -- you've got the

Page 1672

1  Gerdes report in front of you; right?
2      A   Yes.
3      Q   That is R11; right?
4      A   That's correct.
5      Q   All right.  So prior to going to see
6  her, you provided Chief Engler with the notes
7  that you prepared; right?
8      A   I -- what notes?
9      Q   The notes that you prepared.  You
10  listened to the radio traffic of the call.  And
11  you prepared your detailed notes that we already
12  discussed with the time stamps on them?
13     A   I don't believe that that was sent.  I
14  took that to the Gerdes appointment.
15     Q   All right.  Why don't you go look at
16  the red book then -- I'm sorry, the black book.
17         I'll ask you to look at 122.  Is that an
18  e-mail from you to Chief Engler dated July 1,
19  2021, regarding your notes from the warehouse
20  fire?
21     A   Yes, it is.
22     Q   Okay.  So you sent -- your notes that
23  you prepared, you sent to the fire chief on July
24  1st of 2021; is that right?
25     A   That appears to be the time on the top

Page 1753

1    Q   Okay.  So you're fit for duty?
2    A   People wear glasses.  So I compensate
3  my hearing loss with hearing aid.
4    Q   Okay.
5        MR. CORRIGAN:  If you want to
6  take a break, that's okay.
7        MS. GUTTAU:  Can we take a little
8  break, restroom break?  I lost him.  We can't
9  hear.  I think you're on mute.
10       THE ARBITRATOR:  Can you hear me?
11       MS. GUTTAU:  Yeah, we can hear
12  you.  Can we take a restroom break?
13       THE ARBITRATOR:  Yes.  2:50.
14       MR. CORRIGAN:  2:50.
15       MS. GUTTAU:  Okay.  Thank you.
16       (Recess at 2:36 p.m.)
17       (Resumed at 2:50 p.m.)
18       THE ARBITRATOR:  All right.  Go
19  ahead.
20       MR. CORRIGAN:  We don't have any
21  more questions of Mr. Mahler.
22       THE ARBITRATOR:  You pass the
23  witness?
24       MR. CORRIGAN:  Yes.  Redirect?
25       MS. GUTTAU:  Yes.  Thank you.

Page 1754

1        THE WITNESS:  I would like to say
2  something.
3        John, I didn't appreciate your
4  comment about my hearing.
5        MR. CORRIGAN:  It was just a
6  joke, Shawn.
7        THE WITNESS:  I didn't appreciate
8  it.
9        MR. CORRIGAN:  Well, I apologize.
10       REDIRECT EXAMINATION
11  BY MS. GUTTAU:
12    Q   Captain Mahler, you were asked a lot
13  of questions about whether or not you ignored
14  Ms. Benson in the fire.
15       But she did not allege in federal court
16  in a public filing that you ignored her, did
17  she?
18    A   No, she did not.
19    Q   She alleged that you abandoned her,
20  Hurley, and Roberts all in a dangerous warehouse
21  fire that could have killed or injured them;
22  correct?
23    A   That was the accusations, yes.
24    Q   Okay.  That's way beyond just alleging
25  that you ignored her in the fire?

Page 1755

1    A   I would agree.
2    Q   Okay.  And those were the allegations
3  that the paper picked up on?
4    A   Yes.
5    Q   And they reported publicly, the AP,
6  you know, nationwide, that you had abandoned her
7  and her crew; correct?
8    A   That's correct.
9    Q   And your parents had to read about it
10  before you even had a chance to tell them?
11   A   That's what they read.  They read that
12  I left people to die.  Not that I ignored them.
13   Q   You testified you talked to Ms. Benson
14  both before and after going into the warehouse;
15  correct?
16   A   That's correct.
17   Q   Okay.  And you felt that that was
18  appropriate communication with what was needed;
19  correct?
20   A   Yeah.  It provided direction on what
21  needed to be done.
22   Q   Okay.  And also in compliance with
23  your no contact order; correct?
24   A   Yes.
25   Q   Okay.  Again, throughout this, you had

Page 1756

1  never been assigned as a supervisor over Ms.
2  Benson, had you, during the warehouse fire?
3    A   That never occurred.
4    Q   You were asked about why you had not
5  previously reported telling her -- telling Ms.
6  Benson about asking incident command for an
7  assignment.  Do you recall that?
8    A   Yes, I do.
9    Q   Asking incident command for an
10  assignment would be an obvious thing to do;
11  correct?
12   A   Yeah.  If you don't know what your
13  assignment is, the best place to get one is from
14  incident command.
15   Q   Is that something you've told others
16  at other fire scenes?
17   A   Yeah.  I've used language like that
18  before.
19   Q   And so something obvious like that
20  would not necessarily stand out in your mind,
21  would it?
22   A   No.  It's not nothing new for me to
23  say.
24   Q   Backing up to the allegations in 2015
25  and 2016 regarding Ms. Benson's schedule and

Page 1793

1    that a concept you're familiar with?
2        A   Yeah.  I've heard that language.
3        Q   Can you tell us what you think that
4    means?
5        A   I would say it means that each and
6    every member in the union would be offered the
7    same fair representation.
8        Q   A duty that's owed to each member.
9        A   I hesitate because of the oath that
10   was violated.
11       Q   Okay.
12       A   And I would assume that it would do
13   fair representation for a member in good
14   standing.
15       Q   Have you ever filed any internal union
16   charges against Ms. Benson?
17       A   I had discussions with Adam --
18   President Schrunk that the accusations that have
19   been against me by Ms. Benson violated that
20   oath.  He downplayed that conversation saying
21   that it was difficult.  We had to contact the
22   International to start those proceedings.  And I
23   said, Ms. Benson violated the oath.  These
24   things were intentional acts, malicious and
25   egregious and that that violated the oath.

Page 1794

1        And I said, why do we take the oath if
2    we're not going to hold people accountable.
3        Q   Did you file a charge of -- internal
4    union charges against Ms. Benson?
5        A   I did not.
6        MR. CORRIGAN:  Okay.  I don't
7    have any other questions.
8        THE ARBITRATOR:  Heidi?
9        MS. GUTTAU:  That opened the door
10   to just a couple of things.  Real briefly.
11   FURTHER REDIRECT EXAMINATION, CONT'D
12   BY MS. GUTTAU:
13       Q   Do you feel that the union -- do you
14   personally feel the union has fairly represented
15   you?
16       A   No, I do not.
17       Q   Okay.  Did you learn from the -- the
18   Nebraska Equal Opportunity Commission -- you
19   were asked a little bit earlier about the
20   allegations of not providing Ms. Benson training
21   on the truck back in 2015, 2016.  Did you ever
22   learn that the NEOC found her -- her allegations
23   in that regard were without cause?
24       A   I don't believe I ever saw the NEOC's
25   final report.  So I -- that's news to me.

Page 1795

1        Q   Okay.  Okay.
2        A   I would -- back to your previous
3    question.  If it's -- if I've been fairly
4    represented.  This process has been going on for
5    sixteen months.  And even as recently as -- in
6    the last handful of months, my -- none of my
7    executive board, none of my union has reached
8    out to me, asked if I'm okay, do I need anything
9    from them.  Were they going to come and sit with
10   me on -- to support me?  Nobody contacted me.
11       Q   Okay.  You were asked about her
12   discipline and whether you were disciplined and
13   you were not disciplined, because, as you said,
14   you didn't do anything wrong?
15       A   That's correct.
16       Q   Okay.  You never falsely accused
17   anyone of abandoning a fellow firefighter and
18   their crew in a dangerous burning warehouse that
19   could have killed or injured them?
20       A   I never made that accusation.
21       Q   The effect of that accusation against
22   you has been life-changing?
23       A   It has.
24       MS. GUTTA:  Nothing further.
25       THE ARBITRATOR:  John?

Page 1796

1        MR. CORRIGAN:  I have no
2    questions.
3        THE ARBITRATOR:  Captain Mahler,
4    you're excused, sir.
5        THE WITNESS:  Thank you.
6        MS. GUTTAU:  How would you like
7    to proceed, sir?
8        THE ARBITRATOR:  Okay.  So what
9    do we have left besides the cross of Ms. Benson?
10       MS. GUTTAU:  We will probably
11   call -- unless you're going to call him in your
12   case.  We'll call Schrunk.  We're going to
13   briefly call President Schrunk.  I don't think
14   it will take real long.  And then we would --
15   besides Ms. Benson's cross, we would have
16   President Schrunk and then a brief rebuttal with
17   Chief Engler, and that won't be very long.
18       THE ARBITRATOR:  So that will
19   take at least another half a day or another.
20       THE REPORTER:  Do you want this
21   on the record?
22       MR. CORRIGAN:  No.
23       (An off-the-record discussion was had,
24   and at 3:47 p.m., the proceedings were continued
25   to September 6, 2022.)

Page 1797

```
 1       FEDERAL MEDIATION AND CONCILIATION SERVICE
            BEFORE ARBITRATOR STEVEN RUTZICK
 2

    LINCOLN FIREFIGHTERS   )  FMCS CASE NO.
 3  ASSOCIATION, IAFF LOCAL )   22103-00847
    644, and AMANDA BENSON,  )
 4                          )
         Grievants,    )
 5                     )
       vs.          )    VOLUME VIII
 6                )   PAGES 1797-2083
    CITY OF LINCOLN,     )
 7                    )
         Respondent.   )
 8                   )
                    )
 9
10       ARBITRATION HEARING held before
11  Arbitrator Steven Rutzick (via Zoom), with Sally
12  R. Parrack, RPR, CSR and Notary Public for the
13  State of Nebraska, counsel and all parties
14  present at the City-County Building, 555 South
15  10th Street, Suite 300, Lincoln, Nebraska,
16  beginning at 9:07 a.m., on the 6th day of
17  September, 2022.
18
19
20
21
22
23           ** ** **
24
25
```

Page 1798

```
 1            A P P E A R A N C E S
 2
 3  FOR THE GRIEVANTS:
 4
 5    MR. JOHN E. CORRIGAN
      DOWD & CORRIGAN, LLC
 6    6700 Mercy Road
      Suite 501
 7    Omaha, NE  68106
      402.913.9713
 8    jcorrigan@dowd-law.com
 9
10  FOR THE RESPONDENT:
11    MS. HEIDI GUTTAU
      BAIRD HOLM LLP
12    1700 Farnam Street
      Suite 1500
13    Omaha, NE  68102
      402.344.0500
14    hguttau@bairdholm.com
15
16    MS. ABIGAIL LITTRELL
      ASSISTANT CITY ATTORNEY
16    555 South 10th Street
      Suite 300
17    Lincoln, NE  68508
18
19
20  ALSO PRESENT:  Mr. Ryan Moser, Vice President
      IAFF Local 644; Mr. Dave Engler, Fire Chief;
21    Tiffany Leasure, Paralegal for City of Omaha
22
23
24
25
```

Page 1799

```
 1            I N D E X
                         PAGE
 2  CASE CAPTION ......................   1
    APPEARANCES ........................   2
 3  INDEX ...............................   3
    TESTIMONY ..........................  19
 4  REPORTERS' CERTIFICATE ............. 2084
 5
 6            WITNESSES
 7
    FOR THE CITY:
 8
 9  CHIEF DAVID ENGLER
10  Direct by Ms. Guttau................  19
    Cross by Mr. Corrigan..............  136
11  Cross Cont'd by Mr. Corrigan.......  253
    Cross Cont'd by Mr. Corrigan....... 1070
12  Redirect by Ms. Guttau............. 1135
    Recross by Mr. Corrigan............ 1193
13  Further Redirect by Ms. Guttau..... 1202
    Further Recross by Mr. Corrigan.... 1209
14
15  FAO JASON LOVE
16  Direct by Ms. Littrell............  210
    Cross by Mr. Corrigan.............  230
17  Redirect by Ms. Littrell..........  247
    Recross by Mr. Corrigan...........  249
18
19  FAO MATTHEW ROBERTS
20  Direct by Ms. Guttau..............  295
    Cross by Mr. Corrigan.............  342
21  Redirect by Ms. Guttau............  363
    Recross by Mr. Corrigan...........  367
22  Further Redirect by Ms. Guttau....  372
    Further Recross by Mr. Corrigan...  372
23  Further Redirect Cont'd by Ms. Guttau  373
24
25           ** ** **
```

Page 1800

```
 1        WITNESSES, CONT'D
 2
    FOR THE CITY:
 3
 4  FF STEPHEN DYER
 5  Direct by Ms. Guttau..............  375
    Cross by Mr. Corrigan.............  395
 6  Redirect by Ms. Littrell..........  409
    Recross by Mr. Corrigan...........  410
 7
 8  FF MORGAN HURLEY
 9  Direct by Ms. Littrell............  416
    Cross by Mr. Corrigan.............  447
10  Redirect by Ms. Littrell..........  464
    Recross by Mr. Corrigan...........  466
11
12  DIVISION CHIEF MICHAEL SMITH
13  Direct by Ms. Littrell............  470
    Cross by Mr. Corrigan.............  505
14  Redirect by Ms. Littrell..........  569
    Recross by Mr. Corrigan...........  588
15  Further Redirect by Ms. Littrell....  610
    Further Recross by Mr. Corrigan.....  614
16
17  BC CURT FAUST
18  Direct by Ms. Guttau..............  618
    Cross by Mr. Corrigan.............  729
19  Redirect by Ms. Guttau............  806
    Recross by Mr. Corrigan...........  820
20  Further Redirect by Ms. Guttau....  828
21
22  DEPUTY CHIEF GEORGE HEALY
23  Direct by Ms. Guttau..............  971
    Cross by Mr. Corrigan............. 1021
24  Redirect by Ms. Guttau............ 1054
    Recross by Mr. Corrigan........... 1055
25
```

Page 1801

WITNESSES, CONT'D

FOR THE CITY:

AISHAH WITTE
Direct by Ms. Littrell.............. 1214
Cross by Mr. Corrigan............... 1263
Redirect by Ms. Littrell........... 1287
Recross by Mr. Corrigan............ 1297

CAPTAIN SHAWN MAHLER
Direct by Ms. Guttau............... 1554
Cross by Mr. Corrigan.............. 1671
Redirect by Ms. Guttau............. 1754
Recross by Mr. Corrigan............ 1771
Further Redirect by Guttau......... 1784
Further Recross by Corrigan........ 1787
Further Redirect Cont'd by Guttau... 1794

