IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

AMANDA BENSON,            )
                                    )              4:18CV3127
         Plaintiff,        )
                                    )
vs.                           )    **PLAINTIFF'S STATEMENT OF**
                                    )    **ADDITIONAL MATERIAL FACTS**
THE CITY OF LINCOLN, a political   )
subdivision, CHRIS BEUTLER, TOM   )
CASADY, DOUG MCDANIEL, TIM    )
LINKE, LEO BENES, ERIC JONES,    )
DARREN MERRYMAN, and SHAWN   )
MAHLER,                       )
                                    )
        Defendants.

COMES NOW the Plaintiff, AMANDA BENSON, and submits the following Statement of Additional Facts relevant to Defendants' Motion for Summary Judgment.  **LFR's Long History of Sex Discrimination and Retaliation**

**City Workplace Survey**

1.      In 2012, LFR employees completed a workplace harassment survey initiated by City EEO Officer Kimberly Taylor-Riley and Director of Personnel Doug McDaniel. (Doc. 115-10).

2.      Two Battalion Chiefs reported that LFR administration acted in a retaliatory or discriminatory manner.  One of them wrote in response to a question about discrimination that he had witnessed:

> "Retaliation can be a factor.  I just know I only have a few months before retirement and can't wait to leave (note: that this last statement could ID me if anyone in LFR reads this!!)  There is a fine line between just being a crappy condescending boss and discriminating acts or behaviors."
>
> (Doc. 115-10 at CM/ECF p. 18 at #58).

3.      A male Firefighter said reported the mistreatment of a female during her preceptorship to his Captain *three separate times*. (Doc. 115-10 at CM/ECF pp. 10-11, at #20).

4.      Battalion Chief for Human Resources Jeannie Pashalek wrote:

"I believe there are subtle occurrences on a daily basis ranging from ignoring others, comments or jokes, to actual isolation in some cases. Our middle managers really need training on EEO since they are the front-line managers in the stations. The training must also be for all personnel but starting with the captains in the front line 'defense.'"

(Doc 115-10 at CM/ECF p. 8, at #62).

5.      In response to a question about how LFR make improvements regarding discrimination or sexual harassment, Pashalek wrote:

The first step is awareness, followed by education and training, and lastly is the accountability with zero tolerance. Last year we had training due to a grant, but it had been years before that. Our department is a white male dominated culture that believes they treat people fairly, but women are subjected to a lot of subtle harassment/discrimination. The women are too concerned about getting along and not being considered a troublemaker by their peers so they will not report issues. I hear about them and I know several of our women have or currently are experiencing issues. Having a confidential process for reporting will be a huge improvement. We should contract with Cultural Bridges to Justice for training starting next year. If we get multiple agencies to split the cost, it will be affordable.

(Doc. 115-10 at CM/ECF p. 21 at #48).

**Discrimination and Harassment of Sara Khalil**

6.      In 2011 Sara Khalil began her employment with LFR as a trainee and then probationary firefighter. (Doc. 385-11, Ex. 136 at CM/ECF p. 12, 295:12-14). Khalil experienced repeated harassment and discrimination that were documented and reported to supervisors. (Doc. 115-4 at CM/ECF p. 8-10); (Doc. 385-11, Ex. 136 at CM/ECF p. 13, 298:25-302:7; 303:4-311:24).

7.      Captain Troy Hurd reported the mistreatment to Battalion Chiefs Roger Bonin and Leo Benes. (Doc. 115-4 at CM/ECF p. 1 and p. 8).

8.      Before Kahlil even started her probationary period, LFR leadership had decided to make sure she would fail.  Chris Jones was assigned to be her preceptor.  (Doc. 385-11, Ex. 136 at CM/ECF p.2, 264:2-165:8).  Before he had even started precepting Kahlil; Chief Benes, Jamie Pospisil, and others directed Jones to document every negative thing she did because they expected her to sue them *after* they get rid of her. (Doc. 385-11, Ex. 136 at CM/ECF p. 3, 265:24-268:1). Jones submitted a complaint regarding the discriminatory mistreatment.  (Doc. 385-11, Ex. 136 at CM/ECF p. 6, 268:2- 272:20).

9.      Pospisil made comments like, "We live in America.  We speak English.  She can get in fucking line with that." (Doc. 385-11, Ex. 136 at CM/ECF p. 23, 892:1-896:1). Pospisil gave preferential treatment to a Caucasian probationary firefighter by providing her additional time to become proficient.  (Doc. 385-11, Ex. 136 at CM/ECF p.27, 896:2-897:23).  Tony Hewitt, who took over precepting when Jones went on medical leave, told Kahlil to "Go back to Iraq," and threatened to stab her in the neck with a pencil if she asked anymore questions.  (Doc. 385-11, Ex. 136 at CM/ECF p. 19, 303:21-304:9).

10.     Hurd and Captain Brian Giles also reported Kahlil's mistreatment to Chiefs Bonin, Benes and Pashalek.  (Doc. 143-36 at CM/ECF p. 1, ¶4); (Doc. 385-11, Ex. 136 at CM/ECF p. 33, 1022:21-55:23).

11.     Nevertheless, as planned, Defendant fired Kahlil in February 2012.  (Doc. 385-11, Ex. 136 at CM/ECF p. 21, 309:25-310:1).

**LFR Retaliates Against Hurd and Giles**

12.     Following his complaints on Kahlil's behalf, LFR disciplined Hurd in March 2012, August 2012, July 2013 and March 2014.  Fire Chief John Huff also refused to allow him to ride out of grade, which resulted in a loss of money and leadership opportunities.  (Doc. 115-4 at CM/ECF p.1).  Hurd's discipline was in retaliation for reporting the discriminatory treatment of Kahlil. (Doc. 115-4 at CM/ECF p. 1-2).

13.     Chief Bonin attended a meeting with City Director of Public Safety Tom Casady. (Doc. 385-11, Ex. 136 at CM/ECF p. 29, 900:6-901:7).  Bonin indicated he had gotten an "ass-chewing" because of Hurd. (Id.) After that, Bonin's attitude toward Hurd changed.  (Doc. 385-11, Ex. 136 at CM/ECF p. 30, 901:9-901:7). Through others, Chief Benes sent a message to Hurd that he should just "quiet down." (Doc. 385-11, Ex. 136 at CM/ECF p. 31, 902:8-25).

14.     As part of Taylor-Riley's investigation into Captain Hurd's internal EEO complaints, Captain Giles was interviewed multiple times. (Doc. 143-36 at CM/ECF pp. 1-2, ¶¶5-6). Giles provided factual support for Hurd's allegations of illegal retaliation and provided Taylor-Riley assistance in locating documents and other information.  (Id.)

15.     Hurd reported numerous instances of retaliation to City officials during Taylor-Riley's investigation, but the City did nothing to address or remedy them. (Doc. 115-4, generally).

16.     In July 2013, at a Command Staff meeting, Assistant Chief Borer called Hurd a "f'in idiot" and said he wanted to tell Hurd that he would never be promoted or able to serve as an EMS Supervisor because he had complained to the Nebraska Equal Opportunity Commission ("NEOC"). (Doc 115-4 at CM/ECF pp. 41-42;  p. 56, ¶¶2-3).

17.     In September 2014, Captain Giles applied to be placed on a promotions list to a Battalion Chief position if one became available.  (Doc. 143-36 at CM/ECF p. 3, ¶13). The candidates were ranked and scored based on their background, education, performance of certain

tasks and an interview process. Giles received a 74, the highest score of all the candidates. The next highest candidate scored 58. (Doc. 143-36 at CM/ECF p. 3, ¶13, and p. 5 ¶22-30); (Doc. 384-39, Ex. 114). Director Casady acknowledged that under the circumstances he would have a hard time promoting anyone other than Giles. (Doc. 385-3, Ex. 128 at CM/ECF p. 4-5, 16:12-18:14).

18.    Nevertheless, the City failed to promote Giles. (Doc 143-36 at CM/ECF pp. 5-6, ¶ 25).

19.    Giles complained the failure to promote him was retaliatory, but his complaints were never addressed. (Doc. 383-14, Ex. 13 at CM/ECF p. 25, 100:14-25); (Doc. 385-16, Ex. 141); (Doc. 383-14, Ex. 13 at CM/ECF p. 26, 101:21-102:8).

20.    Hurd also applied for the promotions list. (Doc. 385-5, Ex. 130). During the promotional process, Hurd raised concerns about how the process could be fair given his retaliation allegations against the Command Staff members who would be evaluating him. (Doc. 385-4, Ex. 129); (Doc. 380-78, Ex. 168 at CM/ECF pp. 3-4).

21.    On October 24, 2014, Taylor-Riley completed her investigation into Captain Hurd's complaints. She found that LFR retaliated against Hurd. (Doc. 115-4 at CM/ECF pp. 63-64). Her report listed Giles as a witness. (Doc. 115-4 at CM/ECF p. 5).

22.    Taylor-Riley reached the following conclusions:

Reasons advanced by LF&R are a pretext to cover retaliatory motive (reason is not believable, similarly situated individuals who did not oppose discrimination or participate in the EEO process were treated differently.)

In the instant matter:

1.    The Complainant received a reprimand for leaving a meeting that he was not ordered to either attend or remain at;

2.    He was given a verbal warning followed by an EIR for damage or potential damage to E11, but the evidence reveals that the pump was not damaged or at real risk for such by his crew's actions;

5

3.      He received the most severe sanction that was given for the logbook error even though he had not had prior discipline for this conduct in the past and the person that had been disciplined for the conduct previously got the same level of penalty, not a more severe one; in the second instance, Complainant was disciplined when he discovered the error of another Firefighter and made an error himself trying to correct it; and

4.      The Complainant has been precluded from acting out of grade as a Battalion Chief when others have been allowed to do so without complying with the restrictions placed upon Complainant.

Based upon the foregoing analysis, it seems that the reasons proffered by LFR are pretext for retaliation.

*The EEO is of the opinion that the conduct detailed herein is the direct result of a retaliatory environment that is further impaired by a lack of consistent discipline, lack of communication on the administrative level (chief to chief), lack of communication from the administrative level to the rank and file, and a lack of trust at all levels.  These are not issues that can be easily addressed through training or discussion.  These are issues that reflect on overall environment that does not easily lend itself to change.  The EEO would suggest that whatever intervention is sought a supervisor/gatekeeper/facilitator be put in place and given the power to enact new procedures that are needed to bring the necessary changes to fruition through global implementation within LFR.*

(Doc. 115-4 at CM/ECF pp. 63-64).

23.      Battalion Chief Darrell Murrell told Taylor-Riley, "As far as whether or not the current processes result in retaliation toward employees/rank-and-file Firefighters, (this Battalion Chief) feels that it is a retaliatory state. (Doc. 115-4 at CM/ECF p. 61); (Doc. 383-67, Ex. 66 at CM/ECF p. 1, ¶3-4).

24.      In a subsequent interview with Taylor-Riley, Murrell reported that in February 2014 Chiefs Borer and Bonin were upset that a member of the command staff told Taylor-Riley about how Borer had disparaged Hurd.  (Doc. 115-4 at CM/ECF p. 62); (Doc. 383-67, Ex. 66 at CM/ECF p. 1, ¶3-4). Taylor-Riley found this was direct evidence supporting the conclusion that the environment was retaliatory. (*Id.*)

25.     In February 2019, a federal jury found that the City of Lincoln had illegally retaliated against Hurd and assessed more than a million dollars of damages.  (Doc. 172-8).

**City's Policymakers, Supervisors, EEO Ordinances and Policies Are Completely Ineffective at Preventing or Remedying Harassment, Discrimination and Retaliation**

**The Executive Branch**

26.     The Mayor of the City of Lincoln is the individual ultimately responsible for making sure that employees are not illegally harassed, discriminated against, or retaliated against. (Doc. 385-22, Ex. 147 at CM/ECF p. 3, 5:22-12); (Doc. 334-17 at CM/ECF pp. 14-15, 55:7-57:5) and is the head of the executive branch. The head of the Executive Branch for the City of Lincoln is the Mayor. City of Lincoln, City Information, Mayor's Office, https://www.lincoln.ne.gov/City/Mayor (last visited May 24, 2023).

27.     Chris Beutler was the Mayor of the City of Lincoln from 2007 until May of 2019.

28.     City of Lincoln, City Information, Mayor's Office, Past Mayors, 51st- Chris Beutler,  https://www.lincoln.ne.gov/City/Mayor/Past-Mayors#section-1 (last visited May 24, 2023).

29.     Leirion Gaylor Baird is the current Mayor of the City of Lincoln, a role she has held since May of 2019. City of Lincoln, City Information, Mayor's Office, https://www.lincoln.ne.gov/City/Mayor (last visited May 24, 2023).

**Directors/Department Heads**

30.     Retired Public Safety Director Tom Casady supervised Lincoln Fire and Rescue (LFR) from 2014-February. (Doc. 385-10, at CM/ECF pp. 1-5); See also: *Tom Casady announces retirement after decades of service to Lincoln*,  10/11 Now (Feb. 19, 2019 at 10:37 AM), https://www.1011now.com/content/news/Tom-Casady-announces-retirement-after-decades-of-service-to-Lincoln-506044311.html (last visited May 24, 2023).

31.     Retired Director of Human Resources Doug McDaniel served in his role for the City of Lincoln from 2012 through his retirement in January of 2022. (Doc. 384-14, at CM/EF p. 3, 11:1-3, p. 2, 6:10-18); See also: *Human Resources Director McDaniel to Retire*, KFOR (Nov. 24, 2021 at 1:16PM), https://www.kfornow.com/human-resources-director-mcdaniel-to-retire/ (last visited May 24, 2023).

### Fire Chiefs

a.  Lincoln Fire & Rescue was led by the following Chiefs during the times listed below: Interim Chief John Huff April 2011 to July 2012;

b.  Chief John Huff July 2012 to June 14, 2015;

c.  Interim Chief Tim Linke June 15, 2015, to July 17, 2016;

d.  Chief Mike Despain July 18, 2016, to March 20, 2020;

e.  Interim Chief Pat Borer March 20, 2020, to July 15, 2020;

f.  Interim Chief Mike Despain July 15, 2020, to December 1, 2020;

g.  Interim Chief Dave Engler December 2, 2020, to April 2021;

h.  Chief Dave Engler April 2021 to present.

(Doc. 395-2, Ex. 159).

32.     Fire Chiefs reported to Director Casady until his retirement and then directly to the Mayor.  (Doc. 384-42, at CM/ECF pp. 2-3, 8:14-9:9). He was ultimately responsible for the supervision of all personnel within the fire and police departments for the City of Lincoln in 2016.  (Doc. 384-42, at CM/ECF p. 2, 9:10-20); (Doc. 385:10, at CM/ECF pp. 1-9).

33.     Chief Engler doesn't consult with Mayor Gaylor-Baird at all on specific EEO complaints or issues.  (Doc. 334-17, at CM/ECF p. 15, 57:6-22).

34.     Chief Engler testified that if a supervisor has knowledge of something, it's as if he has knowledge of it (Doc. 334-17, at CM/ECF p. 21, 84:23-85:2).

35.     Director McDaniel is responsible for informing the Mayor about personnel issues, but Chief Engler didn't ask him if he did.  (Doc. 334-17, p. 22, 85:3-22).

36.     Chief Engler claims that he has never had a conversation with Mayor Gaylor-Baird about any disciplinary or EEO issues.  (Doc. 334-17, p. 22, 85:23-86:15).

**Fire Chief's Direct Reports**

37.     Fire Chief Dave Engler supervised four direct reports through November of 2021, who included Kim Kabourek (Executive Secretary), Aishah Witte (Administrative Officer), Nancy Crist (Public Information Officer), and Patrick Borer (Assistant Chief of Support Services). (Doc. 385-10 at CM/ECF p. 7).

38.     While the identity of the Fire Chief changed over time, the direct reports to each Fire Chief over time were pretty consistently these same individuals. (Doc. 385-10, Ex. 135).

39.     There are two main functional groups of LF&R, 1) Operations and 2) Support Services. In 2021, an Assistant Chief was designated for each of those groups. (Doc. 385-10 at CM/ECF p. 8).

40.     Mike Smith was promoted to Assistant Chief of Operations to lead that Operations group in November of 2021.  (Doc. 385-10 at CM/ECF p. 8).

41.     As Assistant Chief of Operations, Smith oversees the two Battalions, consisting of sixteen fire stations, that make up Lincoln Fire & Rescue. (Doc. 385-10, Ex. 135).

42.     In 2010, Leo Benes was a Battalion Chief at Station 6, where he supervised David Engler. (Doc. 334-17, Ex. 5 at CM/ECF p. 5, 18:20-19:3)

43.     Leo Benes was a Battalion Chief in charge of Records and Recruit Training in 2014 and 2015. (Doc. 385-10 at CM/ECF pp.1-2).

44.     Benes became the Battalion Chief for the C Shift in 2016. (Doc. 385-10 at CM/ECF p. 3).

45.     Benes served in that capacity in 2016 and 2017. (Doc. 385-10 at CM/ECF pp. 3-4). Chief Benes retired from LF&R on May 21, 2018. Lincoln Fire & Rescue (LFR) (@LNKFireRescue), Twitter, (May 21, 2018 at 12:10 PM), https://twitter.com/lnkfirerescue/status/998612121486323712 (last visited May 24, 2023).

46.     Jamie Pospisil was a Trainer for LF&R from 2014-2021 before becoming a Battalion Chief for EMS in approximately 2022. (Doc. 385-10, Ex. 135).

## LF&R Operations

47.     In 2021, Battalion 1 consists of Stations 1, 2 3, 5, 10, 11, 13, and 14. Battalion 2 consists of Stations 4, 6, 7, 8, 9 12, 15, and 16. (Doc. 385-10, Ex. 135 at CM/ECF p. 9).

48.     In 2021, Battalion 1 has three shift Battalion Commanders, Jeremy Gegg (A Shift), Jim Bopp (B Shift), and Mark Majors (C Shift). (Doc. 385-10, Ex. 135 at CM/ECF p. 9).

49.     In 2021, Battalion 2 has three shift Battalion Commanders, Lloyd Mueller (A Shift), Bob Watton (B Shift), and Curt Faust (C Shift). (Doc. 385-10, Ex. 135 at CM/ECF p. 9).

50.     Captain Shawn Mahler serves as Truck Captain for Station 8, C Shift from 2014-2016. He was supervised by Battalion Chief Jones in 2015, Battalion Chief Leo Benes in 2016-2017, Battalion Chief Dave Engler in 2018, and Battalion Chief Michael Smith in 2019—October of 2021. (Doc. 334-22, at CM/ECF p. 6:23:4-25:13); (Doc. 395-4, Ex. 161); (Doc. 395-5, Ex. 162); (Doc. 395-6, Ex. 163); (Doc. 395-7, Ex. 164); (Doc. 395-8, Ex. 165.); (Doc. 395-9,

Ex. 166). In 2016, Captain Daren Merryman became Amanda's supervisor. (Doc. 384-15 at CM/ECF p. 469, 1874:6-9).

51.     Captain Merryman is still assigned to Station 8, C shift, just as he was when he supervised Amanda. (Doc. 383-10, Ex. 9 at CM/ECF p. 53, 209:11-16).  As Mahler's co-captain at Station 8, Merryman was likewise supervised by Chief Benes in 2016-2017, Battalion Chief Dave Engler in 2018, and Battalion Chief Michael Smith in 2019-2021.

52.     Smith was promoted to Battalion Chief on or about October 21, 2021.  See: Ryan Swanigan, *LFR announces new assistant chief*, 10/11 Now, (Oct. 21, 2021 at 4:44 AM), https://www.1011now.com/2021/10/21/lfr-announces-new-assistant-chief/ (last visited May 24, 2023).

