IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMANDA BENSON, | |
| Plaintiff, | **4:18CV3127** |
| vs. | |
| CITY OF LINCOLN, a political subdivision; CHRIS BEUTLER; TOM CASADY; DOUG MCDANIEL; TIM LINKE; LEO BENES; ERIC JONES; DARREN MERRYMAN; and SHAWN MAHLER, | **MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERTS** |
| Defendants. | |

Plaintiff Amanda Benson, a female firefighter/EMT with Lincoln Fire and Rescue (LFR), brought this action alleging violations of her civil rights against the City of Lincoln, Nebraska, the Mayor and other City officials, and several LFR employees. Filing 188 (Fourth Amended Complaint). This case is now before the Court on Defendants' Motion to Exclude the Testimony of Plaintiff's Designated Expert, Dr. Tellefsen. Filing 421. It is also before the Court on Defendants' Motion to Exclude the Testimony of Plaintiff's Designated Expert, Amy Oppenheimer. Filing 425. For the reasons stated below, the first Motion is denied but the second Motion is granted.

## I.   INTRODUCTION

The Court will state separately the specific factual context and key factual disputes for each Motion now before the Court. For purposes of providing more general context, however, the Court will briefly summarize the factual background to this litigation and the essential procedural background.

## A.  Factual Background

The factual background presented here is a summary of the factual background presented in the Court's ruling on the parties' Motions for Summary Judgment and Motions to Strike. Filing 440.[1] Amanda Benson was hired by Lincoln Fire & Rescue (LFR) on July 1, 2013, as a Firefighter/EMT. Filing 394 at 1 (¶ 1). Defendants are the City of Lincoln, Nebraska, various city officials, and various officers in the LFR. Filing 378 at 1–3 (¶¶ 2–10). Benson was eventually permanently assigned to Station 8 and the Engine 8 crew for C shift on October 15, 2014. Filing 378 at 6 (¶ 24). In November of 2020, Benson became the Acting Captain on Engine 1 at Station 1, then later became the Acting Captain of Truck 1 at that Station. Filing 378 at 39 (¶ 203).

Benson alleges that she was subjected to sexual discrimination, harassment, and retaliation for almost the entirety of her employment with LFR. She filed charges of discrimination with the Nebraska Equal Opportunity Commission (NEOC) on August 15, 2016, *see* Filing 394 at 2 (¶ 3), and four years later with the federal Equal Employment Opportunity Commission (EEOC), on October 14, 2020, *see* Filing 394 at 2 (¶ 6). It is safe to say that many—but not all—of Benson's allegations of discrimination, harassment, and retaliation were based on conduct by Captain Shawn Mahler. Mahler was the Captain of the Truck crew at Station 8. Filing 397 at 3 (¶ 25) (admitting this much of ¶ 25).

Issues between Benson and Mahler came to a head on April 26, 2021, when LFR was called to a cardboard fire within a warehouse. Filing 378 at 43 (¶ 224). Both Benson and her crew in T1 and Mahler had his crew in T8 were involved in responding to the warehouse fire. Filing 378 at 44 (¶¶ 230, 233). On May 5, 2021, when Benson spoke to and submitted a complaint to her superiors at LFR, Benson alleged Mahler had abandoned her during the warehouse fire and that

---

[1] *See also Benson v. City of Lincoln*, No. 4:18CV3127, 2023 WL 4865817 (D. Neb. July 31, 2023).

she and her crew could have been killed or injured. Filing 397 at 59 (¶ 290) (admitting this much of ¶ 290). The LFR conducted an investigation, although Benson disputes its adequacy. Filing 397 at 60 (¶ 292). After pre-disciplinary investigations and proceedings, Benson was terminated effective November 2, 2021. Filing 394 at 1 (¶ 1); *see also* Filing 380–83 at 4 (dismissal letter). Fire Chief David Engler, who is not a party to this litigation, determined that Benson had made false allegations against Mahler and that her actions were "a direct hindrance to the effective performance of LFR's functions and reflect undue discredit upon the department," establishing "good cause" for dismissal. Filing 380 at 3 (dismissal letter).

### B. Procedural Background

On July 6, 2018, well before her termination, Benson filed her original Complaint in this matter in the District Court of Lancaster County, Nebraska. Filing 1 at 4–95. Defendants removed the action to this federal court. Filing 1. However, at this point in the litigation, Benson's operative pleading is her Fourth Amended Complaint, filed November 11, 2021. Filing 188.

