IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMANDA BENSON,<br><br>                Plaintiff,<br><br>     vs.<br><br>CITY OF LINCOLN, a political subdivision;<br>CHRIS BEUTLER; TOM CASADY; DOUG<br>MCDANIEL; TIM LINKE; LEO BENES; ERIC<br>JONES; DARREN MERRYMAN; and SHAWN<br>MAHLER,<br><br>                Defendants. | **4:18CV3127**<br><br><br>**MEMORANDUM AND ORDER ON THE<br>PARTIES' MOTION IN LIMINE** |

Plaintiff Amanda Benson, a female firefighter/EMT with Lincoln Fire and Rescue (LFR), brought this action alleging violations of her civil rights against the City of Lincoln, Nebraska, the former mayor, and several LFR employees. Filing 188 (Fourth Amended Complaint). This case is before the Court on the first of three Motions in Limine in anticipation of a jury trial. That Motion is Defendants' Motion in Limine to Exclude Lincoln Mayor Gaylor Baird from Being Called as Witness for Trial by Plaintiff. Filing 447. For the reasons stated below, Defendants' Motion is granted.

## I. INTRODUCTION

### A. Background

The Court laid out the factual and procedural background to this litigation in some detail in its ruling on the parties' Motions for Summary Judgment. *See* Filing 440, also available at *Benson v. City of Lincoln*, No. 4:18CV3127, 2023 WL 4865817 (D. Neb. July 31, 2023). Thus, the Court's summary of the general background here will be brief.

Amanda Benson was hired by LFR on July 1, 2013, as a Firefighter/EMT. Filing 394 at 1 (¶ 1). In November of 2020, Benson became the Acting Captain on Engine 1 at Station 1, then she

later became the Acting Captain of Truck 1 at that Station. Filing 378 at 39 (¶ 203). Benson alleges that she was subjected to sexual discrimination and harassment for almost the entirety of her employment with LFR. She filed charges of discrimination with the Nebraska Equal Opportunity Commission (NEOC) on August 15, 2016, *see* Filing 394 at 2 (¶ 3), and four years later with the federal Equal Employment Opportunity Commission (EEOC), on October 14, 2020, *see* Filing 394 at 2 (¶ 6). It is safe to say that many—but not all—of Benson's allegations of discrimination, harassment, and retaliation were based on conduct by Captain Shawn Mahler, who was the Captain of the Truck crew at Station 8. Filing 397 at 3 (¶ 25).

On April 26, 2021, LFR was called to a cardboard fire within a warehouse. Filing 378 at 43 (¶ 224). On May 5, 2021, when she spoke to and submitted a complaint to her superiors at LFR, Benson alleged Mahler had abandoned her during the fire and that she and her crew could have been killed or injured. Filing 397 at 59 (¶ 290) (admitting this much of ¶ 290). After pre-disciplinary investigations and proceedings, Benson was terminated effective November 2, 2021. Filing 394 at 1 (¶ 1); *see also* Filing 380–83 at 4 (dismissal letter). Fire Chief David Engler, who is not a party to this litigation, determined that Benson had made false allegations against Mahler and that her actions were "a direct hindrance to the effective performance of LFR's functions and reflect undue discredit upon the department," establishing "good cause" for dismissal. Filing 380 at 3 (dismissal letter).

On July 6, 2018, well before her termination, Benson filed her original Complaint in this matter in the District Court of Lancaster County, Nebraska. Filing 1 at 4–95. Defendants removed the action to this federal court. Filing 1. However, at this point in the litigation, Benson's operative pleading is her Fourth Amended Complaint, November 11, 2021. Filing 188. Defendants are the

City of Lincoln, Nebraska, various city officials, and various officers in the LFR. Filing 188 at 2–3 (¶¶ 5–13); Filing 378 at 1–3 (¶¶ 2–10) (clarifying Defendants' offices).

In her Fourth Amended Complaint, Benson asserts eight causes of action. Her first three causes of action are for violations of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101, *et seq*. Those causes of action are for a sexually hostile work environment and retaliatory harassment, Filing 188 at 59–60 (¶¶ 225–230); sexual discrimination, Filing 188 at 60–61 (¶¶ 231–235); and retaliation, Filing 188 at 61–62 (¶¶ 236–240). Benson's next three causes of action are claims for violations of Title VII that parallel her NFEPA claims. Thus, those causes of action are for a sexually hostile work environment and retaliatory harassment, Filing 188 at 62–63 (¶¶ 241–245); sexual discrimination, Filing 188 at 63–64 (¶¶ 246–250); and retaliation, Filing 188 at 64–65 (¶¶ 251–255). Benson's last two causes of action are for violations of the Equal Protection Clause of the United States Constitution. These claims allege sexual discrimination and a hostile work environment against the City of Lincoln, Filing 188 at 65–67 (¶¶ 252–263); and sexual discrimination and a hostile work environment against the individual Defendants, Filing 188 at 67–68 (¶¶ 264–270). Defendants filed a joint Answer to Plaintiff's Fourth Amended Complaint on December 6, 2021, denying Benson's claims and asserting numerous affirmative defenses. Filing 196.

Jury trial in this matter is set to begin on September 12, 2023. Filing 364.

### B. Additional Factual Background

Benson alleges that Leirion Gaylor Baird was elected to the Lincoln City Council in 2013 and reelected in 2017. Filing 467 at 4 (¶ 10). Gaylor Baird announced her bid for Mayor of the City of Lincoln in November 2018. Filing 467 at 4 (¶ 10). She was elected and has served as Mayor of the City of Lincoln since May 2019. Filing 467 at 9 (¶ 32). Defendants assert that Mayor Gaylor Baird played no role in the decision to terminate Benson; instead, that decision was made solely

by Chief Engler. Filing 448 at 3 (citing Filing 380-3 at 25 (Arb. Transcr., Engler test., 131:19–25);

Filing 449-2 at (Engler Depo. 252:9–13)). Indeed, Defendants contend that Benson's only specific

factual allegations in her Fourth Amended Complaint concerning Mayor Gaylor Baird are that

Mayor Gaylor Baird is a policymaker and that on July 18, 2019, Mayor Gaylor Baird declined

Benson's email request for a meeting because of Benson's pending litigation against Defendants.

Filing 448 at 3 (citing Filing 188 at 29 (¶ 129) 51 (¶ 216)).

    Benson's version of her sole direct contact with Mayor Gaylor Baird is somewhat different.

Benson asserts that she requested a meeting with Mayor Gaylor Baird on July 18, 2019—after

Benson had filed this lawsuit but before her termination—to discuss the working conditions at

LFR. Filing 467 at 9 (¶ 33) (citing Filing 383-18 at 12 (Benson Dec. at ¶ 46); Filing 383-46 (emails

between Benson and Mayor Gaylor Baird). Benson states that she sent Mayor Gaylor Baird a letter

outlining many of her concerns of discrimination, harassment, and retaliation that she and other

female firefighters within LFR had suffered and requesting Mayor Gaylor Baird's assistance in

remedying the environment. Filing 467 at 9 (citing Filing 383-46 at 3). In Benson's telling, Mayor

Gaylor Baird "refused" to meet with her and "admitted" that the reason was that Benson was suing

the City for discrimination, harassment, and retaliation. Filing 467 at 10 (citing Filing 383-46 at

1).

    The Court questions Benson's characterization of Mayor Gaylor Baird's response to

Benson's requests. On July 18, 2019, Benson sent Mayor Gaylor Baird an email to which Mayor

Gaylor Baird responded on July 30, 2019. Filing 383-46. In pertinent part, Mayor Gaylor Baird

responded, "The on-going litigation involving you and the City prevents Jennifer Brinkman [the

Mayor's chief of staff] and me from meeting with you personally at this time to discuss measures

that could improve LF&R. When the litigation is resolved, we would be happy to meet with you."

Filing 383-46 at 2. Benson sent Mayor Gaylor Baird an email on August 2, 2019, with an attached document, to which Mayor Gaylor Baird responded on August 27, 2019. Filing 383-46 at 1. In pertinent part, Mayor Gaylor Baird reiterated, "At this time, I am not able to meet with you personally to discuss the matters raised in your letter, as those matters are related to multiple ongoing litigations involving you, other City employees, and the City. As I mentioned before, I would be happy to meet with you personally when your litigation with the City is resolved. I would also be happy to help facilitate, through my office, a meeting between you and Chief Michael Despain." Filing 383-46 at 1.

The Court has taken the time to point out the problems with Benson's counsel's characterization of this evidence because the Court finds that this is not the only instance in Benson's briefing of the present Motion that presents a doubtful characterization of evidence rather than a statement of fact. These instances cast doubt on the credibility of her further allegations about Mayor Gaylor Baird's involvement or interference in investigations of the complaints of Benson or other City employees.

Benson's further allegations about Mayor Gaylor Baird's contact with her case are at best indirect and inferential and are premised on Benson's contention that the Mayor is required to enforce the law, *see, e.g.,* Filing 467 at 1 (citing Neb. Rev. Stat. § 15-310), and that the Mayor is the chief policymaker for the City with responsibility for employment decisions. Filing 467 at 1 (citing Lincoln Municipal Code Ch. § 2.06.010).[1] Benson asserts without citation to any evidence that the City's Equity, Access & Diversity Plan (EAD Plan) applied to Mayor Gaylor Baird, but that the Mayor took no steps to explore or investigate Benson's complaints. Filing 467 at 10 (¶ 34).

---

[1] In the first seven pages of factual background that Benson contends is relevant to this Motion, the only mentions of Mayor Gaylor Baird are that she was on the City Council and ran for Mayor, and several pages later, that she was elected Mayor but then declined to meet with Benson, as set out in the body of this decision. Thus, there is no evident connection between the Mayor and the numerous incidents discussed in those first seven pages of factual background.

Benson contends that the deposition testimony of Mindy Rush-Chipman, the City's EAD Officer (also called the EEO Officer) from January 2019 indicates that she was "prevented" from performing internal investigations as outlined in the EAD Plan, apparently implying that the Mayor was responsible for this situation. Filing 467 at 11. However, the pertinent testimony from Rush-Chipman states only that it was her "understanding" that she would be reporting to the Mayor about internal investigations but that had not happened in the way she anticipated because she instead notified the Mayor's chief of staff rather than the Mayor directly. Filing 383-2 at 5 (Rush-Chipman Depo. at 20:13–21:1).

Benson also alleges that it was ultimately Mayor Gaylor Baird's role to reach conclusions on internal EEO complaints, Filing 467 at 13. However, the cited testimony from Rush-Chipman is that this was Rush-Chipman's "impression." Filing 383-2 at 16 (Rush-Chipman Depo. at 62:9–63:16). Benson alleges that rather than allow Rush-Chipman to investigate a complaint by Aishah Witte against Assistant Chief Borer, the Mayor and the City Attorney's office retained outside counsel, Tara Tesmer Paulson, in order to protect the investigation "under the cloak of attorney-client privilege." Filing 467 at 14. An email from Rush-Chipman to Witte, cited in support of this allegation, states only, "The law department met on Friday and is putting together a proposed plan for this particular investigation to help protect confidentiality (with other pending litigation, reports produced [b]y me under the current procedures may be discoverable)." Plaintiff's Trial Ex. 290. Benson also points to evidence of Mayor Gaylor Baird's involvement in investigations of complaints by City employees other than Benson. Filing 467 at 14 (¶¶ 51–52). Benson alleges that Mayor Gaylor Baird "initiated or condoned" an "obstructionist" policy of routing employment complaint investigations through the Human Resources Department rather than through the EEO department. Filing 467 at 16–17 (¶ 59). Benson also cites several instances of what she describes

6

as a pervasive culture of sex discrimination against female firefighters during Mayor Gaylor Baird's tenure. Filing 467 at 17–22. However, she does not identify evidence of Mayor Gaylor Baird's involvement in or knowledge of the listed incidents. *See* Filing 467 at 17–22.

## II.  LEGAL ANALYSIS

### A.  The Parties' Arguments

Defendants argue that Mayor Gaylor Baird's testimony is irrelevant, unduly prejudicial, confusing, misleading, and would waste the jury's time, so that it should be excluded under Federal Rules of Evidence 401, 402, and 403. Filing 448 at 3. Defendants assert that Mayor Gaylor Baird does not possess any information relevant to this litigation where she did not assume office until May 2019, well after the bulk of Benson's alleged incidents of discrimination or harassment, and she was not involved in any decisions about Benson's employment. Filing 448 at 3–4. Defendants argue that when Benson attempted to contact Mayor Gaylor Baird, Mayor Gaylor Baird rightly declined to speak to Benson while Benson was involved in litigation with the City. Filing 448 at 4.

Defendants also argue that the "apex doctrine" shields Mayor Gaylor Baird from testifying at trial, where she has no knowledge of the relevant facts. Filing 448 at 6. Defendants contend that Benson had other less burdensome routes to obtain pertinent evidence about the employment decisions involving her by calling individuals who actually participated in those decisions. Filing 448 at 7. Defendants argue that while the Eighth Circuit Court of Appeals has not explicitly adopted the apex doctrine, numerous district courts in this Circuit have. Filing 448 at 7. They also argue that the Eighth Circuit Court of Appeals has recognized a related principle that high-ranking government officials should not be called to testify as to their reasons for taking official actions absent extraordinary circumstances. Filing 448 at 8. Defendants assert no such circumstances are

present here, where Benson has been allowed to take 30 depositions and engage in other extensive discovery. Filing 448 at 8.

Benson argues that Defendants ignore the fact that Mayor Gaylor Baird is responsible for enforcing City and state law regarding the prohibition of discrimination, harassment, and retaliation. Filing 467 at 22. Indeed, she argues that Mayor Gaylor Baird was personally involved in several factual and legal issues relevant to this case, including the following: (1) whether the City discriminated, harassed, and/or retaliated against Benson; (2) whether the City permitted others to discriminate, harass, or retaliate against Benson; (3) whether the City took prompt and appropriate remedial action in response to Benson's repeated complaints of discrimination, harassment, and retaliation; (4) whether that action was reasonably calculated to stop the conduct; (5) whether there was an organizational culture of City government that accepted discrimination, harassment, and retaliation; (6) what if any steps the Mayor took to combat the pervasive sex discrimination, harassment, and perception of retaliation that existed throughout LFR; and (7) why the Mayor violated the City's EAD Plan by refusing Benson access to its protections. Filing 467 at 1–2.

Benson argues that while the Mayor's involvement and decisions may reflect poorly on the City, that does not justify excluding her testimony. Filing 467 at 23, 24. Benson argues that the jury will be considering conduct that was "seemingly condoned by the Mayor," so the jury should be entitled to consider it in context with the Mayor's role as the official responsible for enforcing the City's EAD Plan. Filing 467 at 24. Benson argues that the Mayor is the only person who can testify as to why she made the policy choices and enforcement decisions she did. Filing 467 at 24. Benson also argues that the Mayor's refusal to meet with her and the Mayor's continued failure to

take remedial action that could have prevented further discrimination, harassment, and retaliation is evidence that City leaders did not take Benson's complaints seriously. Filing 467 at 25.

Benson argues that the "apex doctrine" has not been expressly adopted by the Eighth Circuit Court of Appeals, that it applies to discovery depositions not to trial testimony, and that the Federal Rules of Evidence have no exception for busy, important people, particularly when they have relevant personal knowledge. Filing 467 at 26–27. Benson also argues that the Eighth Circuit precedent the Defendants cite relates to testimony of high-ranking officials for discovery not trial, and in any event, a local mayor is a far cry from a person in a national office. Filing 467 at 28.

### B.  The Principles Behind the "Apex Doctrine" and the "High-Ranking Official Doctrine" Warrant Exclusion of the Mayor's Testimony at Trial

Beginning with the last issues raised in the parties' briefs, the Court is not receptive to the notion that anyone is too busy, important, or high-ranking to respond to a subpoena to appear to testify at a trial in federal court on a matter on which the person has relevant information. *See, e.g.,* *May v. Delta Air Lines*, No. 21-CV-710 (ADM/ECW), 2021 WL 6883457, at *3 (D. Minn. Nov. 30, 2021) (acknowledging that "there is no rule precluding the depositions of top corporate executives," but that courts may restrict such depositions in certain circumstances); *Dawkins v. Barnhart Crane & Rigging Co*., No. 8:18CV534, 2020 WL 1535851, at *1 (D. Neb. Mar. 31, 2020) (noting that courts view motions to prevent depositions unfavorably, so it is difficult to persuade them to do so). Indeed, as explained below both the doctrines on which Defendants rely have a caveat concerning the "high-ranking" person's knowledge as the basis for *allowing* that person to testify.

1.      The "Apex Doctrine"

        a.   Requirements of the Doctrine

The parties both acknowledge that the Eighth Circuit Court of Appeals has never explicitly

adopted the "apex doctrine," and this Court has found no decision of the Eighth Circuit Court of

Appeals doing so. On the other hand, several district courts in this Circuit have discussed and

applied the doctrine, albeit only in the context of compelling deposition testimony and most often

describing it as the "apex deposition doctrine."

        As the lone decision in this district explained,

> Generally, the apex deposition doctrine "requires a party seeking to depose a high-level corporate executive to demonstrate (1) that the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information have been exhausted." *Wetch v. Crum & Forster Commercial Ins.*, No. 5:17-CV-05033-JLV, 2019 WL 283654, at *2 (D.S.D. Jan. 22, 2019) (citing *Gladue v. Saint Francis Medical Center*, 2014 WL 7205153 *1 (E.D. Mo. Dec. 17, 2014)). This rule is "aimed to prevent the high level official deposition that is sought simply because he is the CEO or agency head--the top official, not because of any special knowledge of, or involvement in, the matter in dispute." *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 126 (D. Md. 2009). Nevertheless, "A motion seeking to prevent the taking of a deposition is regarded unfavorably by the courts, and it is difficult to persuade a court to do so." *Raml v. Creighton Univ.*, No. 8:08CV419, 2009 WL 3335929, at *2 (D. Neb. Oct. 15, 2009) (Gossett, M.J.) (citing *Static Control Components, Inc. v. Darkprint Imaging*, 201 F.R.D. 431, 434 (M.D.N.C. 2001)).

*Dawkins v. Barnhart Crane & Rigging Co.*, No. 8:18CV534, 2020 WL 1535851, at *1 (D. Neb.

Mar. 31, 2020).

        In *Dawkins*, the magistrate judge was not persuaded that the "high-level corporate

executive" in question had "unique or special knowledge" regarding any claim or defense in the

case such that his deposition should be permitted. *Id.* at *2. Furthermore, the magistrate judge

found that the executive did not directly supervise the plaintiff, was not involved in investigating

the discrimination complaint, was not involved in making the termination decision, and was simply

kept apprised of such matters by a direct supervisor. *Id.* The magistrate judge also noted that

although the executive "technically" had some relevant knowledge "in the broadest sense," where he was advised of what was happening with the plaintiff's complaint and termination, "that knowledge [wa]s not unique to" the executive. *Id.*

Another district court in this Circuit also declined to allow deposition testimony from a high-level executive pursuant to the "apex doctrine," but on slightly different grounds. In *May v. Delta Air Lines*, No. 21-CV-710 (ADM/ECW), 2021 WL 6883457 (D. Minn. Nov. 30, 2021), the magistrate judge concluded that the executive should not be required to testify where the purpose for which the testimony was sought—that the executive "needs to be held accountable through Deposition" for his company's alleged violations of the ADA—"suggests that Plaintiff seeks [the executive's] deposition for punitive reasons rather than because [the witness] has information relevant to a claim or defense in th[e] action." 2021 WL 6883457, at *3. The magistrate judge reasoned that this is the type of conduct the "apex doctrine" is intended to prevent. *Id.* (citing cases).

### b.  Applicability of the Doctrine to Trial Testimony

District courts in other Circuits have occasionally been willing to apply the "apex doctrine" to trial testimony not just to deposition testimony. *See, e.g., Pinn, Inc. v. Apple Inc.*, No. SA19CV01805DOCJDE, 2021 WL 4775969, at *3 (C.D. Cal. Sept. 10, 2021) ("The 'apex doctrine' is usually applied to depositions but can also be applied to protect a senior executive from being compelled to appear at trial."); *see also Equal Emp. Opportunity Comm'n v. St. Joseph's/Candler Health Sys., Inc.*, No. CV420-112, 2022 WL 17978822, at *8 (S.D. Ga. Dec. 28, 2022) (noting that two California federal district courts had reached different conclusions on the applicability of the "apex doctrine" to trial testimony, but resolving the dispute in the case before it on the basis of belated disclosure of the witness). In *Pinn*, the district court excluded the executive's testimony at trial because nothing in the evidence already in the case suggested that

the executive had any further relevant knowledge, let alone any "unique first-hand, non-repetitive knowledge." *Id.* Furthermore, the court observed that "the apex doctrine presumes that compelling the witness to testify would be burdensome." *Id.* at *4.

The Court is persuaded that the "apex doctrine" is applicable to trial testimony for the same reasons it is applicable to deposition testimony. Excluding or preventing the testimony of a high-ranking official or executive in either context is warranted unless the presumed burden of testifying is outweighed by the official's or executive's unique or special knowledge. *See Dawkins*, 2020 WL1535851, at *1; *Pinn*, 2021 WL 4775969, at *3. On the other hand, where the information the official or executive can provide is repetitive of other evidence or available from other sources or where the purpose of obtaining the testimony is punitive or simply because he or she is the top official, the testimony of the official or executive is properly excluded. *See id.*; *May*, 2021 WL 5883457, at *3; *Pinn*, 2021 WL 4775969, at *3.

   c. The "Apex Doctrine" Warrants Exclusion of the Mayor's Testimony

In this case, Benson's own assemblage of information about the City's EAD Plan, EEO operations, investigation of employee complaints of harassment, discrimination, or retaliation, and who was involved in what decision-making demonstrates that Mayor Gaylor Baird does not have "unique or special knowledge" not available from other sources. *See Dawkins*, 2020 WL 1535851, at *1; *Pinn*, 2021 WL 4775969, at *3. Benson has not shown that the Mayor was directly involved in the investigation of her complaints or that she was involved at all in the decision to terminate her. *See Dawkins*, 2020 WL 1535851, at *1. Thus, the Mayor has no information, let alone unique information, about whether the City discriminated, harassed, and/or retaliated against Benson; whether the City took prompt and appropriate remedial action in response to Benson's repeated complaints; or whether those actions were reasonably calculated to stop the conduct. *See* Filing

467 at 1–2 (setting out these topics as ones on which the Mayor has relevant information). As in *Dawkins*, the Mayor may "technically" have some relevant knowledge "in the broadest sense," where she had some involvement in administration and enforcement of City policies and some knowledge of Benson's complaints and termination, but "that knowledge [wa]s not unique to" the Mayor. *Id.* This is the case as to other topics on which Benson asserts the Mayor has relevant information, including whether the City permitted others to discriminate, harass, or retaliate against Benson, whether there was an organizational culture of City government that accepted discrimination, harassment, and retaliation, what steps the Mayor took to combat pervasive sex discrimination, harassment and retaliation, and why (and whether) the Mayor purportedly violated the City's EAD Plan by refusing Benson access to its protections. *See* Filing 467 at 1–2 (setting out these topics as ones on which the Mayor has relevant information).

Moreover, the Court finds that Benson seeks the Mayor's testimony primarily—if not entirely—because she is the highest level executive of the City, not because she has any special knowledge of or involvement in the matters in dispute. *Id.* This is apparent from both the topics on which Benson wishes to question the Mayor and her rather doubtful characterizations of some of the evidence, as mentioned above. In particular, this finding arises from Benson's identification of topics including whether the City permitted others to discriminate, harass, or retaliate against Benson, whether there was an organizational culture of City government that accepted discrimination, harassment, and retaliation, what steps the Mayor took to combat pervasive sex discrimination, harassment, and retaliation, and why (and whether) the Mayor purportedly violated the City's EAD Plan by refusing Benson access to its protections. *See* Filing 467 at 1–2 (setting out these topics as ones on which the Mayor has relevant information). Indeed, the Court is left with the firm conviction that the demand for the Mayor's testimony is "for punitive reasons rather

13

than because [the Mayor] has information relevant to a claim or defense in th[e] action." *See May,* *2021 WL 6883457*, at *3.

Thus, the "apex doctrine" warrants barring the testimony of Mayor Gaylor Baird at trial.

2.      *The "High-Ranking Official Doctrine"*

Defendants argue that in *In re United States (Holder)*, 197 F.3d 310 (8th Cir. 1999), the Eighth Circuit Court of Appeals recognize a principle like the "apex doctrine" to the effect that high-ranking government officials should not, absent extraordinary circumstances, be required to testify about their reasons for taking official actions. Filing 448 at 8. The Court concludes that this principle is also applicable here.

In *Holder*, the Eighth Circuit Court of Appeals set out what this Court calls for the sake of convenience the "high-ranking official doctrine," as follows:

> The need for controlling the use of subpoenas against high government officials was recognized by the Supreme Court in *United States v. Morgan*, 313 U.S. 409, 421–22, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). In that case involving a subpoena directed to the Secretary of Agriculture, the Court stated that regular examination of high officials concerning the reasons for their official actions would undermine the integrity of the administrative process. *Id*. at 422, 61 S.Ct. 999. Other courts have reasoned similarly. Because "[h]igh ranking government officials have greater duties and time constraints than other witnesses ... [they] 'should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.'" *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir.1993) (per curiam) (quoting *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C.Cir.1985)). If other persons can provide the information sought, discovery will not be permitted against such an official. *Id*. at 513; see also *In re FDIC,* 58 F.3d 1055, 1062 (5th Cir.1995) ("We think it will be the rarest of cases ... in which exceptional circumstances can be shown where the testimony is available from an alternate witness."). Allegations that a high government official acted improperly are insufficient to justify the subpoena of that official unless the party seeking discovery provides compelling evidence of improper behavior and can show that he is entitled to relief as a result. See *In re FDIC*, 58 F.3d at 1062.

*Holder*, 197 F.3d at 313–14.

As Defendants suggest, for much the same reason the "apex doctrine" bars the Mayor's testimony, so should this "high-ranking official doctrine." Filing 448 at 8. This is true, because

14

like the "apex doctrine" the reasons for the doctrine also apply to trial testimony, even if the Eighth Circuit Court of Appeals discussed it in the context of deposition testimony. *See Holder,* 197 F.3d at 314. Benson falls well short of showing the "extraordinary circumstances" that would warrant requiring the Mayor to testify where Benson's own evidence shows that other persons can provide the information she hopes to elicit from the Mayor, and her allegations that the Mayor acted improperly are insufficient to compel the Mayor's testimony. *Id.* Where Benson seeks to minimize the Mayor's status as a "high-ranking official" because the Mayor is not a national official, what the Court finds is relevant is the Mayor's status as the highest official in the relevant governmental unit.

Thus, the "high-ranking official doctrine" also warrants barring the testimony of Mayor Gaylor Baird at trial.

### C. Rules of Evidence Warrant Barring the Mayor's Testimony

The Court concludes that even if Mayor Gaylor Baird's testimony should not be excluded at trial pursuant to either the "apex doctrine" or the "high-ranking official" doctrine, it should be excluded pursuant to the Federal Rules of Evidence concerning relevance and prejudice. This is in fact Defendants' principal argument for exclusion of Mayor Gaylor Baird's testimony. Filing 448 at 3–5.

### 1. *Applicable Rules of Evidence*

"Federal Rule of Evidence 401 says that '[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.'" *Williams v. Baum*, 48 F.4th 571, 573 (8th Cir. 2022) (quoting Fed. R. Evid. 401). The Eighth Circuit Court of Appeals has explained, "This threshold is 'quite minimal.'" *United States v. Walker*, 68 F.4th 387, 392 (8th Cir. 2023) (quoting *United States v. Nadeau*, 598 F.3d 966, 968 (8th Cir. 2010)). To be admissible, evidence must be relevant.

Fed. R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible.").

One Federal Rule of Evidence prescribing that even admissible evidence may be excluded is Rule 403. Specifically, "under Rule 403, relevant evidence may be excluded 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Walker*, 68 F.4th at 392 (quoting Fed. R. Evid. 403); *see also Am. Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1071 (8th Cir. 2021) (referring to the considerations set out in Rule 403 as "Rule 403's balancing factors"). The Eighth Circuit Court of Appeals will "afford 'great deference' to a district court's determination that evidence is inadmissible under Rules 402 and 403." *Id.* (quoting *United States v. Pumpkin Seed*, 572 F.3d 552, 558 (8th Cir. 2009)).

When balancing probative value against prejudicial effect, courts must keep in mind that "Rule 403 prejudice is something different than simply being evidence that is detrimental to a party's case; instead, the 'rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis.'" *United States v. Ridings*, 75 F.4th 902, 906 (8th Cir. 2023) (quoting *United States v. Myers*, 503 F.3d 676, 682 (8th Cir. 2007)); *United States v. Patterson*, 68 F.4th 402, 416 (8th Cir. 2023) (explaining that evidence suggesting a decision on an improper basis includes "evidence which is so inflammatory on its face as to divert the jury's attention from the material issues in the trial."). More specifically still, the Eighth Circuit gives "great deference to the balance that the district court str[ikes] between the [evidence's] probative value and [its] prejudicial effect." *Walker*, 68 F.4th at 392. Consequently, a litigant "faces an uphill battle" to overturn a district court's balancing of probative value against prejudicial effect. *Trotter*

16

*v. Lawson*, 997 F.3d 819, 821 (8th Cir. 2021). The other Rule 403 balancing factor that warrants some further explanation here is "needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Evidence is cumulative 'when it adds very little to the probative force of the other evidence and its contribution to the truth would be outweighed by its contribution to the length of the trial.'" *United States v. Lebeau*, No. 22-2604, 2023 WL 5113795, at *2 (8th Cir. Aug. 10, 2023) (quoting *United States v. Robertson*, 948 F.3d 912, 917 (8th Cir. 2020)).

### 2. The Mayor's Testimony Is Excluded As Its Probative Value Is Substantially Outweighed by Several Rule 403 Balancing Factors

Starting with Benson's allegations about her direct contact with Mayor Gaylor Baird, the Court finds that the incident has slight if any probative value and whatever probative value it has is substantially outweighed by a danger of prejudice, confusing and misleading the jury, and wasting the jury's time. Defendants argue that the Mayor rightly declined to speak to Benson while Benson was involved in litigation with the City. Filing 448 at 4. Benson responds that the Mayor's refusal to meet with her is evidence that City leaders did not take her complaints seriously, but she disclaims any argument that this incident constituted adverse action. Filing 467 at 25.

Benson is correct that *Tuccio v. Marconi*, 589 F.3d 538 (2d Cir. 2009), on which Defendants rely specifically considered whether a government official's refusal to meet with a litigation adversary while litigation was pending was unconstitutional retaliation. *Tuccio*, 589 F.3d at 539. That does not mean that was the limit of the relevance of the decision of the Second Circuit Court of Appeals. As the Second Circuit explained,

> To be sure, our constitutional doctrine prohibits government officials from punitive retaliation against persons who exercise their First Amendment right to sue the government. *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87, 91–92 (2d Cir.2002). It does not follow, however, that government officials are compelled by law to behave with a litigation adversary exactly as they would if the person were not a litigation adversary. There are many precautions prudently taken with a litigation adversary to avoid possible prejudice to one's position in the litigation. The mere fact that a government official takes such

17

> reasonable precautions, notwithstanding that the official would not have taken them
> if the counterparty had not been a litigation adversary, does not make such actions
> unconstitutional retaliation, especially when they cause no harm to the adversary.

*Tuccio*, 589 F.3d at 541. For similar reasons, this Court concludes that the Mayor's reasonable precautions with a litigation adversary, including not meeting with the adversary while litigation was pending, provide no reasonable inference as to whether the Mayor took Benson's complaints seriously. On the other hand, evidence of the Mayor's decision not to meet with Benson could confuse or mislead the jury on this issue, particularly when the Court has already taken issue with Benson's unreasonable characterization of the incident as explained in § I.B.

Indeed, for many of the same reasons that the Court concluded above that the "apex doctrine" and the "high-ranking official doctrine" warrant excluding Mayor Gaylor Baird's testimony at trial, the Court concludes that any probative value of such testimony is substantially outweighed by the danger that it will be needlessly cumulative and a waste of the jury's time warranting exclusion of her testimony pursuant to Rule 403. Fed. R. Evid. 403 (permitting exclusion of evidence where *inter alia* the needlessly cumulative nature of the evidence or waste of time substantially outweigh the probative value). As the Court observed above, Benson's own evidence shows that other persons can provide the information she hopes to elicit from the Mayor, such that putting the Mayor on the stand would present evidence that adds very little to the probative force of other evidence and that slight probative value would be outweighed by its contribution to the length of the trial. That is the definition of "cumulative evidence." *See Lebeau*, 2023 WL 5113795, at *2. Such evidence unnecessarily lengthening the trial is necessarily a waste of the jury's time. Fed. R. Evid. 403 (recognizing both waste of time and cumulative evidence as reasons for excluding relevant evidence).

Finally, for the reasons that the Court finds that Benson seeks the Mayor's testimony primarily—if not entirely—because she is the highest level executive of the City, not because she

has any special knowledge of or involvement in the matters in dispute and that Benson may be seeking the Mayor's testimony for punitive reasons, the Court concludes that the probative value of the Mayor's testimony is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. This is particularly true where Benson's purpose is to elicit evidence from the Mayor about of topics including whether the City permitted others to discriminate, harass, or retaliate against Benson, whether there was an organizational culture of City government that accepted discrimination, harassment, and retaliation, what steps the Mayor took to combat pervasive sex discrimination, harassment and retaliation, and why (and whether) the Mayor purportedly violated the City's EAD Plan by refusing Benson access to its protections. Such evidence is potentially inflammatory or at least suggests a decision on the improper basis of an indictment of a City official's actions where that City official is not a defendant rather than on the proper basis of Benson's proof of her claims of harassment, discrimination, and/or retaliation.

Thus, Mayor Gaylor Baird's testimony will be excluded at trial pursuant to Federal Rule of Evidence 403, even though it may have some probative value to Benson's claims.

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Defendants' Motion in Limine to Exclude Lincoln Mayor Gaylor Baird from Being Called as Witness for Trial by Plaintiff, Filing 447, is granted, and Mayor Gaylor Baird will not testify at trial.

Dated this 31st day of August, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge