IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMANDA BENSON,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>CITY OF LINCOLN, a political subdivision; CHRIS BEUTLER; TOM CASADY; DOUG MCDANIEL; TIM LINKE; LEO BENES; ERIC JONES; DARREN MERRYMAN; and SHAWN MAHLER,<br><br>　　　　　　　Defendants. | 4:18CV3127<br><br><br>MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION IN LIMINE ON TOPICS A-Z |

Plaintiff Amanda Benson, a female firefighter/EMT with Lincoln Fire and Rescue (LFR), brought this action alleging violations of her civil rights against the City of Lincoln, Nebraska, the former mayor, and several LFR employees. Filing 188 (Fourth Amended Complaint). This case is before the Court on the unrestricted part of Defendants' Motion in Limine on "topics A–Z." Filing 450. The Court will address in a separate restricted ruling the restricted part of this Motion on "topics AA–EE." For the reasons stated below, the unrestricted portion of Defendants' Motion in Limine is granted in part and denied in part.

## I.   INTRODUCTION

The Court laid out the factual and procedural background to this litigation in some detail in its ruling on the parties' Motions for Summary Judgment. *See* Filing 440, also available at *Benson v. City of Lincoln*, No. 4:18CV3127, 2023 WL 4865817 (D. Neb. July 31, 2023). Thus, the Court's summary of the general background here will be brief.

Amanda Benson was hired by LFR on July 1, 2013, as a Firefighter/EMT. Filing 394 at 1 (¶ 1). In November of 2020, Benson became the Acting Captain on Engine 1 at Station 1, then she later became the Acting Captain of Truck 1 at that Station. Filing 378 at 39 (¶ 203). Benson alleges

1

that she was subjected to sexual discrimination and harassment for almost the entirety of her employment with LFR. She filed charges of discrimination with the Nebraska Equal Opportunity Commission (NEOC) on August 15, 2016, *see* Filing 394 at 2 (¶ 3), and four years later with the federal Equal Employment Opportunity Commission (EEOC), on October 14, 2020, *see* Filing 394 at 2 (¶ 6). It is safe to say that many—but not all—of Benson's allegations of discrimination, harassment, and retaliation were based on conduct by Captain Shawn Mahler, who was the Captain of the Truck crew at Station 8. Filing 397 at 3 (¶ 25).

On April 26, 2021, LFR was called to a cardboard fire within a warehouse. Filing 378 at 43 (¶ 224). On May 5, 2021, when she spoke to and submitted a complaint to her superiors at LFR, Benson alleged Mahler had abandoned her during the fire and that she and her crew could have been killed or injured. Filing 397 at 59 (¶ 290) (admitting this much of ¶ 290). After pre-disciplinary investigations and proceedings, Benson was terminated effective November 2, 2021. Filing 394 at 1 (¶ 1); *see also* Filing 380–83 at 4 (dismissal letter). Fire Chief David Engler, who is not a party to this litigation, determined that Benson had made false allegations against Mahler and that her actions were "a direct hindrance to the effective performance of LFR's functions and reflect undue discredit upon the department," establishing "good cause" for dismissal. Filing 380 at 3 (dismissal letter).

On July 6, 2018, well before her termination, Benson filed her original Complaint in this matter in the District Court of Lancaster County, Nebraska. Filing 1 at 4–95. Defendants removed the action to this federal court. Filing 1.At this point in the litigation, Benson's operative pleading is her Fourth Amended Complaint, filed November 11, 2021. Filing 188. Defendants are the City of Lincoln, Nebraska, various city officials, and various officers in the LFR. Filing 188 at 2–3 (¶¶ 5–13); Filing 378 at 1–3 (¶¶ 2–10) (clarifying Defendants' offices).

2

In her Fourth Amended Complaint, Benson asserts eight causes of action. Her first three causes of action are for violations of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101, *et seq*. Those causes of action are for a sexually hostile work environment and retaliatory harassment, Filing 188 at 59–60 (¶¶ 225–230); sexual discrimination, Filing 188 at 60–61 (¶¶ 231–235); and retaliation, Filing 188 at 61–62 (¶¶ 236–240). Benson's next three causes of action are claims for violations of Title VII that parallel her NFEPA claims. Thus, those causes of action are for a sexually hostile work environment and retaliatory harassment, Filing 188 at 62–63 (¶¶ 241–245); sexual discrimination, Filing 188 at 63–64 (¶¶ 246–250); and retaliation, Filing 188 at 64–65 (¶¶ 251–255). Benson's last two causes of action are for violations of the Equal Protection Clause of the United States Constitution. These claims allege sexual discrimination and a hostile work environment against the City of Lincoln, Filing 188 at 65–67 (¶¶ 252–263); and sexual discrimination and a hostile work environment against the individual Defendants, Filing 188 at 67–68 (¶¶ 264–270). Defendants filed a joint Answer to Plaintiff's Fourth Amended Complaint on December 6, 2021, denying Benson's claims and asserting numerous affirmative defenses. Filing 196.

Jury trial in this matter was set to begin on September 12, 2023. Filing 364. However, owing to a medical emergency experienced by one of Defendants' attorneys, the trial was continued to March 11, 2024. Filing 483; Filing 484. In the order continuing the trial, the Court stated that it would rule on the pending motions in limine, but that no additional pretrial motion practice would be allowed and no expired deadlines would be reset. Filing 483 at 3–4. Consequently, the Court will proceed with its ruling on Defendants' Motion in Limine.

## II. LEGAL ANALYSIS

The Court's analysis of the unrestricted part of Defendants' Motion in Limine falls into two parts. The Court will begin its analysis with evidence on "topics" that Benson agrees can be

excluded. The Court will then consider evidence on a larger number of "topics" that Benson does not agree should be excluded.

### A.  Evidence on Topics the Parties Agrees Can Be Excluded

Benson does not contest exclusion of evidence on several topics. Indeed, Benson has moved to exclude evidence on some similar or overlapping topics in her own Motion in Limine, Filing 452. The Court will address Benson's Motion in Limine in a subsequent ruling. Benson does not contest exclusion of evidence on the following topics challenged in Defendants' Motion in Limine, and they will be excluded at trial to the extent Defendants have framed their challenges:

B.      Any reference to previously undisclosed damages or damages that the jury is not permitted to award. Filing 454 at 3. Benson states that she does not intend to introduce any undisclosed evidence. Filing 472 at 3.

C.      Improper comparisons to financial status of the parties. Filing 454 at 3. Benson states that she cannot predict how this issue could possibly arise, so she has no objection to exclusion of evidence on this issue. Filing 472 at 3.

D.      Argument regarding the "Golden Rule." Filing 454. Benson has no objection to prohibiting such argument. Filing 472 at 3.

F.      Evidence of settlement discussions or negotiations. Filing 454 at 4. Benson does not resist "a mutual order in limine" regarding settlement discussions or negotiations. Filing 472 at 4.

G.      Disposition of the Motions for Summary Judgment. Filing 454 at 4. Benson does not resist "a mutual order in limine" regarding the disposition of Motions for Summary Judgment. Filing 472 at 4.

Z.      Sequestration of non-party witnesses. Filing 454 at 20. Benson does not object to "a mutual order" sequestering witnesses. Filing 472 at 32.

4

### B.  Evidence on Topics the Parties Dispute

The Court will consider in turn the admissibility of the evidence on topics that Defendants contend should be excluded but Benson argues should be admitted.

### 1.    Topic A: Any Subjective Witness Opinions Regarding Unfair Treatment or Violations of the Law

Defendants argue that the Court should not allow Benson or her witnesses or others to testify about their subjective beliefs that Defendants engaged in discrimination, harassment, retaliation, or otherwise violated the law. Filing 454 at 1. Defendants argue such evidence is irrelevant, unfairly prejudicial, not helpful to the trier of fact, and draws inferences or states conclusions within the jury's competence or function. Filing 454 at 1. Defendants also contend that neither Benson nor third-party witnesses should be allowed to testify to their subjective beliefs that Benson specifically was discriminated or retaliated against or harassed. Filing 454 at 2.

Benson argues that lay witnesses can testify regarding their opinions so long as they satisfy Federal Rule of Evidence 701. Filing 472 at 1. She contends that lay witnesses may do so even as to ultimate issues pursuant to Rule 704. Filing 472 at 1. Benson agrees that she and any lay witnesses cannot testify that Defendants' conduct violated state or federal law, but they can testify to opinions formed on the basis of their personal observations on harassment, discrimination, and retaliation. Filing 472 at 1–2. Finally, Benson points out that her good faith belief that conduct violated the law is a vital component of her retaliation claim, so it is admissible. Filing 472 at 3.

In reply, Defendants assert that a judge of this Court has held that witnesses will be precluded in limine from offering their opinions about what the law provides or requires because it is the responsibility of the Court to instruction the jury on the law. Filing 486 at 1. They also argue that Rule 701 bars lay opinion that is nothing more than naked speculation concerning a defendant's adverse employment decision. Filing 486.

Rule 701 limits opinion testimony of lay witnesses as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Rule 704 provides, "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704.

As the Eighth Circuit Court of Appeals recently explained,

> "Personal knowledge or perceptions based on experience is sufficient foundation for lay testimony." *United States v. Smith*, 591 F.3d 974, 982 (8th Cir. 2010) (quotation omitted). Rule 701 permits a [law witness] "to express an opinion that was rationally based on his or her perception, and helpful to understanding the witness's testimony *or to determining a fact in issue*." *United States v. Lemons*, 792 F.3d 941, 948 (8th Cir. 2015) (emphasis added). These issues obviously turn on the facts and circumstances of a particular case. "We review the district court's evidentiary rulings for clear abuse of discretion." *United States v. Pirani*, 406 F.3d 543, 555 (8th Cir. 2005) (en banc).

*United States v. Williams*, 41 F.4th 979, 984 (8th Cir. 2022) (emphasis in the original). In the case before it in *Williams*, the Eighth Circuit concluded that admitting a police officer's testimony based on his experience that he had seen a "muzzle flash" was not erroneous, because it assisted the jury in viewing a video of the incident and the brief testimony did not "so invade[ ] the province of the jury that we cannot with confidence say that there [is] no significant possibility that it had substantial impact on the jury." *Id.* at 985 (quoting *United States v. Peoples*, 250 F.3d 630, 642 (8th Cir. 2001)).

In *Crimm v. Missouri Pac. R. Co.*, 750 F.2d 703 (8th Cir. 1984), a case involving circumstances more like the ones in Benson's case, the Eighth Circuit concluded that the district

court did not abuse its discretion by excluding testimony from one of the plaintiff's witnesses that he believed the plaintiff's age was a factor in the plaintiff's termination. 750 F.2d at 710. The Eighth Circuit explained,

> Fed.R.Evid. 701(a) permits a lay witness to give opinion testimony only if his opinion is rationally based on his perception. Boling had been Assistant Superintendent under appellant for fifteen years, but he had no firsthand knowledge of the factors involved in MoPac's decision to remove appellant.

*Crimm*, 750 F.2d at 710. The court contrasted this testimony with admissible testimony by two other witnesses about what they did, that is, whether they considered the plaintiff's age. *Id.*

Two other points are relevant. First, as the Court pointed out in a prior ruling in this case, even an expert witness is not allowed to offer opinions that trespass on the Court's province to determine the law and the jury's province to apply the law to the facts. Filing 456 at 19–20 (citing, respectively, *Wilson v. Muckala*, 303 F.3d 1207, 1218–19 (10th Cir. 2002), and *United States v. Bull*, 8 F.4th 762, 768 (8th Cir. 2021)). Second, Benson is correct that an element of her retaliation claim is that she reasonably and in good faith believed that conduct she complained about violated the law. *See, e.g., Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 649 (8th Cir. 2022) (citing *Kempcke v. Monsanto, Co.*, 132 F.3d 442, 445 (8th Cir. 1998)).

The Federal Rules of Evidence and the cases cited above make clear that the admissibility of lay opinion testimony is a fact-specific matter. They also make clear that the admissibility of such testimony depends upon whether it is so extensive as to trespass on the province of the jury and unduly impact the jury's determinations or trespass on the Court's province to determine the law. However, Defendants seek a "blanket" exclusion of any testimony about lay witnesses' subjective beliefs that Defendants engaged in discrimination, harassment, retaliation, or otherwise violated the law. Filing 454 at 1. Without essential context, including the experience of the witness and his or her perception of events, it is not clear whether there would or would not be sufficient

foundation for any lay opinions. *See Williams*, 41 F.4th at 984. Nor is it clear without such context whether the opinions expressed are rationally related to the witness's perception or helpful to the jury in determining a fact actually in dispute. *Id.* It is also not possible for the Court to assess pretrial whether the nature and extent of lay witness opinions would so invade the province of the jury as to require exclusion. *Id.* at 985. Assuming proper foundation is laid, a lay witness may properly testify as to his or her belief that conduct toward Benson was because of her sex. *Crimm*, 750 F.2d at 710. It will be up to Defendants to object at trial when they believe lay opinion testimony lacks the required foundation or helpfulness to the jury or trespasses on the province of the jury or the Court.

This part of Defendants' pretrial Motion in Limine is denied.

### 2. *Topic E: Solicitation of Juror Promises*

The next disputed topic in Defendants' Motion is solicitation of juror promises. Specifically, Defendants argue that Benson's counsel should be precluded from asking any questions on voir dire or making arguments that ask jurors to promise to do or not to do something. Filing 454 at 4. Defendants assert that such promises may impede the jurors' ability to following the Court's instructions or to remain impartial throughout the case. Filing 454 at 4.

Benson argues that it is not unusual for attorneys and the trial judge to ask jurors to promise that they will follow the law, pledge not to consider a party's race, or to make sure that their verdict conforms to the evidence. Filing 472 at 4. She argues that the purpose of voir dire is to afford the parties a trial by an impartial jury. Filing 472 at 4. Benson argues Defendants cite no authority supporting a restriction on her ability to ensure that prospective jurors can and will follow the law and obey the Court's instructions. Filing 472 at 4.

In reply, Defendants clarify that they simply seek to prevent counsel for Benson from soliciting promises from the jury on improper topics or language from as yet undetermined jury instructions. Filing 486 at 2.

This is not the first time this issue has arisen in this district, and this Court finds the guidance of colleagues and predecessors helpful. A predecessor addressing the issue resolved it this way:

> It is not uncommon for attorneys to solicit "promises" from the members of the jury panel that they will base their verdict only on the evidence and the law, and disregard other improper influences. Nor is it uncommon for attorneys to solicit "promises" from the members of the jury panel that they will bear in mind the applicable burden of proof. If counsel should solicit improper "promises" from the jury panel, opposing counsel may object and the objection will be addressed by the Court.

*Argenyi v. Creighton Univ.*, No. 8:09CV341, 2013 WL 4434424, at *6 (D. Neb. Aug. 14, 2013).

Similarly, a colleague considered the issue of eliciting a specific pledge or promise from prospective jurors to return a verdict in the "millions of dollars." *Ribeiro v. Baby Trend, Inc.*, No. 8:12CV204, 2017 WL 1393088, at *8 (D. Neb. Apr. 17, 2017). That colleague observed that jurors' thoughts on awarding large amounts of damages in voir dire would be permissible to obtain a fair and impartial jury, as long as the statements are supported by the evidence, but it would not be permissible to elicit promises to award large damages. *Id.* On the more general issue of a motion to preclude the plaintiff from asking the jurors to "promise" something, the same colleague observed in another decision,

> It may be improper to ask for certain promises, but permissible to ask for others. The Court cannot rule on the motion in the pretrial context. The motion is more in the nature of an objection at trial. Any inappropriate questions can be stricken from the record should the situation arise. Accordingly, the defendant's motion will be denied.

*Baker v. Union Pac. R.R. Co.*, No. 8:20CV315, 2022 WL 4241102, at *6 (D. Neb. Sept. 14, 2022).

What "promises" Defendants want to preclude Benson from eliciting in this case based on their opening brief are just as vague as in the defendants' request in *Baker*. *See id.*; *see also* Filing 454 at 4 (seeking exclusion of "any questions on voir dire or making arguments that request jurors promise to do or not to do something"). Defendants' clarification in their reply is more consistent with the guidance of the decisions above. Filing 486 at 2 (limiting the requested exclusion to "soliciting promises from the jury on improper topics or language from yet undetermined jury instructions"). While it is permissible to elicit promises such as promises to base the verdict only on the evidence and the law, to disregard other improper influences, and to bear in mind the applicable burden of proof, *see Argenyi*, 2013 WL 4434424, at *6; *Baker*, 2022 WL 4241102, at *6, it plainly would be improper to elicit a promise to a particular verdict, fact, or amount of damages, *see Rebeiro*, 017 WL 1393088, at *8. The nature of the requested promise is determinative, but the Court cannot evaluate any promise until a party attempts to elicit a promise at trial.

This part of Defendants' motion is denied without prejudice to timely objection to any requests for promises that Defendants deem are improper during jury selection. *See Argenyi*, 2013 WL 4434424, at *6; *cf. Baker*, 2022 WL 4241102, at *6 (noting that the motion in liminie was more in the nature of an objection at trial).

3.    *Topic H: Discovery Disputes or the Disposition of Discovery-Related Motions*

Next, Defendants seek to preclude Benson from making any reference to or comment regarding Defendants' objections to discovery, motions for protective orders regarding discovery, and any action of this Court concerning any discovery matters or rulings on motions for protective orders. Filing 454 at 5. Defendants argue these matters are irrelevant, would be unfairly prejudicial, and would mislead and confuse the jury. Filing 454 at 5. Defendants identify particular matters

that should be excluded as the following: (1) the Gerdes Investigation, (2) discovery and depositions of former City Attorneys Elizabeth Elliott and Jeff Kirkpatrick, and (3) the matters listed in the Court's Order granting Defendants' Motion for Protective Order in part, Filing 217, and upheld over Benson's objection, Filing 252, as well as the Court's Memorandum and Order, Filing 365. Filing 454 at 5.

Benson's resistance equivocates. If her Motion in Limine regarding Baylor Evnen's investigations and Defendants' reliance on advice of counsel is granted, she has no objection to exclusion of evidence on Defendants' "topic H." Filing 472 at 4. On the other hand, if her Motion is denied, then she resists this part of Defendants' Motion for the reasons explained in her Motion. Filing 472 at 4. Benson asserts that Defendants should not be allowed to use the attorney-client privilege as both a sword and a shield. Filing 472 at 4.

In reply, Defendants point out that the Court has previously ruled that Defendants are not attempting to use attorney-client privilege as both a sword and a shield where Defendants are not raising any advice of counsel as the basis for a claim or defense. Filing 486 at 3 (citing Filing 365 at 30). Thus, Defendants assert that the Court has already ruled on this issue. Filing 486 at 3.

Benson's Motion in Limine on these issues appears to the Court to be in large part—if not entirely—a belated backdoor attempt to obtain the Court's reconsideration of its Memorandum and Order Rejecting Magistrate Judge's Order and Protective Order, Filing 365. Indeed, in its Memorandum and Order, the Court rejected Benson's argument that Defendants are using privileges as both swords and shields. Filing 365 at 28–30. As such, the Court will operate on the basis that the Court has (or will) deny Benson's Motion in Limine on these issues and treat this part of Defendants' Motion in Limine as resisted. Where Benson does not offer any proper opposition to this part of Defendants' Motion in Limine, the Motion is granted as to evidence on

all the matters listed in "topic H." Even if somehow relevant, Benson has made no showing that admitting evidence of any discovery dispute, discovery motion, or discovery ruling would not be unfairly prejudicial or inflammatory, would not amount to an improper and untimely attempt to relitigate matters already resolved by the Court, or would not otherwise trespass on the province of the Court. *See* Fed. R. Evid. 403 (requiring a balance of probative value against potential for unfair prejudice and waste of time); *United States v. Walker*, 68 F.4th 387, 392 (8th Cir. 2023); *United States v. Patterson*, 68 F.3d 402, 416 (8th Cir. 2023).

4.      *Topic I: Evidence of Defendants' Assertions of Privilege*

Defendants also seek to exclude any reference to a witness's refusal to answer questions in a deposition due to privilege, an attorney's objections based on privilege in such depositions, or any negative inferences from the assertions of privilege should be excluded. Filing 454 at 6. Defendants point out that Federal Rule of Civil Procedure 30(c)(2) and case law show that counsel may instruct a deponent not to answer to preserve a privilege and that no negative inference is proper from asserting a privilege. Filing 454 at 6. Benson argues again that whether or not she opposes exclusion of evidence on this topic depends upon the Court's ruling on her Motion in Limine. Filing 472 at 5. Again, because the Court has already rejected Benson's argument that Defendants are using privileges as both swords and shields, Filing 365 at 28–30, this part of Defendants' Motion in Limine is granted.

5.      *Topic J: Evidence of Emotional Distress not Relevant to Benson's Claims*

As Topic J, Defendants seek exclusion of testimony from any other persons concerning the emotional impact of Defendants' alleged conduct on them, such as Benson's significant others or family members. Filing 454 at 6. Defendants argue such evidence is irrelevant and unfairly prejudicial. Filing 454 at 6. Benson responds that she does not intend to introduce testimony from witnesses concerning the emotional impact of Defendants' illegal conduct on anyone other than

her, but she contends that testimony from her friends and/or family is relevant and admissible to prove the emotional impact of Defendants' conduct on her. Filing 472 at 5. Benson essentially concedes that she will not offer the evidence Defendants have challenged—that is, evidence of the emotional impact of Defendants' alleged conduct on those others. What evidence may be offered to support Benson's claim of her own emotional distress is not squarely at issue in this part of Defendants' Motion in Limine. Thus, the part of Defendants' Motion in Limine is granted.

6.     *Topic K: Testimony from Former Coworkers about Benson's Skills, Character, and Performance*

Defendants argue that the Court should exclude testimony from Benson's former coworkers or others regarding her work skills, performance, and character under Federal Rules of Evidence 401–404, and 802. Filing 454 at 7.[1] They argue that in employment cases, only the decisionmaker's opinion is relevant. Filing 454 at 7.

Benson vehemently opposes exclusion of this evidence, however. She argues that testimony from others about a plaintiff's job-related skills, characteristics, and performance is relevant and admissible in virtually every employment law case. Filing 474 at 5. She argues that such evidence is relevant here to whether and when she would have been promoted; to how far her career could have been expected to progress; to Mahler's insistence that she would not be allowed to work on his truck until her skills met with his approval; and to whether Mahler's insistence was based on legitimate concerns or whether it was arbitrary sexism. Filing 472 at 5. Benson contends further that information about her excellent work performance is admissible to contradict testimony from Defendants' witnesses that she failed to keep the kitchen tidy, falsely called in sick, was lazy, had a bad reputation, failed to call a Mayday after becoming disoriented, and made

---

[1] Defendants included Rule "600" in this list. Filing 454 at 7. However, there is no Federal Rule of Evidence 600, and simply listing the rule provides the Court with no hint of what rule might have been intended.

false allegations that a firefighter was intoxicated. Filing 472 at 6. Finally, Benson argues that such evidence is admissible to attack the alleged "honesty" and "good faith" of Defendants' asserted beliefs that she deserved to be fired. Filing 472 at 6.

In reply, Defendants argue that Benson's argument does not require admission of this evidence because Benson was not fired over poor job performance but for serious false accusations against a coworker. Filing 486 at 3–4. They also argue that Benson's allegations against Mahler have put his performance at issue. Filing 486 at 4.

Defendants are correct that as to evaluation of a plaintiff's work performance, the plaintiff's own opinion "is 'simply irrelevant, [as] it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.'" *Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003) (quoting *Kelley v. Goodyear Tire and Rubber Co.*, 220 F.3d 1174, 1177 (10th Cir. 2000)). More to the point, as the Court has previously explained in this case, the critical question is not whether the employee actually engaged in the conduct for which she was terminated, but whether the employer in good faith believed the employee was guilty of the conduct justifying discharge. *See* Filing 365 at 25–26 (citing *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir.), *cert. denied*, 142 S. Ct. 585 (2021), and *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 612 (8th Cir. 2014)). That does not mean that the testimony or opinions of coworkers and supervisors are irrelevant, however, even where Defendants assert Benson was terminated for specific misconduct not poor performance.

District courts in this Circuit have at times found testimony of coworkers and supervisors admissible on the question of whether a plaintiff employee's job performance was satisfactory. *See, e.g., E.E.O.C. v. Indep. Stave Co.*, 754 F. Supp. 713, 719–20 (E.D. Mo. 1991) ("Several

14

witnesses testified that they worked with Mrs. Turner and that she performed the job satisfactorily."). District courts have also at times found testimony of coworkers and supervisors admissible for the purpose of demonstrating pretext. *See Curran v. Bernhardt*, No. 5:20-CV-05009-LLP, 2023 WL 2586085, at *11 (D.S.D. Mar. 21, 2023) ("The Court considered these witnesses, particularly Mr. Radford, to be credible. Defendant, however, did not effectively impeach the credibility of plaintiff's witnesses or call any of its own witnesses who had a contradictory perception of Mrs. Turner's performance. Instead, defendant relied on the uncorroborated testimony of Mr. McNail."); *Shoemyer v. Missouri Dep't of Corr.*, No. 2:20-CV-04199-MDH, 2023 WL 1823819, at *1 (W.D. Mo. Feb. 8, 2023) (holding on a motion in limine that "[c]oworkers with personal knowledge about Plaintiff Shoemyer's performance may testify about Plaintiff Shoemyer's conduct they personally observed that specifically relates to Defendant's two stated reasons for termination."). Here, as Benson contends, such testimony is relevant even though her termination was not for poor performance because it is relevant to show the possible impact of sexual harassment on the trajectory of her career, that her sex rather than her performance made her a target of harassment, and even as to the credibility of her complaints about the warehouse fire. *See* Filing 472 at 5–6. Also, where the Eighth Circuit Court of Appeals has found evidence that multiple coworkers complained about a plaintiff's job performance supported the proposition that the plaintiff was fired for appropriate reasons, *see Singer v. Harris*, 897 F.3d 970, 979 (8th Cir. 2018), it is also appropriate to consider supervisors' and coworkers' praise of a plaintiff's job performance as relevant to pretext, *cf. Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) ("An employee may prove pretext by demonstrating . . . that the employee received a favorable review shortly before he was terminated.").

15

Again, the Court concludes that a "blanket" exclusion of the testimony of supervisors and coworkers about Benson's job performance, skills, and characteristics is not appropriate, even if Defendants proffered legitimate reason for her termination was not poor performance. While specific testimony may be excludable on relevance versus prejudice grounds, *see* Fed. R. Evid. 401, 402, 403, or foundation or hearsay grounds, *see* Fed. R. Evid. 802, those determinations must await trial, where the Court can discern more clearly the context and purpose of such evidence.

This part of Defendants' Motion in Limine is denied.

7.    *Topic L: Benson's Testimony about Her Medical Condition*

Defendants also seek to exclude Benson's testimony as to her own medical condition, causation of that condition, or aggravation of any pre-existing health conditions. Filing 454 at 7. They point out that Benson is not a medical expert. Filing 454 at 7. Defendants argue that such evidence is excludable pursuant to Federal Rules of Evidence 401–403, 701, and 702.

Benson responds that she should be allowed to testify as to why she was feeling the emotions she was feeling. Filing 472 at 9. She contends that medical testimony is not required to establish emotional distress in a discrimination case because the required evidence may come from the plaintiff, her family members, and friends. Filing 472 at 9. She also contends that emotional distress can be inferred from the circumstances of a civil rights violation. Filing 472 at 9. Benson acknowledges that she cannot testify regarding medical causation, but she can testify to her emotional distress damages in this case. Filing 472 at 10. She also points out that her testimony will be bolstered by that of her expert, Dr. Tellefsen, who can opine as to causation. Filing 472 at 10.

In reply, Defendants assert that they are not arguing that Benson cannot testify regarding her own symptoms, only that she cannot opine about causation or diagnosis because of a lack of qualification. Filing 486 at 4–5.

16

It is well settled that "emotional distress damages need not be supported by 'medical or other expert evidence.'" *Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 723 (8th Cir. 2017) (quoting *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 552 (8th Cir. 2013)). In addition, "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." *Id.* (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir. 1997), in turn quoting *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996)). Benson asserts that is the evidence she will offer, while not offering her own testimony on causation. Filing 472 at 9–10. Defendants belatedly acknowledge the distinction. Filing 486 at 4–5. This part Defendants' Motion in Limine is denied without prejudice to reassertion if Benson's trial testimony should stray beyond her self-imposed limits.

### 8.    Topic M: Work History or Discipline of Defendants and City Witnesses

Next, Defendants seek to exclude any evidence and testimony regarding the discipline or terminations, if any, of the Individual Defendants or Defendants' witnesses. Filing 454 at 8. Defendants argue that such evidence constitutes impermissible character evidence that is inadmissible under Federal Rules of Evidence 404 and 608. Filing 454 at 8.

Again, Benson vehemently disagrees. Filing 472 at 10. She contends that the jobs that witnesses perform will explain to the jury their role in the case, the scope of their authority within the City, their areas of expertise, and whether or not they acted in a managerial capacity. Filing 472 at 10. She argues that prior discipline of City employees is also relevant to show that similarly situated employees were treated more favorably than she was. Filing 472 at 10–11. Benson contends that the Court already acknowledged in its ruling on Defendants' Motion for Summary Judgment that the way LFR disciplined others for similar offenses is directly relevant to the issues in this case. Filing 472 at 11 (citing Filing 440 at 26). She contends her exhibits are relevant to

17

show disparate treatment in discipline at LFR as well as deviation from the progressive discipline regime in her case. Filing 472 at 11.

In a reply far lengthier than their original statement of the issue, Defendants contend first that a 12-year-old reprimand and 10-year-old disciplinary actions that are unsubstantiated, reversed, irrelevant as to truthfulness, or otherwise irrelevant should be excluded. Filing 486 at 5. They then argue extensively that comparator discipline evidence must be excluded or limited. Filing 486 at 6. Defendants also assert that if Benson seeks only to offer the performance evaluations of individual Defendants to show that they were not disciplined such usage may or may not be admissible, depending upon how the claims proceed at trial. Filing 486 at 5. Consequently, Defendant ask the Court to evaluate any admissibility issues that arise during trial. Filing 486 at 5–6. Defendants argue that Benson seeks to offer a wide range of evidence on disciplinary actions not just disciplinary actions for employees who engaged in dishonesty. Filing 486 at 6.[2] To the extent Benson offers evidence that exceeds the scope of proper comparisons, Defendants argue the evidence should be excluded or redacted. Filing 486 at 7.

Defendants' belated arguments about 12- and 10-year-old disciplinary actions in their reply fail to clarify to any meaningful degree whether the disciplinary actions would be admissible at trial to demonstrate that the recipients were similarly situated but treated more favorably than Benson or for any other reason. Defendants' additional argument in their reply that the admissibility of the evidence depends on how the claims proceed at trial and that evidence should be limited to what is relevant to show the comparators are similarly situated in all relevant ways is essentially a concession that a pretrial "blanket" exclusion of evidence of disciplinary actions

---

[2] Defendants point out that their "topic U" addresses the wide-ranging disciplinary records as irrelevant, hearsay, cumulative, immaterial, unduly prejudicial, misleading, confusing, and improper character evidence. Filing 486 at 6. The Court will deal with "topic U" in due course.

against individual Defendants and witnesses is not possible or appropriate. This is so, because the so-called "comparators" must be "similarly situated in all relevant respects." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019) (quoting *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014)). When the issue is disparate treatment in discipline, the comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (*Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013)). These determinations cannot be made except in the context of trial, as Defendants also essentially concede.

This part of Defendants' Motion in Limine is denied without prejudice to timely objections at trial.

### 9.      *Topic N: Evidence of Discrimination or Retaliation by Non-Decisionmakers*

As topic N, Defendants seek an order excluding evidence regarding alleged retaliatory or discriminatory conduct by anyone other than the relevant decisionmaker—Fire Chief David Engler. Filing 454 at 8. For example, Defendants assert that Benson will try to offer testimony that Battalion Chief Linke discriminated and retaliated against another firefighter, Jessie Lundvall, but there is no evidence that Linke participated in the decision to terminate Benson. Filing 454 at 8–9. Likewise, Defendants seek to exclude evidence of Daisy Brayton's investigation of Lundvall's EEO complaint because it involved much different allegations and ultimately concluded that Lundvall's allegation of retaliation was not sustained. Filing 454 at 9. Defendants also seek to exclude evidence that Mahler allegedly told her that women are less mechanical than men, but Mahler was not a decisionmaker with regard to Benson's employment. Filing 454 at 9.

Benson argues that one does not have to have decisionmaking authority in order to engage in acts of harassment. Filing 472 at 13. Thus, she argues that Mahler's sexually discriminatory

statement about women being less mechanically inclined than men is a "powerful" evidentiary link to his bias against women and his harassment of Benson. Filing 454 at 13. Benson also argues that Chief Engler's and Battalion Chief Linke's discrimination and retaliation against firefighter Jessie Lundvall lends credence to Benson's own constitutional claim of pattern and practice discrimination. Filing 472 at 13. Specifically, Benson contends this evidence makes it more likely that Linke's failure to remedy discrimination against Benson was with malice or reckless indifference to her federally protected rights and shows that the message from the leadership at LFR was that discrimination and retaliation will be condoned. Filing 472 at 13. Benson argues further than such evidence is relevant to show the "ambiance" of the workplace and supports the inference that impermissible considerations entered into ostensibly neutral employment decisions. Filing 472 at 14.

Defendants' reply focuses on the purported irrelevance of conduct years earlier to Benson's allegedly discriminatory termination. Filing 486 at 8. Defendants argue that because the Court has held that Benson's discrimination claim can proceed only on the basis of her termination, and because Chief Engler was the sole decisionmaker on Benson's termination, Benson should not be permitted to use evidence of other retaliatory or discriminatory conduct by others who played no part in the termination decision. Filing 486 at 8.

Defendants are correct that the Court held in its ruling on the parties' Motions for Summary Judgment that "Benson's employment discrimination claim must proceed, if at all, on the basis of her termination." Filing 440 at 25. Benson does not appear to dispute that Chief Engler was the sole decisionmaker in her termination. *See generally* Filing 472. However, those facts do not mean that retaliatory or discriminatory conduct of people other than Chief Engler is wholly irrelevant and inadmissible in this case.

Rather, Benson is correct that harassing, retaliatory, and discriminatory conduct at the LFR, even if not known to her and even if not directed at her, can contribute to the hostility of the work environment. As the Eighth Circuit Court of Appeals has explained,

> When judging the severity and pervasiveness of workplace sexual harassment, this court has long held harassment directed towards other female employees is relevant and must be considered. *See Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014–15 (8th Cir. 1988) ("We also reject appellants' contention that the district court erroneously considered all of the women's claims together in determining that the harassment was sufficiently pervasive and severe...."). In *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 793–94 (8th Cir. 2004), the court discussed the distinction between evidence offered to prove the substance of a plaintiff's hostile work environment claim versus evidence offered to prove the severity and pervasiveness of harassment in the workplace. In *Williams*, the plaintiff (Williams) offered the testimony of several co-workers detailing a host of racially motivated harassment that occurred during his employment at Conagra's plant. *Id.* at 793. Conagra objected because Williams conceded he was unaware of the incidents, and according to Conagra, the evidence could not be used to prove Williams found the workplace subjectively hostile. *Id.* at 794. This court, recognizing the evidence was irrelevant to Williams's subjective perceptions of his workplace, nonetheless found the evidence highly relevant to prove, among other things, the type of workplace environment to which Williams was subjected. *Id.*
>
> Accordingly, we conclude the district court erred in disregarding the evidence of widespread sexual harassment. Though the evidence cannot be used to prove the [plaintiff] found [her] workplace subjectively hostile, it is highly relevant to prove the sexual harassment was severe and pervasive and that ABMK had constructive notice.

*Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802–03 (8th Cir. 2009). Thus, the evidence Benson seeks to offer is relevant and admissible, absent grounds appearing at the time the evidence is offered at trial.

To the extent that evidence relevant as to one claim may not be relevant to another claim, it is the parties' obligation to point that out to the Court and request an appropriate limiting instruction. It is not appropriate for the Court to impose the sort of "blanket" exclusion requested by Defendants, however. This part of Defendants' Motion in Limine is denied.

10. *Topic O: Questions with No Supporting Evidence or Constituting Improper Legal Argument*

Defendants next seek an Order barring questions with no supporting evidence or hypothetical questions constituting improper legal argument. Filing 454 at 9. The entirety of Defendants argument on this topic is that the Court should bar Benson's attempts to impeach a witness based on hypothetical questions that suggest the existence of evidence that is not before the Court and likely is not factual, citing certain ethical standards for lawyers. Filing 454 at 9. Benson asserts she is not sure to what Defendants are referring, so the Court should reserve ruling on any potential questions until they are posed. Filing 472 at 14. She argues that without any clear indication of what Defendants are asking the Court to exclude, it is difficult for her to discern what Defendants are actually requesting. Filing 472 at 15. In reply, Defendants attempt to clarify what is at issue by stating that they are referring to, for example, a situation in which counsel may ask a witness, whom he or she knows has no criminal history, "Were you ever convicted of a crime?" which would suggest to a jury that there is some criminal history. Filing 472 at 8. Perhaps closer to home, Defendants argue that in a prior case against the City, Benson's counsel asked a City attorney without any basis whether the City attorney manipulated a witness's testimony, which the City attorney denied. Filing 486 at 9. Defendants assert that such improper questions without basis are unfairly prejudicial. Filing 486 at 9.

What Defendants appear to object to and desire to preclude are so-called "loaded questions," that is, compound questions to which any answer is prejudicial. *See, e.g., United States v. Kragness*, 830 F.2d 842, 868 (8th Cir. 1987) (noting that counsel complained that the government was asking a "loaded question" or a "when-did-you-stop-beating-your-[spouse] question"); *see also United States v. Barnum*, 564 F.3d 964, 970 (8th Cir. 2009) (explaining that a "loaded question" is a compound one that cannot be answered either yes or no without appearing

to concede an unfavorable inference).[3] Until and unless (1) such a question is asked; (2) Defendants raise a proper objection as to form and foundation; and (3) the Court probes whether the question is properly formulated and whether there is a proper foundation for it, the Court cannot grant a "blanket" exclusion, because it would at best be an improper advisory ruling.

This part of Defendants' Motion in Limine is denied.

11.    *Topic P: Referring to the City as "the Government"*

Defendants also ask the Court to prohibit Benson from referring to the City of Lincoln as "the Government." Filing 454 at 9. Defendants argue that the trial will be held in Omaha, Nebraska, and the jurors will not be residents of the City of Lincoln. Filing 454 at 9–10. Consequently, Defendants argue that suggesting that the City has some governmental authority over the jurors is improper. Filing 545 at 10. Defendants argue further that the Defendants include eight individuals, so that referring to the Defendants as a whole as "the government" is improper. Filing 454 at 10. Defendants also assert that "the current national political environment" is such that calling Defendants "the government" will "likely engender[ ] a negative public perception of the federal governing bodies in the minds of at least some jurors." Filing 454 at 10. Defendants assert that the City of Lincoln should be referred to as "the City" or "the City of Lincoln." Filing 454 at 10.

Benson represents that she does not intend to refer to the City of Lincoln as "the government" whenever she speaks of the City. Filing 454 at 15. On the other hand, she contends that there will likely be instances in which it is appropriate for the jury to know that the City is a governmental entity, for example, to show that the individual defendants were acting under color

---

[3] Britannica.com explains this logical fallacy this way:

> The fallacy of many questions (plurimum interrogationum) consists in demanding or giving a single answer to a question when this answer could either be divided (example: "Do you like the twins?" "Neither yes nor no; but Ann yes and Mary no.") or refused altogether, because a mistaken presupposition is involved (example: "Have you stopped beating your [spouse]?").

*See* https://www.britannica.com/topic/fallacy#ref1102392.

of state law as to Benson's constitutional claims. Filing 472 at 15. Benson also asserts that some jurors may be reluctant to award full damages to her out of concern that doing so would affect their tax burden, so they will have to be excused. Filing 472 at 15.

In reply, Defendants argue that Benson seeks punitive damages only against the individual Defendants, so they should be recognized as individuals, not as "the government," while the City of Lincoln should be referred as "the City." Filing 486 at 9.

Although the Court has found no controlling or persuasive authority on the issue—and the parties cited none—the Court believes that Defendants concerns are for the most part if not entirely illusory. Jurors will clearly be aware that the City of Lincoln is a governmental entity. References to the City of Lincoln as a governmental entity are clearly relevant to claims against a public employer and the employment status of individual defendants as public employees acting under color of state law for purposes of Benson's constitutional claims. *See, e.g., Ottman v. City of Independence, Mo.*, 341 F.3d 751, 756 (8th Cir. 2003) (holding "intentional gender discrimination in public employment by persons acting under color of state law violates the Equal Protection Clause of the Fourteenth Amendment and is actionable under section 1983"). Such transient references to the City of Lincoln as "a governmental entity," "the government" of the municipality, "the City Government," or "a public employer" are highly unlikely to be more prejudicial than probative. *See* Fed. R. Evid. 403. Furthermore, the parties and the Court will have the opportunity during voir dire to determine whether any potential jurors harbor biases against governmental entities or have concerns about the effect of a jury verdict against a governmental entity on its citizens.

This part of Defendant's Motion in Limine is denied.

12.     *Topic Q: References to Benson as a "Victim"*

In a rather similar vein, Defendants ask that the Court bar references to Benson as a "victim." Filing 454 at 10. They argue that "victim" is a "presumptive" term having the potential to inflame the passion of the jury and to cause undue prejudice. Filing 454 at 10 (citing Federal Rule of Evidence 403). Therefore, they ask the Court to bar use of the term because the jury has not yet decided whether or not Benson is a "victim." Filing 454 at 10. Benson complains that Defendants are asking the Court to issue a prior restraint in the form of an Order that witnesses and attorneys are prohibited from uttering in the courtroom a completely legitimate, factually accurate word. Filing 472 at 15. Benson argues that Defendants cite no case law authority for such a request and that judicial opinions as well as attorneys commonly refer to people as victims of unlawful employment actions, torts, or crimes. Filing 472 at 15–16. In reply, Defendants reiterate that it is the job of the jury to decide if Benson is a victim of discrimination, harassment, or retaliation as she claims. Filing 486 at 9. They add a citation to one out-of-circuit district court decision stating that the term "victim" is more prejudicial than probative. Filing 486 at 9 (citing *United States v. August*, 590 F. Supp. 3d 972, 976-77 (W.D. Tex. 2022)).

Unlike the dearth of authority found by the parties and the Court on the question of whether it is permissible to refer to the City of Lincoln as "the government," there are numerous district court cases addressing the issue of referring to the plaintiff in a lawsuit as a "victim." A little closer to home than the case cited by Defendants—in that it is in-circuit—is a decision from the Eastern District of Arkansas in a tort case observing, "On its face, the use of that term [*i.e.*, 'victim'] by a witness is argumentative and, if done repeatedly, it could become prejudicial." *Chism v. New Holland N. Am., Inc.*, No. 2:07CV00150 JTR, 2010 WL 11520495, at *4 (E.D. Ark. Feb. 1, 2010). Consequently, the trial judge directed the plaintiff's counsel to tell a witness not to refer to the plaintiff that way in his trial testimony, where the witness had used that term in a deposition. *Id.*

25

The trial judge stated further, "Plaintiff's counsel is free to refer to Plaintiff as a victim in closing argument, but, otherwise, they also should avoid using that term." *Id.*; *see also Simpson v. Brewer*, No. 19-CV-00410-NJR, 2021 WL 3511324, at *7 (S.D. Ill. Aug. 10, 2021) (granting a motion to exclude use of the term because plaintiff offered no legal basis for objecting); *Lotz v. Steak N Shake, Inc.*, No. CV 5:19-277-DCR, 2021 WL 2270353, at *4 (E.D. Ky. June 3, 2021) (barring use of the term, citing *Chism*, 2010 WL 11520495, at *4).

Other district courts do not regard the term as particularly provocative or prejudicial. See, e.g., *Harris v. Clay Cnty., Mississippi*, No. 1:18CV167 M-P, 2023 WL 2386650, at *5 (N.D. Miss. Mar. 6, 2023) (stating, "This court does not regard the term 'victim' as being particularly inflammatory, and it certainly seems arguable that, in denying Harris of his constitutional rights, defendants did, in fact, 'victimize' him," and denying the motion in limine to bar use of the term); *DeJesus v. Wal-Mart Stores E., LP*, No. 2:19-CV-142, 2021 WL 5501816, at *2 (S.D. Ga. July 12, 2021) (denying a motion to bar use of the term because "the word 'victim' is simply a term, not necessarily [a] piece of evidence unless used by a witness during his or her testimony. Attorneys should be permitted substantial leeway in their word choice when presenting opening statements and closing arguments. Regardless, Defendant has not shown the use of word in every instance at trial would be unfairly prejudicial."); *Harris v. Q&A Assocs., Inc.*, No. 2:16-CV-46, 2018 WL 3084709, at *8 (N.D.W. Va. June 22, 2018) (finding no "inflammatory" connotation to the term and "believe[ing] that the jury is more than competent to understand the nature of the proceedings"); see also *Brooks v. Caterpillar Glob. Mining Am., LLC*, No. 4:14CV-00022-JHM, 2017 WL 3401476, at *9–10 (W.D. Ky. Aug. 8, 2017) (while denying defendant's motion to preclude references to the plaintiff as a "victim," also "advis[ing] all counsel of record that [the court] will not allow grandstanding, theatrics, and gamesmanship in the courtroom").

The Court sides with the latter group of district courts. While "victim" is descriptive, it is not so "inflammatory" or provocative as to warrant exclusion pursuant to Federal Rule of Evidence 403. *See United States v. Patterson*, 68 F.4th 402, 416 (8th Cir. 2023) (explaining that evidence is excludable pursuant to Rule 403 when it suggests a decision on an improper basis, including "evidence which is so inflammatory on its face as to divert the jury's attention from the material issues in the trial"); *accord Harris*, 2023 WL 2386650, at *5; *DeJesus*, 2021 WL 5501816, at *2; *Harris*, 2018 WL 3084709, at *8. The Court also believes that reasonable jurors would recognize that the term is being used in an attempt to sway them or to bolster an inference from the evidence. *See Harris*, 2018 WL 3084709, at *8 (finding no "inflammatory" connotation to the term and "believe[ing] that the jury is more than competent to understand the nature of the proceedings"). The Court also believes that counsel is entitled to some leeway in their word choice in opening statements and closing arguments. *See DeJesus*, 2021 WL 5501816, at *2 ("Attorneys should be permitted substantial leeway in their word choice when presenting opening statements and closing arguments."). However, as with references to the City of Lincoln as "the government," references to Benson as "the victim" with excessive frequency could potentially become prejudicial, so that an objection would be appropriate. *See Chism*, 2010 WL 11520495, at *4 ("On its face, the use of that term [*i.e.*, 'victim'] by a witness is argumentative and, if done repeatedly, it could become prejudicial."); *see also Brooks*, 2017 WL 3401476, at *9–10 (while denying defendant's motion to preclude references to the plaintiff as a "victim," also "advis[ing] all counsel of record that [the court] will not allow grandstanding, theatrics, and gamesmanship in the courtroom").

This part of Defendants' Motion in Limine is denied.

13.    *Topic R: Stray and Outdated Remarks*

Defendants next seek to exclude another hotly contested category of evidence. Defendants assert that Benson should not be permitted to present evidence, testimony, or argument about stray

remarks allegedly made by Mahler regarding women. Filing 454 at 10. They point to the incident in which Benson alleges that when she asked Mahler for advice about joining a rescue or "hazmat" team with Urban Search and Rescue (USAR), he purportedly told her that she would be better suited for the medical or logistics functions on because, "I'm not saying that women can't do the work, but typically they are less mechanically minded and better at medical things." Filing 454 at 10–11. Defendants contend that not only does Mahler deny making such a statement, but Benson never heard him make any other derogatory statement about her or about women in employment, and Captain Giles also stated that he never heard Mahler make any sexist remark toward Benson. Filing 454 at 11. Defendants contend that such a remark, if it was even made, is no more than a "stray remark" that is more prejudicial than probative. Filing 454 at 11. Defendants argue that testimony from other LFR employees that they overheard Mahler make sexist remarks are inadmissible hearsay. Filing 454 at 12.

Benson argues that the remarks showing Mahler held "misogynistic" views are directly relevant to show that Mahler's animus towards her was based on her sex. Filing 472 at 16. She asserts that Taylor-Riley's report on Benson's complaints demonstrates that the City had notice of Mahler's statements, but the City continued to tolerate such behavior. Filing 472 at 16. Benson also argues that "stray remarks" are not entirely irrelevant because they could provide a trier of fact with a "thread" of relevant evidence, particularly if the speaker has influence over management. Filing 472 at 16–17 (citing *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922–23 (8th Cir. 2000), and *Gruttemeyer v. Transit Authority*, 31 F.4th 638, 648 (8th Cir. 2022)). Benson also argues that excluding this evidence will deprive the jurors of the opportunity to weigh conflicting evidence about the motivation for Mahler's conduct toward her. Filing 472 at 17. Benson argues that evidence that coworkers heard Mahler make such comments is relevant to the

City's knowledge of his animus and are not hearsay where Mahler is a party to this litigation. Filing 472 at 18. Benson also asserts that this evidence is admissible on a "cat's paw" theory. Filing 472 at 18–19.

In reply, Defendants distinguish *Fisher* on the ground that the speaker in that case was a manager, but Mahler held no such position. Filing 486 at 9–10. They assert that the Court has already rejected Benson's "cat's paw" theory. Filing 486 at 10. Finally, they reiterate that such remarks by non-decisionmakers are irrelevant and unfairly prejudicial. Filing 486 at 10.

It is well-settled that "'[d]irect evidence' . . . includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 63 F.4th 721, 727–28 (8th Cir. 2023) (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)) (cleaned up). On the other hand, "direct evidence . . . does not include 'stray remarks in the workplace' or 'statements by nondecisionmakers.'" *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 693 (8th Cir. 2021) (quoting *Moody v. Vozel*, 771 F.3d 1093, 1096 (8th Cir. 2014)), *cert. denied*, 142 S. Ct. 13612 (2022). "Stray remarks" include insensitive, inappropriate, or sexist comments by coworkers. *Xuan Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 959 (8th Cir. 2015). Direct evidence also does not include "statements by decisionmakers unrelated to the decisional process itself." *Doucette v. Morrison Cnty., Minn.*, 763 F.3d 978, 986 (8th Cir. 2014).

Mahler was not a decisionmaker as to the decision to terminate Benson, which is the only action on which her discrimination claim is based. *See* Filing 440 at 25 ("Benson's employment discrimination claim must proceed, if at all, on the basis of her termination."). Mahler was Benson's coworker, so sexist comments he might have made are not only remote in time from

Benson's termination but amount to no more than "stray remarks." *See Sellars*, 13 F.4th at 693;

*Doucette*, 763 F.3d at 986; *Xuan Huynh*, 794 F.3d at 959. As to the relevance of such comments

to a harassment claim, the Eighth Circuit Court of Appeals has also explained,

> Stray remarks in the workplace generally are not severe or pervasive enough to change the conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[O]ffhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). This higher standard for workplace harassment prevents attempts to use Title VII to enforce a "general civility code." *Id.*

*Cooper Tire & Rubber Co. v. Nat'l Lab. Rels. Bd.*, 866 F.3d 885, 892 (8th Cir. 2017); *Jackman v.*

*Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 806 (8th Cir. 2013) ("On their face,

[coworkers'] comments are best characterized as [racially] offensive, but not so severe or

pervasive as to permeate the workplace," so they were insufficient to establish a harassment claim).

Nevertheless, as Benson contends, the Eighth Circuit Court of Appeals has also explained:

> Although we agree that stray remarks, standing alone, may not give rise to an inference of discrimination, such remarks are not irrelevant. *See Ryther v. KARE 11*, 108 F.3d 832, 844 (8th Cir.1997) (en banc). Rather, such comments are "surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." *Bevan*, 118 F.3d at 610 (citations and quotations omitted); *see Ryther*, 108 F.3d at 844. Stray remarks therefore constitute circumstantial evidence that, when considered together with other evidence, may give rise to a reasonable inference of age discrimination. *See Fast v. Southern Union Co., Inc.*, 149 F.3d 885, 891–92 (8th Cir. 1998); *Bevan*, 118 F.3d at 610–11; *Madel v. FCI Marketing, Inc.*, 116 F.3d 1247, 1253 (8th Cir. 1997).

> Thus, even assuming that the comments made by [company officers and supervisors] were nothing more than stray remarks, we conclude that these statements, when considered in conjunction with [the plaintiff's] prima facie case and showing of pretext, give rise to an inference of intentional discrimination.

*Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922–23 (8th Cir. 2000). Subsequently, the Eighth

Circuit Court of Appeals reiterated that such comments may "contribute to a hostile work

environment under Title VII," if there is sufficient other evidence to reach the "severe or

pervasive" requirement for a hostile work environment. *Hairston v. Wormuth*, 6 F.4th 834, 842 (8th Cir. 2021). This is true at least in part because in assessing whether the plaintiff has met her burden, the court must "look at the totality of the circumstances." *Id.* at 841 (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010)).

Defendants have not convinced the Court that the comments at issue here are so irrelevant or of such slight relevance that their threat of unfair prejudice warrants pretrial exclusion. Fed. R. Evid. 403; *Hairston*, 6 F.4th at 841–42; *Fisher*, 225 F.3d at 922–23. Although Defendants are correct that the makers of the "stray remarks" at issue in *Fischer* were in managerial roles, the Court finds that the status of the speaker goes more to the weight than the admissibility of the remarks, at least as they relate to a harassment claims. Furthermore, this is not a case in which the challenged comments stand alone as the only basis for an inference of discrimination or harassment. *Cooper Tire & Rubber Co.*, 866 F.3d at 892; *Jackman*, 728 F.3d at 806; *Fisher*, 225 F.3d at 922. The Court deems the better course to be to consider such evidence in the context of trial subject to timely objections and, if appropriate, subject to an instruction on the limited uses that can be made of such evidence.

Benson's assertion of a "cat's paw" theory as a basis for admissibility of these comments by Mahler deserves a brief comment. Benson's cat's paw theory this time is on a somewhat different basis from the one that the Court rejected at summary judgment. *Compare* Filing 472 at 18–19 (basing the theory on Mahler's alleged misogynistic statements), *with* Filing 440 at 21–22 (rejecting a cat's paw theory based on Mahler's alleged "lies" to the City about what happened during the warehouse fire that led to her termination). The fatal flaw in this version of Benson's "cat's paw" theory is the same, however. No reasonable jury could conclude that the decision to terminate Benson was based solely or even substantially on Mahler's alleged sexist or misogynistic

comments. Instead, in the Notice of Dismissal, Fire Chief Engler identified several sources of evidence and numerous grounds for deciding that Benson had made false allegations against Mahler that have nothing to do with whether or not she accused him of making sexist comments. *See* Filing 380-83.

This part of Defendant's Motion in Limine is denied.

14. *Topic S: Arguments Regarding Unconscious Bias, Implicit Bias, or Stereotypes*

Defendants argue that Benson should also be precluded from referring to or offering evidence or argument about implicit bias or unconscious bias because such evidence is speculative and unhelpful to the jury. Filing 454 at 13. Defendants argue that such arguments could confuse or mislead the jurors about the necessity to prove intentional harassment, discrimination, or retaliation. Filing 454 at 13. Benson responds that Defendants cannot seriously assert that discussion of sex stereotypes is irrelevant or prejudicial in a case involving sex discrimination and harassment when an employer's reliance on sex stereotypes creates liability under Title VII and NFEPA. Filing 472 at 19. She points out that at least one judge on the Eighth Circuit Court of Appeals and other courts have acknowledged the importance of educating jurors on potential implicit bias. Filing 472 at 19 (citing *United States v. Young*, 6 F.4th 804, 811-12 (2021) (Kelly, J., concurring)). Thus, Benson argues that it is "vital" that she be able to discuss implicit bias and sex stereotyping with prospective jurors. Filing 472 at 20. In reply, Defendants argue that implicit bias generally requires expert testimony, and even then, courts may exclude such evidence as potentially confusing to jurors in cases involving intentional discrimination or retaliation. Filing 486 at 10–11.

The Court concludes that "stereotypes" are relevant to a sex discrimination, harassment, and retaliation case. *See Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n.

13 (1978) (explaining that Congress intended Title VII to "strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."). Indeed, it is appropriate to offer evidence and argument that actions of Defendants and Benson's coworkers reflect sex stereotypes. The Court finds that it would also be appropriate to allow counsel during jury selection to probe whether prospective jurors harbor sex stereotypes and biases. *Cf. Ham v. South Carolina*, 409 U.S. 524, 527 (1973) (concluding that voir dire on racial prejudice was constitutionally required when a black civil rights activist believed he was being framed by law enforcement). Specifically, it is appropriate to allow counsel to make jurors aware of the jurors' own potential explicit and implicit biases and the effect those biases might have as the jurors weigh evidence and credibility. *See McDonald v. United States*, No. C 17-3057-MWB, 2018 WL 10093946, at *3 (N.D. Iowa Aug. 20, 2018); *United States v. Young*, 6 F.4th 804, 810–12 (8th Cir. 2021) (Kelly, J., concurring) (calling for more efforts during jury selection to mitigate the effects of implicit biases on jurors). On the other hand, Defendants assert valid concerns about the potential for confusing the jurors as to what Benson must prove if evidence or argument about implicit biases of actors in this case are introduced in a case where liability depends upon intentional discrimination and intentional harassment. *See Jackson v. Scripps Media, Inc*., No. 18-00440-CV-W-ODS, 2019 WL 6619859, at *5 (W.D. Mo. Dec. 5, 2019) ("When considering whether to allow expert testimony on implicit bias in cases alleging intentional discrimination, several courts have focused on the absence of any apparent connection between a person's subconscious beliefs, and that person's intent." (citing cases)). Thus, no such evidence or argument will be permitted after jury selection.

This part of Defendants' Motion in Limine is granted as to evidence or argument about any alleged implicit biases of actors in this case, but denied as evidence or argument that actions at

issue in this case reflect sex or gender stereotypes and denied as to discussion during jury selection of stereotypes and implicit or unconscious biases that could potentially affect jurors.

15.     *Topic T: Evidence about Events or Actions before October 20, 2015*

Defendants assert that evidence or testimony regarding alleged events or adverse actions that occurred prior to October 20, 2015, should be excluded. Filing 454 at 14. They argue that Benson filed her first NEOC charge of discrimination on August 15, 2016, so that any references to or claims related to events that occurred more than 300 days prior to that date, *i.e.*, October 20, 2015, should be excluded from trial. Filing 454 at 14. Defendants identify the following matters as falling within this topic: (1) that Benson heard from others in October of 2014 that Captain Mahler did not want her at Station 8; (2) that Captain Mahler did not properly greet her when she joined Station 8; (3) that she complained about him in November of 2014 and then withdrew the complaint "out of fear of retaliation"; and (4) any other actions she alleges occurred before October 20, 2015.

Benson contends that evidence of such events is admissible because one way to show an employer's unlawful motive is to show that the employer had in the past subjected the plaintiff to unlawful discriminatory treatment. Filing 472 at 21. She argues that statutes of limitations cut off claims not evidence that may support those claims. Filing 472 at 21. She also argues that time-barred acts may be offered as probative to the determination of whether an employer's justifications for its present conduct are credible and as background to a timely claim. Filing 472 at 21–22. Benson contends this is true whether the prior discriminatory acts were toward the plaintiff or against a non-party. Filing 472 at 23. She also asserts that a continuing violation like a hostile work environment can be shown by events both within and outside of the limitations period. Filing 472 at 24. Benson then lists several time-barred incidents that she contends are relevant to her continuing violation claim. Filing 472 at 25–26.

In reply, Defendants argue that discrete acts of discrimination prior to October 20, 2015, are time-barred. Filing 486 at 11. To the extent Benson asserts continuing violation claims of sexual harassment, Defendants argue that events prior to October 20, 2015, that are based on inadmissible hearsay or that are not probative of sexual harassment must be excluded. Filing 486 at 11. Finally, Defendants contends that a continuing violation cannot encompass time-barred events that did not even involve Benson. Filing 486 at 11. Defendants assert that this is not a proper "pattern and practice case" brought by a class of plaintiffs but a single plaintiff's claim of disparate treatment and harassment, so that incidents that did not involve Benson or that occurred before she even joined LFR are irrelevant. Filing 486 at 12.

Again, Defendants ask the Court to predetermine the admissibility of evidence, where the admissibility of the evidence depends to a large extent on the context and content of the incidents. After setting out the continuing violation doctrine, the Eighth Circuit Court of Appeals explained,

> In *Rowe v. Hussmann Corp.*, 381 F.3d 775, 779 (8th Cir. 2004), we considered whether acts of sexual roguery that occurred before the limitations period were "part of the same actionable hostile work environment practice" as the acts that occurred within the limitations period. A comparison of the acts revealed that "it was the same harasser ... committing the same harassing acts" both before and within the limitations period, that the employer was made aware of the harassment, and that there was no evidence of an "intervening action." *Id.* at 781. We thus held "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action." *Id.*

*Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 539–40 (8th Cir. 2014). The court in *Clay* found that the acts in question in the case before it were "not similar in 'nature, frequency, and severity'" to the incidents within the limitations period, so that they were insufficient to support a hostile work environment claim. *Id.* at 540. The Eighth Circuit has also cautioned that evidence of discrimination toward non-parties requires "[a] district court [to] engage in a 'fact-intensive, context-specific inquiry' in order to determine whether such evidence is relevant under Federal

Rule of Evidence 401, and—if it is relevant—whether it should be excluded because its probative value is substantially outweighed by its prejudicial effect, in accordance with Federal Rule of Evidence 403. *Bennett v. Nucor Corp.*, 656 F.3d 802, 810 (8th Cir. 2011) (citing *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)).

It is certainly true that events outside of the limitations period could be so tenuously related to Benson's claims because they involved dissimilar actions, different actors, or non-parties that exclusion pursuant to Federal Rule of Evidence 403 would be appropriate on both prejudice and confusion grounds. Given the descriptions of previous incidents described in the voluminous pretrial filings in this case, many of which the Court has already ordered to be excluded from the trial of this matter, the Court believes it is likely that many if not all of the pre-2015 incidents will ultimately be excluded. Further, if evidence of such events is offered with such frequency and involves events of such different magnitude that it overshadows actionable conduct toward Benson it could become excludable pursuant to Rule 403 on both prejudice and confusion grounds. The Court cannot make these calls pretrial on a paper record. Defendants bear the burden to raise timely objections to such evidence in the context of trial. The Court expects Benson to use judgment not to waste the time of the Court in seeking admission of evidence that the law requires to be excluded.

This part of Defendants' Motion in Limine is denied.

16. *Topic U: Discipline Spreadsheets*

Defendants next seek exclusion of extensive lists regarding discipline of other LFR employees, such as Exhibits 8, 401, 410, and 432. Filing 454 at 14. Defendants argue such exhibits are unrelated to Benson, include lists of discipline for employees who are not valid comparators, and include lists of actions taken by decisionmakers other than the decisionmaker it this case. Filing 454 at 14. Defendants assert that Benson has failed to show which, if any, of the employees

on the lengthy lists are valid comparators, so that this evidence should be precluded pursuant to Federal Rules of Evidence 401–402. Filing 454 at 15. In response, Benson relies on the arguments she raised as to Topic M evidence. Filing 472 at 27. She argues further that Aishah Witte testified that "they" reviewed these spreadsheets when deciding to terminate Benson. Filing 472 at 27. In reply, Defendants assert that Witte's reference to looking at past discipline does not justify introducing a decades' long list of all discipline. Filing 486 at 13. Defendants point out that Witte testified that she consulted the disciplinary lists to look for similar situations involving discipline for lying not that "they" looked at the list. Filing 486 at 13.

Benson mischaracterizes Witte's deposition testimony, which indicates Witte would check the lists for discipline in similar circumstances when the Chief asked what had been done in the past; she did not indicate that anyone else consulted the list. *See* Filing 383-53 at 94:6–95:25. That mischaracterization, while disturbing, is not a ground for exclusion of the evidence if the evidence is otherwise admissible.

When the Court considered the similar issue of exclusion of evidence in Topic M above, the Court concluded that Defendants had failed to show that a pretrial "blanket" exclusion of evidence of disciplinary actions against individual Defendants and witnesses was possible or appropriate. This is so, the Court explained, because the so-called "comparators" must be "similarly situated in all relevant respects." *Lucke*, 912 F.3d at 1087 (quoting *Young*, 754 F.3d at 578). When the issue is disparate treatment in discipline, the comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Ebersole*, 758 F.3d at 925 (quoting *Burton* 737 F.3d at 1229). The Court concluded that the necessary determinations cannot be made except in the context of trial.

By the same token, Benson has not shown that it is appropriate to allow the exhibits in this topic to be admitted in their entirety. The Court concludes that offering the disciplinary records *en masse* is unduly confusing, misleading, and would lead to a waste of time. Fed. R. Evid. 403. Plaintiff's exhibits woefully fail to identify only those persons that Benson contends are proper "comparators"—that is, limited to those persons who were "similarly situated in all relevant respects," *see Lucke*, 912 F.2d at 1087, including that they "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances[.]" *See Ebersole*, 758 F.3d at 925. Therefore Exhibits 8, 401, 410, and 432 will be excluded.[4]

17.    *Topic V: Benson's Testimony Regarding Truck Scheduling*

Defendants seek exclusion of what they call "speculative" and "unfounded" testimony by Benson regarding truck scheduling. Filing 454 at 15. More specifically, they assert that Benson claims that Mahler discriminated against her by manipulating her work schedule, while at the same time Benson admits that she does not even know who was responsible for scheduling crew assignments. Filing 454 at 15. Defendants argue that it was in fact Captain Giles who was responsible for Benson's scheduling. Filing 454 at 15. Consequently, Defendants argue this testimony should be excluded pursuant to Federal Rule of Evidence 602 for lack of personal knowledge. Filing 454 at 16. Benson argues that Defendants mischaracterize her deposition testimony, which she asserts was that she was not sure whose responsibility it was to try to get her time on Mahler's truck. Filing 472 at 27. She argues that none of her testimony is inconsistent with

---

[4] Plaintiff offers exhibits containing what appears to be the entire discipline record. Under black letter law, as described in this section, these exhibits are not admissible. This is not a close call. The Court acknowledges that it is possible that some of the information in the exhibits could be admissible if Plaintiff provided appropriate justification and if the exhibits had been appropriately redacted. Plaintiff did not do this, nor has Plaintiff offered a redacted exhibit in response to the objection.

her testimony that she was not allowed to rotate onto Mahler's truck at Station 8. Filing 472 at 27–28. She argues that she has since been able to review time reports produced in discovery that permitted her to itemize the shifts on which she actually performed truck operations while at Station 8. Filing 472 at 28. She asserts that Defendants objections are "baseless" and that Defendants can cross-examine her about her knowledge regarding the truck scheduling. Filing 472 at 28. In reply, Defendants argue that Benson's opposition does not change the fact that she admitted she does not even know who was responsible for scheduling on the truck. Filing 486 at 14.

The deposition testimony Defendants cite in support of this part of their Motion in Limine includes repeated statements by Benson that she did not know who was responsible for scheduling her while she was at Station 8. Thus, this testimony raises a fair inference that Benson does not have personal knowledge that Mahler "manipulated" her schedule. *See* Filing 454 at 15. Benson's reframing of her statement to be that she was not allowed to rotate onto Captain Mahler's truck at Station 8 is a retreat from Benson's characterization of Mahler as "manipulating" her schedule and her deposition testimony that the person who told her that "Mahler manipulated staffing" to keep her on the medic unit on a particular date was Captain Giles. Filing 451-4 at 9 (Benson Depo. at 134:10–22). The recharacterization when viewed in light of her deposition testimony demonstrates that Benson has no first-hand knowledge that Mahler had any impact or control over Benson's rotation onto the truck at Station 8. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

In an attempt to show that she has personal knowledge on which to base her testimony (at least as recharacterized), Benson cites her declaration that she reviewed a spreadsheet of her

assignments at Station 8, her Exhibit 150, and her opinion that "[i]f I had been treated like Firefighter Rist, I should have been entitled to approximately half of the shifts that he was allowed to ride on the truck as indicated by Kimberly Taylor-Riley in her report." Filing 383-18 at 13 (¶ 55). However, Exhibit 150 gives no indication of how often Firefighter Rist was allowed to ride on Truck 8, and one is left to assume that the only person whose assignments are shown in that Exhibit is Benson. *See* Filing 385-25. Also, Benson does not cite the part of Taylor-Riley's report to which she refers. Thus, the Court cannot find from this evidence that Benson has any personal knowledge that Mahler "manipulated" her schedule to keep her from training on a truck or even that she was not allowed to rotate onto Mahler's truck. Fed. R. Evid. 602. At most, Exhibit 150 standing alone suggests that Benson (or whoever's schedule is shown in that Exhibit) was assigned to Truck 8 (T8) much more rarely than she was assigned to an engine or a medical unit. Filing 385-25.

This part of Defendants' Motion in Limine is granted to the extent that Benson will not be allowed to offer speculation that Mahler manipulated the schedule to prevent Benson from rotating onto his truck. This ruling does not prevent Benson from offering evidence—if she actually has any and it has been timely disclosed—that her assignments to Mahler's truck were disproportionately few compared to assignments of comparable firefighters.

18. *Topic W: Post-Termination Information Unknown to the Decisionmaker*

Defendants assert that evidence regarding post-termination information that was not known by the decisionmaker (Chief Engler) at the time he terminated Benson is inadmissible because the issue is whether the decisionmaker in good faith believed that Benson was guilty of the conduct justifying her discharge. Filing 454 at 17. Defendants' "good faith" defense is a hotly contested issue in the case, so Defendants' Motion in Limine on this topic requires a more detailed analysis than some of the other topics.

a. The Parties' Arguments

Defendants assert that evidence that Mahler "lied" about the warehouse fire incident only came to LFR's attention after Benson's termination, so that it does not impact LFR's good faith at the time LFR made the decision to terminate her. Filing 454 at 17 (citing Filing 440 at 26 & n.5). Consequently, Defendants assert that pursuant to Federal Rule of Evidence 403 Benson should not be permitted to offer evidence or testimony about post-termination events that had not come to Chief Engler's attention until after he decided to terminate Benson. Filing 454 at 17.

Benson responds that this evidence is relevant to show pretext. Filing 472 at 28. More specifically, she asserts that she is not required to accept Chief Engler's statements that he did not know Mahler was lying until after he fired her where for example Mahler had been disciplined by LFR for stealing and lying to a battalion chief in the past. Filing 472 at 28. She contends that evidence that an employer's proffered reason for its decision is false is enough to prove discrimination. Filing 472 at 29. Indeed, she argues, "Just the fact that they were wrong is sufficient to make the inference [of pretext] [a]nd there is really no dispute that Defendants got it wrong." Filing 472 at 29–30. She contends that Chief Engler admitted that he knew as early as August 2021 that Mahler was dishonest about his interactions with Benson at the warehouse fire, adding that Chief Engler cannot explain why he has not investigated Mahler's dishonesty. Filing 472 at 30. Benson contends that evidence that Mahler lied suggests that the City jumped at the chance to fire her on the slightest pretense. Filing 472 at 30. She also argues that the failure to discipline Mahler is evidence of a comparable male employee who was not terminated or disciplined for the same offense for which she was fired. Filing 472 at 30.

In reply, Defendants reiterate that Mahler's alleged "lies" are only relevant to the issue of LFR's good faith belief in Benson's dishonesty if LFR knew Mahler had lied or had substantial

41

reason to believe that he lied before LFR terminated Benson, but that is not the case here. Filing 486 at 14.

### b. Benson Misreads Supreme Court Precedent

Benson does not even try to argue that evidence of Mahler's alleged lies is relevant to Defendants' good faith defense. Instead, she attempts to read an employer's good faith out of the analysis by arguing that the fact that the employer is wrong about the reason for terminating an employee is sufficient to establish pretext. *See* Filing 472 at 29. Her position is premised on a misreading of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147–149 (2000), *St. Mary's Honor Center v. Hicks*, 509 U.S. 503, 511 (1993), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Filing 472 at 29 (citing these cases).

Benson points to the following language in *Hicks*, which is quoted in *Reeves*:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Hicks*, 509 U.S. at 511 (emphasis in the original); *Reeves*, 530 U.S. at 147 (quoting this paragraph from *Hicks*); Filing 472 at 29. Benson asserts that recognition of mendacity as supporting an inference of intentional discrimination but not as required to generate that inference makes clear that the jury need not even suspect the employer is lying about its purported nondiscriminatory reason in order to find pretext. Filing 472 at 29. She also points to the statement in *Reeves* that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148; Filing 472 at 29.

However, nowhere in *Reeves* did the Supreme Court state—or reasonably suggest—that a merely incorrect reason is sufficient to demonstrate pretext. To put it another way, although the

Supreme Court made several references to a "false" explanation warranting an inference of pretext, and a trier of fact's "disbelief" of the employer's proffered reason, nowhere did the Supreme Court equate a "false" explanation or one "unworthy of credence" with an explanation that was merely "wrong" or "incorrect." First, the Supreme Court explained that the trier of fact has the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Reeves*, 530 U.S. at 143. The Court then explained,

> And in attempting to satisfy this burden, the plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision — must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." [*Burdine*, 450 U.S. at 253; see also *St. Mary's Honor Center, supra*, at 507–508, 113 S. Ct. 2742.

*Reeves*, 530 U.S. at 143. Thus, the focus in *Reeves*, *Burdine*, and *Hicks* was whether the defendant's reasons were "its true reasons," not whether those reasons were true, *i.e.*, factually correct.

Also, the record in *Reeves* included evidence that the employer knew that at least some of its allegations of wrongdoing were untrue. The employee was terminated for intentionally falsifying company pay records, but the Supreme Court found that the employee "made a substantial showing that [the employer's] explanation was false." *Id.* at 144. The employer's director of manufacturing admitted that the employee was correct about the procedure for recording employee start times if the timeclock malfunctioned and the company president admitted that she knew a different person was responsible for disciplinary writeups the employee had been accused of failing to do. *Id.* at 145.

Furthermore, in *Reeves*, the Supreme Court used "false" in reference to a reason not being the employer's real reason not in reference to the factual correctness of the reason. For example, the Supreme Court explained that "it is *permissible* for the trier of fact to infer the ultimate fact of

discrimination from the falsity of the employer's explanation," but it did not state that discrimination could be inferred from the falsity of the allegation of the employee's misconduct. *See Reeves*, 530 U.S. at 147 (emphasis in the original). The Supreme Court also explained, "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* Again, "falsity" was in reference to the explanation not to the misconduct allegation. The Court explained that "[s]uch an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Id.* at 147 (internal quotation marks and citations omitted). Thus, the Court related "falsity" of the explanation to "dishonesty" of the stated explanation not to incorrectness of the allegation of misconduct.

The Supreme Court precedent does not establish that merely being wrong about whether the employee engaged in misconduct demonstrates pretext.

c.   The Circuit Courts of Appeals Have Recognized the Difference between Incorrect Reasons and False Reasons

Benson has not cited—and the Court has not found—a single case in which any court has found that after-acquired evidence that an employer was wrong in its belief that an employee engaged in misconduct was sufficient to show that the employer's decision to terminate or discipline the employee was a pretext for discrimination or even relevant to that question. On the other hand, decisions of several Circuit Courts of Appeals demonstrate that a merely "incorrect" reason for discharging an employee does not generate an inference that the reason is a pretext.

As this Court has explained twice before in this case, the Eighth Circuit Court of Appeals has held that the critical question in a case involving an allegedly discriminatory termination is not whether the employee actually engaged in the conduct for which she was terminated—in other

words, whether the reason for the termination was right or wrong, correct or incorrect, true or untrue—but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge. *See* Filing 440 at 26 (citing Filing 365 at 25–26); Filing 365 at 25–26 (citing *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir.), *cert. denied*, 142 S. Ct. 585 (2021), and *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 612 (8th Cir. 2014)).

In *Canning*, the Eighth Circuit explained,

> Although "a plaintiff may establish pretext by showing that the employer did not truly believe the employee engaged in the conduct justifying termination," if the employer's proffered reason was "truly ... the reason for the plaintiff's termination," we will not "decide whether [that] reason was wise, fair, or even correct." *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) (quoting *Wilking v. Cty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Wilking*, 153 F.3d at 873 (cleaned up).

*Canning*, 995 F.3d at 612. Still more pointedly, in *Johnson*, the Eighth Circuit explained, "Our precedent establishes that the 'critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated'"—that is, the inquiry is not whether the stated reason is right or wrong—"'but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" 769 F.3d at 612 (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012)).

The Eighth Circuit has reiterated this rule several times just since Canning was decided. See *Said v. Mayo Clinic*, 44 F.4th 1142, 1151 (8th Cir. 2022) ("[T]he 'critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct[.]'" (quoting *McCullough v. Univ. of Ark. for Med. Sci.*, 559 F.3d 855, 861–62 (8th Cir. 2009)); *Banford v. Bd. of Regents of Univ. of Minnesota*, 43 F.4th 896, 900 (8th Cir. 2022) (stating that "the inquiry is limited to whether the employer gave an honest explanation of its behavior" (quoting *Canning*,

995 F.3d at 612), and citing *Pulczinski*, 691 F.3d at 1002–03, as reaffirming the "honest belief rule" that an explanation that turns out to be wrong supports a finding of discrimination only if the employer did not truly believe it); *Vinh v. Express Scripts Servs. Co*., 7 F.4th 720, 727 (8th Cir. 2021) (holding that summary judgment for an employer was proper where the plaintiff had failed to present sufficient evidence to demonstrate that the employer's stated reason for his termination was not truthful and was merely a pretext for discrimination (citing *Wilking*, 153 F.3d at 874)); *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021) ("Though Hairston claims that the accusations against her are false, the 'critical inquiry' at this stage of the McDonnell Douglas analysis 'is not whether the employee actually engaged in the conduct for which [s]he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.' *McCullough v. Univ. of Ark. for Med. Scis*., 559 F.3d 855, 861–62 (8th Cir. 2009). There is no evidence in the record suggesting that Moncrief did not believe the accusations against Hairston."). These decisions distinguish between an incorrect or untrue reason and an untruthful or dishonest one: An employer may truthfully, honestly, or in good faith believe a reason that is actually untrue or incorrect. These cases explain that it is an employer's assertion of a reason that is not the employer's real reason that establishes pretext not that an employer's assertion of a reason that is merely untrue, false, or incorrect establishes pretext.

Other Circuit Courts of Appeals have also explicitly distinguished between a merely incorrect reason and an untruthful reason, where only the latter will demonstrate pretext. *See, e.g., Render v. FCA US, LLC*, 53 F.4th 905, 922–23 (6th Cir. 2022) ("Where, as here, an employee provides evidence that the proffered reason had no basis in fact, the employer may still be able to defeat a retaliation claim under the 'honest belief' rule. [A]s long as an employer has an honest belief in its proffered non-discriminatory reason, the employee cannot establish pretext simply

because the reason is ultimately shown to be incorrect." (internal quotation marks and citations omitted)); *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 877 and n.24 (5th Cir. 2019) ("The issue at the pretext stage is not whether the Board's reason was actually correct or fair, but whether the decisionmakers honestly believed the reason." (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002), as stating, "The issue at the pretext stage is whether Appellee's reason, even if incorrect, was the real reason for Appellant's termination.")); *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 569, 571 (7th Cir. 2019) ("The answer lies in separating pretextual justifications from honest ones.... If the court finds that the reason is honest, it does not ask whether the reason is *correct*—it is enough that the employer believe its own reason in good faith. And the burden of showing pretext rests with the plaintiff." (emphasis in the original)); *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009) ("Our recent Title VII cases explain that a plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent.").

These decisions also demonstrate the fallacy of Benson's contention that evidence that Mahler lied suggests that the City jumped at the chance to fire her on the slightest pretense. Filing 472 at 30. No such inference reasonably arises if the decisionmaker truly believed that Benson engaged in wrongdoing and was unaware that Mahler lied.

Evidence that Mahler lied about the warehouse fire is simply irrelevant to whether Defendants' explanation is in good faith or merely a pretext for a discriminatory termination. In other words, evidence that Mahler lied is not evidence that Chief Engler did not truly believe that Benson engaged in misconduct where Chief Engler did not know at the time he made the decision that Mahler had lied. *See Canning*, 995 F.3d at 612 (explaining that "[a]lthough a plaintiff may establish pretext by showing that the employer did not truly believe the employee engaged in the

conduct justifying termination, if the employer's proffered reason was truly ... the reason for the plaintiff's termination, we will not decide whether [that] reason was wise, fair, or even correct." (internal quotation marks and citations omitted)).

> d.   Evidence that Mahler "Lied" Is Irrelevant because Mahler and Benson Were Not Similarly Situated

Benson's last argument for the admissibility of this evidence is that the failure to discipline Mahler for "lying" is evidence of a comparable male employee who was not terminated or disciplined for the same offense for which she was fired. Filing 472 at 30. The problem with this argument is that Mahler and Benson were not similarly situated as a matter of law.

Benson was not terminated simply because Chief Engler believed that she had "lied." Rather, according to Chief Engler's letter dismissing Benson,

> The evidence confirms that you made serious false allegations against a fellow firefighter. You reported to Lincoln Fire and Rescue (LF&R) and have continuously stated thereafter that you and your crew were abandoned in a dangerous burning warehouse by Captain Shawn Mahler at the April 26, 2021 fire scene. You also stated that his behavior "could have injured or killed [you], FAO Roberts, and FF Recruit Hurley." See, e.g., your June 11, 2021 sworn statement and incorporated attachments filed in Case No. 4:18CV3127.

Filing 380-83 at 1. On the other hand, Benson cites as evidence that Mahler "lied" a paragraph of Mahler's declaration and Chief Engler's deposition testimony. Filing 398 at 32. On July 21, 2021, Mahler declared in the cited paragraph, "I did not ignore or avoid Ms. Benson at the Incident on April 26, 2021." Filing 132-8 at 2 (¶ 6). In a question to Chief Engler in his deposition, Benson's counsel framed Mahler's "lie" as falsely stating that he did not ignore and walk away from Benson in the fire, and Chief Engler acknowledged that he now knows that Mahler "ignored" Benson. *See*

Filing 334-17 at 49 (Engler Depo. at 192:19-23) (asking, "[N]ow you know that he ignored her in the fire, right, and walked away?" to which Chief Engler responded, "He ignored her.").[5]

Mahler and Benson did not "engage[] in the same conduct without any mitigating or distinguishing circumstances" as required to be proper comparators. *Ebersole*, 758 F.3d at 925. This is so, even if the misconduct of both would arguably fall under the same general heading of "lying." There is a material difference between Benson's "lie" of falsely accusing another of dangerous misconduct and Mahler's "lie" about his own conduct during a fire. *See id.* (explaining that the comparator must have "engaged in the same conduct"). Just or more importantly, there is no reasonable similarity in degree of seriousness between Benson's "lie" that Mahler abandoned her and her crew in a dangerous burning warehouse which could have injured or killed them and Mahler's "lie" about not ignoring Benson over whom he had no supervisory authority during a fire. *See id.* (explaining that the comparator must have "engaged in the same conduct without any mitigating or distinguishing circumstances").

Thus, Mahler and Benson were not similarly situated for purposes of demonstrating discrimination.

e.   Conclusion

The Court concludes that evidence of Mahler's "lie" about the warehouse fire is irrelevant to the issue of whether Defendants truly and in good faith believed that Benson engaged in conduct that justified termination. Consequently, that evidence must be excluded pursuant to Federal Rules of Evidence 401 and 402. Even if contrary to the Court's conclusion just above there is some arguable probative value to the alleged difference in treatment of Mahler and Benson for their

---

[5] Chief Engler's answer continued, "He was working in the area. He didn't—he didn't necessarily just walk away and hide. And was this a—was she abandoned? I would say I—I disagree with the term 'abandoned.' She was definitely not working for him. He was—he was not her group supervisor." Filing 334-17 at 48–49 (Engler Depo. at 192:23–193:3).

respective "lies," that evidence is properly excluded under Federal Rule of Evidence 403. This is so, because of its potential for confusion, misleading the jury, and waste of time precisely because it could lead to improper consideration of Mahler's "lie" as undermining Defendants' good faith belief that Benson engaged in misconduct that warranted termination.

This part of Defendants' Motion in Limine is granted.

19.    *Topic X: Testimony on Privileged Matters from former Lincoln City Attorneys and the City's EAD Officer*

Defendants seek an order of the Court precluding Benson from calling former Lincoln City Attorneys Jeff Kirkpatrick, Elizabeth Elliott, and Don Taute. Filing 454 at 18. Defendants point out that the Court has already specifically prohibited Benson from taking Kirkpatrick's and Elliott's depositions based on attorney-client privilege, where they were serving in their capacities as legal advisors and their communications were privileged. Filing 454 at 18 (citing Filing 217 at 9-12). They also point out that Don Taute served as a legal advisor to the city, so it would also be improper for Benson to call him as a witness. Filing 454 at 18. Defendants add that Benson should also be precluded from calling Mindy Rush Chipman, the City's EAD Officer (also called the EEO Officer), as a witness or asking her about the reasons she was not performing internal EEO investigations because such inquiries would also invade privilege, has no bearing on any claim, and would lead to confusion, waste of time, and unfair prejudice. Filing 454 at 18.

This is another part of Defendants' Motion in Limine, like the part concerning "topic H," on which Benson equivocates. If her Motion in Limine regarding the investigations or involvement of former City Attorneys and Defendants reliance on advice of counsel is granted, she has no objection to exclusion of evidence on Defendants' "topic X." Filing 472 at 31. On the other hand, if her Motion is denied, then she resists this part of Defendants' Motion for the reasons explained

in her Motion. Filing 472 at 31. Benson also reiterates that Defendants should not be allowed to use the attorney-client privilege as both a sword and a shield. Filing 472 at 31.

Defendants likewise incorporate their reply regarding "topic H." Filing 486 at 15.

Where Benson does not offer any proper opposition to this part of Defendants' Motion in Limine, the Motion is granted as to evidence on all the matters listed in "topic X." Even if somehow relevant, Benson has made no showing that testimony from former Lincoln City Attorneys and the City's EAD Officer would not be unfairly prejudicial or inflammatory, *see* Fed. R. Evid. 403 (requiring a balance of probative value against potential for unfair prejudice and waste of time); *Walker*, 68 F.4th at 392; *Patterson*, 68 F.3d at 416, would not amount to an improper and untimely attempt to relitigate matters already resolved by the Court, *see* Filing 365 at 28–30, or would not otherwise trespass on the province of the Court.

This part of Defendants' Motion in Limine is granted.

20.     *Topic Y: Prejudicial Presentation on Benson's Equal Protection Claim*

The last evidentiary issue the Court will consider in this ruling is Defendants' request for an order limiting or excluding evidence on Benson's Equal Protection Claim or requiring that such evidence be presented in a manner and order that is not unfairly prejudicial. Filing 454 at 18. Defendants first contend that Benson did not plead her Equal Protection Claims through the "mechanism" of 42 U.S.C. § 1983 in her Fourth Amended Complaint, so she should be precluded from asserting such claims now. Filing 454 at 18–19. Next, Defendants assert that Benson must first prove an underlying substantive claim against Individuals Defendants before municipal liability will even attach. Filing 454 at 19. If Benson establishes such an underly claim, Defendants point out that she will then have to establish municipal liability by proving a policy or custom of deliberate indifference. Filing 454 at 19. Defendants argue that these requirements mean that Benson should not be allowed to try to prove her underlying substantive claim by using evidence

51

of some alleged policy or customs that predated her employment or had not bearing on her employment. Filing 454 at 20.

Benson's response is twofold. First, she argues that Defendants have cited no authority for their proposed procedural limitations on when evidence relevant to some claims is introduced. Filing 472 at 31. Second, she argues that there is substantial overlap with respect to evidence on the claims and conducts or policies relevant to her equal protection claims may also be informative on the nature of work environment she faced and Defendants notice of that environment. Filing 472 at 32.

In reply, Defendants argue that nothing Benson argues changes the fact that she must first prove individual liability of individual defendants. Filing 486 at 16. They clarify that they "merely" seek an order precluding Benson from presenting evidence of non-applicable policies, prior events or unfounded "widespread" allegations, or customs that predated her employment, did not apply to her, or that she did not even know about to try to prove her claims of individual disparate treatment or harassment. Filing 486 at 16.

What Defendants describe as an issue involving the order of proof is better described as an issue involving the order of determination of claims. Indeed, this is essentially what the authority cited by Defendants states. Defendants cite *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005), for the proposition that Benson "must first prove her claims against Individuals Defendants on an underlying substantive claim before municipal liability will even attach." Filing 454 at 19. However, in *McCoy*, the Eighth Circuit stated, "This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy*, 411 F.3d at 922. Requiring findings in a particular order is a far cry from a requiring the evidence be presented in a certain order.

A more recent articulation of the standards for municipal and supervisory liability for a constitutional violation is not to the contrary:

> Under federal standards, "[a] municipality may be liable under § 1983 where 'action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Graham v. Barnette*, 5 F.4th 872, 890 (8th Cir. 2021) (citation omitted). And "a 'pattern of similar constitutional violations' is 'ordinarily necessary' to establish municipal liability." *Id.* at 891 (quoting *Connick v. Thompson,* 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). However, this showing is not required if "'the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights' that the municipality can be said to have been 'deliberatively indifferent to the need.'" *Id.* (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). As to supervisor liability, "supervisors ... are liable under § 1983 for a subordinate's violation of a third person's constitutional right only if their deliberate indifference to the offensive conduct and failure to take adequate remedial action proximately caused the injury." *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007). But "[d]eliberate indifference is a 'stringent standard of fault,'" requiring "proof of reckless disregard of a risk of constitutional harm." *Id.*

*Saunders v. Thies*, 38 F.4th 701, 715 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 1006 (2023). Thus, while there can be no municipal or supervisory liability for an Equal Protection violation unless there is an underlying constitutional violation, that does not require cordoning off evidence going to municipal or supervisory liability until after evidence of a constitutional violation by an individual defendant has been presented. Rather, it requires structuring the jury's determinations in the instructions and verdict form, so that those determinations that are prerequisites to other determinations are made in the proper order.

Furthermore, to the extent that Defendants contend that some evidence is only admissible for the limited purpose of establishing municipal or supervisory liability, the solution is an instruction on the limited use of the evidence upon a timely request by Defendants. "Evidence at trial is often admitted for a limited purpose, accompanied by a limiting instruction." *Samia v. United States*, 599 U.S. 635, ___, 143 S. Ct. 2004, 2013 (2023); Fed. R. Evid. 105. This is true even in civil trials.

This part of Defendants' Motion in Limine is denied.

## III. CONCLUSION

For the reasons set forth above, the unrestricted part of Defendants' Motion in Limine on

"topics A–Z," Filing 450, is granted in part and denied in part, as set out in detail above.

Dated this 13th day of October, 2023.


BY THE COURT:


Brian C. Buescher
United States District Judge