IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMANDA BENSON,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CITY OF LINCOLN, a political subdivision, CHRIS BEUTLER, TOM CASADY, DOUG MCDANIEL, TIM LINKE, LEO BENES, ERIC JONES, DARREN MERRYMAN, and SHAWN MAHLER,<br><br>                    Defendants. | **4:18CV3127**<br><br><br>**MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR APPROVAL OF APPLICATION FOR ATTORNEY FEES, EXPENSES, AND COSTS** |

Plaintiff Amanda Benson, a female firefighter/EMT with Lincoln Fire and Rescue (LFR), brought this action alleging violations of her civil rights against the City of Lincoln, Nebraska, the Mayor, and several LFR employees. Filing 188 (Fourth Amended Complaint). The parties ultimately settled this case for a $650,000 payment from Defendants to Benson and Defendants' agreement to pay Benson's reasonable attorney fees, expenses, and costs ordered by the Court. Filing 502 at 3 (¶ 21). This case is now before the Court on Plaintiff's Motion for Approval of Application for Attorney Fees, Expenses, and Costs. Filing 502. Benson seeks $1,668,600.75 in attorney fees, $2,955.00 in legal assistant fees, and $143,000.41 in litigation expenses through February 13, 2024, for a total of $1,814,555.16. Filing 502 at 6 (¶ 26). Plaintiff has also filed a Supplemental Motion for Approval of Supplemental Application for Attorney Fees, Expenses, and Costs. Filing 513. In that Supplemental Motion, Benson seeks attorney fees totaling $39,815.00 and additional litigation expenses and taxable court costs totaling $632.50[1] incurred from February

---

[1] Filing 512-3 in fact shows a total of $632.20 rather than the $632.50 claimed in Filing 513 at 2 (¶ 4).

4018ebdf13d9bcaa

14, 2024, through March 29, 2024. Filing 513 at 2 (¶ 4). Thus, Benson now seeks a total $1,855,002.66 in attorney fees, expenses, and costs. Filing 513 at 3.

The Court awards attorney fees, expenses, and costs but in a total amount considerably less than Plaintiff seeks, because the Court finds numerous reductions are appropriate. Consequently, the Court awards attorney fees in the amount of $638,156.07 and expenses and costs in the amount of $88,719.97 for a total of $726,876.04.

## I.   INTRODUCTION

For purposes of providing the context for the attorney fees, expenses, and costs claimed, the Court will briefly summarize the factual background to this litigation. This factual background is drawn primarily from the Court's factual summary in its ruling on Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. The Court will then provide a more thorough statement of the procedural background to demonstrate how this case has been over litigated, with Benson's attorneys as the driving force.

### A.    Factual Background

Plaintiff Amanda Benson was hired by Lincoln Fire & Rescue (LFR) on July 1, 2013, as a Firefighter/EMT. Filing 394 at 1 (¶ 1).[2] Defendants in this action are the City of Lincoln, Nebraska, various city officials, and various officers in the LFR. Filing 378 at 1–3 (¶¶ 2–10). Benson eventually became the Acting Captain on Engine 1 (E1) at Station 1 in November of 2020, then later became the Acting Captain of Truck 1 (T1) at that Station. Filing 378 at 39 (¶ 203).

---

[2] Filing 394 is Defendants' Responses to Plaintiff's Statement of Facts in Support of Plaintiff's Motion for Partial Summary Judgment, but it has the virtue of setting out both Benson's statements of facts in support of her Motion for Partial Summary Judgment, *see* Filing 376, and Defendants' responses. Filing 378 is Defendants' Statement of Undisputed Fact Material Facts in Support of Motion for Summary Judgment, and the Court will rely on it for statements that Benson does not dispute. Filing 397 is Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, but it only sets out factual statements that Benson disputes, and the Court will rely on it for that purpose.

Benson alleges that she was subjected to sexual discrimination and sexual harassment for almost the entirety of her employment with LFR. She filed charges of discrimination with the Nebraska Equal Opportunity Commission (NEOC) on August 15, 2016, *see* Filing 394 at 2 (¶ 3), and four years later with the federal Equal Employment Opportunity Commission (EEOC), on October 14, 2020, *see* Filing 394 at 2 (¶ 6). It is safe to say that many—but not all—of Benson's allegations of discrimination, harassment, and retaliation were based on conduct by Shawn Mahler, who was the Captain of the Truck Crew at Station 8. Filing 397 at 3 (¶ 25) (admitting Mahler's position).

Matters between Benson and Mahler came to a head on April 26, 2021, when LFR was called to a cardboard fire within a warehouse. Filing 378 at 43 (¶ 224). Benson and T1 arrived at the scene before Mahler and T8. Filing 378 at 44 (¶ 233). Mahler and his crew were called to the warehouse fire mid-morning. Filing 378 at 44 (¶ 230). The parties disputed several circumstances about that fire and the interaction between Benson and Mahler during that fire. When Benson spoke to and submitted a complaint to her superiors at LFR on May 5, 2021, Benson alleged Mahler had abandoned her during the fire, and that she and her crew could have been killed or injured. Filing 397 at 59 (¶ 290) (admitting this much of ¶ 290). The LFR conducted an investigation that found no rules violations, although Benson disputed its adequacy. Filing 397 at 60 (¶ 292).

Benson was unhappy with the outcome of that investigation, so Benson and her Union filed a grievance on June 9, 2021, seeking a "thorough and honest investigation" and punishment of employees who breached rules of conduct. Filing 378 at 55 (¶ 294). On June 11, 2021, Benson filed a motion for a preliminary injunction in this case asking this Court to order the City of Lincoln to discipline Mahler, enjoin Mahler from working any fire scene while discipline was pending,

3

and appoint an independent investigator of Benson's complaint about Mahler's actions during the fire. Filing 112 at 2 (¶ 8). On August 16, 2021, Judge Kopf, to whom this case was then assigned, denied Benson's Motion for Preliminary Injunction. Filing 146.

After pre-disciplinary investigations and proceedings, Benson was terminated effective November 2, 2021. Filing 394 at 1 (¶ 1); *see also* Filing 380–83 at 4 (dismissal letter). Fire Chief David Engler, who is not a party to this litigation, determined that Benson had made false allegations against Mahler and that her actions were "a direct hindrance to the effective performance of LFR's functions and reflect[ed] undue discredit upon the department," establishing "good cause" for dismissal. Filing 380 at 3 (dismissal letter).

After an arbitration, Benson was reinstated to the LFR on December 21, 2022. Filing 394 at 14–15 (¶ 27) (allegation and response). Benson concedes that any backpay period ended on the date she was reinstated to LFR. Filing 406 at 12–13; *see also* Filing 440 at 115. Reinstatement likewise eliminated any frontpay claim based on sexual discrimination, harassment, or retaliation at issue in this case.

### B.    Procedural Background

#### 1.  *The Evolution of Benson's Claims*

On July 6, 2018, well before her termination, Benson filed her original Complaint in this matter in the District Court of Lancaster County, Nebraska. Filing 1 at 4–45. In her original Complaint, Benson asserted five state-law causes of action. First, she alleged a hostile work environment and retaliatory harassment claim (based on both supervisor and co-worker conduct) in violation of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 *et seq.* Filing 1 at 37. Second, she alleged a NFEPA claim of sexual discrimination. Filing 1 at 38. Third, she alleged a NFEPA claim of retaliation. Filing 1 at 38. Fourth, she alleged a state constitutional equal protection claim of discrimination, retaliatory harassment, and retaliation

against the City of Lincoln and individual defendants. Filing 1 at 40. Finally, she asserted an equal protection claim based on the state constitution against individual defendants. Filing 1 at 42.

On August 28, 2018, Benson filed an Amended Complaint while this matter was still in state court. Filing 1 at 46–95. In the Amended Complaint, Benson's first five claims based on state law remained essentially the same, but Benson added several additional federal claims. Benson's sixth, seventh, and eighth causes of action were under Title VII of the Civil Rights Act of 1964 and paralleled her first three state law claims. Filing 1 at 86–88. Her ninth and tenth causes of action alleged violations of the United States Constitution that paralleled her state constitutional claims. Filing 1 at 89, 91. Benson asserted no eleventh cause of action, but pleaded as her twelfth cause of action a conspiracy to deprive her of her First Amendment rights under the United States Constitution pursuant 42 U.S.C. § 1985. Filing 1 at 92. Defendants removed the action to this federal court on September 7, 2018, based on the federal claims. Filing 1 at 1.

On January 4, 2019, Benson filed her Second Amended Complaint. Filing 18. Benson's Second Amended Complaint dropped the state constitutional claims, so that her Title VII claims became the fourth through sixth causes of action, Filing 18 at 50–52; her federal constitutional claims became her seventh and eighth causes of action, Filing 18 at 53 and 55; and her § 1985 conspiracy cause of action became her ninth cause of action, albeit reframed as a conspiracy to violate her equal protection rights rather than her First Amendment rights under the United States Constitution, Filing 18 at 57.

Defendants filed a Motion to Dismiss the Second Amended Complaint, Filing 23, which Judge Kopf granted in part and denied in part. Filing 30 at 29–31. More specifically, Judge Kopf dismissed the NFEPA and Title VII claims against the individual defendants because such claims could only be asserted against the City and dismissed the equal protection/retaliation claims against

the individual defendants in their individual capacities on the ground that those claims failed as a matter of law. Filing 30 at 29–30. He also dismissed the equal protection/retaliation claim against the City in the seventh cause of action. Filing 30 at 30. Judge Kopf explained that Benson's claims going forward at that point were the following:

    a.  Plaintiff's Title VII and NFEPA claims (COAs 1-6) for gender discrimination, retaliation, and hostile work environment against the City of Lincoln;

    b.  Plaintiff's § 1983 equal-protection claims against the City of Lincoln (COA 7) for gender discrimination and hostile work environment; and

    c.  Plaintiff's § 1983 equal-protection claims against Defendants Beutler, Casady, McDaniel, Linke, Benes, Jones, Merryman, and Mahler in their individual capacities (COA 8) for gender discrimination and hostile work environment.

Filing 30 at 31–32 (¶ 5). Also, pursuant to Judge Kopf's Order, Benson voluntarily dismissed her ninth cause of action for conspiracy under § 1985. Filing 31.

On April 12, 2021, Benson filed a Third Amended Complaint. Filing 94. Although the Third Amended Complaint added additional factual allegations, it did not include any additional or different causes of action.

Benson's last pleading was her Fourth Amended Complaint. Filing 188. In her Fourth Amended Complaint, Benson asserted the same eight causes of action. Thus, her first cause of action was a claim against the City of Lincoln for a sexually hostile work environment and retaliatory harassment in violation of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. §48-1101, et seq. Filing 188 at 59–60 (¶¶ 225–230). Her second cause of action was a NFEPA claim against the City of Lincoln for sexual discrimination. Filing 188 at 60–61 (¶¶ 231–235). Her third cause of action was a NFEPA claim against the City of Lincoln for retaliation. Filing 188 at 61–62 (¶¶ 236–240). Her fourth cause of action was a claim against the City of Lincoln for a sexually hostile work environment and retaliatory harassment in violation of Title

VII. [Filing 188 at 62](#)–63 (¶¶ 241–245). Her fifth cause of action was a Title VII claim against the City of Lincoln for sexual discrimination. [Filing 188 at 63](#)–64 (¶¶ 246–250). Her sixth cause of action is a Title VII claim against the City of Lincoln for retaliation. [Filing 188 at 64](#)–65 (¶¶ 251–255). Benson's seventh cause of action was against the City of Lincoln, acting "through its agents, servants, and employees, including, but not limited to, Defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, Shawn Mahler, Leirion Gaylor-Baird, and David Engler, in their official capacities," for sexual discrimination and a hostile work environment in violation of the Equal Protection Clause of the United States Constitution. [Filing 188 at 65](#)–67 (¶¶ 252–263). Her last cause of action was against individual defendants Chris Beutler, Tom Casady, Tim Linke, Doug McDaniel, Leo Benes, Eric Jones, Darren Merryman, and Shawn Mahler, in their individual capacities, alleging sexual discrimination and a hostile work environment in violation of the Equal Protection Clause of the United States Constitution. [Filing 188 at 67](#)–68 (¶¶ 264–270).

On Benson's claims in her Fourth Amended Complaint, Benson prayed that the Court would grant the following relief:

> A.     Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of sex and retaliation.
>
> B.     Ordering the Defendant to reinstate Amanda to her previous employment with the promotion to Captain that she would have been eligible for at the time of her termination;
>
> C.     Ordering the Defendant to pay Amanda back pay, front pay, compensatory damages, consequential damages, in amounts to be proven at trial, and all other affirmative and equitable relief necessary to eradicate the effects of Defendant's unlawful employment practices.
>
> D.     Direct the Defendant to expunge all negative reports, evaluations, discipline, and termination in Plaintiff's personnel file.

E. Order the Individual Defendants to pay Amanda punitive damages for their malicious and reckless conduct in an amount to be determined at trial.

F. Award the Plaintiff her reasonable attorneys' fees and expert witness fees.

G. Award Plaintiff her costs in this action.

H. Grant such further relief as the Court deems necessary and proper.

Filing 188 at 68–69.

### 2. *The Preliminary Injunction Proceedings*

Between the filing of Benson's Third and Fourth Amended Complaints, Benson filed her Motion for Preliminary Injunction, Filing 112, mentioned in § I.A., arising from Mahler's alleged conduct during the warehouse fire. Specifically, Benson asked the Court to do the following: (1) order that the City of Lincoln immediately initiate disciplinary proceedings against Mahler; (2) enjoin Mahler from assignment/dispatch to any fire scene during the pendency of disciplinary proceedings; and (3) appoint an independent third-party investigator to investigate Plaintiff's complaint about Mahler's actions at the warehouse fire. Filing 112 at 2 (¶ 8). Judge Kopf, to whom the case was then assigned, denied that Motion. Filing 146.

More specifically, Judge Kopf stated,

After careful review of the parties' briefs and evidentiary submissions, the court determines that Benson's Motion for Preliminary Injunction should be denied because the relief requested in the Motion is not of the "same character as that which may be granted finally," *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945), and the effect of the relief requested in Benson's Motion will not be to "preserve the status quo until the merits are determined," *Dataphase [Sys., Inc. v. C.L. Sys., Inc.]*, 640 F.2d [109,] 113 [(8th Cir. 1981)], but to micromanage personnel procedures and decisions of LFR.

Filing 146 at 10. Judge Kopf explained that although Benson's Third Amended Complaint sought a permanent injunction against discrimination based on sex and retaliation, the relief requested in her Motion for Preliminary Injunction was "not to remedy discriminatory employment practices,

8

but to impose directives upon LFR regarding whom it should discipline, whom it should send to fire scenes, and whom to investigate—issues in which federal courts should not be involved." Filing 146 at 11. Judge Kopf also found that Benson had failed to show that Mahler engaged in retaliatory or discriminatory conduct in the warehouse fire. Filing 146 at 12.

Judge Kopf then considered the so-called *Dataphase* factors that must be satisfied to obtain a preliminary injunction. Filing 146 at 12.[3]Judge Kopf found Benson had not shown any future discrimination by Mahler was certain or imminent, where Judge Kopf found none had occurred in the incident in question. Filing 146 at 13. Judge Kopf also found that any potential injuries to Benson could be compensated through a damages award, so that there was no showing of irreparable harm. Filing 146 at 13. Judge Kopf found that where no irreparable harm to Benson had been shown, the greater harm would be to Mahler if the preliminary injunction were granted. Filing 146 at 13. Judge Kopf also found that it was not in the public's interest for a court to dictate how the LFR investigated, disciplined, or suspended employees. Filing 146 at 14. Finally, he found that even if Benson could show a likelihood of success on the merits, the relative harms to the parties and the public weighed against the requested preliminary injunction. Filing 146 at 14.

It is apparent to the Court that Benson's Motion for Preliminary Injunction was neither reasonable nor well-considered and thus was excessive and unnecessary for precisely the reasons Judge Kopf rejected any relief. Defendants allege that Plaintiff's counsel expended at least 206.6 hours in relation to the failed Motion for Preliminary Injunction. Filing 508 at 19–20. Benson

---

[3] As Judge Kopf explained, "In *Dataphase*, the court, sitting en banc, clarified the factors district courts should consider when determining whether to grant a motion for preliminary injunctive relief: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest." Filing 146 at 2 (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).

nowhere disputes Defendants' calculation of the hours spent on that Motion. *See generally* Filing 514.

### 3. Discovery and Discovery Disputes

Benson acknowledges that discovery in this case was "extensive." Filing 503 at 9. She explains,

> There were 35 depositions taken. (Brandon Aff. ¶ 57, pp. 17-22). The parties propounded a total of 129 Interrogatories and 363 Requests for Production of Documents. (Brandon Aff. ¶ 47, p. 15). Discovery responses and Rule 26(a)(1) Disclosures were repeatedly supplemented. Id. A total of 76,803 pages of documents were produced. Id.

Filing 503 at 9. Defendants point out that Benson "insisted" on 30 depositions over Defendants' objections. Filing 508 at 15. The amount of discovery in this case was out of all proportion to a case that ultimately was rather straightforward: a single plaintiff was suing her former employer for various claims regarding her former employment. *See* Filing 491 at 2 (order setting out expectations for trial). It was the parties' counsel—and the Court now adds, Benson's attorneys in particular—that made this case overly complicated. *See* Filing 491 at 2.

There were also several discovery disputes, some of which this Court attributes to Benson's attorneys taking unreasonable and ill-conceived positions resulting in excessive and unnecessary hours of attorney time. One such example is that on April 14, 2022, Judge Kopf had overruled Benson's Objections to a magistrate judge's ruling that privilege applied to documents generated by the City's outside counsel, Torrey Gerdes of Baylor Evnen, in connection with Gerdes's investigation of Benson's claim that Mahler abandoned her in a burning warehouse. Filing 252. Nevertheless, Benson continued to seek Gerdes's investigative file. Consequently, after this case was reassigned to the undersigned on April 14, 2022, owing to the impending retirement of Judge Kopf, Filing 253, the Court was required to revisit the privilege issue on March 1, 2023. *See* Filing 365.

Upon revisiting that issue, the Court rejected Benson's argument that Defendants waived attorney-client and work-product privileges by disclosing Gerdes's Investigation Report concerning the warehouse fire incident and stating that they would rely on it at summary judgment or trial. Filing 365 at 1–2. The Court concluded that the record demonstrated that Defendants had not put the attorney's investigation "at issue" in support of an affirmative defense or another defense premised on the attorney's advice or the adequacy of the attorney's investigation. Filing 365 at 2–3. Instead, the Court found that Defendants offered the attorney's investigation for a very different reason, that is, to show a legitimate, nondiscriminatory and/or nonretaliatory reason for terminating Benson's employment. Filing 365 at 3. The Court found that Benson's contrary arguments "did not bear scrutiny," for numerous reasons. Filing 365 at 19–20.

Defendants assert that Benson's attorneys spent approximately 185.1 hours (and $76,232.50 in fees at their claimed hourly rates) repeatedly and unsuccessfully trying to obtain Gerdes's privileged investigative file. Filing 508 at 20. Benson's attorneys continue to assert that "substantial caselaw" supported the contention that the Gerdes investigation was not privileged, Filing 514 at 8, but the Court rejected that contention when it ruled on the privilege issue. On the other hand, Benson's attorneys do not dispute the number of hours that Defendants allege Benson's attorneys expended on litigating this meritless issue based on their mistaken or willful misconception of Defendants' reasons for offering the investigation report. *See generally* Filing 514.

This overlitigation of the privilege issue is emblematic of Benson's attorneys' overlitigation of the entire case resulting in excessive and unnecessary hours of attorney time.

### 4. The Failed Motion for Partial Summary Judgment

Plaintiff's Motion for Partial Summary Judgment regarding Defendants' affirmative defenses of failure to mitigate and after-acquired evidence, Filing 373, also needlessly multiplied

the litigation and had little chance of success. On July 31, 2023, the Court entered its Memorandum and Order Regarding Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. Filing 440. As to the defense of failure to mitigate damages, the Court took note of Benson's concession that she was reinstated to employment with LFR on December 21, 2022, after arbitration, Filing 440 at 13, and her further concession that the backpay period ended upon her reinstatement. Filing 440 at 15 (citing Filing 406 at 12–13). The Court denied Benson's challenge to the failure-to-mitigate defense for the following reasons:

> The Court recognizes that the standard for comparison [for purposes of mitigation] is that the positions are "substantially equivalent," not that they are identical. At bottom, a reasonable jury could conclude that Benson did not make reasonable efforts to obtain another "substantially equivalent" position in light of evidence of the limitations she placed on her job search, and evidence that she actually went from one interim job to another that paid less. This is so, for example, because of the difference between the thousands of professional fire departments identified by Defendants and the four applications to fire departments Benson had made as of July 2022.

Filing 440 at 17 (citations omitted). For these reasons, the Court now concludes that this part of Benson's Motion for Partial Summary Judgment was unreasonable and ill-conceived and resulted in unnecessary hours of attorney time.

Benson's challenge to the after-acquired-evidence defense was even less reasonable and had even less chance of success. Filing 440 at 18. That is so because the challenge was already moot where Defendants had already withdrawn this defense. Filing 440 at 18 (citing Filing 394 at 13). Indeed, Defendants had notified Benson of withdrawal of the defense in October 2022, Filing 392 at 2, well before Benson filed her Motion for Partial Summary Judgment on May 1, 2023. Filing 373. Benson even acknowledged that the defense had been withdrawn in her brief in support of her Motion for Partial Summary Judgment. Filing 375 at 10–11. Although Benson agreed that Defendants had already waived the defense, she still argued in her reply brief that there was no evidence to support it and that it should be dismissed with prejudice, Filing 406 at 1, or stricken,

Filing 406 at 2–3. *See* Filing 440 at 18. That argument had at best little chance of success, if it was not simply a frivolous dispute for the sake of dispute.

Defendants assert that 40.9 hours and $17,325.50 in attorney fees were related to Benson's failed Motion for Partial Summary Judgment. Filing 508 at 21. Benson's attorneys do not dispute the number of hours that Defendants allege Benson's attorneys expended on litigating that meritless Motion. *See generally* Filing 514.

       5. *Evidentiary Disputes*

The evidentiary disputes provide several examples of the extent to which this case was over litigated. Consequently, the Court will set out here only some of the specific instances of overlitigation of the evidentiary disputes as examples. The first such example concerns Plaintiff's expert Amy Oppenheimer, and a second concerns Benson's intent to call the current Mayor of the City of Lincoln. The Court will then make some more general observations about the evidentiary disputes.

       a.   Oppenheimer's Expert Testimony

On June 30, 2023, Defendants filed their Motion to Exclude the Testimony of Plaintiff's Designated Expert, Amy Oppenheimer. Filing 425. Benson stated in opposition that she intended to offer the expert opinions of Amy Oppenheimer, an attorney not licensed in Nebraska, on the acceptable human resources practices of employers in response to complaints of workplace discrimination, harassment, and retaliation and whether Defendants' actions with respect to Benson met the standard of care. Filing 430 at 3.

On August 18, 2023, the Court granted Defendants' Motion to exclude Oppenheimer's testimony. Filing 456. The Court excluded Oppenheimer's testimony because it would not be useful to the finder of fact in deciding an ultimate issue of fact, *i.e.*, on the basis of lack of relevance of her testimony. Filing 456 at 19. The Court found Oppenheimer's testimony unhelpful because

the facts involved in the investigations and questions about the adequacy of the investigations were not so complicated as to require the testimony of an expert witness. Filing 456 at 19. Rather, they were ones on which a layperson juror would be able to make a commonsense determination without an expert's aid. Filing 456 at 19. The Court concluded that Oppenheimer's testimony also would not be helpful to the jury because Oppenheimer could not properly testify to questions of law that invade the province of the Court or to factual determinations that invade the province of the jury. Filing 440 at 20. Also, Oppenheimer's testimony was improper because it would have been at least an indirect comment on the credibility of Defendants' reasons for their decisions, which clearly would have invaded the province of the jury. Filing 440 at 20. Again, the Court concludes that Benson had little chance of success on an argument for the admissibility of Oppenheimer's testimony, making the litigation of that issue a wasteful overcomplication of the case.

Benson asserts that attempting to use Oppenheimer's expert testimony was reasonable, Filing 514 at 21, but she does not contest Defendants' tally of attorney hours spent on obtaining and defending Oppenheimer's expert testimony, *see generally* Filing 514. Defendants assert that Benson's attorneys spent 93.3 hours and $44,730 in fees fighting over the admissibility of Oppenheimer's testimony. Filing 508 at 20.

b. Testimony from Mayor Gaylor Baird

One of the clearest examples of wasteful litigation on evidentiary issues involved Benson's attempt to call Leirion Gaylor Baird, the current Mayor of the City of Lincoln. Benson's intention to call Mayor Gaylor Baird prompted Defendants' August 15, 2023, Motion in Limine to Exclude Lincoln Mayor Gaylor Baird from Being Called as Witness for Trial by Plaintiff. Filing 447. The Court noted in its Memorandum and Order on that Motion in Limine, Filing 479, that Benson's attorneys' characterization of communications between Benson and Mayor Gaylor Baird was "not

14

the only instance in Benson's briefing of the present Motion that presents a doubtful characterization of evidence rather than a statement of fact." Filing 479 at 5. The Court added, "These instances cast doubt on the credibility of her further allegations about Mayor Gaylor Baird's involvement or interference in investigations of the complaints of Benson or other City employees." Filing 479 at 5. They are also regrettably examples of the manner in which Benson's attorneys litigated this case.

The Court excluded Mayor Gaylor Baird's testimony. Filing 479. In its ruling, the Court was not receptive to the notion that anyone is too busy, important, or high-ranking to respond to a subpoena to appear to testify at a trial in federal court on a matter on which that person has relevant information. Filing 479 at 9. Nevertheless, the Court concluded that exclusion of Mayor Gaylor Baird's testimony was appropriate.

Specifically, the Court found that "Benson's own assemblage of information about the City's EAD Plan, EEO operations, investigation of employee complaints of harassment, discrimination, or retaliation, and who was involved in what decision-making demonstrate[d] that Mayor Gaylor Baird does not have 'unique or special knowledge' not available from other sources." Filing 479 at 12. The Court also found that Benson had not shown that the Mayor was directly involved in the investigation of Benson's complaints or the decision to terminate her. Filing 479 at 12. The Court found that Benson sought Mayor Gaylor Baird's testimony primarily— if not entirely—because she is the highest-level executive of the City, not because she had any special knowledge or involvement in the matters in dispute. Filing 479 at 13. "Indeed," the Court stated, "the Court is left with the firm conviction that the demand for the Mayor's testimony [wa]s for punitive reasons rather than because the Mayor ha[d] information relevant to a claim or defense in th[e] action." Filing 479 at 13–14 (citation omitted). This finding alone demonstrates the

15

unreasonableness of the attempt to call the Mayor as a witness and the waste of resources caused by Benson's attorneys' attempt to do so. However, in addition, the Court determined that the Mayor's testimony had little probative value, and that little probative value was substantially outweighed by other considerations under Rule 403. *See* Filing 479 at 17–19. The Rule 403 analysis further demonstrates the unreasonableness of the attempt to call the Mayor and the unnecessary waste of attorney time.

Neither Defendants nor Benson calculated or estimated the amount of time spent on Benson's attempt to call Mayor Gaylor Baird. Thus, the Court is left to its own devices to determine what if any reduction is appropriate for that unnecessary litigation. The Court finds that it is appropriate to account for that wasteful attempt in the reduction for wasteful evidentiary disputes addressed next.

c. Wasteful Evidentiary Disputes

In addition to a reduction for the hours not reasonably expended on the dispute over Oppenheimer's expert testimony, the Court finds that a further reduction of hours is appropriate for other wasteful evidentiary disputes, including the Motion related to Mayor Gaylor Baird. The Court concludes—conservatively—that 25% of the time Benson's attorneys expended on Motions in Limine and evidentiary issues not including those related to Oppenheimer was expended on arguments with little chance of success and therefore such time was not reasonably expended and was simply unnecessary.

On October 10, 2023, in the undersigned's last Order before the case settled, the Court set out expectations for trial following the final continuance of the trial date. Filing 491. In that Order, the Court made the following observations about the extensive litigation of evidentiary issues:

> The Court notes that it has now issued over 180 pages of orders in response to approximately 57 topics (some with several subparts) raised in motions in limine alone. *See* Filing 456 (21 pages on motion to exclude two experts); Filing 479 (19

16

>pages on motion to exclude testimony of current Mayor of Lincoln, NE); Filing 488
>(54 pages on motion to exclude evidence on 26 topics with subparts); Filing 489
>(restricted) (46 pages on motion to exclude evidence on 5 topics with subparts);
>Filing 490 (45 pages on motion to exclude evidence on 22 topics with subparts). . . .
>The Magistrate Judge has likewise expended significant time on this case.

Filing 491 at 1. It was this record that prompted the Court's observation, "It is the counsel that have made this case overly complicated." Filing 491 at 2. It is true that this observation was applied to counsel for both Benson and Defendants at the time; however, the Court now finds that Defendants were forced to respond in kind to Benson's attorneys' litigation strategy. The Court also observed that it had written 180 pages on motions in limine alone, resulting in exclusion of "numerous exhibits and evidence that the law illustrates should have never been offered for admission in the first place." Filing 491 at 2. In an attempt to rein in overlitigation of the case and to avoid further waste of time and resources, the Court announced that it would limit the trial to eight trial days rather than the thirteen to fourteen days Benson's attorneys had asserted would be required. Filing 491 at 2.

>6.   *Settlement of the Case*

On January 2, 2024, a magistrate judge entered an Order stating that the parties had notified the Court that they had settled the case. Filing 495. On January 10, 2024, the parties filed a Joint Stipulation for Entry of Stipulated Order of Dismissal upon settlement of the case. Filing 498. On January 16, 2024, the Court entered the parties' Stipulated Order of Dismissal. Filing 500. As described by Benson, the settlement "requires Defendants to pay $50,000 to Amanda Benson for her lost wages through December 1, 2022, and $600,000 for her emotional distress damages, as well as her attorney fees, expenses, and court costs." Filing 503 at 2.

With this survey of the course of this litigation in mind, the Court now turns to evaluation of Benson's attorneys' request for attorney fees, expenses, and costs.

## II. ATTORNEY FEES

"A request for attorney[s'] fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Beckler v. Rent Recovery Sols., LLC*, 83 F.4th 693, 695 (8th Cir. 2023). Unfortunately, in this case it has had such a result, as demonstrated by the fact that at 76 pages this is the longest of several long rulings in this case. See Filing 491 at 1 (detailing the length of rulings on evidentiary issues); Filing 365 (37-page ruling on objections to magistrate judge's order on privilege issues related to the Gerdes investigation). It is true that most of the issues concerning attorney fees were raised by Defendants, but they were compelled to respond to what the Court has already found was overlitigation of the case by Benson's attorneys.

### A.      The Appropriate Methodology

The Court finds that it must resolve a preliminary matter concerning what methodology it should use to determine a reasonable attorney fees award. The usual method is the "lodestar method," which begins by determining the number of hours reasonably expended at a reasonable hourly rate, then making other adjustments if appropriate in the circumstances of the case. *See, e.g.*, *Marshall v. Anderson Excavating & Wrecking Co.*, 8 F.4th 700, 712 (8th Cir. 2021). However, Defendants invite the Court to use instead proportionality between the attorney fees award and the settlement amount, *i.e.*, the amount recovered. Filing 508 at 1. Thus, the Court will consider whether Defendants' "proportionality" methodology is appropriate.

#### 1.   Defendants' "Proportionality" Methodology

Defendants assert that the claimed fees (prior to February 14, 2024) in the amount of $1,671,555.75 are disproportionate to the settlement amount of $650,000. Filing 508 at 1. As an alternative to reduction of the fees based on excessive hourly rates and excessive hours, Defendants propose an award of half the parties' settlement amount, that is, $325,000, for attorney fees. Filing 508 at 3. They argue that this amount is roughly equivalent to the reductions in rates and hours

18

they propose and commensurate with Benson's "modest" outcome. Filing 508 at 3–4. Benson counters that such a "proportionality" method would be improper. Filing 514 at 2. Indeed, Benson contends that the Eighth Circuit Court of Appeals has explicitly rejected a rule of proportionality between fees and recovery in civil rights cases. Filing 514 at 2 (citing *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 581 (8th Cir. 2006)). Benson also asserts that it is not unusual for fee awards to exceed recoveries in civil rights cases, where the purpose of fee shifting is to ensure the availability of attorneys to litigate such cases because of the potential for relatively small damages awards. Filing 514 at 2–3.

Benson is correct that the Eighth Circuit stated in *Simpson*, "We have, indeed, explicitly rejected a 'rule of proportionality [between fees and recovery] in civil rights cases because tying the attorney's fees to the amount awarded would discourage litigants with small amounts of damages from pursuing a civil rights claim in court." 441 F.3d at 581 (citing *Jackson v. Crews*, 873 F.2d 1105, 1110 (8th Cir. 1989)); *see also Smith v. AS Am., Inc.*, 829 F.3d 616, 625 n.8 (8th Cir. 2016) (quoting this statement from *Simpson*, 441 F.3d at 581). More recently, in an ERISA case, the Eighth Circuit explained,

> "In a lodestar case, refusing to require that fee awards be strictly proportionate to damages awards makes eminently good sense." [*Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emps. v. Ray Haluch Gravel Co.*, 745 F.3d 1, 6 (1st Cir. 2014)]. This is because "'[t]here are fixed costs of litigation,' so a rigid proportionality rule would allow defendants to 'inflict[ ] with impunity small losses on the people whom they wrong.'" *Id.* (alterations in original) (quoting *Orth [v. Wis. State Emps. Union, Council 24]*, 546 F.3d [868,] 875 [(7th Cir. 2008)]. But a fee-setting court is not forbidden, "in appropriate circumstances, from considering proportionality as one factor among many in determining the amount of fees." *Id.* (citing *City of Riverside [v. Rivera]*, 477 U.S. [561,] 574 [(1986) (plurality op.)]. As a result, "a fee-setting court can take the amount of damages recovered into account." *Id.* But "proportionality cannot be used as the sole determinant of a lodestar-based fee award." *Id.*

*Marshall*, 8 F.4th at 713.

This Court concludes that while there is a place to consider proportionality between a fee award and a plaintiff's recovery, adopting Defendants' strict proportionality would be impermissible, because "proportionality cannot be used as the sole determinant of a lodestar-based fee award." *Id.* (citation omitted). Consequently, the Court turns to a summary of the lodestar method for determining an attorney fees award and the role that proportionality between fees and the award may play in that method.

### 2. *The Lodestar Method*

Again, "[a] request for attorney[s'] fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Beckler v. Rent Recovery Sols., LLC*, 83 F.4th 693, 695 (8th Cir. 2023). Rather, "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.'" *Beckler*, 83 F.4th at 695-96 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)); *Blackorby v. BNSF Ry. Co*., 60 F.4th 415, 420 (8th Cir. 2023) (explaining that the lodestar method "is meant to produce an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case" (quoting *League of Women Voters of Mo. v. Ashcroft*, 5 F.4th 937, 939 (8th Cir. 2021), with emphasis in the original)).

The "fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. The determination of what is "a reasonable attorneys' fee is a matter peculiarly within the district court's discretion." *Marshall v. Anderson Excavating & Wrecking Co.*, 8 F.4th 700, 712 (8th Cir. 2021) (quoting *Greater Kan. City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 931 (8th Cir. 1984) (applying 29 U.S.C. § 1132(g)(2)(D))); *Hanig v. Lee*, 415 F.3d 822, 825 ("Attorney[s'] fees are within the broad discretion of the district court."). "Although there is no one methodology for calculating an award of fees, it is important 'for the district court to provide a concise but clear

explanation of its reasons for the fee award.'" *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 93 F.4th 408, 421 (8th Cir. 2024) (quoting *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 966 (8th Cir. 2012), in turn quoting *Hensley*, 461 U.S. at 437).

"The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates." *Jet Midwest*, 93 F.4th at 420 (quoting *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir. 2002); *Beckler v. Rent Recovery Sols., LLC*, 83 F.4th 693, 695 (8th Cir. 2023). In other words, "the court should calculate the reasonable hourly rate and the reasonable number of hours worked [and] use these two variables to calculate the lodestar. . . ." *Id.* (quoting *Burton v. Nilkanth Pizza Inc.*, 20 F.4th 428, 431 (8th Cir. 2021)). A court's failure to calculate the lodestar may result in reversal. In *Jet Midwest*, the claimant had provided the district court with lodestar charts and other information, but the district court never set forth its lodestar calculation before considering other factors to calculate the attorney fees award. *Id.* at 421. As the Eighth Circuit explained,

> "Because the record contains no lodestar calculation, we vacate the award of attorneys' fees." *Vines [v. Welspun Pipes Inc.]*, 9 F.4th [849,] 857 [(8th Cir. 2021)]. The district court's consideration of additional factors "should come after the district court calculates the lodestar and has moved on to [adjusting] that number." *Id.*

*Jet Midwest*, 93 F.4th at 421. Indeed, "[t]here is a 'strong presumption' that the lodestar figure is reasonable." *Id.* at 420. However, the Eighth Circuit "accord[s] 'substantial deference' to a district court's determination that fees were excessive." *Beckler*, 83 F.4th at 695 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

Although calculating the lodestar is undeniably important, the presumption that it is reasonable "may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Jet Midwest*, 93 F.4th at 420 (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554

(2010)); *Blackorby*, 60 F.4th at 420. The district court must "generally evaluate 'the ultimate reasonableness of the award . . . by considering relevant factors . . .'" *Jet Midwest*, 93 F.4th at 420 (quoting *League of Women Voters of Mo.*, 5 F.4th at 941)). Thus, after calculating the lodestar amount, a district court "may [then] consider other factors to 'adjust the fee upward or downward.'" *Marshall*, 8 F.4th at 712 (quoting *Smith v. AS Am., Inc.*, 829 F.3d 616, 623 (8th Cir. 2016), in turn quoting *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 965 (8th Cir. 2012)).

Having determined that the lodestar methodology is the appropriate one to use in this case, the Court turns to the attorney fees claimed by Benson's attorneys.

### B.    The Fees Claimed

As mentioned at the outset of this opinion, Benson's Motion for Approval of Application for Attorney Fees, Expenses, and Costs seeks $1,668,600.75 in attorney fees and $2,955.00 in legal assistant fees through February 13, 2024, Filing 502 at 6 (¶ 26), for a subtotal award of $1,672,281.75 in attorney fees. Filing 503 at 1. Benson's Motion reflects that this fee award is for a total of 4,140.83 hours among 28 providers. Filing 502 at 4–6 (¶ 26). In addition, Benson's Supplemental Motion for Approval of Supplemental Application for Attorney Fees, Expenses, and Costs seeks $39,815.00 in attorney fees from February 14, 2024, through March 29, 2024. Filing 513 at 2 (¶ 4). Benson's Supplemental Motion reflects that the supplemental fee award is for a total of 79.3 hours among 4 providers. Thus, Benson seeks a total of $1,712,096.75 in attorney fees for 4,220.13 hours.[4] Some further breakdown is appropriate.

Benson's submissions show that Paige Fiedler billed a total of 804.2 hours at $600 per hour for a total of $482,520 in fees.[5] Kelly Brandon billed a total of 2,043.3 hours at $425 per hour for

---

[4] $1,672,281.75 + $39,815.00 = $1,712,096.75; 4,140.83 + 79.3 = 4,220.13.

[5] Filing 502 at 4 (¶ 26) (769.1 hours for $461,460.00); Filing 513 at 2 (¶ 5) (35.1 hours for $21,060.00).

a total of $868,530 in fees.[6] Thus, between them, Paige Fiedler and Kelly Brandon claimed $1,351,050 in fees[7] for 2,847.5 hours.[8] The remaining hours were billed by 12 other attorneys at rates ranging from $375 per hour down to $125 per hour (1,056.63 hours);[9] 10 law clerks at $100 per hour (286.45 hours);[10] and 1 paralegal and 3 legal assistants at $100 per hour (29.55 hours),[11] for a total of 1,372.63 hours[12] and $361,046.75 in fees.[13] By the Court's calculation, Paige Fiedler worked 19.06% of the hours claimed,[14] but she seeks 28.18% of the total fees claimed.[15] Kelly Brandon worked 48.42% of the hours claimed,[16] but she seeks 50.73% of the total fees claimed.[17]

To account for the percentage of work from each of Benson's 28 legal services providers in this case at their claimed hourly rates, the Court derives a "weighted average hourly rate as claimed." The "weighted average hourly rate as claimed" is derived by dividing the total fees claimed by the total hours claimed. This "weighted average hourly rate as claimed" reflects the percentage of each attorney's contribution to the work on the case at each attorney's claimed hourly rate. Specifically, where more hours are billed at a higher rate, the "weighted average hourly rate" will be higher. In contrast, simply averaging the hourly rates of all the attorneys and legal assistants who worked the case would result in an hourly rate that reflected the undue impact of

---

[6] Filing 502 at 4 (¶ 26) (1,999.4 hours for $849,872.50); Filing 513 at 2 (¶ 5) (43.9 hours for $18,657.50).

[7] $482,520 + $868,530 = $1,351,050.

[8] 804.2 + 2,043.3 = 2,847.5.

[9] Filing 502 at 5–6 (¶ 26) (1,056.33 hours); Filing 513 at 2 (¶ 5) (.3 hours).

[10] Filing 502 at 5 (¶ 26).

[11] Filing 502 at 6 (¶ 26).

[12] 1,056.63 + 286.45 + 29.55 = 1,372.63.

[13] $1,712,096.75 – $1,351,050 = $361,046.75.

[14] 804.2 ÷ 4,220.13 = 0.19056.

[15] $482,520 ÷ $1,712,096.75 = 0.2818.

[16] 2,043.3 ÷ 4,220.13 = 0.4842.

[17] $868,530 ÷ $1,712,096.75 = 0.5073.

relatively more numerous lower-paid attorneys who made a relatively smaller contribution to the work in the case.

Using this "weighted average hourly rate as claimed" allows the Court to make fair and reasonable determinations about the total fees to award in cases, such as this one, where the use of multiple attorneys makes it impracticable to assign any adjustment in hours to any particular attorney at any particular rate. For example, now-retired Judge Richard G. Kopf of this District used a "weighted average hourly rate" in a case in which lead counsel had assumed a larger than pro rata share of the responsibility for the prosecution of the cases. *Tabech v. Gunter*, 869 F. Supp. 1446, 1457 n.7 (D. Neb. 1994) (finding that the weighted effective average current billing rate for all members of a firm was approximately $102, where the contributing attorneys billed $100 per hour, $110 per hour, and $140 per hour). More recently, various courts have used "weighted average hourly rates" in cases involving multiple attorneys to determine an hourly rate for purposes of the lodestar calculation.[18] Doing so is in keeping with the goal of a fee that is a fair approximation of the fees properly claimed rather than mathematical precision. *See Beckler*, 83

---

[18] See, e.g., *In re Altria Grp., Inc.*, No. 3:20CV772 (DJN), 2023 WL 2116803, at *3 (E.D. Va. Feb. 20, 2023) (accepting plaintiffs' counsel's calculation of their lodestar figure in a shareholder derivative action "by multiplying 19,398.65 total hours worked by a blended hourly rate of $601.31, which represents the weighted average of the hourly rates for each of the six firms comprising Plaintiffs' Counsel"), *id.* at *7 n.11 ("The reported hourly rates among the six firms comprising Plaintiffs' Counsel fall within the following ranges: (i) Paralegals: $ 135/h to $305/h; (ii) Staff Attorneys: $350/h to $675/h; (iii) Associates: $350/h to $750/h; Partners: $500/h to $1,295/h."); *CoreCivic, Inc. v. Candide Grp., LLC*, No. C 20-03792 WHA, 2022 WL 16823696, at *7 (N.D. Cal. Nov. 8, 2022) ("In sum, this order finds 135 hours reasonable for defense counsel to respond to the anti-SLAPP suit. Using the proportion of purportedly-incurred fees per attorney and paralegal as well as the actual hourly rates that defense counsel charged, the weighted average of defense counsel's hourly rates is approximately $338 (see Burke Decl. ¶ 19; Burke Suppl. Decl. ¶ 7). Multiplying that hourly rate by 135 hours yields $45,630.00 in attorney's fees."); *Fed. Trade Comm'n v. Digital Altitude, LLC*, No. LACV1800729JAKMRWX, 2020 WL 10501849, at *5 (C.D. Cal. Oct. 5, 2020) (determining the weighted average hourly rate for four attorneys and various administrative assistants and using "[t]he weighted average rate is $204, which is lower than the blended hourly rate of $210 agreed to between Receiver and the FTC"); *Kong v. Margaret M. Harris Corp.*, No. CV182112MWFFFMX, 2020 WL 4018294, at *7 (C.D. Cal. Mar. 5, 2020) ("In light of the range of rates approved for the same attorneys over the past year and in light of the fact that Plaintiff's counsel is requesting up to 40 percent increase in their rates, the Court will not approve the full rate requested by Plaintiff. Instead, the Court will adjust the weighted average of the hourly rate from $478.96 to $425."); *Mohammadi v. Nwabuisi*, No. 5:12-CV-042 RP, 2016 WL 9450697, at *5 (W.D. Tex. June 13, 2016) ("Dividing the lodestar of $59,237.50 by 218.8 hours billed, the Court calculates that Plaintiff is requesting a weighted average hourly rate of $270.74 per hour."), aff'd, 673 F. App'x 443 (5th Cir. 2017).

F.4th at 695-96 (explaining that "rough justice" not "auditing perfection" is required (quoting *Fox*, 563 U.S. at 838)); *Blackorby*, 60 F.4th at 420 (explaining that a fee award must "roughly" approximate the fee received from a paying client in a comparable case).

Here, dividing the total fees claimed by the total hours claimed results in a weighted average hourly rate as claimed of $405.70.[19] Thus, the weighted average hourly rate claimed is within $20 per hour of the $425 hourly rate charged by the attorney who worked the greatest number of hours, Kelly Brandon. In contrast, simply averaging of the rates of all 28 attorneys and legal assistants who worked on the case results in an average hourly rate of $211.25, but the lower paid attorneys worked relatively few of the hours claimed.

The Court will conduct its analysis of what is a reasonable fee in two steps. First, the Court will calculate the lodestar by determining the reasonable hourly rate for hours reasonably expended. *Marshall*, 8 F.4th at 712. In making those determinations, the Court will keep in mind that it need not simply accept either the rates or the hours claimed. *See Jet Midwest*, 93 F.4th at 420 ("The court has great latitude to determine a reasonable hourly rate" and "a district court need not accept counsel's submission of hours as conclusive. . . ." (internal quotation marks and citations omitted)). The Court will then consider whether other factors warrant adjusting the fee upward or downward. *Marshall*, 8 F.4th at 712.

### C.    The Lodestar Calculation

In calculating the lodestar, the law does not appear to require the Court to consider the reasonable hourly rate and the hours reasonably expended in that order. Nevertheless, the Court will begin with the reasonable hourly rate, as it is probably the most hotly contested issue in this case. Also, the Court will not attempt to determine precisely which attorneys' hours at what rates

---

[19] $1,712,096.75 ÷ 4,220.13 hours = $405.697 per hour.

should be allowed or eliminated. Rather, the Court will use a weighted average hourly rate as adjusted by the Court times the total hours the Court finds were reasonably expended. This will reasonably—if somewhat "roughly"—"approximate the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Blackorby*, 60 F.4th at 420 (quoting *League of Women Voters of Mo.*, 5 F.4th at 939). The Court will use the weighted average hourly rate as claimed ($405.70) as a reference point for any adjustment in the hourly rate.

### 1.  *The Reasonable Hourly Rate*

Although "[a] request for attorney[s'] fees should not result in a second major litigation," *Hensley*, 461 U.S. at 437, the parties here have engaged in a pitched battle over the appropriate hourly rates for Benson's various attorneys. Like many battles, the result will likely leave both sides aggrieved.

### a.  The Parties' Arguments

Benson argues that her attorneys' hourly rates are reasonable and are the hourly rates that their clients routinely pay them. Filing 503 at 14. She argues that this contention is supported by Defendants' attorneys' rates as well as the rates of other defense counsel in the Omaha legal community and throughout the Midwest. Filing 503 at 14. Indeed, Benson asserts that hourly rates for partners at Defendants' attorneys' law firm range from $250 to $450. Filing 503 at 4. She contends further that employment defense attorneys in Omaha with varying amounts of experience have charged $300 to $600 per hour. Filing 503 at 4. Benson also explains that, while defense attorneys are paid periodically, usually within a month or two of performing services, her counsel are seeking current hourly rates rather than historical rates because of the length of this litigation and the delay in payment of the fees that counsel earned. Filing 503 at 5, 14. She also argues that

an award of the full claimed hours at the claimed hourly rates[20] is appropriate to vindicate the public interest in civil rights suits. Filing 503 at 16. Benson argues that no reduction in the hourly rates claimed is appropriate, even if they exceed local rates, where above-average rates are warranted by her two lead attorneys' experience, reputation, and ability. Filing 503 at 24, 28–29.

Defendants counter that Paige Fiedler's and Kelly Brandon's hourly rates—$600 and $425, respectively—are excessive for this jurisdiction. Filing 508 at 8. They point out that the Court has recently stated that $350 per hour is "at the top of the regional legal market" for employment litigation. Filing 508 at 9 (quoting *Beran v. VSL N. Platte LLC*, 2023 WL 6883630, at *5 (D. Neb. Oct. 18, 2023)). They also point out that another judge of this Court observed in another recent case that "[r]ecent fee applications reflect attorney billing rates for experienced litigators in Nebraska range from $250 to $350 per hour." Filing 508 at 9 (quoting *BJ's Fleet Wash v. City of Omaha*, 2023 WL 2964432, at *5 (D. Neb. Mar. 8, 2023)). Defendants also argue that nearly all the affidavits of other attorneys in support of Benson's attorneys' hourly rates are from attorneys who mostly represent plaintiffs in employment discrimination matters, so that the affiants are willing to support excessively high rates. Filing 508 at 10. Defendants urge the Court to determine the reasonable hourly rates by reference to the marketplace, which they contend includes consideration of their lead attorney's and co-counsel's hourly rates of $300 in this case. Filing 508 at 10. Defendants also explain that Benson relied on Defendants' attorneys' firm-wide rates, rather than the rates that they routinely charged for comparable work. Filing 508 at 11. Defendants argue for reducing Ms. Fiedler's hourly rate to $360 (even though that is higher than the general upper

---

[20] Benson frames this argument in terms of an award of "the full lodestar," by which she appears to mean all the hours claimed at the rates claimed. Filing 508 at 16. That is not the definition of the lodestar. However, she then correctly states, "The 'lodestar' amount of fees is computed by multiplying the number of hours reasonably expended on the litigation times the reasonable hourly rates of the attorneys." Filing 508 at 16." The Court believes that it has correctly characterized Benson's argument to be that her counsel should be awarded the full claimed hours at the claimed rates because the hours and rates claimed are reasonable.

27

limit of $350 per hour that they recognize) and reducing Ms. Brandon's hourly rate to $300, Filing 508 at 12, along with reductions in hourly rates for Benson's attorneys who charged $300 or more per hour to rates ranging between $250 and $300 per hour. Filing 508 at 13–14.

In reply, Benson argues that her attorneys' hourly rates are reasonable and that the fee resulting from hours claimed multiplied by hourly rates claimed is fair. Filing 514 at 9. She asserts that the rates her attorneys charged are not arbitrary or one-off rates; instead, she argues that they are the rates determined by the free market and tempered by her attorneys' efforts to make them affordable to potential clients in need. Filing 514 at 9. She acknowledges that Ms. Fiedler's and Ms. Brandon's rates may be higher than other Iowa or Nebraska attorneys with similar years of experience, but she argues that their skills and their national reputations warrant above-average rates. Filing 514 at 10. Benson also argues that their rates are comparable to rates courts have accepted in litigation in the Nebraska-Iowa area. Filing 514 at 11–12. Benson reiterates that current rates are appropriate because despite years of litigation they still have not received any compensation. Filing 514 at 12. Benson argues that insurance defense attorneys' rates simply are not comparable to plaintiffs' attorneys' rates, where insurance defense attorneys face no risk of nonpayment, but plaintiffs' attorneys may not recover any compensation at all. Filing 508 at 13. Finally, she argues that Defendants' lead attorney's own rate and the rates charged by members of her firm undermine Defendants' arguments, because it appears that Defendants' lead attorney has charged more in the past, but she apparently gave Defendants a "volume discount." Filing 508 at 14.

### b.  Determination of Reasonable Hourly Rates

As the Eighth Circuit explained in *Jet Midwest*,

"As a general rule, a reasonable hourly rate is the prevailing market rate, that is, 'the ordinary rate for similar work in the community where the case has been litigated.'" *Moysis v. DTG Datanet*, 278 F.3d 819, 828 (8th Cir. 2002) (quoting

28

*Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir. 2001)). "The court 'has great latitude to determine a reasonable hourly rate because it is intimately familiar with its local bar.'" *Burton v. Nilkanth Pizza Inc*., 20 F.4th 428, 431 (8th Cir. 2021) (quoting *Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1172 (8th Cir. 2019)).

*Jet Midwest*, 93 F.4th at 420; *Marshall*, 8 F.4th at 712. The Eighth Circuit has also reiterated the Supreme Court's statement "that fees 'are to be calculated according to the prevailing market rates in the relevant community,' not 'the [actual] cost of providing legal services.'" M.B. by *Eggemeyer v. Tidball*, 18 F.4th 565, 569 (8th Cir. 2021) (quoting *Blum v. Stenson*, 465 U.S. 886, 895, 892 (1984), respectively)).

### c.   Several of the Hourly Rates Claimed Require Adjustment

The Court finds reductions are appropriate in the hourly rates claimed by several of Benson's attorneys. Like Defendants, the Court will begin with Benson's lead attorneys, Paige Fiedler and Kelly Brandon.

### i.   Benson's Lead Attorneys' Rates Are Excessive

The Court finds that Ms. Fiedler's hourly rate of $600 exceeds the prevailing rate in the regional legal market for work of the kind involved in this case. *See Jet Midwest*, 93 F.4th at 420 (focusing on the prevailing rate for similar work in the community where the case has been litigated); *M.B. by Eggemeyer*, 18 F.4th at 569 (same); *Marshall*, 8 F.4th at 712 (same). The undersigned judge is familiar with customary rates given he served as a civil litigation attorney for nineteen (19) years at Nebraska's largest law firm. The undersigned judge has also remained knowledgeable of customary fees since his departure from the private practice of law for the Federal bench four years ago, particularly given his experience reviewing fee applications on other cases. Based on the Court's knowledge and experience, an hourly rate of $600 in this state is excessive for the type of work performed in this case. Rather, the Court reiterates prior findings

29

that an hourly rate of $350 would be at the top of the regional legal market for the kind of work involved in this case.

For several reasons the Court has concluded that Ms. Fiedler should be compensated at an hourly rate of $400. Filing 508 at 12. First, the Court notes that Defendants in this case agree with this Court's previous conclusion that $350 is the top end of the regional legal market for the type of work completed in this case. Filing 508 at 9 (quoting *Beran*, 2023 WL 6883630, at *5). Despite this agreement, Defendants still suggest that Ms. Fiedler should be compensated at $360 per hour. Filing 508 at 12. Secondly, Ms. Fiedler has provided this Court evidence of the level of experience she has with employment cases representing plaintiffs, and such experience is greater than both the experience of the other plaintiff's side attorneys in this case and the experience of attorneys for whom this Court previously concluded a lower rate was appropriate.

While $400 per hour for Ms. Fiedler is warranted, the Court finds her claimed hourly rate of $600 is excessive. In light of the Court's experience and its balancing of the prevailing rates in the local legal market against Ms. Fiedler's claimed rate, her experience and reputation, Defendants' recommended rate, the nature of the case, and the delay in payment, the Court concludes that an hourly rate for Ms. Fiedler of $400 is reasonable to provide fair compensation. In other words, in the Court's view, this rate provides an appropriate premium over the otherwise top rates in this market for special skill and experience. For the sake of comparison, if Ms. Fielder had claimed her hours in this case at this reduced hourly rate for all 804.2 hours claimed, her fee claim would have been for $321,680 rather than $482,520. This rate is higher than the undersigned recently awarded in *Beran*, 2023 WL 6883630, at *5, where the undersigned reduced lead counsel's claimed hourly rate of $350 to $300 based on that attorney's level of experience.

Nevertheless, the Court is convinced that, by comparison, Ms. Fiedler's much greater experience justifies the higher rate.

On the other hand, $400 per hour is lower than the $450 per hour that the undersigned recently awarded on default judgment in another case. In *National Indemnity Company v. IRB Brasil RE*, 8:23-cv-00074-BCB-SMB (D. Neb.), the undersigned observed,

> Although the $450 per hour figure is higher than the undersigned generally recognizes as being a reasonable prevailing rate in this legal community, the Court notes the complexity of service on a foreign corporation, which counsel performed competently and which led counsel to secure a default judgment for NICO.

*National Indem. Co.*, 8:23-cv-00074-BCB-SMB, Doc. #45 at 9. In that case, the other attorneys billed at $275 per hour for almost three quarters of the hours claimed. *Id.* The Court concludes that the lower rate for Ms. Fiedler in this case is justified by the Court's conclusion that this case is rather straightforward in comparison to effective service abroad on a foreign corporation under the Hague Convention, because it involves a single plaintiff who was suing her former employer for various claims regarding her former employment under well-settled domestic law without the complications of international service of process. *See* Filing 491 at 2 (order setting out expectations for trial).

The Court finds that Ms. Brandon's claimed hourly rate of $425, like Ms. Fiedler's, is excessive. Nevertheless, the Court concludes that she is entitled to a smaller premium above the prevailing market rate for the kind of work at issue. In light of the Court's experience and its balancing of the prevailing rates in the local legal market against Ms. Brandon's claimed rate, her experience and reputation, Defendants' recommended hourly rate of $300 for Ms. Brandon, the nature of the case, and the delay in payment, the Court concludes that an hourly rate for Ms. Brandon of $325 is reasonable to provide fair compensation. For the sake of comparison, if Ms. Brandon had claimed her hours in this case at this reduced hourly rate for all 2,043.3 hours claimed,

her fee claim would have been for $664,072.50 rather than $868,530. This hourly rate for Ms. Brandon properly reflects her relatively greater experience in employment cases than the lead attorney in *Beran* had. It is also at a reasonable level between $300 per hour, which the Court has previously awarded in an employment discrimination case, and $350 per hour, which the Court considers the top of the regional legal market in ordinary circumstances for the kind of work involved in this case.

ii.  Hourly Rates for Some Other Attorneys Claiming $300 or More per Hour Are Excessive

As set out above, 12 other attorneys billed 1,056.63 hours at rates ranging from $375 per hour down to $125 per hour. Defendants argue that the hourly rates of nine of those attorneys should be reduced to or below $300. Filing 503 at 12–13. The Defendants base their adjusted rates for these attorneys on a broad comparison of these attorneys' rates and years of practicing employment litigation with the hourly rate of $300 and the years practicing employment litigation of the lead attorney in *Beran*. Filing 508 at 14. The Court declines Defendants' invitation to make reductions below $300 per hour for any of these nine attorneys, however. Instead, the Court will use $300 per hour for all nine attorneys, which the Court indicated in *Beran* is a generally acceptable rate in this market for attorneys with some experience in employment cases. This may be somewhat "rough" justice, but that is all that is required. *See Beckler*, 83 F.4th at 695–96 ("The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.'" (quoting *Fox*, 563 U.S. at 838)). The Court also notes that this "rough justice" is to the benefit of Plaintiff, because if the Court were to pursue auditing perfection as to these remaining rates it would likely lead the Court to reduce the rates of some of the attorneys below $300 per hour.

Furthermore, the Court notes that the largest contributor of hours among these nine attorneys (548.4 hours)—in fact, more than half of the hours claimed by the entire group of nine (991.83)—actually claimed $300 per hour as did one other attorney in this group for his 4.7 hours. Also, Defendants' proposed reductions are unlikely to result in significant refinement of the weighted average hourly rate as adjusted because of the relatively small number of hours claimed at an adjusted rate of $300 per hour compared to the total number of hours claimed by these nine attorneys (438.73 hours claimed for seven attorneys above $300 compared to 4,220.13 total hours claimed).

These nine attorneys, their hours, claimed rates, Defendants' proposed rates, and the Court's adjusted rates are shown in the following table:[21]

| Attorney | Hours Claimed | Claimed Hourly Rate | Defendant's Proposed Rate | Court's Adjusted Rate |
|---|---|---|---|---|
| Aimee Bataillon | 548.4 | $300 | $275 | $300 |
| Alexis Mullaney | 154.53 | $325 | $250 | $300 |
| Jessica Källström-Schreckengost | 116.9 | $365 | $275 | $300 |
| Thomas Freeman | 95.9 | $375 | $300 | $300 |
| Amy Beck | 56.8 | $325 | $250 | $300 |
| Madison Fiedler-Carlson | 7.5 | $325 | $250 | $300 |
| David Albrecht | 4.9 | $350 | $275 | $300 |
| Maryl Sattler | 4.7 | $300 | $275 | $300 |
| Brooke Timmer | 2.5 | $325 | $300 | $300 |

The remaining three attorneys are Ashley Griffin, who claimed an hourly rates of $125 for 2.8 hours; Stephanie Costello, who claimed an hourly rate of $150 for 50.4 hours; and Kathryn Leidahl, who claimed an hourly rate of $225 for 11.3 hours. Filing 503 at 12–13. Defendants do not challenge the hourly rates for these three attorneys. Filing 508 at 8 n.5. The Court likewise finds no grounds for adjusting their hourly rates either up or down.

---

[21] Alexis Mullaney contributed 0.2 hour to the supplemental fee claim, while Amy Beck contributed 0.1 hour to the supplemental fee claim. Their total hours claimed reflect these hours.

iii.  The Rates for Law Clerks and Legal Assistants Are
Reasonable

Ten law clerks claimed 286.45 hours at $100 per hour. Filing 502 at 5 (¶ 26). One paralegal

and 3 legal assistants claimed $100 per hour for 29.55 hours. Filing 502 at 6 (¶ 26). Defendants do

not challenge these hourly rates. *See generally* Filing 508. The Court finds these hourly rates for

law clerks are reasonable and appropriate for fair compensation and are consistent with the

prevailing market rates for law clerks in the relevant community. *See M.B. by Eggemeyer*, 18 F.4th

at 569 (stating that the standard is the prevailing market rates in the relevant community).

d.  Calculation of the Adjusted Weighted Hourly Rate

The Court indicated above in § II.C. that it would use a weighted average hourly rate as

adjusted by the Court times the total hours the Court found were reasonably expended as

reflecting—if somewhat "roughly"— the rate at which the hours allowed should have been billed.

*See Beckler*, 83 F.4th at 695-96; *Blackorby*, 60 F.4th at 420. To determine the weighted average

hourly rate as adjusted, the Court must determine the total fee at the adjusted rates for all hours

claimed, then divide the total fee at the adjusted rates by the number of hours claimed. The

following chart shows those calculations.

| Legal Service Providers | Hours at | Adjusted Rate | Adjusted Fee |
|---|---|---|---|
| Paige Fiedler | 804.2 | $400 | $321,680 |
| Kelly Brandon | 2,043.3 | $325 | $664,072.50 |
| 9 Attorneys | 992.13 | $300 | $297,639 |
| 1 Attorney | 2.8 | $125 | $350 |
| 1 Attorney | 50.4 | $150 | $7,560 |
| 1 Attorney | 11.3 | $225 | $2,542.50 |
| 10 Law Clerks | 286.45 | $100 | $28,645 |
| 3 Legal Assistants/Para | 29.55 | $100 | $2,955 |
| TOTAL | 4,220.13 | TOTAL | $1,325,444 |
| Weighted Average Hourly Rate as Adjusted | | $314.08 | |

Thus, the Court will use a weighted average hourly rate as adjusted of $314.08 for all hours

that the Court determines are reasonably expended in the next part of this decision.

2. *The Hours Reasonably Expended*

   a. Determination of Hours Reasonably Expended

As to the second variable in the lodestar calculation, the hours reasonably expended, the

Eighth Circuit recently explained,

> "When calculating the lodestar, a district court need not accept counsel's submission of hours as conclusive but should exclude from that total those hours that were not reasonably expended on the litigation." *Fires v. Heber Springs Sch. Dist.*, 565 F. App'x 573, 575 (8th Cir. 2014) (unpublished per curiam) (citing *Hensley*, 461 U.S. at 433–34, 103 S.Ct. 1933). "Although the district court need not explicitly state which hours it finds reasonable, it must at least calculate the hourly rate and the reasonable number of hours worked." *Vines v. Welspun Pipes Inc.*, 9 F.4th 849, 856 (8th Cir. 2021) (citing *Fires*, 565 F. App'x at 576).

*Jet Midwest*, 93 F.4th at 420 (8th Cir. 2024). More specifically, "[t]he district court must 'exclude

from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" *Beckler*, 83

F.4th at 695 (quoting *Hensley*, 461 U.S. at 434). It is appropriate to compare the hours expended

in this case to the hours expended in similar cases because "[t]he lodestar method is based on the

number of hours reasonably expended on the litigation." *Id.* (emphasis in the original). In making

the determination of what hours were reasonably expended, the district court may consider whether

the claims at issue were "complex and cutting edge" or "factually and legally straightforward." *Id.*

("Despite Beckler's attempt to paint her FDCPA claims as complex and cutting edge, we agree

with the district court that her case was factually and legally straightforward. . . ."). The district

court may also make reductions for time not reasonably spent by using a flat percentage reduction

in appropriate cases. *Id.* at 696 ("Nor did the court abuse its discretion by focusing on the

reasonableness of the time two attorneys spent on legal research and communicating with each

other, and in finding that a fifty percent reduction was appropriate. We have ordered or approved

flat percentage reductions in appropriate cases.").

Although Benson's attorneys litigated this case as if it were complex and cutting edge, *id.* at 695, the Court concluded that it was ultimately rather straightforward because it involved a single plaintiff suing her former employer for various claims regarding her former employment. See Filing 491 at 2 (order setting out expectations for trial). In the context of a straightforward employment case, the Court finds that numerous hours were not reasonably expended, as explained below. See *Jet Midwest*, 93 F.4th at 420 (explaining that hours must be reasonably expended); Beckler, 83 F.4th at 895–96 (emphasizing the reasonableness requirement for allowable hours). Those hours have already been highlighted in § I.B. above.

### b.   Unnecessary Hours Determined by Count

First, the Court found in § I.B.2. above that the Motion for Preliminary Injunction was neither reasonable nor well-considered and thus was excessive and unnecessary for precisely the reasons Judge Kopf rejected any relief. Defendants allege that Plaintiff's counsel expended at least 206.6 hours in relation to the failed Motion for Preliminary Injunction. Filing 508 at 19–20. Benson nowhere disputes Defendants' calculation of the hours spent on that Motion. *See generally* Filing 514. The Court will reduce the hours claimed by Benson's attorneys by 206.6 hours as reasonably reflecting the excessive and unnecessary time. *See Beckler*, 83 F.4th at 695 ("The district court must 'exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" (quoting *Hensley*, 461 U.S. at 434)). At the weighted average hourly rate as adjusted by the Court of $314.08, that reduction in hours would result in a reduction in the fees of $64,888.93.

Next, in a litigation tactic that the Court found was emblematic of the overlitigation in the case, the Court found in § I.B.3. that Benson's attorneys repeatedly and unsuccessfully tried to obtain Gerdes's privileged investigative file. Defendants assert that Benson's attorneys expended 185.1 hours on that failed effort. Filing 508 at 20. Benson's attorneys do not dispute the number of hours that Defendants allege Benson's attorneys expended on litigating this issue. *See generally*

Filing 514. The Court reiterates that it finds the attempts to obtain the report were meritless and based on a mistaken or willful misconception of Defendants' reasons for offering the investigation report. The Court will reduce the hours claimed by Benson's attorneys by 185.1 hours as reasonably reflecting the excessive and unnecessary time. At the weighted average hourly rate as adjusted by the Court of $314.08, that reduction in hours would result in a reduction in the fees of $58,136.21.

As explained in § I.B.4. above, Defendants assert that 40.9 hours were related to Benson's failed Motion for Partial Summary Judgment. Filing 508 at 21. Benson's attorneys do not dispute the number of hours that Defendants allege Benson's attorneys expended on litigating that Motion. *See generally* Filing 514. The Court reiterates its conclusion that the hours spent on this motion were excessive and unnecessary. Therefore, the Court will reduce the hours claimed by Benson's attorneys by 40.9 hours as reasonably reflecting the excessive and unnecessary hours. At the weighted average hourly rate as adjusted by the Court of $314.08, that reduction in hours would result in a reduction in the fees of $12,845.87.

The last reduction in hours the Court is able to make by count of hours concerns Oppenheimer's expert testimony, which the Court determined in § I.B.5.a. above wasted attorney time. The Court will reduce the hours claimed by Benson's attorneys by 93.3 hours calculated by Defendants, Filing 508 at 20, as reasonably reflecting the unnecessary time, where Benson did not dispute that total from Defendants. *See generally* Filing 514. At the weighted average hourly rate as adjusted by the Court of $314.08, that reduction in hours would results in a reduction in the fees of $29,303.66.

Thus, the total reduction of the hours claimed for unnecessary hours expended determined by count is 525.9.

37

c.   Unnecessary Hours Determined by Other Means

The Court also determined in § I.B.5. above that there were other evidentiary disputes on which Benson's attorneys expended excessive and unnecessary hours. Specifically, in § I.B.5.b., the Court concluded that one of the clearest examples of wasteful litigation on evidentiary issues involved Benson's attempt to call Leirion Gaylor Baird, the current Mayor of the City of Lincoln. The Court then concluded in § I.B.5.c. that some of the time expended on Motions in Limine or otherwise related to evidentiary issues—apart from the issues related to Oppenheimer—was expended on arguments with little chance of success and therefore such time was not reasonably expended, was excessive, and was unnecessary. The Court reiterates its conclusion above in § I.B.5.c. that—conservatively—25% of the time Benson's attorneys expended on these matters was wasted in light the issues that the Court found were not remotely close calls or involved "numerous exhibits and evidence that the law illustrates should have never been offered for admission in the first place." Filing 491 at 2.

The Court pointed out above in § II.C.2.a. that it may make reductions for time not reasonably spent by using a flat percentage reduction in appropriate cases. *Beckler*, 83 F.4th at 696 ("Nor did the court abuse its discretion by focusing on the reasonableness of the time two attorneys spent on legal research and communicating with each other, and in finding that a fifty percent reduction was appropriate. We have ordered or approved flat percentage reductions in appropriate cases."). However, Defendants did not tally the hours expended on evidentiary disputes other than those related to Oppenheimer. Certainly, Defendants never tallied hours on evidentiary disputes that the Court now concludes were wasted, nor has Benson acquiesced in Defendants' count of such hours. The Court finds it impracticable to determine the hours spent on the evidentiary disputes in question for itself by reviewing the hundreds of pages in Benson's billing spreadsheet in Filing 505-2. The spreadsheet includes numerous billing entries that either refer to motions in

limine without necessarily indicating which motions in limine were at issue or refer to motions in limine as only one item in the list of activity during the claimed hours. Consequently, the Court is left with no reasonable way to determine the total of hours expended on evidentiary disputes that should then be reduced by a flat percentage of 25% or more. The Court concludes that the appropriate course in these circumstances is to account for the wasted time on these evidentiary disputes when the Court considers whether to impose a percentage reduction for poor recordkeeping and block billing below, among other factors relevant to adjustment of the fee claim up or down.

### 3. Summary

The Court calculated the weighted average hourly rate as adjusted by the Court as $314.08. *See* II.C.1. That is the rate that the Court will multiply by hours reasonably expended to determine the lodestar, as the first step in the assessment of Benson's fee claim. *See Marshall*, 8 F.4th at 712 (explaining that after calculating the lodestar amount, a district court may then adjust the fee in light of other factors). The Court has determined by actual count that 525.9 hours were not reasonably expended. Thus, the Court finds that the hours reasonably expended are 4,220.13 – 525.9 = 3,694.23. Multiplying the reasonable hourly rate as determined by the Court times the hours reasonably expended as determined by the Court yields the following lodestar: $314.08 x 3,695.23 = $1,160,283.76. *See id.* (explaining that "the court should calculate the reasonable hourly rate and the reasonable number of hours worked [and] use these two variables to calculate the lodestar. . . ." (quoting *Burton*, 20 F.4th at 431)). This is the lodestar the Court will use for remaining determinations of a reasonable fee, rather than Benson's claimed $1,712,096.75 in fees, meaning that the Court has reduced the amount claimed by $551,812.99 to determine the lodestar.

### D.      Other Factors

As noted just above, the lodestar calculation is not the end of the analysis of the appropriate

fee award. Instead, after doing the lodestar calculation, the Court may then consider other factors.

*Marshall*, 8 F.4th at 712. The Court finds that the factors the Eighth Circuit Court of Appeals has

identified fall into two groups, which this Court will call "administrative factors" and "*Johnson*

factors," respectively. The Court will consider these two groups of factors in turn.

#### 1.   The "Administrative" Factors

The Eighth Circuit identified what this Court will call "administrative factors" in

*Gruttemeyer v. Transit Auth.*, 31 F.4th 638 (8th Cir. 2022):

> [A] reduction in attorney's fees may be appropriate [1] when recordkeeping is poor
> or [2] block billing is submitted, *Ryan Data Exch., Ltd. v. Graco, Inc.*, 913 F.3d
> 726, 736 (8th Cir. 2019), and we "may reduce attorney hours, and consequently
> fees, for [3] inefficiency or duplication of services in cases where more than one
> attorney is used," *L.B. ex rel. A.J. v. Kierst*, 56 F.3d 849, 864 (8th Cir. 1995).
> Additionally, [4] purely clerical tasks should not be billed at paralegal or attorney
> rates, regardless of who performed such tasks. *See, e.g.*, *Missouri v. Agyei ex rel.
> Jenkins*, 491 U.S. 274, 288 n.10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

*Gruttemeyer*, 31 F.4th at 651 (bracketed numbers added).

#### a.   Poor Recordkeeping and Block Billing

The Court begins its analysis of "administrative factors" with poor recordkeeping and

block billing, see *id.*, as these two factors overlap. Also, the Court indicated in § II.C.2.c. that

consideration of these factors is where the Court would consider if an adjustment to the fees is

required for unquantified time unreasonably expended on discovery disputes.

A judge of this Court "interpret[ed] 'block billing' to mean a paragraph containing multiple

tasks with only one increment of time noted (like 3.20 hours) and one amount billed ($304.00) for

the collection of listed tasks." *Bowen v. Allied Prop. & Cas. Ins. Co.*, No. 4:11CV3163, 2013 WL

942443, at *6 n.14 (D. Neb. Mar. 11, 2013); *see also Gen. Elec. Cap. Corp. v. FPL Serv. Corp.*,

No. C 13-59-MWB, 2014 WL 12907754, at *2 (N.D. Iowa Mar. 26, 2014) ("I noticed, however, that GECC's attorneys used 'block billing' in many of their billing record entries, meaning that a number of activities performed by the attorneys are listed under a single time entry."). That interpretation is consistent with the undersigned's understanding of "block billing" and the parties' arguments here. However, the parties dispute whether any reduction of fees is appropriate based on block billing or vagueness.

i.   The Parties' Arguments

Defendants contend that Benson requests repayment for hundreds of vague billing entries such as ones identified as "Email with Amanda." Filing 508 at 2. Similarly, Defendants assert that Benson's attorneys manufactured time by billing for review of every filing on the Electronic Case Filing (ECF) system, even ones that they filed or that were objectively clerical. Filing 508 at 2. Defendants also assert that Benson's attorneys submit "scores of egregiously block-billed entries." Filing 508 at 2. Defendants contend that these billings do not satisfy the requirements for attorney fees applications under NECivR 54.3(b) and NECivR 54.4(a). Filing 508 at 22. Defendants contend further that Benson's attorneys' billing records are "littered" with the kind of vague entries that courts disfavor. Filing 508 at 24. Defendants identify various examples of vague (and block-billed) entries that they contend are particularly egregious. Filing 508 at 25. Furthermore, Defendants argue that Benson's attorneys' block-billed entries make it difficult to determine what amount of time was spent on listed items, so that the Court cannot assess the reasonableness of the time claimed. Filing 508 at 26. Finally, as to these factors, Defendants assert that quite high percentages of Ms. Brandon's and Ms. Fiedler's billing entries are block billings involving "blocks" of more than eight hours in a day. Filing 508 at 29–30. Defendants make similar arguments about hours claimed for law clerks, paralegals, and legal assistants. Filing 508 at 33–36.

In contrast, Benson argues that her attorneys' time entries are appropriate. Filing 514 at 15. First, Benson argues that there is no rule against block billing. Filing 514 at 15. Furthermore, she contends that as long as the time records contain sufficient information to communicate what was done and that it was connected to the case, no reduction for block billing is warranted. Filing 514 at 15. She also suggests that billing separately for each task could result in higher fees. Filing 514 at 16. Benson then argues that the billing entries are sufficiently detailed to show that the work was done on the case. Filing 514 at 16–17. She also asserts that she is not required to specify the content of attorney-client communications even in billing records. Filing 514 at 17.

> ii.  Reductions for Block Billing and Vagueness Are
>       Permissible

Benson argues that there is no rule against block billing. Filing 514 at 15. The Court agrees that, as one of the decisions Benson cites puts it, "[t]he Eighth Circuit has not prohibited block billing." *Miklesh v. Bradstreet & Assocs., LLC*, No. CIV. 12-457 JRT/LIB, 2013 WL 3716640, at *2 (D. Minn. July 12, 2013); *see* Filing 514 at 15 (citing cases purportedly supporting this argument). That conclusion is not dispositive of the issue of a reduction for block billing, however. Even if there is no rule against block billing, the Eighth Circuit has made clear that "a reduction in attorney's fees may be appropriate when . . . block billing is submitted." *Gruttemeyer*, 31 F.4th at 651 (quoting *Ryan Data Exch., Ltd.*, 913 F.3d at 736). Moreover, block billing is—at the very least—inappropriate under a local rule of this Court, NECivR 54.4(a), which states "guidelines" for fee applications. In most pertinent part, that local rule states the following:

> 54.4    Fee Application Guidelines.
>
> With respect to services performed and expenses incurred in any case, including a Criminal Justice Act case, the following guidelines should help attorneys present to the court information essential to a reasoned explanation of the fee award. Attorneys should also review the most recent circuit court decisions for additional guidance. These fee guidelines also may be appropriate in applications for sanctions.

(a) Services Performed.

(1) Identify with particularity the work done.

      (A) For a conference, state who was present, the subjects discussed, and how long it lasted.

      (B) For research, state who did it, the subjects and issues researched, and whether the results were incorporated into a brief, motion, or pleading.

      (C) For travel time, segregate it, state who traveled, and the purpose and mode of travel.

      (D) For filings, identify the filing and who prepared it.

NECivR 54.4(a)(1). Thus, the lack of a *per se* prohibition on block-billing time simply does not prevent the Court from considering a reduction for block billing when doing so is expressly allowed by *Gruttemeyer*, 31 F.4th at 651; the local rule states guidelines on billing that require attorneys to "[i]dentify with particularity the work done," NECivR 54.4(a)(1); and the block-billed entries may fail to "present the court information essential to a reasoned explanation of the fee award." NECivR 54.4(a). It is also consistent with the Supreme Court's statement, "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.

More than three decades ago, the Eighth Circuit took *Hensley*'s guidance on the problems with vague billings:

> "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. at 1941. Inadequate documentation may warrant a reduced fee. *Id.*; *see, e.g., Ohio–Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 776 F.2d 646, 653 (7th Cir. 1985); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d [1255,] 1275 [(8th Cir. 1980)]. Incomplete or imprecise billing records preclude any meaningful review by the district court of the fee application for "excessive, redundant, or otherwise unnecessary" hours and may make it impossible to attribute a particular attorney's specific time to a distinct issue or claim. *Hensley v. Eckerhart*, 461 U.S. at 434, 437 & n. 12, 103 S.Ct. at

> 1939, 1941 & n. 12. Here, counsel's billing records included numerous entries such as "legal research" or "trial prep" or "met w/client." Some entries were so vague that the district court could not determine with certainty whether they were related to this litigation, much less the claims upon which H.J. ultimately prevailed. Slip op. at 5. In the future the district court might consider directing the plaintiff to submit additional records before deciding to reduce the lodestar for inadequate documentation. Nonetheless, we cannot say that the district court abused its discretion in the present case by reducing the lodestar by 20% for inadequate documentation.

*H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991). More recently, the decision of the

Eighth Circuit in Ryan Data Exchange, cited in Gruttemeyer, provided similar guidance that block-

billing may warrant a reduction when it fails to serve the purpose of providing information

essential to a court to determine the reasonableness of a fee. In Ryan Data Exchange, the Eighth

Circuit affirmed the district court's reduction of the fees based in part on the district court's finding

of "inability to discern separation between the infringement and contract claims [and] lack of

sufficient billing records to precisely grasp the nature of the work done." 913 F.3d at 736 (quoting

the district court).

The effect of the block billing and vague entries on the Court's ability to determine the

reasonableness of the fees is also the guiding factor in the decisions Benson cited. Filing 514 at 15

(citing *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006); *Budco*

*Fin. Servs., LLC v. Miller*, 2023 WL 4234549, *3 (E.D. Mo. June 28, 2023); *Miklesh v. Bradstreet*

*& Assoc., LLC*, 2013 WL 3716640, at *2 (D. Minn. July 12, 2013); and *Heaton v. Weitz Co., Inc.*,

2007 WL 2301251, at *6-7 (N.D. Iowa Aug. 8, 2007), *aff'd sub nom. Heaton v. The Weitz Co.*,

534 F.3d 882 (8th Cir. 2008)). In *Miklesh*, the district court found "that the billing records here,

with the deductions suggested by the [magistrate judge], sufficiently demonstrate[d] that the billed

work related to Defendants." 2013 WL 3716640, at *2. The same was true in the other cases

Benson cited. *See Budco Fin. Servs., LLC*, 2023 WL 4234549, *3 (finding the entries provided

sufficient detail to permit analysis of what tasks were performed, whether the tasks were relevant

to the case, and whether the time expended was reasonable, and also citing a Michigan state court decision as rejecting a *per se* rule that block billing precludes a determination of reasonable hours expended); *Heaton*, 2007 WL 2301251, at *6 (finding that block billing "is not a prohibited practice" (quoting another decision cited by Benson here, *Farfaras*, 433 F.3d at 569), and also stating that the records in question provided adequate descriptions of the work done). These decisions just found that the block billing before those courts did not prevent the courts from assessing the reasonableness of the time claimed.

### iii.  Reductions for Block Billing and Vagueness are Appropriate in This Case

The Court simply does not agree with Benson that all her attorneys' billing entries are adequate. Filing 514 at 15, 16–17. To the contrary, Defendants have identified many entries that the Court finds are inadequate because they do not provide sufficient information and are not sufficiently detailed for the Court to determine the reasonableness of the time spent. *See Ryan Data Exchange*, 913 F.3d at 736; *H.J. Inc.*, 925 F.2d at 260; NECivR 54.4(a); *cf. Hensley*, 461 U.S. at 433.

First, the Court addresses Defendants' argument that Benson requests repayment for hundreds of vague billing entries such as ones identified as "Email with Amanda." Filing 508 at 2. The Court has some sympathy for Benson's counterargument that her attorneys should not be compelled to disclose the contents of attorney-client privileged emails to recover appropriate fees. Filing 514 at 17. Nevertheless, the Eighth Circuit Court of Appeals specifically recognized that a billing entry for "met w/client" was impermissibly vague. *H.J. Inc.*, 925 F.2d at 260. Benson's attorneys could easily have crafted identifications of the general topics to which the attorney-client emails related, similar to the information that would be required for a privilege log, *see* Fed. R.

Civ. P. 26(b)(5), that would have been sufficient for the Court to assess the compensability of the

numerous emails. Such information is lacking here.

One of several egregious examples of vague block billing pointed out by Defendants is Ms.

Brandon's billing of 18.2 hours on May 24, 2023, for the following tasks with no breakdown of

time attributed to any specific task:

> Worked on Response to Defendant's Statement of Facts; finalizing our Statement
> of Facts; various emails with Paige re: facts and brief; conversations with Alexis
> and Jessica re: Response to SOF and brief; revised brief to reduce word count;
> emails with David re: brief content; and conversations and texts with Kory and
> Hailey regarding filing SOF and Response to SOF.

Filing 505-2 at 132. A similarly egregious example identified by Defendants is Ms. Fielder's claim

for 11.5 hours on May 22, 2023, for the following tasks, likewise with no breakdown of time

attributed to any specific task:

> Call to Alexis; emails with Alexis; emails with Kathryn, David, Amy, Madison and
> other firm lawyers pitching in; worked on harassment argument; SJ standards;
> emails from Stephanie Nevins and Kelly; worked on retaliation argument; legal
> research; calls and emails with Brian Giles; prepared Giles affidavit; emails from
> Heidi Guttau; reviewed Amanda affidavit; emails with Kory and Robin re: same;
> email from Hailey to court; reviewed Ruling on motion for extension; emails from
> court re: filings[.]

Filing 505-2 at 231. These are examples of billing entries that are "imprecise" and that "preclude

any meaningful review by the district court of the fee application for 'excessive, redundant, or

otherwise unnecessary' hours and [does] make it impossible to attribute a particular attorney's

specific time to a distinct issue or claim." *H.J. Inc.*, 925 F.2d at 260 (citing *Hensley*, 461 U.S. at

434, 437 & n.12). In this Court's view, the fact that all the time claimed appears to relate to this

case and to a general task—such as responding to a motion for summary judgment—is simply not

enough detail to assess the reasonableness of the time spent, including the time spent in several

consultations with other attorneys, because it does not "identify with particularity the work done"

in relation to the time claimed. *See* NECivR 54.4(a)(1); *Hensley*, 461 U.S. at 433 (explaining that the claimant must provide "evidence supporting the hours worked and rates claimed").

The further problem is that these are not isolated examples. Along with other specific examples, Defendants assert that Ms. Brandon submitted 27 block-billed time entries of 8 or more hours, by date and time claimed, totaling 342.9 hours or 17% of her claimed hours. Filing 508 at 29–30 (citing generally Filing 505-2, which shows Ms. Brandon's billing entries in chronological order, Filing 505-2 at 1–191). Defendants assert that Ms. Fiedler similarly submitted 27 block-billed entries of 8 or more hours, by date and time claimed, for a total of 291 hours or 44% of her claimed hours. Filing 508 at 29–30 (citing generally Filing 505-2, which shows Ms. Fiedler's billing entries in chronological order, Filing 505-2 at 191–255). In response, Benson offers only generalized arguments that block billing is not prohibited and that her attorneys' entries are not too vague to determine that the work was done on Benson's case. Filing 514 at 15–17. The Court finds that Defendants' essentially unrebutted sampling for these two attorneys accounts for 633.9 hours or 15% of the total hours claimed for the case.[22]

The Court recognizes that this percentage represents only a sampling of the block-billed and vaguely claimed hours for only two of Benson's attorneys, albeit the ones who billed the most hours. The Court also reiterates that block billing and vagueness precluded the Court from determining the hours unreasonably expended on evidentiary issues other than Oppenheimer. Under these circumstances, the Court concludes that it is appropriate to impose a 20% reduction of the lodestar figure of $1,160,283.76 determined by the Court above, or $232,056.75 for block billing and vagueness. *Cf. H.J. Inc.*, 925 F.2d at 260 (affirming the district court's reduction of the lodestar by 20% for inadequate documentation alone).

---

[22] $633.9 \div 4{,}220.13 = 0.1502$.

        b.   Duplication of Services and Billing for Clerical Tasks

The other two "administrative factors" identified in *Gruttemeyer* are "inefficiency or duplication of services in cases where more than one attorney is used," and billing for "purely clerical tasks." 31 F.4th at 651 (internal quotation marks and citations omitted). The parties dispute whether consideration of these factors warrants any reduction of the lodestar in this case.

        i.   The Parties' Arguments

Defendants contend that some of the block-billed entries, as well as many of the entries for law clerks and paralegals, include improper billing for administrative activity. Filing 508 at 2, 30–31. Indeed, Defendants identify dozens if not hundreds of attorneys' entries that include or consist of administrative or clerical tasks. Filing 508 at 30–31. They do the same as to several law clerks, paralegals, and legal assistants. Filing 508 at 34–36. Similarly, Defendants identify numerous instances of what they assert was overstaffing and unnecessary internal communications. Filing 508 at 30–31. Defendants argue that the overstaffing of the case resulted in 544 entries for internal communications just between Ms. Fiedler and Ms. Brandon, many of which were purely administrative. Filing 508 at 32. They point to other instances in which entries reflect communications among attorneys and other staff for administrative reasons. Filing 508 at 33.[23]

In reply, Benson asserts, "Plaintiff's law firm does not bill for clerical tasks. Work is billed only when it has required the specialized knowledge and skill of a paralegal or law clerk." Filing 514 at 18. Benson also contends that Defendants have mischaracterized Benson's attorneys as staffing the case with fourteen attorneys, when two, Ms. Fiedler and Ms. Brandon, billed two-

---

[23] Defendants argue, "While some interoffice discussion is expected, Defendants should not bear the burden to the tune of $796,135, as Plaintiff requests." Filing 508 at 33. It is not clear how that enormous amount of fees for internal communications was derived. Consequently, the Court gives that much of Defendants argument little weight.

thirds of the firm's total hours on the case, and six attorneys billed less than 12 hours over the 8-

year life of the case. Filing 514 at 19.

> ii. Reductions for Clerical Tasks and Duplicative Work
> Are Permissible

In *Gruttemeyer*, the Eighth Circuit explained that "purely clerical tasks should not be billed

at paralegal or attorney rates, regardless of who performed such tasks." 31 F.4th at 651 (citing

*Agyei ex rel. Jenkins*, 491 U.S. at 288 n.10). Judges in this district have repeatedly recognized this

principle. *See, e.g., Phillip v. Saul*, No. 8:19CV422, 2020 WL 6544295, at *1 (D. Neb. Nov. 6,

2020) (EAJA fee claim) (citing *Knudson v. Barnhart*, 360 F. Supp. 2d 963, 977 (N.D. Iowa 2004));

*Dean v. Cnty. of Gage, Nebraska*, 332 F. Supp. 3d 1247, 1257 (D. Neb. 2018) (fee claim in a

§ 1983 case) (citing *Murray v. Collections Acquisitions, LLC*, No. 8:11CV301, 2012 WL 2577211,

*2 (D. Neb. 2012), in turn quoting *Jenkins by Agyei*, 491 U.S. at 288); *Birge v. Brumbaugh &

Quandahl, P.S., LLO*, No. 8:13CV8, 2014 WL 688966, at *2 (D. Neb. Feb. 20, 2014) (quoting

*Jenkins by Agyei*, 491 U.S. at 288).

In *Gruttemeyer*, the Eighth Circuit also explained that "inefficiency or duplication of

services in cases where more than one attorney is used" may warrant a reduction. 31 F.4th at 651

(quoting *L.B. ex rel. A.J.*, 56 F.3d at 864). Somewhat more specifically, in *L.B. ex rel. A.J.*, the

court pointed out some relevant considerations when a district court is deciding whether services

are duplicative:

> A court may reduce attorney hours, and consequently fees, for inefficiency or
> duplication of services in cases where more than one attorney is used. We are not
> aware of any cases, however, which hold that a court may reduce attorneys' fees
> solely on the basis that multiple attorneys helped to secure a prevailing party's
> success. In deciding the proper amount of fees to award, the court did not review
> plaintiffs' fee request to determine whether the work of three attorneys who
> expended considerable time and effort on A.J.'s jury claim improperly duplicated
> the work of [lead counsel]. The court, rather, simply relied on its January 1990
> order in which it, without explanation or the benefit of having heard any evidence,
> announced that it would consider awarding fees to only one of plaintiffs' attorneys.

\* \* \*

> In sum, we conclude that the district court erred in limiting attorneys' fees to only one of plaintiffs' attorneys on A.J.'s successful jury claim.

*A.J. by L.B.*, 56 F.3d at 864–65 (internal citation and footnotes omitted). As to the issue of over-staffing, another judge in this district provided additional guidance:

> Courts may reduce attorney hours and fees for duplication or inefficiency where more than one attorney is used. *A.J. by L.B. v. Kierst*, 56 F.3d 849, 864 (8th Cir. 1995). "Time spent by two attorneys on the same general task is not, however, per se duplicative" and "[c]areful preparation often requires collaboration and rehearsal." *Rodriguez–Hernandez v. Miranda–Velez*, 132 F.3d 848, 860 (1st Cir. 1998). For example, in *ACLU Nebraska Found. v. City of Plattsmouth, Neb.*, 199 F.Supp.2d 964, 969 (D. Neb. 2002), the defendants urged the Court to reduce an attorneys' fee award where two of the plaintiff's lawyers were present for meetings, depositions, and the pretrial conference. *Id.* The Court determined that these efforts were not duplicative under the circumstances. *Id.* The Court also noted that "[w]hen the losing party itself uses multiple counsel, the claim that the prevailing party should not have used multiple counsel fails." *Id.* (citing *Carhart v. Stenberg*, 11 F.Supp.2d 1134, 1137–38 (D. Neb. 1998)).

*Argenyi v. Creighton Univ.*, No. 8:09CV341, 2014 WL 1838980, at \*4 (D. Neb. May 8, 2014).

> iii. Reductions for Clerical Tasks and Duplicative Work Are Appropriate in this Case

The Court agrees with Defendants that Benson's attorneys billed attorney time and paralegal time at attorney and paralegal rates for many purely clerical tasks. *See Gruttemeyer*, 31 F.4th at 651. Benson's response that "Plaintiff's law firm does not bill for clerical tasks" and that "[w]ork is billed only when it has required the specialized knowledge and skill of a paralegal or law clerk," Filing 514 at 18, is wholly conclusory and defeated by the evidence Defendants presented. *See* Filing 508 at 30–31, 34–36.

More specifically, using Ms. Brandon's billing entries as examples, Defendants show several instances of what they contend are over 150 billing entries that show time for review of filings by Benson, many of which were non-substantive. Filing 508 at 30–31. An attorney's skills are not required to determine, for example, that the correct document was filed. *See Gruttemeyer*,

31 F.4th at 651 (explaining that "purely clerical tasks" should not be billed at attorney or paralegal rates). Defendants also identify 40 entries of time claimed by Ms. Brandon for internal emails to administrative assistants. Filing 508 at 31. Defendants also point to instances in which time is claimed for three legal assistants to perform secretarial or clerical tasks and an instance in which a paralegal claimed 14 hours for "MSJ Opposition hyperlinking," which is clearly secretarial or clerical. Filing 508 at 34. Defendants also identify numerous instances of billing for clerical tasks performed by law clerks Mr. Runge and Ms. Dobersek. Filing 508 at 34. These identifications of billings for clerical activity stand unrebutted. The Eighth Circuit Court of Appeals has held that a district court did not abuse its discretion by reducing claimed attorney fees and costs for administrative costs because those costs should have been included in the firm's "overhead." *Hernandez v. Bridgestone Americas Tire Operations, LLC*, 831 F.3d 940, 949 (8th Cir. 2016). This Court agrees and will make an appropriate reduction for tasks claimed for administrative matters.

In this case, it is not that multiple attorneys worked for Benson that the Court finds problematic. Instead, it is whether there was unnecessary duplication of effort and whether excessive time was billed for internal communications and management of the litigation team. *See A.J. by L.B.*, 56 F.3d at 864; *Argenyi*, 2014 WL 1838980, at *4. Defendants have identified 544 entries billing for internal communications between Ms. Fiedler and Ms. Brandon. Filing 508 at 32. Again, this evidence stands unrebutted. The Court finds billing for such communications is unreasonable because in the Court's view such internal communications—particularly when billed by both attorneys—are part of the "overhead" of the practice of law. Such billing is in essence a duplication of effort, as well. Another district judge in this Circuit reached a similar conclusion:

> The tenuous support for the reasonableness of the hourly fees is less concerning than the blatant over-charging of hours throughout the billing record submitted. (Invoice Rec. (Docket No. 90).) Plaintiffs' counsel seeks attorney's fees for activities that are not typically compensable in an action for attorney's fees. The

> billing record is replete with time entries for conversations and communications within the firm. It is unreasonable to bill a client—sometimes multiple times over—for myriad internal phone calls, email exchanges, and discussions.

*Lamplighter Vill. Apartments LLP v. City of St. Paul*, No. CV 21-413 (PAM/HB), 2021 WL 5888532, at *2 (D. Minn. Dec. 13, 2021).

Under these circumstances, the Court concludes that it is appropriate to impose a 5% reduction of the lodestar figure of $1,160,283.76 determined by the Court above, or $58,014.19, for improper billings for clerical tasks, and the excessive hours that arose from internal communications among multiple attorneys.

### 2. The "Johnson" Factors

After calculating the lodestar, "the district courts should generally evaluate 'the ultimate reasonableness of the award . . . by considering relevant factors from the twelve factors listed' in *Johnson* [*v. Georgia Exp., Inc.*]." *League of Women Voters of Missouri v. Ashcroft*, 5 F.4th 937, 941 (8th Cir. 2021) (quoting *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018)). The twelve "*Johnson* factors" are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). However, "[h]aving considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness." *Farrar v. Hobby*, 506 U.S. 103, 115

(1992); *Baker v. John Morrell & Co.*, 263 F. Supp. 2d 1161, 1190 (N.D. Iowa 2003) ("[T]he court need not exhaustively address every factor.").

The Court will consider the "*Johnson* factors" in turn to the extent the Court finds them significant in this case. Indeed, the Court has already considered several of the "*Johnson* factors" in its determination of the reasonable hourly rates, including but not limited to factors (2), (3), (5), and (9). Likewise, the Court has already considered at least the first "*Johnson* factor" in its determination of hours reasonably expended.

### a.   Results Obtained

Although it is the eighth factor listed, the "*Johnson* factor" of greatest or central importance is "results obtained," *i.e.*, the plaintiff's degree of success. *Blackorby*, 60 F.4th at 420; *Marshall*, 8 F.4th at 712-13; *Dindinger*, 853 F.3d at 429. Consequently, the Court will begin its consideration of the "*Johnson* factors" with "results obtained." The parties have quite different perspectives on Benson's results obtained or degree of success.

### i.   The Parties' Arguments

Benson asserts that the settlement she obtained was an "excellent" and "exceptional" result. Filing 503 at 2. She argues that through the efforts of her counsel the fundamental principles upon which Section 1983, Title VII, and NFEPA are based were vindicated and her rights and those of other employees of the City of Lincoln were protected. Filing 503 at 2; *see also* Filing 503 at 27 (observing that civil rights cases may produce small recoveries but provide substantial benefit to society). She contends that she recovered a $50,000 payment for lost wages through December 1, 2022, and $600,000 for her emotional distress—an amount she argues is substantial by any measure, Filing 503 at 27—plus attorney fees, expenses, and costs. Filing 503 at 2. She argues that the settlement also preserved her claim for her disability pension and her pending charge of discrimination for Defendants' failure to accommodate her disability, which resulted in her

constructive discharge. Filing 503 at 2. Moreover, she contends that a plaintiff who has won excellent results is entitled to a fully compensatory award, including time spent on related matters on which she did not win. Filing 503 at 26.

Contrary to Benson's trumpeting of "excellent" results, Defendants argue that in context Benson's recovery of $650,000 was at most a "tepid" success. Filing 508 at 18. Defendants argue that it is appropriate to consider the results that a plaintiff obtained by going to trial compared to a settlement offer, so it is likewise appropriate to measure the plaintiff's ultimate outcome against an earlier settlement offer. Filing 508 at 17. Defendants then argue that Benson would arguably have been better off financially if she had accepted Defendants' Offer of Judgment of $300,000 in July 2019 owing to the time value of money and various incidents that followed. Filing 508 at 17. Defendants argue further that Benson's lack of success is evinced by her failure to recover significant portions of the relief requested in the Fourth Amended Complaint. Filing 508 at 18. They point specifically to the lack of any of the significant non-monetary relief and the lack of any punitive damages that Benson sought. Filing 508 at 19.

In reply, Benson doubles down on her assertion that she achieved a high degree of success, which is the most important factor. Filing 514 at 5. Benson cites in support a report of the Nebraska Employment Opportunity Commission that in 2020–21 it settled 737 cases for a total of $1,486,610, which Benson argues means that the "average settlement" was only $2,017. Filing 514 at 6 (citing https://neoc.nebraska.gov/reports/reports.html).[24] Benson also argues that Defendants engage in "gymnastics" based on various assumptions to argue that Benson would have been better off had she accepted Defendants' 2019 Offer of Judgment. Filing 514 at 6. Benson

---

[24] Benson asserts the amount recovered was $1,481,510, but the Court has used the figure in the NEOC report. State of Nebraska, Equal Opportunity Commission, Annual Report, Fiscal Year 2020/2021, 16. The Court has also adjusted the figure for the average settlement.

next argues that success must be judged "as a whole," not by piecemeal consideration of motions that she did not win with resulting reductions, because she contends that a losing argument in support of a successful claim involves compensable time. Filing 514 at 7. To put it another way, she argues that by achieving excellent results, she should recover fees for time spent on related matters on which she did not win. Filing 514 at 8 (citing *Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997)). Indeed, she argues that good lawyering and ethical obligations require attorneys to bring claims and contentions that are not certain to prevail. Filing 514 at 9.

ii.   The Assessment of Results Obtained

As the Eighth Circuit has explained, the court should "consider the extent of a plaintiff's success in considering the appropriate award of attorneys' fees," and, "[w]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Blackorby*, 60 F.4th at 420 (quoting *Marshall*, 8 F.4th at 713)); *Marshall*, 8 F.4th at 712-13 ("[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney[s'] fees.") (quoting *Hensley*, 461 U.S. at 440). Thus, "[o]ur precedent directs courts to consider whether the plaintiff failed on unrelated claims in the case and whether the plaintiff's level of success makes the hours reasonably expended a satisfactory basis for making a fee award." *Id.* at 420 (internal quotation marks and citations omitted); *Dindinger*, 853 F.3d at 429 (explaining that the court should consider if "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded [and] . . . [if] the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award" (quoting *Hensley*, 461 U.S. at 434)).

"Claims are related, rather than distinct, if they are based on a common core of facts or on related legal theories." *Gruttemeyer*, 31 F.4th at 650 (citing *Hensley*, 461 U.S. at 435). Thus,

> [e]ven under the "prevailing party" standard, fees are not limited to successful claims unless "the plaintiff's claims are based on different facts and legal theories, and the plaintiff has prevailed on only some of those claims." *Texas State Teachers Ass'n. v. Garland Indep. Sch. Dist*., 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866(1989). *See also Lowry ex rel. Crow v. Watson Chapel Sch. Dist*., 540 F.3d 752, 765 (8th Cir. 2008). In such situations, "the congressional intent to limit fee awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Garland*, 489 U.S. at 789, 109 S.Ct. 1486.

*Johnson Tr. of Operating Engineers Loc. #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc*., 950 F.3d 510, 526 (8th Cir. 2020) (Charps Welding).

Ultimately, the award must be "proportional to the plaintiff['s] degree of success, both monetary and nonmonetary." *Marshall*, 8 F.4th at 714; see also *Blackorby*, 60 F.4th at 420 ("Where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." (quoting *Marshall*, 8 F.4th at 713)). While "proportionality" is appropriate in this context, the Eighth Circuit Court of Appeals has "previously rejected the argument that 'the percentage of attorney's fees awarded should reflect the percentage of relief obtained versus that sought' in civil rights cases because doing so 'would discourage litigants with small amounts of damages from pursuing a civil rights claim in court.'" *Dindinger*, 853 F.3d at 431 (quoting *Simpson*, 441 F.3d at 580–81).

To address this apparent inconsistency, this Court understands "proportionality" in the context of degree of success or results obtained to consider (1) the degree of success or failure on unrelated claims brought in the same action and (2) the nature of the relief sought versus the nature of the relief obtained, rather than the dollar amount recovered, and whether the plaintiff's success so measured is in proportion to the attorney fees claimed such that the "level of success makes the hours reasonably expended a satisfactory basis for" the attorney fees sought. *Marshall*, 8 F.4th at 714; *accord Blackorby*, 60 F.4th at 420 ("Where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results

56

obtained." (quoting *Marshall*, 8 F.4th at 713)). For that reason, where a plaintiff prevails on a claim that "was at the heart" of her case, her degree of success is "significant," even if she lost on other claims. *Blackorby*, 60 F.4th at 421; *see also Thurairajah v. City of Fort Smith, Arkansas*, 3 F.4th 1017, 1029 (8th Cir. 2021) (explaining that an award of nominal damages may be sufficiently significant based on the difference between the damages sought and recovered, the legal issue involved, and the public goal or purpose the litigation serves to warrant an award of attorney fees). Considering proportionality of the award to the plaintiff's success in terms of claims and the nature of the relief sought is consistent with the Eighth Circuit's statement that "[i]t is generally true that status as a prevailing party is determined on the outcome of the case as a whole, rather than by piecemeal assessment of how a party fares on each motion along the way." *Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 714 (8th Cir. 1997).[25]

### iii. Benson's Results Obtained Warrant Further Reduction of the Lodestar

The Court concludes that Defendants are off the mark when they assert that Benson's attorney fees award should be reduced for limited success in light of the Offer of Judgment that Benson rejected in 2019, even if she might have been better off financially if she had taken that Offer. Filing 508 at 17. As the Court explained just above, the Court does not consider the dollar amount of the prevailing plaintiff's recovery; instead, the Court considers the nature of the relief sought versus the nature of the relief obtained and the degree of success or failure on unrelated claims in the action. *See Marshall*, 8 F.4th at 714.

At the same time, the Court concludes that Benson is off the mark when she argues that a factor relevant to her degree of success is that the settlement preserved her claim for her disability

---

[25] On the other hand, the Court believes that it rightly "exclude[d] from a fee request hours that [we]re excessive, redundant, or otherwise unnecessary" when it determined whether time spent on various motions was reasonably expended. *See Beckler*, 83 F.4th at 695 (quoting *Hensley*, 461 U.S. at 434).

pension and her pending charge of discrimination for Defendants' failure to accommodate her disability, which resulted in her constructive discharge. Filing 503 at 2. Those claims were simply not part of this lawsuit—nor are they related (meaning sharing a common core of facts) to any claims in this lawsuit—so that no fees should be awarded in this action for such claims. *Cf. Charps Welding*, 950 F.3d at 526 (explaining that the congressional intent in limiting fee awards to prevailing parties requires that unrelated claims be treated as if they had been raised in a separate lawsuit and thus not to be awarded on a successful claim in the case); *see also Blackorby*, 60 F.4th at 420 (explaining that fees should not be awarded for unrelated claims); *Gruttemeyer*, 31 F.4th at 650 ("Claims are related, rather than distinct, if they are based on a common core of facts or on related legal theories.").

Defendants are nearer the mark when they argue that Benson's lack of success is evinced by her failure to recover significant relief of various kinds requested in the Fourth Amended Complaint. Filing 508 at 18. That argument is in accord with this Court's reading of applicable precedents above as requiring the Court to consider the nature of the relief sought versus the nature of the relief obtained and whether the plaintiff's success so measured "makes the hours reasonably expended a satisfactory basis for" the fees claimed—or a satisfactory basis for the lodestar adjusted by the Court. *See Marshall*, 8 F.4th at 714; *accord Blackorby*, 60 F.4th at 420 ("Where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." (quoting *Marshall*, 8 F.4th at 713)).

Benson failed on her claim for a preliminary injunction, which Judge Kopf found sought relief that was not of the "same character as that which may be granted finally," *i.e.*, it was an "unrelated" claim. Filing 146 at 10. However, the Court has already accounted for the

unreasonableness of the Motion for Preliminary Injunction in its determination of hours reasonably expended for purposes of establishing the lodestar.

What is relevant to the adjustment for results obtained is that Benson sought "back pay, front pay, compensatory damages, and consequential damages." Filing 188 at 69 (Prayer, ¶ C). Of her economic damages, she recovered only the relatively modest sum of $50,000 for "lost wages" through December 1, 2022. Filing 503 at 2. She recovered nothing for front pay, nothing for her termination, and no consequential damages. She was not reinstated to her previous employment with the promotion to Captain that she claimed she would have been eligible for at the time of her termination. *See* Filing 503 at 68 (Prayer, ¶ B). Neither did she obtain any "affirmative and equitable relief necessary to eradicate the effects of Defendant's unlawful employment practices." Filing 503 at 69 (Prayer, ¶ C). She did not obtain expungement of all negative reports, evaluations, discipline, or termination in her personnel file. *See* Filing 503 at 69 (Prayer, ¶ D). She also failed to recover any punitive damages from any defendants, individual or institutional. *See* Filing 503 at 69 (Prayer, ¶ E). She also obtained no injunctive relief for herself or any other persons. *See* Filing 503 at 68 (Prayer, ¶ A).

The only part of Benson's recovery that can plausibly be considered significant is her recovery of $600,000 in compensatory damages for emotional distress. *See* Filing 503 at 69 (Prayer, ¶ C). Yet, the Court concludes that the lodestar of $1,160,283.76 calculated by the Court is still out of proportion to Benson's recovery of $600,000 for emotional distress (or her total recovery of $650,000). The twelfth "*Johnson* factor" is awards in similar cases. *Johnson*, 488 F.2d at 719. Thus, it is appropriate for the Court to consider the emotional distress damages award in relation to the fees recovered in other cases. In *Beran v. VSL North Platte LLC*, No. 7:21CV5003, 2023 WL 6883630 (D. Neb. Oct. 18, 2023), where the plaintiff recovered $500,000 in damages

for emotional distress after a jury trial, the plaintiff sought $128,153 in attorney fees for 343 hours of work, which the Court reduced to $95,665.80 by reducing the hourly rate for one attorney and making a percentage reduction for partial success. 2023 WL 6883630, at *1, *5–7. Ten years ago, another district judge of this Court awarded $199,675 in attorney fees for 2,251.4 hours under 42 U.S.C. § 1988 on a recovery of compensatory damages of $965,000 for emotional distress. *Sampson v. Lambert*, No. 8:07CV155, 2014 WL 1309556, at *1, *3, *6 (D. Neb. Mar. 31, 2014).

Benson cites several decisions that she contends demonstrate that the award she seeks is appropriate in relation to the results obtained. She offers no information about the results obtained in any of those cases, however; instead, she focuses on the amounts recovered for attorney fees and costs. *See* Filing 503 at 31–33. Moreover, only one of the cases she cites is from this district and several are from outside of this Circuit. Filing 503 at 31–33. The one decision from this district she cites is *Morales v. Farmland Foods, Inc.*, No. 8:08CV504, 2013 WL 1704722 (D. Neb. Apr. 18, 2013). In that case, the plaintiffs sought $2,881,472 in attorney fees for lead counsel and another $55,755 in fees for co-lead counsel. 2013 WL 1704722, at *1. Benson omits to explain that in that case the defendants had agreed to pay $275,000 to the FLSA class in damages, including $35,000 to the named plaintiffs for statutory damages and service as class representatives. *Id.* The Court finds a class action under the FLSA is simply not a relevant comparator to what this Court has described as a case in which a single plaintiff was suing her former employer for various claims regarding her former employment. *See* Filing 491 at 2 (order setting out expectations for trial).

The disproportion between the lodestar amount and the emotional distress damages making up the majority of the recovery in Benson's case is glaring in light of the comparators cited by the Court—and only slightly less glaring when the lodestar is considered against Benson's total

60

recovery. Nevertheless, the Court will impose only a relatively modest 20% reduction for partial success, with the goal of making sure that the final award for attorney fees is reasonable. This reduction results in a reduction of $232,056.75.

b. Other "*Johnson* Factors"

The "*Johnson* Factors" that the Court has not yet explicitly considered are the fourth, the preclusion of other employment by the attorney due to acceptance of the case; the sixth, whether the fee is fixed or contingent; the seventh, the time limitations imposed by the client or the circumstances; the eighth, to the extent it considers the amount involved; the tenth, the "undesirability" of the case; and the eleventh, the nature and length of the professional relationship with the client. *Johnson*, 488 F.2d at 718-19. Benson argues that most of these factors warrant awarding the full amount claimed. *See* Filing 503 at 22–23, 25–26, 26–28, 30–31, and 31. Benson acknowledges that the seventh factor, "time limits," has "[n]o special relevance" in this case. Filing 503 at 26. The Court agrees with that conclusion. Indeed, the Court has considered the amount and nature of the damages award and all the other relevant factors in the case and finds that the remaining "*Johnson* factors" have no meaningful impact on the Court's conclusion about what fee is reasonable. *See Farrar*, 506 U.S. at 115 ("Having considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness."); *Baker*, 263 F. Supp. 2d at 1190 ("[T]he court need not exhaustively address every factor.").

3. *Summary*

After calculating the lodestar at $1,160,283.76 in § II.C., the Court has considered in this § II.D. other factors to determine whether it is appropriate to adjust the lodestar amount up or down. *Marshall*, 8 F.4th at 712. The Court concludes that it is appropriate to impose a 20%? reduction of the lodestar figure, or $232,056.75 for block billing and vagueness. The Court

concludes that it is appropriate to impose a further 5% reduction of the lodestar figure, or $58,014.19, for improper billings for clerical tasks and internal communications among multiple attorneys. Lastly, the Court will impose only a relatively modest 20% reduction of the lodestar figure, or $232,056.75, for partial success, with the goal of making sure that the final award for attorney fees is reasonable. A total reduction of 45% of the lodestar results in a reduction of $522,127.69, and a fee award of $638,156.07.

Consequently, the Court will reduce the lodestar by $522,127.69 and award a total of $638,156.07 for attorney fees.

### III. EXPENSES AND COSTS

In addition to attorney fees, Benson seeks $143,000.41 in litigation expenses and taxable court costs through February 13, 2024, Filing 502 at 6 (¶ 26), and additional litigation expenses and taxable court costs totaling $632.50 incurred from February 14, 2024, through March 29, 2024. Filing 513 at 2 (¶ 4). However, Exhibit 2 to Benson's Supplemental Motion for Approval of Supplemental Application for Attorney Fees, Expenses, and Costs shows that the additional litigation expenses and costs actually total $632.20. Filing 512-3 at 1. Thus, the total expenses and costs Benson claims comes to $143,632.61. The Court will consider separately "taxable costs" and "nontaxable expenses" because Defendants make quite different challenges to them.

#### A.      Taxable Costs

##### 1.  Recoverability of Taxable Costs

Defendants raise the question of whether Benson can recover any taxable costs at all based on alleged procedural failings. Benson asserts that she properly sought taxable costs in the manner provided in the Stipulated Order of Dismissal.

a.   The Parties' Arguments

Defendants complain that Benson did not submit a Bill of Costs using form AO 133 as mandated by the Court in its local rules and that Benson did not identify the taxable costs as required by 28 U.S.C. § 1920. Filing 508 at 4, 37. Defendants argue that these failings alone are sufficient grounds to refuse to award any taxable costs, which they assert amount to $34,844.99. Filing 508 at 4–5, 37. Defendants argue that Benson has conflated taxable costs under 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54(d)(1), which are awarded by the Clerk of Court, with nontaxable expenses under 42 U.S.C. §§ 1988(b) and 2000e-5(k) and Federal Rule of Civil Procedure 54(d)(2)(A), which are awarded by the Court with attorney fees. Filing 508 at 37–38. Defendants argue that the local rules make the same distinction between taxable costs, governed by NECivR 54.1, and nontaxable expenses (and attorney fees), governed by NECivR 54.3. Filing 508 at 38–39. Defendants cite decisions from judges of this district and judges in other districts declining to award taxable costs when the requirements of the applicable statues and rules were not satisfied. Filing 508 at 40–41. Defendants then itemize what they believe are the forfeited taxable costs. Filing 508 at 41–42.

Benson argues that she is entitled to recover taxable court costs. Filing 514 at 19. She acknowledges that one must ordinarily file a Bill of Costs to recover taxable costs, but that the parties agreed to—and the Court authorized—submission of a claim for attorney fees, costs, and expenses directly to the Court. Filing 514 at 19.[26] Benson argues that neither the parties' agreement nor the Stipulated Order of Dismissal approved by the Court required her to submit a Bill of Costs to the Clerk of Court. Filing 514 at 20. She argues that another judge of this district authorized a

---

[26] Benson incorrectly cites Filing 500 at 3 (¶ 6) as the pertinent language of the Stipulated Order of Dismissal and quotes language not found in that paragraph or anywhere else in the Stipulated Order of Dismissal. Similar language is found in paragraphs 11 and 12 of the Stipulated Order of Dismissal. Filing 500 at 4–5 (¶¶ 11–12).

similar process for an application for both litigation expenses and court costs without a Bill of Costs. Filing 514 at 20 (citing *Morales v. Farmland Foods, Inc.*, 2013 WL 1704722 (D. Neb. April 18, 2013)).

> b. Benson's Claim for Taxable Costs and Litigation Expenses Was Properly Submitted

The local rule applicable to "taxable costs" states the following in pertinent part:

> 54.1    Taxation of Costs.
>
> * * *
>
> (b) Bill of Costs; When Filed; Form.
>
> A party entitled to recover costs must file within 30 days after entry of judgment a verified bill of costs on a form available on the court's web page, https://www.ned.uscourts.gov/forms "Bill of Costs Form" or from the clerk. Post-trial motions do not extend the time for filing a verified bill of costs under this rule.
>
> * * *
>
> (d) Waiver of Costs.
>
> A party failing to file a bill of costs within the time allowed waives taxable costs.

NECivR 54.1(b), (d). The form referenced in NECivR 54.1(b) and provided on the Court's website is Form AO 133. NECivR 54.1(b) is cast in mandatory terms ("A party entitled to recover costs must file. . . ."). Thus, Defendants are correct that applications for taxable costs must ordinarily be presented in the manner required by NECivR 54.1(b) and the failure to comply results in waiver pursuant to NECivR 54.1(d).

Nevertheless, NECivR 54.1(a)'s mandate must be understood in the context of NEGenR 1.1(c). That general local rule provides in pertinent part:

> 1.1    Introduction.
>
> * * *
>
> (c) Deviations from Rules or Procedures.

> Notwithstanding contrary authority, in the interest of justice a judge may deviate
> from this court's rules or procedures. A deviation supersedes every other rule or
> procedure.

NEGenR 1.1(c). Thus, it is permissible for the Court to deviate from the mandatory requirements

of NECivR 54.1(b) and instead order the time and method of making a claim for taxable costs.

It is worth noting that, in contrast to NECivR 54.1(b)'s mandate as to when and how

"taxable costs" are claimed, the local rule applicable to claims for "attorney's fees and nontaxable

expenses" contains no such mandate. Rather, NECivR 54.3(a) provides as follows:

> 54.3    Award of Attorney's Fees and Nontaxable Expenses.
>
>      (a) Time and Method.
>
> Where a party may be entitled to receive attorney's fees and related nontaxable
> expenses, the court may order, on its own or a party's motion, the time and method
> of making showings regarding a fee award. Otherwise, Federal Rule of Civil
> Procedure 54(d)(2) controls the time and method for filing a claim for attorney's
> fees and related nontaxable expenses.

NECivR 54.3(a). Thus, it is also permissible for the Court to set the time and method for making

a claim for attorney fees and nontaxable expenses.

Benson is correct that the Stipulated Order of Dismissal, Filing 500, addresses Benson's

filing of an application for attorney fees, expenses, and costs. In pertinent part, the Stipulated Order

of Dismissal states the following:

> 11.    Plaintiff is entitled to file an application for attorney fees, expenses,
> and costs for consideration of an award by the Court under 42 U.S.C. § 1988, 42
> U.S.C. § 2000e-5(k), and Neb. Rev. Stat. §48-1119(4). The Plaintiff shall be
> considered the prevailing party in the litigation for all claims when the Court is
> considering the merits of the application and for no other purposes. Defendants may
> not oppose Plaintiff's prevailing party status in the litigation for all claims when
> responding to Plaintiff's application. Defendants retain the right to oppose
> Plaintiff's application for attorneys' fees and costs on any and all remaining
> grounds.
>
> 12.    Plaintiff shall submit her application for an award of attorney fees
> and costs on or before thirty (30) days after the Agreement has been fully executed
> by the parties pursuant to paragraph 6 of this Order. Defendants shall be permitted

to oppose Plaintiff's application within thirty (30) days of its filing. Plaintiff may file a reply and/or supplement to her application within ten (10) days of the filing of Defendants' opposition. The parties have the right to appeal any award of the Court, but if not timely appealed, Defendants shall pay the amount awarded by the Court to Plaintiff's counsel no later than thirty (30) days after entry the award. Plaintiff's counsel shall provide Defendants' counsel with the appropriate tax forms in connection with the payment. Within three (3) business days following receipt of the payment, Plaintiff shall file a receipt of satisfaction of judgment attached to this Order as Exhibit "C".

Filing 500 at 3–4 (¶¶ 11–12). These provisions did not expressly distinguish between "taxable costs" and "non-taxable expenses," but they do refer to "an application for attorney fees, expenses, and costs." Filing 500 at 3 (¶ 11). The reasonable inference is that the reference to "expenses" is "nontaxable expenses" within the meaning of Federal Rule of Civil Procedure 54(d)(2) and NECivR 54.3. Similarly, the reasonable inference is that the reference to "costs" is to costs taxed by the Clerk of Court identified simply as "costs" in Federal Rule of Civil Procedure 54(d)(1) and identified as "taxable costs" in NECivR 54.1.

Thus, in this case, the terms of the Stipulated Order of Dismissal were controlling on when and how Benson was required to claim both "taxable costs" and "nontaxable expenses," as well as attorney fees. *See* NEGenR 1.1(a) (allowing the Court to modify the mandated method for claiming "taxable costs" in NECivR 54.1(b)); NECivR 54.3(a) (allowing the Court to set the method for claiming "attorney's fees and nontaxable expenses"). Benson is not precluded from seeking "taxable costs" because she sought them in a motion submitted to the Court pursuant to the Stipulated Order of Dismissal.

### 2. *Recoverable Taxable Costs*

Defendants itemize the taxable costs that they contend Benson waived by failing to follow NECivR 54.1(b). Filing 508 at 41–42. Those costs, with Defendants' identification of the source of the numbers and the provisions of 28 U.S.C. § 1920 that authorize their award are as follows:

- Copying: $4,671.75 (Dkt. 505-4, p. 3) (28 U.S.C. § 1920(3-4));

- Printing: $81.43 (Dkt. 505-4, p. 3) (28 U.S.C. § 1920(3-4));

- Subpoena fees: $213.26 (Dkt. 505-4, p. 11) (28 U.S.C. § 1920(1));

- Deposition Transcripts: $26,706.59 (Dkt. 505-4, p. 14) (28 U.S.C. § 1920(2));

- Trial Transcripts: $2,213.60 (Dkt. 505-4, p. 15) (28 U.S.C. § 1920(2), (3), (4));

- Miscellaneous transcripts from "litigation support vendors": $9,582.36 (Dkt. 505-4, p. 18) (28 U.S.C. § 1920(2), (3), (4))

Filing 508 at 41 (underlining omitted). Defendants assert these allegedly waived taxable costs total $34,844.99. Filing 508 at 42. However, the Court finds these six categories of costs actually total $43,468.99, none of which are waived.

Defendants do not otherwise challenge Benson's claim for these costs. *See generally* Filing 508. Benson's Supplemental Motion for Approval of Supplemental Application for Attorney Fees, Expenses, and Costs does not differentiate between taxable costs and nontaxable expenses. Filing 513. However, Exhibit 2 to that Supplemental Motion shows that the supplemental expenses and costs claimed do not fall within the statutory list of taxable costs in 28 U.S.C. § 1920. *See* Filing 512-3 at 1 (claiming amounts for litigation support vendors and court PACER charges).

Consequently, the Court awards Benson taxable costs in the amount of $43,468.99.

### B.     Nontaxable Expenses

With the taxable costs awarded above, the remaining nontaxable expenses Benson claims amount to $100,163.62.[27] The parties dispute whether some of these costs are recoverable.

#### 1.    *The Parties' Arguments*

Benson argues that she is entitled to recover out-of-pocket expenses beyond those allowed as taxable costs if those expenses would normally be charged to a fee-paying client. Filing 503 at

---

[27] $143,632.61 − $43,468.99 = $100,163.62.

34–35. She argues that recoverable expenses include items such as scanning, photocopying, printing, computerized legal research, long-distance calls, mileage, postage, meals, parking, travel, and other litigation expenses not recoverable as part of "costs." Filing 503 at 35. Defendants counter that Benson has submitted no evidence apart from an affidavit concerning various transcripts obtained during litigation showing that it is the prevailing practice in Nebraska to bill clients for any of the expenses they challenge. Filing 508 at 42. Defendants also argue that Benson seeks reimbursement for many expenses that are not reasonable and should not be shifted to Defendants. Filing 508 at 42. In reply, Benson contends that the litigation expenses claimed are customarily billed. Filing 514 at 20–21.

The Court will set out Defendants' specific challenges and Benson's responses in more detail when it turns to the legal analysis of the items at issue. First, the Court will summarize the standards for an award of nontaxable expenses.

### 2. Recoverable Nontaxable Expenses

The Eighth Circuit has explained,

> Some expenses . . . might be awarded as attorney's fees if they are separately billed under the prevailing practice in the local community. *See Missouri v. Jenkins*, 491 U.S. 274, 287 n.9, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (allowing compensation for attorney's fees under 42 U.S.C. § 1988). *See also Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008) (recharacterizing nontaxable costs as attorney's fees awarded under Title VII); *Trustees of Const. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1259 (9th Cir. 2006) (recharacterizing nontaxable costs as attorney's fees under ERISA); *Evans v. Books-A-Million*, 762 F.3d 1288, 1299 (11th Cir. 2014) (same). Litigation expenses may be included in attorney's fees. *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 804 (8th Cir. 2015). Attorney travel expenses are also recoverable as attorney's fees. *Sturgill*, 512 F.3d at 1036; *Ludlow*, 788 F.3d at 803-04. Postage and delivery fees may be attorney's fees if normally charged to clients. *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294-95 (8th Cir. 1996). However, expert witness fees are generally not part of attorney's fees. *See W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 96, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). *See also Neosho R-V Sch. Dist.*, 315 F.3d at 1032-33 (holding that an award of attorney's fees and costs under IDEA does not include expert witness fees).

*Charps Welding*, 950 F.3d at 528; see also *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 804–05 (8th Cir. 2015) ("In general, an award of reasonable attorney's fees may include litigation expenses if it is 'the prevailing practice in a given community' for lawyers to bill those expenses separately." (quoting *Missouri v. Jenkins*, 491 U.S. 274, 287 (1989)).

One of the statutes authorizing recovery of attorney fees and expenses in this case is a provision of Title VII, which states:

(k) Attorney's fee; liability of Commission and United States for costs

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e-5(k). Thus, even though "expert witness fees are generally not part of attorney's fees," *see Charps Welding*, 950 F.3d at 528, this statute expressly authorizes an award of expert fees—in the district court's discretion—in this Title VII case. The Eighth Circuit has recognized, "[O]ther circuits have construed § 2000e–5(k) as allowing the award of reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client," and the Eighth Circuit found no abuse of discretion in awarding costs that the opposing party did not argue were not normally charged to fee-paying clients. *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008) (internal quotation marks omitted) (citing cases from "other circuits").

With these standards in mind, the Court turns to the nontaxable expenses Defendants challenge.

### 3. *The Challenged Nontaxable Expenses*

#### a. Oppenheimer's Fees Are Excluded

First, Defendants challenge any award for fees charged by Benson's expert Amy Oppenheimer, whose testimony the Court excluded. Filing 508 at 43. Defendants argue that it is

unreasonable to award fees for an expert that was excluded prior to trial. Filing 508 at 43. Benson

argues that the proper inquiry is whether the attempt to call Oppenheimer was reasonable litigation

strategy, not whether she was successful in calling Oppenheimer. Filing 514 at 21.

The Court plainly has discretion to award expert fees pursuant to 42 U.S.C. § 2000e-5(k).

The Court declines to award expert fees for Oppenheimer, however. The Court determined above

in § I.B.5.a. that attempting to call Oppenheimer wasted attorney time because her testimony was

not proper expert testimony but instead trespassed on the province of the Court and the province

of the jury. Thus, attempting to call her was not reasonable litigation strategy and it would be

unreasonable for Defendants to have to pay the fees of an expert they successfully excluded.

The Court will exclude from the award for nontaxable expenses the $49,428 claimed for

Oppenheimer's fees. *See* Filing 505-4 at 18–19 (listing fees for experts and dates paid).

> b.   "Overhead" Expenses Are Excluded

Defendants challenge as improperly claimed "overhead" expenses $951.60 for PACER

charges (to which should be added another $32.20 in PACER charges claimed in Benson's

Supplemental Motion, Filing 512-3 at 1); $570.51 for "trial exhibits" that were actually funds spent

on "office supplies" consisting of three-hole punched paper, flash drives, and binders for trial

exhibits; and $572.25 for a "box.com subscription," totaling $2,126.56. Filing 508 at 44–45 (listing

the expense but reaching a total of $2,094.36 without the PACER charges claimed in the

Supplemental Motion).

Defendants are correct that "[p]laintiffs are not entitled to reimbursement for expenses that

are part of normal office overhead in the community." *Emery v. Hunt*, 272 F.3d 1042, 1048 (8th

Cir. 2001). *See* Filing 508 at 44. Benson responds that her litigation expenses are customarily

billed, Filing 514 at 20, but she cites no authority demonstrating that is true of any of these

expenses. *See generally* Filing 514. Indeed, she makes no mention of these specifically challenged expenses in her briefing.

The Court will exclude from the award for nontaxable expenses the $2,094.36 claimed for "overhead" expenses.

      c.   Expenses Not Justified by "Prevailing Practice"

Defendants contend that Benson has not demonstrated that it is the "prevailing practice" to charge fee-paying litigants for various expenses. Filing 508 at 45. These challenged expenses are best addressed in turn.

The first expenses Defendants challenge in this category are $5,948.06 for Westlaw and Lexis/Nexis legal research. Defendants argue that courts have considered these "overhead" expenses rather than finding that there is a prevailing practice to charge fee-paying clients for such legal research,. Filing 508 at 45–46. Benson argues that the City agreed to pay Defendants' law firm for computerized legal research showing that it is a prevailing practice to do so. Filing 514 at 20 (citing Filing 512-11 at 11).

The Eighth Circuit Court of Appeals has recognized that "if the prevailing party demonstrates that separately billing for [computerized legal research (CLR)] is the 'prevailing practice in a given community' and that such fees are reasonable, the district court may award those costs." *Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 432 (8th Cir. 2017) (quoting *Hernandez v. Bridgestone Ams. Tire Operations, LLC*, 831 F.3d 940, 950 (8th Cir. 2016), in turn quoting *Missouri v. Jenkins*, 491 U.S. 274, 287 (1989)); *see also Charps Welding*, 950 F.3d at 528 (stating the "prevailing practice" standard as the general standard for expenses); *Ludlow*, 788 F.3d at 804– 05 (same). There are some decisions from this district awarding computerized legal research fees as nontaxable expenses, suggesting it is at least a common practice. *Ludlow v. BNSF Ry. Co.*, No. 4:12CV3113, 2014 WL 2155086, at *8 (D. Neb. May 22, 2014), *aff'd*, 788 F.3d 794 (8th Cir.

71

2015); *Morales v. Farmland Foods, Inc.*, No. 8:08CV504, 2013 WL 1704722, *7 n.9 (D. Neb. 2013) (including computerized legal research charges in a fee award in an FLSA case); *see also UnitedHealth Group Inc. Shareholder Derivative Litigation*, 631 F.3d 913, 918–19 (8th Cir. 2011) (reviewing decisions of sister circuits considering awarding computerized legal research expenses). Furthermore, in this case, Defendants will not be heard to complain that it is not the "prevailing practice" to bill clients for computerized legal research fees when a provision of Defendants' attorneys' "Standard Terms of Representation" provides for billing clients for such fees. Filing 512-11 at 11. The award for nontaxable expenses will include the fees for Westlaw and LexisNexis legal research.

Defendants next challenge an award of $323.97 for local travel because Benson offers no evidence that this is a "prevailing practice" for Omaha attorneys. Filing 508 at 46. Again, Benson responds that Defendants' attorneys' fee agreement with the City authorizes Defendants' attorneys to bill the City for "travel expenses" as a standard term. Filing 514 at 20 (citing Filing 512-11 at 11). The Court finds that there may be a difference between "travel expenses" and "local travel expenses," but Defendants' attorneys' fee agreement does not draw that distinction. Again, Defendants will not be heard to complain that it is not the "prevailing practice" to bill clients for local travel expenses when a provision of Defendants' attorneys' "Standard Terms of Representation" provides for billing clients for "travel expenses," which reasonably encompasses both local and non-local travel. Filing 512-11 at 11. The award for nontaxable expenses will include the claimed amount for local travel expenses.

Defendants also challenge an award of $143.15 for "private investigators" who purportedly performed a "license plate search" and a "restricted database search re: white Ford van." Filing 508 at 46 (citing Filing 505-4 at 19). Defendants assert that Benson offers no details for these

charges. Filing 508 at 46. Benson responds that the license plate search was for a suspicious van parked outside her home. Filing 514 at 20 (citing Filing 512-1 at 6 (¶ 28) (Aff. of Ms. Brandon)). It simply is not clear from this brief explanation that researching the license plate of a "suspicious van" parked outside a plaintiff's home is necessarily or reasonably connected to this litigation. Therefore, the award for nontaxable costs will not include the claimed $143.15 for "private investigators."

In a similar vein is Defendants' challenge to an award of $378.38 for "Searching and Monitoring." Filing 508 at 46 (citing Filing 505-4 at 28–29). Defendants argue that these expenses include a bill for a $15 "Radio Reference Subscription" and "Research – book 'Delaying Death' by Kelly . . . fictional book about LFR," which is shown as priced at $13.90, even though Benson actually claimed "$0.00" for it. Filing 508 at 46. Defendants argue that these charges are unrecoverable overhead or are unsupported by evidence of a "prevailing practice" to charge for them. Filing 508 at 46. Benson argues that the Radio Reference Subscription was "necessary" to listen to LFR radio calls and points out that her counsel did not claim any expense for the book. Filing 514 at 20.

The Court notes that Defendants have only challenged $15 of claimed expenses but assert that all the expenses in this category should be excluded from the award. The Court is able to glean reasonable trial-related reasons for only a few of the charges in this category. Filing 505-4 at 28–29. Benson has also failed to show that whatever these expenses are for, it is prevailing practice in Omaha or Nebraska or even in the Eighth Circuit to bill them to paying clients. *See Charps Welding*, 950 F.3d at 528 (stating the "prevailing practice" standard as the general standard for expenses); *Ludlow*, 788 F.3d at 804–05 (same). Therefore, because of the lack of support for

awarding this category of expenses and the vagueness of the claimed expenses, the award for nontaxable expenses will not include $378.38 for "Searching and Monitoring."

The last expense Defendants challenges is $2,868.75 for "Plaintiff's half" of the November 27, 2023, mediation. Filing 508 at 46 (citing Filing 505-4 at 19). Defendants argue that the parties agreed that each side would pay half the mediator's fee. Filing 508 at 46 (citing Filing 509-2 at 2). Benson responds that Defendants agreed that all her expenses, including mediation costs, would be submitted to the Court. Filing 514 at 20 (citing Filing 500 at 4 (¶11)).

The Court notes that the cited provision of the Stipulated Order of Dismissal states in part, "Plaintiff is entitled to file an application for attorney fees, expenses, and costs for consideration of an award by the Court under 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and Neb. Rev. Stat. §48-1119(4)." Filing 500 at 4 (¶ 11). The parties entered into a Memorandum of Understanding that states it "set[s] forth the understanding of the parties regarding their respective obligations pursuant to a settlement negotiated during a mediation conference" on November 27, 2023. Filing 510-2 at 1. Thus, the parties' intent regarding the settlement—embodied in the Stipulated Order of Dismissal—is set out explicitly in the Memorandum of Understanding, at least to the extent that the Memorandum of Understanding addresses any specific terms. The Memorandum of Understanding plainly and unambiguously states, "The mediator's fees for the November 27, 2023 mediation conference shall be paid ½ by Plaintiff and/or her attorney and ½ by the individual Defendants and/or their attorney." Filing 510-2 at 2. Benson is advancing a reading of the settlement as permitting a claim for half of the mediation fee that is contrary to her express agreement that she would bear half of the mediation fee set out in the Memorandum of Understanding interpreting the settlement. The claim for half of the mediation fee is at best

frivolous and at worst duplicitous. The award for nontaxable expenses will not include $2,868.75 for "Plaintiff's half" of the November 27, 2023, mediation.

Thus, the Court will exclude from the award for nontaxable expenses a further $3,390.28 consisting of $143.15 for "private investigators," $378.38 for "searching and monitoring," and $2,868.75 for "Plaintiff's half" of mediation fees.

## IV. CONCLUSION

The Court finds that the reasonable hourly rate in this case is a weighted average hourly rate as adjusted of $314.08. The Court finds that the number of hours reasonably expended is 3,695.23. These determinations result in a lodestar for attorney fees of $1,160,283.76. The Court concludes that it is appropriate to impose a 20% reduction of the lodestar figure for block billing and vagueness; a further 5% reduction of the lodestar figure for improper billings for clerical tasks and internal communications among multiple attorneys; and a relatively modest 20% reduction for partial success. The resulting 45% reduction of the lodestar reduces the fee award by $522,127.69 to $638,156.07.

The Court finds that the total of the expenses and costs Benson claims is $143,632.61. Although the Court concludes that all taxable costs claimed, totaling $43,468.99, are allowable, it has reduced some of the nontaxable expenses. Specifically, the Court will exclude from the award for nontaxable expenses the $49,428 claimed for Oppenheimer's fees. The Court will exclude from the award for nontaxable expenses the $2,094.36 claimed for "overhead" expenses. The Court will also exclude from the award for nontaxable expenses a further $3,390.28 consisting of $143.15 for "private investigators," $378.38 for "searching and monitoring," and $2,868.75 for "Plaintiff's half" of mediation fees. Thus, the total award for expenses and costs is $88,719.97.

Accordingly,

1.    Plaintiff's Motion for Approval of Application for Attorney Fees, Expenses, and Costs, Filing 502, and Plaintiff's Supplemental Motion for Approval of Supplemental Application for Attorney Fees, Expenses, and Costs, Filing 513, are granted in part and denied in part as follows:

     a.    Plaintiff is awarded $638,156.07 in attorney fees; and

     b.    Plaintiff is awarded $88,719.97 in expenses and costs.

2.    Plaintiff's Unopposed Motion for Expansion of Word Limit for a Combined Reply Brief in Support of Motion and Supplemental Motion for Approval of Plaintiff's Application for Attorney Fees, Expenses, and Costs, Filing 511, is denied as moot.

Dated this 13th day of May, 2024.

BY THE COURT:

Brian C. Buescher
United States District Judge