CAPTAIN ADAM SCHRUNK
Direct by Ms. Guttau............... 2059
Cross by Mr. Corrigan.............. 2073
Redirect by Ms. Guttau............. 2077

FOR THE UNION:

CHIEF EDWARD HADFIELD
Direct by Mr. Corrigan............. 844
Cross by Ms. Guttau................ 888
Redirect by Mr. Corrigan.......... 951
Recross by Ms. Guttau.............. 962

CAPTAIN MICHAEL WRIGHT
Direct by Mr. Corrigan............. 1316
Cross by Ms. Littrell.............. 1357
Redirect by Mr. Corrigan.......... 1393
Recross by Ms. Littrell............ 1398

Page 1802

WITNESSES, CONT'D

FOR THE UNION:

CAPTAIN DAN RIPLEY
Direct by Mr. Corrigan............. 1399
Cross by Ms. Littrell.............. 1405
Redirect by Mr. Corrigan.......... 1421
Recross by Ms. Littrell............ 1429

NICHOLAS CUNNINGHAM
Direct by Mr. Corrigan............. 1432
Cross by Ms. Littrell.............. 1446
Redirect by Mr. Corrigan.......... 1457

AMANDA BENSON
Direct by Mr. Corrigan............. 1463
Cross by Ms. Guttau................ 1867
Redirect by Mr. Corrigan.......... 2056

CAPTAIN BRIAN GILES
Direct by Mr. Corrigan............. 1810
Cross by Ms. Littrell.............. 1823
Redirect by Mr. Corrigan.......... 1859
Recross by Ms. Littrell............ 1864

** ** **

Page 1803

CITY EXHIBITS

EXHIBIT    DESCRIPTION

1    8/16/21 Memorandum and Order Denying
     Plaintiff's Motion for Injunction by
     Senior District Judge Richard G.
     Kopf, United States District Court
     for the District of Nebraska,
     8/15/21
2    Declaration of Fire Chief David
     Engler
3    Declaration of BC Michael Smith
4    Declaration of Captain Mahler
5    Declaration of FAO Matt Roberts
6    Declaration of FF Morgan Hurley
7    Declaration of FF Jason Love
8    Declaration of FF Stephen Dyer
9    Declaration of FF Trent Borchers
10   Statement of Curt Faust
11   8/19/21 Investigation Report into
     4/26/21 Fire Incident by Attorney
     Torrey Gerdes, Baylor Evnen Law Firm
12   Audio of Fire Department Radio
     Recording of 4/26/21 Warehouse Fire
13   Transcript of Fire Department Radio
     Recording of 4/26/21 Warehouse Fire
14   Declaration of Aishah Witte,
     Authenticating Audio Transcript
15   Benson's 5/5/21 Complaint Regarding
     the 4/26/21 Warehouse Fire
16   Warehouse Photographs

Page 1804

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

17   LFR Prime Report of Warehouse Fire
18   Benson's 6/9/21 Grievance
19   Benson's 6/11/21 Affidavit
20   Benson's 8/9/21 Affidavit
21   Media Articles
22   Benson's Interview Audio 7/14/21
23   8 of '21 Grievance Hearing RE:
     June 9, 21 Grievance
24   9/24/21 Denial of 6/9/21 Grievance
     Letter to Benson
25   9/27/21 Pre-Disciplinary Meeting
     Notice Letter to Benson
26   Audio of 10/12/21 Pre-Disciplinary
     Meeting
27   Transcript of 10/12/21 Meeting
28   10/19/21 Termination Letter
29   CBA, 8/20/20 to 8/31/21
30   CBA, 8/19/21 to 8/30/23
31   LFR Professional Code of
     Ethics/Standard of Conduct Policy
32   LFR FF Safety Policy
33   LFR 2020 Annual Report
34   Captain Mahler's Awards
35   2017 Letter to Mahler
36   Terminal Building Fire Near-Miss
     Report, 2/19/18

Page 1805

CITY EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | |
|---|---|
| 37 | Chief Engler's Video Message |
| 38 | Healy Expert Report |
| 39 | Lincoln Municipal Code - Cause for Disciplinary Action |
| 40 | Lincoln Municipal Code - Dismissal and Grievance Procedure |
| 41 | Grievant's 11/3/21 Appeal E-mail |
| 42 | Documents Regarding LFR Discipline |
| 43 | Captain Mahler Notes for Investigator Gerdes |
| 44 | Witte Investigation Correspondence |
| 45 | Witte Investigative File |
| 46 | Benson's Motion for Preliminary Injunction |
| 47 | Benson's Brief ISO Preliminary Injunction |
| 48 | Benson 2014 Complaint Retraction |
| 49 | Mahler Discipline Reversal |
| 50 | Management Policy |
| 51 | Victim Removal Presentation |

** ** **

Page 1806

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | |
|---|---|
| 100 | CBA |
| 101 | 4/27/2011 Suspension Notice |
| 102 | 11/4/2014 Memo of BC Pashalek |
| 103 | Dispositional Memorandum of Kimberly Taylor-Riley |
| 104 | 4/4/21 Complaint |
| 105 | E-mail of BC Curt Faust, 4/4/21 |
| 106 | E-mail of BC Michael Smith, 4/7/21 |
| 107 | E-mail of BC Curt Faust, 4/13/11 |
| 108 | E-mail of Benson to Witte, 4/18/21 |
| 109 | Transcript of Radio Traffic |
| 110 | LFR Incident Report, 4/26/21 |
| 111 | E-mail from Benson to Faust & Witte, 5/5/21 |
| 112 | E-mail from Benson to Witte, 5/13/21 |
| 113 | Witte Investigation Summary |
| 114 | E-mail to Benson from Witte, 5/25/21 |
| 115 | Transcript of Audio File |
| 116 | E-mail from Smith to Witte, 5/26/21 |
| 117 | Investigation Summary |
| 118 | Grievance, 6/9/21 |
| 119 | Benson Affidavit, 6/11/21 |
| 120 | E-mail from Schrunk to Engler, 6/14/21 |

Page 1807

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | |
|---|---|
| 121 | E-mail from Kelly Brandon to Chris Connolly and Ms. Gerdes, 7/12/21 |
| 122 | E-mail from Engler to Mahler, 7/1/21 |
| 123 | Interview Audio Recording |
| 124 | Letter to Ms. Gerdes |
| 125 | Declaration of David Engler |
| 126 | Declaration of Michael Smith |
| 127 | Declaration of Matthew Roberts |
| 128 | Declaration of Morgan Hurley |
| 129 | Declaration of Trent Borchers |
| 130 | Declaration of Stephen Dyers |
| 131 | Declaration of Jason Love |
| 132 | Declaration of Shawn Mahler |
| 133 | Grievance Letter |
| 134 | Declaration of Edward Hadfield |
| 135 | Enhanced Fireground Safety, Effective Use of Division & Group Supervisors |
| 136 | Transcript of Grievance Hearing, 8/20/21 |
| 137 | Letter of Chief Engler Denying Grievance, 9/24/21 |
| 138 | Notice of Pre-disciplinary Action, 9/27/21 |
| 139 | Transcript of Pre-disciplinary Hearing |

Page 1808

UNION EXHIBITS, CONT'D

EXHIBIT    DESCRIPTION

| | |
|---|---|
| 140 | Termination Letter, 10/19/21 |
| 141 | Underlying Confidential Correspondence Regarding Comparative Discipline |
| 142 | Disciplinary Action, 10/14/11 to 10/14/21 |
| 143 | Performance Evaluations |
| 144 | Deposition of Shawn Mahler, 5/9/22 |
| 145 | Awards and Recognitions |
| 146 | LFR Best Practices No. 2-Division/ Group Supervision |
| 147 | Daisy Brayton Investigation |
| 148 | Text Message exchange between Faust and Benson |
| 149 | Arbitration Award, RE: Dan Duncan |
| 150 | Arbitration Award, RE: Jon Reed |
| 151 | E-mail from Corrigan to McDaniel, 11/3/21 |
| 152 | E-mail, Benson to Witte, 4/22/21 |
| 153 | E-mail, BC Smith, 4/22/21 |
| 154 | Discipline Letter, 5/24/21 |
| 155 | Discipline Letter, 6/6/22 |
| 156 | Telephone Log Activity |
| 156 | E-mail from Mahler to Witte, 6/24/21 |

** ** **

Page 1809

1
2  * All exhibits offered with objections to Union's 101, 102, 103, 147, 149, 150; and City Exhibits 20, 21, 38, 46, and 47
3
4  * Union Exhibit 149 was offered and received on page 142
5  * Union Exhibit 150 was offered on page 143 and received on page 144
6
7  * Union Exhibit 156, Telephone Log Activity, was marked on page 750
8  * City Exhibit 156, E-mail to Aishah from Mahler, was marked on page 1738
9
10 * City Exhibit 50 was marked on June 22nd, 2022, offered and received on page 571
11
12
13
14                    ** ** **
15
16
17
18
19
20
21
22
23
24
25

Page 1810

1          (On September 6, 2022, at
2  9:07 a.m., the proceedings continued as
3  follows:)
4          MR. CORRIGAN:  The Union is going
5  to call Captain Brian Giles.
6          THE ARBITRATOR:  All right.  Give
7  me one second here.  Mr. Corrigan, all right.
8          All right.  Would you -- Do you
9  want to swear him in, Court Reporter?
10         THE REPORTER:  Yes, sir.  Please
11 raise your right hand.
12         CAPTAIN BRIAN GILES,
13    Having been sworn to tell the truth,
         the whole truth and nothing but the
14         truth, testified as follows:
15         THE ARBITRATOR:  Would you state
16 and spell your name for the record, please.
17         THE WITNESS:  It's, Brian,
18 B-R-I-A-N, Giles, G-I-L-E-S.
19         THE ARBITRATOR:  All right.  You
20 may proceed.
21         DIRECT EXAMINATION
22 BY MR. CORRIGAN:
23    Q   Captain Giles, what is your position
24 with the Lincoln Fire and Rescue?
25    A   I am a captain at Fire Station No. 16.

Page 1811

1    Q   How long have you been employed with
2  the City?
3    A   This Thursday, September 8th, will be
4  thirty-three years.
5    Q   In what capacity have you worked in
6  the fire department?
7    A   In the fire department, I started
8  November of 2000 as a firefighter.  In summer of
9  2004, I was promoted to fire apparatus operator,
10 which is a driver position.
11         In January of 2008, I was promoted to
12 captain in the position I currently still hold.
13    Q   And prior to your work in the fire
14 department, did you work in the City of Lincoln
15 Police Department?
16    A   I did.
17    Q   How long were you a police officer?
18    A   A little over eleven years.
19    Q   As a captain -- You're an engine
20 company captain?
21    A   I am.
22    Q   You're familiar with Ms. Benson?
23    A   I am.
24    Q   In addition to your work on the fire
25 department, have you held offices or positions

Page 1812

1  with the Firefighters Local 644?
2    A   I have.
3    Q   And what were those?
4    A   I believe 2003 I was appointed to the
5  executive board as an executive board member.
6  And in 2007, I was elected vice president, a
7  position that I held for three terms, or six
8  years.
9    Q   And in addition to the training that
10 you receive in the fire department through the
11 City of Lincoln, have you had any other training
12 or certification as a firefighter?
13    A   I've had a lot of training.
14    Q   Do you hold any certifications or
15 licenses as a firefighter?
16    A   I'm credentialed as an executive fire
17 officer through the National Fire Academy in
18 Emmitsburg, Maryland, which would be the most
19 prominent one.
20    Q   What is an executive fire officer?
21    A   It's a four-year program through the
22 U.S. Fire Administration at the National Fire
23 Academy that's somewhat equivalent to a police
24 officer attending the FBI National Academy.
25         It's a credential that, upon

Page 1869

1  communicating enough?
2      A   I'm sorry?
3      Q   You alleged in your lawsuit he was not
4  communicating with you enough at that time in
5  2014 -- I'm sorry -- 2015?
6      A   Can -- can you cite like the specific?
7      Q   Yeah.  You claimed he wouldn't assign
8  you to truck.  He wouldn't communicate with you
9  about what needed to be done or training?
10     A   Right.
11     Q   And you allege that in your lawsuit?
12     A   Yes.
13     Q   Okay.  And he did communicate with you
14  with regard to a situation where the kitchen was
15  not completely cleaned.  Do you recall that?
16     A   I -- yes.
17     Q   Okay.  And you also included that
18  communication in your lawsuit against him as
19  well?
20     A   Yes.
21     Q   Okay.  And then in 2017, he did --
22  Captain Mahler did communicate with you about a
23  concern regarding another firefighter who had
24  possibly touched you inappropriately.  Do you
25  recall that?

Page 1870

1      A   Yes.
2      Q   Okay.  And when he -- when Captain
3  Mahler made that communication, you complained
4  to the chief at the time about that; right?
5      A   Yeah.  The complaint was not about the
6  communication, the fact that he communicated
7  with me.  The complaint was about the substance
8  of the communication.
9      Q   Okay.  But it was a complaint about
10  his communication to you?
11     A   Regarding what he said to me, yes.
12     Q   Okay.  And as a result of your
13  complaint, the chief issued a no contact order
14  at that time; correct?
15     A   It -- it was always referred to me as
16  a limited contact order.
17     Q   Okay.
18     A   There was still expectation that we
19  communicate professionally for work-related
20  things.
21     Q   Okay.  But throughout we've been
22  calling it no contact order via different
23  witnesses.  So if I refer to it that way, can we
24  agree that we're talking about the order issued
25  by the chief at that time in 2017?

Page 1871

1      A   Yes.
2      Q   And you were provided a copy of that
3  no contact order at the time it was issued;
4  correct?
5      A   Yes.
6      Q   And so fair to say you've included in
7  your lawsuit that you filed in or about 2018
8  complaints against Captain Mahler regarding when
9  he does not communicate with you and when he
10  does; correct?
11     A   Can you -- sorry.
12     Q   Yeah.  Fair to say that in your
13  lawsuit that you filed against one of the
14  defendants being Captain Mahler, you included
15  allegations regarding times that he did
16  communicate with you that you didn't feel were
17  appropriate and times that he did not
18  communicate with you; is that correct?
19     A   Yes.
20     Q   And that lawsuit is still ongoing
21  today; correct?
22     A   Yes.
23     Q   You also testified in direct regarding
24  the Kimberly Taylor Riley report issued in 2016.
25  Do you recall?

Page 1872

1      A   The report, yes.
2      Q   Okay.  You recall talking about that
3  with Mr. Corrigan during your direct briefly?
4      A   Yeah.  I recall going over it.
5      Q   Okay.
6      A   I don't really remember specifics
7  right now.
8      Q   I won't go through it in detail.  I
9  just had a few questions about it.  Isn't it
10  true during the time she was investigating, Ms.
11  Riley would text with you?
12     A   Yeah.  She would call.  We would text
13  and send e-mails back and forth.
14     Q   Okay.  And you don't have any evidence
15  that she was doing the same for Captain Mahler,
16  do you?
17     A   I -- no.  I would have no way of
18  knowing that.
19     Q   Okay.  The City did not discipline
20  Captain Mahler for anything contained in the KTR
21  report, did it?
22     A   I'm not aware.
23     Q   Okay.
24     A   I'm not aware of any.
25     Q   Okay.  Were you aware that it put him

Page 1877

1    not Captain Mahler, was it?
2        A    No.
3        Q    Okay.  Rather he had talked to you
4    about it, and that resulted in the no contact
5    order that we discussed earlier?
6        A    Correct.
7        Q    Okay.  Let's just -- to refresh, let's
8    turn to Exhibit 35.  And that would be the red
9    book.
10       A    (Witness complies.)
11       Q    Okay.  Is Exhibit 35 the no contact
12   order?
13       A    Yes.
14       Q    Okay.  And at the time this was
15   issued, you were not a captain, were you?
16       A    No.
17       Q    Okay.  And so -- and you understood
18   that Captain Mahler had to abide by the order of
19   the chief; correct?
20       A    Yes.
21       Q    Okay.  And you understood that any
22   contact had to be in the presence of your direct
23   supervisor or a chief officer; correct?
24       A    That -- that's one of the
25   stipulations, yes.

Page 1878

1        Q    And the second one is that orders
2    given to you directly related to and in the
3    course of an emergency incident; correct?
4        A    Yes.
5        Q    Okay.  And at that time, he was a
6    supervisor in rank and could give you orders;
7    correct?
8        A    He was a superior, yeah.
9        Q    Okay.  Mr. Corrigan also discussed
10   that you had filed some charges with NEOC, or
11   Nebraska Equal Opportunity Commission.  The NEOC
12   found no cause on your charges; correct?
13       A    If -- is that like one of the -- they
14   denied it?
15       Q    Correct.
16       A    Yeah.  So then, yeah.
17       Q    Okay.  I want to skip ahead then to
18   2019.  Do you recall filing a grievance because
19   you felt that the captain's test was unfair to
20   you?
21       A    Yeah.  I felt that the captain's test
22   was -- had a portion of it that was rated in a
23   way that would negatively impact female or more
24   feminine presenting men.
25       Q    Okay.  Did you learn that it was

Page 1879

1    actually third-party administrators that
2    administered that test?  It wasn't LFR personnel
3    administering the test, was it?
4        A    Right.  Right.
5        Q    Okay.  After the Union investigated
6    that matter, did they withdraw the grievance?
7        A    I believe so, yes.
8        Q    You've also sued Chief Benisch;
9    correct?
10       A    Correct.
11       Q    And who is he to you?
12       A    He was a battalion chief at Lincoln
13   Fire and Rescue.
14       Q    Okay.  You've also sued Chief Linke,
15   Battalion Chief Linke; correct?
16       A    Correct.
17       Q    And who was he to you?
18       A    He was the interim fire chief.
19       Q    You've also sued Chief Jones.  And who
20   was he to you?
21       A    Battalion chief.  And he oversaw -- at
22   the time oversaw Station 8 personnel and was who
23   the complaints originally were reported to and
24   then did not -- did not respond or -- or
25   intervene.

Page 1880

1        Q    Okay.  And in 2020, did you -- you
2    also accused a work comp -- City work comp
3    claims risk management employees of retaliating
4    against you?
5        A    I raised concerns about the fact that
6    they were not communicating with me.  I also
7    raised concerns because there was backdating
8    done on my medical forms.  And I brought that
9    concern to Aishah Witte and, I believe, Chief
10   Engler.  I believe it's illegal to backdate work
11   comp forms, any medical forms.  And I brought
12   that to their attention because it did result in
13   me temporarily being considered AWOL and not
14   being on work comp anymore and having to utilize
15   my sick leave.
16       Q    Okay.  And I believe we established in
17   your deposition that you weren't sure who had
18   backdated it, if it had to be the medical office
19   doctor or somebody else?
20       A    Correct.  I believe that the
21   individual I spoke with at the medical office
22   stated that that was normal.  That staff in the
23   office would put whatever date and information
24   was needed on the form at the request of city
25   risk management.

470 (Pages 1877 to 1880)

Page 1881

1      Q   Okay.  And you don't have any evidence
2  that City risk management actually did that, do
3  you?
4      A   Requested that it was backdated?
5      Q   Right.
6      A   I -- that was the reason I brought it
7  to Aishah Witte, and I believe it was Engler
8  because it was done, and we didn't know who had
9  done it.
10     Q   Okay.
11     A   And why it had been done.  And I had
12 concerns.  Because of my ongoing case with the
13 City and the director of HR.  I was dealing with
14 lack of communication from HR.  I was dealing
15 with an injury that had nerve damage where I was
16 having muscle atrophy in my hand and I was
17 concerned that I would actually have to be
18 disabled from the job.
19         No one would answer my calls or return
20 my calls.  And then with no communication, I was
21 suddenly -- I suddenly had my status affected
22 through backdating, which as a medical provider
23 I know it's illegal.  So I just gave all of that
24 information over so that it could be looked
25 into.

Page 1882

1      Q   So just to confirm though.  As you
2  stated, it was the medical provider who
3  backdated it; correct?
4      A   I don't know who backdated it.
5      Q   If it was illegal, have you pursued a
6  claim against the medical providers?
7      A   I just gave it over to my supervisors.
8      Q   Okay.  Nonetheless, you accused in
9  your charge and lawsuit that the City was
10 retaliating against you in regard to that work
11 comp claim; right?  Or injury?
12     A   I don't know, yeah.  Can you repeat
13 that?
14     Q   Yeah.  In your charge and lawsuit,
15 you've accused the City of retaliating against
16 you in regard to the work comp allegations that
17 you just discussed?
18     A   Yeah.  I believe it was retaliatory.
19     Q   Okay.  And you also have accused the
20 City was surveilling you; correct?
21     A   Yes.
22     Q   And you don't have any proof of that,
23 do you?
24     A   No, I do not.
25     Q   Okay.  But you did include that in

Page 1883

1  your lawsuit; correct?
2      A   Yes.
3      Q   Okay.  In 2021, you claimed that you
4  heard comments Captain Chad Roof made negatively
5  about women.  And you complained about him;
6  correct?
7      A   Yes.
8      Q   You also claim you heard negative
9  comments by Matt Woitalewicz at the station;
10 correct?
11     A   Yes.
12     Q   In your direct examination -- I wrote
13 it down -- you testified Matt made public
14 attempts to attack me.  What was he saying?
15     A   Which -- are you talking in, like,
16 over the period?  Which time are you talking
17 about?
18     Q   When you said that he made public
19 attempts to attack me, what were you referring
20 to?
21     A   With Matt Woitalewicz?
22     Q   Yes.
23     A   Matt Woitalewicz -- I mean, I could
24 refer to specifics in the charge.  Are you just
25 asking off the top of my head?

Page 1884

1      Q   Yeah.
2      A   Or would you like to go over the
3  charge?
4      Q   Yes.  Off the top of your head what
5  you recall.
6      A   Okay.  So one of the main portions of
7  the complaint regarding him was the -- the
8  repeated public comments he made regarding
9  training -- his perceived training deficiencies.
10         He also made public comments with
11 another firefighter about his -- his perception
12 of me not being talkative enough and then me
13 saying -- me being too talkative.  And he also
14 made public statements stating that -- I
15 reported it -- regarding the Brady Papik
16 statements.  I guess that was an exchange
17 between Brady Papik and Matt Woitalewicz where
18 there were comments stating that I just sit
19 there and say nothing along the lines of
20 contributing to a hostile work environment, how
21 someone -- it's not safe to work and not train.
22     Q   Okay.  Anything else?
23     A   I'm sure.  I mean, it would -- it
24 would be outlined in my e-mails where I reported
25 it or my -- all -- all of the evidence in the

Page 1905

1  that they knew what the source was. The source
2  was the interim fire chief and he had been
3  disciplined for it. So there was a HIPAA
4  violation. And the interim fire chief was
5  disciplined for it.
6      Q  But you don't know if the interim fire
7  chief learned it from hospital personnel. So
8  you don't know the original source of it, do
9  you?
10     A  I'm not sure. I don't know that there
11 was ever an investigation done to find that out.
12     Q  He testified that he shared that with
13 your Union president with out of concern for
14 your health and well-being?
15     A  I'm not sure. There was a note
16 somewhere where there is a meeting between him
17 and it might have been Linke -- Trouba, Linke,
18 and maybe Merry- -- I don't remember where the
19 note was. It was either Linke's note or
20 Merryman's note where they were meeting to
21 discuss whether I could be disciplined for it.
22 And then no discipline -- they never disciplined
23 me or talked to me about discipline.
24     Q  That was for being disciplined for
25 calling in sick, wasn't it?

Page 1906

1      A  Yes. Originally.
2      Q  Okay. So just -- go back to my
3  original question. You did later accuse and
4  include in your lawsuit a claim that the City
5  violated your HIPAA rights as well; correct?
6      A  Correct. A City employee was
7  disciplined for violating my HIPAA rights. So,
8  yes.
9      Q  On a different note. When a former
10 girlfriend obtained a restraining order against
11 you alleging that you tried to harm her, you
12 claim that she lied about those events?
13     A  This is what you talked to me about in
14 my deposition; correct?
15     Q  Correct.
16         MR. CORRIGAN: What year would
17 this have been?
18         THE WITNESS: Like 2008 maybe.
19 Maybe 2- -- it was '07 or 2008.
20     Q  (By Ms. Guttau) I'll find it here.
21     A  It was before I was an employee at the
22 City of Lincoln.
23     Q  2009?
24     A  2009. Okay. We talked about it in my
25 deposition. I do remember that, yes.

Page 1907

1      Q  Okay. She obtained a restraining
2  order against you, didn't she?
3      A  Yes.
4      Q  Okay. She accused you of trying to
5  hit her with -- that you hit her with your car?
6      A  Yes. And like I said in my
7  deposition, there was a car accident that
8  happened. There was a police report filed. We
9  both discussed it with the police. It was an
10 accident, and it took place before this had
11 happened. And there was an -- the police -- I
12 was never charged with anything or accused of
13 anything.
14     Q  But you did -- there was a restraining
15 order against you; correct?
16     A  Correct.
17     Q  And in your deposition, you testified
18 that her allegations against you, you believe --
19 you're claiming that those were lies?
20     A  I believe I pointed out several --
21 several instances in the document we went over
22 that I believe were dishonest. But if we're
23 going to -- do you have a transcript from my
24 deposition?
25     Q  I do.

Page 1908

1      A  We can go line by line on things where
2  we can talk about it. But I can't remember
3  specifics of what we talked about at this point.
4      Q  Okay. You claimed though -- and
5  you're still claiming -- that when she says you
6  hit her with the car after an argument, that
7  that was false?
8      A  She was hit by a car, yes. I don't
9  believe it was following an argument, and it was
10 never intentional. It was a car accident.
11     Q  Okay.
12     A  So, yes, that -- that was intentional
13 in that it was -- and it -- intentionally to
14 harm her, that was incorrect.
15     Q  She alleged a week after this
16 happened, you were willing to ruin her life.
17 Was that truthful, or is she -- is she telling
18 the truth there?
19     A  No. No.
20     Q  Okay.
21     A  I had no reason to harm her ever.
22     Q  And she says that when you're -- she
23 was sleeping, she -- you grabbed her hands and
24 head and began jerking her head up and down. Is
25 that true?

Page 1913

1    A  At some points.  I can't even think of
2  specifics.
3    Q  But that was okay in your mind?
4    A  It didn't involve -- it didn't
5  negatively impact his working environment.  So
6  there's a difference there.
7    Q  But if you're talking negatively in
8  your lawsuit; correct?
9    A  Of stating my experiences, I don't
10  believe -- I can state my experiences.  Any
11  negative thing that -- in my lawsuit I believe
12  mostly has been -- like, I would have to look.
13  But those are all things that the City has
14  received evidence about, what my concerns are
15  about.
16    Q  Your position is that he's not allowed
17  to state anything about him being a defendant?
18    A  The issue with that communication was
19  that there was an investigation going on.
20    Q  But you weren't even there, so you
21  don't know what was said, do you?
22    A  Correct.  And I stated that.
23    Q  And Ms. Lundvall, when she reported it
24  to you, she told you she never heard your name
25  mentioned; correct?

Page 1914

1    A  I believe Lundvall told me that she
2  knew exactly who he was talking about.  They
3  didn't even need to state your name.
4    Q  But she said she never heard your
5  name; correct?
6    A  I don't recall it.  It might be in the
7  e-mail.
8    Q  Let's look at --
9        MS. GUTTAU:  This will be Union
10  152.
11        THE WITNESS:  Okay.
12    Q  (By Ms. Guttau)  Do you want to take a
13  moment to look at that?
14    A  (Witness complies.)  Okay.
15    Q  Is that the e-mail you're talking
16  about, your complaint to Ms. Witte?
17    A  Yes.
18        MS. GUTTAU:  Okay.  Let me find
19  just the statement real quick so we can
20  cross-reference here.
21        That's the one number I didn't
22  put down.  I'll find it.
23    Q  (By Ms. Guttau)  If Ms. Lundvall's
24  report indicates that she's told the chief she
25  never heard your name stated, do you have any

Page 1915

1  reason to refute that?
2    A  No.  I wasn't present for when she --
3  if she talked to the chief, I don't know if she
4  was -- I don't think she was interviewed.  I
5  think she just sent an e-mail.
6    Q  Have you seen that e-mail?
7    A  I probably have.  But --
8    Q  Okay.  And you stated in your
9  complaint that he was making defamatory comments
10  about you?
11    A  That's what it says, yes.
12    Q  Okay.  Again, at this point you have
13  not -- you were not there?  You've not heard it?
14    A  Let's see.  So what I said is the fact
15  that my co-workers are so blatant and
16  unrelenting in public in their defamatory
17  comments about me leads me to believe that they
18  have no respect at all for my rights to a
19  workplace that is free from harassment,
20  discrimination, and retaliation.  This is
21  unacceptable.
22    Q  So are you claiming that whatever he
23  said that you didn't hear at the ladder training
24  was defamatory?
25    A  I'm saying that people are willing to

Page 1916

1  -- like -- exactly what I said here.  The fact
2  that people are willing to believe -- be
3  unrelenting in public and defamatory comments
4  about me leads me to believe that they have no
5  respect for my rights.
6    Q  Okay.  But you made that complaint
7  only based on what Ms. Lundvall told you; right?
8    A  This complaint is about Jesse Lundvall
9  calling me, yes.
10    Q  Okay.  And you -- the purpose of that
11  e-mail is because you wanted these -- you wanted
12  the public statements to stop about you?
13    A  Yeah.  I did not want the -- I didn't
14  want to be retaliated against.  And I believed
15  that the statements were coming from Chad Roof's
16  -- partially because Chad Roof was angry that I
17  had reported him.
18    Q  So you called in here -- in your
19  e-mail, you stated at approximately 11:48 I
20  received a call -- phone call from Jesse
21  Lundvall.  This is about the ladder training;
22  correct?
23    A  Yes.
24    Q  So that would be 11:48 a.m. that day?
25    A  Probably, yes.

Page 1917

1    Q   Okay.  And you send this e-mail to Ms.
2    Witte at 12:24; correct?
3    A   That's what it says.
4    Q   So about thirty-six minutes later?
5    A   Probably.
6    Q   Okay.  And you said -- the first line,
7    this e-mail is to follow up the information I
8    verbalized to you a few minutes ago.  So you had
9    even reported it to her in less than thirty-six
10   minutes; correct?
11   A   Probably.  I think on this day
12   Aishah's office is right across the hallway.
13   And if we weren't on a call over the lunch
14   period or where we were eating, that I could run
15   over and talk to her real quick.
16   Q   Okay.  So thirty-six minutes after
17   hearing a rumor that Captain Mahler might be
18   talking about you, you submitted both a verbal
19   and a written complaint; correct?
20   A   Correct.  I believe though this was --
21   this was about -- and I verbalized this to
22   Aishah my concern that Chad Roof would involve
23   other people -- other people in the matter that
24   was being investigated.  That's what --
25   Q   So you believed it was very serious

Page 1918

1    and urgent?
2    A   I just believed it needed to be
3    documented, and I had time at the moment.
4    Q   Did you believe it was serious?
5    A   Yes.  I believed that I was tired
6    of -- I was tired of this happening.
7    Q   Okay.  Let's turn now to -- this would
8    be in the red book -- City Exhibit 19.
9    A   (Witness complies.)  Okay.
10   Q   Do you want to turn to page 2,
11   paragraph 5?
12   A   (Witness complies.)  Okay.
13   Q   And this is your affidavit filed with
14   the Court; correct?
15   A   Yes.
16   Q   Okay.  You state, recently on April
17   22nd, 2021, I reported Mahler for retaliatory
18   behavior when he disparaged me to another
19   firefighter.  And that's the e-mail you're
20   referring to in report to Aishah?
21   A   Yes.
22   Q   Even though you did not have any
23   evidence that that happened other than the rumor
24   that Ms. Lundvall told you?
25   A   I just had -- like I said, just what

Page 1919

1    Jesse had told me, and then I believed that they
2    had asked her for an e-mail, but I don't
3    believe -- I wasn't interviewed and I don't
4    think she interviewed about it.  I don't know
5    who was interviewed about it.
6    Q   All the firefighters present confirmed
7    that that is not what happened, didn't they?
8    A   I don't know that.  I don't know who
9    all was interviewed.  And Aishah Witte did not
10   take notes on many of those interviews, so I
11   have no idea.
12   Q   If -- if all of the firefighters who
13   were present at the ladder training indicate
14   that Captain Mahler wasn't talking about you, do
15   you have any evidence to refute that?
16   A   I'm sorry?
17   Q   I said, if all of the firefighters
18   present at the ladder training confirmed that
19   Captain Mahler was not talking about you, do you
20   have any evidence to refute that?
21   A   No.  I don't know -- like I said, I
22   don't know who -- I don't know if they all were
23   talked to.  I don't know who she talked to and
24   the content of those.  So I have nothing to say
25   that it happened or didn't happen.

Page 1920

1    Q   Okay.  But yet you included that
2    serious allegation in paragraph 5 in your
3    affidavit; correct?
4    A   I included that because a witness told
5    me that -- that they witnessed that.
6    Q   Okay.  But the witness didn't tell you
7    that it was about you for sure?
8    A   That is why the witness called me is
9    because she indicated the conversation was about
10   me.  My conversation with Jesse Lundvall was not
11   very long.  I reported what I heard, what she
12   told me.  And then that ended up in the e-mail
13   and a verbal report to Aishah Witte.
14        So whether -- whether people disagreed
15   with that happening, that -- that has nothing to
16   do with whether I would report that or not.
17   That is just what was reported to me.
18        MS. GUTTAU:  Do you need to take
19   a break?
20        (Recess at 11:30 a.m.)
21        (Resumed at 11:36 a.m.)
22        THE ARBITRATOR:  Okay.  Let's go.
23   Q   (By Ms. Guttau)  Okay.  If you want to
24   turn to Exhibit 45.
25        MS. GUTTAU:  City Exhibit 45.

Page 1921

1    Q   (By Ms. Guttau)  Turn to page 38.
2    A   (Witness complies.)
3    Q   Are you on page 38?
4    A   Yes.
5    Q   Okay.  And this was the complaint
6    language that Ms. Lundvall submitted.  As you
7    can see, she said, Chief Engler, below you will
8    find my document and account of what took place
9    at the CC training tower.
10       At the bottom of that, Jesse wrote,
11   Firefighter Benson asked me to document what
12   happened as she needed to report what I was
13   telling her.  I informed her that Captain Mahler
14   never mentioned her name.  Is that true?
15   A   If you go on with that --
16   Q   I'm just asking about that first part.
17   I'll ask you about the second part.  Is that
18   true?
19   A   That would -- yes.  That's the first
20   part of a sentence that she put in this e-mail,
21   yes.
22   Q   My question is, did she tell you, when
23   she called you, that Captain Mahler never
24   mentioned your name?
25   A   I don't -- I don't remember.  We've

Page 1922

1    talked about this so many times.  We've talked
2    about this e-mail, my report.  It -- it gets
3    muddied.
4    Q   So you're not sure?
5    A   I can't remember if she told me that
6    on the phone or if I read it in here or we
7    talked about it later.
8        The best document that I have to go
9    off of what I knew at that point is what I put
10   in an e-mail to Aishah Witte.
11   Q   You said the second part, however, by
12   what he was saying, I knew who he was talking
13   about.  So you remember her telling that --
14   telling you that?
15   A   What I -- I remember this because I
16   have learned this.  I don't remember specifics
17   about that particular phone call.
18   Q   Okay.  And even though nobody else
19   confirmed that Captain Mahler was talking about
20   you, you still included that in your affidavit
21   to the Court requesting that he be removed from
22   responding to fires; correct?
23   A   This was included in the report,
24   because I believed that me reporting this issue,
25   whether she mentioned his name or not, me

Page 1923

1    reporting this happened just a couple of days
2    before the warehouse fire.  And he has a history
3    of not speaking to people when he's angry and
4    upset, especially me for reporting him, which is
5    what I believed was retaliatory.  That's why I
6    believe his behavior at the warehouse fire was
7    retaliatory, because he was mad that I reported
8    him.  That's why -- that's why this is included.
9    Q   But you stated that he -- that you
10   reported him for retaliatory behavior when he
11   disparaged me to another firefighter.  So you're
12   saying in your facts of your affidavit in
13   Exhibit 19, which is your affidavit in support
14   of motion for preliminary injunction; correct?
15   A   Are you saying my -- my affidavit is
16   in support of preliminary -- what are you asking
17   about that?
18   Q   Yeah.  So you submitted your affidavit
19   to support your motion for preliminary
20   injunction; correct?
21   A   Correct.
22   Q   And that motion requested in part that
23   Judge Kopf remove Captain Mahler from reporting
24   to any further fires; correct?
25   A   I would have to look at the exact

Page 1924

1    wording of it.
2    Q   Something to that effect?
3    A   Something along the lines of it needed
4    to be investigated because, if I remember
5    correctly, like it was a safety concern.
6    Q   Okay.  Do you recall that it also
7    requested that he be removed from service?
8    A   It may have.  I would have to look at
9    it.
10   Q   Okay.  For clarity, let's just flip
11   back.  Let's look at Exhibit 46.
12   A   Okay.
13   Q   And you understand 46 is your motion
14   for preliminary injunction?
15   A   Yes.
16   Q   Okay.  If you want to turn to
17   paragraph 8 on the second page.
18   A   (Witness complies.)
19   Q   And it says plaintiff.  You understand
20   that was you?
21   A   Yes.
22   Q   Respectfully requests that the Court
23   order the City of Lincoln to immediately
24   initiate disciplinary proceedings against
25   Mahler; correct?

Page 1925

1      A   That's what it says.
2      Q   And then also to enjoin Mahler from
3   assignment or dispatch to any fire scene during
4   the pendency of disciplinary proceedings.  So
5   you were asking that he not be allowed to
6   respond to fire calls; correct?
7      A   Enjoined from any fire scene during
8   the pendency of disciplinary proceedings.  Okay.
9      Q   Correct?
10     A   Yeah, that's what it says, yeah.
11     Q   And then also to appoint the
12  third-party independent investigator?
13     A   That's what it says.
14     Q   Okay.  So what I'm asking is, your
15  affidavit back on 19, you understood that
16  Exhibit 19 you submitted that in support of your
17  request to the Court to initiate discipline
18  against him and enjoin him from responding to
19  fires?
20     A   Which affidavit are you talking?
21     Q   Exhibit 19.
22     A   Okay.  This is the motion that my
23  lawyer wrote.
24     Q   Correct.
25     A   And then you're asking about my

Page 1926

1   affidavit then?
2      A   Uh-huh.
3      Q   Okay.  What are you asking about this?
4      Q   Okay.  So in photograph 5, what we're
5   talking about, you said in your affidavit you
6   reported Mahler for retaliatory behavior when he
7   disparaged me to another firefighter.  So you
8   were stating that as fact in your affidavit in
9   support of your motion; correct?
10     A   I'm stating that I reported Mahler for
11  retaliatory behavior when he -- I'm stating that
12  that's what I reported.
13     Q   But you're saying you reported it when
14  he disparaged me to another firefighter;
15  correct?
16     A   I reported Mahler -- yes.
17     Q   Okay.  And that's my question.  You're
18  stating that as a fact in support of your
19  request to the Court for a pretty serious --
20  pretty serious request for orders against
21  Mahler; correct?
22     A   This is a statement of what I
23  reported.
24     Q   But you're also stating as a fact that
25  you reported it when he disparaged you.  So

Page 1927

1   you're saying that he did disparage you;
2   correct?
3      A   I reported -- okay.  So my e-mail to
4   Aishah Witte, I outlined what I was reporting
5   him for.  This No. 5 is me saying on April 22nd,
6   this is what I reported.
7      Q   So you don't know whether or not he
8   had disparaged you when you made the statement?
9      A   I know what the witness said to me,
10  and that is what I reported.
11     Q   In paragraph 28 of that same
12  affidavit, you state, Mahler refused to
13  communicate with me at the warehouse fire
14  because of this underlying litigation and recent
15  complaints.
16     A   Hold on.  Where are you at?
17     Q   I'm sorry.  Exhibit 19.
18     A   Exhibit 19.
19     Q   Yeah.  Paragraph 28.
20     A   28.  Okay.
21     Q   You state, Mahler refused to
22  communicate with me at the warehouse fire
23  because of this underlying litigation and recent
24  complaints of retaliatory behavior.
25         By the time you filed this, the

Page 1928

1   underlying litigation had been pending since
2   2018, correct, for years?
3      A   Correct.
4      Q   You allege in your lawsuit that he
5   retaliated against you before the warehouse
6   fire; correct?
7      A   If -- if that's what it -- if that's
8   what it says, then yes.
9      Q   Okay.  And you've been in other fires
10  with him since the filing of your lawsuit
11  without incident; correct?
12     A   Yeah.  We actually have worked
13  numerous fires where I was a firefighter and
14  where I was an acting officer where we
15  communicated whether I was working underneath
16  him or just communicated in passing on the
17  fireground, and we had no issues.  I had no
18  issues.
19         My issue was that this change in
20  demeanor on the fireground happened immediately
21  after I reported his behavior that was reported
22  to me by Jesse Lundvall, which historically when
23  I have reported something against him in the
24  past, he refuses to speak to me.  This time it
25  was in a fire.

Page 1929

1    So his previous ability to
2  communicate -- our previous ability to
3  communicate on a fireground shows that we can
4  communicate on a fireground.  There -- this was
5  a change in expected behavior -- in my expected
6  behavior from him.
7    Q    But you've made repeated allegations
8  of discrimination and retaliation against him,
9  haven't you?
10    A    I've reported issues between him and I
11  were unprofessional and I believe retaliatory,
12  harassing, and discriminatory.
13    We've had numerous conversations,
14  communications -- sorry, conversations is the
15  right word.  We've had numerous contacts while
16  executing medical calls, fire calls where we
17  professionally communicate with one another.
18    The issue with this incident is that
19  he refused to talk to me in a fire.  So he's
20  talked to me numerous times since the beginning
21  of this lawsuit and since the no contact order.
22    The only issue right with this part it
23  was a couple of days after I had reported him
24  again.
25    Q    But you've had other incidents after

Page 1930

1  you have reported him at other fire scenes and
2  had no problems; correct?
3    A    With Mahler?
4    Q    Uh-huh.
5    A    I'm not sure.  I'm not sure how
6  frequently we worked scenes after this.
7    Q    You responded -- no, I mean, before
8  this.  So the filing of your lawsuit, you've
9  responded to fires with him 2018, 2019, 2020;
10  correct?
11    A    Absolutely, yeah.
12    Q    Okay.
13    A    In order -- there were no issues.
14    Q    And he knew at that time that he had a
15  lawsuit pending against him by you?
16    A    Correct.
17    Q    Okay.
18    A    And he also knew at that time there
19  was a no contact or a limited contact order and
20  we still communicated professionally on scene
21  whether I was a subordinate or an officer.
22    Q    Thirty-six minutes was the amount of
23  time to report a rumor that he may have been
24  talking about you.  Yet you waited nearly a week
25  to report that you thought he had abandoned you,

Page 1931

1  didn't you?
2    A    I believe that I made report of my
3  concerns immediately at the fire and that night
4  and then over Kelly days still communicated with
5  my battalion chief about it.
6    Q    Let me back up.  I think you misheard
7  my question.  You didn't accuse him of
8  abandoning you at a dangerous warehouse fire
9  until about a week after the fire occurred;
10  correct?
11    A    I sent my formal complaint by e-mail
12  when I returned from Kelly days.
13    Q    Okay.  So that was May 5th?
14    A    Kelly days are eight days long.
15    Q    Okay.
16    A    So my last day of work, I communicated
17  with battalion chief.  At the fire and that
18  night, we communicated over Kelly days, and he
19  told me to send it on Wednesday.
20    Q    Okay.
21    A    Which is when we returned to work.  So
22  I'm -- I'm kind of confused as to --
23    Q    Right.
24    A    What's -- what's the issue that
25  you're --

Page 1932

1    Q    So you -- you testified earlier that
2  you had spoken to Captain -- or Chief Faust
3  about confusion about assignments perhaps that
4  evening after the fire.  My question is, you
5  didn't accuse Captain Mahler of abandoning you
6  in a dangerous warehouse fire, that wasn't
7  reported until your complaint, right, after --
8  towards the end of Kelly days?
9    A    The first time I did a complaint was
10  Wednesday morning back.  So my first day back.
11    Q    That's May 5th?
12    A    If that's what the e-mail -- the
13  e-mail would be my first day back.  So that is
14  the first time I wrote a complaint and filed it.
15    Q    Okay.  And let's check the date
16  because I want to make sure I've got it right.
17    MR. CORRIGAN:  We'll stipulate
18  that it was May 5th.
19    MS. GUTTAU:  Thank you.
20    Q    (By Ms. Guttau)  So you didn't -- and
21  my question is, you did not report the
22  abandonment in a dangerous warehouse fire until
23  your complaint on May 5th; correct?
24    A    That was the first time I had written
25  anything about it.

Page 1933

1    Q   Okay.  That was the first time you
2  reported that aspect of your complaint?
3    A   I don't remember the specifics of my
4  conversations with Curt Faust.  I know that the
5  phone conversation that I had over Kelly days
6  led to me basically putting that e-mail
7  together.  So it's quite possible that I
8  discussed that and my concerns with that.  I
9  know that when I sent that email, he never told
10  me that there was anything in there that was
11  news to him or that was surprising to him.  So I
12  would imagine if I had said something that was
13  completely out of -- out of the ballpark with
14  what he had already been communicating, he would
15  have said something to me.  So it would be
16  speculating like when -- when we first talked
17  about it.
18    Q   You certainly didn't complain that
19  your life had been placed in danger within
20  thirty-six minutes of it happening, did you?
21    A   I believe -- no.  We were still
22  fighting the fire so --
23    Q   Or within thirty-six minutes of
24  returning to the station?
25    A   These are two different scenarios.

Page 1934

1    Q   Would you agree that --
2    A   So --
3    Q   -- being an accusation of -- of your
4  life being threatened is more serious than a
5  rumor that somebody is talking about your
6  lawsuit?
7    A   I think time is needed to process
8  what -- what you -- what you went through, what
9  you experienced.  And the entire call needs to
10  be processed.  And that is the difference
11  between the warehouse incident and me reporting
12  what somebody said to me verbatim.
13    Q   Let's talk about the warehouse fire.
14  You testified you did not remember if you heard
15  the initial Truck 8 to ventilation assignment;
16  is that correct?  That's what I have down in my
17  notes.
18    A   I did not hear the initial what?
19    Q   Initial Truck 8 to ventilation
20  assignment.
21    A   I don't remember.  No.  When Truck 8
22  was originally assigned ventilation, is that
23  what you're talking about?
24    Q   Correct.
25    A   I don't -- so the first time I

Page 1935

1  listened to this was right before my interview
2  with Torrey Gerdes.  I listened to the radio
3  traffic numerous times throughout her interview.
4  I don't recall exactly when I first heard
5  certain things.
6         What I do know is that I was looking
7  for Mahler when I left the building.
8    Q   Okay.
9    A   So I would assume that I knew he was
10  assigned to ventilation.
11    Q   If you testified on direct that you
12  did not remember if you heard the initial Truck
13  8 to the ventilation assignment at the time, is
14  that still correct?
15    A   I believe -- are we talking about my
16  deposition?
17    Q   No.
18    A   To here?
19    Q   Uh-huh.
20    A   When did I -- which time are you
21  talking about?
22    Q   When Mr. Corrigan began asking you
23  questions.
24    A   If I first heard Mahler -- like Truck
25  8 get assigned to ventilation?

Page 1936

1    Q   Uh-huh.
2    A   I don't remember when I first heard
3  it.  But I would assume that if I left the
4  building looking for Truck 8, there was a reason
5  I was looking for Truck 8.
6    Q   I guess my point is, is it fair to say
7  that as a captain or firefighter, you don't hear
8  everything that is said on the radio, do you?
9    A   Yeah.  No.  I don't think you can.
10    Q   Okay.  And Captain Wright testified to
11  that same thing; correct?
12    A   Okay.
13    Q   Do you recall that?
14    A   I don't -- if you say that he did,
15  then --
16    Q   Okay.
17    A   -- it would make sense.
18    Q   And if Mahler testified that he did
19  not hear assist with ventilation message, you
20  don't have any reason to dispute that, do you?
21    A   No.
22    Q   And both you and Captain Mahler, I
23  believe he stated, having some hearing deficits;
24  correct?
25    A   I'm sorry?

Page 1937

1    Q    Both you and Captain Mahler have
2  hearing deficits?
3    A    Correct.
4    Q    Okay.
5    A    I don't know his -- I just speak for
6  my own.
7    Q    Okay.  Is it possible you did not hear
8  him say, when you first met up with him, to
9  contact incident command if you need an
10  assignment?
11    A    I didn't -- I didn't see -- I didn't
12  -- I mean, it's always possible that you don't
13  hear things.  I -- the communication was so
14  clipped between us, I -- I think I would have
15  stopped -- I think I would have stopped to try
16  to hear what he said or ask for clarification.
17  But I do not recall there being anything else
18  said at that moment.
19    Q    But it's possible that you guys didn't
20  hear things, each other's side; correct?
21    A    Sure.
22    Q    Okay.  At the time Mahler arrived, he
23  had a job to do; correct?
24    A    I'm assuming so, yeah.  I don't know
25  when he got his first assignment.  I don't

Page 1938

1  remember.
2    Q    You had been in and out of the
3  warehouse at least once already before he
4  arrived?
5    A    In and out, yes.
6    Q    Okay.  And I know during your
7  deposition there was some clarification that you
8  actually were in and out three times total, kind
9  of a second time was just a small in and out.
10  Do you recall that?
11    A    Yeah.  We just -- we just dipped into
12  the door and then walked along the wall a short
13  distance to make sure that the overhead was
14  clear.  Some people might not call that entry.
15  Some people do.
16         It was -- we didn't -- we didn't
17  really breach the wall.  We stayed onto the wall
18  when we walked.
19    Q    On the interior of the building?
20    A    Yes.
21    Q    Okay.  So the first time you went in
22  with your crew -- this is before Captain Mahler
23  had been in there -- you do what you need to do.
24  And then why did you exit that first time?
25    A    We got a new assignment.

Page 1939

1    Q    Okay.  What was that?
2    A    To assist with ventilation.
3    Q    Okay.  So the second time that you
4  said was just in along the wall.  Who was with
5  you?
6    A    I can't really remember exactly.  I'm
7  pretty sure Morgan Hurley was.
8    Q    Okay.
9    A    I don't recall.  I remember her being
10  like right behind me, but I don't remember if
11  Matt Roberts was there or not.
12    Q    Okay.  And this is before Captain
13  Mahler had gone with this crew?
14    A    Before we all?
15    Q    Yes.
16    A    Yes.  This was -- this was right after
17  I met him at the A/B corner.  We went back and
18  then we went in that door real quick and went
19  along the wall and then came right back out.
20    Q    So when you exited the first time, you
21  didn't have any trouble exiting, did you?
22    A    We followed a hose line out the first
23  time.  Then we were able to follow the hose line
24  out without any problems.
25    Q    And as Matt Roberts testified, that

Page 1940

1  was at his suggestion, wasn't it?
2    A    I don't recall at this point.
3    Q    Is that possible?
4    A    Sure.  Yeah.
5    Q    And you didn't have any trouble going
6  out at that time?
7    A    No.
8    Q    Okay.
9    A    All --
10    Q    I'm sorry.
11    A    No.  Like I said, we followed the hose
12  line out.
13    Q    And you could -- Roberts and Hurley
14  both testified that you could see the doorways.
15  Do you dispute that?
16    A    At which point?
17    Q    The first time you exited.
18    A    You cannot -- so like Mahler testified
19  and like Mike Wright testified, it depended on
20  where you were at.  If you were close to the
21  trash compactor, the visibility was worse.  So
22  you could walk along that hose line or walks
23  toward that door.  And at some point you were
24  close enough to it where you absolutely could
25  see the outline of the door.

Page 1945

1     asked, yeah, if they needed -- I believe I said
2     something along the lines if they needed us to
3     assist with ventilation.
4         Q   Back on the conditions in the
5     building.  The first time you were in there you
6     claim you saw skylights at the top of the
7     building in the warehouse; correct?
8         A   I don't -- I honestly don't remember.
9     I remember Matt Roberts saying something about
10    skylights.  I don't remember specifics.
11        Q   So you -- you don't recall seeing them
12    yourself?
13        A   I don't -- I don't remember.  I mean,
14    that was -- I might have -- I might have
15    remembered better closer to the fire.  But I
16    don't -- at this time don't remember.
17        Q   Captain Mahler told you, outside of
18    the building of the fire, that he was going to
19    open an overhead door; correct?
20        A   Truck 8 was going to open, something
21    along those lines.
22        Q   So he told you what needed to be done;
23    correct?
24        A   I think -- I took that as him just
25    saying like this is first step of ventilation.

Page 1946

1     That was my interpretation.
2         Q   Okay.
3         A   We're going to open this door or these
4     doors.  Something along those lines.
5         Q   And you reported to Commander Faust
6     that you had contact with him on the Charlie
7     side.  That's not disputed?
8         A   The -- the Alpha/Bravo corner?
9         Q   Yeah.
10        A   Yeah.  The Alpha/Bravo corner is when
11    he told me that, yeah.
12        Q   Okay.  And he had said something about
13    opening doors?
14        A   Yeah.  Something along those lines.
15        Q   Okay.
16        A   I wrote it down.  It's in one of those
17    e-mails.
18        Q   By this time he's still not entered,
19    but you've been there twice in the warehouse?
20        A   No.  Just once.
21        Q   Okay.  When did you go in along the
22    wall?  After this?
23        A   Yes.  I went in along the wall to see
24    if the overhead was clear behind the doors.
25        Q   Okay.  So you had more knowledge of

Page 1947

1     the scene interior than he did; correct?
2              THE REPORTER:  I'm sorry.  I just
3     went blank.
4              MS. GUTTAU:  No problem.
5         Q   (By Ms. Guttau)  You had more
6     knowledge of the scene than he did because you
7     had been interior already; correct?
8         A   I -- yeah.  I mean, just of like smoke
9     conditions and kind of where the fire was.
10    But --
11        Q   And those are significant things to
12    observe?
13        A   Yeah.
14        Q   Right?
15        A   Absolutely.
16        Q   Okay.  So fair you went in and
17    assessed it when you first entered; correct?
18        A   Yes.
19        Q   And fair that he would do the same?
20        A   Everybody -- everybody is different.
21    Sometimes officers, when they get assigned
22    ventilation, don't have the ability to look
23    inside.
24        Q   Okay.
25        A   They just kind of go off of radio

Page 1948

1     reports or what they're observing conditions
2     from the outside.  So it's very regular that an
3     officer, like let's say that is doing
4     ventilation from the roof, it's very normal for
5     them not to go inside, never, and to see the
6     smoke conditions on the inside of the fire or
7     the fire conditions.  They just start
8     implementing their plan based on what they're
9     seeing.  It's a strategy.
10             So he could be doing -- like Shawn
11    Mahler, for example, could come up to a house.
12    He might not need to see the inside of that fire
13    to know where he wants to put the hole in -- in
14    the roof, because he can read where the smoke is
15    coming out.  He can read things from the
16    outside.  So we don't always have the luxury of
17    going in and looking.  So I mean --
18        Q   Let me specify.  So at this warehouse
19    though, you said you went in and you observed
20    smoke conditions where the fire was and you're a
21    truck captain; correct?
22        A   Yes.
23        Q   Okay.  So my question is, fair that
24    Captain Mahler would need time to, if he wanted,
25    to go in and assess the conditions just like you

Page 1949

1    did?
2        A   Yeah.  You kind of always run like a
3    constant assessment throughout it.  So he --
4    yeah.  If he wants to look at it, I'm sure
5    that's fine.
6        Q   Okay.  So the radio, you knew how to
7    ask for an assignment from incident command if
8    you weren't getting a response from Captain
9    Mahler; correct?
10       A   One more time.
11       Q   On the radio, you knew how to ask for
12   an assignment from incident command if you
13   weren't getting a response from Captain Mahler
14   or anybody else; right?
15       A   Did I know how to do that?
16       Q   Yeah.
17       A   To just use the radio?
18       Q   Yeah.  And to ask for an assignment if
19   you're unsure?
20       A   Yeah.  You could do that.  I wasn't --
21   I wasn't -- I didn't feel as though I was sure
22   of my assignment.  So -- but, yeah, you could
23   always contact command if you need to.
24       Q   If you weren't getting a response from
25   Captain Mahler, you knew how to ask incident

Page 1950

1    command; correct?
2        A   I could.  But I could also -- if I'm
3    close to somebody, I can continue to keep trying
4    to communicate with them in order to keep it off
5    the radio if it's not necessary.
6        Q   Why did you leave the warehouse the
7    second big time?  I guess not the time you went
8    in along the wall but the last time?
9        A   Matt Roberts' low air level.
10       Q   And you didn't have any problem
11   exiting at that time, did you?
12       A   No.  We -- I think we followed the
13   hose line for a little bit.  And then once you
14   got far away from the trash compactor, you could
15   see the door.  And I believe -- yeah.  I can't
16   remember exactly what distance I said that was
17   to Torrey Gerdes.  But I guessed just a little
18   walk from the trash compactor and then you could
19   see the doors, and then you could walk out, and
20   you didn't have to follow the hose lines.
21       Q   You didn't have to crawl out?  You
22   could just walk, you said?
23       A   Yeah.  Just walked.
24       Q   Okay.  And in your pre-disciplinary
25   meeting, and we can turn to it, you had stated

Page 1951

1    that you weren't as concerned with air levels,
2    you told the chief that, because you did not
3    believe you would be operating extensively
4    inside; is that true?
5        A   Yeah.  Yes.  Sorry.
6        Q   There is no LFR management policy that
7    says the words "assist with" that makes someone
8    a group supervisor, is there?
9        A   I don't believe that there's -- I
10   don't believe that that's -- it's normal
11   terminology used with LFR, but I don't think
12   that there's anything that specifically outline
13   what that means.  So I don't know -- I don't
14   know if there isn't anything that says that.  As
15   well as I don't know if there's anything that
16   does.
17       Q   Okay.  If you want to turn to --
18           MS. GUTTAU:  Can I pause a
19   moment?  What time would you like to take a
20   lunch break, sir?
21           THE ARBITRATOR:  Whenever you
22   guys want.
23           MS. GUTTAU:  Okay.  It's up to
24   you guys.  If you want to take one.
25           THE ARBITRATOR:  Let me ask you.

Page 1952

1    What else do we have today?
2            MS. GUTTAU:  I think just
3    Mr. Schrunk.  I think just one more witness,
4    pretty short.
5            THE ARBITRATOR:  Okay.
6            MS. GUTTAU:  I mean, I'm kind of
7    at a stopping point, if you want.  And then I
8    could finish the last half, hopefully less than
9    half.
10           THE ARBITRATOR:  All right.
11           MS. GUTTAU:  Or I can keep going.
12           THE ARBITRATOR:  Let's stop.  If
13   you're at a good point to stop, then we will
14   stop now.
15           MS. GUTTAU:  Okay.
16           THE ARBITRATOR:  How much time do
17   you guys want for lunch today?
18           MR. CORRIGAN:  Thirty minutes.
19           MS. GUTTAU:  Thirty.  Would
20   thirty work?
21           THE ARBITRATOR:  No.
22           MS. GUTTAU:  Forty?  Would
23   forty --
24           THE ARBITRATOR:  I've got a
25   couple of things to do.

Page 1989

1  out?
2       A   They were doing tasks that weren't
3  towards ventilation.
4       Q   Uh-huh.
5       A   Which is why I was asking Trent where
6  Mahler was and what's going on.  But Trent was
7  climbing -- climbing up the -- the -- a ramp to
8  a compactor.  And he yelled at one point for me
9  to hand him -- he handed me his halogen tool and
10  asked me -- he said he needed a hose, and I
11  helped facilitate getting the hose.
12           But shortly after that, Roberts --
13  Roberts' low air went off, so we just left.
14       Q   And you were in there about a total of
15  ten minutes at the same time as Captain Mahler
16  was; correct?
17       A   I do not know.
18       Q   Okay.  If that's what the record
19  shows, do you have any reason to dispute that?
20       A   Are you talking about the time stamps?
21       Q   Yes.
22       A   Because I know like when we talked
23  about time stamps, we were unable to really
24  determine when the clock started when Truck 8
25  and Truck 1 went interior together, because

Page 1990

1  neither of us -- if I remember correctly,
2  notified command that we were walking inside.
3           So I think it's kind of open-ended.
4  We don't really know how long -- as far as I
5  know, we don't really know how long we were in
6  there together.  More of people speculating it
7  was five minutes or it was fifteen minutes,
8  which is really subjective.  Time and distance
9  both are really subjective in a fire.
10       Q   If the record indicates it was around
11  ten minutes, do you have any records to refute
12  that?
13       A   What -- I guess I'm saying what --
14  what -- what's the record that says that?  Are
15  you talking about a statement?
16       Q   I'm talking about time stamps.
17       A   So what I'm saying is that neither
18  Truck 1 or Truck 8 made radio announcements that
19  we were entering the building together.  So
20  there's no way to determine how long that chunk
21  of time that was that we were in there together.
22       Q   Do you know how long you were in
23  there?
24       A   I don't know.  It's all speculative.
25       Q   Okay.

Page 1991

1       A   That's why I'm saying I don't
2  understand how the record could state that.
3       Q   You said you couldn't find him.  But
4  Captain Mahler wasn't required to stay by your
5  side, was he?
6       A   I'm sorry?
7       Q   You stated you couldn't find him at
8  some point during the fire.  So you were asking
9  Borchers.  But Captain Mahler wasn't required to
10  stay by your side, was he?
11       A   I don't know if there are requirements
12  like that.  I believe -- I had the expectation
13  that he communicated with me so I knew what was
14  going on.
15       Q   My question is, do you know of any
16  requirements requiring him to stay by your side?
17       A   I don't think there's any requirements
18  for anybody to -- I don't think that's a
19  requirement that's normal on a fireground.
20       Q   And his crew didn't even know where he
21  was for some portion of the time; correct?
22       A   Correct.
23       Q   Do you believe he abandoned them as
24  well?
25       A   No, I don't.  I assume that he had

Page 1992

1  communications with them and they kind of knew
2  what was going on.
3       Q   How many times did you approach Mahler
4  on the inside to ask him?
5       A   I'm not sure.  Several.
6       Q   Several as in three, or do you have
7  any way to estimate?
8       A   Numerous times.
9       Q   Okay.
10       A   We had a walking commentary.  So as we
11  walked, I tried to communicate with him by his
12  side.  I can't determine when one of those
13  contacts becomes another one.
14       Q   And part of the time you're inside
15  though.  You couldn't find him, so you weren't
16  talking to him, of course, then; correct?
17       A   Correct.
18       Q   Okay.  What exactly about his failure
19  to communicate at this fire do you claim could
20  have killed you here, if that's what you're
21  claiming?
22       A   So failure to communicate is one of
23  the leading causes of firefighter death.  So not
24  outlining a game plan for ventilation, for
25  example.  That can lead to an unintended fire

Page 1993

1   event.  It could be dangerous for everybody on
2   the fireground.  If there's essential
3   communication such as what the vent strategy is
4   between two rigs who are trying to execute
5   ventilation, that can create a whole bunch of
6   issues.
7           And failing to communicate in general
8   on a fireground means that I don't have
9   confirmation of my assignment from him.
10  Regardless of whether you say that he can give
11  me one or not, I had the right and a reasonable
12  expectation to at least be told that he believed
13  I was confused or to open up that dialogue so
14  that we could figure out what was going on or
15  for him to make sure if he had said, contact
16  Battalion 1 for assignment, and I just didn't
17  hear him.
18          My continued attempts to communicate
19  with him would indicate that I didn't catch that
20  transmission.  And at that point, it's still
21  important to say, hold on.  Contact incident
22  command.  You're confused.
23          Because when you knowingly have
24  somebody who -- who you know they are confused
25  in a fireground and they are coming to you with

Page 1994

1   -- whether it's wrong or right -- the idea or
2   impression that they were responding to you and
3   you ignore them because you think it's not your
4   problem or you don't like them or whatever
5   reason and you walk away, that person, one,
6   confusion, disorientation in a fireground is
7   incredibly dangerous and it leads death.  But,
8   two, somebody could be having a medical
9   emergency.
10          Any number of things could be causing
11  disorientation or confusion on a fireground.
12  And if you just walk away from somebody who is
13  obviously confused or has a different
14  understanding than you are, then that absolutely
15  can result in death and absolutely is your
16  responsibility.
17      Q   Okay.  And I wasn't asking about
18  potential.  So let me clarify.  What exactly
19  about Captain Mahler's failure to communicate at
20  this particular fire where everybody else on
21  your crew and his crew said they had no safety
22  concerns could have killed you?
23      A   I had safety concerns, which I
24  outlined in my report.  And like I said, failing
25  to communicate can lead to disorientation.  This

Page 1995

1   can lead to a number of issues or situations.
2           Situational awareness that is not
3   fully grasped by another individual, that could
4   essentially be remedied by communication.  Those
5   things can all lead to a dangerous situation and
6   firefighter death and firefighter injury.  It's
7   well-documented.
8       Q   Could have potentially is what you're
9   saying?
10      A   Which is what -- which is what I
11  have -- I have said -- what I've said since the
12  beginning.  This could result in this situation.
13  This could result in these things happening.
14      Q   But you did allege he abandoned you in
15  a dangerous warehouse fire, in this particular
16  fire; correct?
17      A   Correct.
18      Q   You also stated you were -- were your
19  questions to him just about what your assignment
20  was?  Is that what you were asking him?
21      A   I don't recall.  I -- I said -- I
22  asked what the game plan was.  Reiterated
23  Truck 1 is assigned to assist.  Asked what --
24  what -- what they want us to do.  What he wants
25  us to do.  And like I said, I documented all --

Page 1996

1   all of the things that I reported.  Closer to
2   the time of the fire and talked about them with
3   Torrey Gerdes.
4       Q   How does Captain Mahler not giving you
5   an assignment equate to abandoning you?
6       A   I didn't say he just didn't give me an
7   assignment.  I said he refused to talk to me in
8   the interior of the fire.  So I perceive that as
9   abandonment because I have the expectation and
10  I'm under the impression that he's my supervisor
11  at that point and he's refusing to talk to me.
12          At no point until I listen to that
13  radio traffic with Torrey Gerdes did I learn
14  that the actual word "group supervisor" was not
15  used.  I was not aware of any of this
16  beforehand.
17          And nobody told me that I was
18  misunderstanding incident command or that I was
19  misstating or misrepresenting anything.  And
20  there was ample opportunity for someone to come
21  to me and say, hey, you've got this wrong or you
22  were off on this.  Nobody ever came to me to say
23  that.
24          So when I'm -- when we're talking
25  about the potential and what I said and what my

Page 1997

1  expectations for communications were --
2      Q   So you weren't aware that the words
3  "group supervisor" weren't used until you
4  listened to it with Torrey Gerdes.
5      A   Yeah. It's probably around the time.
6  See, I never listened to the radio traffic at
7  all until -- until it was given to me by Torrey
8  Gerdes, which was months later, I think.
9      Q   As a captain though, you have access
10 to any of the recordings of any fire scene;
11 correct?
12     A   I don't think so.
13     Q   If that is the policy, do you have any
14 evidence to dispute that?
15     A   I have never heard -- no one has ever
16 told me how you can get ahold of these things.
17 I was given radio traffic one time, but it was
18 not a normal thing. And I did not know how to
19 go about doing that nor did I ever expect that
20 this would be needled down to such a specific
21 thing instead of focusing on the failure to
22 communicate, which was my concern. So I at --
23 at no point until after my Torrey Gerdes
24 interview was I even aware that my terminology
25 of using "group supervisor" was even coming into

Page 1998

1  question.
2      Q   So even though you weren't aware or
3  weren't sure that was the right terminology, you
4  still put it in your affidavit to the court
5  seeking to have Captain Mahler removed from his
6  position?
7      A   That's not what I just said.
8      Q   But you did put it your affidavit?
9      A   Hold on. What you just said before
10 that, restate that, would you?
11     Q   So you said you hadn't -- you weren't
12 aware until you listened to the reporting with
13 Torrey Gerdes that the words "group supervisor"
14 were not used?
15     A   Correct.
16     Q   Okay. But you put in your affidavit
17 that that was a fact that he was your group
18 supervisor?
19     A   Correct. Because of what I had
20 testified to just a little bit ago. There can
21 only be one person in charge of ventilation --
22 of ventilation assignment. So that person would
23 be the group supervisor in my understanding.
24     Q   So then why was it significant to you
25 that you -- when you listened to the recording,

Page 1999

1  that was the first time you learned those words
2  were never used?
3      A   Because Torrey Gerdes brought it up to
4  me.
5      Q   But if those words don't matter, why
6  is it significant to you?
7      A   Because they still don't matter. And
8  it was significant to me because at that point I
9  realized that the focus was not even on my
10 safety concern. The focus was on whether or not
11 I used terminology that they agreed with.
12     Q   Okay. You said you didn't realize
13 they would be needling this down. But I mean,
14 you publicly alleged that Captain Mahler had
15 abandoned you and you didn't have to publicly do
16 that, did you?
17     A   Well, I reported it. And it wasn't
18 investigated. And then I felt as though my
19 safety was not being taken seriously. And I
20 felt that City Legal was controlling whether or
21 not the department actually investigated what my
22 safety concerns were. And so at that point my
23 attorney notified City Legal that there were
24 these concerns and notified City Legal that --
25 that an injunction would be filed after so much

Page 2000

1  time if things had not been addressed. And that
2  resulted in the injunction filed.
3      So if -- if you ignore my safety
4  concerns, I have every right to ring to
5  continuously the bell if I believe my safety is
6  at risk and I believe behaviors will continue
7  and just escalate and escalate.
8      And so by ringing the bell, that was
9  just another avenue. When I filed an injunction
10 or my attorney filed an injunction on my behalf
11 or however that works, I was running out of
12 options to be heard.
13     Q   But you had just filed a grievance a
14 day or two before that; correct?
15     A   I believe -- so I can't remember the
16 exact timeline. But I remember the City being
17 notified that an injunction would -- would
18 follow if it wasn't looked into.
19     Q   Okay. Let's look at your grievance
20 real quick so we've got the timeline down.
21     A   And those are two separate things
22 also. The grievance and the injunction are not
23 related.
24     Q   You asked for an independent
25 investigator in both of them, didn't you?

Page 2013

1    why didn't you express your concern that you
2    were abandoned in the structure, you said, I did
3    not discuss that concern with Faust until Kelly
4    days.  Would that be accurate that you not
5    discuss that with him until Kelly days?
6        A   I'm not -- this is based on me not
7    remembering exactly what I said to him at the
8    battalion car.  So I'm not sure when that --
9    that would have been first reported to Curt.
10       Q   Okay.  And as we sit here today, do
11   you have any reason to dispute what you
12   testified then?
13           MR. CORRIGAN:  Can we just
14   clarify that what you're reading from is the
15   transcript of the pre-disciplinary hearing from
16   October 12th of '21?
17           MS. GUTTAU:  Correct.  Yeah.
18           MR. CORRIGAN:  All right.
19           THE WITNESS:  Okay.  Go again.
20       Q   (By Ms. Guttau)  As we sit here today,
21   are you changing that timeline, or do you
22   believe that to still be accurate?
23       A   No.  I'm saying right here is when I
24   said I did not discuss that concern with Faust,
25   I did not remember specifically what was spoken

Page 2014

1    to him at the battalion car at the time.  So I
2    did not report that as an official time as I
3    reported that Mahler was not speaking to me.
4           After the course of the depositions
5    and the arbitration, when Curt testified that
6    that conversation did happen and shed some more
7    light on it, then I was able to recall better.
8        Q   But he didn't say that abandonment was
9    discussed?
10       A   I don't know -- I don't remember what
11   he said.  Do you have the transcript of that?
12       Q   I do.  But do you recall?
13       A   I -- I don't recall at this time.
14       Q   Okay.  You testified in your direct
15   that Chief Faust would regularly come up to you,
16   just in general, to make sure Captain Mahler's
17   communications with you were appropriate.  Do
18   you recall that?
19       A   Yes.
20       Q   So fair to say if that's on the
21   forefront of Chief Faust's minds -- mind, it
22   would be on the forefront of Captain Mahler's
23   mind to make sure he was complying with orders
24   and communicating appropriately?
25       A   I don't think Chief Faust's concerns

Page 2015

1    had anything to do with a no contact order.  I
2    think Chief Faust's concerns as he relayed them
3    to me were that I felt like that there was
4    adequate communications to stay safe on the
5    fireground.
6           I can't speculate as to what was on
7    the forefront of Shawn Mahler's mind.  I do know
8    that I never heard anything about this no
9    contact order until we were addressing -- or I
10   was attempting to address the failure to
11   communicate.
12          If there was a concern with
13   communication with -- between Shawn Mahler and I
14   on the fireground before this, it should have
15   been addressed right away.  I don't -- I do not
16   believe that -- it is my opinion, I do not
17   believe that he was worried about this.
18          I believe it was a convenient excuse
19   to excuse failing to communicate with me on a
20   fireground.
21       Q   That's your belief?
22       A   That's -- that's my -- that's my
23   suspicion.
24       Q   If your crew's lives were in danger,
25   you had a responsibility to tell them; correct?

Page 2016

1        A   That's kind of a vague question.  I
2    think it depends on the situation.  I think in
3    the triage process, we problem-solve first and
4    then communicate.
5           If -- if -- in this particular
6    situation, if I would not have been able to
7    orient, I believe it's important to communicate
8    with the crew.
9           However, while I'm problem-solving, if
10   I can fix it, there's no need for me to bring
11   anybody into the fold on that.
12       Q   But if you're going to put in a public
13   federal court filing that it wasn't just you but
14   also your crew whose lives were placed in
15   danger, fair to say you should have notified
16   them that their lives had been in danger?
17       A   I stand by what I just said.
18       Q   So I want to -- do you recall
19   approximately what time of day the fire --
20   warehouse fire was?
21       A   I don't -- I don't recall.  It was
22   before lunch, I believe.
23       Q   Okay.  If the time stamps show about
24   eleven -- or the articles, does that sound about
25   right, 11 a.m.?

Page 2017

1    A   Sure.
2         MS. GUTTAU:  Do you want to take
3  a break?
4         MR. CORRIGAN:  Yeah.
5         MS. GUTTAU:  We can take a break.
6  I saw John eyeing the clock, so we better take a
7  break.
8         THE ARBITRATOR:  How much time do
9  you need?
10        MS. GUTTAU:  Ten minutes.
11        MR. CORRIGAN:  Ten minutes.
12        (Recess at 2:00 p.m.)
13        (Resumed at 2:10 p.m.)
14        THE ARBITRATOR:  Ready?
15        MS. GUTTAU:  Yeah.  Sure are.
16        THE ARBITRATOR:  All right.  Hit
17  it.
18        MS. GUTTAU:  Okay.
19     Q   (By Ms. Guttau)  If you want to turn
20  to Exhibit 45 of the City's exhibits.  I'll have
21  you flip back to page 55.
22     A   (Witness complies.)
23        (An off-the-record discussion was had.)
24     Q   (By Ms. Guttau)  All right.  So
25  looking at Exhibit 45, page 55, at the -- at the

Page 2018

1  bottom of this, is this -- the bottom part has
2  an e-mail that goes onto the next page.  Is that
3  an e-mail that Ms. Witte sent you on April 26th
4  around 9:17?
5     A   It appears so, yes.
6     Q   Okay.  And then it looks like -- I
7  assume that's 9:17 in the morning because your
8  response is above at 3:54 p.m.; is that correct?
9     A   It appears so, yes.
10     Q   So in the bottom e-mail, she is
11  informing you about causing the retaliation
12  investigation pending the Lundvall
13  investigation.  And then in the second
14  paragraph, she says, as a side note on the
15  Mahler matter you reported last week, was that
16  the ladder training?
17     A   Most likely.
18     Q   Okay.  The chief had -- Battalion
19  Chief immediately contacted Captain Mahler and
20  plans to do some follow-up with identifying
21  parties today as well.  Then she says, please
22  just let me know if you have any questions or
23  concerns; correct?
24     A   Okay.
25     Q   Okay.  And then you e-mail back at

Page 2019

1  3:53 this afternoon -- that afternoon.  And so
2  this is presumably shortly after you got back to
3  the station from the fire; correct?
4     A   Could be.  I'm not sure.
5     Q   If the fire -- if the records indicate
6  that that happened at about eleven and you're
7  e-mailing her at 3:54, would you have been back
8  to the station by then?
9     A   If I'm e-mailing, I would assume so.
10     Q   Okay.  And so she sends you the
11  morning e-mail.  You go to the fire that's --
12  that's the subject of this claim that Captain
13  Mahler abandoned you; correct?
14     A   Correct.
15     Q   Okay.  And then at 3:54, so probably
16  within hours of you returning from that fire,
17  you respond to Aishah and you say, thank you for
18  reaching out and keeping me updated on the
19  process.  And thank you for updating me on the
20  Mahler issue; correct?
21     A   Yes.  That's what it says.
22     Q   Okay.  And then you go on to talk
23  about, you know, retaliation needs to stop, that
24  type of thing.  But you never mention that
25  Captain Mahler had just refused to talk to you

Page 2020

1  or abandoned you in a dangerous warehouse fire
2  just hours before, do you?
3     A   No.  I don't -- I don't put that in
4  here, no.
5     Q   Even though that's the very -- she's
6  e-mailing you about the very complaint that you
7  claimed he retaliated against you; correct?
8     A   Yeah.  And this is something that I
9  communicated with Chief Faust that evening about
10  -- and this is something that I continuously
11  communicated with him about.  I don't think I
12  had even unpacked it.  And this was about --
13  this was a response to an e-mail.  I don't think
14  it is -- I don't think I would have put it in
15  here.  I don't think I would have reported it to
16  anybody outside of any communication with Faust
17  until I continued to communicate about it with
18  Faust.
19     Q   So even at the end of your second
20  paragraph, you say, why is it that Captain
21  Mahler is able to repeatedly engage in this
22  behavior without being disciplined.  Above that,
23  you're referring to the ladder training.  You
24  include that statement, but you don't mention
25  that he allegedly had just done to you within

Page 2021

1    hours before?
2        A    This is talking about the ladder
3    training.  We're not talking about the warehouse
4    fire in this.  So this would just be ladder
5    completion training.
6        Q    But if that was that serious, as you
7    have since complained, it would certainly make
8    sense you would report that to Aishah when you
9    were discussing Captain Mahler, wouldn't it?
10       A    Not necessarily.  I would report it
11   after I understood it completely and
12   communicated with my superior officer about it.
13   And also, yeah, it was probably -- I mean, I
14   don't -- if I remember correctly, I don't think
15   Curt even got back to the station until late
16   that night.  My crew was still probably
17   rehabbing into the early afternoon.  It just --
18   I -- I wouldn't even speak on that until I had
19   had time to think about it and -- and reflect on
20   it and talk to the crew, talk to Faust.
21       Q    But just four days before, you had
22   immediately reported to her within thirty-six
23   minutes that you had heard a rumor that he was
24   talking about you; correct?
25       A    These are two -- correct.  But these

Page 2022

1    are two separate situations you're talking
2    about.
3        Q    Well, she's investigating that and you
4    just -- you don't mention it here at all, the
5    fire?
6        A    Correct, I don't mention the fire in
7    here.
8        Q    Do you understand why that may appear
9    suspicious when everything else you had reported
10   was immediate about him?
11       A    No.  I don't understand why that would
12   seem suspicious.
13       Q    Faust didn't make you -- didn't force
14   you to file a complaint, did he?
15       A    Faust advised me that I felt unsafe,
16   that it was serious and needed to be addressed
17   and had involved more people than just myself
18   and Mahler at this point.  And we communicated
19   about it pretty extensively, if I remember
20   right.  He advised me that I should report this.
21       Q    He didn't force you to, did he?
22       A    He's my supervisor, and he advised me
23   to do it.
24       Q    The question is, he didn't force you
25   to, did he?

Page 2023

1        A    I don't know.  No.
2        Q    Okay.  You would expect Faust to take
3    you at your word when you were talking to him
4    about the fire?
5        A    Yes.
6        Q    Okay.  And he never told you to lie,
7    did he?
8        A    No.
9        Q    Okay.  I want to look -- flip to
10   Exhibit 17.
11           MS. GUTTAU:  So this is City 17.
12   Let me get there.
13           THE WITNESS:  (Witness complies.)
14       Q    (By Ms. Guttau)  We've talked about
15   this before.  This is the Prime report; correct?
16       A    Yes.
17       Q    Okay.  And on page 3 at the bottom
18   where it says T1C?
19       A    Yes.
20       Q    That paragraph by T1C is what you
21   typed; correct?
22       A    Correct.
23       Q    And did you draft this document by
24   yourself?
25       A    Yes.

Page 2024

1        Q    And did you understand it was a legal
2    document?
3        A    Yes.
4        Q    You were not forced or told what to
5    include, were you?
6        A    No.
7        Q    Okay.  And did you include everything
8    that you believed was significant from the
9    warehouse fire?
10       A    I believe the Prime reports to be a
11   log of tactical actions.  And so I believed that
12   I put in my tactical actions.  So yes.
13       Q    Did -- you didn't mention Captain
14   Mahler in it, did you?
15       A    I believe I did mention -- reference
16   Truck 8.
17       Q    Okay.  And let me clarify.  You didn't
18   mention Captain Mahler endangering you, did you?
19       A    No.  I do not believe this is the form
20   for that.
21       Q    You didn't mention any safety issues
22   in your Prime report, did you?
23       A    No.  Again, I do not believe this is
24   the forum for that.  I had not been trained that
25   this was the forum for that anyways.

Page 2025

1    Q   So even if it's a big enough fact to
2 you to include in your request to a federal
3 judge to remove him from his job, you didn't
4 think it was important enough to include in the
5 Prime reports?
6    A   As I stated, I do not believe this was
7 the forum for that.  I believe that those
8 concerns are near-misses or -- or outside --
9 this -- I understood the Prime reporting system
10 to be a collection and a timeline of -- of tasks
11 and objectives completed at a fire.  I've never
12 had it explained to me other than that.
13    Q   Let's look at the middle of it where
14 there's a sentence that starts with T1 was
15 reassigned.
16    A   Okay.  I see it.
17    Q   It says, T1 was reassigned to assist
18 T8 with ventilation.  T1 assisted T8 with
19 opening another overhead door.
20       And so you indicated that that's what you
21 did and you did know and complete your
22 assignment of opening an overhead door; correct?
23    A   Our -- our extent -- Truck 1's extent
24 on that was just making sure that there was
25 clear -- clear -- like, that the door was clear

Page 2026

1 on the back side of it.
2    Q   And you did complete that?
3    A   Making sure it was clear?
4    Q   Yes.
5    A   Yes.  The door opened as we were
6 arriving to it.
7    Q   Okay.  Did you secretly tape-record
8 conversations with Chief Majors about incident
9 command systems?
10    A   I recorded many of my conversations
11 with command staff.
12    Q   Okay.
13    A   I wouldn't call it secretly.  I think
14 everybody knew that I recorded my discussions
15 with command staff.
16    Q   Did you always tell them you were
17 recording?
18    A   No.  Several times I just would put my
19 phone on record and set it on the table, as they
20 did the same.
21    Q   Did you tell Chief Majors you were
22 recording him?
23    A   I do not recall.
24    Q   Let's talk about -- let's turn to
25 Exhibit Gerdes report, which is 11.

Page 2027

1       MS. GUTTAU:  Exhibit 11.
2       THE WITNESS:  (Witness complies.)
3 Okay.
4    Q   (By Ms. Guttau)  Backing up from that.
5 You testified in your direct that, when you
6 filed your lawsuit, your attorneys told you that
7 the news can pick it up; correct?  Do you recall
8 that?
9    A   Are you talking about the first time I
10 testified in arbitration?
11    Q   Yes.  In your direct, I had down that
12 you testified to that.
13    A   Restate it, please.
14    Q   Yeah.  In your direct, you testified
15 that, when you filed your lawsuit, your
16 attorneys told you that the press can pick it
17 up.
18    A   Yes.  Sometimes they told me that
19 filings could end up in the news kind of a
20 heads-up because it gave me a lot of anxiety any
21 time it would happen.
22    Q   And yours was the third within a kind
23 of a two years period of time that was filed by
24 a firefighter against LFR; correct?
25    A   Yeah.  I think -- I think it's three

Page 2028

1 out of four maybe with fire.  And I think
2 there's eleven total between police and fire.  I
3 believe there's just four firefighters.
4    Q   Okay.  And you understood that the
5 prior lawsuits, including the one Mr. Giles
6 testified, had been reported in the courts;
7 correct?
8    A   Yes.
9    Q   And the courts, before you filed your
10 motion for injunction -- I'm sorry.  The papers
11 had reported on their lawsuits.
12       Let me clarify that question because I
13 think I misstated that.  You were aware that the
14 papers had reported on the Giles lawsuit;
15 correct?
16    A   To some extent.  I guess I'm not sure
17 if every single filing is reported by the news.
18 So --
19    Q   And the newspaper had reported about
20 your lawsuit on various occasions; correct?
21    A   At some point, yes.
22    Q   Okay.  And so you realized it would be
23 likely that the paper could pick up a serious
24 allegation that you're alleging that Captain
25 Mahler, defendant in this lawsuit, had been --

Page 2029

1  had abandoned you in a dangerous warehouse fire?
2  You knew that was a possibility?
3      A   For the -- for the filing for the --
4      Q   For the papers to pick that up?
5      A   For the motion for injunction?
6      Q   Yes.
7      A   I guess, yeah, probably.
8      Q   Okay.  So if you were outraged by what
9  you called public attacks by Matt Woitalewicz
10  made at the fire station, you surely recognized
11  the seriousness of this public attack, don't
12  you, against Captain Mahler?
13      A   I don't view it as a public attack.  I
14  view it as me having the right to -- having the
15  right to stand up for what I believe are
16  violations of my civil rights.
17          Whether you view it as an attack
18  against an individual is irrelevant to me
19  because this is my right to pursue.  So I don't
20  -- as far as I'm concerned, I -- I could care
21  less about the negative repercussions that the
22  media might have for me or Shawn Mahler because
23  I have an obligation to stand up for myself and
24  my rights.
25      Q   Okay.  You don't have a right to make

Page 2030

1  false accusations though, do you?
2      A   I guess that's a weirdly worded
3  question.  I think, should people make false
4  accusations?  No.  But could you reword that?  I
5  don't think that's a --
6      Q   Do you think it's appropriate to
7  publicly make false accusations?
8      A   No, I do not.
9      Q   I want to talk about the Gerdes report
10  now, R11.  So as we established earlier, you had
11  requested an independent investigator; correct?
12      A   Correct.
13      Q   To your knowledge, Ms. Gerdes was not
14  a City lawyer, was she?
15      A   No, she was not.
16      Q   She's from an outside firm?
17      A   Correct.  And if you -- so I Googled
18  -- I did an internet search on Torrey Gerdes
19  when I was -- found out that she would be the
20  person that would be investigating this.  And on
21  their website it's clear that they -- the firm
22  represents employers in defense of litigation in
23  reference of this -- the types of litigation
24  like I brought forth.
25      Q   Okay.  And so you assumed that made

Page 2031

1  her biased?
2      A   That's my opinion.
3      Q   Okay.  And you've accused her of
4  manipulating the auto recording of your
5  interview; correct?
6      A   I believe I brought -- I believe my
7  attorney notified City Law that there was issues
8  with the recording.  And City Law was given a
9  list of anomalies in the recording where
10  portions of my audio skipped and cut out.  And
11  then I was talking about something completely
12  different.
13          I do not know if there was ever any
14  response about this.  And then later on, I think
15  it might have been my pre-disciplinary hearing.
16  Could have been.  I brought up my concern and
17  supplied a list of these anomalies to Chief
18  Engler, and I can't remember exactly.  But I --
19  I pointed out that I believed that it hadn't --
20  been preserved properly.  I didn't know if it
21  had been edited.  But I believe that if -- if
22  those recordings were going to be used against
23  me, that they should have at least been properly
24  preserved so that things that I said wouldn't be
25  able to be taken out of context or

Page 2032

1  misrepresented.  That was my stance about those.
2          MS. GUTTAU:  So let's turn to
3  Exhibit 139.
4          THE WITNESS:  (Witness complies.)
5      Q   (By Ms. Guttau) So at the bottom, it
6  will be page 7, but it's transcript page 25.  So
7  transcript page 25, you stated in that first
8  line, someone has also edited the recordings.
9  Before that you were referring to Gerdes
10  recordings.  So are you alleging that she's the
11  one that edited the recording?
12      A   Just a second.  Okay.  So the next --
13  on the next page, page 26, it said, so that's an
14  example of chunks of my audio that have not been
15  properly preserved in this process.  As you can
16  see, like I said, I'll provide this to you.  I'm
17  assuming that's what that is supposed to say.
18  There's a significant amount of my audio that
19  has not been preserved from this interrogation.
20          I believe -- because I believe someone
21  edited the recording, these noticeable skips
22  include the one I just played for you.  I
23  thought I was hearing things as I was listening
24  to them but realized what I was hearing didn't
25  line up with the questioning and there were

Page 2065

1        Q   Okay.  If discipline has been reversed
2    and removed from a firefighter's file, what is
3    the union's position on whether or not that
4    should be used against them in the future?
5        A   I guess I'm not sure exactly what
6    you're talking about.
7        Q   So if Captain Mahler had a reprimand
8    that was later reversed and removed from his
9    file, as a Union representative you wouldn't
10   want the chief to count those reversed and
11   removed disciplines against a Union member,
12   would you?
13       A   I wouldn't think so.
14       Q   Okay.
15            THE ARBITRATOR:  What's the
16   relevance?
17            MS. GUTTAU:  Well, I think
18   because they were trying to offer that for
19   credibility.  And it seems like they're
20   reversing a position to support Ms. Benson
21   against another Union member in a way that will
22   be detrimental to all Union members.
23            MR. CORRIGAN:  If I could speak
24   to that, I would like to.
25            THE ARBITRATOR:  There's no

Page 2066

1    question to you, sir.  All right.
2            Well, go ahead.  I'll try to
3    follow.
4            MS. GUTTAU:  Okay.  That was all
5    my questions on that.
6        Q   (By Ms. Guttau)  Benson's complaints
7    have been the reason -- as you heard the
8    testimony today that several of your Union
9    members were removed from their stations for a
10   time or placed on leave; correct?
11       A   Correct.
12       Q   Captain Roof is a Union member;
13   correct?
14       A   Correct.
15       Q   Matt Woitalewicz?
16       A   Correct.
17       Q   And Captain Mahler?
18       A   Yes.
19       Q   Okay.  And there were questions --
20   this is way back in August -- or sorry, June,
21   where Mr. Corrigan asked Chief Engler if the
22   removal of the firefighters for discipline is
23   about the same as like a USAR deployment.
24        But USAR deployments are just fourteen
25   days usually; correct?

Page 2067

1        A   I'm not a part of USAR.  We don't
2    represent them.  I don't know.
3        Q   Okay.  USAR penalties aren't punitive,
4    are they?
5        A   No.
6        Q   No.  Okay.  Is removal of your Union
7    members from their stations for disciplinary
8    investigations viewed as punitive by your
9    members?
10       A   It probably is by our members.
11   Typically it's for their own protection, for
12   their own good.
13       Q   Does the Union push for cohesion in
14   having their people stay together at stations
15   they work at?
16       A   Of course.
17       Q   Okay.  Can it affect your Union
18   member's morale when they are moved away from
19   their crew?
20       A   Yes.  I suppose it can.
21       Q   Okay.  A couple of weeks ago, Ms.
22   Benson testified that she had concerns about
23   Chief Faust's stories, and she suggested he was
24   retaliated against when Chief Majors was
25   promoted before him.  But you had told even on

Page 2068

1    behalf of -- as a Union president had told Chief
2    Engler at the time that Mark Majors was the guy
3    to promote; correct?
4        A   I did.
5        Q   Okay.  There was no conspiracy theory
6    as far as you were aware to keep Faust out, was
7    there?
8        A   No.  Not at all.
9        Q   You sat in on the thirteen hours or so
10   of the interview by Torrey Gerdes with Ms.
11   Benson; correct?
12       A   I did.
13       Q   Okay.  Did you believe in what you
14   observed that Ms. Gerdes conducted herself in a
15   manner that appeared to you to be fair and
16   impartial?
17       A   Yeah.  I thought it was ridiculous you
18   can ask somebody that many -- same questions
19   that many times to keep somebody in there for
20   thirteen hours.
21        But I -- I think Amanda was honest,
22   and I think it was a -- very thorough.
23       Q   Okay.  She claims that Ms. Gerdes
24   manipulated the audio taping.  Did you see --
25   did you ever observe any behavior by her that

1  But the -- but we do find out that -- that there
2  is validity to the things that the -- the issues
3  she's had in those cases.  At least to some
4  extent.
5          THE ARBITRATOR:  Was there like
6  discriminatory allegations?  Is that what you're
7  talking about?
8          THE WITNESS:  In my opinion, I
9  wouldn't say discriminatory.  I would say more
10  to -- to find a word for it.  More things that
11  shouldn't be said.  Maybe more is to -- you
12  know, if they don't like her or things about
13  her, not necessarily her being a woman or
14  anything else, but more -- more --
15          THE ARBITRATOR:  Personality
16  clashes?
17          THE WITNESS:  Right.
18          THE ARBITRATOR:  Okay.  Okay.
19  I'm good -- I'm good with that.  Go ahead.
20          REDIRECT EXAMINATION
21  BY MS. GUTTAU:
22      Q   Okay.  Just a couple of follow-up also
23  on that same vein.
24       You didn't -- the Union didn't
25  investigate Ms. Benson's allegations against the

1  former mayor, the current mayor, Chief Jones,
2  Chief Linke, Chief Benisch, Captain Merryman,
3  Dan McDaniel, or Tom Cassidy, did it?
4      A   We did not.
5      Q   Okay.  So you don't have an opinion on
6  the credibility of those, do you?
7      A   I don't.
8      Q   Okay.  And you don't -- the Union
9  didn't investigate the allegations against Chad
10  Roof, did you?
11      A   No.
12      Q   Or the ones against Matt Woitalewicz?
13      A   We aren't in the investigatory
14  business so much.
15      Q   Okay.  So when you say you think they
16  could have some basis, you don't -- you haven't
17  done any investigations?
18      A   Only -- only what I hear from those
19  members.
20      Q   Okay.  You don't have any -- is the
21  Union claiming that Chad Roof and Matt
22  Woitalewicz discriminated against Ms. Benson?
23      A   I wouldn't say it's discrimination.
24      Q   That Brady Papik -- are you claiming
25  that Roof or Matt Woitalewicz retaliated against

1  her?
2      A   No.
3      Q   Okay.  Same with Brady Papik, you are
4  not claiming that he discriminated or
5  retaliated?
6      A   No.
7      Q   And you haven't investigated her
8  complaints against Captain Mahler, have you?
9      A   No.
10      Q   How about the complaints against the
11  City work comp administrators, did the Union
12  look into that at all?
13      A   I don't think we were ever informed of
14  that.
15      Q   Okay.  You stated after the
16  pre-disciplinary hearing, you had the impression
17  it was just a difference of opinion between two
18  employees.  But it wasn't just two employees.
19  It was Ms. Benson's story versus Mahler and the
20  other members of the crew, which are all Union
21  members; correct?
22      A   Correct.
23      Q   Okay.  And no reason to think that
24  they're not credible?
25      A   No.  I think they're credible.

1      Q   Okay.  And so at that point this one
2  versus eight story, she had gone public with it
3  and accused Captain Mahler of abandoning her in
4  a public filing, hadn't she?
5      A   Yeah.
6      Q   And that's a really serious violation
7  for a firefighter?
8      A   Oh, it certainly is.
9      Q   It affects their career and their
10  reputation?
11      A   It does.
12      Q   Is trust critical in firefighting?
13      A   It is.
14      Q   If Matt Roberts and Morgan Hurley
15  testified that they would have concerns about
16  returning to work with her, do you take those
17  Union members' concerns seriously?
18      A   Of course.
19      Q   Okay.  You stated that it was voted
20  unanimously to pursue the arbitration.
21          MR. CORRIGAN:  No, he did not say
22  that.
23          MS. GUTTAU:  He did.  Yeah, he
24  did.  Yeah.
25          MR. CORRIGAN:  Then I withdraw

Page 2081

1    that.  I thought he said --
2        Q   (By Ms. Guttau)  Didn't you?
3        A   I think so.  Yeah.
4        Q   Okay.  And my question is, when you
5    say unanimous, who are you referring to?
6    Like --
7        A   Our ten executive board members.
8        Q   Okay.  And so who are -- Do you know
9    who those ten are?
10       A   We have Ryan, of course, Ryan Moser,
11   Phil Lewiston, Aletha Burt, Marie Hillabrand,
12   Mike Wright, Trevis Schroeder, Andy Evans, Nate
13   Caldwell, and myself, of course.
14       Q   Okay.  And so your testimony is that
15   they unanimously voted to pursue this
16   arbitration?
17       A   Yes.
18       Q   And you didn't put it to the vote of
19   the membership, did you?
20       A   That's not the way our process works.
21       Q   Okay.  Has Ms. Benson threatened to
22   sue the Union?
23       A   I don't believe so.
24       Q   Okay.  Not at any time has she or her
25   attorneys threatened to sue the Union?

Page 2082

1        A   No.  I don't believe we've had that
2    threat.
3        Q   Any communications to that effect?
4        A   No.  Kelly Brandon always concerns me,
5    but not to that effect.
6        Q   And Kelly is her attorney?
7        A   Yeah.
8            MS. GUTTAU:  Nothing further.
9            THE ARBITRATOR:  All right.  So
10   where are we?
11           MS. GUTTAU:  We are done.
12           MR. CORRIGAN:  We're done.
13           THE ARBITRATOR:  No way.
14           MR. CORRIGAN:  Way.
15           THE ARBITRATOR:  All right.
16           THE REPORTER:  Are we on or off?
17           MR. CORRIGAN:  Off.
18           (On September 6, 2022, at 3:35
19   p.m., the proceedings concluded.)
20
21
22
23
24
25

Page 2083

1            C E R T I F I C A T E
2    STATE OF NEBRASKA )
                        )ss
3    COUNTY OF DOUGLAS )
4        Quinn's Quality Reporting, Ltd, Certified
5    Court Reporters and General Notary Publics for
6    the State of Nebraska, do hereby certify that
7    the hearing as above set forth was reduced to
8    print by transcription of our machine shorthand
9    notes;
10       That the within and foregoing hearing was
11   taken by us at the time and place herein
12   specified;
13       That we are not counsel, employee or relative
14   of either party or otherwise interested in the
15   event of this suit.
16       IN TESTIMONY WHEREOF, on behalf of Quinn's
17   Quality Reporting, Ltd, I have placed my hand
18   and seal this 3rd day of October, 2022.
19
              VICKIE L. QUINN
20            GENERAL NOTARY PUBLIC
21
22
23
24
25