### The Ineffectiveness of the City of Lincoln EEO Policies

53.     Current Fire Chief Dave Engler acknowledged that EEO policies are only effective if firefighters are not fearful of retaliation from reporting harassment, discrimination or retaliation. (Doc. 334-17 at CM/ECF p. 24, 96:12-18). It is difficult for firefighters to come forward because they don't want to lose the trust of their crew or be perceived as disloyal.  (Doc. 334-17 at CM/ECF p. 25, 98:8-100:13). It is especially hard to bring forward complaints against people of higher rank. (Doc. 334-17 at CM/ECF p. 25, 99:7-12).

54.     Several LFR female employees have been fearful of bringing forward EEO complaints (Doc. 334-17 at CM/ECF p. 25, 99:23-100:13); (Doc. 334-2 at CM/ECF p. 22); (Doc. 383-59, Ex. 58 at CM/ECF p. 41, 167:12-168:20); (Doc. 335-4 at CM/ECF p. 1).  In October of 2021, two young recruits were afraid to report that Senior Firefighter A solicited nude photos from them because they didn't want to jeopardize their own jobs. (Doc. 334-4 at CM/ECF p. 1). LFR's

own EEO officer, Aishah Witte, was scared to bring forward a sex discrimination complaint against Assistant Chief Borer.  (Doc. 334-17 at CM/ECF p. 25, 99:23-100:13).

55.     Fire Chief Engler acknowledged that LFR command staff has a history of retaliatory behavior. (Doc. 334-17 at CM/ECF p. 29, 114:17-20); (Doc. 115-4 at CM/ECF p. 64).

56.     He also acknowledged that LFR had not done a good job of training personnel on their obligations under EEO laws before his tenure began in 2021.  (Doc. 383-25, Ex. 24, timestamp 7:13-8:38).

57.     Director McDaniel believed that it would be concerning if an employee didn't want to go forward with a harassment complaint because they thought it would negatively impact their career.  It becomes difficult to protect employees if they don't want to pursue a situation or find out what is really transpiring in the workplace so that the City can correct behaviors. (Doc. 384-14, Ex. 89 at CM/ECF p. 6-7, 24:22-27:10).  But that does not relieve the City of its responsibility to remedy the unlawful conduct.  (Id.)

58.     On July 18, 2019, Amanda requested a meeting with newly-elected Mayor Leirion Gaylor-Baird, to discuss the working conditions at LF&R. (Doc. 383-18, Ex. 17 at CM/ECF p. 11, Doc. 383-46). Amanda sent her a letter outlining many of her concerns of discrimination, harassment, and retaliation as it related to herself and other female firefighters within LF&R requesting her assistance in remedying the environment. (Doc. 383-46 at CM/ECF p.3).  Mayor Gaylor-Baird refused to meet with Amanda and admitted the reason was because she was suing the City for discrimination, harassment, and retaliation. (Id., at CM/ECF p. 1).

59.     The City's sexual harassment policy dated May 2001 (in effect until 2022) did not prohibit harassment based on gender unless the harassment was sexual in nature.  (Doc. 384-14, Ex. 89, at CM/ECF p. 2, 7:17-8:10, pp. 3-4, 12:15-13:15); (Doc. 383-4, Ex. 3).

60.     The City had an Equity, Access & Diversity Plan that was in effect during Plaintiff's employment.  (Doc. 383-2, Ex. 1 at CM/ECF p.12, 45:12-46:16); (Doc. 115-1 at CM/ECF p. 1, ¶1); (Doc. 115-2); (Doc. 115-3); (Doc. 383-3, Ex. 2); (Doc. 383-4, Ex. 3). The plan states, "Duty to Report. Supervisors and administrators who knowingly condone, fail to report, or fail to take action to remedy incidents of harassment or retaliation may themselves be subject to discipline." (Doc. 115-3 at CM/ECF p. 8, ¶7). Employees are required to report harassment to their supervisor or department head immediately, and may also report to the City-County Personnel Director or Affirmative Action Officer.  The complaints may be either written or verbal.  (Doc. 115-3 at CM/ECF p. 8). The policy also prohibited retaliation for reporting incident of harassment or for participating in a procedure to redress the complaints of harassment. (Id., ¶9)

61.     The Defendants were all aware of these policies and their duty under the law to follow them.  (Doc. 385-22, Ex. 147 at CM/ECF p. 3, 5:22-7:4); (Doc. 384-42, Ex. 117 at CM/ECF p. 4, 14:5-18; p. 4, 15:1:-6; p. 6, 22:1-17;  p. 8, 29:2-22); (Doc. 384-14, Ex. 89 at CM/ECF p. 2, 7:17-8:11; p. 4, 13:7-14:5; p. 5, 18:16-19:11; p. 6, 22:19-24; p. 6-7, 24:22-27:10); (Doc. 334-15 at CM/ECF p. 4, 12:24-13:3; 13:20-15:25); (Doc. 385-23, Ex. 148 at CM/ECF p. 9); (Doc. 383-12, Ex. 11 at CM/ECF p. 32, 125:2-127:4); (Doc. 383-10, Ex. 9 at CM/ECF p. 6, 22:4-27:7); and (Doc. 334-22 at CM/ECF p. 15, 59:2-16);  (Doc. 334-17 at CM/ECF p. 14-15, 55:7-57:5;  p. 20-21, 79:9-84:21).

62.     Director Casady failed to implement an independent gatekeeper to address  EEO complaints within LFR as recommended in Taylor-Riley in her October 10, 2014 report.  (Doc. 115-4 at CM/ECF pp. 63-64); (Doc. 384-42, Ex. 117 at CM/ECF p. 10, 38:14-39:9). In fact, in a classic "fox-guarding the henhouse" move, LFR appointed two of the individuals who were accused of retaliation against Captain Hurd to be gatekeepers.  (Id.)

13

63.    Human Resources Coordinator Daisy Brayton isn't familiar with the City's EEO policies.  Brayton doesn't know if the Equity Access and Diversity Plan was in effect during her employment, nor does she know who at the City is responsible for receiving and processing employee complaints of discrimination.  (Doc. 383-59, Ex. 58, at CM/ECF p. 5, 19:2-14;  p. 11, 41:11-15;  p. 42:2-10;  at CM/ECF p. 11, 43:4-12; 44:1-6;  p. 12, 46:6-10). She doesn't know where to locate the retaliation policy or what EEO training City employees receive.  She didn't know what the City does to ensure that employees know that if they make a complaint, they won't be retaliated against. (Doc. 383-59, Ex. 58 at CM/ECF p. 14, 53:24-54:19).

64.    Aishah Witte served as the EEO Officer for LFR from her time of hire until February 2022, however, she testified that she had little knowledge regarding the City's EEO policies.  (Doc. 383-53, Ex. 52, at CM/ECF p. 29, 114:8-17; p. 26, 102:15-21; p. 26, 104:7-12; p. 28, 109:3-5)

65.    Her lack of knowledge regarding the City's EEO policies, even though she was supposed to be serving in the role of the equal employment opportunity officer for LFR, indicates her experience in EEO investigations is limited or she was not credible during her deposition.  (Doc. 383-53, Ex. 52, at CM/ECF p. 29, 114:8-16; p. 26, 102:15-21; p. 26, 104:7-12; p. 28, 109:3-5)

66.    Regarding Amanda's EEO Complaints in the spring of 2021, Witte wasn't even sure if she made any conclusions or credibility determinations in connection with her investigation. (Doc. 383-53, Ex. 52, at CM/ECF p. 22-23, 87:3-89:12)

67.    Witte knew Amanda believed the treatment she was receiving was based on her gender but did not investigate this at all. (Doc. 383-53, Ex. 52, at CM/ECF p. 28-29, 112:22-113:16)

68.     Witte's investigations did not meet the appropriate standard of care of human resource practice because she failed to interview key witnesses, failed to properly document her investigation, and solicited complaints about Amanda from other employees, which is against the CBA.  (Doc. 143-14, at CM/ECF p. 3-7); (Doc. 383-9, p. 37); (Doc. 143-14, at CM/ECF p. 4).

### LF&R Support Services

69.     Retired Chief Patrick Borer (Assistant Chief of Support Services) supervised five direct reports, including US&R Program Manager Brad Thavenet. (Doc. 385-10, Ex. 135 at CM/ECF p. 9).

70.     US&R Program Manager Brad Thavenet oversaw US&R Specialist Nic Cunningham. (Doc. 385-10, Ex. 135 at CM/ECF p. 9).

### Amanda Benson Begins her Career at LFR

71.     On or about July 1, 2013, Plaintiff Amanda Benson began her employment with the City in LFR as a Firefighter/EMT. (Doc. 196 at CM/ECF p. 2, ¶8).

72.     During the fire academy, Amanda learned that the culture at LFR demanded unflinching loyalty and that speaking up about discrimination, harassment, or retaliation was unacceptable.  Her recruit class was instructed to keep their mouths shut and their heads down. They were told that if they "got on a Chief's radar," their careers would be over. (Doc. 383-18, Ex. 17 at CM/ECF p. 10, ¶37).

73.     For a little over a year, Amanda worked as a floating firefighter, gaining experience at different fire stations. (Doc. 334-18 at CM/ECF p. 13, 50:14 - 52:8-19).

74.     While Amanda was a floater, her male colleagues made fun of FAO Annette Woehrer.  They told Amanda she was promiscuous, slept around with male firefighters and gave them sexually transmitted diseases.  (Doc. 334-18 at CM/ECF p. 16, 61:11-62:14).

75.     Acting supervisor Mike Selvage asked Amanda for sexy photographs of her girlfriend.  (Doc. 334-18 at CM/ECF p. 16, 61:11-62:14; 63:7-17).

76.     Other male firefighters made fun of lesbians, asked her to explain how she had sex with a woman, and asked if "scissoring" was a real thing lesbians did.  (Doc. 334-18 at CM/ECF p. 16, 61:11-62:14).

77.     In October 2014, Amanda was assigned to Station 8. (Doc. 196 at CM/ECF p. 2, ¶9).  Amanda replaced male firefighter, Nic Cunningham.  (Id.)  She was the only female at Station 8.  (Doc. 383-29, Ex. 28 at CM/ECF p. 3, 6:2-18).

**Mahler is Furious Amanda is Assigned to his Station**

78.     Shawn Mahler and Giles were the Captains at Station 8.  (Id.)  Mahler was the Truck Captain and Giles was the Engine Captain.  (Doc. 334-2 at CM/ECF p. 1).

79.     Two captains lead every multiple-rig station and all the personnel in the station.  The system is designed for Captains to mentor less-experienced firefighters and assist them in learning new skills, increasing their competence, and gaining confidence.  (Doc. 395-12, Ex. 169 at CM/ECF p. 1, ¶3).

80.     The main way new firefighters learn is to receive regular training from the Captain or Captains assigned to their Station.  This includes formal training sessions, informal discussions and demonstrations, and feedback after calls.  (Doc. 395-12, Ex. 169 at CM/ECF p. 1, ¶4).

81.     A good relationship with one's Captains is extremely important for the future career trajectory of a firefighter.  (Doc. 395-12, Ex. 169 at CM/ECF p. 1, ¶5).

82.     Upon learning that Amanda would be assigned to Station 8, Mahler became visibly upset and had a verbal confrontation with Cunningham and Giles, whom he blamed for her assignment.  Cheyenne Jeffers, a civilian who was at Station 8 for a ride-along, witnessed the confrontation. (Doc. 143-36 at CM/ECF pp. 2-3, ¶¶10-11).

83.     Jeffers told Amanda Mahler was unhappy she was coming and that he was aggressive and inappropriate.  (Doc. 334-18 at CM/ECF p. 22, 86:1-87:13-23).

84.     Mahler had a documented history of dishonesty.  In 2011, Mahler was suspended for lying to Assistant Chief Pat Borer when he falsely told Borer that turnout gear had been returned to the supplier.  (Doc. 143-24); (Doc. 143-25 at CM/ECF p. 2). Mahler actually kept the gear for himself, which Borer said "bordered on criminal behavior." (Id.); (Doc. 344-2 at CM/ECF p. 39, 156:10-14)

85.     At that time, Borer also expressed concern to Personnel Director McDaniel that Mahler had a conceal and carry permit and that Borer believed Mahler took his gun to work at LFR.  (Doc. 143-25 at CM/ECF p. 2).

86.     Mahler had a documented history of sexual harassment.  Firefighter Andrea DeForge worked with Captain Mahler at Station 5. (Doc. 334-19 at CM/ECF p. 19; 60:18-61:21). Station 5 had a group of five "like-minded" firefighters who were loyal to Mahler. (Doc. 385-5 at CM/ECF p. 1 authenticated at Doc. 334-14 at CM/ECF p. 39, 154:10-13).  They looked at porn, spoke negatively about their wives, and disparaged women in general.  (Id.)

87.     EEO Director Taylor-Riley interviewed DeForge during the subsequent investigation into Amanda's complaints, but DeForge was too afraid to go on the record.  (Doc. 334-14 at CM/ECF p. 39, 154:10-155:4); (Doc. 385-5 at CM/ECF pp. 1-2); (Doc. 334-2 at CM/ECF pp. 22-23).

17

88.    Firefighters Amber Wade, Vicki Barada, and Ron Carlson told Amanda that Mahler sexually harassed and discriminated against DeForge (Doc. 334-18 at CM/ECF p. 17, 65:17-66:14).

89.    Wade, Barada, Carlson, and DeForge herself warned Amanda that Mahler "did not like working with women." (Doc. 334-18 at CM/ECF p. 17, 65:17-66:14; 67:17-68:4).    Other firefighters also alluded to that fact or joked about it.  (Doc. 334-18 at CM/ECF p. 17, 67:17-68:10).

90.    DeForge told Amanda that she almost quit because of harassment from Mahler and his "gang of bullies."  She reported it through her Captain several times, but since her Captain and Mahler were friends, she was too terrified to take it further.  (Doc. 334-18 at CM/ECF p. 19, 73:23-74:18); (Doc. 380-60 at CM/ECF p. 6).

91.    Amanda noted lots of differences between herself and DeForge and felt those differences would protect her from being targeted by Mahler.  (Doc. 334-18 at CM/ECF p. 19, 74:19-75:20).

92.    Amanda began her assignment at Station 8 on October 15, 2014.  (Doc. 196 at CM/ECF p. 3, ¶12).  She was supervised by both Giles and Mahler. (Doc. 334-18 at CM/ECF p. 21, 83:10-15-90:1).

93.    It is customary within LFR for Station Captains to greet a newly assigned person. (Doc. 334-18, at CM/ECF p. 22, 85:6-25). They typically go through the house rules, expectations, and procedures. (Id.) This process also allows the Station Captains and the new station member to build rapport. (Doc. 334-18 at CM/ECF p. 23, 89:9-15); (Doc. 143-36 at CM/ECF p. 2, ¶10); (Doc. 383-10, Ex. 9 at CM/ECF p. 31 123:12-16).

94.     Mahler refused to speak to Amanda or go through the house rules, expectations, or procedures. (Doc. 334-18 at CM/ECF p. 21, 84:4- 85:25). He did not attempt to build any sort of rapport with Amanda. (Doc. 334-18 at CM/ECF p. 22, 88:19-89).

95.     Mahler was strong-willed, abrasive, and—if not a bully—at least "bully-ish." (Doc. 383-12 at CM/ECF p. 48, 192:12-22).

96.     Mahler and other male firefighters at Station 8 would make derogatory comments about their wives.  They would engage in derogatory jokes, off-color comments, and disrespectful banter about women.  (Doc. 334-18 at CM/ECF pp. 29-30, 116:25-118:1).

97.     Mahler talked about how he and others once held down a male firefighter and tried to poke his rectum through his pants.  They laughed "about how he squealed and tried to get away." (Doc. 334-18 at CM/ECF p. 30, 119:13-22).

98.     In Mahler's presence, other male firefighters at Station 8 made insolent remarks about Chief Jeannie Pashalek, claiming that she was not equipped to fight fires and was too scared to do so; that she got a job only because she sued; and that she was the "equal opportunity promotion."  (Doc. 334-18 at CM/ECF p. 30, 118:6-119:11).

**Mahler Denies Amanda Truck Training and Manipulates Schedule
to Prevent her from Rotating to Truck**

99.     Amanda was primarily an engine firefighter at Station 8. (Doc. 196 at CM/ECF p. 3, ¶13).  But the standard rotation at Station 8 and throughout LFR required all firefighters to also alternate to the ambulance and the truck. (Doc. 383-12 Ex. 11 at CM/ECF p. 7, 25:1-22;  p. 42, 166:22-168:11); (Doc. 383-13, Ex. 12 at CM/ECF p. 12, 45:11-47:17); (Doc. 383-49, Ex. 48 at EM/ECF p. 5, 17:1-13; 17:25-20:11).

100.     However, Mahler did not allow Amanda to rotate onto the truck. (Doc. 334-2 at CM/ECF p. 18-19); (Doc. 383-18, Ex. 17 at CM/ECF p. 11, ¶44); (Doc. 385-15, Ex. 140); (Doc.

383-13, Ex. 12 at CM/ECF p. 12, 42:12-46:21). Anytime she was assigned to the truck, he would change the schedule to ensure he didn't have to work with her.  (Doc. 383-13, Ex. 12 at CM/ECF p. 11, 43:9-14).

101.    Mahler's actions directly violated a directive from Fire Chief Huff.  (Doc. 383-13, Ex. 12 at CM/ECF p. 12, 47:24-48:25).

102.    Mahler didn't manipulate the schedule or make excuses to avoid putting male firefighters on the truck, even when they weren't part of his regular crew.  (Doc. 383-13, Ex. 12 at CM/ECF p. 16, 61:2:20).  A brand-new male employee without any experience was allowed to move immediately to the truck.  (Id.)

103.    By not allowing Amanda to rotate to the truck, Mahler denied Amanda important training that she could have obtained through that rotation. (Doc. 383-18, Ex. 17 at CM/ECF p. 1, ¶2.) When firefighters are floated out to another station or work overtime, they have to be proficient on both the truck and the engine. There are serious safety risks if a firefighter is not trained on both apparatuses.

104.    Part of the Captain's test covers truck company operations. (Id.) Amanda took the Captain's test in both 2019 and 2021, so such training was important to her. (Id.)

105.    As a condition of their employment, LFR required firefighters to be certified as a Fire Apparatus Operator ("FAO") within the first three years of their employment.  To do so, firefighters must demonstrate their proficiency on all three apparatuses (engine, truck, and medic unit).  If a firefighter failed to complete the FAO certification, their employment ended. (Doc. 383-10, Ex. 9 at CM/ECF p. 42, 165:8-21).

106.    At Station 8 the engine took more calls than the truck, so firefighters assigned to the truck had more downtime and more opportunities for extra training. (Doc. 334-2 at CM/ECF pp. 18-19); (Doc. 383-13, Ex. 12 at CM/ECF p. 17, 65:21-67:69:11).

107.    Because Amanda was constantly assigned to the engine or medic unit, she missed out on crucial training that all the other men got.  This training would have allowed her to perform her job duties more effectively and assist her career trajectory. (*Id.*); (Doc. 383-18, Ex. 17 at CM/ECF p. 1, ¶2).

**Amanda Is Scared to Complain about Mahler**

108.    Around late October 2014, Chief Pashalek contacted Amanda to see how things were going at Station 8. (Doc. 380-58 at CM/ECF p. 1). Amanda mentioned that Mahler wasn't happy with her presence there, but that she enjoyed everyone else. (*Id.*)

109.    On November 5, 2014, Eric Jones, the Battalion Chief in charge of Station 8, went to Station 8 to get a statement regarding the incident between Cunningham, Mahler, and Giles, in which Mahler vehemently objected to Amanda's transfer there. (Doc. 380-59).

110.    Amanda was interviewed by Chief Jones.  Afterwards, Giles and others warned her it would go badly for her if she allowed the City to investigate.  Based on those warnings, as well as what she'd learned in the Academy, she was terrified that it would ruin her career.  (Doc. 383-18, at CM/ECF pp. 25-26, 99:25-101:2; 102:10 - 103:16); (Doc. 334-18, at CM/ECF p. 18, 70:22-71:20).

111.    At this early stage, Amanda didn't know Mahler was manipulating the schedule to keep her off the truck.  He hadn't yet made sexist comments to her face, and she was very afraid. (Doc. 334-18 at CM/ECF p. 25, 99:15-100:21). She called Fire Chief Huff to tell him that she was

fearful and didn't want to ruin her career. (Doc. 334-18 at CM/ECF p. 25, 100:14-16). She said she hadn't asked for an investigation; she wanted it to go away; and she wanted a chance to build a relationship with Mahler. (Doc. 334-18 at CM/ECF p. 25, 100:14-19).

**Mahler Blatantly Discriminates Against Amanda Because She is Female**

112.   On or about December 19, 2014, Amanda approached Mahler and requested training and advice regarding joining the Urban Search and Rescue Team ("USAR"). (Doc. 334-18 at CM/ECF p. 28, 112:19-113:2); (Doc. 380-60 at CM/ECF p. 2).

113.   Mahler told Amanda that women were not mechanically-inclined and therefore not qualified to participate in USAR teams.  (Doc. 334-2 at CM/ECF p. 6); (Doc. 383-67, Ex. 66 at CM/ECF p. 1, ¶3-4).

114.   Amanda also inquired why she was not included in the truck rotation like the male firefighters. *(Id.)* Mahler told Amanda she should stick with medical specialties because "women are less mechanically minded than men." *(Id.)*

115.   Mahler told Amanda he would not allow her to perform roof venting operations because she didn't own a fall protection belt (which he privately sold to firefighters). *(Id.)* LFR does not require fall protection belts for roof venting.  (Doc. 383-13, Ex. 12 at CM/ECF p. 16, 61:2-8).  Mahler allowed male firefighters who did not have fall protection belts to vent roofs. (Doc. 334-2 at CM/ECF p. 23).

116.   Amanda informed Mahler that she worked on the truck for six months at Station 5 before coming to Station 8, but Mahler insisted she had not been trained to his level of satisfaction. (Doc. 334-18 at CM/ECF p. 28, 112:19-113:2); (Doc. 380-60 at CM/ECF p. 2).

117.   Mahler told Amanda he would observe her for 18 months to three years, and *then* he would decide if she was qualified and competent enough to be on "his" truck.  *(Id.)*

118.     It violates LFR policies for a Station Captain to refuse to permit a firefighter on the truck until he observes her for 18 months to three years.   (Doc. 334-2 at CM/ECF p. 16; 18-19); (Doc. 383-12, Ex. 11 at CM/ECF p. 7, 25:1-22;  p. 42, 166:22-168:11); (Doc. 383-13, Ex. 12 at CM/ECF p. 12, 45:11-47:17); (Doc. 383-49, Ex. 48 at CM/ECF p. 5, 17:1-13; 17:25-20:11).

119.     Mahler did not require the observation of similarly situated male firefighters for 18 months to three years before they were allowed to rotate onto the truck.   Mahler allowed firefighters Garrett Rubendall, Brad Hasenjaeger, Hadley Cooksley, Robert Simmons, Dylan Delaney, Tyler Barry, Stephen Dyer, Jason Hemmingson, and Troy Hassebroek to rotate onto the truck with no waiting times or observation periods. (Doc. 334-2 at CM/ECF p. 18-20; p. 27); (Doc. 334-18 at CM/ECF p. 20, 79:7-21); (Doc. 383-18, Ex. 17 at CM/ECF p. 10-11 ¶37).

120.     Amanda told Mahler she wanted to become proficient on all fire apparatuses.  (Doc. 334-18, at CM/ECF p. 27, 107:5-108:18); (Doc. 380-60, at CM/ECF p. 2).  She asked Mahler if he would work with her on rope rescue and rigging to meet his standard.

121.     Mahler told Amanda it was not his job to train her. *(Id.)*

122.     Amanda contemporaneously relayed this conversation to Captain Giles and firefighter Jeremy Phillips.  (Doc. 383-13, Ex. 12 at CM/ECF pp. 15-16, 60:24-61:20); (Doc. 383-12, Ex. 11 at CM/ECF pp. 39-40, 154:6-157:8); (Doc. 383-28, Ex. 27 at CM/ECF p. 1).

123.     Throughout Amanda's two years at Station 8, Mahler rarely spoke to her, and when he did, he was demeaning and condescending.  Given that LFR firefighters are required to live with their supervisors, Amanda frequently felt unwelcome at her own firehouse due to Mahler's treatment of her.  (Doc. 334-18 at CM/ECF p. 20, 79:11-21); (Doc. 334-17 at CM/ECF p. 36-37, 143:19-145:1).

**Captain Giles Advocates for Amanda, but Linke and
Jones Fail to Address the Problem**

124.    Prior to Amanda joining Station 8, Giles and Mahler got along well.  (Doc. 383-13,
Ex. 12 at CM/ECF p. 10, 40:22-41:10).

125.    Captain Giles witnessed Mahler's manipulation of the schedule and discrimination
against Amanda throughout her time at Station 8. (Doc. 383-13, Ex. 12 at CM/ECF p. 12, 46:9-
17); (Doc. 334-2 at CM/ECF pp. 18-19); (Doc. 143-36 at CM/ECF pp. 2-3, ¶¶10, 18, 19-21).
Amanda also complained to Giles throughout her time at Station 8 about Mahler's disparate
treatment of her in comparison to all of the male firefighters.  On five different occasions in 2015,
Giles complained to Battalion Chief Eric Jones that Mahler was treating Amanda unfairly and
discriminating against her because she was female by manipulating the schedule so he would not
have to ride with Amanda. Giles reported that the environment at Station 8 had turned hostile, and
Jones needed to address it. *Id.*

126.    Jones repeatedly promised he was going to rectify the situation. Jones told Giles
that he *had* confronted Mahler regarding his discriminatory treatment of Amanda, but Mahler had
responded by refusing to speak to him for a month, so Jones took Mahler out for a beer and
apologized for bringing it up. (*Id.* at CM/ECF pp. 4-5, ¶21).

127.    On August 8, 2015, Amanda purchased a fall protection belt from Firefighter Jason
Relford in the hopes that Mahler would then allow her to do roof ventilations.  Amanda told Mahler
she now had the belt.  Mahler insisted she still hadn't proven to him that she was trained to his
standards and that she would not be doing any ventilation operations. (Doc. 334-18 at CM/ECF p.
27, 107:5-108:18); (Doc. 380-60, at CM/ECF p. 3).

24

128.    On August 12, 2015, Amanda met with her EAP counselor to discuss her frustration with Mahler's discriminatory treatment and how other women at LFR were also treated unfairly. (Doc. 383-13, Ex. 12 at CM/ECF pp. 12-13).

129.    Mahler was upset on August 15, 2015, because Amanda was actually assigned to his truck that day.  (Doc. 334-18, at CM/ECF p. 29, 133:1-21)..

130.    The truck was dispatched to a lift assist call.  All personnel except Mahler reported to the rig to leave, but he refused to take the call with Amanda in the truck.  (Doc. 380-60, Ex. 59, at CM/ECF p. 4); (Doc. 334-18, at CM/ECF p. 29, 133:11-21).  He literally just refused to respond to the emergency call from a citizen.  (Doc. 383-12, at CM/ECF p. 29, 82:10-13).

131.    On August 17, 2015, male Firefighter Jesse Johnson was scheduled to drive the Medic 8 Unit. Shortly before then, Mahler manipulated the schedule to switch Amanda from the Engine Unit to the Medic unit at 7:00 p.m. during her twenty-four-hour shift.  While she was on the engine unit at approximately 6:15 p.m., it was dispatched to an emergency situation.  (Doc. 334-2 at CM/ECF p. 24); (Doc. 385-24, Ex. 149).

132.    While at the emergency, Amanda told Giles that her schedule switched to the medic unit at 7:00 p.m.  Giles confronted Mahler about once again manipulating the schedule to Amanda's detriment. (Doc. 334-2 at CM/ECF p. 24).

133.    Chief Jones summoned Mahler and Giles to discuss the incident. (Doc. 334-2 at CM/ECF p. 24). During the meeting, Mahler threatened Jones, saying, "You want to come after me, I'll give you more than you bargained for."  (Doc. 383-13, p. ?, 49:18-50:10).

134.    Giles again told Jones that Mahler was discriminating against Amanda and denying her training by manipulating the schedule.  Giles also reported how Mahler's discrimination was

hurting Amanda, and that she had started counseling with the Employee Assistance Program ("EAP"). (Doc. 143-36 at CM/ECF p. 6; pp. 27-28).

135.    Jones acknowledges that Giles spoke with him in August or September of 2015 regarding Mahler refusing to rotate Amanda to the truck.  (Doc. 383-14, Ex. 13, p. 11, 41:23-42:23).  Fire Chief Linke knew that Giles was reporting that Mahler's manipulation of the schedule was sex discrimination, and that Jones did not address those complaints.  (Doc. 383-14, Ex. 13 at CM/ECF p. 7, 26:9-27:1; p. 26, 104:24-105:8).

136.    Fire Chief Linke directed Jones to discipline Mahler for refusing the lift assist call on August 15, but Jones failed to do so.  (Doc. 383-12, Ex. 11 at CM/ECF p. 22, 85:2-9).  The reasonable inference is that Jones was cowered by Mahler's threats against him and scared to get on Mahler's bad side.

137.    In the fall of 2015, Director Casady reprimanded Jones for failing to discipline Mahler.  (Doc. 196 at CM/ECF p. 4, ¶24).

138.    On September 30, 2015, Amanda met with her counselor to discuss the continued hostile work environment at Station 8 and how Mahler's misogynistic behavior was affecting her work life. (Doc. 383-19, Ex. 18 at CM/ECF pp. 11-12).

139.    On October 14, 2015, Amanda met with her counselor again regarding her ongoing issues with Mahler at Station 8 and expressed her frustration with no one at LFR holding Mahler accountable for his harassment.

140.    Mahler continued to ignore Amanda, to single her out for disparate treatment, and to sabotage her career by denying her training and experience on the truck throughout 2015. (Doc. 334-2 at CM/ECF pp. 18-19).

**Hostile Work Environment Erupts Over the Kitchen**

141.    Station 8's rules said that was the responsibility of the person on kitchen duty to sweep, clean the prep utensils, and run the dishwasher with the dishes used during the station meal. According to the house policy, only the employees who eat the house meal need to clean up.  (Doc. 334-18 at CM/ECF p. 36, 141:8-142:3).

142.    In roughly the summer of 2015, Bryan Kratochvil was Acting Captain at Station 8. There had been a big meal resulting in a lot of dirty pans, bowls, and dishes.  Amanda hadn't joined in the meal, but Mahler expected her to clean up the mess the other nine males had made.  Amanda had been called out to several emergencies and was working to get the medic unit restocked with supplies.  Yet Mahler was sitting at the table complaining that she wasn't cleaning the kitchen.

143.    Kratochvil heard Mahler say clearly and loudly, "And that's why there's no room for women in the fire service." Mahler was "dead serious."  (Doc. 383-15 at CM/ECF pp. 6-7, Ex. 14, 23:15-25:24); (Doc. 334-2 at CM/ECF pp. 23-24).

144.    Kratochvil was "dumbfounded."  His head was spinning.  He went upstairs, sat in the bedroom, and contemplated his next move.  Rather than reporting Mahler's conduct, he kept his mouth shut because he wanted to get promoted.  *(Id.)*

145.    Mahler once again attacked Amanda over her failure to keep a tidy kitchen on December 21, 2015.  That morning, Amanda and the engine crew took three calls and worked on some training.  Mahler and the truck crew did not complete any calls or training that morning.

146.    Amanda and Giles each cooked, ate, and cleaned up after their own lunches.  Others made fried chicken for the truck crew.  Although it was not their job to clean, Amanda and Giles wanted to give the Firefighters who prepared the meal a break.  They cleaned up, started the dishwasher, and washed the dishes that needed to be done by hand.  There were dishes drying in

the rack and others waiting to go in the dishwasher once it was done cycling.  (Doc. 334-18 at CM/ECF p. 20, 79:7-21); (Doc. 380-57 at CM/ECF p. 10, ¶51).

147.   Mahler walked into the kitchen and said snidely, "Whoever's the kitchen man needs to learn how to do their job." (Doc. 383-13, Ex. 12. at CM/ECF p. 18, 69:10-70:13).  He directed the remark at Amanda.  (Doc. 334-18, Ex. 6 at CM/ECF p. 36, 142:4-143:18).

148.   Even after Giles and Amanda explained the circumstances, Captain Mahler insisted that Amanda handwash the remaining dishes while the other male firefighters watched. (Doc. 334-2, at CM/ECF p. 1); (Doc. 334-18 at CM/ECF p. 27, 146:16-147:3); (Doc. 380-61 at CM/ECF p. 1).

149.   When Amanda clarified that Mahler was demanding that she hand wash all the men's dishes.  Mahler said she was supposed to "shut her mouth and do as she's told." (Doc. 383-60, Ex. 59 at CM/ECF p. 2)

150.   The incident caused both Amanda and Giles to shake and become physically ill.  They had to leave work for the day.  (Id.)

151.   After LFR administration was notified, they initiated an investigation. (Doc. 334-18 at CM/ECF p. 27, 146:16-147:3); (Doc. 380-61 at CM/ECF p. 1); (Doc. 384-25, Ex. 100).

152.   Mahler was moved from Station 8 to a vacancy at Station 5 pending the outcome of a pre-disciplinary hearing.  (Doc. 380-70).

153.   When Amanda returned to work, Nick Thill (a firefighter assigned to Mahler's truck) would not speak to her.  If she joined a discussion, he would get up and leave the area.  (Doc. 383-60, Ex. 59 at CM/ECF p. 2).

**The City Fails to Adequately Investigate or
Discipline Captain Mahler**

154.    The pre-disciplinary hearing for Mahler was scheduled for January 5, 2016. (Doc. 196 at CM/ECF p. 4, ¶29). Mahler requested that the hearing be continued. (Doc. 384-15, Ex. 90). Vice President of the Local 644 Firefighter's Union Ron Trouba, Jr. assisted Mahler in his defense and requested more information regarding the allegations. (Id.).  Director McDaniel advised Fire Chief Linke that the CBA required the City to provide Mahler with *all witness statements*.  (Doc. 383-31); (Doc. 384-27).  Linke gave Mahler complete statements from Amanda and Giles prior to the hearing.  (Doc. 384-26, Ex. 101, at CM/ECF pp. 11-15); (Doc. 383-26, Ex. 101, at CM/ECF pp. 1-15).

155.    On January 6, 2016, Director Casady asked Director Taylor-Riley about whether Amanda had contacted her about filing an EEO Complaint. (Doc. 334-2 at CM/ECF p.7, ¶3). Concerned about this inappropriate inquiry, Taylor-Riley emailed mayoral aide Denise Pearce asking that department directors be advised not to approach her regarding her contact with employees as these communications are confidential. (Id.)

156.    On January 7, 2016, Fire Chief Linke contacted Amanda to meet with him downtown. (Doc. 196 at CM/ECF p. 4, ¶31). Amanda complained to Linke about the disparate treatment she was receiving in comparison to the male firefighters at Station 8. (Doc. 380-60 at CM/ECF p. 5). Amanda asked Linke what the investigative process entailed. (Id.) Linke informed Amanda that the pre-disciplinary hearing for Mahler had been postponed so Mahler could prepare a defense. (Doc. 380-60). Following the meeting, Amanda emailed Linke and asked if he wanted the information from her EAP counselor. (Id.)

157.    On January 8, 2016, Amanda again met with her EAP counselor to try and process the kitchen incident and investigation. (Doc. 383-19, Ex. 18 at CM/ECF p. 10).

158.    During his hearing, Mahler represented that Amanda had ridden the truck at Station 8 for a total of only 29 hours less than two male comparators. (Doc. 334-22 at CM/ECF p. 11, 183:5-14); (Doc. 383-28, Ex. 103 at CM/ECF p. 11).  This was incorrect.  The difference was actually **1,077 hours**. (Doc. 334-2 at CM/ECF p. 19).  The City did not hear any testimony from Amanda or Giles. (Doc. 383-28, Ex. 103).  In response to Amanda and Caption Giles' written statements, Mahler read aloud a three-hour statement. (Doc. 143-25 at CM/ECF p. 1).

159.    On January 18, 2016, Amanda again met with her EAP counselor to decide whether she wanted to pursue a formal complaint through the City's EEO Office. (Doc. 383-19, Ex. 18 at CM/ECF p. 9).

160.    On January 19, 2016, the City found no reason to discipline Mahler and advised Amanda to return to Station 8. (Doc. 383-30, Ex. 29 at CM/ECF p. 3-4, 7:20-9-15); (Doc. 196 at CM/ECF p.5, ¶36). Mahler returned to his post at Station 8. (Id.)

**Amanda is Fearful to Return to Station 8**

161.    Amanda explained to Chief Benes that she feared she would be retaliated against because of her complaint. (Doc. 383-30, Ex. 29 at CM/ECF p. 6, 18:2-19;17, p. 9, 33:6-18). On August 20, 2016, Amanda told Benes and Linke that she did not feel safe reporting to Captain Mahler, especially given the high-risk situations in which her job responsibilities placed her. (Doc. 383-29, Ex. 28 at CM/ECF p. 2, 2:16-5:15).

162.    On January 19, 2016, Captain Giles met with Command Staff to discuss the internal investigation and his continued objections to Mahler's discrimination and harassment.  Giles vehemently questioned the decision to allow Mahler back.  He said he had repeatedly made Chief Jones aware of Mahler's behavior and that he could not believe they were going to put Mahler and Amanda back in the same environment. (Doc. 385-12 at CM/ECF p. 1, ¶3-4); (Doc. 384-29 at

CM/ECF pp. 6-7, 20:2-21:25).    Giles explained that Jones never addressed his multiple complaints. (Doc. 384-29 at CM/ECF pp. 7, 22:19-23:6).

163.    During the conversation, Giles asked Jones, "Am I lying?" Jones' reply was, "You brought up lots of problems about [Mahler]." (Doc. 384-29, Ex. 104 at CM/ECF p. 12, 45:12-25). Giles warned Chief Linke and Battalion Chiefs Jones, Bopp, and Benes that since Amanda reported Mahler, she had a target on her back. (Doc. 388-7, Ex.157 at CM/ECF p. 3). He also reported his belief that "someone" had a gun at Station 8. (Id.)

164.    Later that day, Mahler met with the Command Staff. The plan was to provide him "with an opportunity to work with Amanda and fulfill some of her career aspirations." (Doc. 388-7, Ex. 157, at CM/ECF p. 2). They directed him to work with incoming Captain Daren Merryman (who was replacing Giles at Station 8) to prepare a training and conflict resolution plan that included specific guidelines for everyone at the Station to work and function together. They communicated to Mahler the clear expectation that the engine and truck crews would work together in training, house duties, and incident response. They directed Mahler to "reach out to Amanda and work to repair her perceptions of his leadership style." Mahler agreed to do so and promised to "take strenuous efforts to provide Amanda with the tools to succeed." The Chiefs told Mahler that Nic Thill (on Mahler's crew) was still ignoring Amanda and treating her differently. They stressed that this "cannot be allowed to happen" and that it was his responsibility to ensure that it didn't. (Doc. 388-7, Ex. 157 at CM/ECF pp. 4-5). Chief Linke directed Mahler to partner with Merryman to work collaboratively and ensure that all personnel were given an opportunity to grow and be successful. (Doc. 380-84 at CM/ECF p.6).

165.    They also warned Mahler that guns were not allowed on LFR property. (Doc. 388-7, Ex. 157 at CM/ECF p. 5).

166.   Later that day, Amanda met with Command Staff.  She expressed fear that the work environment would only get worse, and that Mahler would retaliate against.  They assured Amanda that the Command Staff would maintain a strong presence at Station 8 and would be diligent in addressing any hostility going forward.  They asked that she trust them.  (Doc. 388-7, Ex. 157, at CM/ECF p. 4).  She explained that Captain Giles was her only supporter and she was uneasy now that he would no longer be working at Station 8. (Doc. 383-30, Ex. 29 at CM/ECF p.7, 22:13-24:38).

167.   On January 20, 2016, Amanda again met with Chief Linke and Battalion Chief Benes.  They assured her that Merryman had been briefed on her situation. Amanda was told that Mahler would take part in the re-education of Station 8 but he would be returning to Station 8.  (Doc. 383-29, Ex. 28, at CM/ECF p. 4, 10:1-11:14).  Amanda reiterated to Chief Linke that she was fearful about her career and about further retaliation. (Id. at CM/ECF p. 3, 5:7-25)..

168.   Amanda said that Mahler had "humiliated [her] in front of everyone and berated [her]."  She expressed fear for her physical safety from some of the Station 8 firefighters, who could "let something happen" to her at a fire or "not assist" her.  (Doc. 388-7, Ex. 157 at CM/ECF pp. 5-7).  She said it felt like she was "going back into the lion's den."  (Id.)  Amanda explained that Mahler had a "history of not liking female firefighters" and the same kind of thing had happened at Station 5 when he was there. (Id.)  She said Command Staff had known for some time that Mahler was a bully and hostile, and that he ignored her in the station.  She notified them she was having mental health issues because of this.  (Id.)

169.   After Amanda told them she did not feel safe at Station 8, Linke removed Amanda from administrative leave and required her to take sick leave for the remainder of the day.  (Doc. 380-84 at CM/ECF p. 8).

170.    Fire Chief Linke repeatedly asked Amanda to trust them. *(Id.)* He claimed Mahler thought she had a lot of potential and he wanted to help her succeed. *(Id.)* Linke said Mahler had agreed to ensure his crew was professional and not to retaliate in any way. He indicated he had "asked Captain Mahler to reach out to her in order to move forward with providing her opportunities to be successful." *(Id.)* He assured her that Mahler "desired the opportunity to work with Amanda and make amends." *(Id.)* Linke promised to support her and "take immediate action if she or any member of her crew reported any retaliation or hostility." *(Id.)*

171.    Amanda also reported to Linke that Nic Thill was "documenting a case" against her and Giles. *(Id.* at CM/ECF p. 3, 8:1-22).. *(Id.* at CM/ECF p. 3, 6:16-18).

172.    Amanda was forced to become a temporary floater. (Doc. 383-29, Ex. 28 at CM/ECF p. 26, 101:14-16).

**Amanda's Mental Health Declines Due to the Harassment**

173.    On January 20, 2016, Amanda emailed Chief Linke and others, requesting that they find a long-term solution and that she not be forced to go back to Station 8 where she did not feel safe. *(Id.)*

174.    On January 20, 2016, Chief Linke informed Director Casady of Amanda's concerns and that he had given specific expectations to Command Staff that Mahler would be intensely supervised. (Doc. 380-84, at CM/ECF p. 6). Casady approved these directives, but took no action to ensure they were followed. (Doc. 380-84 at CM/ECF p. 6); (Doc 334-2); (Doc. 383-44, Ex. 43 at CM/ECF p. 10).

175.    On January 21, 2016, Amanda contacted Union Vice President Trouba to discuss her concerns about her transfer rights. Amanda and Trouba arranged to meet on February 3, 2016. (Doc. 384-30, Ex. 105 at CM/ECF p. 11, 43:10-14).

176.    On January 27, 2016, Amanda met with her EAP counselor to discuss her frustration regarding the outcome of the investigation and Linke's decision to return her to Station 8 despite her retaliation and safety concerns.  (Doc. 383-19, Ex. 18 at CM/ECF p. 8).

177.    On January 28, 2016, Amanda filed an internal EEO complaint based on sexual harassment and discrimination through EEO Director Taylor-Riley. (Doc. 383-37, Ex. 36); (Doc. 196 at CM/ECF p.5, ¶41); (Doc. 334-2 at CM/ECF p.1, ¶1).

178.    On February 2, 2016, Amanda experienced a panic attack on the ambulance during her shift.  (Doc. 383-19, Ex. 18 at CM/ECF p. 7). Acting Battalion Chief Shane Cuttlers took the rig out of service to try and calm Amanda down.  (Doc. 383-18, Ex. 17 at CM/ECF p. 11, ¶47). Amanda took a sick day for the remainder of the day and met with her EAP counselor to discuss her feeling overwhelmed, lack of appetite and frustration with having to float to Station 6 because of her fear of working with Mahler.  (Id.)

179.    On February 3, 2016, Amanda met with Trouba. (Doc. 334-2 at CM/ECF p. 9, ¶2). Amanda asked Trouba about her transfer rights given that she was also a member of Local 644 and entitled to the union protection. (Id.) During the conversation, Trouba mentioned some private medical information about Amanda that he should not have known. (Id.) He stated, "I am just going to be honest with you.  Your reputation is that you are lazy.  People don't like you.  They think you have an attitude problem.  It's going to take you a long time to become a respected firefighter." (Id.) He told Amanda that she should be spending her energy trying to fix her career and reputation instead of pursuing a harassment claim against the City. (Id.) Amanda expressed her discomfort to Trouba about his knowledge of her private medical information and his attempt to dissuade her from pursuing her harassment complaint. (Id.)

180.    Trouba also told Amanda that she would eventually run out of the ability to float to a different station. (*Id.*)

181.    On February 4, 2016, Amanda asked Captain Merryman about the re-education program for Station 8. (Doc. 384-31, Ex. 106). Merryman denied knowing anything whatsoever about Amanda's situation and denied her request to meet with him. (*Id.*)

**Amanda Returns to Station 8 -- Nothing has Changed**

182.    Despite all this, on February 5, 2016, Amanda agreed to return to Station 8. (Doc. 380-10); (Doc. 384-32, Ex. 107). She reiterated her understanding that everyone involved, including herself, displayed the diligence it would take to continue fighting to make the station a safe and healthy environment for everyone. (*Id.*)

183.    What actually happened was a far cry from what the City promised.  Amanda returned to Station 8 on February 10, 2016.  Mahler refused to address her or even look her way. (Doc. 380-11). Merryman told her that he would be "the contact between Mahler" and her "until the tension cleared, if it ever did." (*Id.*) Merryman said Amanda would never work on the truck and that Mahler only wanted Mark Rist to rotate in.  Amanda objected that these weren't the working conditions the Chiefs had promised her.  (*Id.*) Merryman said that he would personally train her until she could meet Mahler's standards. (*Id.*)

184.    Merryman also told Amanda that Mahler was angry about Amanda's complaint. (*Id.*)

185.    In response, Amanda did exactly what Chiefs Linke and Benes told her to do.  On March 3, she emailed Benes and explained the reception she received and what Merryman communicated about how things would be going forward.  By that point, she had been back at

Station 8 for three weeks, and Mahler had still not spoken a word to her.(Doc. 334-2 at CM/ECF p. 10, ¶2).

186.    Rather than "taking immediate action," as Defendant promised, <u>Benes never even replied to Amanda's email</u>.  No one from Command Staff called or met with her.  In fact, Benes was physically present at the Station twice in eleven days after her March 3 email, but he did not bother to speak to her.  (Doc. 388-8, Ex. 158 at CM/ECF pp. 1-2).

187.    On March 3, 2016, Amanda reported to her EAP counselor that her physician recommended medication to cope with her current work situation and that she opted to try some natural supplements for her anxiety. (Doc. 383-19, Ex. 18 at CM/ECF pp. 5-6).

**Amanda Languishes at Station 8 with No Advocate**

188.    The same day, unbeknownst to Amanda, Captain Merryman began recording his phone calls with her.  (Doc. 383-10, Ex. 9 at CM/ECF p. 37, 148:20-22).  He didn't record his calls with Captain Mahler. (Doc. 383-10, Ex. 9 at CM/ECF p. 38, 151:12-14).

189.    On March 14, 2016, Amanda met with Merryman.  She said the administration had told her that Mahler had "displayed incredible sincerity and that it was his desire to remedy the problem and right his wrongs."  She said either the Chiefs had lied to her or Mahler had lied to them to stay out of trouble.  (Doc. 388-8, Ex. 158).

190.    Merryman had no idea what had led to Giles leaving or how Mahler had treated Amanda.  (Doc. 383-10, Ex. 9 at CM/ECF p. 19, 74:6-75:8).

191.    No one had bothered to tell Merryman about the plan, his responsibilities, or the actions the Chiefs expected of Mahler.  The only conversation he remembered was that guys around the Station said Amanda would be coming back to Station 8 on the next set.  The only thing the Chiefs told him is there had been a lot of tension and he should try to "foster a better

atmosphere." When asked if they had given any advice about how to handle the tense atmosphere, he replied, "No. Just to do my best." (Doc. 383-10, Ex. 9, at CM/ECF p. 20, 77:18-79:5).

192.   On March 23, 2016, Director Taylor-Riley sent a blind copy request for interviews to Mahler, Jesse Johnson, Jeff Draper, and Nic Thill, all members of the T8 crew. (Doc. 334-2 at CM/ECF p.12, ¶2).

193.   On March 24, 2016, City Privacy Officer Sherry Meints informed Amanda there had been a HIPAA violation involving her medical records. (Doc. 334-2 at CM/ECF p. 11, ¶1).

194.   On March 25, 2016, Mahler responded to Taylor-Riley on behalf of his entire crew, seeking to coordinate their individual interviews with Taylor-Riley. (Doc. 334-2 at CM/ECF p.12, ¶2). Taylor-Riley responded individually to each crew member, attempting to prevent Mahler from coordinating their responses. (Doc. 334-2 at CM/ECF p.13).

195.   On March 25, 2016, Amanda emailed Privacy Officer Meints to get more information about the disclosure of her private medical information. (Doc. 384-34, Ex. 109).

196.   On March 25, 2016, Amanda met with Merryman to discuss FAO training. (Doc. 380-16). The training document set her midpoint evaluation on June 27, 2016, and scheduled her re-evaluation on September 19, 2016. (Doc. 380-16). By the September 19, 2016, evaluation, Amanda was to be ready for the FAO certification process and prepared to fulfill the duties of an FAO, despite her lack of rotation to the truck. (Doc. 380-16). The document Amanda signed was not standard policy and pertained only to Amanda because other Station 8 personnel had already been certified. (Doc. 383-10, Ex. 9 at CM/ECF p. 41, 162:3-7).

197.   On March 29, 2016, Mahler again responded to Taylor-Riley, stating he had been directed to coordinate times for her to interview his crew. (Doc 334-2 at CM/ECF p.13). Taylor-Riley contacted Benes to ask if he given this direction, but he had not. (Id.) Taylor-Riley expressed

"her discomfort at Mahler orchestrating interviews of his staff when the issue at hand involved Mahler's conduct." (*Id.*) Benes agreed to intervene and have the individual members of Mahler's crew contact Taylor-Riley individually to schedule their interviews. (*Id.*)

198.    On March 29, 2016, Amanda met with Benes and Merryman to again report that Mahler continued to refuse to speak with her.  Amanda brought up the Chiefs' earlier assurances that Mahler was ready to move forward.  She said she was worried about rotating to the truck on the following day because of the continued hostile work environment. (Doc. 334-2 at CM/ECF p.11, ¶2).

199.    On March 30, 2016, Amanda met with Meints and Benes regarding the breach of her HIPAA rights.   (Doc. 383-18, Ex. 17 at CM/ECF p. 12 ¶53). She informed them that Union Vice President Trouba was aware of her private medical information, but Trouba discouraged her from taking any further action against the City. (*Id.*)

200.    On March 31, 2016, Merryman told Amanda that he was under a lot of pressure to force Mahler to let her on the truck.  It was apparent to her that she was viewed as the "difficult child" and the "agitator." (Doc. 395-15, Ex. 172).

201.    On April 2, 2016, Amanda met with Merryman.  She asked to be treated equally, for Mahler to quit ignoring her, and to attempt to mediate with a third-party mediator. (Doc. 383-16, Ex. 15, at CM/ECF p. 11).  Merryman informed her that because she filed a complaint against Mahler, he would not be speaking with her until the EEO investigation was over. (*Id.*)

202.    That same day Amanda emailed Taylor-Riley requesting to discuss transferring out of Station 8 because of the negative impact the work environment was having on her emotional and physical health. (Doc. 384-36, Ex. 111).

203.    On or about April 4, 2016, Amanda, Meints, Bonin, Giles, and Assistant City Attorney Liz Elliot met to discuss Trouba's actions.  (Doc. 384-37, Ex. 112). Amanda also learned that Firefighter Kyle Reinhart had requested her personal medical information. (Id., at CM/ECF p. 4). Amanda raised complaints in the meeting about her private medical information being disclosed following her EEO complaint in violation of HIPAA.  (Id. at CM/ECF p. 11).

204.    On April 12, 2016, Amanda met with her EAP counselor to express her frustration with Mahler's continued refusal to speak with her at Station 8. (Doc. 383-19, Ex. 18 at CM/ECF p.4). Amanda also reported that Mahler was finally being forced to put her on the truck. (Id.) Amanda said she was now terrified to work on the truck because she didn't trust Mahler or anyone at Station 8. (Id.)

205.    On April 12, 2016, Captain Merryman told Amanda that no mediation would occur that would allow her to rotate to Mahler's truck until Taylor-Riley's investigation was over.  (Doc. 383-16, Ex. 15 at CM/ECF pp. 12-13).

**City Protects the Offenders who Violated Amanda's HIPAA Rights**

206.    On or around April 19, 2016, Assistant City Attorney Elliot informed Amanda she was not obligated to investigate Trouba for doing his job for the Union and the investigation was inconclusive regarding the HIPAA violation. (Doc. 383-34, Ex. 33).

207.    In actuality, however, despite Elliot's representations, the City's investigation revealed that Fire Chief Linke himself was the individual who disclosed Amanda's private medical information to Trouba. (Doc. 380-33, Ex. 32).  Merryman had also told Elliott that several crew members were discussing Amanda's confidential medical information, and they could have been easily identified through staffing records.  (Doc. 334-15 at CM/ECF p. 19, 73:6-74:12); (Doc. 383-

10, Ex. 9, at CM/ECF p. 33, 130:1-6).  Although Merryman recorded this meeting, he could not produce it in discovery.  (Doc. 383-10, Ex. 9, at CM/ECF p. 38, 150;1-17).

208.   On April 25, 2016, Mahler met with Taylor-Riley and provided a host of supplemental documentation criticizing Captain Giles' leadership and asserting that Amanda was insubordinate.  (Doc. 383-43, Ex. 42 at CM/ECF pp. 1-6).'

### Mahler and Others Retaliate against Amanda

209.   On or about April 26, 2016, Taylor-Riley told Amanda that during her investigation into Amanda's complaint, witnesses said that Amanda had been accused of insubordination, wearing socks in the fire station, refusing to accept a pastry offered to her, refusing coffee refills, and for having a strange, possibly romantic relationship with Giles. (Doc. 383-18, Ex. 17 at CM/ECF p. 12, ¶49). Taylor-Riley told Amanda several attempts were made by Mahler and others under Mahler's direction to take secret photos of her sitting next to Giles as evidence of their supposedly inappropriate relationship.  (*Id.*)  No one else had advised Amanda about these accusations, and she never had any romantic relationship with Giles.  (*Id.*)

210.   Merryman reported to Taylor-Riley that Amanda was refusing to speak to Mahler, implying that she was being insubordinate—even though Merryman had ordered her not to communicate with Mahler. (Doc. 334-2 at CM/ECF p. 26)

211.   After Amanda learned of the alleged complaints about her performance, she asked Merryman if there had been any complaints about her.  Merryman denied any issues had been relayed to him, and said her performance was excellent. (Doc. 383-10, Ex. 9 at CM/ECF p. 51, 206:13-207:3).

212.     On or about May 6, 2016, Amanda reported to Merryman that she did not feel safe at Station 8 because of retaliation from Mahler and his peers. (Doc. 383-16, Ex. 15 at CM/ECF pp. 30-31).

213.     Fellow firefighter Jeremy Phillips told Amanda he was transferring out of Station 8. He said the discrimination against her was so blatant and severe that he could no longer watch it. (Doc. 334-18 at CM/ECF p. 20, 79:11-21); (Doc. 188, p. 22, ¶109) .

### Taylor-Riley Finds Mahler and LFR have Discriminated, Harassed and/or Retaliated Against Amanda

214.     On May 6, 2016, Taylor-Riley issued her report into the investigation of Amanda's complaints to Mayor Beutler and Denise Pearce.     (Doc. 334-2). Her investigation found the following:

- Despite Mahler's denials that he manipulated the schedule to not rotate Amanda to his truck and his representations in his own predisciplinary hearing, Amanda worked only 100 hours (8 shifts) on the truck in comparison to Mark Rist's 1,177 hours (60 shifts) from October 2014 to December 2015. (Doc. 334-2 at CM/ECF p. 18-19).

  Rist and Amanda were comparable as each is assigned as a firefighter to E8 and would reasonably have the same rotation pattern from E8 to M8: E8 to T8. While the medic unit rotation is comparable, the E8 and T8 hours clearly are not. (Doc. 334-2 at CM/ECF p. 19).

- Amanda was assigned to the two busiest rigs at Station 8 for all but 100 of her work hours. The call volumes for Truck 8 are significantly lower than those of E8 and M8, and this reflects a much heavier workload for Complainant than for her comparator. This affords Rist the much-needed down time that lower Truck 8 call volumes provide and also allows him hands-on experience with truck functions. (Id.).

- Derrald Murrell, a retired Battalion Chief, who supervised Mahler at station 5, indicated that Chief Jones and Mahler were good friends. Murrell said that before he retired, he spoke with Jones and advised that he needed to deal with Mahler. Murrell stated, "Mahler does not feel that women are equipped to be on the USAR team, they are better suited to medical positions."  Murrell also indicated that he

didn't believe Merryman was strong enough to supervise Mahler and address his issues. Murrell suggested that Mahler be transferred to another stationhouse until the investigation was complete and said LFR had the power to take that action. *(Id., at CM/ECF p. 21); (Doc. 383-67, Ex. 66).*

- Firefighter Nic Cunningham informed Taylor-Riley that Mahler did not let him participate in venting roofs because he didn't have a fall protection belt, but that he was allowed to rotate to the truck. He also stated that ignoring, refusal to speak or interact is something he has seen Mahler do in the past. *(Id., at CM/ECF p. 23).*

- Dylan Delaney, a new male recruit with no previous track experience, never bought a fall protection belt, but Mahler allowed him to work on the Station 8 truck crew and vented his first roof his third day on Truck 8. *(Id.)*

- Station 8 Firefighter Jesse Johnson stated that he had always been on the truck and that Mahler doesn't want his truck crew to drive the medic unit. *(Id.)*

- Many witnesses said that Mahler had similar issues to those alleged by Amanda with a female firefighter when Mahler was at Station 5. Taylor-Riley confirmed such issues; however, the witness would not go on the record with a statement. *(Id., at CM/ECF p. 22).*

- Firefighter Bryan Kratochvil reported that the was floating at Station 8 several months ago and the kitchen was not cleaned. Mahler commented at the time, "That's why there's no room for women in the fire service." *(Id., at CM/ECF p. 23-24).*

- Giles reported that the conflict at Station 8 was not with him and Mahler, but the result of Mahler's unfair treatment of Amanda. Giles reported that he complained to Chief Jones on five occasions about Mahler's manipulation of the medic unit schedule, but Jones did not address the issue effectively. Giles indicated that the rules that Mahler created were to keep Amanda off Truck 8, but did not apply to men *(Id., at CM/ECF p. 24).*

- Former Captain Mike Mayfield confirmed that firefighters were not required to have any truck experience before an assignment. A firefighter could be sent to a truck right out of the academy and the captain is expected to train them. *(Id., at CM/ECF p. 25).*

- Merryman indicated that he was not told what happened between Mahler and Giles and had to figure out what happened on his own.  He stated that he spoke to Chief Benes and  Fire Chief Linke, but there was no clear-cut answer as to how to fix the problem.  Merryman indicated that they are engaged in "leadership by avoidance;" no plan and no follow through.  He expressed frustration about the lack of support from command staff.  (*Id.,* at CM/ECF pp. 25-26).

- Jeremy Phillips reported that Mahler did not allow Amanda on the truck from the time she arrived at Station 8, but that new employee Troy Hassebroek was on Truck 8 straight from probation.  He indicated that Mahler's manipulation of the medic unit's schedule created stress and fatigue.  Phillips said that Amanda was bullied by Mahler. (*Id.,* at CM/ECF p. 27).

- While Linke stated in his notes that command staff would maintain a strong presence at Station 8 after Amanda's return and address any allegations of hostility moving forward, command staff did not communicate with Amanda after her return and failed to respond to direct communication from her. (*Id.,* at CM/ECF p. 29).

- Chief Jones admitted that he was not at Station 8 much and failed to reprimand Mahler regarding his refusal to take the lift assist call in August 2015.  Jones said that he consulted with the City Legal Department, Personnel Director McDaniels, and Director Casady, but that he believed that they needed training for supervisors on equity, hostile work environment and equality.  He stated, "LFR needs a culture change." (*Id.,* at CM/ECF p. 31).

- Chief Benes offered no response to Amanda's report that Mahler refused to have contact with her.  Benes indicated that he wanted to meet with them and force them to move forward.  Taylor-Riley suggested to Benes that a baseline trust be healed before that happened and that forcing them to work together on the truck if they are not speaking was a serious safety.  Benes admitted the relationship exploded in December 2015 and remained unaddressed.  Benes admitted he never responded to Amanda's March 3 email. (*Id.,* at CM/ECF pp. 31-32).

- On March 30, 2016, Taylor-Riley met with Mahler, who agreed to meet with Amanda and third-party neutral mediator.  Amanda also agreed, as did Chief Benes and the Personnel Department.  (*Id.,* p. 32)

- On April 14, 2016, Taylor-Riley was advised by Personnel, City Legal and mayoral aide Pearce, that no mediation was going to occur until the investigation was complete. (*Id.*, at CM/ECF p. 33).

- Taylor-Riley interviewed 26 individuals and reviewed over 30 compilations of relevant documentation to reach her findings and conclusions. *(Id., at CM/ECF pp. 2-3).*

- **Taylor-Riley concluded that Amanda had been discriminated and retaliated against by City officials.** *(Id., at CM/ECF p. 34-37).*

215.     In May 2016, Chief Benes told Amanda if she had accepted a mediation with Mahler at the onset of the issues, then the problem would not have gotten "so bad" and her issues with Mahler would be over.  *(Doc. 384-49, Ex. 124 at CM/ECF p. 5).* Amanda explained to Benes she had never been given an option to mediate with Mahler. *(Id. at CM/ECF p. 5-6).*

216.     Amanda said that she felt that as a supervisor, Captain Mahler's conduct was illegal and that he should be able to be professional and treat her appropriately. *(Id.)*   Amanda also informed Benes about the harassment that women endure at LFR.  She said:

> "What happens to women. And it's across the board, no matter what type of woman you are. You're sexualized, everything's sexualized. You can't have a friend with a coworker without it being insinuated. And then God forbid they don't like you for this, that or the other, then you're going to slut shamed for something that's not even real."

*(Id. at CM/ECF p. 18).*

217.     These issues were never investigated.  *(Doc. 334-18 at CM/ECF p. 123, 491:18-21); (Doc. 383-17, Ex. 16 at CM/ECF p. 10).*

### Amanda is Forced to Transfer out of Station 8

218.     After Taylor-Riley's report was released, LFR gave Amanda the following options: float for the work-set; lose her position and transfer to a floating position; or float for 90 days if the Union, City Administration, and the City Hall agreed to write a Memorandum of

Understanding ("MOU"), making an exception to the CBA. (Doc. 383-16, Ex. 15 at CM/ECF p. 35).

219.    Rather than the City addressing the problem, Amanda was forced to become a floating firefighter.    On May 19, 2016, Mayor Beutler approved the Memorandum of Understanding. (Doc. 385-15, Ex. 140). Knowing that she could not continue working in Station 8's hostile work environment, Amanda signed the MOU. (Doc. 384-14, Ex. 89).

220.    Amanda's career was gutted by the toxic environment created by Shawn Mahler.  (Doc. 380-78, Ex. 168 at CM/ECF p. 2, ¶ 6).

221.    If Amanda had had supportive Captains throughout her career, a reasonable jury can find she would be a Captain at LFR now and on her way to becoming a Battalion Chief.  (Doc. 395-12, Ex. 169 at CM/ECF p. 2, ¶ 6).

222.    On May 24, 2016, Amanda was put on injury leave to have surgery because of a work injury. (Doc. 196 at CM/ECF p. 7, ¶57).

223.    On about June 8, 2016, Giles filed his own Charge of Discrimination with the NEOC, claiming the City's failure to promote him to Battalion Chief was retaliation because he was a witness for Hurd and reported the harassment and discrimination against Sara Khalil and Amanda. (Doc. 384-39, Ex. 114).

224.    In July 2016, Captain Merryman continued to record calls with Amanda in which she told him that she didn't want to leave Station 8, but that she was struggling mentally because of the harassment. (Doc. 383-21, Ex. 19 at CM/ECF p. 9); (Doc. 384-48 at CM/ECF p. 10). Amanda said, "It makes me feel isolated. I am completely, 100% isolated there." (Doc. 383-48 at CM/ECF p. 7). She explained that she was tired of the sexist comments and that she "just wanted to be treated like a human being." (Id.) Fire administration's failure to remedy the hostility and

isolation at Station 8 forced her to accept the transfer. (Doc. 383-21, Ex. 19, at CM/ECF p. 7).

Merryman responded that he didn't think it was healthy for her to return to Station 8 and agreed

that the way command staff handled the situation was a "disaster." (Doc. 383-21, Ex. 19 at

CM/ECF p. 12); (Doc. 383-21, Ex. 20 at CM/ECF p. 5).

225.    On July 18, 2016, Merryman emailed Amanda, notifying her that her injury leave

was expiring, and that she needed either to give up her assignment or return to Station 8.  At the

time, the City had not responded to Taylor-Riley's report or Amanda's continued complaints

concerning the harassment, discrimination, and retaliation. (Doc. 380-42).

226.    On July 19, 2016, Director Casady met with Mayor Beutler to discuss the Taylor-

Riley report.  In violation of the Equity Access and Diversity Plan, the City Legal Department

provided Director Casady only a "summary" of the report.  (Doc. 384-42, Ex. 117 at CM/ECF p.

20, 79:3-80:19; p. 21, p. 18, 81:18-82:11); (Doc. 384-41). Mayor Beutler directed Casady to keep

the Taylor-Riley report confidential, and stated he was not allowed to consult with any command

staff about it.  (Doc. 384-42, Ex. 117 at CM/ECF p. 21, 82:12-18).  Casady was not aware of

Captain Mahler's previous history of problems with female firefighters at Station 5.  (Doc. 384-

42, Ex. 117, at CM/ECF p. 21, 84:7-85:15).

227.    On July 22, 2016, Amanda told Merryman she was giving up her assignment at

Station 8 because the environment was so toxic and retaliatory she felt she had no other option.

(Doc. 384-40, Ex. 115). (Id.) Station 8 was located in her neighborhood, she loved the busy call

volume because she could get more training, and she didn't want to leave.

### Mayor Beutler Ignores Taylor-Riley's Recommendations -- Again

228.    On July 28, 2016, Amanda received a letter from Mayor Beutler. (Doc. 380-42).

The letter stated the City Legal Department conducted its own investigation regarding her

complaints and found no grounds for discrimination or retaliation. (*Id.*) The City Legal Department failed to interview Amanda or her witnesses in connection with its investigation.  (*Id.*)

229.    The letter also stated Amanda could schedule a meeting with McDaniel and Casady to discuss how to improve fire house interactions. (*Id.*)  The letter did not inform Amanda of any actions put in place to remedy harassment or retaliation at LFR. (*Id.*)

230.    On about August 1, 2016, Director Casady contacted Amanda to schedule a meeting with her and Director McDaniel. (Doc. 196 at CM/ECF p. 7, ¶60). Amanda requested to bring Giles as a witness to their conversation rather than a union representative.  Casady denied the request because Giles had a pending NEOC complaint. (Doc. 384-43, Ex. 118).

231.    On August 2, 2016, Amanda met with Casady and McDaniel. (Doc. 383-44, Ex. 43). Casady admitted that there had been a "management failure" when Command Staff failed to communicate with her supervisors at Station 8 about their expectations for Mahler's behavior. (Doc. 383-44, Ex. 43 at CM/ECF p. 15). McDaniel told Amanda that LFR had "a systemic issue that need[ed] to be addressed."  McDaniel also said, "If we had the advantage of the HR Wand, this never would have happened. It would have been solved in 2012 with the culture, but the HR wand is pretty damn weak." (Doc. 383-44, Ex. 43 at CM/ECF pp. 17-18).

232.    McDaniel and Casady attempted to pressure Amanda into returning to Station 8. They urged her to trust them and said they finally "had Mahler's attention." (Doc. 383-44, Ex. 43 at CM/ECF pp. 8-9).  Amanda told them that she would not return to Station 8 because they had not remedied the situation. (Doc. 383-44, Ex. 43, at CM/ECF pp. 1, 7, 14 and 17).

233.    Casady admitted that management failed to communicate their expectations to Captain Merryman about Amanda's return to Station 8.  (Doc. 384-42, Ex. 117, at CM/ECF p. 22, 88:19-89:15).

234.    Director Casady was never aware of any of Amanda's complaints of retaliation or discrimination until her lawsuit "hit the news."  (Doc. 384-42, Ex. 117, at CM/ECF p. 23, 89: 16-22).

235.    In August 2016, newly appointed Fire Chief Michael Despain contacted Amanda to discuss her options. (Doc. 196 at CM/ECF p. 7, ¶61). Amanda told Chief Despain that she needed to be in an environment where she had support and would be treated the same as everyone else and that being continually targeted was exhausting.  She explained that the continued harassment and discrimination destroyed her entire love for the job.  Amanda reiterated that Command Staff had told her, "Just trust us. We're going to make it right.  It won't happen again," and that she'd already done that for months.  (Doc. 383-45, Ex. 44, at CM/ECF p. 7).  Amanda ultimately decided to give up her spot because she had no alternative options to be free from Mahler's harassment.  (Doc. 383-45, Ex. 44 at CM/ECF p. 10).  Amanda was then transferred to Station 3.

236.    Amanda was forced to transfer stations to remove herself from the hostile work environment created by Mahler that was never effectively addressed by management, even though LFR management could have moved Mahler for the betterment of the entire department. (Doc. 384-19, Ex. 94, p. 4, ¶16, and p. 22, §3); (Doc. 383-6, Ex. 5 at CM/ECF p. 15, §3); (Doc. 383-21, Ex. 20, at CM/ECF, p. 2).

**Amanda Files her First Charge of Discrimination**

237.    On or about August 15, 2016, Amanda filed a Charge of Discrimination with the NEOC, alleging sex harassment, discrimination, and retaliation.  (Doc. 380-65).

**Merryman Downgrades Amanda's Evaluation for 2016**

238.    On December 12, 2016, Captain Merryman called Station 3 and asked Captain Dan Ripley to send Amanda to Station 8 to receive her performance evaluation. (Doc. 196 at CM/ECF p. 7, ¶63). Ripley told Merryman that Amanda would not being going to Station 8 for her evaluation and something else needed to be arranged. (Doc. 334-18 at CM/ECF p. 36, 141:3-6; Doc. 188 at CM/ECF p. 28, ¶122).

239.    Later that day, while Amanda was enroute to the hospital with a patient on the Medic 3 unit, Merryman contacted Amanda on the radio. Merryman demanded Amanda meet him as soon as possible regarding her evaluation. Merryman instructed Amanda to wait at the hospital once her medic unit had transferred the patient's care. Despite the unusual circumstances, Amanda agreed. Merryman gave Amanda her evaluation in the hospital break room in the presence of another firefighter. (Doc. 334-18 at CM/ECF p. 36, 141:3-6); (Doc. 188 at CM/ECF p. 28, ¶123)

240.    Merryman rated Amanda 74%--far lower than her last score. (Doc. 380-33). (Doc. 384-44, Ex. 119 at CM/ECF p. 1). Captain Merryman had previously informed Amanda in July of 2016, she had "done nothing but an excellent job." (Doc. 383-20, Ex. 19 at CM/ECF p. 10). LFR's Performance Evaluation standards indicate that excellent performers are to receive scores far above what Amanda received. (Doc. 383-47, Ex. 46 at CM/ECF p. 4). Captain Ripley at Station 3 later scored her at over 91%. (Doc. 384-42, Ex. 117, at CM/ECF p. 4).

**Sexual Harassment at Station 3**

241.    Despite moving to Station 3, Amanda continued to experience discrimination based on her sex and protected activity. The City continually refused to investigate or remedy her complaints of discrimination and retaliation. (Doc. 334-18 at CM/ECF p. 123, 491:18-21); (Doc. 383-17, Ex. 16 at CM/ECF pp. 4-16); (Doc. 132-18); (Doc. 132-20).

242.    During the time she was assigned to Station 3, Amanda faced offensive language and conduct from many firefighters including:

➢ Alex Martin told Amanda to shut up and make him a sandwich. (Doc. 334-18 at CM/ECF p. 71, 284:17-25).

➢ Martin changed the lyrics to the song "Amanda" to make the lyrics about killing her and "skull, skull, fucking [her]." (Doc. 334-18 at CM/ECF p. 72, 285:1-5).

➢ Martin called Amanda a "stupid woman." (Doc. 334-18 at CM/ECF p. 72, 285:6-8).

➢ Martin continually referred to female firefighters in degrading ways and spread rumors about them. (Doc. 334-18 at CM/ECF p. 72, 285:9-12.)

➢ Martin made degrading comments about firefighter Ashley Engler. (Doc. 334-18 at CM/ECF p. 72, 285:13-15).

➢ Tony Hewitt made several comments about a female recruit's body while she was participating in the running section of a test. (Doc. 334-18 at CM/ECF p. 72, 286:6-287:16).

➢ Hewitt made several comments about a heavier-set female recruit, stating "What is she thinking showing up to do a run wearing something like that?' (Doc. 334-18 at CM/ECF p. 72, 286:6-287:16).

➢ Male firefighters made degrading hip motions when Kelsey Kuss ran by. (Doc. 334-18 at CM/ECF p. 72, 286:6-287:16).

➢ Ricky Dewitt told Amanda that he didn't think Kelsey Kuss should be hired by LFR because he thought male firefighters would hit on her and he couldn't deal with the embarrassment of that. (Doc. 334-18 at CM/ECF p. 72, 286:6-287:16).

> ➤ Amanda reported the behavior of Hewitt and the other male firefighters' behavior during the run test to Recruitment Committee Chair Chris Gutierrez.  Gutierrez told Amanda to "let it go." (Doc. 334-18 at CM/ECF pp. 72-73, 288:22-289:12).

### Amanda is Ostracized Across Lincoln Fire & Rescue

243.    Firefighter Jessie Lundvall described the isolation and the discriminatory treatment Amanda received after she spoke up:

> All I can tell you is that from the 5 time that woman made the complaint, and then it became public knowledge that she was filing a  lawsuit, there were attitudes, I can't speak for everyone, and I didn't take notes, but I know what I witnessed, that there were attitudes about her that changed. And it went from she was a hardworking firefighter, to she was a piece of shit, trouble maker, and that was how people talked about her, in front of me. And, and, and that was the furthest thing from the truth, because Amanda would work circles around people at a scene.

(Doc. 334-19 at CM/ECF p. 15, 57:19-58:16).

> It was said a lot, but I didn't write it down who said it. It was a, like, a cancer, somebody that everybody just wanted away from, because she was going to turn them in, instead of having the attitude of, I'll do what I'm supposed to do, and behave like I'm supposed to behave, it was, she's here to ruin our fun and we need to avoid her.

(Doc. 334-19, at CM/ECF p. 25, 98:3-19); (Doc. 334-19 at CM/ECF p. 11-15, 43:3-60:10; p. 24-25, 95:1-98:19).

### Amanda Faces Discrimination from Chief Mueller on the USAR Team

244.    Nebraska Task Force-1, the Urban Search and Rescue Team ("USAR"), is sponsored by LFR and managed exclusively by LFR employees. (Doc. 383-18, Ex. 17 at CM/ECF p. 1-2, ¶3-5).  The Program Manager is LFR Battalion Chief Brad Thavenet.  (Doc. 384-19, Ex. 94).  Amanda's employment evaluations address her USAR activities, and Fire Chiefs have to approve orders to allow LFR employees to deploy with USAR.  (Doc. 384-45, Ex. 120); (Doc. 384-46, Ex. 121).

245.     Eddie Mueller held that position of Training Manager of the USAR Team under the direction of Chief Brad Thavenet, the USAR Manager for LFR. (Doc. 383-18, Ex. 17 at CM/ECF p. 1-2, ¶3-5).; (Doc. 385-10, p. 6)

246.     USAR is an incredibly valuable opportunity for training, growth, and professional development.  Even though it is a separate entity, LFR employees are gate keepers for who gets access to these opportunities. (Doc. 383-18, Ex. 17 at CM/ECF p. 2, ¶5).

247.     In July of 2019, after Amanda's co-worker submitted a complaint regarding Chief Mueller, Chief Despain ordered Amanda to forward any notes she had regarding Mueller's conduct.  Amanda did so, and those notes included her reporting my damaged suit to Chief Thavenet. (Doc. 383-18, at CM/ECF p. 3, ¶8).

248.     In the fall of 2019, Amanda transferred from Station 3 to Station 1/Truck 1 because she was going to be riding out of grade as an Acting Captain.  (Doc. 334-18 at CM/ECF p. 87, 345:4-346:14).

**Chief Mueller Denies Amanda USAR Training
and Water Rescue Instructor's Position**

249.     In 2019 and 2020, Amanda sent Chief Eddie Mueller emails asking to go to additional Water Rescue training to become an instructor.   (Doc. 383-18, Ex. 17 at CM/ECF p. 2, ¶9); (Doc. 384-21, Ex. 96).  (Doc. 383-18, Ex. 17 at CM/ECF p. 2, ¶9).     Mueller told Amanda she needed to be a state certified instructor. When Amanda reported that she already was, he then changed the requirements and said she needed to attend more trainings, then finally just ignored her requests. (*Id.*)

250.     When Captain Ashley Engler took over from Mueller as the training manager in December 2020, Amanda asked her why she wasn't allowed to instruct and what the process was. (Doc. 383-18, Ex. 17, at CM/ECF p. 3, ¶10). Engler told Amanda that she was going to implement

changes to the entire process.  When Amanda asked how Ben Bolte and Nate Spath got spots, she said that Mueller had rushed in some of "his favorites" before she took over. (*Id.*)

251.    LFR pays its USAR team members for the hours they spend on deployments and instructing.  The federal government later reimburses LFR for those wages. (Doc. 383-18, Ex. 17 at CM/ECF p. 3, ¶12).

252.    The Helicopter Search & Rescue Team ("HSART") team was open only to USAR members. (Doc. 383-18, Ex. 17 at CM/ECF p. 3, ¶13).  Chief Mueller and City of Lincoln employees acted as gate keepers to this team and the extra training it provides. Amanda could not have bypassed Chief Mueller to gain access to this team.  (*Id.*)

253.    Chief Mueller hand-selected USAR team members for the beta testing group of the HSART team in the summer of 2019.  They were all men.  (Doc. 383-18, Ex. 17 at CM/ECF p. 3, ¶14).  Amanda had faster swim times and was more physically capable than some of the men that were selected.  (*Id.*) Even though she had expressed interest, she was not notified about the application process or deadlines. (*Id.*) She found out after the fact and had to get details directly from the Chief Majors, who was also on the USAR team.  (*Id.*) Mueller's hand-picked favorites were the first group to go through the helicopter rescue training up front.  Conversely, Amanda had to apply for the training in 2020. (*Id.*)

254.    Because she was kept out of the Beta testing group, Amanda had to schedule testing at a later date, but then was unable to do so because of a duty-related injury. (Doc. 383-18, Ex. 17 at CM/ECF p. 3, ¶15).

255.    The HSART program eventually ceased operations, and Amanda was never allowed to complete the training. (Doc. 383-18, Ex. 17 at CM/ECF p. 4, ¶15).  Male USAR team

members from LFR *were* allowed. (Doc. 383-18, Ex. 17 at CM/ECF p. 3, ¶15); (Doc. 383-23, Ex. 98).

### City Secretly Conducts Surveillance on Amanda During her Injury Leave

256.    On March 13, 2020, Amanda sustained a work-related injury to her hand.  (Doc. 196 at CM/ECF p. 8, ¶70). Dr. Durand, the physician used by the City for medical evaluations and care of employees, verified Amanda's work-related injury with objective measurements.  Dr. Durand advised Amanda that she was not to work as a firefighter until she received further treatment.  (Doc. 383-18, Ex. 17 at CM/ECF p. 4, ¶17).

257.    After Amanda's injury, members of the City's Risk Management team refused to return her calls.  Despite being unable to perform her duties pursuant to doctor's orders, Risk Management communicated with her orthopedist office about her return-to-work status.  (Doc. 383-18, Ex. 17 at CM/ECF pp. 8-9, ¶¶28-29). Her return-to-work releases were backdated by either the physicians office or risk management resulting in her injury leave getting cancelled and her sick leave being docked.  (Doc. 383-18, Ex. 17 at CM/ECF p. 8, ¶27 and p. 9, ¶31).

258.    This did not occur when Amanda sustained a previous work-related injury prior to filing her charge of discrimination.  (Doc. 383-18, Ex. 17, at CM/ECF p.10, ¶36).

259.    Sometime before June 2, 2020, Chief Benes called Amanda's supervisor Captain Curt Faust, while Amanda was on injury leave. (Doc. 383-49, Ex. 48 at CM/ECF p. 7, 25:24-27:22); (Doc. 132-20 at CM/ECF p. 2).  Benes told Faust that the City thought she was faking her injury, that the City was having her house watched, and that whomever the City had surveilling her house seen her gardening.  Amanda did not plant a garden in 2020 because was unable to operate a tiller due to her injury. (*Id.*)

**Amanda Returns from Injury Leave
to a Hostile Work Environment at Station 1**

260.    In spring 2020 Amanda returned from injury leave and continued riding out of grade as an Acting Captain at Station 1.  (Doc. 334-18 at CM/ECF p. 87, 345:23-346:14).

261.    Amanda was subjected to numerous offensive comments at Station 1.  Battalion Chief Curt Faust was present for many of these discussions and tolerated this behavior.  (Doc. 334-18 at CM/ECF p. 77, 308:1-16)

262.    Around the same time, Chad Roof returned to Station 1 as the Engine Captain.  (Doc. 383-50, Ex. 49, at CM/ECF p. 4).

263.    Faust thought Roof was a liar and was not thrilled that he was coming to Station 1.  (Doc. 383-49, Ex. 48 at CM/ECF p. 10, 40:7-20); (Doc. 383-50, Ex. 49 at CM/ECF p. 4 and 7).  Faust was also particularly worried that Roof would try and recruit firefighter Brady Papik to come to Station 1.  (Doc. 383-50, Ex. 49 at CM/ECF pp. 4-5).

264.    In July of 2020, Captain Giles and the City settled his lawsuit for $500,000.  When the settlement was publicized in the local media, Roof became visibly upset. (Doc. 383-51, Ex. 50 at CM/ECF p. 15, 58:11-64:11); (Doc. 383-50, Ex. 49 at CM/ECF p. 53:14-55:2).  Roof commented that he was a generational firefighter and he hated the "traitors' that dragged LFR's name through the mud.  (Doc. 380-79); (Doc. 385-16, Ex. 141 at CM/ECF p. 1-2). He singled out Amanda because of her ongoing litigation against LFR.  (Doc. 383-50, at CM/ECF pp. 1-2); (Doc. 380-49, Ex. 48 at CM/ECF p. 53:14-59:1). Roof made comments about females not being physically capable of meeting physical strength Job Performance Requirements (JPRs).  (Doc. 383-50 at CM/ECF p.1).

265.    Amanda was subjected to additional offensive harassment at Station 1:

➢ Firefighters Matt Woitalewicz and Trent Borchers made offensive comments about Cheyenne Jeffers and made fun of the way she dressed and talk.  They criticized her for not wearing what they deemed to be appropriate underwear at work and "bouncing around the fire station" without a bra. (Doc. 334-18 at CM/ECF p. 73, 290:14-25).

➢ Male firefighters said Ashley Busboom was promiscuous and made fun of her for how many times she had been married. (Doc. 334-18 at CM/ECF p. 73, 291:18-292:3).

➢ Male firefighters spread rumors that Ashley Busboom was sleeping with a married firefighter. (Doc. 334-18 at CM/ECF p. 73, 292:4-6).

➢ Male firefighters spread rumors that Ashley Busboom was sleeping with Chief Mueller. (Doc. 334-18 at CM/ECF p. 73, 292:7-9).

➢ Male firefighters also spread rumors that firefighter Cari Wagner was having an affair with Mueller. (Doc. 334-18 at CM/ECF pp. 73-74, 292:21-293:4).

➢ Male firefighters spread rumors that firefighter Ashley Engler was having an affair with Mueller. (Doc. 334-18 at CM/ECF p. 74, 294:10-16).

➢ Alex Martin discussed how many times Engler had been married and spread rumors that she engaged in anal sex. Martin said that the only reason that Engler's marriage lasts is because her husband keeps his genitals in her mouth and that's how he keeps himself sane. (Doc. 334-18 at CM/ECF pp. 74-75, 294:24-295:13).

➢ Male firefighters teased Katie Hurd because another male firefighter had a crush on Hurd and she did not reciprocate.  Male firefighters claimed that Hurd would lead male firefighters on. (Doc. 334-18 at CM/ECF pp. 74-75, 296:3-297:7).

➢ Chad Roof told Amanda that Katie Hurd threw herself at firefighter Matt Woitalewicz and that Matt didn't go for it because he doesn't "shit where he sleeps." (Doc. 334-18 at CM/ECF p. 74-75, 296:3-297:7).

➢ Trent Borchers disparaged Katie Hurd's mental health, claimed she was throwing herself at him, and that she needed therapy. (Doc. 334-18 at CM/ECF p. 74-75, 296:3-297:7).

➢ Amanda personally witnessed Borchers pursue a relationship with Katie Hurd. (Doc. 334-18 at CM/ECF pp. 74-75, 296:3-297:7).

➢ Chad Roof and Matt Woitalewicz made fun of Natalie Potrzeba because they didn't think she could carry a 2 ½ inch hose adequately.  They said Potrzeba was too small to be a firefighter and that the standards at LFR weren't high enough. (Doc. 334-18 at CM/ECF p. 75, 297:23-298:20).

➢ Male firefighters said that Natalie Potrzeba should receive failing marks for ladder throwing. Amanda could tell Natalie met the standards.  Male firefighters then claimed that the standards were incorrect and wanted them changed because they didn't believe that Potrzeba was doing it appropriately. (Doc. 334-18 at CM/ECF pp. 75-76, 298:21-300:1).

➢ In 2021, a female firefighter told Amanda that Trent Borchers was relentless in his pursuit of her and said that he was texting her.  Jessica then told Amanda that Trent found out what Jessica said and aggressively approached her about it. (Doc. 334-18 at CM/ECF p. 75, 300:5-302:21). She also told Amanda that Joel Johnson was harassing her by text, too. (Doc. 334-18 at CM/ECF p. 75, 300:5-302:21).

➢ Matt Woitalewicz told Amanda that female firefighter Kerri Rulon was sleeping with an older male firefighter and mocked her for that. (Doc. 334-18 at CM/ECF p. 76, 302:22-304:3).

➢ Male firefighters told Amanda that FAO Mark Davis had inappropriately touched firefighters Kerri Rulon and Claire Borer. (Doc. 334-18 at CM/ECF p. 76, 302:22-304:3).

➢ Male firefighters discussed Fire Officer Nancy Crist's sexual history and made fun of her for having an affair with a married firefighter.  Matt Roberts told Amanda that they nicknamed Christ "Dirty Pants Nance." (Doc. 334-18 at CM/ECF p. 77, 305:5-20).

➢ Male firefighters at Station 1 frequently misgendered Jessie Lundvall as "him" or "it" or "they." Station 1 male firefighters referred to Jessie as transgendered and claimed they would file complaints if they were forced to share a locker room with her. (Doc. 334-18 at CM/ECF p. 77, 307:8-308:13).

**Captain Chad Roof Creates a Hostile Work Environment at Station 1**

266.    On February 26, 2021, after working with Captain Roof for several months and dealing with his sexist attitudes and divisive nature, she had a discussion with Captain Faust about how to solve it.  Captain Faust emailed Chief Engler about her concerns, and Witte, shared it with City Legal.  (Doc. 380-77 at CM/ECF p. 1).

267.    On March 5, 2021, Amanda met with Interim Fire Chief Engler to address the ongoing discriminatory and retaliatory treatment that she and other women continued to experience at LFR. (Doc. 196 at CM/ECF p.9, ¶72)..  (Doc. 380-78).  Amanda gave Engler a written summary of examples of the discriminatory treatment as follows:

- A continued pattern and practice of perpetuating a culture at LF&R that allows for and fuels unlawful and discriminatory behavior perpetrated by rank-and-file supervisors that is left unchecked by administration, as it relates to her and other people of protected classes;

- Examples of comments made by frontline supervisors that reinforce the idea that the minority firefighters (women, lgbt, people of color, etc) are actually an enemy to the fire service or that they are unqualified to perform their jobs;

- That all of the unchecked behavior is not only costing the city money in litigation expense, but also in employee efficiency and productivity;

- That the retaliatory behavior against those who do report unlawful and discriminatory behavior discourages other good employees from reporting doing because of fear and that those who do stand up are labeled as "traitors";

- Examples of sexual harassment of other female firefighter recruits and firefighters and how they are discouraged from associating with Captains or others who may be their advocates;

- That harassers are protected and given preferential treatment by the City because they specifically staff the offenders' stations to prevent women from ever being scheduled or floating to them.  In essence, rather than enforcing policies protecting victims of discrimination; violations of that policy are ignored and essentially rewarded;

- Squandering training opportunities by providing inappropriate all-staff "career survivor training" where discriminatory and harassing conduct is dismissed as "firefighters being firefighters" and calling out the "rat" firefighters that broke code and betrayed the brotherhood, rather than actually teaching what is unlawful behavior;

- How exhausting and depressing it can be for people who do come forward when the leaders that actually have the power to effect change will not do so.

(*Id.*)


268.   Amanda told Chief Engler about problems at Station 1 involving Firefighter Matt Woitalewicz and Captain Roof (Doc. 380-79); (Doc. 385-17, Ex. 142, p. 1, ¶3); (Doc. 385-16, Ex. 141).   Amanda explained that Captain Roof undermined her authority, spoke negatively about female firefighters' physical abilities, and disparaged Giles because of his litigation against the

City.  (*Id.*)  Engler thought what Amanda was telling him was "very concerning."  (Doc. 385-16, Ex. 141 at CM/ECF p. 8).  He told her that if it continued, "I don't want you to subject yourself to it. Report it right away."  (Doc. 385-16, Ex. 141 at CM/ECF p. 11).

269.  Chief Engler was also aware of Chad Roof's propensity to lie.  (Doc. 383-49, Ex. 48 at CM/ECF p. 10, 40:7-20).

270.  Following the meeting, Captain Faust and Chief Mike Smith met with Roof. (Doc. 385-18, Ex. 143).  Amanda's supervisors assured her that Roof would not disclose these interactions with their crew at Station 1. (Doc. 383-18, Ex. 17 at CM/ECF p. 12, ¶51).

271.  That is just what he did, though.  On about April 4, 2021, Captain Roof informed Firefighters Woitalewicz and Papik about Amanda's complaints and orchestrated retaliatory complaints about her work performance.  (Doc. 383-56, Ex. 55).

272.  Captain Faust knew that Firefighter Brady Papik instigated problems with Amanda's crew at Station 1 and was the "puppet master extraordinaire." He had history of riling people up, sitting back, and watching it play out. (Doc. 383-49, Ex. 48 at CM/ECF p. 11, 42:5-43:6). Part of Amanda's original complaint was that Papik purposefully goaded Woitalewicz in an effort to undermine Amanda's supervisory authority.  (Doc. 383-56, Ex. 55 at CM/ECF p. 3). Woitalewicz, Papik, and Roof were all close friends.  (Doc. 383-49, Ex. 48, at CM/ECF p.11, 43:7-10).

273.  On April 4, 2021, Amanda took Chief Engler's advice and reported Roof's discriminatory and retaliatory behavior to her supervisors. (Doc. 385-19, Ex. 144).  On April 7, 2021, Amanda met with Chief Faust and Chief Smith at Station 1 to discuss the complaint again and learned that someone was questioning her performance at the Ambassador Fire.  (Doc. 385-20, Ex. 145).

274.    On April 8, Amanda reported this additional discriminatory and retaliatory behavior by Captain Roof. (Doc. 383-62, Ex. 61).

**Witte Appointed to Investigate—but Not According to Policy or Good Practice**

275.    Chief Engler appointed LFR's Administrative Officer Aishah Witte to investigate. Witte kept the City's Legal Department abreast of all developments in the investigation. (Doc. 380-72).

276.    Witte told Amanda that Chief Engler had a "dishonesty concern" regarding Roof, Woitalewicz, and Papik, and that it was a significant factor as to why she was investigating. (Doc. 388-6, Ex. 156 at CM/ECF p. 13, 46:15-47:20).

277.    On or about April 22, 2021, Captain Mahler was discussing that the "target was off his back" referring to Amanda's issues with Roof with other firefighters at ladder training. (Doc. 334-3) Fire Instructor Jessica Lundvall overheard the conversation and reported it to Chief Engler that same day. (Id.)

278.    On April 22, 2021, Amanda filed a report with Administrative Officer Witte for Mahler's retaliatory behavior of disparaging her to another firefighter. (Doc. 380-72); (Doc. 196 at CM/ECF p. 9, ¶74). Witte assured Amanda that Chief Smith would address the behavior with Mahler immediately. (Doc. 380-72).

279.    Chief Smith informed Mahler that there had been a complaint made about him talking about Amanda, and Mahler said he knew the complaint originated with Amanda. (Doc. 334-20 at CM/ECF at CM/ECF p. 10); (Doc. 384-15, at CM/ECF p. 128, 510:17-20). Chief Smith reported the conversation to Witte. (Doc. 383-68).

**The Warehouse Fire**

280.     Four days later, on April 26, 2021, Mahler and Amanda were both dispatched to a cardboard storage warehouse fire. (Doc. 143-29; Doc. 196 at CM/ECF p. 9, ¶75). Amanda was the Acting Captain of Truck 1 ("T1"). The T1 crew included FAO Matt Roberts and firefighter trainee Morgan Hurley. (Doc. 196 at CM/ECF p. 9, ¶75). Mahler was the captain of Truck 8 ("T8") and assigned the task of ventilation. (Doc. 334-22 at CM/ECF p. 73, 291:24-292:6). Amanda's crew was assigned to assist with ventilation. Based on the circumstances of this functional task and ICS[1] training at LFR, that meant T1 would report to T8 for the ventilation task. (Doc. 143-29 at CM/ECF p.3). Captain Faust served as Incident Commander over the warehouse fire. (Doc. 143-29 at CM/ECF p.5-6); (Doc. 196 at CM/ECF p. 9, ¶75).

281.     Upon assignment to assist T8 with ventilation, Amanda approached Mahler, intending to ask how her crew should assist with ventilation, but he walked past her. (Doc. 334-22 at CM/ECF p. 75, 299:16-300:10; p. 77, 306:2-20). She caught up to Mahler and told him that her team had been assigned to assist him. (Doc. 334-22 at CM/ECF p. 75, 299:16-300:10; p. 77, 306:2-20). She asked what his plan was for ventilation. (Doc. 334-22 at CM/ECF p. 75, 300:1-10). Mahler refused to make eye contact with Amanda and just said that his crew was going to open some overhead doors. (Doc. 334-22 at CM/ECF p. 75-6, 300:11-301:22). He did not indicate how Amanda's crew should assist with his ventilation plan. (Doc. 334-22 at CM/ECF p. 76, 301:23-302:21). T1 went inside to check conditions behind the overhead door. T1 and T8 reconvened in front of the building, and Amanda attempted to communicate with Mahler again. (Doc. 334-22 at CM/ECF p. 77, 307:4-14). Mahler again ignored Amanda, and T8 began moving towards the building. (Doc. 334-22 at CM/ECF p. 77, 306:11-20).

---

[1] "Incident Command Structure" is an organized set of protocols firefighters are supposed to follow at an incident to eliminate confusion and maximize the use of resources.

282. Amanda attempted to get direction from Mahler on the exterior and received no response. (Doc. 334-22 at CM/ECF p. 79, 314:4-316:8).

283. Mahler and T8 went interior, and Amanda and the rest of her crew followed Mahler into the building to assist. (Doc. 334-22 at CM/ECF p. 78 ,309:10-14). Amanda made another attempt to get Mahler to provide her with direction, but he continued to ignore her questions. (Doc. 334-22 at CM/ECF p. 77, 308:6-14).

### Mahler Refuses to Speak to Amanda and Walks Away

284. Amanda physically grabbed him and told him that Roberts believed there was a skylight above. (Doc. 334-22 at CM/ECF p. 78, 309:21-310:11); (Doc. 334-18 at CM/ECF p. 102:406:12-407:5). Mahler then suddenly walked away from Amanda and abandoned the T1 crew without communication or direction on where to proceed. (Doc. 334-18 at CM/ECF p. 102:406:12-407:5).

285. There was extremely low visibility inside the building due to heavy smoke at this time. (Doc. 384-15, Ex. 90, at CM/ECF p. 338-339, 1352:17-1353:11; Doc. 334-22, at CM/ECF p. 73, 290:11-17; p. 80, 317:2-15 Respiratory protection was necessary for all personnel operating in the structure. (Doc. 334-22 at CM/ECF p. 80, 317, 2-15). Realizing that Mahler had abandoned T1 in what is referred to as an immediately dangerous to life or health environment ("IDLH environment"), Amanda worked to get her crew to safety. (Doc. 334-18 at CM/ECF p. 106, 420:5-22). Amanda used her thermal imaging camera to identify the direction of the fire because if her crew could get close to the fire, they would be able to find a hose line to follow out of the building. (Doc. 334-18 at CM/ECF p. 102-3, 407:15-409:7).

286. As Amanda and her crew approached the fire, they ran into a different team battling the flames. (Doc. 334-18 at CM/ECF p. 102-3, 407:15-408:7). Amanda saw T8 Firefighter Trent

Borchers and asked him where Mahler was. (*Id.*) Borchers said he did not know. (*Id.*)  Shortly thereafter, Roberts' low-air alarm went off, and Amanda had to immediately exit the building with him and Hurley to switch out their oxygen bottles. (Doc. 334-18 at CM/ECF p. 103, 408:8-15).

287.   Once they obtained new bottles, Faust assigned Amanda's crew (T1) to replace Mahler's crew (T8). (Doc. 334-18 at CM/ECF p. 107, 426:8-14). As T8 exited the building, Amanda approached Mahler, but he tried to side-step and walk around her. (Doc. 334-18 at CM/ECF p. 107, 425:17-23; 426:8-22). Amanda moved directly in front of him to get him to stop and acknowledge her.  (Doc. 334-18 at CM/ECF p. 107, 425:17-23; 426:8-22).

288.   Amanda told him her team was taking over for T8 and needed to know what he had been working on inside the building. (Doc. 334-18 at CM/ECF p. 107, 425:17-23; 426:8-22). Mahler refused to look at Amanda. (Doc. 334-18 at CM/ECF p. 107, 425:17-23; 426:8-22). He quickly replied, "Chasing hot spots on the Charlie side," and then moved around Amanda and walked away without giving any further information. (Doc. 334-18 at CM/ECF p. 107, 425:17-23; 426:8-22).

289.   Under LFR's management policies, as the supervisor in charge of the functional task of ventilation for T1 and T8, Mahler was required to maintain voice, visual, or physical contact with the personnel under his command and provide them direction about their assignment while inside the building. (Doc. 383-70). His actions also violated LFR's incident command policies and department best practices. (*Id.*)

290.   Amanda reported Mahler's conduct the evening of the warehouse fire to Faust and again on May 4, 2021. (Doc. 334-20 at CM/ECF p.169, 676:13-23); (Doc. 334-18 at CM/ECF p. 110, 436:2-439:22).  Faust ordered Amanda to report the incident when they returned to work on May 5, 2021.  On May 5, 2021, Amanda made a detailed complaint to Faust and Witte.  (Doc.

114-3); (Doc. 196 at CM/ECF p. 10, ¶78). Faust elevated the complaint to Chief Engler, who assigned Witte to investigate it. (Doc. 132-1 at CM/ECF p. 2, ¶4).

**City Legal Directs Witte to Alter Her Investigation Methods**

291.    Unbeknownst to Amanda, City Legal directed Witte to not interview certain individuals and not to document her investigation because otherwise they would have to provide it to Kelly Brandon (attorney for Plaintiff) in discovery. (Doc. 383-54 at CM/ECF p. 16, 62:21-64:20). Chief Engler testified that if the City Legal department directed Witte to not document her investigation because it might be discoverable in Amanda's litigation, that would violate LFR policy regarding investigations. (Doc. 334-17 at CM/ECF p. 43, 170:24-171:12)

292.    The majority of Witte's interviews were not documented. (Doc. 383-53, Ex. 52 at CM/ECF p. 34, 133:7-22) She supposedly interviewed 28 people, but her findings don't reflect anything many of them said. (Doc. 383-53, Ex. 52 at CM/ECF p. 75, 297:6-24); (Doc. 383-74, Ex. 73); (Doc. 334-5). Amazingly, Witte did not interview Amanda about the warehouse fire. (Doc. 334-17 at CM/ECF p. 32, 125:16-126:5). Witte spoke with Mahler, but never interviewed Amanda, Roberts or Hurley. (Doc. 383-53, Ex. 52 at CM/ECF p. 34, 133:7-22); (Doc. 383-75; Ex. 74); (Doc. 334-17 at CM/ECF p. 32, 126:14-25). Despite this shabby investigation, Witte claims to have found that Amanda's complaint was unfounded. (Doc . 380-49).

**LFR's Shifting Position on Initial Warehouse Fire Investigation**

293.    Witte's position on who was in charge of ventilation at the warehouse fire changed from May 26, 2021, until June 7, 2021 when her findings were amended.  Witte interviewed Mahler prior to initial report in May. (Doc. 383-53, Ex. 52 at CM/ECF p. 75, 298:15-17) She had listened to the audio "a lot of times" maybe even a hundred times, prior to issuing her findings on May 26, 2021. (Doc. 383-53, Ex. 52 at CM/ECF p. 26, 102:4-14) At the meeting on May 26,

2021, Witte said, "**Mahler was unclear of his assignment at the time.  And there was a lot of back and forth, and he didn't understand *he was in charge.***" This implies that she knew he was in charge because he was assigned to ventilation and Amanda was assigned to assist with ventilation but were excusing him from communicating with her because he told her he was "unsure what his assignment was." (*Id.*)  She didn't say, "He understood that he was assigned to ventilation, but he wasn't in charge because you were operating in a peer-to-peer capacity." (*Id.*) Moreover, Mahler testified he was **not** confused about his assignment at all.  (Doc. 334-22 at CM/ECF p. 76, 303:20-25) He understood he had been assigned the functional objective of ventilation. (Doc. 334-22 at CM/ECF p. 70-71, 280:22-281:1)

294.    On May 26, 2021, Amanda met with Witte, Chief Engler and Bataillon Chief Smith to discuss the investigative findings. After learning that Witte decided Amanda's complaints could not be substantiated, Amanda expressed concern for her safety. (Doc. 334-17 at CM/ECF p. 43), (Doc. 334-17 at CM/ECF p. 43, 172:2-6). Amanda and Witte's exchange during this meeting is as follows:

> AISHAH WITTE: But anything we can do for you, for real, to make you feel comfortable and help you out. Because we really -- the chief really does want to help you.

> AMANDA BENSON: I know how comfortable I can feel. And I've known for a while. But this solidifies it. You're leaving me in an unsafe environment. You're not ensuring that I have a work place free from retaliation and discrimination and bullying and harassment.

(Doc. 334-4 at CM/ECF p. 7, 22:25-23:8). Engler confirmed that he believed Amanda was sincere when she reported these safety concerns. (Doc. 334-17 at CM/ECF p. 43, 172:7-10). Engler didn't remember if Witte reported this last exchange between Amanda and Witte to him since he had stepped away from the meeting. But he acknowledged that Witte would be required to do so under the City's EEO policies. (Doc. 334-17 at CM/ECF p. 44, 173:20-23).

66

**Mahler Blatantly Lies to Chief Smith**

295.    That same day, Chief Smith spoke with Mahler again about the warehouse fire. (Doc. 334-6).  Mahler lied to Chief Smith at that time, falsely telling him that he did not make any contact with Amanda's crew on the interior of the fire after meeting up with her on the corner of the building. *(Id.)*  Captain Mahler knew that Amanda thought she was assigned to him when she first came up to him on the exterior of the fire at the Alpha/Bravo corner.  (Doc. 334-22, at CM/ECF p. 75, 299:23-300:10) Amanda attempted to communicate with Captain Mahler several times on the interior of the fire, but he refused to speak to her and walked away.  (Doc. 334-22, at CM/ECF p. 79-80, 316:21-317:1; p. 81, 321:20-323:16; Doc. 114-1, at CM/ECF p. 3, ¶14)

296.    Captain Mahler later admitted that he knew that Amanda thought she was reporting to him and that she repeatedly approached him on the interior of the fire, yet he refused to speak with her. (Doc. 334-22 at CM/ECF pp. 75, 78-80); (Doc. 334-22 at CM/ECF p. 75, 299:23-300:8; p. 78, 312:23-314:11; p. 79, 316:21-317:1). On May 26, 2021, reported to Chief Smith that he did not make further contact with Amanda or the T1 Crew at the warehouse fire on the interior at all. (Doc. 334-20, Ex. 8 at CM/ECF p. 11, 528:1-4); (Doc. 334-6). Mahler failed to tell Smith that Benson repeatedly approached him inside the fire, asking for direction and that Mahler simply pretended she did not exist. (Doc. 334-20 at CM/ECF p. 12); (Doc. 334-20, Ex. 8 at CM/ECF p. 12, 533:1-2). Smith acknowledged that what Mahler told him was inconsistent with Mahler's sworn deposition testimony. (Doc. 334-20, Ex. 8 at CM/ECF p. 13, 539:2–11). Chief Engler also acknowledged Mahler's dishonesty about the warehouse fire. (Doc. 334-17 at CM/ECF pp. 44-45; 48-52, 176:17-177:3; 178:6-9; 189:1-208:16-20); (Doc. 334-20 at CM/ECF p. 13, 539:2).

297.    Chief Engler didn't discipline Captain Mahler after learning he was dishonest regarding the warehouse fire.  Engler doesn't "have a good explanation for why not." (Doc. 334-17 at CM/ECF p. 45, 178:23-179:3).

298.    **Fire Chief Engler testified that Mahler should be investigated for his misconduct in lying about the warehouse fire—but no investigation has been done.** (Doc. 334-17 at CM/ECF p. 56, 224:6-9). Chief Engler has not even asked Mahler why he was dishonest. Engler has not initiated any disciplinary proceeding against Mahler. (Doc. 334-17 at CM/ECF p. 53,  209:15-23). Chief Engler is the only supervisor at LFR who can issue discipline. (Doc. 334-17 at CM/ECF p. 16, 63:3-6).

299.    Chief Engler admitted that if Witte's investigation had been thorough, Amanda's Motion for Preliminary Injunction would never have been necessary. (Doc. 334-17 at CM/ECF p. 56, 222:11-16).

300.    Engler also believes that if Mahler had told the truth at the time, that would have made a difference in Amanda's termination, no outside investigation may not have been required, and that could have prevented a lot of the aftermath. (Doc. 334-17 at CM/ECF pp. 45, 49); (Doc. 334-17, Ex. 5 at CM/ECF p. 62, 179:4-9; 193:17-25).

301.    **Based on everything that Chief Engler learned through the arbitration process, he's not sure if his decision to terminate Amanda was correct**. (Doc. 334-17 at CM/ECF p. 62, 248:20-25).

302.    Witte's spring 2021 investigation into Amanda's complaints did not meet the standard of care for human resource professionals. (Doc. 143-14 at CM/ECF pp. 3-6). Expert Amy Oppenheimer, who has decades of experience in investigations best practices, reviewed Witte's investigation and found it entirely deficient. (*Id.*)

**Amanda Files Union Grievance Regarding Wite's Investigation**

303.   Because of Witte's inadequate investigation, Amanda filed a grievance under the CBA.  (Doc. 334-9).  She requested the City retain an independent investigator to investigate her complaints stemming from the warehouse fire. (Doc. 196. at CM/ECF p. 10, ¶80).

304.   Under the CBA, administration only has thirty-five working days to initiate disciplinary proceedings against LFR employees. (Doc. 383-8 at CM/ECF p. 37).

305.   On June 7, 2021, Amanda's counsel sent a letter to City Attorney Yohance Christie demanding the City address the hostile work environment.  (Doc. 384-1, Ex. 76).  Brandon cautioned that if the City did not respond by June 9, 2021, she would initiate preliminary injunction proceedings.  (Doc. 388-1, at CM/ECF p. 2, ¶4).

306.   The City never responded.  (Doc. 388-1 at CM/ECF p. 2, ¶4).

**Amanda Files Motion for Preliminary Injunction for Protection**

307.   Amanda's Motion for Preliminary Injunction was filed on June 11, 2021.  (Doc. 114)

308.   In response to Plaintiff's Motion for Preliminary Injunction, Defendants filed an Affidavit, signed by Mahler, claiming "I did not ignore or avoid Ms. Benson at the [warehouse fire]." (Doc. 132-8 at CM/ECF p. 2, ¶ 6).  Mahler has now admitted under oath that that was a lie. (Doc. 334-22, at CM/ECF p. 79-80, 316:21-317:1; p. 81, 321:20-323:16; Doc. 114-1, at CM/ECF p. 3, ¶14)

309.   Chief Engler testified that the City never effectively investigated Amanda's complaints of retaliation surrounding the warehouse fire. (Doc. 334-17, at CM/ECF p. 57, 226:7-227:10).

### City Retains Attorney to Conduct—not a Neutral Investigation—but an Investigation for the Litigation

310.     The City retained Torrey Gerdes[2], an attorney who defends employers like the City, to perform what they call an "independent investigation."  (Doc. 196 at CM/ECF p. 10, ¶80).

311.     Gerdes did not interview Amanda until after she interviewed Mahler, his crew, Acting Chief Faust, and Amanda's crew, which is against best practice. (Doc. 143-14 at CM/ECF p. 3).

312.     When scheduling Amanda's interview, Gerdes told her it would take three or four hours. (Doc. 143-1 at CM/ECF p. 4, ¶3).  Gerdes interviewed Amanda on July 14, 2021, for over twelve hours.  (Doc. 143-1 at CM/ECF p. 4, ¶9).

313.     This interview was recorded, but there were anomalies in the recording.  (Doc. 171-1); (Doc. 171-3).  It contains multiple interruptions and skips over parts of Amanda's answers.[3] (Id.)

### Chief Majors Confirms Amanda's Understanding of ICS and "Assist With"

314.     Following her interview, Amanda contacted her Battalion Chief Mark Majors to confirm her understanding of incident command.  (Doc. 383-13).  He agreed that if Amanda is assigned to "assist with" a functional objective (such as Ventilation), that implies she will be operating under the command of the officer first assigned to that objective.  (Doc. 383-13, Ex. 88 at CM/ECF p. 3, 3:16-19).  He even gave her an example when he was the incident commander

---

[2] Plaintiff maintains her objections to Gerdes' testimony and report as outlined in her Response to Defendants' Statement of Material Facts.  Her counsel objected and directed her not to answer question after question, because they were "outside the scope" of her report. (Doc. 384-50, summarized at Ex. 170).  She refused to respond to the kind of basic questions that all trial witnesses are expected to answer.  She testified over thirty times that she could not adequately respond because she would need to refer to her notes, which are secret. (Doc. 384-50, summarized at Ex. 170)  Plaintiff could not and will not be able to cross-examine Gerdes, because the City opted to preserve its attorney client privilege rather than allow discovery into the investigation.
.

where he told someone to assist Captain Faust; and that implied Faust was in charge. (Doc. 383-13, Ex. 88 at CM/ECF pp. 13-14, 13-14:1). While he agreed with Amanda's interpretation, he said that there had been so much confusion regarding the words "assist with" that the Chiefs met to discuss it in June of 2021 and decided they were going to "gut" the policy.  (Doc. 383-13, Ex. 88 at CM/ECF pp. 4-6, 4:25-6:8).  On September 13, 2021, it was announced at the 7:05 all personnel meeting that LFR had decided to ban the words "assist with" from being used at a fire." (Doc. 383-18, Ex. 17 at CM/ECF p. 13, ¶54).

315.    Before and after the interview, Amanda provided Gerdes with extensive documentation regarding her underlying claims of sex discrimination, harassment and retaliation, as well as national incident command structure ("ICS") standards and LFR policies and practices regarding ICS. (Doc. 143-5).  She provided the Declaration and report of Fire Chief Ed Hadfield, an expert in ICS protocols who trained LFR command staff.  Hadfield agreed that T8 was supervising T1 at the warehouse fire. (Doc. 143-17); (Doc. 143-18); (Doc. 143-19).

316.    Chief Hadfield opined that:  (a) Mahler was the company officer responsible for the ventilation task at the warehouse fire; (b) only one supervisor was responsible for ventilation; (c) Amanda's crew was assigned to be under Mahler's command, and (d) if Mahler did not communicate with Amanda as she alleges, he committed a serious dereliction of duty. (Doc. 384-15, Ex. 90); (Doc. 334-20 at CM/ECF p. 518-519, 2072:25-2073:9); (Doc. 143-17 at CM/ECF p. 1-3, ¶2-7); (Doc. 143-19).

317.    Gerdes ignored most of the information that Amanda provided her.  Gerdes ultimately found that Mahler did not violate department policy or protocol in failing to communicate with Amanda. (Doc. 196 at CM/ECF p. 10, ¶82). The scope of Gerdes' report

included not just written policy but protocol, i.e. how LFR operated on a daily basis. (Doc. 384-50 at CM/ECF p. 24, 94:1-25).

318.  Gerdes report is fundamentally flawed for a number of reasons.

➢ Chiefs Engler, Linke, Faust, and Smith did not accurately describe how LFR Incident Command actually operates on a fireground.  (*See* Response to SOF 228 and 323-4); (Doc.384-13 at CM/ECF p. 13, 13:16-14:1).

➢ Gerdes' report fails to reference Amanda and Mahler's interactions on the interior of the fire. (Doc. 334-17 at CM/ECF p. 62, 247:1-5)  The subject matter Gerdes was supposed to investigate was Amanda's May 5, 2021, complaint which alleged Captain Mahler refused to speak to her multiple times, including on the interior of the fire, and abandoned her in a dangerous environment. (Doc. 114-3); (Doc. 384-50 at CM/ECF p. 23, 90:12-4-92:2:12). The only communications Gerdes mentions occurred outside the building. (*Id.*)

➢ Mahler apparently lied to Gerdes as well, because Gerdes testified that if he had admitted that he repeatedly ignored Amanda on the interior of the fire, she would have noted that in the report. (Doc. 384-50 at CM/ECF p. 55 :218 :21-219:7); (Doc. 384-50 at CM/ECF p. 18 :70 :20-71 :12).

➢ Gerdes' reviewed Chief Smith's interview with Mahler on May 26, 2021 where he denies ever encountering Amanda on the interior of the fire or telling her to call incident commander if she needed an assignment.  (Doc. 384-50 at CM/ECF p. 48, 189:11-18); (Doc. 334-6).

➢ Mahler's dishonesty about the warehouse fire didn't raise any alarm bells for Gerdes.  (Doc. 384-50 at CM/ECF p. 48, 189:16-192:12)

➢ Gerdes found that Captain Mahler couldn't be Amanda's Group Supervisor because LFR protocol required that there had to be an express designation of that command with the assigned person formally accepting the assignment ("closed loop communication"). (Doc. 167-2 at CM/ECF p. 7). However, the radio transcript itself reveals multiple incidences *at the warehouse fire itself* where that did not occur. (*See* Response to SOF 323-1). Moreover, Chief Linke testified that LFR doesn't always communicate appropriately when operating as groups. (Doc. 334-15 at CM/ECF p. 40, 157:6-160:24)

➢ Only *one* supervisor can be in charge of the functional objective of ventilation when two crews are in the same geographic area. (Doc. 334-15 at CM/ECF p. 40, 157:6-158:24) Jessie Lundvall who taught ICS classes at LFR testified it could be very dangerous if there was more than one supervisor for ventilation. (Doc. 334-19 at CM/ECF p. 34, 133:13-134:4; p.34-35, 134:21-137:11) Amanda requested that Gerdes interview Lundvall, but she did not. (Doc. 167-2); (Doc. 143-6 at CM/ECF p. 3).

➢ Captain Mahler was assigned ventilation (Doc. 380-89 at CM/ECF p. 4, 9:11-12) and accepted that assignment. (Doc. 334-22 at CM/ECF p. 70-71, 280:22-281:1) It was reasonable for Amanda to assume that he was in charge when she was assigned to assist with ventilation and they were operating in the same geographical area. (Doc. 334-15 at CM/ECF p. 40-41, 160:1-161:11) (Doc. 143-17 at CM/ECF p. 1-3, ¶2-7); (Doc. 143-19 at CM/ECF p. 4-5).

➢ Gerdes testified she believed Amanda believed that Captain Mahler was her group supervisor. (Doc. 384-50, Ex. 125 at CM/ECF p. 73, 289:1-290:7). That is not in her report. (Doc. 167-2).

➢ Most importantly, Gerdes never investigated the actual substance of Amanda's complaint—whether Mahler's refusal to communicate with her at the warehouse fire was done *in retaliation* for her protected activity. (Doc. 167-2).

**Mahler's Refusal to Communicate with Amanda
Continually Exposes the City to Risk**

319.    Even if the jury were to find Mahler and Amanda were merely peers at the warehouse fire, everyone at LFR agrees that failure to communicate on a fire ground can be extremely dangerous. (Doc. 334-19 at CM/ECF p. 34, 133:13-134:4; pp. 34-35, 134:21-137:11); (Doc. 334-17 at CM/ECF p. 50, 198:13- 199:4).

320.    Benes identified Mahler's refusal to speak with Amanda at station 8 as a huge safety issue nearly five years earlier, saying, "If you look at the NIOSH5, what's probably the number one thing that happens. Communication. That is probably the number one issue on the fire ground that kills firefighters." (Doc. 383-49 at CM/ECF p. 9).

321.    The City's failure to address Mahler's earlier retaliation could have prevented Mahler's retaliatory behavior in 2021. (Doc. 383-44 at CM/ECF p. 10); (Doc. 334-2 at CM/ECF p. 33-36).

**Amanda and the Union Exposes Witte's Investigation at the Grievance Hearing**

322.    On or about August 20, 2021, Amanda attended a grievance hearing regarding LFR's inadequate investigation of the warehouse fire. Present were Chief Engler, Witte, and Union attorney John Corrigan, plus Union representatives Adam Schrunk and Ryan Moser. (Doc. 383-54, Ex. 53).

323.    Witte admitted that she performed her underlying investigation regarding Amanda's complaints of discrimination and retaliation in the spring of 2021 outside of her normal practice because the City Attorney's office told her that if she documented everything or interviewed everyone that she thought was necessary, the investigation would have to be reviewed by Amanda's attorney, Kelly Brandon.  (Doc. 383-54 at CM/ECF p. 16, 62:21-64:20).  Witte said she intentionally did not interview people or appropriately document her investigation based on this direction provided by the City Attorney's office. (*Id.*)  This violated LFR policy.  (Doc. 334-17 at CM/ECF p. 43, 170:24-171:12)

324.    On September 12, 2021, at the 7:05 department-wide announcement, LFR command staff ordered banned all employees from using the words "assist with" on the radio on the fireground.  (Doc. 383-18, Ex. 17 at CM/ECF p. 13, ¶54).

**Defendants Admit Retaliating Against Amanda**

for Filing Affidavit and Motion for Preliminary Injunction

325.    On September 27, 2021, LFR issued Amanda a Notice of Pre-disciplinary Hearing for conduct unbecoming for engaging in protected activity by asserting that Mahler abandoned her and her crew in a dangerous environment at the Warehouse Fire. (Doc. 196 at CM/ECF p. 10, ¶84); (Doc. 380-82). LFR admits the bases for the discipline were Amanda's Affidavit filed in conjunction with the Preliminary Injunction in this matter and statements she made to Gerdes. (*Id.*)

326.    This disciplinary process violated the union contract as Amanda was not provided her *Weingarten* rights prior to the Gerdes interview.  In fact, Assistant City Attorney Chris Connolly specifically advised that Amanda would not be receiving any sort of notification.  (Doc. 384-2, Ex. 77). Gerdes testified that because Amanda had not been given her *Weingarten* rights

prior to her interview, the City should not have utilized her statements to Gerdes as a basis to terminate her.  (Doc. 384-50, Ex. 125 at CM/ECF p. 73: 290:16-281:292:3).

327.   Additionally, Gerdes' retention letter with the City specifically requires that they not utilize her investigation for legal purposes.  (Doc. 167-1 at CM/ECF p. 3); (Doc. 384-50 at CM/ECF p. 21, 83:1-84:2); (Doc. 384-50 at CM/ECF p. 85, 16-25). Mahler received a *Weingarten* letter before he was interviewed by Gerdes.  (Doc. 384-50 at CM/ECF p. 17, 66:13-23); (Doc. 385-8).

328.   The City also violated Amanda's contractual rights by not providing her all the statements Gerdes had from other City employees to mount her defense. (Doc. 383-31); (Doc. 384-14 at CM/ECF p. 23, 89:43-24-45:4).  Both the City and Gerdes claimed that the statements and Gerdes' investigation were protected by the work-product and attorney-client privileges.  (Doc. 164); (Doc. 177-2); (Doc. 384-50 at CM/ECF p. 22, 86:21-87:6).

329.   HR Director McDaniel testified that pursuant to the union contract, any firefighter facing discipline should be provided with all statements to be utilized against them.  (Doc. 384-14 at CM/ECF p. 23, 89:43-24-45:4). Failing to provide Amanda with all the evidence used against her in the disciplinary process violated City policy and Amanda's contractual rights.  (Doc. 384-14 at CM/ECF p. 23, 43:24-46:1); (Doc. 383-13 at CM/ECF p. 1).

330.   Before the 2016 pre-disciplinary hearing, the City provided Mahler all evidence to be utilized against him.  (Doc. 384-14 at CM/ECF p. 23, 43-24-46:1); (Doc. 383-31 at CM/ECF p.1). When Mahler requested this information pursuant to the Union contract, McDaniel and Linke gladly obliged and turned over not only the statements written by Amanda and Giles, but all of the investigatory materials assembled by command staff.  (Doc. 384-26, Ex. 101, at CM/ECF pp. 11-15).

**Defendants' Lawyers Are Steering the Ship and Making Substantive Employment Decisions for Litigation Advantage**

331.    After receiving the disciplinary notice, Amanda emailed EEO Officer Mindy Rush-Chipman, pleading for help.  (Doc. 384-11). Rush-Chipman told her the City had directed that all investigations now had to go through the HR Department even though that violates the City's Equity Access and Diversity Plan.  (Doc. 384-11); (Doc. 115-1 at CM/ECF ¶1); (Doc. 115-2); (Doc. 115-3 at CM/ECF p. 8); (Doc. 383-2 at CM/ECF p. 13, p. 12 :8-20).

332.    City employees didn't trust the HR department to be independent.  The experienced EEO officers who also served as investigators for the Lincoln Human Rights Commission were perceived as more neutral.  (Doc. 388-5, Ex. 155).

333.    The entire disciplinary process targeting Amanda in the fall of 2021 was directed by the City's Legal Department and the lawyers representing Captain Mahler and the rest of the Defendants in this case.  The defense team decided the scope of the Gerdes investigation, which was in no way geared toward actually addressing Amanda's retaliation complaint.  (Doc. 384-50 at CM/ECF p. 59, 235 :1-17).

334.    The original purpose of the investigation was to address Amanda's retaliation complaint.  (Doc. 132-1 at CM/ECF p. 5); (Doc. 334-23 at CM/ECF p. 4, 14 :10-21; p. 6, 23 :15-20); (Doc. 132-16). However, Chief Engler testified that the City has never effectively investigated Amanda's complaints of retaliation surrounding the warehouse fire.  (Doc. 334-17 at CM/ECF p. 56, 222:11-16); (Doc. 334-17 at CM/ECF p. 57, 226:7-227:10).

335.    Chief Engler was confused on whether he was the final decisionmaker on whether Amanda's EEO complaints were unfounded or founded.  (Doc. 334-17 at CM/ECF pp. 33-34, 131:16-134:3) First, he said he was the final decisionmaker, but he didn't know what standard he

used to judge the evidence.  (Doc. 334-17 at CM/ECF p. 33, 130:24-131:15) Then he said he didn't make the final decisions on the EEO complaints.  (Doc. 334-17 at CM/ECF p. 33, 132:13-17)

336.     Regardless, the City failed to ever investigate the fundamental nature of Amanda's complaint about the fire.  Did Mahler refuse to communicate with her in retaliation for her protected activities?  (Doc. 115-3 at CM/ECF pp. 8-9); (Doc. 380-4 at CM/ECF p. 2). Engler admitted that any proper investigation would need to address the interactions between Mahler and Amanda in the warehouse.  (Doc. 334-17 at CM/ECF p. 37, 148 :12-19).

337.     Gerdes' report does not contain a single reference to anything Mahler said about his interactions with Amanda in the warehouse.  It is clear that the investigation was orchestrated to investigate her--not Captain Mahler.  (Doc. 334-17 at CM/ECF p. 62, 247:1-5)

338.     Chief Engler did not write the letter to Amanda about her prediscipinary hearing. It was drafted by Assistant City Attorney Don Taute; reviewed by Mahler's attorneys then sent to Engler for signature.  (Doc. 334-17 at CM/ECF p. 59, 233:22-236:18); (Doc. 383-52, Ex. 51 at CM/ECF p. 37).

339.     This is not normal.  Typically, such letters are drafted by Witte.  (Id.; Doc. 334-17 at CM/ECF p. 60, 239:24-240:10)

340.     When the City denied Amanda's grievance regarding Witte's investigation, Chief Engler said that City Legal had "forced his hand" "due to some upcoming trial." (Doc. 383-18 at CM/ECF p. 10, ¶41); (Doc. 384-8, Ex. 83 at CM/ECF p. 10).

341.     Chief Engler also said that City Legal forced his hand to fire Jessie Lundvall.  (Doc. 384-9, Ex. 84 at CM/ECF p. 16, 713:3-10). Engler also told Lundvall herself that it was City Legal and HR who made the decision to terminate her.  (Doc. 334-17 at CM/ECF p. 67, 268:20-25) The

Fire Chief is the only individual who is supposed to make disciplinary decisions at LFR.  (Doc. 383-8 at CM/ECF p. 39-40).

342.    The City's privilege log reveals how the entire disciplinary and termination process was driven by the attorneys who represent the City in this action, including outside counsel, who have the duty to zealously represent the interests of the City and Captain Mahler.  (Doc. 383-52, Ex. 51 at CM/ECF p. 37, p. 29).

343.    Prior to the pre-disciplinary meeting, Amanda and/or her legal or Union representatives requested Gerdes' investigative file, including Gerdes' recorded interrogation of Amanda, to prepare for the pre-disciplinary meeting. (Doc. 196 at CM/ECF p. 11, ¶86).

344.    The City gave Amanda a copy of her recorded interrogation and Gerdes' investigative report but refused to provide any other parts of Gerdes' investigative file, including Mahler's and other witness' interviews. (Doc. 196 at CM/ECF p. 11, ¶86).  Failure to do so violates the CBA.  (Doc. 384-14, Ex. 89, at CM/ECF p. 11, 43:24-45:4).

345.    On or about October 12, 2021, Amanda's pre-disciplinary meeting occurred before Chief Engler.  (Doc. 196 at CM/ECF p. 11, ¶89).  Amanda presented argument and evidence showing that she had a good faith basis to assert that Mahler had abandoned her and her crew in a dangerous environment at the Warehouse Fire. (Doc. 196 at CM/ECF p. 11, ¶89). Amanda and her representatives explained that under the incident command structure, Mahler was the responsible company officer for the ventilation objective at the Warehouse Fire and that Amanda's crew was assigned under Mahler's command.   As the company officer, Mahler was expected to communicate with and provide direction to Amanda.

346.    At the pre-disciplinary hearing, Amanda also pointed out that Chief Engler had not considered all of the evidence relevant to the Warehouse Fire.  She noted that Gerdes' recorded

interrogation of her did not capture the entire interrogation, as the recording contained multiple interruptions and skips of Amanda's answers.  Amanda also noted that Chief Engler had not reviewed Gerdes' investigative materials like her interviews of Mahler and other witnesses.

347.    Captain Mahler's attorneys and other members of the City's legal department were involved in the decision to terminate Amanda Benson, and Chief Engler has stated multiple times that City Legal forces his hand regarding employment decisions.  (See Response SOF 316).  On October 14, 2021, Chief Engler met with Heidi Guttau, Captain Mahler's outside counsel, as well as, Abigail Littrell and Jocelyn Golden, Mahler's in-house counsel, to discuss the pre-disciplinary hearing.  (Doc. 383-52, Ex. 51, at CM/ECF p. 29) Shortly after that, Littrell forwarded the draft termination letter to Chief Engler that appears to have been drafted by Ms. Guttau's office based on the document identifier. (Doc. 383-52, Ex. 51, at CM/ECF p. 29; Doc. 384-17, Ex. 92)

348.    Daisy Brayton told Jessie Lundvall that City Legal along with input from Mayor Lerion Gaylor-Baird are involved in EEO investigatory decisions.   (Doc. 383-65, Ex. 64, at CM/ECF p. 29, 107:17-108:12)  Chief Engler denies this. (Doc. 334-17, p. 22, 85:23-86:15). The Mayor is the Chief policymaker for the City and responsible for employment decisions.  Neb. Rev. Stat. §15-310 and Lincoln Municipal Code Chapter §2.06.010 and is ultimately responsible for them.

349.    Chief Engler did not draft and does not know who drafted Amanda's termination letter.  (Doc. 334-17, at CM/ECF p. 60-61, 240:11-242:7)

350.    Despite the overwhelming evidence that the statements Amanda made were made in good faith and protected by the Constitution, the City suspended her without pay for 10 working days beginning October 19, 2021, and terminated her, effective November 2, 2021. (See Response to SOF 319-217; Doc. 380-83)

351.    The evidence proves that:

➤ Amanda would not have terminated but-for her protected activity; (Doc. 380-83)

➤ The City's reasons for termination are unworthy of credence; (RSOF 228, 316-327)

➤ The City treated similarly-situated males firefighters who are governed by the same Article 23 Discipline standards differently than Amanda giving them every benefit of the doubt, while scrutinizing every word Amanda says;  (RSOF ?

➤ The City admits Amanda's protected activity was a basis for her termination and that was sincere when she made her complaints and that her story has never changed; (Doc. 334-17, at CM/ECF p. 57-58, 228:24-229:14; p. 54, 214:19-24; (Doc. 114-3).

➤ The City violated several policies and the CBA when they terminated Amanda; (RSOF 326)

➤ The City's attorneys controlled the Gerdes' investigation and have treated Amanda's disciplinary process much differently than male firefighters' discipline process;  (SOF 291, 292, 331-349)

➤ Mahler has a history of discriminating against Amanda and others;(SOF 86-91, 142-44, 214)

➤ LFR has a history of discriminating against women and firefighters who engage in protected activity; (SOF 1-68)

➤ The City's positions have shifted over time; (RSOF 326); and

➤ Amanda was a decorated firefighter with no disciplinary history – no verbal written counselings; no written warnings; no suspensions – nothing; (RSOF 326)

352.    Male LFR employees and employees who engaged in conduct unbecoming to the department but who have not sued the City for civil rights violations have not been terminated. (Doc. 386-3 at CM/ECF pp. 4-50); (Doc. 386-4, Ex. 202, at CM/ECF pp. 3-6, 285:17-286:1; 287:12- 297:11); (Doc. 386-3, Ex. 201, at CM/ECF p. 16) (Doc. 334-17 at CM/ECF p. 68, 272: 5-17); (Doc. 386-3, Ex. 201 at CM/ECF p. 16); (Doc. 334-17, at CM/ECF p. 39, 153:6-158:14);

(Doc. 334-17, p. 66, 263:25- 264:22)   (Doc. 386-4, Ex. 202, at CM/ECF p. 3-6, 285:17-286:1; 287:12- 297:11); (Doc. 386-3, Ex. 201 at CM/ECF p. 16).

353.     When Mahler stole turn-out gear and lied about it to Chief Borer in April 2011, he was not suspended, not terminated.  (Doc. 143-24): (Doc. 143-25 at CM/ECF p. 2).

354.     When Mahler lied again in 2021 about the warehouse fire to Gerdes, and to this Court in a sworn Affidavit, he was not disciplined at all.  (Doc. 334-17 at CM/ECF p. 45, 178:23-179:3).

355.     Engler admits that Amanda is not lying about what happened at the warehouse fire. He believes she made her complaints about it in good faith and that she is just mistaken about ICS protocols.  (Doc. 334-17, at CM/ECF p. 43, 172:2-15; Doc. 384-15, Ex. 90, at CM/ECF, p. 279, 1115:11-1116:10)

356.     Chief Engler also testified that he believed Amanda's story has never changed from the date she wrote her complaint on May 5 of 2021 to the present time. (Doc. 334-17, p. 54, 214:19-24);

357.     Engler admits that Amanda has every right to be concerned for her safety in every working fire. (Doc. 334-17, at CM/ECF p. 56, 224:10-17)

358.     The City just didn't' take Amanda's livelihood and pension from her.  They took her identity – her passion for the career she once loved has all but disappeared. (Doc. 383-18, pp. 13-14, ¶56-57)   City's unlawful actions have caused severe mental and physical symptoms, for which she has consistently treated for since 2015.  Her career prospects and her reputation have been materially adversely affected by the Defendants' illegal actions and inactions. She is still fearful of the City of Lincoln – in her words --   "Even though I live out of state now, I fear that

the City of Lincoln will continue to interfere with my life no matter where I go." (Doc. 383-18, p. 14, ¶56-57)

359.   Amanda engaged in protected activity many times, and the City did not respond appropriately or sometimes not at all.  (Doc. 395-23, Ex. 180; Doc. 395-24, Ex. 181).  The list of unlawful conduct that Amanda endured during her employment at LFR is long and heartbreaking. (Doc. 395-24, Ex. 181).  The City, as well as, the individual defendants were all deliberately indifferent of her civil rights. (*Id.*)

360.   Not one of the individual defendants was disciplined for any of their discriminatory and retaliatory conduct toward Amanda at LFR.  During 2015 and 2016, Linke, Jones, Benes, Mahler, and Merryman all received very positive reviews, despite their complete "management failure".  (Doc. 383-44, Ex. 43 at CM/ECF p. 15.; Doc. 395-4; Doc. 395-5; Doc. 395-6; Doc. 396-7; Doc. 395-8; Doc. 395-9; Doc. 395-10)

361.   After Arbitration, Amanda was reinstated to LFR.  (Doc. 374-2, p. 5, ¶14)

362.   Jessie Lundvall is an example of another lesbian, female firefighter who was discriminated and retaliated against under Mayor Gaylor-Baird, McDaniel and Engler's water, which speaks to the pattern of unlawful conduct. (Doc. 383-59, Ex. 58, at CM/ECF p. 17, 66:20-25; Doc. 383-63, Ex. 62).

363.   After Arbitration, Jessie Lundvall was reinstated to LFR on May 24, 2023.  (Doc. 395-16, pp. 22-23)

AMANDA BENSON, Plaintiff

BY:   /s/ Kelly K. Brandon
           Kelly K. Brandon, #20734
           Alexis Mullaney, #25908
           Fiedler Law Firm, P.L.C.
           17330 Wright Street,Ste. 102
           Omaha, NE  68130
           (402) 316-3060
           (402) 513-6501 (facsimile)
           kelly@employmentlawnebraska.com
           alexis@employmentlawnebraska.com

           Paige Fiedler, #27447
           FIEDLER LAW FIRM, P.L.C.
           8831 Windsor Parkway
           Johnston, IA 50131
           (515) 254-1999
           (515) 254-9923 (F)
           paige@employmentlawiowa.com

           Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 24th day of May  2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all CM/ECF participants.

           /s/ Kelly K. Brandon