In her Fourth Amended Complaint, Benson asserts eight causes of action. Her first cause of action is a claim for a sexually hostile work environment and retaliatory harassment in violation of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. §48-1101, *et seq.* Filing 188 at 59–60 (¶¶ 225–230). Her second cause of action is a NFEPA claim of sexual discrimination. Filing 188 at 60–61 (¶¶ 231–235). Her third cause of action is a NFEPA claim of retaliation. Filing 188 at 61–62 (¶¶ 236–240). Her fourth cause of action is a claim for a sexually hostile work environment and retaliatory harassment in violation of Title VII. Filing 188 at 62–63 (¶¶ 241–245). Her fifth cause of action is a Title VII claim of sexual discrimination. Filing 188 at 63–64 (¶¶ 246–250). Her sixth cause of action is a Title VII claim of retaliation. Filing 188 at 64–65 (¶¶ 251–255). Benson's seventh cause of action alleges sexual discrimination and a hostile work environment in violation of the Equal Protection Clause of the United States Constitution against

the City of Lincoln. Filing 188 at 65–67 (¶¶ 252–263). Her last cause of action alleges sexual discrimination and a hostile work environment in violation of the Equal Protection Clause of the United States Constitution against the individual Defendants. Filing 188 at 67–68 (¶¶ 264–270). Defendants filed a joint Answer on December 6, 2021, denying Benson's claims and asserting various affirmative defenses. Filing 196.

In the Court's Memorandum and Order Regarding Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment, the Court among other things denied Benson's Motion as to Defendants' affirmative defenses of failure to mitigate damages and after-acquired evidence. Filing 440 at 27. The Court also denied Defendants' Motion for Summary Judgment on all claims in Benson's Fourth Amended Complaint. Filing 440 at 27.

The Motions now before the Court were filed prior to the Court's ruling on the summary judgment motions. This matter is scheduled for trial to begin on September 12, 2023.

## II.  LEGAL ANALYSIS

The Court will consider in turn the two Motions to exclude experts. First, however, the Court notes that both Motions are premised on Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Daubert*'s progeny. Thus, the Court begins its analysis with a summary of the applicable standards.

### A.  Standards for Admission of Expert Testimony

A district court's determination on the admissibility of expert testimony is reviewed for abuse of discretion. *United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023). Federal Rule of Evidence 702 and Daubert govern the admissibility of expert testimony and give the district court "a gatekeeper function" to ensure that expert testimony is relevant and reliable. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021), cert. denied sub nom. *3M Co. v. Amador*, 142 S. Ct. 2731 (2022). Somewhat more specifically,

4

> Rule 702's screening requirement has been boiled down to a three-part test. First, the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant. Second, the expert must be qualified to assist the finder of fact. Third, the testimony must be reliable or trustworthy in an evidentiary sense.

*In re Bair Hugger*, 9 F.4th at 777 (internal quotation marks and citations omitted).

As to the first requirement, an expert's opinion lacks relevance if it does not fit the facts of the case. *McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021). On the other hand, "Rule 702 is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" *Perry*, 61 F.4th at 606 (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)). As to the second requirement, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Thus, an expert is qualified if for example the expert's degrees and training gave the expert competence for the subject area of the expert's testimony. *Perry*, 61 F.4th at 606. However, the Eighth Circuit Court of Appeals has also reiterated that "'[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility,'" and "the weight given to witness testimony is the province of the jury." *Id.* (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)). The third requirement, reliability, involves consideration of several factors:

> These factors are (1) whether the expert's theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error of the theory or technique, and (4) whether the technique or theory is generally accepted. Factors recognized since *Daubert* include whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

*In re Bair Hugger*, 9 F.4th at 777 (internal quotation marks omitted). "[A] district court may exclude expert testimony if it finds 'that there is simply too great an analytical gap between the

data and the opinion proffered.'" *Id*. at 777–78 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "[T]o put it in the language we have frequently used both before and after Daubert and Joiner, a district court may exclude an expert's opinion if it is 'so fundamentally unsupported' by its factual basis 'that it can offer no assistance to the jury.'" *Id*. at 778 (quoting *Loudermill v. Dow Chem. Co*., 863 F.2d 566, 570 (8th Cir. 1988)). On the other hand, the "general rule" is that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Id*. at 778.

It is also wise to keep in mind that Daubert and its progeny "call for the liberal admission of expert testimony." *In re Bair Hugger*, 9 F.4th at 777. Thus, "the rejection of expert testimony is 'the exception rather than the rule.'" *Perry*, 61 F.4th at 606 (quoting *Robinson*, 447 F.3d at 1100) Finally, the Supreme Court has said, and the Eighth Circuit has reiterated, "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of addressing 'shaky but admissible evidence.'" *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

### B.  The Motion to Exclude Dr. Tellefsen's Testimony

#### 1.  *Additional Background*

Benson alleges that she sought mental health treatment in July 2015 through the City's Employee Assistance Program for the decline in her mental health, which she attributed to the adverse treatment she was receiving from Mahler at Station 8. Filing 432 at 1 (citing Filing 386-2 (EAP records)). Benson also alleges that following her initial complaints to LFR, she sought psychological treatment from Bryan Bratt, a licensed mental health practitioner, first at Monarch Counseling and then at Renewing Hope. Filing 432 at 1–2; *see also* Filing 434-8 at 1–2 (Bratt Aff. at ¶ 3). Benson retained Dr. Christiane Tellefsen, M.D., a board-certified general and forensic

psychiatrist, to provide opinions regarding Amanda's medical diagnoses, causation, and damages.

Filing 432 at 2. Dr. Tellefsen filed three reports in this case, and she was also deposed.

 In the first report, dated July 30, 2020, Dr. Tellefsen stated that her understanding of the

purpose of her evaluation of Benson "was to determine if she has a mental disorder and, if so, how

it may be related to her employment at the Lincoln Fire Department in Lincoln, Nebraska." Filing

523-2 at 1. Dr. Tellefsen stated in the "Opinion" section of her first report,

> In my opinion, to a reasonable degree of medical certainty, Amanda Benson developed Major Depression, Severe and suffered an exacerbation of PTSD stemming from her employment with the Lincoln Fire Department. Her conditions are considered chronic or permanent and require ongoing treatment. Her psychiatric conditions have initiated or exacerbated her other health problems. Her prognosis is highly guarded and dependent on her working conditions.

Filing 423-2 at 27.

Dr. Tellefsen produced a second report dated December 10, 2020, after reviewing the

report and records from a neuropsychological evaluation by Robert Arias, Ph.D., Defendants'

expert, dated September 10, 2020, and after an additional 45-minute telephone interview of Benson

on November 10, 2020. Filing 423-3 at 1. In her second report, Dr. Tellefsen provided the

following "Summary":

> Dr. Arias' report is inconsistent with Ms. Benson's history and treatment. The symptoms of personality disorder he listed are either incorrect, such as pill abuse, or more fully consistent with her PTSD. She has emotional numbing, anger, depressed mood and flashbacks stemming from her abusive childhood, but which have been rekindled by her situational stress at the Fire Department. She has had an uptick in her physical health problems as well. As discussed in my prior report, her physical health problems have been caused by work injuries or are conditions that are typically exacerbated by stress. She has a consistent work ethic and successful work performance at the fire department despite the various obstacles she has attributed to the ongoing stressful work environment. She has lost relationships in the past several years, largely due to her depressed and angry mood stemming from work. Thus, after review of this additional information, my opinions listed in my July 2020 report have not changed.

Filing 423-3 at 3.

Dr. Tellefsen produced a third report, dated June 2, 2023, after reviewing more information. Filing 423-3 at 1. After discussing the latest information, Dr. Tellefsen opined as follows:

> As a result of this additional information, my opinions in this case have not changed, with the exception of a worsening of both [Benson's] Major Depression Disorder and her PTSD in relation to first being fired and then reinstated and told to return to work without support or protection. While she has found some relief in Florida, she continues to be highly symptomatic of both conditions. In that her condition related to the hostile work environment has now continued for over seven years, her condition is considered permanent and she will require treatment indefinitely.

Filing 423-4 at 2.

Defendants point primarily to Dr. Tellefsen's deposition. Dr. Tellefsen testified that she "would approach every forensic evaluation . . . with a blank canvas, and then I just start looking and seeing what's out there," to see what is the most likely diagnosis. Filing 434-7 at 5 (Tellefsen Depo. at 19:20–20:1).[2] Although Dr. Teleffsen acknowledges that the Minnesota Multiphasic Personality Inventory (MMPI) may be revealing about personality characteristics, she does not use it, because she "can ferret out, symptoms of malingering, in other ways." Filing 434-7 at 22 (Tellefsen Depo. at 86:12–13). Indeed, she stated, "I don't – I don't need an MMPI." Filing 434-7 at 22 (Tellefsen Depo. at 86:13–14). She testified further that she "think[s] the MMPI tends to muddy the picture more than it clears it," so she "do[esn't] think [she] need[s] one." Filing 434-7 at 22 (Tellefsen Depo. at 86:14–16).

Dr. Tellefsen also testified,

> There is something called vicarious PTSD that a lot of first responders can develop from witnessing gory stuff all day long. [Benson] didn't seem -- She didn't report

---

[2] Defendant supports the argument that Dr. Tellefsen's opinions should be excluded by pointing out how Dr. Tellefsen oddly likened her evaluation process to Georges Seurat's pointillist painting technique. Filing 424 at 3 (¶ 7). Dr. Tellefsen's comments in this regard certainly give this Court significant pause. These comments cause the Court to question whether Dr. Tellefsen's process is a generally accepted scientific methodology. However, the Court concludes that despite these comments, Dr. Tellefsen's opinions should be allowed based on the entirety of her submissions.

> any, any issues with that other than at one point she said something to me -- I think
> this was not in the initial interview, but, but at one point she did say to me that it's,
> you know, it's hard enough having to deal with the stuff that I see as, as you know,
> that I'm doing in my job, the things that we're responding to. It's hard enough to
> deal with that, in addition to having to deal with all of this -- sort of suffer more
> ridiculous behavior from her supervisor.

Filing 434-7 at 17 (Tellefsen Depo. at 68:8–19). Despite this mention of Benson's comment on

the usual workplace stress on a firefighter, when Dr. Tellefsen was asked how much time she spent

with Benson discussing the trauma that she witnessed through accidents, fires, and other things,

Dr. Tellefsen responded, "I don't really recall getting into that much at all. I mean, she didn't really

report it as a problem." Filing 434-7 at 17 (Tellefsen Depo. at 68:24–25).

### 2. *Exclusion of Dr. Tellefsen's Testimony Is Not Warranted*

Applying the three-part test described in I*n re Bair Hugger,* 9 F.4th at 777, exclusion of

Dr. Tellefsen's testimony is not warranted. Defendants do not dispute Dr. Tellefsen's

qualifications as an expert. *See id.* (explaining that second requirement of Rule 702 and Daubert

is that the expert is qualified to assist the finder of fact); but see Filing 432 at 15 (arguing in

opposition that Dr. Tellefsen is exceptionally qualified). Rather, Defendants argue first that

Dr. Tellefsen's testimony would be neither useful nor relevant. Filing 424 at 8.

The first requirement for admission of expert testimony is that "the testimony must be

useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant." *In

re Bair Hugger,* 9 F.4th at 777. Defendants argue that Dr. Tellefsen's testimony leaves the lay

jurors to determine for themselves which aspects of Benson's employment may have caused her

emotional harm because Dr. Tellefsen simply took Benson's word for it that her mental conditions

are caused by discrimination, harassment, or retaliation rather than workplace stressors common

to all firefighters. Filing 424 at 9. Benson disputes these contentions, although she does not clearly

articulate in what way Dr. Tellefsen's testimony will be relevant to the case or helpful to the jury.

*See* Filing 432 at 15 (asserting that Dr. Tellefsen's opinions are relevant and reliable), 25 (asserting that the relevance of Dr. Tellefsen's testimony is not substantially outweighed by the danger of unfair prejudice), 26 (asserting that Dr. Tellefsen's testimony is relevant, reliable, and will be helpful to the jurors).

Notwithstanding the lack of clear argument from Benson on the issue, the Court concludes that Dr. Tellefsen's diagnoses of Benson's mental conditions and Dr. Tellefsen's explanations of the nature and sources of those mental conditions is likely to advance the trier of fact's understanding to at least some degree. *Perry*, 61 F.4th at 606 (stating such a showing satisfies Rule 702's relevance requirement). While Dr. Tellefsen's opinions are expressed in terms of Benson's "employment" as the circumstance causing Benson's mental distress, *see* Filing 423-2 at 27, and an "ongoing stressful work environment," *see* Filing 423-3 at 3, Dr. Tellefsen does opine that "[Benson's] condition related to the hostile work environment has now continued for over seven years," *see* Filing 423-4 at 2. Moreover, Dr. Tellefsen's opinions suggest that Benson's stress arose from alleged harassment, discrimination, and retaliation rather than from the workplace stressors common to all firefighters. For example, Dr. Tellefsen acknowledges—perhaps more clearly in her deposition than in her reports—that both sources of stress existed, but that Benson was able to cope successfully with the common stressors. *See, e.g.,* Filing 434-7 at 17 (Tellefsen Depo. at 68:8–19); Filing 423-4 at 2 (noting that Benson "found some relief in Florida," where she was away from the alleged harassment, discrimination, and retaliation at the LFR).[3] The Court will not grant a blanket exclusion of Dr. Tellefsen's testimony for lack of relevance.

---

[3] As an adjunct to Defendants' "relevance" argument, Defendants argue that Dr. Tellefsen's testimony should be excluded pursuant to Federal Rule of Evidence 403 as confusing, misleading, and unfairly prejudicial, because it contradicts Benson's own statements that her stress from work arose from a combination of "the horrible stuff you see on the job" and the harassment, discrimination, and retaliation she was allegedly suffering. Filing 424 at 10. Defendants are welcome to point out inconsistencies between or within Dr. Tellefsen's testimony or statements and Benson's testimony or statements, but the Court finds those alleged inconsistencies will not unfairly prejudice Defendants. Rather, they may provide Defendants with ammunition for impeachment.

To be admissible, an expert's testimony also "must be reliable or trustworthy in an evidentiary sense." *In re Bair Hugger*, 9 F.4th at 777 (also setting out factors involved in consideration of reliability). Defendants contend that Dr. Tellefsen's testimony is unreliable because she unquestioningly accepted Benson's self-diagnoses of the sources of her mental distress and because she did not ground her opinions in any scientific testing, methodology, or verifiable test results. Filing 424 at 11. Benson argues that Dr. Tellefsen testified that her forensic methodology—her psychiatric examination—is universally recognized by the psychiatric community as reliable for differential diagnosis and causation analysis. Filing 432 at 17. Indeed, Benson contends that Dr. Tellefsen performed an "exhaustive" differential diagnosis evaluation in a thorough psychiatric examination that considered numerous sources of information about Benson. Filing 432 at 17.

Bearing in mind the considerations that courts use to determine reliability, see I*n re Bair Hugger,* 9 F.4th at 777, the Court concludes that Dr. Tellefsen's testimony is sufficiently reliable to be admissible. Considering whether the expert's theory or technique has been tested, peer reviewed, and is generally accepted, see id*.,* the Court finds that Dr. Tellefsen opined in her declaration that the methodology she employs in her forensic practice to assess each subject's psychiatric condition—including Benson's—is the psychiatric examination. F*i*ling 434-1 at 2 (¶ 7). Dr. Tellefsen also opined that a psychiatric examination is universally recognized in the psychiatric community as a reliable method for differential diagnosis and causation analysis. Filing 434-1 at 2 (¶ 7). Dr. Tellefsen also gave reasons for not using the MMPI, even though it is a standardized diagnostic tool. Filing 434-7 at 22 (Tellefsen Depo. at 86:12–16). The Court concludes that a jury should assess the sufficiency of Dr. Tellefsen's reasons for not using the MMPI instead of the Court concluding that her opinions should be rejected for not using that one

particular diagnostic tool. As to additional considerations, it is clear that Dr. Tellefsen's opinions grow naturally and directly out of her clinical experience and research independent of this litigation and were not developed for purposes of testifying. *In re Bair Hugger*, 9 F.4th at 777 (internal quotation marks omitted).

The Court concludes that this is not a case in which "there is simply too great an analytical gap between the data [Dr. Tellefsen considered] and the opinion[s] [she] proffered." *Id.* at 777–78 (quoting *Joiner*, 522 U.S. at 146). Neither is Dr. Tellefsen's opinion "'so fundamentally unsupported' by its factual basis 'that it can offer no assistance to the jury.'" *Id.* at 778 (quoting *Loudermill*, 863 F.2d at 570). Rather, this is a case in which the "general rule" that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility" is applicable. *Id.* at 778.

In this case, in light of precedent showing that "the rejection of expert testimony is 'the exception rather than the rule,'" *Perry*, 61 F.4th at 606 (quoting *Robinson*, 447 F.3d at 1100), and that Daubert and its progeny "call for liberal admission of expert testimony," *In re Bair Hugger*, 9 F.4th at 777, the Court denies Defendants' motion to exclude Dr. Tellefsen's expert testimony. It is true that Defendants have identified grounds to impeach or challenge Dr. Tellefsen's expert opinions, but that simply confirms the Court's conclusion that this is a case in which "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means'" of addressing Dr. Tellefsen's expert testimony. *In re Bair Huggers*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

## C.  The Motion to Exclude Ms. Oppenheimer's Expert
## Testimony

*1.    Additional Background*

Benson states that she intends to offer the expert opinions of Amy Oppenheimer, an

attorney not licensed in Nebraska, on the acceptable human resources practices of employers in

response to complaints of workplace discrimination, harassment, and retaliation and whether

Defendants' actions with respect to Benson met the standard of care. Filing 430 at 3. Oppenheimer

has authored two reports and an affidavit in this case.

In her first report, dated July 20, 2020, Oppenheimer states that she was retained on behalf

of Benson "to render an opinion of the defendants' actions in response to complaints of workplace

discrimination, harassment and retaliation, including what is considered typical and acceptable

human resource practice in regard to responding to and investigating such complaints." Filing 426-

5 at 1 (¶ 1). After setting out her qualifications, the materials she reviewed, and a factual summary,

Filing 426-5 at 1–5, Oppenheimer summarizes her opinions as follows:

> Based on these facts, and the documents reviewed, my opinion is that the
> Defendants did not meet the standard of care established in the human resource
> field for responding to complaints of gender harassment, discrimination, and
> retaliation.

Filing 426-5 at 6. Oppenheimer then sets out what she finds are "serious deficiencies in the

response to Benson's complaint," consisting of the following: (1) Defendants' action in not

investigating and/or following up after Benson raised concerns about Mahler's discriminatory

treatment toward her in November 2014 did not meet the standard of care, Filing 426-5 at 8; (2)

Defendants' failure to take action in 2015 to address concerns raised by Captain Giles that Mahler

was mistreating Benson did not meet the standard of care, Filing 426-5 at 8; (3) Defendant's

response to Benson's complaint about Mahler in December 2015 did not meet the standard of care,

Filing 426-5 at 9–10; and (4) Defendant's defense of Benson's charge of discrimination with the

13

NEOC was contrary to the City's own investigation by Taylor-Riley, Filing 426-5 at 10.

Oppenheimer's conclusion in her first report was as follows:

> The Defendants' actions in responding to Benson's complaints were seriously flawed and fell significantly below the standard of care in several respects. The Defendants failed to take reasonable and customary steps to implement appropriate remedial measures based upon the results of Kimberly Taylor-Riley's investigations.

Filing 426-5 at 11.

On August 6, 2021, Benson filed an affidavit by Oppenheimer with this Court in support of Benson's Motion for a Preliminary Injunction. Filing 426-6. In that affidavit, Oppenheimer offered opinions after the 2021 investigations by Witte of Benson's complaints, including the warehouse fire incident. Filing 426-6 at 1–2 (¶ 4). Oppenheimer opined that "Witte's investigation fell below the standard of care" in several ways. Filing 426-6 at 2–5 (¶ 9(a)–(j)). Oppenheimer's affidavit concludes with the following opinions:

> 10.    Benson's concerns raise safety issues that could be a matter of life or death. The need for a truly fair, thorough and unbiased review of her concerns should be both obvious and compelling. Unfortunately, Witte has not done that type of complete and unbiased investigation and, given the high-stakes litigation underlying this matter, there are reasons to question whether anyone hired by either side would do so.
>
> 11.    Thus, if any case called for the appointment of a neutral party to investigate, this one does.

Filing 426-6 at 5–6 (¶¶ 10–11).

Oppenheimer also provided a supplemental report in this case on May 30, 2023. Filing 426-7. After reiterating the opinions in her first report, Oppenheimer offered the following additional opinions: (1) Witte's investigation of Benson's April 2021 complaints did not meet the standard of care, Filing 426-7 at 12–13; (2) Gerdes's investigation of the warehouse fire did not meet the standard of care, Filing 426-7 at 13–15; and (3) Benson's termination was inconsistent with appropriate human resources practice. Filing 426-7 at 15–16. In the conclusion to her second

report, after reiterating the conclusion in her first report, Oppenheimer adds that Defendants "failed to adequately investigate Benson's complaints of retaliation and terminated her for bringing what they themselves admit was a good faith complaint." Filing 426-7 at 16.

2.     *Admissibility of Human Resources Experts' Opinions*

The Court finds that the admissibility of a human resources expert requires consideration of some additional judicial decisions discussing such experts. In the first of only two decisions from this Circuit squarely addressing the issues presented here, a colleague in this district considered admissibility in a Title IX case of testimony of an expert on the standard of care for educational institutions' policies and procedures relevant to Title IX and on one such institution's response to dating violence allegations by a female student. *Roohbakhsh v. Bd. of Trustees of Nebraska State Colleges*, No. 8:17CV31, 2019 WL 5653448, at *3 (D. Neb. Oct. 31, 2019). The district judge concluded that the expert could not testify that the educational institution's conduct amounted to deliberate indifference because that was a question for the jury, nor could the expert testify as to any other "ultimate legal conclusion." *Id.* at *4. However, he concluded that the witness was qualified to testify as an expert on industry standards for Title IX training, compliance, investigations, and responses, as well as about the history and purposes of Title IX, and that the witness's expert opinions would help the trier of fact determine if the educational institution's responses and investigations comported with industry standards. *Id.*

The same colleague who wrote the *Roohbakhsh* decision also very recently wrote another decision that is more closely related to the case now before this Court. That decision addressed when a human resources expert may trespass into opinions on the law or the facts that are not the province of experts. *See Batiste II v. Titan Med. Grp., LLC*, No. 8:22CV190, 2023 WL 5105170, at *3 (D. Neb. Aug. 9, 2023). The district judge concluded that the human resources expert was "qualified to testify as an expert on industry standards for human resources investigations and

responses to allegations of discrimination, as well as about the history and purposes of antidiscrimination laws," and that these opinions might help the trier of fact to determine whether the defendant's actions "comported with industry standards." *Id.* On the other hand, the district judge would not allow the expert "to testify to issues of law or to express opinions that invade the province of the Court or the jury," such as whether an activity is protected under the statute for purposes of a retaliation claim because that is a question of law. *Id.* The district judge declined to make a categorical exclusion of the expert's testimony, leaving exclusion determinations for trial. *Id.*

Although the district judge in *Batiste II* found that a human resources expert could "generally" testify on industry standards for human resources investigations and responses to allegations of discrimination, the Tenth Circuit Court of Appeals took a different view. That Court concluded that a district court properly prohibited testimony from a human resources expert regarding the employer's response plan in cases of sexual harassment and the reasonableness of the employer's response to an employee's claim. *Wilson v. Muckal*a, 303 F.3d 1207, 1218 (10th Cir. 2002). Even though the district court found the testimony was relevant, it "excluded it because the facts were 'not so complicated as to require the testimony of an expert witness on either the adequacy of the plan or policy or the investigation' that followed." *Id.* The Tenth Circuit found no abuse of discretion for the following reasons:

> The 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact. *Werth v. Makita Elec. Works, Ltd*., 950 F.2d 643, 648 (10th Cir.1991). "When the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper." *Frase v. Henry*, 444 F.2d 1228, 1231 (10th Cir.1971). After reviewing the record, we agree with the district court that the issues to which Ms. Wilson's expert would have testified were not so impenetrable as to require expert testimony.

*Wilson*, 303 F.3d at 1219.

16

More recently, the Third Circuit Court of Appeals concluded that the district court did not abuse its discretion when it excluded expert testimony on "reasonable human-resources practices" on slightly different relevance/helpfulness grounds. *See Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 84 (3d Cir. 2017). The expert at issue in that case intended to testify as to twenty "reasonable" HR practices that the employer could have employed but did not employ when conducting a reduction in force. *Id.* The Third Circuit agreed with the district court that the testimony was not relevant where an employee could only rebut the employer's defense of reasonable factors other than age by "showing that *the factor relied upon* is unreasonable, not by identifying twenty *other* practices that would have been reasonable instead." *Id.* (emphasis in the original).

The Court finds one other decision from a Circuit Court of Appeals instructive on issues presented by human resources experts. The Second Circuit Court of Appeals concluded that a human resources expert cannot properly testify on the credibility of an employer's statement that it lacked certain information pertinent to an employee's discrimination claim because that determination belongs to the jury. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005).

   3.   *Exclusion of Oppenheimer's Testimony Is Warranted because It Will Not Assist the Jury*

Applying the three-part test described in *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021), exclusion of Oppenheimer's testimony is warranted. Although the Court finds one part of the test dispositive, it will analyze all three.

As to Oppenheimer's qualifications, see *id.* (identifying qualifications as the second part of the test), Defendants contend that Oppenheimer is not qualified as an expert beyond the limited topic of workplace investigation. Filing 417 at 10. Defendants argue that she should not be allowed

to render opinions on whether the actions taken by Defendants, the decision to discharge Benson, the existence of widespread patterns and practices of discrimination, and/or that the City of Lincoln's decision to defend itself against the NEOC charge violated some standard of care. Filing 417 at 10. Defendants argue that Oppenheimer lacks necessary qualification where she admits that she does not defend employers in EEOC proceedings nor advise employers on how to defend themselves. Filing 417 at 10. Benson counters that Oppenheimer is eminently qualified to offer opinions on reasonable and acceptable human resources practices. Filing 430 at 1. The Court finds that Oppenheimer is qualified by her "knowledge, skill, experience, training, [and] education" to offer competent testimony on human resources investigations. See Fed. R. Evid. 702; *Perry*, 61 F.4th at 606. The gaps in her knowledge and experience to which Defendants point go to the weight of her testimony—a matter for the jury—not its admissibility. *Id.* Oppenheimer's lack of qualifications does not warrant a blanket or topical exclusion of her testimony.

Likewise, the Court concludes that Openheimer's testimony is sufficiently reliable. See *id.* (identifying reliability or trustworthiness as the third requirement of the test). This is so, notwithstanding Defendants' contentions that Oppenheimer's opinions are not reliable because the standard upon which she renders her opinions "is not based on any industry standard whatsoever, but rather an amalgamation of EEO policy and guidance, out-of-state laws, inapplicable administrative practices, and misstatements of Federal law," Filing 427 at 5, and because Oppenheimer's opinions are based on false statements of fact and assumptions. Filing 417 at 11. Bearing in mind the considerations that courts use to determine reliability, the Court concludes that Oppenheimer's testimony is sufficiently reliable. Oppenheimer's theories have been developed, tested, and peer reviewed with other human resources specialists and accepted by such specialists on a national and global scale in light of her teaching, her involvement in training human

18

resources professionals, and her involvement in national and internal organizations.  See *In re Bair Hugger*, 9 F.4th at 777 (identifying factors involved in the reliability determination); see also Filing 426-4 (Oppenheimer's CV).  The Court cannot say "that there is simply too great an analytical gap" between the facts of this case that Oppenheimer reviewed and the opinions that she offers. *Id.* at 777-78 (quoting *Joiner*, 522 U.S. at 146).

       The expert requirement Oppenheimer's testimony does not meet is usefulness to the finder of fact in deciding an ultimate issue of fact, *i.e.*, relevance. *Id.* at 777. On this requirement, the Court disagrees with the judge in *Roohbakhsh*, 2019 WL 5653448, at *3, and *Batiste II*, 2023 WL 5105170, at *3, and agrees with the Tenth Circuit Court of Appeals in *Wilson*, 303 F.3d at 1218–1219, that the facts involved in the investigations and questions about the adequacy of the investigations are not so complicated as to require the testimony of an expert witness. *Id.* at 1218 (agreeing with the district court's assessment). Like the Tenth Circuit in *Wilson*, the Eighth Circuit requires expert testimony to be helpful to the jury, that is, it must advance the jury's understanding to some degree. *Perry*, 61 F.4th at 606. However, "a layperson juror" would be able to make a "common sense determination" of the facts involved in and questions about the adequacy of the investigations at issue here "without the technical aid of an expert." *United States v. Watkins*, 66 F.4th 1179, 1185 (8th Cir. 2023) (explaining that if a layperson juror could do so, the expert evidence would be superfluous); *see also Wilson*, 303 F.3d at 1219 ("When the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper." (quoting *Frase*, 444 F.2d at 1231)). As in *Wilson*, after reviewing the record, this Court concludes that the issues to which Oppenheimer would testify are "not so impenetrable" as to require expert testimony. *Wilson*, 303 F.3d at 1219.

This Court also concludes that Oppenheimer's testimony is not helpful to the jury because she cannot properly testify to questions of law that invade the province of the Court or factual determinations that invade the province of the jury. To this extent, the Court agrees with *Roohbakhsh*, 2019 WL 5653448, at *4, and *Batiste II*, 2023 WL 5105170, at *3. As the Eighth Circuit Court of Appeals has explained,

> "[E]xpert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Accordingly, a district court may exclude the testimony of an expert if it finds that such testimony constitutes an "impermissible instruction on the law." *United States v. Benton*, 890 F.3d 697, 717 (8th Cir. 2018).

*United States v. Bull*, 8 F.4th 762, 768 (8th Cir. 2021). Oppenheimer intends to offer opinions on "acceptable" human resources investigations and conduct and whether the investigations or conduct meet a "standard of care" defined by something other than this Court's statement of the applicable law. These opinions would invade the province of the Court to instruct on the law. *Id.* The Court also concludes that testimony by Oppenheimer about reasonable investigation techniques that Defendants could have employed does not properly demonstrate the inadequacy of the investigation techniques Defendants did use. Cf. *Karlo*, 849 F.3d at 84. Such testimony is also at least an indirect comment on the credibility of Defendants' reasons for their decisions, which invades the province of the jury. Cf. *Woodman*, 411 F.3d at 86.

Defendants' Motion to Exclude Oppenheimer's testimony is granted.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that

1.      Defendants' Motion to Exclude the Testimony of Plaintiff's Designated Expert, Dr. Tellefsen, Filing 421, is denied; and

2.     Defendants' Motion to Exclude the Testimony of Plaintiff's Designated Expert, Amy Oppenheimer, Filing 425, is granted. Testimony of Amy Oppenheimer will not be permitted at trial.

Dated this 18th day of August, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge